**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE THE ESTÉE LAUDER CO., INC. SECURITIES LITIGATION | No. 1:23-cv-10669-AS |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATION OF THE FEDERAL SECURITIES LAWS**

**<u>TABLE OF CONTENTS</u>**

**Page**

I.      NATURE OF THE ACTION ...................................................................................... 2

    A.      Lauder's Asia Travel Retail Business.................................................................. 4

    B.      Asia Travel Retail's Basement Exchange: China's *Daigou* Gray Market.............. 6

    C.      Lauder Flooded *Daigou* with Product to Achieve Sales Growth Despite Telling Investors That It Never Benefits from the Gray Market ........................... 8

    D.      China Cracked Down on *Daigou* and Lauder Concealed the Impact on Its Travel Retail Sales ............................................................................................. 12

    E.      Lauder Attributed Travel Retail Sales Increases to Its Brand Strength, Knowing *Daigou* Resale Was the True Driver.................................................... 13

    F.      Defendants Falsely Touted an "Unchanged" Landscape in Hainan, Despite China's Severe Regulatory Crackdowns on *Daigou* Taking Effect .................... 14

    G.      Lauder's Stock Price Dropped as It Revealed Partial Truths Explaining Poor Sales, While Offering False Reassurances to Investors .............................. 15

    H.      Defendants Admitted that the Company's Over-Reliance on *Daigou* Was the Primary Driver of Lauder's Net Sales Decline in Travel Retail ................... 17

II.     JURISDICTION AND VENUE ............................................................................... 18

III.    PARTIES .................................................................................................................. 19

    A.      Lead Plaintiff ..................................................................................................... 19

    B.      Defendants ......................................................................................................... 20

        1.      Corporate Defendant............................................................................... 20

        2.      Individual Defendants............................................................................. 20

        3.      Relevant Third Parties............................................................................ 22

IV.     SUBSTANTIVE ALLEGATIONS ......................................................................... 23

    A.      Lauder's Prestige Beauty Brand ....................................................................... 23

    B.      Lauder's Travel Retail Business Segment ........................................................ 25

    C.      Lauder's Focus on Chinese Consumers via Travel Retail................................. 26

D.      Hainan: China's Domestic Duty-Free Island ........................................ 27

E.      Asia Travel Retail's Basement Exchange: China's *Daigou* Gray Market............ 28

F.      Lauder Publicly Denied Its Use of *Daigou* to Boost Sales.................................. 29

G.      Despite its Known Risks, Lauder Flooded *Daigou* with Product to Grow
         Sales and Became Over-Dependent........................................................................ 31

H.      CDFG Pledge and Government Crackdowns in Hainan Stopped Lauder's
         Ability to Drive Revenue Through *Daigou* ......................................................... 36

I.       Lauder Misled Investors that Its Asia Travel Retail Business Was
         Prospering, Despite Knowing Its Pipeline to Gray Market Sales Shut................ 38

J.       The Truth Emerges and Lauder's Stock Declines as It Incrementally
         Reports Poor Financials and Offers False and Misleading Reassurances to
         Investors.................................................................................................................... 41

K.      Lauder Admitted that *Daigou* Was the Primary Driver of Lauder's Net
         Sales Decline in Travel Retail................................................................................. 45

L.       Post-Class Period Events .......................................................................................... 47

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
         AND OMISSIONS DURING THE CLASS PERIOD ...................................................... 47

A.      February 3, 2022 – Second Quarter 2022 Financial Results ................................. 48

B.      February 3, 2022 – Second Quarter 2022 Earnings Press Release ...................... 52

C.      May 3, 2022 – Third Quarter 2022 Earnings Call ................................................. 53

D.      June 2, 2022 – Bernstein Strategic Decisions Conference ................................... 57

E.      August 18, 2022 – Fourth Quarter 2022 Earnings Call ........................................ 58

F.      November 2, 2022 – First Quarter 2023 Earnings Press Release & First
         Partial Corrective Disclosure/Materialization of the Risk .................................... 59

G.      February 2, 2023 – Second Quarter 2023 Earnings Call & Second Partial
         Corrective Disclosure/Materialization of the Risk ................................................ 60

H.      May 3, 2023 – Third Quarter 2023 Earnings Call & Third Partial
         Corrective Disclosure/Materialization of the Risk ................................................ 61

I.       August 18, 2023 – Fourth Quarter 2023 Earnings Call & Fourth Partial
         Corrective Disclosure/Materialization of the Risk ................................................ 62

VI.    LOSS CAUSATION/ECONOMIC LOSS ......................................................... 63

    A.    November 2, 2022 – First Partial Corrective Disclosure/Materialization of the Risk ....................................................................................................... 65

    B.    February 2, 2023 – Second Partial Corrective Disclosure/Materialization of the Risk ................................................................................................... 69

    C.    May 3, 2023 – Third Partial Corrective Disclosure/Materialization of the Risk ............................................................................................................... 72

    D.    August 18, 2023 – Fourth Partial Corrective Disclosure/Materialization of the Risk ....................................................................................................... 76

    E.    November 1, 2023 – Final Corrective Disclosure/Materialization of the Risk ............................................................................................................... 79

VII.    ADDITIONAL INDICIA OF SCIENTER ..................................................... 82

    A.    The Individual Defendants Closely Tracked Sales, Forecasting, and Pricing Data That Provided "Clear Visibility" Into the Source of Company Sales ................................................................................................................ 82

    B.    Lauder's Travel Retail Distribution Channels Were Core Operations ................. 86

    C.    During the Class Period, the SEC Inquired About Lauder's Increased Net Sales Volumes in 2021 ......................................................................................... 89

    D.    Defendants' Statements Themselves Support a Strong Inference of Scienter ................................................................................................................. 90

    E.    Defendants Were Frequently Interviewed About "Government and Retailer Policies Related to Unstructured Market Activity" ................................ 92

VIII.    CLASS ACTION ALLEGATIONS .................................................................. 93

IX.    PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ............. 95

X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................. 97

XI.    CONTROL PERSON ALLEGATIONS ....................................................................... 98

XII.    CAUSES OF ACTION ..................................................................................... 100

    COUNT  I For Violation of §10(b) of the Exchange Act and Rule 10b-5 against Defendants Lauder, Freda, and Travis .......................................................... 100

    COUNT  II For Violation of §20(a) of the Exchange Act  against the Individual Defendants ....................................................................................................... 102

XIII.   PRAYER FOR RELIEF ................................................................................. 103

XIV.    JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS ...................................... 103

Lead Plaintiff Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System (collectively, "Lead Plaintiff" or the "Michigan Funds"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all persons and entities who or which purchased or otherwise acquired the publicly traded Class A common stock of The Estée Lauder Companies Inc. ("Lauder" or the "Company") during the period from February 3, 2022 through October 31, 2023, inclusive (the "Class Period"), subject to certain exclusions (the "Class"), against Defendants Lauder, Fabrizio Freda ("Freda"), and Tracey T. Travis ("Travis") (the "Individual Defendants," and collectively with Lauder, "Defendants").[1]

The allegations herein are based on Lead Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: SEC filings by Lauder; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews of former employees of Lauder with knowledge of the matters alleged herein; and consultation with experts in the areas of accounting, loss causation, and damages.[2] Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of Lauder during the Class Period, and of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Lauder's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

[2] Emphasis added unless otherwise noted.

are known only to, or are exclusively within the custody or control of, the Defendants.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  On behalf of themselves and the class they seek to represent, Lead Plaintiff alleges as follows:

## I.    NATURE OF THE ACTION

1.    For years, Estée Lauder—one of the world's leading prestige beauty companies— assured investors that sales growth within its critical Asia travel retail segment was driven by sustainable underlying demand for the Company's products and the strength of its brand.  In reality, Lauder had been supplying and growing dependent on a pervasive, prohibited gray market resale industry in China and South Korea, called *daigou*,[3] to drive sales within its Asia travel retail segment—an unsustainable practice that Defendants concealed from investors.  Critically, in 2019, Lauder publicly denied its use of *daigou* to inflate sales, citing Company policies and purchasing quotas at retail locations designed to "limit any risk of gray market around the world." Nevertheless, Lauder's pressure to grow led it to become reliant on the *daigou* resale pipeline as it pumped massive amounts product into the gray market via its travel retail channels.  Indeed, according to multiple former Lauder employees, the Company was using *daigou* to offload product during the COVID-19 pandemic when sales were slumping.  For a time, Lauder's surreptitious use of the *daigou* gray market had its intended effect and allowed the Company to report surprisingly strong travel retail sales given a global pandemic.

2.    However, Lauder's ability to rely on *daigou* to prop up sales figures inevitably came to an abrupt end.  First, on July 1, 2021, Lauder's largest customer, China Duty Free Group—

---

[3] *Daigou* directly translates from its Chinese origin (代购) to English as "buy on behalf of." *Daigou* are resellers that purchase luxury goods at reduced, duty-free prices and resell them to end-consumers in mainland China at a price below retail but high enough to profit.

the number one travel retailer in China, which generated **14%** of Lauder's net sales—pledged to eradicate all *daigou* activity.  Then, on January 1, 2022, Chinese regulators implemented severe crackdowns on all *daigou* activity, effectively putting an end to Lauder's ability to rely on the gray market as a revenue stream.  On the first day of the Class Period, February 3, 2022, Defendants misleadingly touted Lauder's second quarter financial results, which captured activity from October 1, 2021 to December 31, 2021—prior to China's *daigou* crackdowns taking effect. Defendants touted "***[n]et sales increased in [Lauder's] travel retail business . . . reflecting continued strength of [Lauder's] brands with the Chinese consumer***," which falsely attributed sales revenue generated from illicit and unsustainable *daigou* to Lauder's brand strength.  After China's *daigou* crackdown took effect, however, Lauder's financial results rapidly declined and Defendants made a series of misrepresentations designed to convey a misleading picture of continued travel retail growth and demand.  In doing so, Defendants concealed from investors the material effects that China's crackdown on *daigou* had on Lauder's *daigou*-dependent travel retail business.  For example, on May 3, 2022, Defendant Freda touted that the Company's "***confidence into Hainan['s] future is unchanged, actually increased***," concealing the fact that the actual source of Lauder's success in Hainan, China—the epicenter of travel retail in China—was *daigou* and that the Company's ability to generate the same level sales there had in fact changed negatively.  As the Class Period progressed, each quarter Lauder began issuing incrementally worse financial results related to its travel retail segment.

3.      Rather than reveal the real reason for the poor results, as required under the federal securities laws, Defendants misleadingly reassured investors of the temporary nature of disruptions to Lauder's now flailing travel retail sales.  For example, on November 2, 2022, while omitting reference to the *daigou* crackdowns, Defendants reported declining sales figures, claiming that any

such softness in sales was simply a "**near-term temporary pause**" that did "**not diminish [Lauder's] deep conviction in Hainan for the long term**."  Similarly, on May 3, 2023, Defendants again reassured investors that "**the challenges in travel retail are abated with time**."  However, with Lauder's ability to rely on *daigou* sales gone for good and analysts asking questions about the reasons for the travel retail segment's inexplicable poor performance, Defendants were forced to finally admit on August 18, 2023, that "retail sales trends deteriorated and turned steeply negative following the enforcement actions to control daigou activity."  Later, on November 1, 2023, Defendants disclosed that its travel retail sales downturn was "**primarily**" caused by government and retailer crackdowns on "**unstructured**" gray market activity.  Investors were shocked. For example, on November 1, 2023, Jefferies Research reported that the Company's poor quarterly and full year financial outlook "both proved to be far worse than models" and as a result of the disclosures understood that the "Daigou portion was a meaningful part of the [travel retail business]."  In response to the disclosures, Lauder's stock price lost close to **50% of its value** over the course of several disclosures falling from **$206.76** per share on November 1, 2022 to **$104.51 per share** on November 1, 2023, injuring investors in the process.  This Action seeks to recoup those losses.

        **A.**     **Lauder's Asia Travel Retail Business**

       4.     Lauder is a leading prestige beauty company that manufactures, markets, and sells skincare, makeup, fragrance, and hair care products worldwide.  As of January 2024, Lauder held a 13.6% share of the global beauty market, making it the second largest beauty company in the world.  Lauder distributes its products in approximately 150 countries and territories under many well-known luxury brand names.  Some of the most recognizable brands in Lauder's luxury portfolio include Estée Lauder, La Mer, Origins, M·A·C, Le Labo, and Bobbi Brown.

5.      Prestige beauty is an extremely competitive business.  Discerning consumers drive sales.  Accordingly, Lauder's commitment to preserving both its market position and public perception as a leader in the high-end prestige beauty space is crucial to its business.  Lauder's commitment to its luxury brand image is clear from how the Company describes itself on its website: "We are Prestige Beauty. It's in our DNA."

6.      The "channels" or venues through which Lauder distributes its products are critical to its sales and meant to align with Lauder's luxury brand image and price point.  As Lauder explains in its SEC filings: "We sell our prestige products through distribution channels that complement the luxury image and prestige status of our brands . . . . We believe that our strategy of pursuing selective distribution heightens the aspirational quality of our brands."  Accordingly, Lauder's traditional distribution channels include high-end department stores, upscale spas, and luxury e-commerce websites.

7.      In recent years, travel retail has fast become one of Lauder's most important and profitable sales channels.  Travel retail is comprised of duty-free shops, including those at airports or on cruise ships.  Products sold in Lauder's travel retail channels are in high demand by international travelers because they are exempt from import and sales taxes.  In 2021, travel retail accounted for 28% of Lauder's total revenue, which was a significant increase from 18% in 2018 and 6% in 2009.  Indeed, by 2023, Defendant Freda touted that travel retail accounted for "nearly a third" of Lauder's overall business.

8.      Lauder's travel retail channel is especially popular in certain Asian markets, notably China and South Korea.  Lauder's website acknowledges that "Asian consumers are among the most discerning in the world—which bodes well for the prestige beauty category." Lauder's appeal in Asia is also due to large international price differentials on certain beauty

products, the outsized demand for luxury beauty products in Asian countries, and the limited availability of certain brands in different countries. When coupled with international tax exemption and a massive consumer base, Lauder's duty-free travel retail channels in China[4] and South Korea[5] have become a critical source of revenues for Lauder and were therefore closely watched by the Company and investors. For example, on February 6, 2023, analysts at Credit Suisse detailed their expectation that Lauder's "travel retail revenues are poised to step-change higher very quickly and will continue to be a significant driver for several quarters."

9.    Defendants also highlighted the specific importance of Lauder's China travel retail segment in the Company's 2021 and 2022 Annual 10-Ks, which reported that the Company's single "largest customer . . . sells products primarily in China travel retail," and accounted for 14% of Lauder's consolidated net sales in 2021. Analysts determined that Lauder's "largest customer" during those periods was likely the world's number one travel retailer, China Duty Free Group Company Limited ("CDFG"). CDFG's parent company is China Tourism Group Duty Free Corporation Limited ("CTGDF"), a Chinese state-owned franchise company authorized by the State Council to carry out nationwide duty-free business in China.

B.    **Asia Travel Retail's Basement Exchange: China's *Daigou* Gray Market**

10.    In China, growing travel retail channels gave rise to a backchannel gray market for luxury goods. Beginning around 2005, a clandestine gray market resale industry known as *daigou* emerged in certain Asian markets to serve end-consumers in mainland China. The *daigou* industry

---

[4] According to Lauder's Annual Report on Form 10-K ("Annual 10-K") that was filed with the SEC during the Class Period on August 18, 2023, for Lauder's fiscal year ended June 30, 2023, "net sales in mainland China, as well as net sales from travel retail locations, in fiscal 2023, 2022 and 2021 were approximately 28%, 34% and 36% of consolidated net sales, respectively."

[5] Also according to Lauder's 2023 10-K, in 2022 and 2023 "net sales in Korea, including net sales from travel retail locations, were approximately 10% and 11% respectively, and no other country represented greater than 10% of the Company's consolidated net sales."

is a form of surrogate shopping whereby large quantities of goods are purchased, typically from duty-free stores in travel retail channels, and resold at a profit to end-consumers in local markets. The *daigou* gray market capitalizes on the scarcity and high import price of luxury goods in China, and profits from price arbitrage and tax exemptions unique to duty-free locations.[6]

11.    Over the years, China has enacted regulations ensuring oversight of *daigou* entities. For example, on January 1, 2019, a new Chinese regulation took effect, called the E-Commerce Law of the People's Republic of China ("ECL").  The ECL obligates *daigou* enterprises to register and pay taxes, a requirement designed to remove *daigou's* ability to profit from tax exemptions. The measure was part of the Chinese government's ongoing effort to curtail gray market activity.

12.    *Daigou* thrives in locations where these enterprises can efficiently purchase large quantities of luxury items at a lower, duty-free price for resale in mainland China.  As corporate *daigou* enterprises expanded their underground resale networks, certain locations in Asia became purchasing hubs.  Internationally, South Korea is a common hotspot for the *daigou* industry because of its proximity to mainland China and relatively favorable luxury goods pricing and duty-free policies.

13.    Domestically, the Chinese island province of Hainan sits just twelve miles from the mainland and became a haven for the *daigou* industry due to a highly favorable duty-free policy that allows tourists to purchase luxury goods at lower prices compared to mainland China.[7] Moreover, because up to 90% of Chinese citizens do not have a passport, domestic travel is particularly popular in China.  Though purchases for *daigou* gray market resale can and does occur

---

[6] Modern "corporate" *daigou* now have vast digital resources to reach their end-consumers and have largely displaced earlier, individualized operations.  Corporate *daigou* can distribute massive amounts of luxury goods through the gray market pipeline.

[7] Established in 2011, the Hainan Offshore Duty-Free Policy ("Hainan Duty-Free Policy") allowed tourists to purchase up to $4,170.20 USD (30,000 RMB) worth of duty-free luxury goods per person.

in any travel retail location, these two geographic locales became critical to the *daigou* industry's ability to bulk purchase duty-free luxury goods for resale on the gray market in mainland China.

14.     However, luxury brands that funnel products through the *daigou* gray market expose themselves to significant financial, legal, and reputational risk for the singular purpose of driving near-term, voluminous sales.  For this reason, the *daigou* market is universally condemned by prestige beauty brands and their investors, who recognize that these gray markets can damage a brand's image and impede the ability to generate above-board sales through legitimate retail channels.  For example, in 2022 and 2023, luxury behemoth and Lauder's competitor Louis Vuitton Moet & Hennessey SE ("LVMH") publicly described *daigou* as "basement" exchanges that are "dreadful" for luxury companies, emphasizing that "there is nothing worse" for prestige brand equity.

### C.     Lauder Flooded *Daigou* with Product to Achieve Sales Growth Despite Telling Investors That It Never Benefits from the Gray Market

15.     On February 5, 2019, Defendant Freda addressed industry questions about the impact of *daigou* and China's recently enacted ECL on Lauder's business during the Company's 2Q19 earnings call.  Defendant Freda condemned the practice and denied the Company's reliance on gray market resale, assuring investors that Lauder was "**never benefiting from a lot of the *daigou* business because of [Lauder's] strict policies to avoid any phenomenon like this**." Freda also told investors that Lauder would continue to enforce its internal purchasing quota policies in its travel retail channels "**to limit any risk of gray market around the world**."

16.     Despite these public representations to the contrary, Lauder did the opposite and diverted massive amounts of product into the gray market resale pipeline to drive lagging sales. Indeed, Lauder became dependent on *daigou* to make its numbers during the COVID-19 pandemic, when the amount of international travel had dramatically decreased.

8

17.    In mid-2020, during the height of the pandemic, looser duty-free regulations implemented in China presented an opportunity for Lauder to drive sales through the *daigou* gray market.  Specifically, on July 1, 2020, China's Hainan Island increased its duty-free spending limits.  Purchasers in Hainan could now acquire up to $13,900.67 USD (100,000 RMB) worth of duty-free goods, causing *daigou* sales to proliferate.

18.    Lauder capitalized on these loosened regulations in Hainan by supplying massive shipments of products to its travel retail channels to generate sales through the *daigou* gray market. Former Lauder employees confirmed that the Company became reliant on *daigou* to grow sales in its travel retail business.  These former employees ("FE") describe in detail how the Company's senior management drove travel retail growth through *daigou* gray market resale.

19.    FE-2 described travel retail as an area of Lauder's biggest growth, going "way back."  FE-3 explained that China and particularly Hainan were "huge markets."  FE-1 recalled that there was a shift from South Korea to China in the travel retail space during 2020 when the new regulations increased purchasing limits in Hainan.  Additionally, FE-2 recalled that Lauder sometimes asked its brand teams to do what it could to including moving launches to be first to market, change promotional calendars or accelerate new distribution.  FE-1 recalled that large purchases made during the pandemic, from 2020 through her tenure at Estée Lauder, were "almost definitely" made by *daigou*.

20.    FE-1 continued to say that companies could control the *daigou* market by limiting the supply of goods provided to duty-free locations, but preferred to sell more product, which came at the risk of "flooding the market."  Similarly, FE-3 further explained that the movement of product into *daigou* channels was "activated" through retailers, such as China Duty Free Group and that Estée Lauder utilized "incentives" in order to facilitate that movement.  FE-1 described

Lauder as being "much looser" when it came to "loading" retailers with stock in comparison to its competitors, such as L'Oréal. FE-1 explained that Estée Lauder "took a lot of market share" during the pandemic and that this was "very telling" because *daigou* were the only people buying product at that time. FE-1 commented that while Estée Lauder's increased market share was "nice on paper," Lauder's gains in its market share came from *daigou* business. FE-1 continued to say that Estée Lauder is now seeing the "repercussions" from their reliance on *daigou* during this period. FE-1 described the data surrounding Estée Lauder's jump in market share as "very jarring." FE-2 remarked that it was hard to reconcile the growth of travel retail in China with the lockdowns and lack of travel, stating that it did not make sense and that the growth was "counterintuitive."

21.    FE-3 stated that, that if there were issues with overstocks that Estée Lauder would "bulk ship" to places like Korea, where it was known that a *daigou* market existed, to cover losses. According to FE-3, the Company would "switch on the *daigou* market if needed," including sending "popular" products into these channels. FE-3 added that "popular" product was frequently held back from Europe in order to send to APAC.

22.    Further, former Lauder employees confirmed that Defendants knew that the product it fed into its travel retail channels entered the *daigou* gray market. For example, FE-2 confirmed that Lauder's executive leadership knew about the *daigou* reselling practice. FE-2 confirmed that the Company and its leadership could see sales spikes which were attributed to *daigou* practices. FE-2 confirmed that Lauder had "clear visibility" in its sales because the Company had very detailed sell-through and sales reporting information from its retail partners.

23.    FE-2 noted that Lauder held monthly and sometimes weekly demand planning meetings, which were "brutal" with abuse. FE-2 further noted that there was plenty of information available at these meetings to "triangulate" the correct sources of the sales, including the impact

10

of the *daigou* or gray market sales.  FE-2 further added that "everyone" knew the price differentials based on the pricing database.  FE-2 explained that the pricing database was updated fairly regularly, and the tool used for the database was called Anaplan.  FE-2 recalled that there was a team of about 5-10 people working on it, and that the head of that team became Chief of Staff for Defendant Travis.  FE-2 described how the database was used to track exchange rates and other differentials between brands and regions.  The database, FE-2 continued, was used to prepare slide decks and reports which were presented to the company's senior executives, including Defendant Freda, who were briefed on these pricing differentials.

24.    According to FE-3, there was a whole team involved in the process led by the current Global President Travel Retail Israel Assa.  FE-3 explained that there was a team that was a part of travel retail APAC that specifically analyzed the *daigou* market.  According to FE-3, there was a "huge" amount of people on the Commercial Team in Singapore, the head office for APAC, that reported into Global Travel Retail and whose responsibilities included analyzing the *daigou* market.

25.    FE-3 continued to say that the movement of product into *daigou* channels was "overseen," "approved," and "activated" by Assa.  FE-3 explained that "everything, absolutely everything" was approved by Assa and that he had influence over the process while occupying his prior role as President, Commercial Estée Lauder Travel Retail Worldwide.  According to FE-3, Assa was also responsible for allocating product to the various regions and that *daigou* was taken into account when making these decisions.

26.    Importantly, Defendants also knew that its products were being sold into the *daigou* gray market because they had a system to track the final locations where their high-end products were sold.  For example, FE-2 explained that Lauder used "pincodes" for certain products to know

if those products were going someplace where they were not supposed to be. FE-2 further confirmed that if a product was pincoded, Estée Lauder had the ability to see where the product ended up. Similarly, FE-1 explained that all products had tracking codes in order to exercise "market control."

**D.    China Cracked Down on *Daigou* and Lauder Concealed the Impact on Its Travel Retail Sales**

27.    As the COVID-19 pandemic abated, the Chinese authorities began enacting policies to crack down on *daigou* in China due to the negative tax implications of the practice. Meanwhile, Lauder's travel retail sales remained inflated as a result of the Company's over dependence on *daigou* gray market resale.

28.    On July 1, 2021, travel retail titan and Lauder's largest customer, CDFG, held a pin to the Company's ballooning sales when it publicly pledged to eradicate *daigou* gray market resale in Hainan. That day, CDFG announced that "it is necessary to maintain the healthy ecology of the offshore duty-free industry, severely cracking down on purchasing agents and preventing market risks."

29.    Then, on December 7, 2021, the Chinese government publicly announced that regulations aimed at cracking down on *daigou* activity would take effect in the new year. Chinese policy commentators quickly noted that "[t]he promulgation of this law shows the determination of the Hainan provincial government and the Chinese government to resolutely crack down on illegal *daigou* and smuggling."

30.    Formal regulations enforcing this policy and cracking down on *daigou* took effect on January 1, 2022. By this time, Lauder knew that it could no longer depend on this unsustainable sales practice to drive sales growth and that the Company's critical travel retail business segment would be unable to maintain prior levels of *daigou*-inflated sales. Meanwhile, Lauder's investors

were in the dark as to the threat posed to Lauder's travel retail business because Defendants repeatedly assured the market that the Company condemned *daigou* and was not in the business of selling into the gray market.

**E.    Lauder Attributed Travel Retail Sales Increases to Its Brand Strength, Knowing *Daigou* Resale Was the True Driver**

31.    The Class Period begins on February 3, 2022, when Defendants made a series of misrepresentations and omissions to investors about the cause of its sales success in its Asia travel retail business.  On February 3, 2022, Lauder reported its 2Q22 financial results, which captured a three-month period from October 1, 2021 to December 31, 2021.  The same day, Lauder issued a press release and held an earnings conference call.  Critically, the time frame reflected in Lauder's February 3, 2022 financial results was prior to China's January 1, 2022 regulations cracking down on *daigou*, when Lauder was generating sales growth from and dependent on *daigou* gray market resale.

32.    Defendants touted the Company's net sales increases in travel retail and misleadingly attributed the reported sales growth to sustainable, market-driven factors, such as the "strength" of Lauder's brand.  In doing so, Lauder misled investors by failing to disclose that the Company had been relying on unsustainable sales practices — namely, inundating the *daigou* gray market with product supply — to drive its sales growth.  Specifically, the Company's 2Q22 10-Q boasted that "***[n]et sales increased in our travel retail business . . . reflecting continued strength of our brands with the Chinese consumer***."  However, this statement misled investors to believe that Lauder's net sales increased in travel retail because its brand equity was strong with Chinese consumers while concealing the reality that Lauder's net sales increase was due to *daigou*.

**F.     Defendants Falsely Touted an "Unchanged" Landscape in Hainan, Despite China's Severe Regulatory Crackdowns on *Daigou* Taking Effect**

33.    By the time Lauder reported its financial results for 3Q22, China's government crackdowns on *daigou* activity had taken effect.  On May 3, 2022, during Lauder's 3Q22 Earnings Call, Defendants continued to misrepresent to the public that the Company's "***confidence into Hainan['s] future is unchanged, actually increased***."  However, this statement was false and misleading because it represented an "***unchanged***" landscape in Hainan despite China's severe regulatory crackdowns on *daigou* having materially altered Lauder's ability to maintain its travel retail sales growth.  Moreover, because the Company had become heavily dependent on the *daigou* gray market to generate sales growth within its travel retail segment, Lauder's statements omitted material information that the Company could not sustain its sales figures as a result of no longer being able to rely on this illegitimate backchannel to drive growth.[8]

34.    Likewise, on August 18, 2022, during Lauder's 4Q22 Earnings Call, Defendant Freda stated that "***the power of Hainan in the future remain[s] intact***."  Defendant Freda's statement again gave the public the misimpression of an unchanged market in Hainan, when in reality, Lauder had lost its ability to divert massive quantities of product to the *daigou* market to shore up its sales figures.  However, as the Class Period progressed, Lauder could not stem the tide of the *daigou* regulatory crackdowns forever.  Soon, Lauder's public statements touting the resilience of its travel retail business were spliced with disclosures revealing declining net sales

---

[8] In 2022, late-stage COVID-19 variant surges caused episodic governmental lockdowns in parts of China, including Shanghai in February 2022 and Hainan in August 2022.  Though these surges caused a wave of disruption, China's governmental lockdowns had the parallel effect of further obscuring the impact of the Hainan *daigou* crackdown on Lauder's travel retail business.  Lauder's statements amplified this obscurity, so as not to admit to its dependence on *daigou* to prop up its sales.

that, unbeknownst to investors, were the result of Lauder's inability to access the *daigou* gray market in the wake of China's 2022 regulatory crackdowns on the illicit resale practice.

  **G. Lauder's Stock Price Dropped as It Revealed Partial Truths Explaining Poor Sales, While Offering False Reassurances to Investors**

  35. Eventually, Lauder was forced to begin revealing incrementally worse news of sales declines within its travel retail business and the negative impact it was having on the Company's financial outlook. Specifically, on November 2, 2022, Lauder issued a press release announcing financial results for its 1Q23. In the press release, Lauder reduced full year outlook for FY 2023, which it claimed was done "primarily to reflect tighter inventory management in Asia travel retail, given reduced traffic as a result of COVID-19 restrictions." The market reacted accordingly, **and Lauder's stock price dropped over 8%**, a reduction of $16.80 per share, bringing the share price down to $189.96 at closing. Notwithstanding its disclosure, on November 2, 2022, Defendants reassured investors that it "***anticipate[d] sequential acceleration . . . as these pressures begin to abate***." Defendants' reassurances were false and misleading because they failed to disclose that Lauder was no longer unable to tap into the *daigou* gray market sales that accounted for its prior travel retail growth and that such pressures were not going to abate with time.

  36. As the Class Period continued, Lauder's stock price repeatedly dropped as Defendants revealed new information about the decline in travel retail sales. On February 2, 2023, Lauder again lowered its outlook for FY 2023, due to the "disruption to travel and staffing levels in Hainan that slowed the expected normalization of inventory and the recently announced potential roll-back of COVID-related supportive measures in Korea duty free." In response to this news, shares of **Lauder's common stock declined 4.41%**, a reduction of $12.39 per share, bringing the share price down to $268.41 on February 2, 2023. That same day, Defendants

nonetheless continued to mislead investors when they assured investors that the Company was "***sitting on a decent amount of inventory . . . to supply the sales that we expect to see in the fourth quarter***." However, Defendants' reassurances were materially false and misleading because Defendants' rosy picture of its inventory levels failed to disclose that Lauder could no longer rely on the *daigou* gray market to drive sales within its Asia travel retail segment.

37.     Then, on May 3, 2023, Defendants again lowered Lauder's FY 2023 guidance because of the slow recovery in Asia travel retail markets. Lauder noted that as "the shape of recovery from the pandemic for Asia travel retail comes into better focus, it is proving to be both far more volatile than we expected and more gradual relative to what we experienced in other regions." Lauder cited COVID-19 recovery and tightening inventory levels for the poor financial results. As a result of these revelations, **Lauder's common stock declined over 17%**, a reduction of $42.52 per share, bringing the share price down to $202.70 on May 3, 2023. Defendants again continued to reassure investors that sales would rebound despite knowing that the *daigou* sales spigot had been turned off. For instance, Defendant Freda misleadingly claimed during Lauder's May 3, 2023 earnings call that: "[e]ncouragingly, retail sales performance is significantly ahead of organic sales results in Global travel retail, ***which gives us confidence that the challenges in travel retail are abated with time***."

38.     At this point, analysts at Deutsche Bank expressed concern about the Company's lowering of guidance for the third consecutive time stating: "the sheer magnitude of the reduced outlook and associated operating deleverage raises questions related to EL's capabilities vis-à-vis demand forecasting, visibility, and supply-chain agility in its most profitable geography and channel." Lauder's false and misleading narrative concerning its net sales decline in travel retail

16

was becoming increasingly unbelievable as the truth emerged and the risk of Lauder's over dependence on the *daigou* gray market materialized.

**H.    Defendants Admitted that the Company's Over-Reliance on *Daigou* Was the Primary Driver of Lauder's Net Sales Decline in Travel Retail**

39.    On August 18, 2023, Lauder finally, explicitly admitted that its travel retail "**sales trends deteriorated and turned steeply negative from the enforcement actions to control *daigou* activity**." As a result of these revelations, **Lauder's common stock declined over 3.3%**, a reduction of $5.37 per share, bringing the share price down to $156.69 on August 18, 2023. Lauder's stock continued to fall on the next trading day, August 21, 2023, when it declined **an additional 3.7%**, a **total decline of 6.89%**.

40.    However, Defendants continued to mislead investors by failing to disclose that the loss of *daigou* sales were the primary cause of its declining sales. Indeed, Defendants continued to reassure investors that any negative effects from *daigou*-related enforcement actions were merely "***short term headwinds***." Defendants also described the sales declines as a "***timing issue that's having a big short-term temporary impact for us***." These reassurances were false and misleading because Lauder depended on *daigou* gray market resale to generate travel retail growth for many quarters, which could not be maintained in the wake of China's 2022 crackdowns. Further, Defendant's reassurance omitted the fact that the referenced "enforcement actions" were not isolated events but reflected the Chinese government's 2022 regulatory enactment to eradicate *daigou* for good, as endorsed by Lauder's largest customer.

41.    The full truth about Defendants' fraud was revealed on November 1, 2023, when the Company disclosed that its sales declines "primarily reflect a decline in our Asia travel retail business, **primarily due to our and our retailers' actions to reset retailer inventory levels, and changes in government and retailer policies related to unstructured market activity**, that led

to lower product shipments compared to the prior-year period." This disclosure revealed to investors for the first time that the declining net sales that Lauder had been attributing for over a year to other causes was "**primarily**" due to and reflective of government and retailer crackdowns on "**unstructured market activity**"—i.e., the *daigou* gray market. On this news, the price of **Lauder common stock declined $24.36, or nearly 19 percent**, to close at $104.51 on November 1, 2023. The Daily Telegraph soon published an article describing how Lauder's stock "plunged to a six year low," citing that "[t]he company blamed 'changes in government and retailer policies related to unstructured market activity,'" which was understood to be China's "clamp down on *daigou* resellers[.]" Similarly, for on November 1, 2023, Jefferies Research reported that the Company's poor quarterly and full year financial outlook "both proved to be far worse than models" and understood that the "Daigou portion was a meaningful part of the [travel retail business]." Over the course of these disclosures, Lauder's stock price lost close to **50% of its value**, injuring investors in the process.

## II.    JURISDICTION AND VENUE

42.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

43.    Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1391(b), as upon information and belief, Lauder shareholders reside in this District, the acts and transactions giving rise to the violations of law complained of occurred in part in this District, the false and misleading statements were disseminated in this District, and the manipulative conduct was carried out in part in this District.

44.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities exchange.

### III.    PARTIES

#### A.    Lead Plaintiff

45.    Lead Plaintiff Macomb County Employees' Retirement System ("Macomb County ERS") is a single employer defined benefit pension plan based in Macomb County, Michigan that provides pension and ancillary benefit services to substantially all of the County's employees.  As of December 31, 2023, Macomb County ERS managed over $1.1 billion in total assets on behalf of approximately 4,600 Macomb County employees, retirees, and beneficiaries.  As set forth in its certification (ECF No. 26-1 at 2-6), Macomb County ERS purchased EL common stock on the New York Stock Exchange ("NYSE") during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

46.    Lead Plaintiff Macomb County Retiree Health Care Fund ("Macomb County RHC") is a related public employee health and welfare trust based in Macomb County, Michigan that provides healthcare benefits to county retirees.  As of December 31, 2023, Macomb County RHC managed over $400 million in total assets on behalf of approximately 4,000 Macomb County employees, retirees, and beneficiaries.  As set forth in its certification (ECF No. 26-1 at 7-9), Macomb County RHC purchased EL common stock on the NYSE during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

47.    Lead Plaintiff Wayne County Employees' Retirement System ("Wayne County ERS") is a single employer defined benefit pension plan based in Wayne County, Michigan that provides pension and ancillary benefit services to substantially all of the County's employees.  As of September 30, 2023, Wayne County ERS managed over $990 million in total assets on behalf of approximately 6,700 Wayne County employees, retirees, and beneficiaries.  As set forth in its

certification (ECF No. 26-1 at 10-13), Wayne County ERS purchased EL common stock on the NYSE during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

**B.    Defendants**

**1.    Corporate Defendant**

48.    Defendant Lauder is incorporated under the laws of Delaware, with its principal executive offices located in New York, New York.  The Company's common stock is traded on the NYSE under the ticker symbol "EL."

49.    Founded in 1946 by Estée and Joseph Lauder, Lauder is now one of the world's leading manufacturers, marketers, and sellers of luxury skincare, makeup, fragrance, and haircare products.  Lauder sells its products in approximately 150 countries and territories under several well-known brand names, including but not limited to: Estée Lauder, Clinique, Origins, M·A·C, Bobbi Brown, La Mer, Aveda, Jo Malone London, Too Faced, Dr.Jart+, and The Ordinary. Lauder's commitment to its luxury brand image is evident from the culture and values displayed on its website: "We are Prestige Beauty. It's in our DNA."

50.    During the Class Period Lauder's fiscal year began on July 1 and ended on June 30 of each calendar year.  Accordingly, the first quarter ("1Q") of Lauder's fiscal year was from July 1 through September 30; the second quarter ("2Q"), from October 1 through December 31; the third quarter ("3Q"), from January 1 through March 31; and the fourth quarter ("4Q"), from April 1 through June 30.

**2.    Individual Defendants**

51.    Defendant Freda was, at all relevant times, the President, Chief Executive Officer ("CEO"), and Director of Lauder. Defendant Freda joined Lauder in March 2008 as President and Chief Operating Officer and assumed the CEO position in July 2009.  Defendant Freda is also a

Case 1:23-cv-10669-AS    Document 47    Filed 03/22/24    Page 26 of 109

member of Lauder's Board of Directors.  As highlighted on Lauder website, Defendant Freda "is responsible for the company's overall vision, strategy, financial objectives and investment priorities."  Defendant Freda is also a member of Lauder's Board of Directors.  In his role as CEO of Lauder, Freda participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to Lauder's travel retail business.

52.      Defendant Travis was, at all relevant times, the Executive Vice President and Chief Financial Officer ("CFO") of Lauder.  Defendant has held those roles with Lauder since August 2012.  As highlighted on Lauder's website, Defendant Travis's role in the Company includes "responsibilities for Global Finance, Accounting, Investor Relations, Information Technology, and Strategy and New Business Development.  Ms. Travis also co-leads the company's major cost savings and process improvement initiatives."  In her role as Executive Vice President and CFO of Lauder, Travis participated in earnings calls and conferences with securities analysts, during which she made false and misleading statements and omissions of material fact relating to Lauder's travel retail business.

53.      Defendants Freda and Travis, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors (i.e., the market).  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been

disclosed to, and were being concealed from the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

### 3.    Relevant Third Parties[9]

54.    FE-1 worked for Lauder from July 2022 to January 2023 as a Regional Marketing Director of Travel Retail for the Asia-Pacific ("APAC") region, La Mer | Le Labo.  FE-1 worked closely with the General Manager for the Lauder brands for which she was responsible, La Mer and Le Labo.  FE-1 also attended regular sales meetings, composed "action plans" for her department, and participated in monthly meetings with Lauder brand General Managers and Vice Presidents and Presidents of Travel Retail APAC, along with relevant employees from the sales and marketing teams.  FE-1 was also responsible for managing the marketing calendar, which included budget management for new product launches, working closely with the commercial sales teams and demand planning and forecasting.  Further, FE-1 was also responsible for promotions, some aspects of pricing, and public relations work. Prior to working for Lauder, FE-1 worked in travel retail APAC for her previous employer.

55.    FE-2 worked for Lauder for more than ten years ending in mid-2021. Prior to her most recent role, FE-2 held the position of Senior Vice President in the finance part of the organization for one of Lauder's regions. This role included overseeing demand planning and store replenishment functions for Lauder. In this role, FE-2 attended monthly demand planning and financial review meetings for her region. From 2019 to 2021, FE-2 worked for Lauder on special projects to improve various aspects of Lauder's business planning capabilities, including supply chain, demand planning, and financial planning.

---

[9] FEs are identified herein by number (FE-1, FE-2, etc.).  All FEs are described in the feminine to protect their identities.

56.    FE-3 was employed by Estée Lauder in a variety of roles for several years before the Class Period through early 2023.  FE-3 was most recently employed in a Senior Leadership position in Travel Retail EM[E]A.  FE-3 attended monthly meetings with the members of the leadership team for EMEA, where the General Manager for the region provided information from another monthly meeting that occurred between Worldwide leadership attended by the Global President TR WW and the regional general managers.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Lauder's Prestige Beauty Brand

57.    Lauder, founded in 1946, is now one of the world's leading beauty companies that manufactures, markets, and sells skin care, makeup, fragrance, and hair care products worldwide.  As of January 2024, Lauder held a 13.6% share of the global beauty market, making it the second largest beauty company in the world.

58.    Members of the Lauder family remain "at the heart of" the "family-controlled company."  For example, Leonard A. Laudner — son of founders Estée and Joseph Lauder — served as CEO of the Company from 1982 through 1999.  His son, William P. Lauder ("William Lauder") served as CEO of the Company from 2004-2009.[10]

59.    Since stepping down as the CEO in 2009, William Lauder has remained closely involved with the Company, and still serves as Executive Chairman and Chairman of the Board of Directors.  In this role, according to the Company's September 29, 2022 Proxy Statement, William Lauder "works with the CEO to set overall vision, strategy, financial objective, and investment priorities for the business" and "provides high-level leadership in areas that are important to the

---

[10] Defendant Freda only is the second person in the Company's seventy-eight year history to serve as CEO without being a member of the Lauder family (Fred H. Langhammer was the first non-Lauder family CEO from 2000 until 2004).

Company[.]"  In addition to William Lauder, three other members of the Lauder family hold executive positions in the Company and two remain affiliated with the Company.

60.    Lauder sells its products in approximately 150 countries and territories under a number of well-known, brand names, including: Estée Lauder, Aramis, Clinique, Lab Series, Origins, M·A·C, Bobbi Brown, La Mer, Aveda, Jo Malone, Bumble & Bumble, Tom Ford Beauty, Kilian Paris, Dr.Jart+, and Le Labo.  The brands under the Lauder's umbrella "are differentiated by numerous factors, including quality, performance, a particular lifestyle, where they are distributed (e.g., prestige or mass) and price point."

61.    Certain best-selling "hero" products sold under Lauder's various prestige brands have historically been in high demand and fetch extremely high prices. For instance, the La Mer brand—one of Lauder's leading luxury brands—sells a moisturizer called Crème de la Mer, a "hero" product that retails for $380 for a 2-ounce jar and $2,675 for a 16.5-ounce jar on La Mer's United States website.  Likewise, the Estée Lauder brand—the Company's "heritage" brand—sells a 3.9-ounce bottle of Advanced Night Repair Serum Synchronized Multi-Recovery Complex that retails for $245 on Estée Lauder's United States website.

62.    Lauder's prestige reputation is critical to its brand.  The Company describes itself as a "leader in the beauty industry due to the global recognition of our brand names, our excellence in product innovation, our strong position in key geographic markets and the consistently high quality" of its products.  Lauder makes similar disclosures in its SEC filings: "[w]e sell our prestige products through distribution channels that complement the luxury image and prestige status of our brands, and we provide 'High-Touch' consumer experiences across our distribution channels. . . . We believe that our strategy of pursuing selective distribution heightens the aspirational quality of our brands."

24

63.     For this reason, Lauder sells its products through distribution "channels" and into retail locations that reinforce its prestige brand image, such as department stores, specialty-multi retailers, upscale perfumeries, salons, spas, Lauder's own freestanding stores, retailer websites, third-party online malls, stores in airports, and duty-free locations.

**B.      Lauder's Travel Retail Business Segment**

64.     Lauder's travel retail business segment "covers the world of duty-free environments including airports, airlines, cruises, downtown locations and border shops." Because products sold in these locations are purchased for international use, they are exempt from import and sales taxes. Lauder's travel retail channels are intended to reinforce its prestige band image through the luxury of overseas travel.

65.     In recent years, travel retail has become one of Lauder's fastest growing and most profitable channels. During the Class Period, travel retail accounted for roughly one-third of Lauder's annual revenue. The percentage of Lauder's revenue derived from travel retail has significantly increased over time from 6% in 2009, to 18% in 2018, to 28% in 2021.

66.     Analysts at Morgan Stanley acknowledged this trend at Lauder, and on December 16, 2019 commented that Lauder's "favorable channel mix shift . . . towards high growth (and much higher margin) channels and geographies, including e-commerce, travel retail, emerging markets, and specialty channel underpins our long-term bullish outlook." Similarly, analysts acknowledged the importance of travel retail to Lauder's overall financial performance. On February 23, 2023, analysts at Credit Suisse expressed their view that "EL's travel retail revenues are poised to step-change higher very quickly and will continue to be a significant driver for several quarters."

67.     While critically important to the Company, Lauder's reporting for its travel retail segment is far from transparent. Operated out of Switzerland, travel retail at Lauder is divided

into three geographic regions ostensibly based on where sales occur: Asia Pacific ("APAC"), Europe, Middle East, and Africa ("EMEA"), and Americas. However, since 2019, Lauder has grouped and reported all global travel retail sales in its EMEA region regardless of where the sale took place across the globe. Lauder's 2021-2023 Annual 10-Ks relegate this significant fact to a footnote.[11] By grouping travel retail worldwide into the EMEA region sales reporting, Lauder was able to obscure what region or subregion was actually driving its travel retail sales.[12]

### C.    Lauder's Focus on Chinese Consumers via Travel Retail

68.    Consumer demand for luxury beauty goods is particularly high in China. However, the price of luxury beauty products is significantly higher in China as compared to other countries worldwide. Accordingly, the ability to purchase expensive, luxury beauty products in duty-free (and thus tax free) shops appeals greatly to Chinese consumers. For these reasons, Lauder became focused on selling to Chinese end-consumers through its travel retail channels. Despite Lauder's opaque travel retail reporting, China was far and away the most important end-consumer location amongst the Company's travel retail business segment. Investors understood this fact. Indeed, on August 10, 2021, an analyst at Wells Fargo acknowledged that "China is increasingly a driver of EL's global travel retail growth."

---

[11] Specifically, during the Class Period, Lauder's 2022 and 2023 Annual 10-Ks stated: "The net sales from the Company's travel retail business are included in Europe, the Middle East & Africa region, with the exception of Dr. Jart+ in the travel retail channel that are reflected in Korea in the Asia/Pacific region. Operating income attributable to the travel retail sales included in the Europe, the Middle East & Africa is included in that region and in The Americas."

[12] Complicating matters, at the very beginning of the Class Period, Lauder's travel retail leadership changed. On March 7, 2022, Lauder announced that then-Global President, travel retail and Retail Development, Olivier Bottrie ("Bottrie"), would exit the company on June 30, 2022 to retire after twenty-six (26) years with Lauder. During Bottrie's tenure with Lauder, travel retail jumped from 6% of Lauder's net sales in 2004 to 28% in 2021. Under Bottrie's leadership, Lauder steadily increased the degree to which it profited from travel retail sales. Following Bottrie's departure, Israel Assa ("Assa") was appointed to fill the position. Assa assumed the title of Global President, travel retail and Retail Development on May 1, 2022, which he continued to hold as of the filing of this Consolidated Amended Complaint.

69.     In addition, Chinese travel retail also held the important distinction of being the segment where Lauder's largest customer operated.  Lauder's largest customer was critically important for the Company and accounted for a massive (and growing) portion of its Company-wide net sales.  Specifically, this critical and unnamed customer accounted for 14% for fiscal 2021, 7% for fiscal 2020, and 5% for fiscal 2019.  Analysts have identified this "largest customer" as China Duty Free Group, a subsidiary of CTGDF, a Chinese state-owned franchise company authorized by the State Council to carry out nationwide duty-free business in China.  CDFG is the world's number one travel retailer by sales.

**D.     Hainan: China's Domestic Duty-Free Island**

70.     In addition to more traditional, international duty-free locations like airports, China's southernmost island province, Hainan, has grown into a massive, Chinese-sponsored domestic duty-free shopping hub.  Hainan Island sits just twelve miles off the coast of the mainland and is easily accessible via various forms of transport, including airplane, train, bus, and ferry service.

71.     Because up to 90% of China's population does not have a passport, travel to domestic locations like Hainan is particularly popular.  In 2011, to boost the local Hainanese (and overall Chinese) economy, the Chinese government introduced the Hainan Duty-Free Policy, which allows Hainan's visitors to purchase duty-free goods domestically at designated shops on the island without having to travel internationally.  At the time it was enacted, the Hainan Duty-Free Policy allowed the island's tourists to purchase up to 30,000 RMB (currently $4,170.20 USD) worth of goods per person.[13]

---

[13] On July 6, 2021, industry commentators noted that duty-free store purchasing limits in Korea were 670,000 won, while in Hainan the new limits were 17 million won.

72.     Defendants highlighted the importance of Hainan to Lauder's travel retail segment. Lauder was all in on the opportunity presented by Hainan in the wake of its expanded duty-free purchasing limits.  For example, on February 5, 2021, Defendant Freda touted that "[w]ithin China domestic, Hainan is the star.  And it's driven by the new traffic and by the increased conversion and by the quantities purchased because of the regulations . . . and by the development of retail."

### E.     Asia Travel Retail's Basement Exchange: China's *Daigou* Gray Market

73.     Duty-free shopping provided easy access to discounted, but highly demanded, luxury products.  *Daigou*, which translates from Chinese to English as "buy on behalf of," is also known as surrogate shopping.  *Daigou* exchanges occur when large quantities of luxury goods are purchased from duty-free stores and resold at a profit to end-consumers in mainland China. Referred to by industry commentators as uniquely Chinese, *daigou* is hotly controversial because it acts as an end-run around Chinese tax revenue.  It is also publicly condemned by high-end retailers (like Lauder and its competitors) because the mass, discounted sales harm brand image and cannibalize valuable full price sales elsewhere.

74.     After a modest start in the 2000's, *daigou* operations have grown increasingly commercial or "corporate" and facilitate their gray market resale through online applications like WeChat and Taobao, which are secure and private.  Such corporate *daigou* operations are more sophisticated and require massive bulk purchases to be effective because the *daigou* entity is making its profit off the spread between the duty-free purchase price and the end-consumer price (which still must be below the retail price to be economical to the end-purchaser).

75.     As *daigou* enterprises expanded their underground resale networks, certain locations in Asia became purchasing hubs.  Internationally, South Korea is a common hotspot for the *daigou* industry based on its proximity to mainland China and relatively favorable luxury goods pricing.  Domestically, the Chinese island province of Hainan, discussed above, became a haven

for *daigou* while having the distinct advantage of being a domestic island with favorable duty-free policies that allow tourists to purchase luxury goods at lower prices compared to mainland China. Though purchases for *daigou* gray market resale can occur in any travel retail location, these two geographic locales became hotspots for the *daigou* industry to bulk purchase duty-free luxury items to be resold on the gray market.

76.      Critical to the fraud alleged herein, Lauder had the ability to control the flow of its products to locations where the *daigou* industry procured duty-free goods, like Hainan and South Korea, for gray market resale and did exactly that to meet its sales goals.

77.      On January 1, 2019, China passed the E-Commerce Law of the People's Republic of China (the "ECL"). The ECL required *daigou* operations to obtain licenses and formally register as a business. Failure to do so subjected *daigou* industry participants to fines as high as $291,620 USD for illegal business and tax evasion. Essentially, the ECL sought to impose taxes on *daigou* participants to disincentivize the practice by cutting into the profits gained by taking advantage of duty-free tax avoidance. Despite these efforts by Chinese authorities, the *daigou* gray market continued to operate against the backdrop of — or rather through the basements of — legitimate travel retail channels, shielded from public view.

**F.      Lauder Publicly Denied Its Use of *Daigou* to Boost Sales**

78.      A myriad of known risk accompanied participating in *daigou* activity: volatile regulatory landscapes, unpredictable enforcement, geographic overconcentration, trade interruptions, unstable demand, inventory surplus, consumer discount dependency, dilution of brand equity, and loss of price control. For these reasons, luxury brand companies (and their investors) publicly condemned *daigou* resellers.

79.      For example, Lauder's direct competitor, LVMH, has publicly emphasized that *daigou* gray market resale "has a terrible negative effect on the image of the brand" engaging it.

In January 2022, LVMH specifically remarked that brand equity is harmed by the *daigou* industry, when products go "straight from the store, or rather from the basement[] of that store to retailers in China who sell them at a discount." The following year, in January 2023, LVMH was again quoted admonishing *daigou*, saying, "[f]or your image, there is nothing worse. It's dreadful."

80.    Lauder likewise outwardly condemned the practice of *daigou* to investors and was aware of the threats that the *daigou* gray market posed to its travel retail business. On February 5, 2019, in a Company earnings call for 2Q19, Defendant Freda responded to an analyst's question regarding the "impact" of China's ECL on Lauder's travel retail business. Defendant Freda commented on the "*daigou* phenomenon" by stating:

> First of all, our Travel Retail business has not seen the impact from the stricter enforcement through January. So we don't see the impact so far. It is also important, however, to remember that **we at Estée Lauder companies have a long-standing policy that limits the numbers of products that a single consumer can buy at any counter in our** travel retail **globally** – **since ever**. So we were never benefiting from a lot of the *daigou* business because of **our strict policies to avoid any phenomenon like this and, obviously, to limit any risk of gray market around the world**.

Defendant Freda's response to the analyst's inquiry demonstrated both an awareness of the potential impact of governmental regulations relating to the *daigou* gray market, as well as Lauder's internal mechanisms to track and limit the flow of its products into gray market resale.[14]

---

[14] Lauder's commitment to repudiating gray market resale extends back quite far in the Company's history. While in his role as Company CEO, William Lauder – grandson of the Company's founders – spoke on a Company earnings call on May 3, 2007 about Lauder's "strategic decision to cut back a certain group of retailers in the shipments we were making . . . to a very significant degree because we found that there was a great deal of gray market activity going on from these retailers." William Lauder not only renounced the gray market – in this instance involving retailers in Spain – but showed the Company's ability to control the flow of Lauder products into the gray market through control of its shipments, noting that "significant quantities of [Lauder's] merchandise was showing up in markets well outside of Spain, well outside of our established distribution and to far greater quantities than we were comfortable with."

G.      **Despite its Known Risks, Lauder Flooded *Daigou* with Product to Grow Sales
and Became Over-Dependent**

81.      Despite Lauder's public vow in 2019 to "**limit any risk of gray market around
the world**," the Company purposefully pumped large amounts of product into the *daigou* gray
market to cover up slow sales growth and became dependent on the level of revenue it generated.
Specifically, in 2020, Lauder tapped into the back-alley, high-volume sales of the *daigou* gray
market to cover up lagging sales growth resulting from the global COVID-19 pandemic.

82.      Beginning on July 1, 2020, China dramatically expanded duty-free shopping limits
to 100,000 RMB ($13,900.67 USD) worth of goods per person in order to stimulate the local
economy.  Faced with suppressed travel retail sales and an attractive new duty-free opportunity in
Hainan, Lauder used *daigou* gray market resale to boost sales and quickly became dependent on
the gray market to maintain its sales figures.

83.      Numerous former Lauder employees confirmed that Lauder over-relied on *daigou*
to grow sales in its travel retail business.  With respect to the Company's travel retail business,
FE-2 recalled that it had been a focus or strategic growth initiative for Lauder for a while, even
prior to the pandemic.  FE-2 described travel retail as an area of Lauder's biggest growth, going
"way back."  FE-2 further explained that travel retail was one of Estée Lauder's "largest growth
pillars" and part of its "key strategic initiatives."  FE-2 also described the manner in which certain
regions, like Lauder's North America market, were not growing and experienced a lot of decline
in sales through traditional retail outlets during her employment with the Company.

84.      FE-3 explained that China and particularly Hainan were "huge markets."  FE-1
recalled that there was a shift from South Korea to China in the Travel Retail space during 2020
when the new regulations increased purchasing limits in Hainan.  FE-1 further explained that the

*daigou* had "very big businesses" with "structures in place" and is now primarily made up of medium and "corporate *daigou*," who deal directly with retailers, and less individual *daigou*.

85.    FE-2 indicated that there was a huge amount of pressure every quarter to deliver sales results, and that sometimes that pressure, and the demands management made on its staff, were unreasonable and uncomfortable.  FE-2 reiterated that there was "huge pressure" to improve Lauder's top line through sales growth, which happened "very often," as Estée Lauder was positioned as a growth company.  Additionally, FE-2 recalled that Lauder sometimes asked its brand teams to do what it could to including moving launches to be first to market, change promotional calendars or accelerate new distribution.

86.    FE-1 continued to say that companies could control the *daigou* market by limiting the supply of goods provided to duty-free locations, but preferred to sell more product, which came at the risk of "flooding the market."  Similarly, FE-3 further explained that the movement of product into *daigou* channels was "activated" through retailers, such as *China Duty Free Group* and that Estée Lauder utilized "incentives" in order to facilitate that movement.  FE-3 recalled products moving into these channels both through physical sales on the shop floor and via internet purchases.  According to FE-1, practices during this period "overflooded" the market.  FE-1 recalled that large purchases made during the pandemic, from 2020 through her tenure at Estée Lauder, were "almost definitely" made by *daigou*.  FE-1 remembered that the biggest issue during her tenure was "high" stock holdings of retailers in Hainan, China. FE-1 noted that this period was "very challenging for the business."

87.    Additionally, FE-1 described Lauder as being "much looser" when it came to "loading" retailers with stock in comparison to its competitors, such as L'Oréal. FE-1 explained that Estée Lauder "took a lot of market share" during the pandemic and that this was "very telling"

because *daigou* were the only people buying product at that time.  FE-1 commented that while Estée Lauder's increased market share was "nice on paper," Lauder's gains in its market share came from *daigou* business.  FE-1 continued to say that Estée Lauder is now seeing the "repercussions" from their reliance on *daigou* during this period.  FE-1 described the data surrounding Estée Lauder's jump in market share as "very jarring."

88.    FE-2 remarked that it was hard to reconcile the growth of travel retail in China with the lockdowns and lack of travel, stating that it did not make sense and that the growth was "counterintuitive."  FE-2 explained that "things didn't make sense" and that she could not "square" certain things that she observed.

89.    FE-2 elaborated that there was too much pressure on sales growth, and that she could not understand why some people at the company – who did not appear to be nice or good at their jobs – were able to survive and keep their positions at Lauder, for example in the supply chain.  FE-2 figured that those people who did survive at Lauder must be "up to something," like using the gray market of *daigou* resellers, to enable the practice.

90.    FE-3 stated that, that if there were issues with overstocks that Estée Lauder would "bulk ship" to places like Korea, where it was known that a *daigou* market existed, to cover losses.  According to FE-3, the Company would "switch on the *daigou* market if needed," including sending "popular" products into these channels.  FE-3 explained that products were "held back" so that they could be sent into areas with an extensive *daigou* market during "crunch time" of the fiscal year.  Further, FE-3 recalled promotions also being utilized to send product into these channels.  Further, FE-3 recalled that there was an emphasis on sending stock to APAC, which left other regions short of product, despite having retailers asking and ready to sell product while

APAC was still experiencing lockdowns.  FE-3 added that "popular" product was frequently held back from Europe in order to send to APAC.

91.    Similarly, FE-1 described instances where it was important that Lauder move products with upcoming expiration dates "out of warehouses and into the channels."  In such instances, FE-1 stated that Lauder "pushed products as fast as they can."

92.    The accounts of former Lauder employees confirm Defendants' knowledge of Lauder's declining net sales in Asia travel retail resulting from regulatory and retailer crackdowns on *daigou* activity.  For example, FE-2 confirmed that Lauder's executive leadership knew about the *daigou* reselling practice.  FE-2 confirmed that the Company and its leadership could see sales spikes which were attributed to *daigou* practices.  FE-2 confirmed that Lauder had "clear visibility" in its sales because the Company had very detailed sell-through and sales reporting information from its retail partners. FE-2 described that Lauder monitored this data on a weekly and monthly basis and held monthly estimate meetings with senior chief financial officers for various regions, during which sales data was reviewed in detail by the retailer, brand, and key product lines.

93.    FE-2 elaborated that that you could see sales spikes in key stores and/or key items that were out of sync with historic norms and it would make you question the sales spikes at certain stores, regions based on which items had spikes.  FE-2 went on to say that it would then become clear that they were for *daigou* or "suitcase trade" and had correlations with activities or promotions in China.

94.    FE-2 also advised that Lauder's brands with the biggest business in China were the higher-priced, more prestige brands, such as Estée Lauder and La Mer.  FE-2 advised speaking with former Demand Planners at Estée Lauder.  FE-2 noted that Lauder held monthly and sometimes weekly demand planning meetings, which were "brutal" with abuse.  FE-2 further noted

34

that there was plenty of information available at these meetings to "triangulate" the correct sources of the sales, including the impact of the *daigou* or gray market sales. Regarding pricing differentials between North America and China, FE-2 explained that Estée Lauder maintained a global database of pricing for every product in every market and region. FE-2 noted that, in China, Estée Lauder's products were sometimes sold up to a substantial premium over North American prices.

95.    FE-2 added that the Company employed pricing teams which worked on analyzing the disparities in pricing, factoring in different markets, demand, exchange rates, and other variables, such as competition. FE-2 further added that "everyone" knew the price differentials based on the pricing database. FE-2 explained that the pricing database was updated fairly regularly, and the tool used for the database was called Anaplan. FE-2 recalled that there was a team of about 5-10 people working on it, and that the head of that team became Chief of Staff for Defendant Travis. FE-2 described how the database was used to track exchange rates and other differentials between brands and regions. The database, FE-2 continued, was used to prepare slide decks and reports which were presented to the company's senior executives, including Defendant Freda, who were briefed on these pricing differentials.

96.    According to FE-3 "everyone" in leadership was aware of the *daigou* market, but it was not formally discussed. FE-3 noted that "everyone was very aware," despite *daigou* not being formally discussed in Europe. According to FE-3, there was a whole team involved in the process led by the current Global President Travel Retail Israel Assa. FE-3 explained that there was a team that was a part of travel retail APAC that specifically analyzed the *daigou* market. According to FE-3, there was a "huge" amount of people on the Commercial Team in Singapore, the head office for APAC, that reported into Global Travel Retail and whose responsibilities

included analyzing the *daigou* market.  Further, FE-3 explained that there was a "team" and a "structure in place" to analyze the *daigou* market, which included the employee who was "heading up Korea" that worked directly with Assa on this issue.

97.    FE-3 continued to say that the movement of product into *daigou* channels was "overseen," "approved," and "activated" by Assa.  FE-3 explained that "everything, absolutely everything" was approved by Assa and that he had influence over the process while occupying his prior role as President, Commercial Estée Lauder Travel Retail Worldwide.  According to FE-3, Assa was also responsible for allocating product to the various regions and that *daigou* was taken into account when making these decisions.  FE-3 explained that these allocation decisions even occurred while global pandemic lockdowns were in place, whereby travel retail shipments all went to China.

98.    FE-2 also explained that Lauder used "pincodes" for certain products to know if those products were going someplace where they were not supposed to be. FE-2 further advised that the more expensive products from Lauder and La Mer products (as examples) would be pincoded in Estée Lauder's systems to trace where they came from and if they ended up in an unusual place.  FE-2 further confirmed that if a product was pincoded, Estée Lauder had the ability to see where the product ended up.  Similarly, FE-1 that all products had tracking codes in order to exercise "market control."

**H.    CDFG Pledge and Government Crackdowns in Hainan Stopped Lauder's Ability to Drive Revenue Through *Daigou***

99.    Lauder's ability to rely on the *daigou* market to drive sales was about to meet an abrupt end.  First, in mid-2021, Lauder's largest customer — CDFG — announced that it would no longer allow any sales into the *daigou* gray market.  Given the importance of CDFG to Lauder's

sales and profitability, CDFG's refusal to continue to engage in *daigou* posed an imminent threat to Lauder's ability to rely on this unsustainable sales channel to drive sales growth.

100.    Specifically, in response to the sentiment that the *daigou* industry in Hainan posed a grave, long-term threat to the health of the island's economy, CDFG, which held an estimated 90% to 99% share of the market in Hainan, issued a public statement signaling its solidarity with the Chinese government's efforts to combat gray market resale:

> In order to enable this engine to exert its strongest momentum and provide tourists with a better shopping experience, **it is necessary to maintain the healthy ecology of the offshore duty free industry, severely cracking down on purchasing agents and preventing market risks. That has become the unshirkable responsibility of market entities.**

CDFG cited numerous enforcement actions undertaken by Hainan customs, including "knocking out 80 pirate buying gangs" between July 1, 2020 and July 1, 2021, underscoring the chaos that the *daigou* industry had brought to Hainan in just one year since the Hainan Duty-Free Policy was expanded.

101.    Analysts at Jefferies covering CDFG noted on August 5, 2021 that the "Hainan government has decided to take a stricter approach" when it came to *daigou* activities. It remarked on CTGDF's — CDFG's parent company — marketing campaigns and traceable QR codes to enforce policies against *daigou* resale. Analysts commented that, "these regulatory actions aim to deter *Daigou* and creates a business environment that respects the rule of law[.]"

102.    A few months later, Hainan publicized impending regulations that echoed the policy positions endorsed earlier in the year by CDFG. On December 7, 2021, the Office of Free Trade Port Working Committee of the Hainan Provincial Committee published a statement on WeChat announcing new regulations. It explained that they were designed to "resolutely crack down on illegal *daigou* and smuggling." The regulations were meant to "have a strong impact on *daigou* — both individuals involved in purchasing ton behalf of other (transferring their tax

exemption quota to a *daigou* company) as well as large-scale *daigou* companies that resell duty free products in violation of regulations."  Hainan set the formal regulation to take effect on January 1, 2022.

103.    By January 1, 2022, Lauder knew that the valve supplying its inflated travel retail sales — *daigou* gray market resale — was tightening and about to close.  On that date, new regulations in Hainan took effect memorializing ongoing efforts to "crackdown" on *daigou* activities in Hainan to preserve the long-term viability of duty-free sales on the island.  Over the course of the next twenty-two months, Defendants continuously misled the public regarding the cause and extent of its travel retail net sales declines, failing to disclose that the Company had become heavily reliant on the *daigou* gray market to generate sales within the travel retail segment and that its net sales would decline as a result of no longer being able to rely on this sales channel to drive sales growth.

### I.    Lauder Misled Investors that Its Asia Travel Retail Business Was Prospering, Despite Knowing Its Pipeline to Gray Market Sales Shut

104.    Having become dependent on *daigou* gray market resale by the time the January 1, 2022 Hainan *daigou* crackdowns took effect, Lauder scrambled to triage the cascading impact of the regulatory crackdowns and the refusal of the Company's biggest customer to engage in *daigou* business.  In doing so, Lauder made a series of public misrepresentations and omissions concerning the extent and cause of declining net sales in its travel retail business segment.

105.    The Class Period begins on February 3, 2022, when Lauder touted the Company's continued sales growth in the Asia travel retail segment.  On that day Lauder also reported its 2Q22 Company financial results, for the period ended December 31, 2021.  Critically, Defendants' statements on this day concerned the Company's financial results for the three-month period preceding the January 1, 2022 enactment of China's regulatory crackdown on *daigou*.  As a result,

Defendants' February 3, 2022 statements captured financial results during a period when Lauder's sales figures were still largely attributable to *daigou*.

106.    Notwithstanding, Defendants falsely and misleadingly attributed the reported sales growth within the travel retail segment to sustainable, market-driven factors, such as the "continued strength" of Lauder's brand, while failing to disclose that the Company's travel retail growth was the product of unsustainable gray market resale through the *daigou*.  For example, on Lauder's 2Q22 Earnings Call, Defendant Freda boasted that "*[n]et sales increased in our travel retail business . . . reflecting continued strength of our brands with the Chinese consumer*" and touted that the Company "*continue[s] to prosper in the east with Chinese consumers as well as in global travel retail*."  Defendants' statements misleadingly concealed from investors the fact that Lauder achieved this growth in travel retail by feeding the *daigou* gray market, rather than sustainable factors such as "*continued strength of [its] brands*."

107.    As the Class Period progressed, Defendants continued to make false and misleading statements about sales growth within its travel retail segment and Hainan, despite knowing that the Company had lost the ability to boost sales through *daigou*.  For example, on May 3, 2022, during Lauder's 3Q22 Earnings Call, Defendants continued to represent to the public that the Company's "*confidence into Hainan['s] future is unchanged[,] actually increased*."  This statement was false and misleading because it represented an "*unchanged*" landscape in Hainan despite the loss of *daigou* sales having materially altered Lauder's ability to maintain its travel retail sales through traditional retail exchanges.

108.    As travel retail sales diminished, Defendants also misled investors through statements attributing Lauder's prior sales growth in travel retail on Hainan Island to customers engaging in above-board travel retail purchases.  For example, on June 2, 2022, Defendant Freda

spoke at the Bernstein Strategic Decisions Conference, where he credited Lauder's "***incredible results in travel retail*** during the COVID Western lockdowns" to the fact that "***Hainan was more than substituting the amount of travelers in airports around the world***." During the conference, Defendant Freda fielded questions about China's current 2022 lockdowns, which he compared to past lockdowns "in the US, in Europe during 2020." In doing so, Defendant Freda attributed Lauder's previous "incredible results in travel retail **during the COVID Western lockdowns**" in 2020 to Hainan supplanting airport travelers globally at that time. However, this statement, was materially false and misleading because *daigou* gray market resale was the true source of Lauder's travel retail growth in Hainan at that time in 2020, which did not equate to "travelers in airports" at all. Rather, Lauder's prior, formidable travel retail sales figures was attributable to the corporate *daigou* industry and its gray market reselling. Lauder capped off its fourth quarter with similar sentiments lauding the success of Hainan while shielding the public from the severe impact that the closed pipeline to the *daigou* gray market had on Company sales. On August 18, 2022, during Lauder's 4Q22 Earnings Call, Defendant Freda stated that "***the power of Hainan in the future remain[s] intact***." Defendant Freda's statement again gave the public the false impression of a fruitful and unchanged market in Hainan. However, Lauder could not stem the tide of the *daigou* regulatory crackdowns forever.

109. Analysts absorbing Lauder's August 18, 2022 messaging accepted Lauder's statements of continued success in Asia travel retail in formulating their market guidance. For example, on August 18, 2022, analysts at Bernstein stated, "we continue to believe that China is likely to be the primary driver of the premium beauty category over the medium-term."

**J.      The Truth Emerges and Lauder's Stock Declines as It Incrementally Reports Poor Financials and Offers False and Misleading Reassurances to Investors**

110.    The truth began to emerge, through a series of partial disclosures in late 2022 and 2023.  As Lauder's ability to use *daigou* gray market resellers to generate sales evaporated, its inventory piled up and forced the Company to repeatedly lower its revenue forecasts.  Throughout the Class Period, Lauder represented to investors that a host of other issues were driving its declining sales: episodic lockdowns due to COVID-19 variant surges, supply chain issues, retailers tightening inventory, and inflation, among others.  Lauder's disclosure of those issues misleadingly concealed the actual root cause of its travel retail sales declines — its inability to rely on the *daigou* gray market to prop up sales.

111.    Eventually, the house of cards began to topple as Lauder was forced to begin revealing declining sales in its travel retail business and the negative impact it was having on the Company's financial outlook.  Specifically, on November 2, 2022, Lauder issued a press release announcing financial results for its first quarter of 2022.  In the press release, Lauder reduced full year outlook for 2023, which it claimed was reduced "primarily to reflect tighter inventory management in Asia travel retail, given reduced traffic as a result of COVID-19 restrictions."  The market reacted accordingly, and **Lauder's stock price dropped over 8%**, a reduction of $16.80 per share, bringing the share price down to $189.96 at closing.

112.    Importantly, with respect to the revelation about "tighter inventory management," analysts began to wonder why Lauder was feeling the effects of the cited market conditions more than its competitors.  For example, on November 2, 2022, Evercore ISI noted that "Covid restrictions in China have triggered significant retailer destocking — **much greater than what L'Oréal indicated**" — even posing the questions: "Why Hainan destocking will carry into 2Q, given that sell- through was up + 9% this 1Q, as per L'Oréal?"  Unbeknownst to investors,

41

Lauder's self-created overdependence on *daigou* drove its "inventory management" issues because the Company could no longer funnel inventory into the *daigou* gray market for illicit, cheap resale.

113.    On November 2, 2022, notwithstanding its disclosure, Lauder offered reassurance to investors that it "***anticipate[d] sequential acceleration . . . as these pressures begin to abate***." Further, Lauder remarked on the COVID-19 restrictions in Asia travel retail and Hainan in particular as a "***near-term temporary pause***" that "***does not diminish our deep conviction in Hainan for the long term***."  Lauder's encouragement, however, was false and misleading because Lauder's inability to tap into *daigou* gray market resale after China's 2022 regulatory crackdowns took effect was more than a mere "***temporary pause***" — it was a permanent loss of a major source of sales in the travel retail segment.  Having made Lauder overdependent on a stream of revenue that was now restricted by the Chinese government and Lauder's largest retailer alike, the Company knew that even if the misleadingly disclosed "***pressures***" were to "***abate***," they would not resolve Lauder's inability to effect sales through the *daigou* gray market.

114.    Contrary to Defendants reassurances, Lauder's stock price continued to drop as Defendants revealed new information about the continued decline in travel retail sales caused by the Company's over reliance on *daigou* to drive sales.  For example, on February 2, 2023, Lauder again lowered its outlook for fiscal 2023, due to the "disruption to travel and staffing levels in Hainan that slowed the expected normalization of inventory and the recently announced potential roll-back of COVID-related supportive measures in Korea duty free."  As a result, shares of **Lauder's common stock declined 4.41%**, a reduction of $12.39 per share, bringing the share price down to $268.41 on February 2, 2023.

115.    Nonetheless, on February 2, 2023, Lauder continued to misrepresent the Company's business position and reassure investors on its 2Q23 Earnings Call, noting that

"inventory levels are still coming down in Hainan," and that the Company was "**sitting on a decent amount of inventory . . . to supply the sales that we expect to see in the fourth quarter**." Defendants' statements were materially false and misleading because Lauder's rosy picture of inventory ready to be sold concealed and omitted the fact that Lauder's Asia travel retail sales were dependent on a now non-existent gray market that could no longer pad sales.

116.    Lauder's disclosures and reassurances surrounding inventory levels misled investors as to the reason for inventory problems in the first place, which was that Lauder could no longer funnel its products into corporate *daigou* for gray market resale.  As a result of Lauder's false and misleading statements, Analysts believed Defendants' reassurances.  In fact, Barclays Research reported the next day that "we came away from the quarter feeling more comfortable on the visibility of Estee Lauder's recovery in China and China Travel Retail (~34% of total company sales) particularly as in mainland China the company is outpacing the market and shipments were in-line with consumption."

117.    On May 3, 2023, the Company's poor financial results continued to slide beyond expectations as Lauder issued a press release announcing financial results for its 3Q23 ended March 31, 2023.  On that date, the Company announced yet another reduction of fiscal year 2023 guidance because of the slow recovery in Asia travel retail markets. As a result of these revelations, **Lauder's common stock declined over 17%**, a reduction of $42.52 per share, bringing the share price down to $202.70 on May 3, 2023.

118.    Despite this disclosure (and the resulting stock drop) Defendants nonetheless continued to reassure investors that sales would rebound despite knowing the opposite to be true given that it could no longer rely on *daigou* to boost sales.  For instance, Defendant Freda misleadingly claimed during Lauder's May 3, 2023 earnings call that "[e]ncouragingly, retail sales

performance is significantly ahead of organic sales results in Global travel retail, ***which gives us confidence that the challenges in travel retail are abated with time***."

119.    Such statements continued to be false and misleading because the Chinese government's 2022 *daigou* crackdown, which had gutted Lauder's travel retail sales, would not be "abated with time."  Lauder's May 3, 2023 misstatement severely misled the public as to the cause and extent of its net sales declines, which, unbeknownst to investors, stemmed from Lauder's inability to pump products through the gray market resale pipeline in China following the implementation of government and retailer crackdowns on *daigou*.

120.    At this point, Lauder's false and misleading narrative concerning its net sales decline in travel retail was becoming increasingly unbelievable.  For example, analysts at Deutsche Bank expressed concern about the Company's lowering of guidance for the third consecutive time stating, "[w]hile we appreciate the complexity of current challenges in EL's travel retail (TR) business, the sheer magnitude of the reduced outlook and associated operating deleverage raises questions related to EL's capabilities vis-à-vis demand forecasting, visibility, and supply-chain agility in its most profitable geography and channel."

121.    Nevertheless, analysts were again encouraged by Defendants' reassurances, even believing that the problems in China were only short-term.  For example, on May 3, 2023, Piper Sandler Research reported that "[w]e continue to see opportunity for good eventual tailwinds from China and Travel Retail" and that "there's still a lot to like for EL beyond the near term bumpiness, and we suggest investors be patient here and take advantage of today's weakness."  That same day Jefferies Research reported that "EL has been able to reclaim market share via promotions, and expects share gains to continue in Q4," and that "[r]ecovery in these markets is a good indicator of Hainan and Korea future performance."

**K.    Lauder Admitted that *Daigou* Was the Primary Driver of Lauder's Net Sales Decline in Travel Retail**

122.    On August 18, 2023, prior to market close, Lauder released financial results for its fourth fiscal quarter of 2023 and fiscal year ended June 30, 2023.  Specifically, these results included a substantial decrease in sales stemming largely from the travel retail markets in China and South Korea. During the earnings call, Defendant Freda admitted that its travel retail "**sales trends deteriorated and turned steeply negative from the enforcement actions to control daigou activity**."  As a result of these revelations, **Lauder's common stock declined over 3.3%**, a reduction of $5.37 per share, bringing the share price down to $156.69 on August 18, 2023. Lauder's stock continued to fall on the next trading day, August 21, 2023, as this news was amplified when it declined **an additional 3.7%**.  Together, both drops on August 18 and 21 reflected a **total decline of 6.89%**.

123.    However, Lauder brazenly continued to mislead investors concerning the extent of the Company's reliance on *daigou* as the primary cause of its declining sales.  Instead, Lauder reassured investors that any negative effects from *daigou*-related problems were merely "***short term headwinds***" and represented that it had represented that it had "***no concerns whatsoever about travel retail growing with traveling consumers***."

124.    As a result of Lauder's false assurances and downplaying of *daigou* issues, analysts were convinced by Defendants' statements that *daigou* was *not* something to worry about.  For example, while Piper Sandler Research reported on August 18, 2023 that "[d]aigou restrictions are having a negative impact on Travel Retail traffic, with a 'meaningful contraction' in Hainan in May and June," the report further stated that "management is pulling back shipments in FQ1 to rightsize retailer inventory levels," and thus "**[w]e foresee this as a more transitory challenge, however, with overall demand in mainland China looking encouraging**."

125.    The full truth about Lauder's issues was revealed on November 1, 2023, when the Company disclosed that Lauder's decline in net sales, "primarily reflect a decline in our Asia travel retail business, **primarily due to our and our retailers' actions to reset retailer inventory levels, and changes in government and retailer policies related to unstructured market activity**, that led to lower product shipments compared to the prior-year period." This disclosure revealed to investors that the declining net sales that Lauder had been attributing for over a year to other causes was "**primarily**" due to and reflective of government and retailer crackdowns on "**unstructured market activity**" meaning the *daigou* gray market. Lauder's identification of a primary cause for its net sales decline revealed that Lauder had used litany of parallel problems to conceal the root cause of declining travel retail sales from investors during the Class Period. On this news, the price of **Lauder common stock declined nearly 19%**, a reduction of $24.36 per share, to close at $104.51 on November 1, 2023.

126.    The Daily Telegraph soon published an article describing the manner in which "Estée Lauder shares have **plunged to a six year low**" after "[t]he company blamed 'changes in government and retailer policies related to unstructured market activity.' **This is thought to relate to Beijing's clamp down on daigou resellers**[.]" Notwithstanding the fact that the practice had been shut down, analysts expressed concern about reputational harm to Lauder and revealed signs of being misled by the Company during the Class Period. Specifically, Barclays Research, on November 2, 2023, even raised concern that Lauder's reputation was harmed as a result of these *daigou* problems: "we wonder to what degree Estée Lauder's brand equities are already impaired as consumers have become accustomed to buying on discount . . . not to mention the amount of pantry inventory consumers already have at home."

L.    **Post-Class Period Events**

127.    In February 2024, Lauder announced company layoffs affecting over 3,000 of its 62,000 employees.  The job cuts are part of lauder's multi-year plan to rebuild profit margins in 2025 and 2026, according to the Company.  With respect to the layoffs, Defendant Travis said, "we are focused on strategically leveraging our strengths to accelerate our return to a more sustainable profitable growth while elevating our consumer activations and increasing our operating agility."  The layoffs amount to "an expected net reduction in positions globally of 3% to 5%" and are designed to "right-size and streamline select areas within" the Company.

V.    **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[15]**

128.    As alleged above, after years of impressive growth in its travel retail business, during the Class Period Lauder was experiencing a decline in its net sales because Lauder was over-reliant on gray market sales generated by *daigou* activity.  Rather than admit the truth about Lauder's declining growth brought on by inability to continue to rely on gray market sales, , throughout the Class Period, Defendants made a series of misrepresentations concerning the true source of its Travel Retail revenues as well as the extent and cause of net sales declines in its Asia travel retail business.

129.    As alleged herein, such statements artificially inflated or artificially maintained the price of Lauder common stock and operated as a fraud or deceit on all persons and entities that purchased or otherwise acquired those securities during the Class Period.  Because Defendants

---

[15] Lead Plaintiff alleges that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  As alleged herein, such statements artificially inflated or maintained the price of Lauder's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

chose to speak on the issues described below, and thereby put these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts and information regarding these issues. As described below. Defendants created an impression of a state of affairs at Lauder that differed in a material way from the one that actually existed. To the extent any of Defendants' statements were opinions, they were false and misleading because they lacked a reasonable basis as Defendants knew that its travel retail growth occurred because it supplied *daigou* with product for gray market sales and that subsequent regulations cracking down on *daigou* activity impacted Lauder's net sales in its travel retail business.

A.        **February 3, 2022 – Second Quarter 2022 Financial Results**

130.    The Class Period begins on February 3, 2022. On that day, Lauder filed its quarterly 10-Q, containing Lauder's financial results for the 2Q22, for the period ended December 31, 2021 (the "2Q22 Financial Results"), which was signed by Defendant Travis. Defendants stated in the 2Q22 Financial Results that:

> ***Net sales increased in our travel retail business in both periods, reflecting continued strength of our brands with the Chinese consumer***, the easing of travel restrictions, which drove increased traffic levels compared to the prior-year periods, and continued success of hero product franchises from La Mer, Origins, Clinique, Jo Malone London and Tom Ford Beauty.

131.    Defendants' February 3, 2022 statement in its 2Q22 Financial Results was materially false and misleading because Defendants failed to disclose that the reported travel retail net sales increase was generated through *daigou* gray market resale. Critically, Defendants' February 3, 2022 statement in its 2Q22 Financial Results spoke to net sales increases achieved during Lauder's 2Q22, which captured sales figures from the period of October 1, 2021 through December 31, 2021. During those months (and as was the case for many quarters before that), Lauder's travel retail sales increased because of the Company's heavy reliance on the *daigou* gray

market.  Lauder concealed its reliance on *daigou* to achieve high-volume gray market sales from investors.

132.    Moreover, the above statements in Lauder's 2Q22 Financial Results attributed the Company's net sales growth to sustainable factors like the strength of Lauder's brand, which was false and misleading because the Company's net sales growth in travel retail was primarily driven by illicit *daigou* activity.  Through this false and misleading growth attribution, Defendants also concealed from investors that it was overdependent on *daigou*, an unsustainable sales practice.  Put simply, Defendants' statements were false and misleading with respect to the primary driver of Lauder's net sales increases.  The primary driver was not the "***continued strength of our brands with the Chinese consumer***" but, in fact, unsustainable and undisclosed *daigou* sales.

133.    Indeed, as detailed above, multiple FEs confirmed that Lauder over relied on *daigou* to achieve staggering sales growth in its travel retail business.  For example, FE-1 explained that companies could control the *daigou* market by limiting the supply of goods provided to duty-free locations, but preferred to sell more product, which came at the risk of "flooding the market." Similarly, FE-3 further explained that the movement of product into *daigou* channels was "activated" through retailers, such as *China Duty Free Group* and that Estée Lauder utilized "incentives" in order to facilitate that movement.  FE-3 recalled products moving into these channels both through physical sales on the shop floor and via internet purchases.  According to FE-1, practices during this period "overflooded" the market.  FE-1 recalled that large purchases made during the pandemic, from 2020 through her tenure at Estée Lauder, were "almost definitely" made by *daigou*.  FE-1 remembered that the biggest issue during her tenure was "high" stock holdings of retailers in Hainan, China.  FE-1 noted that this period was "very challenging for the business."

134.    Additionally, FE-1 described Lauder as being "much looser" when it came to "loading" retailers with stock in comparison to its competitors, such as L'Oréal. FE-1 explained that Estée Lauder "took a lot of market share" during the pandemic and that this was "very telling" because *daigou* were the only people buying product at that time. FE-1 commented that while Estée Lauder's increased market share was "nice on paper," Lauder's gains in its market share came from *daigou* business. FE-1 continued to say that Estée Lauder is now seeing the "repercussions" from their reliance on *daigou* during this period. FE-1 described the data surrounding Estée Lauder's jump in market share as "very jarring."

135.    FE-2 remarked that it was hard to reconcile the growth of travel retail in China with the lockdowns and lack of travel, stating that it did not make sense and that the growth was "counterintuitive." FE-2 explained that "things didn't make sense" and that she could not "square" certain things that she observed.

136.    FE-2 elaborated that there was too much pressure on sales growth, and that she could not understand why some people at the company – who did not appear to be nice or good at their jobs – were able to survive and keep their positions at Lauder, for example in the supply chain. FE-2 figured that those people who did survive at Lauder must be "up to something," like using the gray market of *daigou* resellers, to enable the practice.

137.    FE-3 stated that, that if there were issues with overstocks that Estée Lauder would "bulk ship" to places like Korea, where it was known that a *daigou* market existed, to cover losses. According to FE-3, the Company would "switch on the *daigou* market if needed," including sending "popular" products into these channels. FE-3 explained that products were "held back" so that they could be sent into areas with an extensive *daigou* market during "crunch time" of the fiscal year. Further, FE-3 recalled promotions also being utilized to send product into these

channels.  Further, FE-3 recalled that there was an emphasis on sending stock to APAC, which left other regions short of product, despite having retailers asking and ready to sell product while APAC was still experiencing lockdowns.  FE-3 added that "popular" product was frequently held back from Europe in order to send to APAC.

138.    Similarly, FE-1 described instances where it was important that Lauder move products with upcoming expiration dates "out of warehouses and into the channels."  In such instances, FE-1 stated that Lauder "pushed products as fast as they can."

139.    Additionally, as detailed above, numerous FEs confirmed that Defendants knew the manner in which *daigou* affected Lauder's sales growth.  For example, FE-2 confirmed that Lauder's executive leadership knew about the *daigou* reselling practice.  FE-2 confirmed that the Company and its leadership could see sales spikes which were attributed to *daigou* practices.  FE-2 confirmed that Lauder had "clear visibility" in its sales because the Company had very detailed sell-through and sales reporting information from its retail partners.  FE-2 described that Lauder monitored this data on a weekly and monthly basis and held monthly estimate meetings with senior chief financial officers for various regions, during which sales data was reviewed in detail by the retailer, brand, and key product lines.

140.    FE-2 elaborated that that you could see sales spikes in key stores and/or key items that were out of sync with historic norms and it would make you question the sales spikes at certain stores, regions based on which items had spikes.  FE-2 went on to say that it would then become clear that they were for *daigou* or "suitcase trade" and had correlations with activities or promotions in China.  FE-2 also advised that Lauder's brands with the biggest business in China were the higher-priced, more prestige brands, such as Estée Lauder and La Mer.

141.    Similarly, according to FE-3, there was a whole team involved in the process led by the current Global President Travel Retail Israel Assa.  FE-3 explained that there was a team that was a part of travel retail APAC that specifically analyzed the *daigou* market.  According to FE-3, there was a "huge" amount of people on the Commercial Team in Singapore, the head office for APAC, that reported into Global Travel Retail and whose responsibilities included analyzing the *daigou* market.  Further, FE-3 explained that there was a "team" and a "structure in place" to analyze the *daigou* market, which included the employee who was "heading up Korea" that worked directly with Assa on this issue.

142.    FE-3 continued to say that the movement of product into *daigou* channels was "overseen," "approved," and "activated" by Assa.  FE-3 explained that "everything, absolutely everything" was approved by Assa and that he had influence over the process while occupying his prior role as President, Commercial Estée Lauder Travel Retail Worldwide.  According to FE-3, Assa was also responsible for allocating product to the various regions and that *daigou* was taken into account when making these decisions.  FE-3 explained that these allocation decisions even occurred while global pandemic lockdowns were in place, whereby travel retail shipments all went to China.

**B.**    **February 3, 2022 – Second Quarter 2022 Earnings Press Release**

143.    Also on February 3, 2022, Lauder filed its current report on Form 8-K with the SEC for the 2Q22, for the period ended December 31, 2021 (the "2Q22 Earnings Press Release"), which was signed by Defendant Travis.  The 2Q22 Earnings Press Release stated that:

> ***Global travel retail sales increased double digits, reflecting continued growth from Asia/Pacific, despite ongoing travel restrictions there during much of the second quarter of fiscal 2022.***  Net sales also grew from Europe, the Middle East & Africa and The Americas as the partial lifting of travel restrictions, specifically in the United Kingdom and the United States, increased traffic and supported the reopening of doors.

144.    Defendants' above February 3, 2022 statement was materially false and misleading for the same reasons set forth in paragraphs 131-142 and alleged in Section IV.G, *supra*. Specifically, Defendants' statement above in its 2Q22 Earnings Press Release was materially false and misleading because Defendants attributed 2Q22 travel retail sales increases to "continued growth from Asia/Pacific" when sales growth in Lauder's travel retail business were primarily driven by *daigou* gray market resale in China, an unsustainable practice that Defendants previously denied being involved in.

### C.    May 3, 2022 – Third Quarter 2022 Earnings Call

145.    On May 3, 2022, Defendants held an earnings conference call discussing Lauder's financial results for 3Q22, for the period ended March 31, 2022 (the "3Q22 Earnings Call").  In response to an analyst question regarding China, Defendant Freda stated:

> But also, we have seen historically, that also the bounce-back can be a very strong, because when this restriction finish, people travel domestically very fast and very happily.   And **so the confidence into Hainan future is unchanged actually increased given the incredible development of the place** and the confidence in online is very strong

146.    Defendants' above May 3, 2022 statement was materially false and misleading because Defendants projected "confidence" into an "unchanged" future in Hainan, despite knowing that the January 1, 2022 Chinese government and earlier retailer crackdowns on *daigou* activity significantly altered Lauder's ability to continue depending on gray market resale to drive its travel retail growth.  Because the Company had become heavily dependent on the *daigou* gray market to generate sales growth within the travel retail segment, Lauder's statements omitted material information that the Company's net sales would decline as a result of no longer being able to rely on this illegitimate *daigou* sales to drive sales growth following China's 2022 *daigou* crackdowns.  Moreover, Defendants' statement on the 3Q22 Earnings Call is materially false and misleading because it attributed "increased" confidence in an "unchanged" future to "incredible

development of the place [Hainan]," despite knowing that Lauder's sales in Hainan were primarily driven by *daigou* gray market resale, an unsustainable sales practice.

147.    Numerous FEs confirmed the manner in which the regulations in Hainan created a massive opportunity for Lauder to increase its market share and net sales figures through travel retail.  FE-2 described travel retail as an area of Lauder's biggest growth, going "way back."  FE-2 further explained that travel retail was one of Estée Lauder's "largest growth pillars" and part of its "key strategic initiatives."  FE-3 explained that China and particularly Hainan were "huge markets."  FE-1 recalled that there was a shift from South Korea to China in the Travel Retail space during 2020 when the new regulations increased purchasing limits in Hainan.

148.    FE-2 indicated that there was a huge amount of pressure every quarter to deliver sales results, and that sometimes that pressure, and the demands management made on its staff, were unreasonable and uncomfortable.  FE-2 reiterated that there was "huge pressure" to improve Lauder's top line through sales growth, which happened "very often," as Estée Lauder was positioned as a growth company.  Additionally, FE-2 recalled that Lauder sometimes asked its brand teams to do what it could to including moving launches to be first to market, change promotional calendars or accelerate new distribution.

149.    FE-1 continued to say that companies could control the *daigou* market by limiting the supply of goods provided to duty-free locations, but preferred to sell more product, which came at the risk of "flooding the market."  Similarly, FE-3 further explained that the movement of product into *daigou* channels was "activated" through retailers, such as China Duty Free Group and that Estée Lauder utilized "incentives" in order to facilitate that movement.  FE-3 recalled products moving into these channels both through physical sales on the shop floor and via internet purchases.  According to FE-1, practices during this period "overflooded" the market.  FE-1

recalled that large purchases made during the pandemic, from 2020 through her tenure at Estée Lauder, were "almost definitely" made by *daigou*. FE-1 remembered that the biggest issue during her tenure was "high" stock holdings of retailers in Hainan, China. FE-1 noted that this period was "very challenging for the business."

150.    Additionally, FE-1 described Lauder as being "much looser" when it came to "loading" retailers with stock in comparison to its competitors, such as L'Oréal. FE-1 explained that Estée Lauder "took a lot of market share" during the pandemic and that this was "very telling" because *daigou* were the only people buying product at that time. FE-1 commented that while Estée Lauder's increased market share was "nice on paper," Lauder's gains in its market share came from *daigou* business. FE-1 continued to say that Estée Lauder is now seeing the "repercussions" from their reliance on *daigou* during this period. FE-1 described the data surrounding Estée Lauder's jump in market share as "very jarring."

151.    FE-2 remarked that it was hard to reconcile the growth of travel retail in China with the lockdowns and lack of travel, stating that it did not make sense and that the growth was "counterintuitive." FE-2 explained that "things didn't make sense" and that she could not "square" certain things that she observed.

152.    FE-2 elaborated that there was too much pressure on sales growth, and that she could not understand why some people at the company – who did not appear to be nice or good at their jobs – were able to survive and keep their positions at Lauder, for example in the supply chain. FE-2 figured that those people who did survive at Lauder must be "up to something," like using the gray market of *daigou* resellers, to enable the practice.

153.    FE-3 stated that, that if there were issues with overstocks that Estée Lauder would "bulk ship" to places like Korea, where it was known that a *daigou* market existed, to cover losses.

According to FE-3, the Company would "switch on the *daigou* market if needed," including sending "popular" products into these channels. FE-3 explained that products were "held back" so that they could be sent into areas with an extensive *daigou* market during "crunch time" of the fiscal year. Further, FE-3 recalled promotions also being utilized to send product into these channels. Further, FE-3 recalled that there was an emphasis on sending stock to APAC, which left other regions short of product, despite having retailers asking and ready to sell product while APAC was still experiencing lockdowns. FE-3 added that "popular" product was frequently held back from Europe in order to send to APAC.

154.    Similarly, FE-1 described instances where it was important that Lauder move products with upcoming expiration dates "out of warehouses and into the channels." In such instances, FE-1 stated that Lauder "pushed products as fast as they can."

155.    Additionally, as detailed above, numerous FEs confirmed that Defendants knew the manner in which *daigou* affected Lauder's sales growth. For example, FE-2 confirmed that Lauder's executive leadership knew about the *daigou* reselling practice. FE-2 confirmed that the Company and its leadership could see sales spikes which were attributed to *daigou* practices. FE-2 confirmed that Lauder had "clear visibility" in its sales because the Company had very detailed sell-through and sales reporting information from its retail partners. FE-2 described that Lauder monitored this data on a weekly and monthly basis and held monthly estimate meetings with senior chief financial officers for various regions, during which sales data was reviewed in detail by the retailer, brand, and key product lines.

156.    FE-2 elaborated that that you could see sales spikes in key stores and/or key items that were out of sync with historic norms and it would make you question the sales spikes at certain stores, regions based on which items had spikes. FE-2 went on to say that it would then become

clear that they were for *daigou* or "suitcase trade" and had correlations with activities or promotions in China.  FE-2 also advised that Lauder's brands with the biggest business in China were the higher-priced, more prestige brands, such as Estée Lauder and La Mer.

157.    Similarly, According to FE-3, there was a whole team involved in the process led by the current Global President Travel Retail Israel Assa.  FE-3 explained that there was a team that was a part of travel retail APAC that specifically analyzed the *daigou* market.  According to FE-3, there was a "huge" amount of people on the Commercial Team in Singapore, the head office for APAC, that reported into Global Travel Retail and whose responsibilities included analyzing the *daigou* market.  Further, FE-3 explained that there was a "team" and a "structure in place" to analyze the *daigou* market, which included the employee who was "heading up Korea" that worked directly with Assa on this issue.

158.    FE-3 continued to say that the movement of product into *daigou* channels was "overseen," "approved," and "activated" by Assa.  FE-3 explained that "everything, absolutely everything" was approved by Assa and that he had influence over the process while occupying his prior role as President, Commercial Estée Lauder Travel Retail Worldwide.  According to FE-3, Assa was also responsible for allocating product to the various regions and that *daigou* was taken into account when making these decisions.  FE-3 explained that these allocation decisions even occurred while global pandemic lockdowns were in place, whereby travel retail shipments all went to China.

D.        **June 2, 2022 – Bernstein Strategic Decisions Conference**

159.    On June 2, 2022, Defendant Freda spoke at the Bernstein Strategic Decisions conference, where he stated:

> Then I believe that one of the most important opportunities globally in beauty is the development of the Hainan duty-free space, which we believe is just the beginning of the journey.

. . .

> And that's explained – by the way, ***the incredible results in travel retail*** during the COVID Western lockdowns [were] ***because Hainan was more than substituting the amount of travelers in airports around the world*** just because it was domestic travel duty-free in China. So huge opportunity, this will continue.

160.    Defendant Freda's above June 2, 2022 statement was materially false and misleading for the same reasons set forth in paragraphs 131-142 and 146-158 and alleged in Section IV.G, *supra*.  Additionally, during this conference, an analyst asked Defendant Freda questions about whether intermittent lockdowns affecting China in 2022 would impact the Company's participation in upcoming promotional events.  As described above, Defendant Freda's response touted Lauder's "incredible results in travel retail **during the COVID Western lockdowns**."

161.    However, earlier in the conference, Defendant Freda specified what he referred to as "COVID Western lockdowns" by referencing travel restrictions "in the US, in Europe **during 2020** when there were COVID lockdowns also."  Accordingly, Defendant Freda's statement which touted Lauder's "incredible results in travel retail **during the COVID Western lockdowns**" referred to travel retail sales during 2020 and was false and misleading because, at that time in 2020 Lauder's sales were attributable to *daigou* gray market sales and not legitimate foot traffic in Hainan.  Therefore, Defendant Freda's statement was materially false and misleading because it attributed Lauder's "incredible results in travel retail" to "Hainan more than substituting the amount of travelers in airports around the world," when in fact, Lauder's travel retail growth generated through Hainan was not because of travelers in airports.

**E.        August 18, 2022 – Fourth Quarter 2022 Earnings Call**

162.    On August 18, 2022, Defendants held an earnings conference call to discuss Lauder's financial results for 4Q22, for the period ended June 30, 2022 (the "4Q22 Press Release").

When asked by an analyst about Lauder's underlying market share performance in China as supply returns to normal, Defendant Freda responded:

> [W]e do expect for the full year, China to go back growing double digit. We expect strong recovery in Hainan in the second part, in the second semester of the fiscal year, for sure, a gradual recovery before. That's our assumption, which obviously is going to give us also results in market share.
>
> . . .
>
> We believe the Hainan -- despite the current lockdown, which is obviously painful in the short term, but is a super strong opportunity for the long term*, the power of Hainan in the future remain[s] intact, and we have strong presence and market share in this operation*.

163.    Defendant Freda's above June 2, 2022 statement on Lauder's 4Q22 Earnings Call was materially false and misleading for the same reasons set forth in paragraphs 146-158 and alleged in Section IV.G, *supra*.  Additionally, Defendant Freda's remarks on the 4Q22 Earnings call failed to disclose the fact that the Company had previously been relying on *daigou* sales to boost sales but had subsequently lost that ability in describing its "strong presence" and "market share" in Hainan.  Lauder's market share grew in Hainan as a result of its dependence on *daigou* gray market resale and was therefore premised on factors the Company knew were not sustainable.

**F.     November 2, 2022 – First Quarter 2023 Earnings Press Release & First Partial Corrective Disclosure/Materialization of the Risk**

164.    On November 2, 2022, Lauder filed its 1Q23 8-K for the period ended September 30, 2022 (the "1Q23 Earnings Press Release"), which was signed by Defendant Travis.  In the 1Q23 Earnings Press Release, Lauder reduced its fiscal year outlook for 2023:

> For fiscal 2023, we are lowering our outlook primarily to reflect tighter inventory management in Asia travel retail, given reduced traffic as a result of COVID-19 restrictions, tightening of inventory by some retailers in the United States, and a greater negative impact from the far-stronger U.S. dollar. *We anticipate sequential acceleration to strong organic sales and adjusted EPS growth in the second half of our fiscal year as these pressures begin to abate*, momentum continues to build

in other areas of our business, and our ongoing investments in innovation and advertising drive growth. Our optimism in the long-term growth opportunities for our brands and for prestige beauty remains intact. Reflecting our confidence, today we raised our quarterly dividend.

165.    Defendants delivered this statement in connection with their first partial corrective disclosure, *see* Section VI.A, *infra*, when the Company lowered its financial outlook "primarily to reflect tighter inventory management in Asia travel retail." However, Defendants made false and misleading statements which misled investors regarding the temporary nature of the poor results. Defendant Freda's above November 2, 2022 statement in its 1Q23 Earnings Press Release was materially false and misleading for the same reasons set forth in paragraphs 146-158 and alleged in Section IV.G, *supra*. Additionally, Defendant Freda's statements of reassurances were materially false and misleading insofar as Lauder knew that the Company's ability to rely on *daigou* to prop up sales in the Travel Retail segment would not "abate" and would, in fact, continue to impact the Company's sales. Moreover, Lauder's references to "strong organic sales" were belied by the fact that the Company had been—for many years—relying on *daigou* gray market resale, an unsustainable sales practice that was now formally outlawed by the Chinese government.

### G.    February 2, 2023 – Second Quarter 2023 Earnings Call & Second Partial Corrective Disclosure/Materialization of the Risk

166.    On February 2, 2023, Defendants held an earnings conference call to discuss Lauder's financial results for its second fiscal quarter of 2023 ended December 31, 2022 (the "2Q23 Earnings Call"). On the 2Q23 Earnings Call, Defendant Travis was asked about Lauder's supply chain management, specifically as it relates to China. Defendant Travis stated:

> We do expect that – we will – two things, one is ***inventory levels are still coming down in Hainan***. They are almost at the level that we would expect sales to accelerate. ***So yes, we should start to see an inventory build related to the shipments that we expect to see in Q4.***
>
> In Korea, again, the pace is a little bit more uncertain given the transitory nature of what's going on right now. So we do anticipate, as I mentioned in the prepared

remarks, that we will start to see resumption of travel in Korea. And depending on the pace of that resumption, that will depend on the amount of shipments that we have in the quarter. But we have taken obviously an assumption there. ***We are sitting on a decent amount of inventory even in our own warehouses to supply the sales that we expect to see in the fourth quarter***.

167.    Defendants delivered this statement in connection with their second partial corrective disclosure, *see* Section VI.B, *infra*, when the Company again lowered its outlook for fiscal 2023, citing inventory problems and problems in its travel retail markets. However, Defendants offered reassurances to investors through their false and misleading statements. Defendant Travis's above February 2, 2023 statement in Defendants' 2Q23 Earnings Press Release was materially false and misleading for the same reasons set forth in paragraphs 146-158 and alleged in Section IV.G, *supra*.

### H.    May 3, 2023 – Third Quarter 2023 Earnings Call & Third Partial Corrective Disclosure/Materialization of the Risk

168.    Defendants' fraud was further revealed on May 3, 2023, when Defendants held an earnings conference call to discuss Lauder's financial results for 3Q23, for the period ended March 31, 2023 (the "3Q23 Earnings Call"). On that date, the Company announced a further reduction of fiscal year 2023 guidance because of the slow recovery in Asia travel retail markets.

169.    However, Defendants continued to mislead investors regarding the Company's business prospects. For instance, Defendant Freda claimed during the 3Q23 Earnings Call that:

Our retail sales growth was even stronger than organic sales growth in many markets around the world, including China and the US. ***Encouragingly, retail sales performance is significantly ahead of organic sales results in Global travel retail, which gives us confidence that the challenges in travel retail are abated with time***.

On the same call, Defendant Travis stated:

I think the thing that gives us more comfort now on a more continuous steady progression of recovery is the fact that the COVID restrictions have been lifted. And so ***what we were experiencing before with our travel retail business is the volatility related to just some of the COVID restrictions and the flow of traffic in***

*travel and people's comfort with travel, so that gives us more comfort that we're going to see a recovery*.

170.     Defendants delivered these statements in connection with its third partial corrective disclosure, *see* Section VI.C, *infra*, when the Company announced a further reduction of fiscal year 2023 guidance because of the slow recovery in Asia travel retail markets.   However, Defendant Freda again reassured investors that the decline in sales would be "abated with time" and Defendant Travis reassured investors that Lauder was "going to see a recovery."  Defendants' above May 3, 2023 statements in Lauder's 3Q23 Earnings Press Release was materially false and misleading for the same reasons set forth in paragraphs 146-158 and alleged in Section IV.G, *supra*.  Moreover, Defendants' statements were materially false and misleading insofar as they attribute "volatility" in Lauder's travel retail business to traffic flows, people's comfort with travel and COVID restrictions, while omitting the primary driver of travel retail volatility – *daigou* gray market crackdowns.

I.        **August 18, 2023 – Fourth Quarter 2023 Earnings Call & Fourth Partial Corrective Disclosure/Materialization of the Risk**

171.     On August 18, 2023, Defendants held an earnings conference call to discuss Lauder's 4Q23 financial results, for the period ended June 30, 2022 (the "4Q23 Earnings Call"). Despite revealing the impact of *daigou* enforcement actions, Defendant Travis continued to mislead investors, stating:

And **we have no concerns whatsoever about travel retail growing with traveling consumers.**  It's a timing issue for us right now. And so I just want to really underscore that.  **It's a pretty -- it's having a timing issue that's having a big short-term temporary impact for us.**  But we are not concerned at all about what we have shared with you in the past in terms of our strategy to continue to grow travel retail globally and certainly in all of our markets in Asia.

172.     Defendant Travis delivered this statement in connection with Lauder's fourth partial corrective disclosure, *see* Section VI.D, *infra*, when the Company included a substantial

decrease in sales stemming largely from the travel retail markets in China and South Korea. Defendants' above August 18, 2023 statements in Lauder's 4Q23 Earnings Call was materially false and misleading for the same reasons set forth in paragraphs 146-158 and alleged in Section IV.G, *supra*.  However, Defendants continued to mislead investors about the extent of the *daigou* problem.  Specifically, Defendants' statements on Lauder's 4Q23 Earnings Call were materially false and misleading insofar as they cast China's severe government crackdowns on *daigou* activity as "a timing issue" with a "big short-term temporary impact."  Far from "short-term headwinds," the "enforcement actions" to control *daigou* activity flowed from laws implemented by the Chinese government that put an end to Lauder's running spigot of high-volume gray market travel retail growth.

## VI.    LOSS CAUSATION/ECONOMIC LOSS

173.    Defendants' misstatements and omissions, as alleged herein, directly and proximately caused the economic loss (i.e., damages) under the federal securities laws suffered by Lead Plaintiff and the Class.  Throughout the Class Period, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to defraud investors. Defendants' misstatements and omissions artificially inflated and/or artificially maintained the price of Lauder common stock and operated as a fraud and deceit on the Class.  During the Class Period, Lead Plaintiff and the Class purchased Lauder common stock at artificially inflated and/or artificially maintained prices, whereby Lauder's common stock reached as high as $319.68 per share on February 9, 2022, and were damaged thereby when the price of Lauder common stock declined when the truth was revealed and/or the risks concealed by Defendants' misrepresentations and omissions materialized.

174. As a result of the disclosure of the truth of Defendants' fraud and/or materialization of the risks through the series of disclosures described below, investors incurred billions of dollars in losses.

175. The declines in the price of Lauder common stock during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

176. Each decline in the price of Lauder common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

177. The market for Lauder common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 1,844,214 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, Lauder's common stock traded at artificially inflated and/or artificially maintained prices. Lead Plaintiff and other Class members purchased Lauder common stock relying upon the integrity of the market relating to Lauder common stock and suffered economic losses as a result thereof.

178. The timing and magnitude of the declines in Lauder common stock evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

179. Specifically, Defendants made false and misleading statements and omissions about the cause and extent of declining sales in its travel retail business segment. When

Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors, the price of Lauder's common stock dropped significantly.

180.    As described below, Lauder's misrepresentations and omissions were revealed to the market through a series of five (5) corrective disclosures and/or materializations of concealed risk from November 2, 2022 through November 1, 2023.  It was not until the final corrective disclosure and/or materialization of concealed risk on November 1, 2023 that the full truth was known to the market, such that there was no longer any artificial inflation and/or artificial maintenance in Lauder's stock price attributable to the fraud.

**A.    November 2, 2022 – First Partial Corrective Disclosure/Materialization of the Risk**

181.    On November 2, 2022, prior to market close, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized when Lauder issued a press release announcing financial results for its first fiscal quarter of 2023 ended September 30, 2022. Specifically, Lauder reduced full year outlook for 2023, "**primarily to reflect tighter inventory management in Asia travel retail**."  Similarly, Lauder announced that net sales in its Asia/Pacific region also declined.

182.    The November 2, 2022 announcements about the Company's reduction in full year outlook, declining net sales, and pressure and negative impacts on its travel retail business were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's net sales in its travel retail business and the cause of the decline in such net sales.

183.    Moreover, the November 2, 2022 announcements revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed

and/or obscured from the market. The November 2, 2022 announcements partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's travel retail business segment's overdependence on back-alley *daigou* gray market resale.

184.    In other words, because of the Company's overdependence on the *daigou* market—facts that Defendants concealed from investors—as the governmental crackdown and restrictions on the *daigou* market intensified, Lauder knew (i) that its net sales would decline as a result of not being able to make as many sales in the *daigou* market; (ii) that the Company's retailers would not need as much of Lauder's products due to the diminishing *daigou* market and thus be forced to tighten their inventory management; and (iii) as a result of declining net sales and pressure and negative impacts on its travel retail business, that the Company would have to reduce its guidance. To the detriment of Lauder investors, these very problems were partially revealed and/or risks began materializing on November 2, 2022, as revealed by Defendants' announcements.

185.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Lauder common stock declined over 8%, a reduction of $16.80 per share, bringing the share price down to $189.96 on November 2, 2022.

186.    Upon learning of this news, analysts were disappointed and surprised. For example, on November 2, 2022, Credit Suisse reported that Lauder's "FY23 guidance cut was larger than expected" and that "we're disappointed by the magnitude of the cuts." That same day, Raymond James similarly reported that "today's guide reset was significantly larger than we had anticipated," and UBS Research reported that "the magnitude of negative revision outlined this morning is far greater than even some of the more bearish outcomes we heard from investors."

187. The market also linked the Company's stock price decline to the announcement. For example, on November 2, 2022, CNBC stated that Lauder's "shares tumbled 11.5% in premarket trading after the company issued [in part] a weaker-than-expected outlook." Morgan Stanley similarly explained that same day that "EL's stock should be down significantly post a large negative revision to FY23 guidance and far below consensus Q2 guidance, which was driven per EL press release remarks primarily by weaker China (and Hainan) trends with COVID restrictions [and] exacerbated by tighter inventory management in Asia travel retail . . . ."

188. Critically, with respect to the revelation about "tighter inventory management," analysts began to wonder why Lauder was feeling the effects of the cited market conditions more than its competitors. For example, on November 2, 2022, Evercore ISI reported that "[s]ales are forecast down 9-11% on 'tighter inventory management in travel retail' because of Covid restrictions. That's Hainan." Evercore ISI further noted that "Covid restrictions in China have triggered significant retailer destocking – **much greater than what L'Oréal indicated**"—even posing the questions: "Why Hainan destocking will carry into 2Q, given that sell–through was up + 9% this 1Q, as per L'Oréal?"

189. Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to conceal from investors the extent of which the Company relied on the *daigou* gray market for its travel retail business net sales and continued to reassure the market, among other things, that the Company was well-positioned financially and operationally in the Asian markets, thus downplaying (and omitting) the true effect that the shrinking *daigou* market had on Lauder. For example, on November 2, 2022, Defendant Freda reassured investors that while the primary drivers for the Company's revised and reduced outlook were significant, "***this near-term temporary pause does not diminish our deep conviction in Hainan for the long term***

as it is among the best brand-building destination for new consumers acquisition." Defendant Freda further reassured investors that the revised guidance still represented growth, with Defendant Freda noting that Lauder "***expect[s] a gradual sequential improvement . . . in the second half of fiscal year***" as "***these pressures begin to abate***."

190.    Despite their initial disappointment, analysts were encouraged by Defendants' reassurances. For example, on November 3, 2022, Morgan Stanley was reassured by Company's positive statements, reporting that the Lauder "was surprisingly optimistic" and cited the primary drivers of the revised guidance "as more transitory or non-operating," and further noted that Defendants' were "'very confident in our retail trend globally and the growth of our business even in very difficult external and complex times.'" Barclays Research also issued a report that same day, stating that, "[a]s it relates to China and Hainan, we heard several positive data points on yesterday's call to suggest the longer-term structural growth of these businesses are intact."

191.    That same day, Telsey Advisory Group (TAG) reported, "[w]hile the updated outlook is disappointing, we believe that the company's portfolio of brands remains healthy and in-demand globally, and that some level of pent-up demand can be released as restrictions are eased . . . ." Likewise, Piper Sandler's November 2, 2022 report kept positive about Lauder's long-term outlook, based on the Company's positive assurances, stating "China and travel retail remain the main ongoing overhangs, while Fx and inventory tightening are adding to the near term headwinds. . . . [W]e're keeping our focus beyond the near term bumpiness, and we continue to like the long term outlook for EL[.]" Similarly, that same day, J.P. Morgan urged "investor patience . . . EL deserves the benefit of the doubt, in our view," and stated that "management cut FY23 guide mainly driven by what management called 'temporary' weakness in the upcoming FQ2."

**B.    February 2, 2023 – Second Partial Corrective Disclosure/Materialization of the Risk**

192.    On February 2, 2023, prior to market close, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further partially revealed and/or partially materialized when Lauder issued a press release announcing financial results for its second fiscal quarter of 2023 ended December 31, 2022.  Specifically, despite meeting second quarter expectations, the Company again lowered its outlook for fiscal 2023, citing inventory problems and problems in its travel retail markets.  The press release stated in pertinent part:

> For fiscal 2023, we are lowering our outlook given the November and December disruption to travel and staffing levels in Hainan that slowed the expected normalization of inventory and the recently announced potential roll-back of COVID-related supportive measures in Korea duty free. **Together, these are creating a near-term, transitory pressure to our travel retail business.**
>
> …
>
> The COVID-19 pandemic continued to disrupt the Company's operating environment through the first half of fiscal 2023, including the COVID-related impacts, affecting Asia travel retail, particularly Hainan, and retail traffic in mainland China. In Asia travel retail, **these challenges led to prolonged store closures as well as the curtailment of travel and caused the tightening of inventory by certain retailers who had previously placed orders in anticipation of the return of travel that was since delayed**.

193.    The February 2, 2023 announcements about the near-term, transitory pressure to the Company's travel retail business were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's net sales in its travel retail business and the cause of the decline in such net sales.

194.    Moreover, the February 2, 2023 announcements revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.    The February 2, 2023 announcements partially (but

incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's travel retail business segment's overdependence on back-alley *daigou* gray market resale.

195.    Specifically, because of the Company's overdependence on the *daigou* market—facts that Defendants concealed from investors—as the crackdown and restrictions on the *daigou* market intensified, Lauder faced multiple risks, including (i) pressure to its travel retail business; (ii) that the Company's retailers would not need as much of Lauder's products due to the diminishing *daigou* market and thus be forced to tighten their inventory management; and (iii) as a result of pressure and negative impacts on its travel retail business, that the Company would have to reduce its guidance.  To the detriment of Lauder investors, these very problems were partially revealed and/or risks materialized on February 2, 2023, as revealed by Defendants' announcements.

196.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Lauder common stock declined 4.41%, a reduction of $12.39 per share, bringing the share price down to $268.41 on February 2, 2023.

197.    Upon learning this news, analysts were shocked and linked the news to the Company's declining share price.  For example, on February 2, 2023, Bernstein Research reported that "[t]hese 2Q results are disappointing" (specifically referring to the revenue falls "driven by 'double-digit' declines in travel retail") and that "[g]uidance will come as a shock to many." Bernstein Research also noted that "[w]e expect the stock to be down heavily today."  Telsey Advisory Group (TAG) also noted that same day that the third quarter guide was "disappointing."

198.     Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to conceal from investors the extent of which the Company relied on the *daigou* gray market for its travel retail business net sales and continued to reassure the market, among other things, that the Company was well-positioned financially and operationally in the Asian markets, thus downplaying (and omitting) the true effect that the shrinking *daigou* market had on Lauder.  For example, in response to an analyst's question during the Company's 2Q23 Earnings Call about Lauder's supply chain management, specifically as it relates to China, Defendant Travis reassured investors that, regarding inventory levels in Hainan, "***we should start to see an inventory build related to the shipments that we expect to see in Q4***" and that "***[w]e are sitting on a decent amount of inventory even in our own warehouses to supply the sales that we expect to see in the fourth quarter***."

199.     Despite their initial disappointment, analysts were encouraged by Defendants' reassurances.  For example, on February 2, 2023, Morgan Stanley reported its belief that "[w]e also expect the travel retail recovery could be particularly robust when international travel fully returns post COVID, as local in-country China travel has been developed during COVID in Hainan, opening up travel to the 80+% of Chinese who do not have international passports."

200.     Furthermore, Morningstar reported its belief that, regarding the problems in travel retail in Hainan, "we think these headwinds will prove short-lived as demand has quickly rebounded once pandemic restrictions ease."  J.P. Morgan likewise expressed its belief that such problems were only "temporary" when it reported on February 3, 2023, that "F3Q will be more challenging than investors (and management) had hoped for, but we think these headwinds are temporary" and that "[t]he increased Chinese mobility/travel helps not only EL's top line but also its margins as the region carries the highest profitability."

201.    In fact, Barclays Research reported that same day that "we came away from the quarter feeling more comfortable on the visibility of Estée Lauder's recovery in China and China travel retail (~34% of total company sales) particularly as in mainland China the company is outpacing the market and shipments were in-line with consumption."    Similarly, Barclays Research stated, "We believe the China/Hainan recovery is intact . . . Importantly, while the company mentioned that inventory levels are still coming down, it also indicated that they are almost at the level from which they would expect sales to accelerate."    Credit Suisse Research similarly reported on February 6, 2023 that "[w]e think EL's travel retail revenues are poised to step-change higher very quickly in F4Q and will continue to be a significant growth driver for several quarters."

C.    **May 3, 2023 – Third Partial Corrective Disclosure/Materialization of the Risk**

202.    On May 3, 2023, prior to market close, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further partially revealed and/or partially materialized when Lauder issued a press release announcing financial results for its third fiscal quarter of 2023 ended March 31, 2023. Specifically, the Company announced a further reduction of fiscal year 2023 guidance because of the slow recovery in Asia travel retail markets.    The press release stated, in pertinent part, that:

> As the shape of recovery from the pandemic for Asia travel retail comes into better focus, it is proving to be both far more volatile than we expected and more gradual relative to what we experienced in other regions. **We are, therefore, lowering our organic sales and EPS outlook for fiscal 2023 to reflect significantly greater headwinds in our fourth quarter than we expected in February**.

203.    Defendants further attributed the reduction in guidance to the fact that Lauder's

> Asia travel retail business continued to be pressured by the slower than anticipated recovery from the COVID pandemic. Specifically, in Hainan, while traffic into the island exceeded prior year levels, conversion of travelers to consumers in prestige beauty lagged. **This led to the slower than anticipated depletion of elevated levels of retailer inventory and, therefore, lower replenishment orders**.

204.    During the related earnings call on May 3, 2023, Defendant Travis also said that:

**[C]ompounding this pressure is the tightening of inventory by retailers in Hainan. We now expect that a far more gradual return to normal sales growth in Asia travel retail is likely to persist into the first half of fiscal 2024.** In addition, higher inflation and currency volatility, as well as promotions in certain markets to alleviate high stock levels more than offset our price increases and further pressured our business margins.

205.    The May 3, 2023 announcements about lowering the Company's lower organic sales and EPS outlook for fiscal 2023, the significantly greater headwinds in the fourth quarter than the Company previously expected, the slower than anticipated depletion of elevated levels of retailer inventory and lower replenishment orders were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's net sales in its travel retail business and the cause of the decline in such net sales.

206.    Moreover, the May 3, 2023 announcements revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  The May 3, 2023 announcements partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's travel retail business segment's overdependence on back-alley *daigou* gray market resale.

207.    Because of the Company's overdependence on the *daigou* market—facts that Defendants concealed from investors—as the crackdown and restrictions on the *daigou* market intensified, Lauder faced multiple risks, including (i) lower organic sales and EPS outlook for fiscal 2023; (ii) slow depletion of elevated levels of retailer inventory and low replenishment orders pressure to its travel retail business; and (iii) as a result of low organic sales and EPS outlook and slow depletion of retail inventory levels and low replenishment orders in its travel retail business, that the Company would have to reduce its guidance.  To the detriment of Lauder

investors, these very problems were partially revealed and/or risks materialized on May 3, 2023, as revealed by Defendants' announcements.

208.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Lauder common stock declined over 17%, a reduction of $42.52 per share, bringing the share price down to $202.70 on May 3, 2023.

209.    Upon learning this news, analysts were disappointed.  For example, on May 3, 2023, Raymond James reported "FY23 guide down worse than anticipated on delay in travel retail recovery" and noted that "EL reported a worse than expected F3Q and outlook for F4Q/FY, reflecting a slow to recover Asia travel retail channel, particularly in Hainan and Korea."  That same day TD Cowen Research reported that "[t]he biggest issues were Hainan and Korea (~20% of mix est.) as the recovery in travel retail is slower than previously expected."  Interestingly, TD Cowen Research also raised the possibility of whether, and the extent to which, there were any changes in the *daigou* market and whether that would affect Lauder's business—although Defendants did not at that point make the connection between the Company's poor performance and *daigou*: "we worry if larger than desired inventories, non-beauty luxury competitors, structurally changed Daigou shopping trends, and/or optimistic guidance could lead to even lower estimates despite a substantial -32% full year EPS cut . . . ."

210.    Additionally, MarketWatch published an article on May 3, 2023 at 7:09am ET (and updated at 10:30am ET), where it linked the Company's stock price decline to the Company's above announcements: "Shares of Estée Lauder Cos. plunged toward their worst-ever one-day performance Wednesday, after the beauty products company missed fiscal third-quarter profit expectations, amid a big drop in skin-care sales, and slashed its full-year outlook."  Likewise,

Morgan Stanley Research stated that "[w]e are sharply lowering EL EPS after far below consensus FQ4 guidance mainly on travel retail weakness."

211.    Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to conceal from investors the extent of which the Company relied on the *daigou* gray market for its travel retail business net sales and continued to reassure the market, among other things, that the Company was well-positioned financially and operationally in the Asian markets, thus downplaying (and omitting) the true effect that the shrinking *daigou* market had on Lauder.  For example, on May 3, 2023, Defendant Freda reassured investors that "***the challenges in travel retail are abated with time***."  Defendant Freda further reassured investors that the challenges Lauder faced were nothing to worry about: "***what we were experiencing before with our travel retail business is the volatility related to just some of the COVID restrictions and the flow of traffic in travel and people's comfort with travel, so that gives us more comfort that we're going to see a recovery***."

212.    Despite their initial disappointment, analysts were encouraged by Defendants' reassurances, even believing that the problems in China were only short-term.  For example, on May 3, 2023, Piper Sandler Research reported that "[w]e continue to see opportunity for good eventual tailwinds from China and travel retail" and that "there's still a lot to like for EL beyond the near term bumpiness, and we suggest investors be patient here and take advantage of today's weakness."  That same day Jefferies Research reported that "EL has been able to reclaim market share via promotions, and expects share gains to continue in Q4," and that "[r]ecovery in these markets is a good indicator of Hainan and Korea future performance."

**D.    August 18, 2023 – Fourth Partial Corrective Disclosure/Materialization of the Risk**

213.    On August 18, 2023, prior to market close, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were further partially revealed and/or partially materialized when the Company released financial results for its fourth fiscal quarter of 2023 and fiscal year ended June 30, 2023. Specifically, these results included a substantial decrease in sales stemming largely from the travel retail markets in China and South Korea.

214.    Additionally, on the associated earnings call for 4Q23, Defendant Freda stated:

Looking ahead, for Asia travel retail, **the pressure in Hainan intensified over the course of the fourth quarter. In May and June, retail sales trends deteriorated and turned steeply negative following the enforcement actions to control daigou activity.** The implication of these are ***favorable for sustainable, long-term growth, but certainly create significant short-term headwinds*** through the transition.

215.    The August 18, 2023 announcements about how the retail sales trends deteriorated and turned steeply negative following the enforcement actions to control *daigou* activity and that they certainly create significant short-term headwinds were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's net sales in its travel retail business and the cause of the decline in such net sales.

216.    Moreover, the August 18, 2023 announcements revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.    The August 18, 2023 announcements partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's travel retail business segment's overdependence on back-alley *daigou* gray market resale.

217.    Specifically, because of the Company's overdependence on the *daigou* market—facts that Defendants concealed from investors—as the crackdown and restrictions on the *daigou* market intensified, Lauder faced multiple risks, including deteriorating retail sales trends turning steeply negative following the enforcement actions to control *daigou* activity.

218.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Lauder common stock declined over 3.3%, a reduction of $5.37 per share, bringing the share price down to $156.69 on August 18, 2023.  Lauder common stock continued to fall on the next trading day. On Monday, August 21, 2023, Lauder common stock declined an additional 3.7%, a reduction of $5.79 per share, bringing the share price down to $150.90 on August 21, 2023. Together, both drops on August 18 and 21 reflect a total decline of 6.89%, a total reduction of $11.16 per share, bringing the share price from $162.06 on August 17, 2023 to $150.90 on August 21, 2023.

219.    Upon learning this news, analysts were disappointed.  For example, on August 18, 2023, Jefferies Research reported that the Company's FY24 guide "proved to be far worse than street models."  The Financial Post/Bloomberg also stated that same day that "[t]he company has too much inventory piled up in its travel retail business after executives repeatedly misjudged consumer demand for those products this year in China and South Korea in particular."

220.    The market also linked the stock price decline to the Company's announcement. For example, the Motley Fool published an article on August 18, 2023, stating that "[t]he company's share price sagged 3.3% on the day, following the release of its latest set of quarterly results" and that "[o]ne of the big factors in Estée Lauder's performance during the quarter was a 16% year-over-year decline in sales of skin care products in the Europe, Middle East, and Africa region. The company attributed this to weakness in the travel retail segment."

221.    Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to conceal from investors the extent to which the Company relied on the *daigou* gray market for its travel retail business net sales and continued to reassure the market, among other things, that the Company was well-positioned financially and operationally in the Asian markets, thus downplaying (and omitting) the true effect that the shrinking *daigou* market had on Lauder. For example, the Company reassured investors, with respect to enforcement actions to control *daigou* activity, that such enforcement actions "***create significant short-term headwinds*** through the transition."

222.    Despite their initial disappointment, analysts were encouraged by Defendants' reassurances.  In fact, while the notion that *daigou* could be a factor into the travel retail problems were on the minds of some analysts, such analysts were convinced by Defendants' statements that *daigou* was *not* something to worry about. For example, on August 18, 2022, although Bernstein Research reported, "[t]here's no denying that EL's over-indexing to China and Chinese travel retail is creating a bumpy road for shareholders today," it further stated that "for all the talk of 'multiple engines of growth', we continue to believe that China is likely to be the primary driver of the premium beauty category over the medium-term."

223.    For example, while Piper Sandler Research reported on August 18, 2023 that "[d]aigou restrictions are having a negative impact on travel retail traffic, with a 'meaningful contraction' in Hainan in May and June," the report further stated that "management is pulling back shipments in FQ1 to rightsize retailer inventory levels," and thus "**[w]e foresee this as a more transitory challenge, however, with overall demand in mainland China looking encouraging**."  Piper Sandler Research thus also reported that "[w]e continue to see good long term potential for China and travel retail tailwinds."

224.     On August 21, 2023, J.P. Morgan Research similarly reported its believe that the Company "can emerge from the current travel retail (TR) weakness because it is very localized to travel within China (Hainan), and mostly due to the transitory reduced discounts to curtail wholesale purchases (Daigou) by transitioning sales to individual travelers and also online."

**E.     November 1, 2023 – Final Corrective Disclosure/Materialization of the Risk**

225.     On November 1, 2023, prior to market close, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized.  On that date, the Company announced its financial results for its first fiscal quarter of 2024 ended September 30, 2023.  As part of these results, the Company disclosed that Lauder's decline in net sales:

> [P]rimarily reflect a decline in our Asia travel retail business, **primarily due** to our and our retailers' actions to reset retailer inventory levels, and **changes in government and retailer policies related to unstructured market activity**, that led to lower product shipments compared to the prior-year period.

226.     The Company also announced that the slow pace of recovery had forced it to accelerate and expand a restructuring plan, which it called a "Profit Recovery Plan," to improve margin and lower operating expenses.  Finally, Lauder cut its net sales estimate for fiscal year 2024.

227.     The Company's November 1, 2023 announcements revealed to investors for the first time that the declining sales that Lauder had been attributing for a year to other causes was "**primarily due**" to government and retailer changes related to "**unstructured market activity**." Lauder's identification of a "primary" cause for these issues revealed information previously concealed by a litany of parallel problems that were not the root cause of Lauder's travel retail sales decline.  Further, Lauder revealed that the promised rapid growth in those markets was still far off.  This disclosure underscored a central point regarding Lauder's over reliance on *daigou*

gray market resale: if *daigou* activity was not driving Lauder's travel retail sales, changes in government and retailer policies cracking down on such "**unstructured market activity**" would not be "**primarily**" responsible when sales plummeted.

228.    Critically, the market understood the Company's reference to "unstructured market activity" to mean the *daigou* market.  For example, on November 2, 2023, The Daily Telegraph reported, with respect to the Company's announcement: "The company blamed 'changes in government and retailer policies related to unstructured market activity.'  **This is thought to relate to Beijing's clamp down on so-called "daigou" resellers**, who buy luxury products in countries including Japan and South Korea and resell them in mainland China."

229.    The November 1, 2023 announcements about the Company's decline in net sales being primarily due to the Company's and its retailers' actions to reset retailer inventory levels, and changes in government and retailer policies related to unstructured market activity were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's net sales in its travel retail business and the cause of the decline in such net sales.

230.    Moreover, the November 1, 2023 announcements revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or obscured from the market.  The November 1, 2023 announcements revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding the Company's travel retail business segment's overdependence on *daigou* gray market resale.

231.    As a direct and proximate result of this corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Lauder common stock declined

approximately 19%, a reduction of $24.36 per share, bringing the share price down to $104.51 on November 1, 2023.

232.    Analysts were downcast upon learning of this news—especially learning for the first time that *daigou* was in fact a primary reason for the Company's net sales declines—and linked the stock price decline to the Company's announcements. For example, on November 1, 2023, Jefferies Research reported that the Company's FQ2 guide and revised FY 24 "both proved to be far worse than models" and even noting that "we believe Daigou portion was a meaningful part of the [travel retail business]." Similarly, Canaccord Genuity Research reported that same day that "deja vu strikes again with management continuing to lower expectations due to a slow recovery in China and the Asia travel retail channel," that "EL's exposure to the Asian travel retail channel continues to prove a major pain point," and that "[m]anagement noted that they continue to rebase inventory in the channel and face crackdown on the daigou reseller practice."

233.    Furthermore, on November 1, 2023, UBS Research reported that "EL shares traded -19% lower today (Nov 1), as the company lowered guidance for the sixth consecutive quarter owing to ongoing inventory de-stocking in Asia travel retail and lower prestige beauty consumption in Mainland China." That same day, WWD Beauty published an article that explained that, regarding the above announcements, "[t]he news sent [Lauder's] share price down by around 19 percent."

234.    Also on November 2, 2023, RBC questioned Defendants' credibility, downgraded its rating from Outperform to Perform, and reported that the "material guidance cut was a major disappointment." In fact, RBC explained: "While the data points around China were negative during the quarter, we thought EL's guidance (provided last quarter) already embedded this dynamic. We were clearly wrong." RBC further explained: "While we gave management the

benefit of the doubt on having a handle on the situation, there are simply too many headwinds and not enough visibility at this time for us to believe in the 2H growth story." Notably, RBC reported that "the slowdown of the expected growth rate of overall prestige beauty in mainland China points to more than just seasonal/one-time business dynamics that are impacting performance."

235.    Barclays Research, on November 2, 2023, even raised concern that Lauder's reputation was harmed as a result of these *daigou* problems: "we wonder to what degree Estée Lauder's brand equities are already impaired as consumers have become accustomed to buying on discount . . . not to mention the amount of pantry inventory consumers already have at home."

## VII.    ADDITIONAL INDICIA OF SCIENTER

236.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Lauder's materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A.    The Individual Defendants Closely Tracked Sales, Forecasting, and Pricing Data That Provided "Clear Visibility" Into the Source of Company Sales

237.    Throughout the Class Period, Defendant Freda served as Lauder's CEO and Defendant Travis served as Lauder's CFO. By way of their roles in the Company, they had intimate knowledge of Lauder's business operations. Accordingly, the Individual Defendants closely tracked sales, forecasting, and pricing data reflecting the source of Company sales.

238.    Indeed, evidencing the Individual Defendants' responsibility for monitoring such information, Lauder's 2022 Proxy Statement states that the Individual Defendants, as CEO and CFO, would "regularly" report to the Lauder's Board of Directors "regarding areas of significant risk to us [Lauder], including strategic, operational, financial, legal and regulatory, cybersecurity, and reputational risks."  The Proxy continues, "senior management is responsible for assessing and managing the Company's various risk exposures on a day-to-day basis."  The Proxy describes the manner in which:

> [V]arious management functions within the Company, such as Legal, Finance, Treasury, Internal Audit, Information Technology, **Global Supply Chain**, Research & Development, and Environment, Health and Safety, focus on particular risks. **Management has a systemic and integrated approach to overall risk management that includes the identification of risks and mitigation plans in the strategic planning process**.

239.    In fact, Defendants even conceded that they tracked data related to the travel retail business.  For example, on May 3, 2021, in response to an analyst's question about Lauder's "expectations for the Travel Retail category going forward," Defendant Freda noted that "Travel Retail is about traffic" and Defendant Travis explained that "we are obviously watching traffic patterns and travel patterns pretty closely, our Travel Retail team is. . . . So, again, we're watching it closely."

240.    The accounts of former Lauder employees confirm Defendants' knowledge and/or reckless disregard of Lauder's declining net sales in Asia travel retail resulting from regulatory and retailer crackdowns on *daigou* activity.  For example, FE-2 confirmed that Lauder's executive leadership knew about the *daigou* reselling practice.  FE-2 confirmed that the Company and its leadership could see sales spikes which were attributed to *daigou* practices.  FE-2 confirmed that Lauder had "clear visibility" in its sales because the Company had very detailed sell-through and sales reporting information from its retail partners. FE-2 described that Lauder monitored this data

on a weekly and monthly basis and held monthly estimate meetings with senior chief financial officers for various regions, during which sales data was reviewed in detail by the retailer, brand, and key product lines.

241.    FE-2 elaborated that that you could see sales spikes in key stores and/or key items that were out of sync with historic norms and it would make you question the sales spikes at certain stores, regions based on which items had spikes.  FE-2 went on to say that it would then become clear that they were for *daigou* or "suitcase trade" and had correlations with activities or promotions in China.  FE-2 also advised that Lauder's brands with the biggest business in China were the higher-priced, more prestige brands, such as Estée Lauder and La Mer.

242.    FE-2 advised speaking with former Demand Planners at Estée Lauder.  FE-2 noted that Lauder held monthly and sometimes weekly demand planning meetings, which were "brutal" with abuse.  FE-2 further noted that there was plenty of information available at these meetings to "triangulate" the correct sources of the sales, including the impact of the *daigou* or gray market sales.  Regarding pricing differentials between North America and China, FE-2 explained that Estée Lauder maintained a global database of pricing for every product in every market and region. FE-2 noted that, in China, Estée Lauder's products were sometimes sold up to a substantial premium over North American prices.

243.    FE-2 added that the Company employed pricing teams which worked on analyzing the disparities in pricing, factoring in different markets, demand, exchange rates, and other variables, such as competition.  FE-2 further added that "everyone" knew the price differentials based on the pricing database.  FE-2 explained that the pricing database was updated fairly regularly, and the tool used for the database was called Anaplan.  FE-2 recalled that there was a team of about 5-10 people working on it, and that the head of that team became Chief of Staff for

Defendant Travis. FE-2 described how the database was used to track exchange rates and other differentials between brands and regions. The database, FE-2 continued, was used to prepare slide decks and reports which were presented to the company's senior executives, including Defendant Freda, who were briefed on these pricing differentials.

244.    According to FE-3 "everyone" in leadership was aware of the *daigou* market, but it was not formally discussed. FE-3 noted that "everyone was very aware," despite *daigou* not being formally discussed in Europe. According to FE-3, there was a whole team involved in the process led by the current Global President Travel Retail Israel Assa. FE-3 explained that there was a team that was a part of travel retail APAC that specifically analyzed the *daigou* market. According to FE-3, there was a "huge" amount of people on the Commercial Team in Singapore, the head office for APAC, that reported into Global Travel Retail and whose responsibilities included analyzing the *daigou* market. Further, FE-3 explained that there was a "team" and a "structure in place" to analyze the *daigou* market, which included the employee who was "heading up Korea" that worked directly with Assa on this issue.

245.    FE-3 continued to say that the movement of product into *daigou* channels was "overseen," "approved," and "activated" by Assa. FE-3 explained that "everything, absolutely everything" was approved by Assa and that he had influence over the process while occupying his prior role as President, Commercial Estée Lauder Travel Retail Worldwide. According to FE-3, Assa was also responsible for allocating product to the various regions and that *daigou* was taken into account when making these decisions. FE-3 explained that these allocation decisions even occurred while global pandemic lockdowns were in place, whereby travel retail shipments all went to China.

246.    FE-2 also explained that Lauder used "pincodes" for certain products to know if those products were going someplace where they were not supposed to be. FE-2 further advised that the more expensive products from Lauder and La Mer products (as examples) would be pincoded in Estée Lauder's systems to trace where they came from and if they ended up in an unusual place. FE-2 further confirmed that if a product was pincoded, Estée Lauder had the ability to see where the product ended up. Similarly, FE-1 explained that all products had tracking codes in order to exercise "market control."

**B.    Lauder's Travel Retail Distribution Channels Were Core Operations**

247.    The Individual Defendants' knowledge of the extent and cause of declining net sales in its Asia travel retail business segment can be inferred because these facts are critical to Lauder's core operations. Indeed, as discussed throughout this Complaint, Lauder's largest and fastest growing distribution channel was its travel retail business segment. In 2018, prior to the global pandemic, travel retail accounted for 18% of Lauder's revenue, and by 2022, it occupied 28% of Company revenue. Further, travel retail grew almost six-fold during a period of depressed global travel and heightened reliance on e-commerce during the COVID-19 pandemic.

248.    Defendants themselves acknowledged the importance of travel retail to the Company's business. For example, on June 7, 2022, at the opening ceremony for Lauder's Swiss Distribution Center, where its travel retail Channel is based, Defendant Freda emphasized travel retail's centrality to Lauder, stating "travel retail accounts for nearly a third of our business and we are extremely confident in the channel for the long term." Additionally, on February 2, 2023, during an earnings call with investors, Defendant Freda explained that the Company's "travel retail, like China, travel retail Asia" were "high-profit, high-important channels."

249.    Notably, on May 3, 2023, in response to an analyst's question about Lauder's travel retail business (which alone supports the fact that the market thought of it as important), Defendant Freda explained:

> [T]ravel retail will remain a large, very important channel. Because it is an important channel also for consumer acquisition and is a growing channel. And so to grow global market share[,] to be strong in travel retail[,] will remain important. Also, in the case of Asia travel retail and China travel retail, it's very important for coverage, because in many emerging markets, for sure in China the coverage of small cities is possible only via online and via the people traveling, because the brick and mortars are not there, are only in a part of the city which is the reason of high productivity in China.

> So travel retail is also a great opportunity for discovering product, for the physical experience, for interacting with our product, so and is a very luxury channel, meaning the experience of luxury is very high.

250.    Lauder's SEC filings echo the fact that Lauder's travel retail distribution channels are critical to Lauder's success. For example, in Lauder's Annual 10-K for the fiscal year ended June 30, 2021 filed with the SEC on August 27, 2021, the Company stated "[t]ravel retail continues to be an important channel for brand building due to the increase in traveling consumers, particularly those from emerging markets, who often experience our brands for the first time while traveling." Likewise, the Company's 2021, 2022, and 2023 Annual 10-Ks noted that travel retail was "a significant contributor to our overall results." The Company's 2023 Annual 10-K similarly stated, "net sales in mainland China, as well as net sales from travel retail locations, in fiscal 2023, 2022 and 2021 were approximately 28%, 34% and 36% of consolidated net sales, respectively." For those same years, "net sales in Korea, including net sales from travel retail locations, were approximately 10% and 11% respectively, and no other country represented greater than 10% of the Company's consolidated net sales."

251.    Analysts following Lauder also understood that the Company's travel retail segment was critical to Lauder's success. For example, on February 5, 2019, Barclays Research

indicated that "China, Travel Retail" was a "critical region[]" for Lauder.  Similarly, an August 20, 2020 Piper Sandler report referred to the segment as Lauder's "**critical** travel retail segment." On February 6, 2023, Credit Suisse detailed its expectation that Lauder's "travel retail revenues are poised to step-change higher very quickly in 4 FQ and will continue to be a significant growth driver for several quarters."  Credit Suisse also reported on May 3, 2023 that "the travel retail channel will remain a very important channel for EL (brand exposure / building, access to consumers, luxury experience, very profitable)." Notably, on May 3, 2023, in relation to the Company's corrective disclosure and/or materialization of the risk event and accompanying stock price decline, Jefferies Research reported: "**We are not surprised by the stock reaction given the importance of China and Travel Retail to the company's earnings power**."  And on May 7, 2023, Raymond James reported that "Chinese travelers remain of key importance to EL's travel retail business, especially with 70% of the Chinese beauty market in the high margin skincare category."  Additionally, on August 18, 2023, the Financial Post referred to the segment as Lauder's "crucial travel retail business in Asia."

252.    Finally, Lauder's largest customer was a travel retailer in China—further demonstrating the importance that Lauder placed on the China travel retail market. In 2021, Lauder's largest customer, accounting for 14% of net sales was an undisclosed retailer in China travel retail.  Lauder's 2021 Annual 10-K stated that "[o]ur largest customer in fiscal 2021 sells products primarily in China travel retail and accounted for 14% of our consolidated net sales for fiscal 2021, 7% for fiscal 2020 and 5% for fiscal 2019, and 10% and 24% of our accounts receivable at June 30, 2021 and 2020, respectively."  Although Lauder did not name this "largest customer" publicly, an analyst report by Wells Fargo published in 2021 stated that it was "likely . . . China Duty Free Group."

253.    Given the importance of the Company's Asia travel retail business to the Company's total revenue, knowledge of the extent to which the Company was over-reliant on *daigou* sales and the impact the loss of such sales was having on the Company's travel retail net sales can therefore be imputed to the Individual Defendants.

### C.    During the Class Period, the SEC Inquired About Lauder's Increased Net Sales Volumes in 2021

254.    The Individual Defendants' scienter is further evidenced by an SEC inquiry into Lauder's increased net sales volumes in 2021.  During the Class Period, on May 12, 2022, Lauder received a comment letter from the SEC regarding its Form 10-K Annual Report for the year ended June 30, 2021.  In its letter, the SEC noted "significant changes in net sales on a consolidated as well as segmented basis."  The SEC highlighted that Lauder's consolidated net sales increased by 13% from $14.3 billion in 2020 to $16.2 billion in 2021. The SEC asked Lauder to expand its "net sales discussion to disclose the extent to which changes in prices, changes in volume, or the introduction of new products contributed to fluctuations in net sales."  In response, on May 25, 2021, Lauder issued a signed response from Defendant Travis stating that the "fiscal 2021 increase in net sales was mainly attributable to the challenges stemming from the COVID-19 pandemic that negatively impacted the second half of fiscal 2020."  Lauder also cited an "increase in volume of sales of luxury skin care products and luxury fragrance products" as well as "new product launches" as having contributed to growth.

255.    On June 9, 2022 the SEC wrote again to seek clarification concerning Lauder's increase in net sales, noting that Lauder's disclosures at the time attributed net sales increases in fiscal 2021 as "primarily due to higher net sales in skin care, fragrance and hair care, as well as growth in our Asia/Pacific and Europe, the Middle East & Africa regions." The SEC noted that "[i]t is again not clear whether these net sales increases are due to changes in pricing, changes in

volume, or the introduction of new products." Lauder responded on July 21, 2022 through another letter signed by Defendant Travis, confirming that "the increase in the volume of sales of higher priced luxury skin care products and luxury fragrance products contributed to the increase in net sales from fiscal 2020 to fiscal 2021."

256.    As such, the SEC's heightened scrutiny of Lauder's net sales figures leads to the reasonable inference that Defendants paid particular attention to their net sales numbers, as well what contributed to such net sales—thus supporting the inference that Defendants knew or were reckless in not knowing that the Company's net sales were overly dependent on *daigou* during the Class Period.

### D.    Defendants' Statements Themselves Support a Strong Inference of Scienter

257.    As discussed above, the Individual Defendants spoke at length during the Class Period about the Company's travel retail business—demonstrating that they were aware of or, at the very least, were reckless in not knowing the true impact that the crackdown on the *daigou* market had on Lauder's travel retail business. Accordingly, Defendants breached their duty under the federal securities laws by speaking about these topics and failing to fully disclose all relevant material information while doing so.

258.    As a preliminary matter, Defendant Freda even acknowledged that he knew about the interplay between the *daigou* market and Lauder's business even before the Class Period. For example, on February 5, 2019, Defendant Freda addressed industry questions about the impact of *daigou* and China's recently enacted ECL on Lauder's business during a Company earnings call. Defendant Freda condemned the practice and denied the Company's reliance on gray market resale, assuring investors that Lauder was "never benefiting from a lot of the *daigou* business because of [Lauder's] strict policies to avoid any phenomenon like this." Defendant Freda also

told investors that Lauder would continue to enforce its internal purchasing quota policies in its travel retail channels "to limit any risk of gray market around the world."

259.    With respect to statements made during the Class Period, Defendants repeatedly touted the Company's net sales and travel retail business, evidencing their knowledge of, or reckless disregard to, the basis for such statements.  For example, on February 3, 2022, Defendants stated, among other things, that "***[n]et sales increased in our travel retail business in both periods, reflecting continued strength of our brands with the Chinese consumer,***" and that they "***continue to prosper in the east with Chinese consumers as well as in global travel retail***."

260.    Defendant Freda even specifically referred to the Hainan market (which was directly impacted by the *daigou* market crackdown) when he stated on May 3, 2022 that "***the confidence into Hainan future is unchanged actually increased given the incredible development of the place.***"  Defendant Freda again discussed the Hainan market on June 2, 2022 when he assured investors that "the incredible results in travel retail during the COVID Western lockdowns [were] ***because Hainan was more than substituting the amount of travelers in airports around the world.***"  Defendant Freda similarly stated on August 18, 2022 that "***the power of Hainan in the future remain[s] intact, and we have strong presence and market share in this operation***."  In fact, even faced with problems in the Asian market, Defendant Freda reassured investors on November 2, 2022 that "***this near-term temporary pause does not diminish our deep conviction in Hainan for the long term.***"  Defendants Freda and Travis made similar assurances throughout the Class Period.

261.    Defendants' repeated assurances that the Company's net sales in the travel retail segment remained strong and unharmed from changes in the regulatory landscape surrounding the *daigou* market—when in fact the Company's travel retail segment relied heavily on *daigou* and

was thus negatively affected by such a crackdown—demonstrate that they *either* knew that the Company was experiencing declining net sales in their travel retail segment due to an overdependence on *daigou*, *or* were reckless in not knowing or investigating that this was the case. In either scenario, there is a strong inference that Defendants made these statements with scienter.

### E.    Defendants Were Frequently Interviewed About "Government and Retailer Policies Related to Unstructured Market Activity"

262.    The Individual Defendants' scienter with respect to ongoing developments in "**government and retailer policies related to unstructured market activity**" as acknowledged in Lauder's November 1, 2023 10-Q, is evident from the frequency they were asked about it publicly. Prior to and during the Class Period, Defendants spoke publicly about the *daigou* gray market and its growing presence in China travel retail. Notably, these discussions addressed the impact of regulations and enforcement on its China travel retail business. For example, on February 5, 2019, Defendant Freda was asked during a Company earnings call to comment on the *daigou* "phenomenon" and whether the ECL's new requirements applicable to the *daigou* industry had any impact on Lauder's travel retail business. Defendant Freda stated that Lauder "[didn't] see the impact so far." Defendant Freda continued:

> It is also important, however, to remember **that we at Estée Lauder companies have a long-standing policy that limits the numbers of products that a single consumer can buy at any counter in our Travel Retail globally** – since ever. **So we were not benefiting from a lot of the daigou business because of our strict policies to avoid any phenomenon like this and, obviously, to limit any risk of gray market around the world.**

263.    Again, on August 19, 2021, during the Company's earnings call, Defendant Freda addressed "government action" with respect to the development of Hainan specifically:

> [W]e see . . . **all the government actions have been taken to support the development of Hainan** and the duty free in Hainan, there is obviously an interest in supporting internal consumption. . . . **So, it's all of a positive trend.**

264.    As the truth emerged throughout the Class Period, Defendants were questioned about the potential damage to its prestige brand posed by the *daigou* gray market.  On June 1, 2023, at the Bernstein Strategic Decisions Conference, Defendant Freda responded to a question about dilution of brand perception resulting from *daigou* activity, where he admitted to Lauder tracking *daigou* impact and reviewing those reports himself:

> **No. If you mean [daigou is a] problem for the image of our brands or for our long-term brand equities**. . . . However, we don't believe there has been any impact on our brands. . . . Our brands, particularly La Mer and Lauder, are in the top of the desire – desirability of the Chinese consumers still now. **We check this every month by the way. And so they are among the most desirable brands**. We call it brand love. **It's the study that we do every month**. Our brand love is strong and is going up in most of the brands.

## VIII.    CLASS ACTION ALLEGATIONS

265.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who or which purchased or otherwise acquired the publicly traded Class A common stock of Lauder during the period from February 3, 2022 through October 31, 2023, inclusive.   Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of Lauder during the Class Period and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Lauder's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

266.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lauder's shares actively traded on the New York Stock Exchange ("NYSE").   While the exact number of Class members is unknown to Lead

Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Lauder shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Lauder or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

267.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

268.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

269.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Lauder;

(c)    Whether, and to what extent, the market price of Lauder common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d)    Whether Defendants acted with the requisite level of scienter;

(e)      Whether Defendants Freda and Travis were controlling persons of Lauder; and

(f)      Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

270.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

271.      To the extent that Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely upon the presumption of reliance established by the fraud on-the-market doctrine in that, among other things:

(a)      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      the omissions and misrepresentations were material;

(c)      Lauder common stocks traded in an efficient market;

(d)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Lauder common stock; and

(e)      Lead Plaintiff and other members of the Class purchased Lauder common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

(f)      Lauder common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g)     According to the Company's SEC Form 10-Q filed on February 5, 2024, the Company had approximately 232,931,380 shares outstanding as of the date of the filing, demonstrating a very active and broad market for Lauder common stock;

(h)     Lauder filed periodic public reports with the SEC;

(i)     Lauder regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures;

(j)     Lauder was followed by several securities analysts employed by major brokerage firms including Barclays, JP Morgan, Jefferies, UBS, and Wells Fargo, which wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms, were publicly available, and entered the public marketplace;

(k)     Unexpected material news about Lauder was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

(l)     There were market makers for Lauder's shares during the Class Period.

272.    As a result of the foregoing, the market for Lauder common stock promptly digested current information regarding Lauder from publicly available sources and reflected such information in Lauder's share price.  Under these circumstances, all persons and entities who purchased or otherwise acquired Lauder common stock during the Class Period suffered similar injuries through their purchases of Lauder common stock at artificially inflated prices and the presumption of reliance applies.

273.    The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Lauder common stock.

274.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Lauder common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

275.    To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Lauder's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

276.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

277.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested.  As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Lauder's

travel retail sales' overreliance on *daigou* was materially impacted by the crackdown on *daigou* in Hainan, causing the travel retail sales to decline.

278.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Lauder who knew that the statement was false when made.

## XI.    CONTROL PERSON ALLEGATIONS

279.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

280.    The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to Lauder during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

281.    The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Lauder's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings thereof, and reports and other information provided to them in connection therewith.

282.    As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Lauder's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of Lauder common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

283.    The Individual Defendants are liable as primary participants in a fraudulent scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired Lauder common stock during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) concerning net sales in Lauder's travel retail business and the cause of declines in net sales in Lauder's travel retail business.

284.    The scheme: (i) deceived the investing public regarding Lauder's operations and the true value of Lauder common stock, and (ii) caused Lead Plaintiff and other members of the Class to purchase or otherwise acquire Lauder common stock at artificially inflated prices.

285.    In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Lauder, were acting on behalf of the Company in the regular course of business.    Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## XII.    CAUSES OF ACTION

### COUNT  I

**For Violation of §10(b) of the Exchange Act**
**and Rule 10b-5 against Defendants Lauder, Freda, and Travis**

286.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

287.    The Count is asserted on behalf of all members of the Class against Defendants Lauder, Freda, and Travis for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

288.    As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants intended to and did, as alleged here in: (i) deceive the investing public, including Lead Plaintiff and the Class; and (ii) artificially manipulate the price of Lauder common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Lauder common stock at artificially inflated prices.

289.    The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged here in and having engaged in

a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

290.    As set forth above, Defendants made their false and misleading statements omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Lauder common stock during the Class Period.

291.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Lauder common stock, Lead Plaintiff and other members of the Class purchased Lauder common stock at artificially inflated prices during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have purchased Lauder common stock at such artificially inflated price.  As set forth herein, when the true facts were subsequently disclosed, the price of Lauder common stock declined precipitously, and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Lauder common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

292.    By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT  II

### For Violation of §20(a) of the Exchange Act
### against the Individual Defendants

293.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

294.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violation of § 20(a) of the Exchange Act.

295.    The Individual Defendants had control over Lauder and made the materially false and misleading statements and omissions on behalf of Lauder within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

296.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Lauder, in turn, controlled the Individual Defendants and all of its employees.

297.    By reason of such wrongful conduct, Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful

conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel for the Class;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## XIV.   JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS

Lead Plaintiff demands a trial by jury.

Dated:  March 22, 2024

**LABATON KELLER SUCHAROW LLP**

By: /s/ *Michael P. Canty*
Michael P. Canty

James T. Christie
Guillaume Buell
Jacqueline R. Meyers
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
Email:   mcanty@labaton.com
        jchristie@labaton.com
        gbuell@labaton.com
        jmeyers@labaton.com

*Lead Counsel for Lead Plaintiff Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System and the Proposed Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**

Thomas C. Michaud (*pro hac vice forthcoming*)
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
Email:   tmichaud@vmtlaw.com

*Liaison Counsel for Lead Plaintiff Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System and the Proposed Class*