# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE THE ESTÉE LAUDER CO., INC. SECURITIES LITIGATION | No. 1:23-cv-10669-AS<br><br>Hon. Arun Subramanian<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Counsel for Defendants The Estée Lauder Companies Inc., Fabrizio Freda, and Tracey T. Travis*

May 3, 2024

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 4

    A.    Plaintiffs Challenge ELC's Accurate Disclosures During the Class Period as False or Misleading Solely by Omission, and Ignore ELC's Warnings. ...................... 4

    B.    Pre-Class Period Restrictions on the *Daigou* Channel. ................................................. 7

    C.    Unprecedented Headwinds From the Resurgence of COVID-19 in China ................. 8

    D.    ELC Lowers its Outlook to Adjust for Evolving Headwinds ...................................... 9

ARGUMENT ................................................................................................................ 10

    I.    PLAINTIFFS FAIL TO STATE A SECTION 10(b) CLAIM .................................. 11

        A.    Plaintiffs Do Not Plead a Material Misstatement or Omission. ......................... 11

            1.    Plaintiffs' Purely Omissions-Based Theory of Fraud is Wholly Speculative and Unsupported by Particularized Facts............................ 11

            2.    Plaintiffs' Allegations Do Not Satisfy the PSLRA's Heightened Pleading Standard for Defendants' Forward-Looking Statements. .......... 22

            3.    Plaintiffs Do Not Plead That Defendants Did Not Genuinely and Reasonably Believe the Opinions They Personally Expressed................ 23

        B.    Plaintiffs Do Not Plead a Strong Inference of Scienter ........................................ 25

            1.    The Opposing Inference of Non-Fraudulent Intent is Compelling. .......... 25

            2.    Plaintiffs Do Not Plead Motive and Opportunity. .................................... 26

            3.    Plaintiffs Do Not Plead Recklessness. ...................................................... 27

         C.    Plaintiffs Do Not Adequately Allege Loss Causation ........................................ 28

    II.    PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM................................... 30

CONCLUSION............................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Pages(s)**

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020), *aff'd sub nom. Bristol Cnty. Ret.*
  *Sys. v. Adient PLC*, 2022 WL 2824260 (2d Cir. 2022).....................................................27, 28

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ........................................................................................25, 30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................10, 11

*ATSI Commc'ns, Inc. v Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)................................................................................................11

*Bell Atl. Corp v. Twombly*,
  550 U.S. 544 (2007).....................................................................................................10, 11

*Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*,
  2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ....................................................................24

*City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*,
  374 F. App'x 83 (2d Cir. 2010) .........................................................................................13

*Ford v. Voxx Int'l Corp.*,
  2016 WL 3982466 (E.D.N.Y. July 22, 2016) ....................................................................12

*In re Francesca's Holdings Corp. Sec. Litig.*,
  2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ..............................................................13, 17

*Francisco v. Abengoa, S.A.*,
  481 F. Supp. 3d 179 (S.D.N.Y. 2020)......................................................................15, 26, 28

*Frankfurt-Trust Inv. Luxemburg AG v. United Techns. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018).........................................................................4, 12, 13, 24

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................................18

*Gluck v. Hecla Mining Co.*,
  657 F. Supp. 3d 471 (S.D.N.Y. 2023)................................................................................21

*Gray v. Wesco Aircraft Holdings, Inc.*,
  454 F. Supp. 3d 366 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).............3, 22, 23

*Gregory v. ProNAi Therap. Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018)..........................................................................23

*Gru v. Axsom Therapeutics, Inc.*,
  2023 WL 6214581 (S.D.N.Y. Sept. 25, 2023)............................................................29

*Holbrook v. Trivago N.V.*,
  2019 WL 948809 (S.D.N.Y. Feb. 26, 2019)................................................................28

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012)..........................................................................24

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)................................................................................3, 28, 29

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010).............................................................18, 26, 27

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020)...................................................................12, 15

*Malin v. XL Cap. Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) .....................14

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021)....................................................................26, 27

*Menkes v. Stolt-Nielsen S.A.*,
  2005 WL 3050970 (D. Conn. Nov. 10, 2005) ...........................................................25

*In re MINISO Grp. Holding Ltd. Sec. Litig.*,
  2024 WL 759246 (S.D.N.Y. Feb. 23, 2024)................................................15, 29, 30

*In re Molycorp, Inc. Sec. Litig.*,
  2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) ...........................................................23

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
  2013 WL 1188050 (D. Conn. Mar. 23, 2013) ...........................................................19

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).......................................................................................12

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
  951 F. Supp. 2d 479 (S.D.N.Y. 2013)........................................................................26

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)..............................................................................................3, 24

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) .................................................................................. 29

*In re Omnicom Grp., Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ............................ 29

*In re PetroChina Co. Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015) ....................................................................... 27

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) .................................................................................. 11

*Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton
   Interactive, Inc.*,
   665 F. Supp. 3d 522 (S.D.N.Y. 2023) .................................................................. 11, 12

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................................. 2, 12

*Salvani v. ADVFN PLC*,
   50 F. Supp. 3d 459 (S.D.N.Y. 2014) ......................................................................... 30

*Schiro v. Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019) .................................................................. 16, 17

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
   412 F. Supp. 3d 353 (S.D.N.Y. 2019) ....................................................................... 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................................ 3, 25

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) .................................................................................. 24

*Tyler v. Liz Claiborne, Inc.*,
   814 F. Supp. 2d 323 (S.D.N.Y. 2011) ....................................................................... 28

*Villare v. Abiomed, Inc.*,
   2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ............................................................. 27

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011) .................................................................. 16, 19

*In re WEBMD Health Corp. Sec. Litig.*,
   2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ................................................................... 26

*In re Y-mAbs Therapeutics Sec. Litig.*,
   2024 WL 451691 (S.D.N.Y. Feb. 5, 2024) ............................................................ 23, 24

**Statutes**

15 U.S.C. § 78u-4 ........................................................................................................1, 3, 25

15 U.S.C. § 78u-5 ..............................................................................................................22

**Rules**

Fed. R. Civ. P. Rule 8 ..........................................................................................................1

Fed. R. Civ. P. Rule 9(b)..............................................................................................1, 11

Fed. R. Civ. P. Rule 12(b)(6) .....................................................................................1, 10

Defendants The Estée Lauder Companies Inc. ("ELC" or the "Company"), Fabrizio Freda, and Tracey T. Travis (together, the "Individual Defendants" and, collectively with ELC, "Defendants"), respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the Consolidated Amended Class Action Complaint (the "Complaint") pursuant to Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(3) (the "PSLRA").

## PRELIMINARY STATEMENT

Plaintiffs have filed this action against Defendants, alleging that from February 3, 2022 to October 31, 2023 (the "Class Period"), Defendants' public disclosures relating to its travel retail business were false and misleading. Specifically, while conceding the accuracy of ELC's reported results, Plaintiffs assert that Defendants should have disclosed that ELC was "over dependent" on a gray market known as "*daigou*" in China, and that unspecified Chinese government action to restrict *daigou* would cause ELC's net sales to decline significantly at some unspecified future time. Plaintiffs' theory fails to support three elements of a Section 10(b) claim. First, Plaintiffs fail to plead particularized allegations supporting that ELC's disclosures were false and misleading (falsity). Second, Plaintiffs fail to plead that any Defendant acted with the requisite intent to defraud (scienter). Finally, Plaintiffs fail to plead that any actionably false misstatement was the proximate cause of stock declines and investor losses (loss causation).

The proposed Class Period in this action was marked by the outbreak of COVID-19 and its variants, constant and confusing sequences of global lockdowns and re-openings in disparate regions, changing ability to travel, and zero-COVID policies in China, followed by additional outbreaks after China abandoned its zero-COVID policies. Against this backdrop, Plaintiffs focus their Complaint on ELC's sales to retailers in the travel retail channel, such as in airports and duty-free stores—*i.e.*, locations most affected by this unprecedented volatility. Plaintiffs do *not* allege

that ELC's disclosures concerning its actual net sales results (of which travel retail is a portion) were factually incorrect at any point during the Class Period. Instead, Plaintiffs rely on the stock drops following ELC's disclosure of slower-than-expected recovery late in the Class Period to leap to the conclusion that, for a year-and-a-half, Defendants knew and omitted the specific risk that *daigou* was driving its travel retail sales, and that the government crackdown on *daigou* would cause ELC's net sales to decline. An inability to predict the unpredictable—the timing of government enforcement and the corresponding impact on travel retail results during a pandemic—is not securities fraud.

*Falsity*. Plaintiffs must do more than simply assert that ELC's statements were false or misleading; "they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). For the most part, Plaintiffs' allegations rest on vague, uncorroborated statements from three former employees who were in no position to hold relevant knowledge, had no alleged contact with the Individual Defendants, and say absolutely nothing about ELC's supposed knowledge that it was "over dependent" on *daigou*, let alone that it knew months in advance that a supposed enforcement of gray market restrictions would negatively impact its travel retail sales. The *only* facts regarding any "crackdown" on the gray market are from ELC's own disclosures, which speak of *daigou* crackdowns in May and June 2023. Finally, ELC did not "admit" that *daigou* was the primary driver of travel retail sales throughout the Class Period—the allegedly corrective disclosure that Plaintiffs reference *ad nauseam* addresses only financial results for the three-month quarter ended September 30, 2023. *It self-evidently says nothing about the drivers of ELC's performance earlier in the Class Period*.

Separately, and in addition, many of the challenged statements are inadequately pled forward-looking statements or personal opinions expressed by the Individual Defendants. The

Second Circuit has made clear that a forward-looking statement is not actionable where, as here, it was accompanied by meaningful cautionary language, or if Plaintiffs fail to prove that it was "made with actual knowledge that it was false or misleading." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 385 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021). And opinion statements are not actionable unless Defendants did not genuinely believe their expressed opinions or they lacked a reasonable basis, as required by *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). Plaintiffs plead none of this. *See* Point I.A.

*Scienter*. Plaintiffs have not pled "with particularity" facts giving rise to a "strong inference" that Defendants acted with scienter. 15 U.S.C. § 78u-4(b)(2), (b)(3). This "strong inference" must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Plaintiffs do not allege what benefit Defendants stood to gain from this improbable scheme. By contrast, the circumstances alleged in the Complaint give rise to an obvious inference of non-fraudulent intent. ELC reported its financial results, lowered its forward-looking guidance as circumstances evolved differently than anticipated, and truthfully explained the drivers for its guidance and results in real-time as circumstances developed—all during an unprecedented global pandemic that impacted the travel retail business in China in ways that no person could possibly predict. *See* Point I.B.

*Loss Causation*. Plaintiffs have not alleged that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). To the extent that the alleged "corrective" disclosures even discussed *daigou* (the majority do not), it was only to promptly disclose the effect of enforcement of *daigou* regulations in real-time, and thus did not reveal any "truth" of a prior misstatement. Moreover, the

supposed "truth" revealed with the final disclosure on November 1, 2023 was, on the face of the Complaint, publicly discussed by ELC months earlier. *See* Point I.C.

**Control Person Claim**. Plaintiffs' Section 20(a) claim should be dismissed for failure to plead a primary violation or culpable participation. *See* Point II.

## STATEMENT OF FACTS[1]

ELC is a global prestige beauty company that distributes beauty products in approximately 150 countries and territories through a variety of distribution channels, including travel retail. *See* ECF No. 47 ("Compl.") ¶ 60, 64. The travel retail business includes duty-free stores in locations such as airports and cruise ships, as well as where permitted by government regulation, such as the island of Hainan, a luxury travel retail destination in China. *Id.* ¶¶ 64, 70–71. ELC's reported sales in its travel retail business consist entirely of sales to "travel retail operators," who then sell through to consumers; ELC does not make any direct-to-consumer sales in its travel retail business. *See* Ex. C at 17; Ex. D at 8.[2]

### A.    Plaintiffs Challenge ELC's Accurate Disclosures During the Class Period as False or Misleading Solely by Omission, and Ignore ELC's Warnings.

Plaintiffs' Complaint focuses on *daigou*, a "gray market" that has developed in which individuals and groups purchase lower-priced, duty-free items from retailers (who had already purchased product from the initial manufacturer or distributor) and resell those products to end-consumers in China for a profit. Compl. ¶¶ 1, 73–75. ELC only makes sales to retailers, not *daigou*

---

[1] "Ex. _" refers to the exhibits attached to the accompanying Declaration of Caroline H. Zalka. On this motion, the Court may consider facts from the Plaintiffs' Complaint, documents incorporated therein, documents filed with the SEC, and documents relied on by Plaintiffs in bringing suit. *See Frankfurt-Trust Inv. Luxemburg AG v. United Techns. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018) (taking judicial notice of securities filings and earnings call transcripts when plaintiff cited similar documents in its second amended complaint).

[2] ELC's fiscal calendar starts on July 1 and ends on June 30 the following year. *See* Ex. B.

resellers. *See* Ex. D at 8. Plaintiffs' Class Period "begins on February 3, 2022," when ELC filed

its Form 10-Q and Form 8-K for the quarter ended December 31, 2021. Compl. ¶¶ 130–144.

Plaintiffs challenge the following statements in ELC's February 3, 2022 disclosures:

- "***Net sales increased in our travel retail business in both periods, reflecting continued strength of our brands with the Chinese consumer***, the easing of travel restrictions, which drove increased traffic levels compared to the prior-year periods, and continued success of hero product franchises from La Mer, Origins, Clinique, Jo Malone London and Tom Ford Beauty." *Id.* ¶ 130 (emphasis in original); *see also* Ex. E at 45.

- "***Global travel retail sales increased double digits, reflecting continued growth from Asia/Pacific, despite ongoing travel restrictions there during much of the second quarter of fiscal 2022.*** Net sales also grew from Europe, the Middle East & Africa and The Americas as the partial lifting of travel restrictions, specifically in the United Kingdom and the United States, increased traffic and supported the reopening of doors." Compl. ¶ 143 (emphasis in original); *see also* Ex. F at 8.

Remarkably, Plaintiffs do not allege that ELC's global travel retail sales did not, in fact, increase

double digits during that quarter; in fact it did. Plaintiffs assert instead that these accurate

disclosures were rendered false—which they were not—because ELC failed to disclose that its

travel retail sales were "overdependent on *daigou*," and did not state what the ultimate impact of

unspecified future government crackdowns would be on its net sales. Compl. ¶¶ 132, 144.

For each quarter, Plaintiffs block-quote ELC's disclosures about its global travel retail

business and cherry-pick statements by ELC executives reflecting optimism or positive opinions

about the future outlook for that business. *See id.* ¶¶ 145–172. For example, among the next

disclosures Plaintiffs challenge is a statement by Mr. Freda during a May 3, 2022 earnings call:

- "But also, we have seen historically, that also the bounce-back can be a very strong, because when this restriction finish, people travel domestically very fast and very happily. And ***so the confidence into Hainan future is unchanged actually increased given the incredible development of the place*** and the confidence in online is very strong." *Id.* ¶ 145 (emphasis in original).

Plaintiffs do not allege it was untrue that, historically, ELC had seen a strong bounce-back after

travel restrictions were lifted (because it was not), or that Hainan was not experiencing incredible

development (because it was). They say the statement "was materially false and misleading because Defendants projected 'confidence' into an 'unchanged' future in Hainan, despite knowing that the January 1, 2022 . . . [regulations] significantly altered [ELC]'s ability to continue depending on gray market resale to drive its travel retail growth." *Id.* ¶ 146. Plaintiffs never specify how, when, or in what volumes ELC's sales would be effected by this purported crackdown. Moreover, Plaintiffs grossly mischaracterize Defendants' disclosure. Far from representing an "'unchanged' landscape in Hainan" (*id.* ¶ 107), Defendants expressly disclosed "significant headwinds" had emerged, including **"increased COVID-related restrictions in China, also impacting Hainan,"** and that the Company expected "a meaningful **decline in net sales**" from "Mainland China and Hainan" for the next quarter. Ex. G at 8 (emphasis added).

Plaintiffs repeat this pattern for all of the disclosures challenged in the Complaint. Compl. ¶¶ 159–172. Indeed, in Plaintiffs' own words,

> "Over the course of the next twenty-two months, Defendants continuously misled the public regarding the cause and extent of its travel retail net sales declines, failing to disclose that the Company had become heavily reliant on the *daigou* gray market to generate sales within the travel retail segment and that its net sales would decline as a result of no longer being able to rely on this sales channel to drive sales growth." *Id.* ¶ 103.

But Plaintiffs' Complaint lacks well-pleaded, particularized *factual allegations* supporting this "*daigou*" theory. What percentage of ELC's travel retail sales—even roughly—were allegedly driven by *daigou* in any quarter during the Class Period? Were *daigou*-driven sales static or fluctuating as compared to any other driver? Why did ELC continue to experience strong performance following the effective date of the government regulations on *daigou*, if, as Plaintiffs claim, ELC was "overdependent" (whatever that means) on *daigou* all along? No question is addressed; there are no well-pleaded facts to fill these glaring holes in the Complaint. Instead, Plaintiffs rely on select excerpts and distortions of ELC's disclosures, and a purposefully thin and

confusing set of allegations about government regulations and retailer policies, in the hope that obfuscation will substitute for particularized facts. It does not. The record is set straight below.

### B.    Pre-Class Period Restrictions on the *Daigou* Channel.

Regulation of *daigou* in China began at least three years before the start of the Class Period. *See* Compl. ¶ 11. The Complaint mentions three measures to restrict *daigou* sales before Hainan's December 7, 2021 announcement of its January 1, 2022 regulations:

- On January 1, 2019, China's E-Commerce Law took effect and regulated the *daigou* channel by requiring businesses that purchased in order to resell to register for business licenses and pay taxes, or else face fines for tax evasion. *Id.*

- On July 1, 2021, China Duty Free Group Company Limited ("CDFG"), which analysts identify as ELC's largest customer at the time (*id.* ¶ 9), announced its own *daigou* crackdown policy. *Id.* ¶ 28.

- Hainan customs "'knock[ed] out 80 pirate buying gangs' between July 1, 2020 and July 1, 2021." *Id.* ¶ 100.

These restrictions on *daigou* are not alleged to have had any effect on ELC's travel retail business. Indeed, one month after the January 2019 regulations, ELC's disclosure (which Plaintiffs do not challenge as false or misleading) noted that its "travel retail business ha[d] not seen the impact from the stricter enforcement [of the 2019 regulation] through January." Ex. H at 16. And, ELC's fiscal 2019 full year results—reporting on a period over six months after the new law went into effect—state that "[n]et sales increased in [its] travel retail business." Ex. I at 31.

Likewise, following the July 1, 2021 CDFG announcement and 2020-2021 enforcement activity in Hainan, ELC reported that, for the quarter ended September 30, 2021, "[g]lobal travel retail sales increased double digits reflecting continued growth in Asia/Pacific." Ex. J at 7. When ELC reported its results for the fiscal year ended June 30, 2021, it reported that "travel retail in Asia/Pacific" performed "exceptionally well." Ex. K at 1. And, the following quarter, ELC reported that "[g]lobal travel retail sales increased double digits." Ex. F at 8. Plaintiffs do not allege

that any of those disclosures relating to ELC's travel retail business following announcements of enhanced government and retailer efforts to restrict the *daigou* channel, were false or misleading.

### C.    Unprecedented Headwinds From the Resurgence of COVID-19 in China.

The Class Period begins on February 3, 2022, one month after the regulations announced on December 7, 2021 by Hainan officials on WeChat—designed to "'crack down on illegal *daigou* and smuggling'"—went into effect on January 1, 2022. Compl. ¶ 102. Notwithstanding Hainan's new regulations, ELC's performance for January through March of 2022 reflected "double digit" growth in global travel retail net sales. Ex. L at 7.

Around that same time, late-stage COVID-19 variant surges caused episodic governmental lockdowns in parts of China. Compl. ¶ 33 n. 8. China's strategy, *implemented for the first time in February 2022*, was to "manage [COVID] with a zero tolerance policy. . . [which] created a lot of closures of entire cities . . . particularly Shanghai," the location of one of ELC's distribution facilities. Ex. M at 3. ELC disclosed that these COVID-19 restrictions led to reduced "[t]ourism, to Hainan Island . . . in March [2022], after a vibrant start of the quarter." Ex. G at 3. But because "Hainan was strong till mid-March and then Hainan had a very strong decline of traffic," ELC remained confident in Hainan's long-term future once these temporary COVID-19 restrictions abated. *Id.* at 12–13. Because of the lockdown, ELC warned that "there will be a far greater impact" on its results the following quarter, *id*. at 3, and revised its fiscal year outlook in light of "additional headwinds . . . including the COVID-related restrictions in China, that are also affecting its travel retail business." Ex. L at 9. ELC's results for the next quarter (April-June 2022), were of course affected, and ELC disclosed that its net sales for the quarter declined due to "increased COVID-related restrictions in China," which "temporarily reduced capacity at the Company's Shanghai distribution facilities." Ex. N at 8. ELC further explained that traffic in Hainan was "minus 80%" in April and "minus 70%" in mid-May, Ex. M at 3, but "recovered and went to minus 30%" in

July. Ex. O at 15.

### D.    ELC Lowers its Outlook to Adjust for Evolving Headwinds.

The uptick in traffic to Hainan in July was counterbalanced in August 2022, when Hainan locked down *for the first time*. *See* Compl. ¶ 33 n. 8. ELC was facing an uncertain road given "new lockdowns in Hainan during August and no visibility as to when Chinese Covid-19 policies may change." Ex. P at 1; *see* Compl. ¶ 109. However, analysts agreed that "China is likely to be the primary driver of the premium beauty category over the medium-term [and ELC's] positioning le[ft] them best-placed to capitalize on that once the Chinese market . . . normalizes." Ex. P at 1.

To adapt to evolving headwinds from COVID-19 restrictions in mainland China, tightening inventories by retailers in the United States, and a stronger U.S. dollar, ELC updated its forward guidance for fiscal year 2023 in each of the next three quarters. *See* Ex. O at 3; Ex. Q at 1–2; Ex. R at 2. ELC's disclosures were specific and unambiguous: for Hainan, they were "looking at fiscal 2024 for traffic to recover. And again, it's a guesstimate at this point in time." Ex. O at 16. ELC acknowledged at calendar year-end that *"this year has undoubtedly been a perfect storm of unforeseen macro pressures"* and the "transition to accelerated recovery has indeed been longer than we anticipated." Ex. S at 9 (emphasis added). And reporting on the results from January to March 2023 (fiscal Q3), ELC stated, "As the shape of recovery . . . comes into better focus," it was "both far more volatile than we expected and more gradual relative to what we experienced in other markets." Ex. T at 3. And that "obviously in . . . [the] pandemic moment, travel retail has been more difficult to predict and has been more volatile to anticipate." *Id*. at 12.

Nonetheless, the Company saw positive signs that Hainan would return; Mr. Freda visited Hainan in March 2023 and was optimistic on its future, and "Hainan actually reflected positive retail sales in the third quarter." *Id*. at 4, 10. In addition, in line with what ELC had experienced in

2019, ELC still believed there was no material impact on brand equity from the *daigou* channel. ELC discussed that "*daigou* has always existed, also . . . before 2019. . . . [W]e never sell to *daigou*, we sell to our retailer[,]" but ELC doesn't "believe there has been any impact on our brands," because they were "among the most desirable" to the Chinese consumer. Ex. D at 8–9.

In August 2023, ELC promptly disclosed a new event—that "enforcement actions to control *daigou*" had occurred "[i]n **May and June**" of 2023. Ex. C at 3 (emphasis added); Compl. ¶ 214. Following these actions, "retail sales trends deteriorated and turned steeply negative." Ex. C at 3. ELC explained, "[w]ith the sudden change in *daigou* . . . retail traffic [was] slower than what we had anticipated. And as a result of that, it's changing our view on the shipments that we will need for Hainan in the first quarter and . . . into the second quarter." *Id*. at 13.

When ELC reported the results for the "anticipated to be challenging" first fiscal quarter, it disclosed a decline in Skin Care net sales that "**also reflected the pressures of incremental headwinds from** a slower-than-expected recovery of overall prestige beauty in mainland China and **the changes in government and retailer policies related to unstructured market activity.**" Ex. U at 3. In other words, the already-disclosed *daigou* enforcement that started in May and June 2023 impacted ELC's performance that quarter. ELC also lowered its fiscal year outlook due to external headwinds it faced because in mainland China, "the expected growth rate of overall prestige beauty has slowed," and "potential risks of further business disruptions in Israel and other parts of the Middle East." *Id*. at 7. Not surprisingly, based on all public statements made, ELC's stock price declined. This lawsuit followed.

## ARGUMENT

To avoid dismissal under Rule 12(b)(6), Plaintiffs must "state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). A complaint offering nothing more than "labels and conclusions" will not suffice. *Twombly*, 550 U.S. at 555. A complaint alleging securities fraud must satisfy the "heightened pleading requirements" of Rule 9(b) and the PSLRA that require Plaintiffs to plead their claims "with particularity." *ATSI Commc'ns, Inc. v Shaar Fund, Ltd*., 493 F.3d 87, 99 (2d Cir. 2007).

## I.    PLAINTIFFS FAIL TO STATE A SECTION 10(b) CLAIM

To state a Section 10(b) claim, Plaintiffs must allege "(1) a material misrepresentation or omission . . . ; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Philip Morris Int'l Inc. Sec. Litig*., 89 F.4th 408, 417 (2d Cir. 2023). Here, Plaintiffs fail to plead (A) a misrepresentation or omission, (B) scienter, or (C) loss causation, each of which is an independent ground for dismissal.

### A.    Plaintiffs Do Not Plead a Material Misstatement or Omission.

#### 1.    Plaintiffs' Purely Omissions-Based Theory of Fraud is Wholly Speculative and Unsupported by Particularized Facts.

Plaintiffs take aim at nine disclosures between February 2022 and August 2023 concerning the drivers of ELC's performance in travel retail and its future outlook. *See* Compl. ¶¶ 130, 143, 145, 159, 162, 164, 166, 169, 171. Plaintiffs do not allege that there was anything *incorrect* about ELC's financial statements during this period. *See supra* pp. 5–6. Instead, their case rests entirely on the supposition that, in each disclosure, ELC "fail[ed] to disclose that the Company had become heavily reliant on the *daigou* gray market to generate sales within the travel retail segment and that its net sales would decline as a result of no longer being able to rely on th[e] [*daigou*] sales channel to drive sales growth" (at some unspecified point in the future). Compl. ¶ 103.

To state a claim, Plaintiffs must plead that a material misstatement was "false at the time it was made." *Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton*

*Interactive, Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023). Plaintiffs must also "demonstrate *with specificity* why and how that is so." *Rombach*, 355 F.3d at 174 (emphasis added). This means Plaintiffs must plead particularized facts supporting that each challenged disclosure was false when made because, at that time, ELC (1) was "heavily reliant" on *daigou*; and (2) knew the steps Chinese government would take (though the Complaint does not say what these steps were), at some specific time (though the Complaint does not say when) to enforce *daigou* restrictions such that net sales would decline. As set forth below, Plaintiffs have not met their burden.

### a.    Plaintiffs' Allegations about Three Anonymous Former Employees Are Not Credible, Particularized, or Demonstrative of Falsity.

Because Plaintiffs rely on anonymous, confidential witnesses (the "FEs") to support their allegations of falsity, they must meet a two-part test. First, Plaintiffs must describe each FE with "sufficient particularity to support the probability that a person in the [FE's] position . . . would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). Unless Plaintiffs' description of each FE indicates "a *high likelihood* that they actually knew facts underlying their allegations," this Court should decline to credit their allegations. *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 798 (S.D.N.Y. 2020) (emphasis added). And second, if Plaintiffs establish the credibility of any of the FEs, their substantive allegations must be pleaded "with sufficient particularity to demonstrate that the [] statements were actually false." *Ford v. Voxx Int'l Corp.*, 2016 WL 3982466, at *5 (E.D.N.Y. July 22, 2016). Plaintiffs fail on all fronts.

### i.    FE-1, Regional Marketing Director of Travel Retail for APAC.

The Complaint describes FE-1 as "a Regional Marketing Director of Travel Retail Asia-Pacific ('APAC') region," for the brands "La Mer" and "Le Labo," during the period July 2022 to January 2023. Compl. ¶ 54. Any knowledge FE-1 might purport to have is thus at best limited to only two of the over 15 brands in ELC's broad portfolio. Compl. ¶ 60; *See Frankfurt-Tr. Inv.*

*Luxemburg AG*, 336 F.3d Supp. at 223 (declining to credit allegations where FE "worked mainly within a single . . . unit, so they had no insight on how other . . . units, let alone other . . . divisions, projected aftermarket sales"). FE-1 also was employed for only 6 months out of the 21-month Class Period, further undermining her credibility and basis of knowledge. *See In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *15 (S.D.N.Y. Mar. 31, 2015).

Moreover, even if the Court credited Plaintiffs' allegations about FE-1, none are sufficient to show that any of the challenged disclosures were contemporaneously false. FE-1 is not alleged to have any involvement in, knowledge of, or access to (i) overall sales results; (ii) the drivers of those results in any given quarter; (iii) reporting relating to *daigou* or its effect on ELC's net sales (which she does not even allege to have existed); or (iv) any other financial reporting. As a result, FE-1's alleged statements about ELC's sales practices and data are wildly speculative: FE-1 "described [ELC] as being 'much looser' when it came to 'loading' retailers with stock," and observed that ELC "'took a lot of market share' during the pandemic" which according to FE-1, "was 'very telling' because *daigou* were the only people buying product at that time." Compl. ¶¶ 20, 87, 134, 150. FE-1 also "commented that while [ELC]'s increased market share was 'nice on paper,' [ELC]'s gains in its market share came from *daigou* business," that the Company is "now seeing the 'repercussions' from their reliance on *daigou*," and that "the data surrounding [ELC]'s jump in market share [w]as 'very jarring.'" *Id.* ¶¶ 20, 87, 134, 150. There is nothing pleaded regarding what market share ELC had, what repercussions it was suffering, how its market share jumped, or when any of this happened. Instead, this all appears to be based on FE-1's hindsight view of subsequently-reported public developments. Plaintiffs' conclusory assertions "fail to offer any factual underpinnings," which is insufficient. *City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc.*, 374 F. App'x 83, 85 (2d Cir. 2010).

Moreover, FE-1's statements about ELC's alleged dependence on *daigou* amount to "[g]eneric and conclusory allegations based upon rumor or conjecture," which are "undisputedly insufficient." *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009). Plaintiffs allege that "FE-1 recalled that large purchases made during the pandemic, from 2020 through her tenure at [ELC], were 'almost definitely' made by *daigou*," with no support for why or how FE-1 knew that. Compl. ¶¶ 19, 86, 133, 149. They also point to statements that "practices during [2020] 'overflooded' the market," again without elaborating on how FE-1 knew this. *Id.* ¶¶ 86, 133, 149.

Plaintiffs' remaining FE-1 allegations are equally deficient. Plaintiffs allege that "FE-1 described instances where it was important that [ELC] move products with upcoming expiration dates 'out of warehouses'" and that in such instances, "[ELC] 'pushed products'" and retailers had "'high' stock holdings." Compl. ¶¶ 86, 91, 133, 138, 149, 154. These statements have nothing to do with *daigou*; if true, they describe a general practice of moving inventory before it expires (*i.e.*, good business). The same is true of the allegation that "all products had tracking codes." *Id.* ¶¶ 26, 98, 246. FE-1 also "explained that . . . *daigou* had 'very big businesses' with 'structures in place' and is now primarily made up of medium and 'corporate *daigou*,' who deal directly with retailers, and less individual *daigou*." *Id.* ¶ 84. This says nothing about ELC's purported dependence on *daigou* at any specific point. If anything, it confirms that *daigou* transactions were happening without involvement from upstream distributors like ELC.[3] Finally, FE-1 offers no specific allegations about how ELC could have had the magical foresight to predict that regulators would

---

[3] Similarly, the assertion that "FE-1 recalled that there was a shift from South Korea to China in the travel retail space during 2020 when the new regulations increased purchasing limits in Hainan" (*id.* ¶¶ 19, 84, 147) predates the Class Period and FE-1's tenure, and is consistent with what ELC reported about its travel retail growth in Asia in 2020 and 2021. *See supra* at 7–8.

take unspecified steps at some unspecified time in the future to enforce restrictions on *daigou*, or known—from the beginning of the Class Period—the ultimate impact this enforcement would have on ELC's actual sales results.

### ii. FE-2, Senior Vice President in Finance for an Unidentified Region.

The FE-2 allegations are more of the same. The Complaint describes FE-2 as a "Senior Vice President in the finance part of the organization for one of [ELC]'s regions." Compl. ¶ 55. "[F]inance part of the organization" is hardly a rigorous job description. *See Long Miao*, 442 F. Supp. 3d at 803 (declining to credit statements from FEs described as occupying "a financial role"). And Plaintiffs conspicuously conceal which region FE-2 belonged to, even though ELC's operations are organized into three large and vastly different regions.[4] As far as the Complaint is concerned, FE-2 may have well worked in The Americas region, specialized in Brazil's beauty market, and known nothing at all about ELC's operations in Asia travel retail. *See In re MINISO Grp. Holding Ltd. Sec. Litig.*, 2024 WL 759246, at *12 (S.D.N.Y. Feb. 23, 2024) (finding that a North American FE would not "possess the information alleged about MINISO's operations outside of North America"). Coupled with the fact that Plaintiffs do not even plead that FE-2 worked in travel retail (raising the obvious inference that she did not), there is already ample ground to discredit FE-2. But her employment period further blows any credibility FE-2 could possibly have; FE-2 left the Company in "mid-2021," at least 5-6 months before the start of the Class Period, and before the 2022 *daigou* regulations were even announced. Compl. ¶ 55. This Court should follow other courts that have "disregarded" the statements of FEs when the FE "left the company before the start of the class period." *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020).

---

[4] Asia/Pacific ("APAC"), Europe, the Middle East, and Africa, ("EMEA"), and The Americas (LATAM and North America). *See* Ex. I at 23.

Many of Plaintiffs' FE-2 allegations are outright speculation. For example, FE-2 vaguely "remarked that it was hard to reconcile the growth of travel retail in China [during COVID] with the lockdowns and lack of travel, stating . . . that the growth was 'counterintuitive.'" Compl. ¶¶ 20, 88, 135, 151. She also posited that "there was too much pressure on sales growth," and that "some people at the company – who did not appear to be nice . . . were able to survive and keep their positions at [ELC]" because they "must be 'up to something,' like using the gray market of *daigou* resellers, to enable the practice." *Id.* ¶¶ 89, 136, 152. These statements are rank conjecture that should not be credited. *Cf. Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) (rejecting FE allegations "that they were told that there were 'strange dealings'").

Plaintiffs' allegations about ELC's purported sales reporting practices and knowledge of *daigou* are similarly vague, un-particularized, and lacking in foundation. Plaintiffs say "FE-2 confirmed that [ELC]'s executive leadership knew about the *daigou* reselling practice," and that "the Company and its leadership could see sales spikes which were attributed to *daigou* practices" because they "had very detailed sell-through and sales reporting information" and "'pincodes' for certain products." Compl. ¶¶ 22, 26, 92, 98, 139, 155, 240, 246. FE-2 claimed there was information at ELC's demand-planning meetings that enabled ELC "to 'triangulate' the correct source of [its] sales, including the impact of the *daigou* or gray market sales." *Id.* ¶¶ 23, 94, 242. But Plaintiffs do not tie these allegations to specific time periods or facts (presumably because FE-2 was not actually employed by ELC during the Class Period), making it "all but impossible" to "match[] [FE] allegations to contrary public statements." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011). Nor do they say if FE-2 was privy to these meetings or the data, how ELC could "triangulate" the sources of retail sales, or what the actual impact of *daigou* was on ELC's travel retail sales. *Cf. Schiro*, 396 F. Supp. 3d at 305 ("Plaintiffs do not allege that

CW-1 witnessed money changing hands, that anyone told him . . . , or any other facts from which the Court could infer either that bribes were paid or that CW-1 would have known about them.").

Plaintiffs' remaining allegations about FE-2 consist of generalized assertions about travel retail or the type of sales pressures present in any business, untethered to ELC's alleged over-dependence on *daigou*. For example, FE-2 allegedly described travel retail as "one of [ELC]'s 'largest growth pillars'" going "way back," "even prior to the pandemic." Compl. ¶¶ 83, 147. Similarly, FE-2 also allegedly "indicated that there was a huge amount of pressure every quarter to deliver sales results," that "the demands management made on its staff[] were unreasonable," "that there was 'huge pressure' to improve [ELC]'s top line through sales growth," and that "[ELC] sometimes asked its brand teams . . . to mov[e] launches to be first to market, change promotional calendars or accelerate new distribution." *Id.* ¶¶ 85, 148. These allegations just reflect the reality of doing business; they are irrelevant to ELC's purported reliance on an unsustainable *daigou* channel.[5] *See In re Francesca's*, 2015 WL 1600464, at *13 ("Plaintiffs do not endeavor to explain why a supplier 'bending over backwards' for its customers should be considered problematic."). And again, like FE-1, FE-2 simply says nothing at all—not a word—about the critical alleged omission concerning ELC's prescience regarding the efficacy of the announced crackdown on *daigou*, what the authorities would do or when, and how this would impact travel retail sales.

### iii.    FE-3, Senior Leadership Position in Travel Retail EMEA.

The Complaint's allegations about FE-3 are similarly not credible or particularized. Plaintiffs describe FE-3 as "most recently employed in a Senior Leadership position in Travel

---

[5] FE-2's allegations about a "pricing database" that allowed "everyone" to know the "price differentials" between various ELC brands and regions are similarly untethered to *daigou* or any of the alleged misstatements. Compl. ¶¶ 23, 95, 243. Indeed, the only other mention of "price differentials" in the Complaint is the assertion that differentials "on certain beauty products" help explain the "appeal in Asia" of ELC luxury brands. *Id.* ¶ 8.

Retail EMEA." Compl. ¶ 56. This vague description says almost nothing about the type of information FE-3 may or may not be privy to. *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011) (disregarding allegations attributed to a former "senior executive" because "[m]issing from the complaint . . . is any indication of what aspect of [the company] or its management [the FE] was involved in, [or] what [the FE's] job duties entailed"). All that the Complaint says about FE-3's basis of knowledge is that she "attended monthly meetings" where the "General Manager . . . provided information from another monthly meeting" with members of "[w]orldwide leadership." Compl. ¶ 56. But allegations from "low-level" "rank-and-file positions" who did not have "access to aggregated data" about ELC's sales should be discounted. *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010). And the little detail Plaintiffs disclose—that FE-3 works in EMEA—*undermines* her knowledge about ELC's operations in Hainan, China. The Complaint is conspicuously silent on whether FE-3 worked within Asia travel retail.

Plaintiffs' allegations about FE-3 also fail on the merits. They rely on generalized assertions that have nothing to do with the purported falsity of any of ELC's disclosures—such as the fact that "China and particularly Hainan were 'huge markets.'" Compl. ¶¶ 19, 84, 147. This unremarkable insight from FE-3 is entirely consistent with ELC's disclosures about its sales and growth strategy in Hainan. *See, e.g.*, *id.* ¶ 159 (attributing "the incredible results in travel retail during the COVID Western lockdowns" to booming domestic travel in Hainan).

Plaintiffs' other allegations lack particularity. For example, FE-3 "explained that the movement of product into *daigou* channels was 'activated' through retailers . . . and that [ELC] utilized 'incentives' in order to facilitate that movement." Compl. ¶¶ 20, 86, 133, 149. FE-3 also said "that if there were issues with overstocks that [ELC] would 'bulk ship' to places like Korea,

where it was known that a *daigou* market existed, to cover losses," that ELC could "switch on the *daigou* market if needed," and that "'popular' product was frequently held back from Europe in order to send to APAC." *Id.* ¶¶ 21, 90, 137, 153. These allegations "are so amorphous as to time periods" that they "are not pled with the requisite specificity" for that reason alone. *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, 2013 WL 1188050, at *28 (D. Conn. Mar. 23, 2013); *see also In re Wachovia*, 753 F. Supp. 2d at 352. The same is true of FE-3's statements about the alleged team "led by the current Global President Travel Retail Israel Assa" that "was a part of travel retail APAC that specifically analyzed the *daigou* market." Compl. ¶¶ 24, 96, 141, 157, 244. Plaintiffs allege that according to FE-3, "the movement of product into *daigou* channels was 'overseen,' 'approved,' and 'activated' by Assa," who "was responsible for allocating product to the various regions and that *daigou* was taken into account when making these decisions." *Id.* ¶¶ 25, 97, 142, 158, 245. But Plaintiffs never say when these activities allegedly occurred, how FE-3 supposedly knew about them, whether they related to Hainan, or whether the purported allocation decisions showed that ELC was overly dependent on *daigou* (at any point in time) or knew that its travel retail sales would decline. Finally, once again, FE-3 does not say anything about the new *daigou* regulations, ELC's purported knowledge of such crackdown, or how it would impact the Company's net sales.

**b.** **The November 2023 Alleged Corrective Disclosure Does Not Support Plaintiffs' Theory of Falsity.**

Plaintiffs' reliance on ELC's November 1, 2023 disclosure is likewise insufficient to plead falsity. Plaintiffs assert that ELC revealed for the first time through this disclosure that—for the entire Class Period—*daigou* was "**primarily**" responsible for ELC's declining sales. Compl. ¶ 227; *see also id.* ¶¶ 41, 125, 225. Plaintiffs infer "if *daigou* was not [the] driv[er] [of] [ELC's] travel retail sales, changes in government and retailer policies cracking down on such

'**unstructured market activity**' would not be '**primarily**' responsible when sales plummeted." *Id.* ¶ 227 (emphasis in original); *see also* Ex. V at 31.

Plaintiffs' characterization disregards the plain language of the disclosure. On its face, the November 1, 2023 disclosure describes changes in government and retailer policies related to unstructured market activity as one among a number of factors driving the decline in sales. It does not say—as Plaintiffs suggest—that it was the sole *primary* basis for the sales declines during that quarter. This is also apparent from the Company's Form 8-K filed that same day:

> "Skin Care net sales decreased 21%, reflecting a decline in the Company's Asia travel retail business, primarily due to the Company's and its retailers' actions to reset retailer inventory levels. **The decline also reflected the pressures of incremental headwinds from** a slower-than-expected recovery of overall prestige beauty in mainland China and **the changes in government and retailer policies related to unstructured market activity**." Ex. U at 3. (emphases added).

Just as important, on November 1, 2023, ELC announced its results for one quarter—July, August, and September 2023. Compl. ¶ 225. Accordingly, to the extent ELC disclosed the drivers of sales and attributed any declines to changes to unstructured market activity, that disclosure pertained *only to the Company's sales performance during the first quarter of fiscal year 2024, not the rest of the Class Period*. Moreover, as ELC had already announced on its August 18, 2023 earnings call, which Plaintiffs do not challenge as false, it was "the enforcement actions to control *daigou* activity," in "May and June" that preceded "retail sales trends deteriorat[ing] and turn[ing] steeply negative." Ex. C at 3. These disclosures discuss the contemporaneous events of those quarters, and cannot support that ELC knew that this would happen back at the beginning of the Class Period, as Plaintiffs imply.

### c.    The Complaint Lacks Any Particularized Allegations About the *Daigou* Regulations Central to Plaintiffs' Fraud-By-Omission Theory.

In addition to the paucity of Plaintiffs' FE allegations and the repeated mischaracterization of ELC's disclosures discussed above, the sum total of Plaintiffs' allegations about the 2022

*daigou* regulations and subsequent policy changes is a *single paragraph* stating that on December 7, 2021, the "Office of Free Trade Port Working Committee of the Hainan Provincial Committee published a statement on WeChat announcing new regulations," that these regulations were designed to "resolutely crack down on illegal *daigou* and smuggling," and that "Hainan set the formal regulation[s] to take effect on January 1, 2022." Compl. ¶ 102. *See supra* p. 8. From this, Plaintiffs leap to the conclusion that for the duration of the Class Period, *daigou* was "shut down" (Compl. ¶ 126), "now non-existent" (*id.* ¶ 115), and "formally outlawed" (*id.* ¶ 165), and, therefore, ELC knew it "could no longer funnel" products into *daigou* (*id.* ¶ 112), causing ELC a "permanent loss of a major source of sales" (*id.* ¶ 113).

Nowhere do Plaintiffs describe the actual content of the new regulations, when or how they were enforced, or how they differed from the old 2019 government regulations, the July 2021 CDFG policy announcement, or the Hainan officials' prior enforcement activity, which did not appear to affect ELC's travel retail sales results. *See supra* pp. 7–8. Nor do they provide any detail about the alleged effect of the new regulations on Hainan, on ELC's alleged "*daigou* sales spigot," or ELC's knowledge thereof. Compl. ¶ 37. Plaintiffs thus have "not alleged sufficient facts to suggest what effect these negative conditions would have had" on ELC's overall sales. *Gluck v. Hecla Mining Co.*, 657 F. Supp. 3d 471, 489 (S.D.N.Y. 2023). The *only* facts in the Complaint concerning the effect of efforts to limit *daigou* activity on ELC's sales trends are Defendants' own disclosures—which are not alleged to be false and cannot be squared with the allegations in the Complaint. Again, as ELC disclosed, "in May and June, retail sales trends deteriorated . . . following the enforcement actions to control *daigou* activity." Comp. ¶ 214; *see also supra* p. 10. Critically, Plaintiffs do not allege *any connection* between the January 1, 2022 regulations and the enforcement actions occurring in May and June 2023.

2.    **Plaintiffs' Allegations Do Not Satisfy the PSLRA's Heightened Pleading Standard for Defendants' Forward-Looking Statements.**

The majority of the challenged disclosures also are quintessential "forward-looking statements" that are each made by the Individual Defendants discussing ELC's projections[6] and its expectations for the travel retail channel generally, and Hainan specifically.[7] *See Wesco Aircraft*, 454 F. Supp. 3d at 387. These statements are protected by the PSLRA, which shields "forward-looking statements whether written or oral" from liability, 15 U.S.C. § 78u-5(c), when that statement is "identified and accompanied by meaningful cautionary language . . . *or* is immaterial . . . *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Wesco Aircraft*, 454 F. Supp. 3d at 385.

Here, ELC's public disclosures and earnings calls were prefaced with specific, meaningful cautionary language relating to forward-looking statements.[8] ELC disclosed that travel retail was "a significant contributor to our overall results," and "[e]vents that impact consumers' willingness or ability to travel or purchase our products while traveling may impact our business." Ex. X at 20. ELC also consistently warned of the precise risk that Plaintiffs allege occurred—"changes in the laws, regulations and policies (including the interpretations and enforcement thereof)" that

---

[6] *See, e.g.*, Compl. ¶ 164 ("We anticipate sequential acceleration to strong organic sales"); Ex. W at 2 (same); Compl. ¶ 166 ("we should start to see an inventory build related to the shipments that we expect to see in Q4" and "we are sitting on a decent amount of inventory…to supply the sales we expect to see in the fourth quarter."); *see also id*. ¶ 169 (expressing "confidence that the challenges in travel retail are abated with time" and "comfort that we're going to see a recovery."); *id*. ¶ 171 ("we have no concerns whatsoever about travel retail growing with traveling consumers.")

[7] *See, e.g.*, Compl. ¶ 145 ("the confidence into Hainan future is unchanged actually increased given the incredible development of the place"); *id.* ¶ 162 ("the power of Hainan in the future"); *id.* ¶ 171 ("we have no concerns whatsoever about travel retail growing with traveling consumers").

[8] *See, e.g.*, Ex. O at 2 ("[O]ur remarks today contain forward-looking statements, let me refer you to our press release and our reports filed with the SEC."). "Incorporation of cautionary language in SEC filings during earnings calls is sufficient to trigger the PSLRA's safe harbor." *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc*., 412 F. Supp. 3d 353, 362 (S.D.N.Y. 2019).

"affect, or will affect, [ELC]'s business, including those relating to its products or distribution networks." *See, e.g.*, *id.* at 56; Ex. Z at 13; *Gregory v. ProNAi Therap. Inc.*, 297 F. Supp. 3d 372, 405 (S.D.N.Y. 2018) (disclosures that warn of "precise risks" that "eventually materialized" are meaningful).

This alone shields the Individual Defendants from liability for all forward-looking statements. But these statements are also not actionable because the Complaint does not contain a single well-pleaded allegation suggesting that Mr. Freda or Ms. Travis had "*proof of knowing*" that their statements regarding the future of Hainan or the Company's expected sales were false. *Wesco Aircraft*, 454 F. Supp. 3d at 395. No FE alleges any direct personal contact with Mr. Freda or Ms. Travis, nor do Plaintiffs allege the presence of (let alone that either executive actually received) internal reports stating that a crackdown on *daigou* would cause a long-term decline in the Company's travel retail business. *See In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *13 (S.D.N.Y. Mar. 12, 2015) (allegations that an individual defendant "was involved in all operations" and that an FE was told that he "already knew" about sales were insufficient to support *actual knowledge* of contemporaneous falsity). Plaintiffs also fail to meet the higher standard for actual knowledge because they cannot even plead recklessness. *See infra* Point I.B.3.

### 3. Plaintiffs Do Not Plead That Defendants Did Not Genuinely and Reasonably Believe the Opinions They Personally Expressed.

The Individual Defendants' statements—comments such as "*I believe* one of the most important opportunities globally in beauty is the development of the Hainan Duty-Free space," Compl. ¶ 159, and "*[w]e believe* the Hainan . . . is a super strong opportunity," *id.* ¶ 162; Ex. Y at 14—are also personal opinions expressing beliefs about the future.[9] *See In re Y-mAbs Therapeutics*

---

[9] *See supra* p. 22 n.6 (citing Compl. ¶¶ 164, 166, 169, 171); *see also id.* ¶ 145 ("so the confidence into Hainan future is unchanged actually increased given the incredible development of the

*Sec. Litig.*, 2024 WL 451691, at *8 (S.D.N.Y. Feb. 5, 2024) (Subramanian, J.) (rejecting argument that statements without express qualifiers like "I believe" are not opinions). Such statements are actionable only if the speaker "'did not hold the belief [] professed'" or "omit[ted] information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 575 U.S. at 186–87). Nothing in the Complaint suggests that the Individual Defendants did not genuinely hold the opinions they expressed on these earnings calls. And to show that their stated opinions were misleading by omission, Plaintiffs must "identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Bldg. Trades Pension Fund of W. Pa. v. Insperity, Inc.*, 2022 WL 784017, at *7 (S.D.N.Y. Mar. 15, 2022). Moreover, even if the Individual Defendants had some awareness of the *daigou* crackdown, "omitting even significant, directly contradictory information from opinion statements is not misleading." *Frankfurt-Tr. Inv. Luxemburg AG*, 336 F. Supp. 3d at 229. Thus, "[a]bsent any clearer conflict between [the impact of the *daigou* crackdown] and Defendants' statements, opinions expressing optimism . . . or that Defendants were . . . 'confident,' are not actionable under section 10(b)." *In re Y-mAbs Therapeutics*, *Inc*., 2024 WL 451691, at *9. Plaintiffs plead none of this. *See supra* Point I.A.1.[10]

---

place."); *id.* ¶ 189 ("this near-term temporary pause does not diminish our deep conviction in Hainan for the long term"); *id.* ¶ 204 ("We now expect that a far more gradual return to normal sales growth in Asia travel retail is likely to persist into the first half of fiscal 2024").

[10] Plaintiffs' challenge to disclosures about the source of ELC's past performance in travel retail and its optimism about future performance (*see, e.g.*, Compl. ¶¶ 130, 143, 145, 159, 162) also fail because these statements "neither state nor imply anything" about *daigou*'s impact on ELC's revenues that would mislead a reasonable investor. *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012). Statements that travel retail sales "reflect[] continued strength of our brands with the Chinese consumer" or "reflect continued growth from Asia/Pacific" (Compl. ¶¶ 130, 143) along with others expressing "confidence" in

### B.    Plaintiffs Do Not Plead a Strong Inference of Scienter.

Plaintiffs' failure to plead a material misstatement or omission ends the case. But they also independently fail to plead "with particularity" facts giving rise to a "strong inference" of scienter for each alleged misrepresentation and omission. 15 U.S.C. § 78u-4(b)(2), (b)(3). They must—but do not—allege with particularity: (i) "that defendants had the motive and opportunity to commit fraud" or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022).

### 1.    The Opposing Inference of Non-Fraudulent Intent is Compelling.

Plaintiffs must allege an inference of scienter that is "more than merely plausible or reasonable," but rather "cogent and at least as compelling as any opposing inference of nonfradulent intent." *Tellabs*, 551 U.S. at 314. This requires a "comparative evaluation" of "inferences urged by the plaintiff" and "competing inferences rationally drawn from the facts alleged." *Id.* Here, there is a clear and compelling inference of non-fraudulent intent. The Class Period was a time of intense and unpredictable turmoil defined by an unprecedented pandemic that included unexpected "late-stage COVID-19 variant surges" and "government lockdowns" in China (Compl. ¶ 33, n. 8), and an unpredictable regulatory landscape concerning *daigou* (*id.* ¶¶ 29, 30). This whirlwind of events—entirely outside of ELC's control—made it exceedingly difficult to predict its sales in the channel most affected by foreign distribution and travel restrictions: travel retail. ELC was forthcoming about the challenges brought on by COVID-19, *see supra* pp. 8–9, lowered its forward-looking guidance four times (*see* Compl. ¶¶ 181, 192, 202, 226), accurately reported net sales (*see id.* ¶¶ 213, 225), truthfully explained the reasons for its

---

"Hainan['s] future" (*id.* ¶¶ 145, 162) or referring to the "incredible results in travel retail during the COVID Western lockdowns" (*id.* ¶ 159) bear no "direct connection" to the alleged non-disclosed facts and are not misleading by omission. *Menkes v. Stolt-Nielsen S.A.*, 2005 WL 3050970, at *8 (D. Conn. Nov. 10, 2005).

revised guidance and declining sales, and then promptly disclosed the impact of "enforcement actions to control *daigou* activity" as soon as they began to be felt (*id.* ¶ 214). ELC's inability to predict that *daigou* regulations may be enforced and could impact its net sales *at some point in the future* does not support a strong inference of fraudulent intent. After all, "[c]orporate officials need not be clairvoyant." *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund*, 724 F. Supp. 2d at 460.

Plaintiffs, by contrast, do not offer *any* well-pled theory explaining the alleged fraud— never mind one that is at least as compelling as the opposing inference of non-fraudulent intent. Plaintiffs posit that Defendants chose to slowly partially reveal "the relevant truth" about ELC's declining "net sales in its travel retail business" over many months, punctuated by multiple reductions in ELC's forward-looking guidance. Compl.¶¶ 181–82; *see also id.* ¶¶ 185, 192, 196, 202, 208, 213, 218, 225, 231. Plaintiffs do not bother to explain how Defendants would benefit from such an implausible scheme. *See In re WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511, at *13 (S.D.N.Y. Jan. 2, 2013). "In light of the number, frequency, and level of detail of [ELC's] negative disclosures . . . the more compelling inference is that defendants went to great lengths to" disclose impacts on its travel retail business as they unfolded. *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 503 (S.D.N.Y. 2013).

### 2. Plaintiffs Do Not Plead Motive and Opportunity.

Plaintiffs also have not pleaded facts showing that Defendants "'benefited in some concrete and personal way from the purported fraud.'" *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 779 (S.D.N.Y. 2021). Plaintiffs do not allege a single "concrete" benefit. Stray references to ELC's "commitment to preserving both its market position and public perception" (Compl. ¶ 5) are plainly insufficient. *See, e.g., Francisco*, 481 F. Supp. 3d at 213 (the "desire for the corporation to appear profitable and the desire to keep stock prices high . . . do[es] not suffice to establish a motive").

26

### 3.    Plaintiffs Do Not Plead Recklessness.

Because Plaintiffs have not pleaded motive, the strength of the circumstantial allegations of conscious misbehavior or recklessness must be "'correspondingly greater.'" *Maloney*, 518 F. Supp. 3d. at 780. They must establish conduct which is "highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *22 (S.D.N.Y. Sept. 21, 2021). Plaintiffs have not met their burden. Their allegations of recklessness are more of the same—that ELC should have better predicted the unpredictable— and are based on allegations by three anonymous FEs that are both unreliable and substantively deficient. *See* Compl. ¶¶ 240–46; *supra* Point I.A.1.a. The alleged access to information described by these FEs does not constitute "'strong circumstantial evidence' of recklessness." *Maloney*, 518 F. Supp. 3d at 781; *see also In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *30 (S.D.N.Y. Apr. 2, 2020) (allegations that senior executives "tracked" problems were insufficient). And none of the FEs "identify a report demonstrating that the Individual Defendants were aware" of any overdependence on *daigou* and impact on ELC's sales. *Am. Exp.*, 724 F. Supp. 2d at 460.

Plaintiffs' handful of additional theories to attempt to establish scienter also fail.

***Individual Defendants' Positions.*** Plaintiffs allege that as CEO and CFO, the Individual Defendants "had intimate knowledge of [ELC's] business operations," "closely tracked sales," and therefore "knew or recklessly disregarded" that ELC's statements were false and misleading. Compl. ¶¶ 236–38. But Plaintiffs "must do more than allege that the Individual Defendants had or should have had knowledge of certain facts . . . simply by virtue of their high-level positions." *In re PetroChina Co. Sec. Litig.*, 120 F. Supp. 3d 340, 366 (S.D.N.Y. 2015).[11]

---

[11] Similarly, Plaintiffs' allegations that because "the Individual Defendants spoke at length . . . about the Company's travel retail business" and were asked about "government and retailer policies related to unstructured market activity" they somehow "knew that the Company was

*Core Operations.* Plaintiffs claim travel retail was a part of the "core operations" of ELC. Compl. ¶ 247. But "the majority rule" in the Second Circuit "is to 'consider the core operations' allegations to constitute supplementary, but not an independent, means to plead scienter." *Holbrook v. Trivago N.V.*, 2019 WL 948809, at *22 (S.D.N.Y. Feb. 26, 2019). Plaintiffs also do not allege what portion of travel retail is attributable to travel retail in China, much less *daigou*. Their assertion that "travel retail accounted for roughly one-third of [ELC]'s annual revenue" (Compl. ¶ 65) falls far short of the requirement "that the operation in question constitute nearly all of a company's business." *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011). And vague claims that travel retail was a "large[] growth pillar" and a "key strategic initiative[]" (Compl. ¶ 83, 147) are likewise insufficient. *See In re Adient plc*, 2020 WL 1644018, at *29.

*The Pre-Class Period SEC Inquiry.* Plaintiffs allege the "SEC's heightened scrutiny of [ELC's] net sales figures . . . support[s] the inference that Defendants knew or were reckless in not knowing that the Company's net sales were overly dependent on *daigou*." Compl. ¶ 256. But this allegation concerned disclosures about granular pricing and sales metrics, not *daigou*, and moreover, concerned increased net sales volumes in *2021*, *before* the Class Period.

*Corporate Scienter.* Plaintiffs have failed to plead scienter on the part of any ELC employee that could be attributed to ELC. *See supra* pp. 25–27; *Francisco*, 481 F. Supp. 3d at 214.

**C.    Plaintiffs Do Not Adequately Allege Loss Causation.**

Plaintiffs' failure to plead loss causation is a third, independent ground for dismissal. Plaintiffs must allege that "'the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Lentell*, 396 F.3d at 173. Here, Plaintiffs attempt to recast five loss-

---

experiencing declining net sales . . . due to an overdependence on *daigou*" are entirely conclusory. Compl. ¶¶ 257, 261–62; *see also id.* ¶¶ 239, 258–264. At best, they indicate the Individual Defendants knew about the existence of *daigou*, tracked sales data for ELC's travel retail segment, and were knowledgeable about certain travel trends.

causing events as corrective disclosures or the materializations of risk concealed by the fraud. Compl. ¶¶ 181, 192, 202, 213, 225. Under either theory, Plaintiffs' allegations fail.

*First*, to be sufficiently corrective, a disclosure must "reveal to the market the falsity of the prior [disclosures]." *Lentell*, 396 F.3d at 175 n.4. But the first three allegedly corrective disclosures relate to: (i) "tighter inventory management in Asia travel retail" (Nov. 2, 2022); (ii) "disruption to travel and staffing levels in Hainan," and "potential roll-back of COVID-related supportive measures in Korea duty free" (Feb. 2, 2023); and (iii) volatility of recovery from COVID-19 (May 3, 2023) (Compl. ¶¶ 181, 192, 202–03), not *daigou*.[12] Disclosures that "have nothing to do with the alleged fraud" "are not 'corrective'" *In re MINISO Grp.*, 2024 WL 759246, at *20. Plaintiffs' reliance on the August 18, 2023 and November 1, 2023 disclosures also fail. Compl. ¶¶ 214, 225. The August announcement attributes sales declines for the "***fourth quarter***" to "enforcement actions to control *daigou* activity." *Id.* ¶ 214 (emphasis modified). And the November announcement attributes sales declines in the first quarter of 2024 when "***compared to the prior-year [quarter]***." *Id.* ¶ 225 (emphasis added). Both disclosures relate to the impact of new *daigou* enforcement actions for two specific quarters; they say nothing about the rest of the Class Period. *See Gru v. Axsom Therapeutics, Inc.*, 2023 WL 6214581, at *5 (S.D.N.Y. Sept. 25, 2023) (no loss causation where "[t]here was no corrective disclosure about manufacturing issues").

Moreover, the November 1, 2023 disclosure did not reveal anything new to the market. "A negative [] characterization of previously disclosed facts does not constitute a corrective disclosure." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010). ELC's August

---

[12] Plaintiffs also fail to "distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price." *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010). Here, the "tangle of other factors" like the pandemic volatility in Asia Pacific generally affected the stock price, not *daigou* in Hainan.

18, 2023 statement already discussed *daigou* enforcement and its likely effect on ELC as known at the time. *See supra* p. 10. The November 1, 2023 disclosure merely repeated that "changes in government and retailer policies related to unstructured market activity" impacted ELC's net sales in the relevant quarter. *Compare with* Compl. ¶ 214 (citing Earnings Call dated August 18, 2023) ("retail sales trends deteriorated and turned steeply negative following the enforcement actions to control *daigou* activity"). Plaintiffs cannot establish that the November 1, 2023 announcement disclosed "any new facts." *In re MINISO Grp. Holdings*, 2024 WL 759246, at *20.

*Second*, materialization of the risk "requires a direct connection between the risk that is hidden from investors and the subsequent loss suffered by those investors." *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 475 (S.D.N.Y. 2014). Plaintiffs fail this test because they do not allege that the effects of the crackdown on *daigou* were foreseeable to ELC at the time of the alleged misstatements, many of which were made at the height of unprecedented and uncontrollable events. *See supra* Point I.B.

## II.    PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM

Because Plaintiffs have failed to plead an underlying "primary violation" of Section 10(b) or culpable participation by the Individual Defendants for all the reasons stated above, Plaintiffs' control person claim fails. *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 356.

### <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.

Dated: May 3, 2024
        New York, New York

Respectfully submitted,

_/s/ Jonathan D. Polkes_

Jonathan D. Polkes
Caroline Hickey Zalka
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

_Counsel for Defendants The Estée Lauder Companies Inc., Fabrizio Freda, and Tracey T. Travis_