**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE THE ESTÉE LAUDER CO., INC. SECURITIES LITIGATION | No. 1:23-cv-10669-AS |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... iii

I.    PRELIMINARY STATEMENT .......................................................................... 1

II.   STATEMENT OF FACTS .................................................................................... 4

    A.    In 2019, Defendants Assured Investors that Lauder Was "Never Benefiting" from *Daigou* and Had "Strict Policies" in Place to Avoid the Gray Market .......... 5

    B.    In 2020, Unbeknownst to Investors, Lauder Flooded *Daigou* with Product to Grow Sales and Became Over-Dependent ................................................................ 5

    C.    In 2021, Investors Were in the Dark as to the Impact of Lauder's Largest Customer and the Chinese Government's Pledge to Eradicate *Daigou* ................. 6

    D.    In 2022, the Class Period Begins as Lauder Misleads Investors Concerning *Daigou*'s Role in its Declining Travel Retail Sales ............................................... 6

III.  LEAD PLAINTIFF HAS ADEQUATELY STATED A § 10(B) CLAIM ....................... 8

    A.    LEAD PLAINTIFF SUCCESSFULLY PLEADS FALSE AND MISLEADING STATEMENTS ............................................................................. 9

        1.    Defendants' Attack on the Complaint's Allegations by Anonymous Former Employees Ignores Applicable Precedent and Is Unjustified ...................................................................................... 11

            a.    Each FE Is Credible and Possesses a Sufficient Basis of Knowledge as to Her Allegations ............................................... 11

            b.    The FEs' Allegations Demonstrate Falsity ................................... 14

        2.    On November 1, 2023, Lauder Admitted that *Daigou* Was a Primary Driver of Sales in Its Asia Travel Retail Business ..................... 16

        3.    The *Daigou* Crackdowns Matter Because of Defendants' Statements Concerning Lauder's Reliance on the Prohibited Sales Practice ......................................................................................... 17

        4.    The Statements that Defendants Contest as Forward-Looking Are Not Entitled to Safe Harbor Under the PSLRA ....................................... 18

        5.    The Purported Statements of Opinion Are Actionable ........................... 20

6.      Defendants Do Not Challenge Certain Statements as Forward-
        Looking or Opinion Statements ................................................................. 22

B.      THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER ........ 23

1.      Defendants Had Actual Knowledge, or, at Minimum, Acted with
        Recklessness When They Made the Misstatements.................................. 24

2.      Defendants Ignore Plaintiffs' Other Alleged Indicia of Scienter.............. 27

C.      THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION............. 28

IV.     LEAD PLAINTIFF HAS ADEQUATELY STATED A § 20(A) CLAIM ...................... 30

V.      CONCLUSION................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. NewLink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020)..................................................................................21, 22

*Akerman v. Arotech Corp.*,
   608 F. Supp. 2d 372 (E.D.N.Y. 2009) ............................................................................25

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012)............................................................................................9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)............................................................................................25

*In re Barrick Gold Sec. Litig.*,
   2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015).................................................................29

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014).............................................................................................4

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
   2018 WL 2382600 (S.D.N.Y. May 24, 2018) ...............................................................19

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*,
   2019 WL 719751 (S.D.N.Y. Feb. 19, 2019)..................................................................26

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020)............................................................................12

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)............................................................................25

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
   423 F. Supp. 2d 348 (S.D.N.Y. 2006)............................................................................23

*Cornwall v. Credit Suisse Grp.*,
   689 F. Supp. 2d 629 (S.D.N.Y. 2010)......................................................................14, 25

*In re Dynex Cap., Inc. Sec. Litig.*,
   2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ................................................................14

*Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)...................................................................................8, 13, 23

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
　2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ........................................................11

*Freudenberg v. E\*Trade Fin. Corp.*,
　712 F. Supp. 2d 171 (S.D.N.Y. 2010).............................................................9, 20

*Gagnon v. Alkermes PLC*,
　368 F. Supp. 3d 750 (S.D.N.Y. 2019)..................................................................23

*Galestan v. Onemain Holdings, Inc.*,
　348 F. Supp. 3d 282 (S.D.N.Y. 2018)..................................................................14

*Gauquie v. Albany Molecular Rsch., Inc.*,
　2016 WL 4007591 (E.D.N.Y. July 26, 2016)......................................................27

*In re Gen. Elec. Sec. Litig.*,
　857 F. Supp. 2d 367 (S.D.N.Y. 2012)..................................................................27

*In re Henry Schein, Inc. Sec. Litig.*,
　2019 WL 8638851 (S.D.N.Y. Sept. 27, 2019)......................................................23

*In re Initial Pub. Offering Sec. Litig.*,
　544 F. Supp. 2d 277 (S.D.N.Y. 2008)..................................................................29

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
　251 F. Supp. 3d 596 (S.D.N.Y. 2017)...............................................................9, 10

*Kramer v. Time Warner, Inc.*,
　937 F.2d 767 (2d Cir. 1991)...................................................................................9

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
　797 F.3d 160 (2d Cir. 2015).............................................................................9, 28

*Matrixx Initiatives, Inc. v. Siracusano*,
　563 U.S. 27 (2011)..................................................................................................8

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
　761 F.3d 245 (2d Cir. 2014)....................................................................................9

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
　982 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................19

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
　709 F.3d 109 (2d Cir. 2013)..................................................................................13

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
　455 F. App'x 10 (2d Cir. 2011) ............................................................................27

iv

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)......................................................................................11, 23, 25

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
563 F. Supp. 3d 259 (S.D.N.Y. 2021)............................................................................28, 29

*Omnicare, Inc. v. Laborers Dist. Council Indus. Pension Fund*,
575 U.S. 175 (2015)...............................................................................................................21

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015).....................................................................................25

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)..................................................................................................20

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona, Inc.*,
2024 WL 1898512 (S.D.N.Y. May 1, 2024) .......................................................................6, 26

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001).......................................................................................................9

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010)...................................................................................................19

*Speakes v. Taro Pharm. Indus., Ltd.*,
2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018).....................................................................27

*In re Supercom Inc. Sec. Litig.*,
2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ......................................................................26

*Tellabs, Inc. v. Makor Issues & Rights., Ltd.*,
551 U.S. 308 (2007)..........................................................................................................23, 24

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005)...............................................................................20, 23

*In re Vivendi, S.A. Securities Litigation*,
838 F.3d 232 (2d Cir. 2016)...................................................................................................29

*Wallace v. IntraLinks*,
2013 WL 1907685 (S.D.N.Y. May 8, 2013) ........................................................................11

*Wilson v. LSB Indus., Inc.*,
2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ...................................................................18, 19

*In re XL Fleet Corp. Sec. Litig.*,
2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)........................................................................14

*In re Y-mAbs Therapeutics Sec. Litig.*,
  2024 WL 451691 (S.D.N.Y. Feb. 5, 2024).................................................................21

*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021) ...........................................................24

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B).................................................................................................9

Private Securities Litigation Reform Act of 1995 (PSLRA) ........................................9, 18, 19, 20

Securities Exchange Act of 1934
  Securities Exchange Act Section 10(b) ........................................................................8, 23, 30
  Securities Exchange Act Section 20(a)...........................................................................30

**Rules and Regulations**

Fed. R. Civ. P. 8.................................................................................................................4
Fed. R. Civ. P. 9(b) ...........................................................................................................9
SEC Rule 10b-5(b)..............................................................................................................8

Lead Plaintiff Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System (collectively, "Lead Plaintiff") respectfully submits this memorandum of law in opposition to Defendants'[1] Motion to Dismiss[2] the Consolidated Amended Class Action Complaint.[3]

## I.    PRELIMINARY STATEMENT

In 2020, leading beauty company Lauder took advantage of a duty-free policy in Hainan, China to misleadingly prop up sales during the global pandemic.  Defendants exploited this policy by funneling Lauder's high-end products into a prohibited gray market called *daigou*, which allowed the Company to generate unexpectedly strong sales in its travel retail business.  However, investors were not aware that *daigou* was the true source of Lauder's industry-leading sales during the height of the pandemic in 2020 and 2021.  Indeed, the prior year, Defendant Freda assured investors that Lauder maintained "**long-standing**," "**strict policies**" to avoid *daigou* and was "**never benefiting**" from gray market activity.

By mid-2021, Hainan became overrun with *daigou,* and the practice predictably threatened China's economic health.  In response, Lauder's largest customer, government-owned travel retailer China Duty Free Group, pledged to eradicate gray market activity in July 2021.  The Chinese government followed suit by enacting strict regulations on January 1, 2022 to stamp out *daigou*.  By this point, investors remained unaware that Lauder's soaring travel retail sales figures had become dependent on sales generated by unsustainable and illegal *daigou* gray market resale. The proverbial writing was on the wall, as Lauder sat poised to lose its ability to rely on *daigou* as

---

[1] Defendants are The Estée Lauder Companies Inc. ("Lauder," "ELC," or the "Company"), Fabrizio Freda ("Freda"), and Tracey T. Travis ("Travis") (the "Individual Defendants," and collectively with Lauder, "Defendants").

[2] "Motion" or "Mot." refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF No. 51).

[3] Lead Plaintiff's pleading is referred to herein as the "Complaint" (cited as "¶_").  ECF No. 47.

a critical revenue stream. Throughout the Class Period, beginning February 3, 2022, Defendants engaged in a series of actionable, fraudulent misrepresentations designed to conceal that Lauder previously relied on *daigou* to boost travel retail sales and that it was the crackdowns that drove a series of travel retail sales declines.

In their Motion, Defendants do not deny that Lauder secretly used *daigou* to generate sales in its travel retail business—the core allegation giving rise to Defendants' fraud. To distract from this key point, Defendants intentionally misconstrue the theory of fraud pled in the Complaint, choosing to focus only on China's *daigou* crackdowns. In doing so, Defendants tellingly ignore the manner in which Lauder leveraged Hainan's duty-free policy to push sales through to a prohibited gray market, while concealing the true source of Lauder's travel retail success from investors. For the reasons set forth herein, Defendants' Motion should be denied.

*First*, Defendants' attack on falsity fails because it improperly evaluates the Complaint's allegations in isolation and ignores its cohesive theory of fraud. For example, Defendants do not assess the complete picture of each anonymous former employee's credibility, including their lines of reporting, and neglect the corroborative effect of the whole Complaint on their allegations of falsity. This includes statements by Defendants themselves, which bolster the former employees' allegations. Defendants then attempt to rewrite their November 1, 2023 disclosure by cross-referencing separate Company filings, which strains logic and has no bearing on falsity. In another attempt to recast the Complaint as conjecture, Defendants argue that more information about the *daigou* crackdowns is required. This argument fails because several statements pled relate to Defendants' misrepresentations about the true source of Lauder's travel retail growth **before** the *daigou* crackdowns. Defendants then incorrectly challenge several of the statements as forward-looking, despite the fact that those statements are expressed in the past or present tense and, in any

2

event, are not protected by the safe harbor because: (i) Lauder's generic warnings about "regulations" were meaningless to investors who believed that the Company was not engaged in *daigou*; and (ii) were also made with knowledge of their falsity. Defendants' final argument that certain statements are nonactionable opinions is similarly unpersuasive because those statements were expressions based on facts and knowledge conveyed by the speaker at the time, not opinions.

*Second*, Defendants' piecemeal attack on scienter fails. Viewed holistically, as the Court must, the Complaint demonstrates that Defendants had actual knowledge or, at a minimum, acted with recklessness when they made the misstatements. Specifically, Defendants closely tracked travel retail sales and received reports identifying their origin. Additionally, travel retail functioned as a core operation, comprising nearly one-third of Lauder's revenues. Further, the SEC inquired about Lauder's increased net sales during the pandemic, which echoes the Complaint's theory that Defendants funneled massive amounts of product into *daigou* during that time to generate sales. Finally, Defendants made frequent public statements concerning travel retail sales, Chinese regulations, Hainan, and *daigou*, conveying to investors they were aware of these topics and their potential impact on Lauder's business. In sum, the Complaint's scienter allegations are cogent and at least as compelling as any opposing inference.

*Third*, Defendants argue that the five partial corrective disclosures pled have either "nothing to do" with the alleged fraud, or "did not reveal anything new to the market." These arguments fail because, during the course of these disclosures, Defendants led investors to believe that Lauder was "never benefiting" from *daigou*. Following the crackdowns, Lauder's travel retail sales declined, which Defendants misleadingly attributed to a host of other factors. Even after Defendants disclosed "**steeply negative**" sales trends in the wake of *daigou* enforcement actions, Defendants maintained that these were merely "***short-term headwinds***." Accordingly, each of the

3

alleged disclosures revealed new information to investors about the reality of the poor performance and capabilities of Lauder's critical travel retail segment. In addition, each disclosure of increasingly negative performance was a foreseeable risk that materialized as Defendants slowly revealed more information about the reality of its travel retail segment's financial health in the absence of *daigou* sales. Such a showing is all that is required at this stage under the Federal Rules of Civil Procedure 8 pleading standard. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 231 (2d Cir. 2014) (requiring that plaintiff's loss causation allegations are "plausible"). The Court should deny Defendants' motion to dismiss.

## II.    STATEMENT OF FACTS

Defendants effectively concede that Lauder relied on *daigou* to generate travel retail sales. To cast attention away from this critical admission, Defendants manipulate a plain reading of the Complaint. *See* Mot. at 4-7. For example, Defendants repeatedly focus on the *daigou* crackdowns and ignore that the fraud alleged hinges on Defendants' failure to disclose that *daigou* drove Lauder's travel retail success **prior to the crackdowns**. Mot. at 1-2, 5-6, 17-18, 23-24; ¶¶130-144, 159-161. Defendants' tactic distorts the role of the pandemic by failing to address that Defendants **took advantage** of Hainan's duty-free policy, a 2020 pandemic stimulus measure. *See* Mot. at 4-7. ¶¶81-98. Instead, Defendants argue that China's late-stage, episodic coronavirus variant closures in 2022 and 2023, should shield Lauder from its fraudulent misrepresentations and omissions concerning *daigou*. Mot. at 25. Defendants cannot use the pandemic to shelter themselves from liability, when their fraud springs from exploiting a pandemic stimulus policy to generate sales through *daigou*—activity that Defendants claimed Lauder was "never benefiting" from. *See* ¶80. Lead Plaintiff recounts the complete factual timeline below, as set forth in the Complaint.

4

A.    **In 2019, Defendants Assured Investors that Lauder Was "Never Benefiting" from *Daigou* and Had "Strict Policies" in Place to Avoid the Gray Market**

On February 5, 2019, Defendant Freda publicly reassured investors on an earnings call that the Company did not benefit from *daigou*.  ¶¶78-80.  Specifically, an analyst asked whether China's newly enacted *daigou* regulations—designed to disincentivize the illicit practice via registration requirements—had any "impact" on Lauder's travel retail business.  ¶¶11, 80.  Freda responded by assuring investors that *daigou* regulations did not "impact" the Company, thanks to Lauder's "long-standing," "strict policies" aimed to avoid "any phenomenon like this."  ¶80.

Freda's statements flatly denied the Company's use of *daigou*.  *Id.*  Freda further gave investors certainty that governmental regulations relating to *daigou* would not "impact" Lauder's business and touted Lauder's internal mechanisms to track and prevent the flow of products into the gray market.  *See id.*; ¶¶78-80, 98 (containing former employee allegations detailing Lauder's policy).  Defendants now contradict Freda's statements, for example, by arguing that investors should have been aware that *daigou* regulations would impact Lauder's business based on its generic risk disclosures.  *See* Mot. at 7, 22-23.  In sum, Defendants cherry-pick the contents of Freda's pre-Class Period statements and omit his assurances to investors that the Lauder had "strict policies" to avoid the gray market, was "never benefiting" from *daigou* activity.  *See* ¶80.

B.    **In 2020, Unbeknownst to Investors, Lauder Flooded *Daigou* with Product to Grow Sales and Became Over-Dependent**

Defendants fail to respond to allegations concerning the Company's incentive, opportunity, and actions taken to pump products into *daigou* following the onset of the pandemic.  *See* Mot. at 7; ¶¶81-98.  As pled, an integral part of Defendants' fraud was exploiting Hainan's duty-free policy during the initial pandemic outbreak to generate high-volume sales by pushing products into *daigou*.  ¶¶81-83.  Unbeknownst to investors, Lauder flooded the gray market and quickly became dependent on the unsustainable practice to inflate its sales.  ¶¶81-98.  Lauder's activity during this

timeframe was critical to the false and misleading statements made during the Class Period. ¶¶81-98, 128-172. Further, Defendants' attempt to distance themselves from *daigou* by arguing that Lauder's "travel retail business consist[s] entirely of sales to 'travel retail operators,' who then sell through to consumers" should be rejected. *See* Mot. at 4; *San Antonio Fire & Police Pension Fund v. Dentsply Sirona, Inc.*, 2024 WL 1898512, at *1, 4 (S.D.N.Y. May 1, 2024) (rejecting a similar argument, citing "of course, distributors would only buy as much as they could sell to end users").

### C. In 2021, Investors Were in the Dark as to the Impact of Lauder's Largest Customer and the Chinese Government's Pledge to Eradicate *Daigou*

Predictably, Lauder's ability to rely on *daigou* to drive sales came to an end. ¶¶99-103. Specifically, in July 2021, Lauder's largest customer—government-owned travel retailer China Duty Free Group ("CDFG")—announced that it would crack down on *daigou* gray market resale. *Id.* CDFG's pledge was part of the Chinese government's call to end *daigou*, which was memorialized through regulations cracking down on the illicit sales practice on January 1, 2022. ¶¶99, 102-103. Defendants briefly dismiss this event of critical importance, incorrectly arguing that CDFG's crackdown is "not alleged to have had any effect on ELC's travel retail business." Mot. at 7. However, the Complaint alleges that CDFG's pledge both "held a pin to the Company's ballooning sales" and "posed an imminent threat to Lauder's ability to rely on this unsustainable sales channel to drive growth." ¶¶28, 99. The Complaint repeatedly alleges that CDFG was "critically important" to Lauder's travel retail sales, accounting for 14% of the Company's net sales in 2021 and 2022 and 90-99% of the market share in Hainan. ¶¶2, 9, 69, 100. By 2023, Lauder's annual 10-K filing no longer reported a largest customer. *See* ¶¶9, 99-103.

### D. In 2022, the Class Period Begins as Lauder Misleads Investors Concerning *Daigou*'s Role in its Declining Travel Retail Sales

Having become dependent on *daigou* by the time China's crackdowns took effect, Defendants made a series of public misrepresentations and omissions during the Class Period

6

concerning the drivers of net sales swings (positive and negative) in its travel retail business. ¶¶104, 128-172.  Throughout the Class Period, beginning February 3, 2022, Lauder misrepresented to investors that a host of other issues were driving these sales results—including consumer demand, coronavirus variant surges, supply chain issues, inventory tightening, and inflation, among others—while omitting reference to *daigou*.  ¶¶110, 130-171.  For example, when speaking on the period **before** the *daigou* crackdowns, Lauder attributed its travel retail success to "***continued strength of our brands with the Chinese consumer***," (¶¶130-142) and "***Hainan . . . more than substituting the amount of travelers in airports around the world***" (¶¶159-161).

Subsequently, **after** the *daigou* crackdowns took effect, Defendants attempted to explain Lauder's dwindling travel retail sales through factors such as "***volatility related to just some of the COVID restrictions and the flow of traffic in travel and people's comfort with travel***" (¶¶168-170).  Defendants did so while reassuring investors that their "***confidence into Hainan['s] future is unchanged***" (¶¶145-158) despite the Company's inability to access *daigou*, which—unbeknownst to investors—had become a critical revenue stream.  ¶¶104-109.  Instead of addressing these allegations, Defendants' Motion uses late-stage coronavirus variant surge shutdowns in 2022 and 2023 to avoid explaining the impact of the crackdowns on Lauder's ability to push sales through to *daigou* during that same time.  *See* Mot. at 8; ¶33 n.8.  This argument is misleading because, by Lauder's own admission, its travel retail business performed "exceptionally well" during the 2020 and 2021 pandemic lockdowns, when the Company was still able to funnel products into *daigou*.  *See* Mot. at 7.

Defendants also distort the five partial corrective disclosures alleged in the Complaint by arguing that Lauder "promptly disclosed a new event"—*daigou* enforcement actions—on August 18, 2023.  Mot. at 10.  Through this argument, Defendants attempt to temporally limit their

misrepresentations to investors. *See id.* However, at that time, Defendants also represented to investors that the "implication" of the *daigou* enforcement actions was simply "***a timing issue that's having a big short-term temporary impact for us***." ¶171. These statements conveyed nothing about Lauder's prior travel retail success via *daigou*, the true reasons for Lauder's reported poor performance, or the long-term effect of the crackdowns, leaving investors in the dark as to the driver of Lauder's poor travel retail sales results. *See id.*

The truth was not fully revealed to investors until Defendants' final corrective disclosure on November 1, 2023. ¶¶225-235. Defendants then disclosed that the Company's declining sales, which it had been attributing for over a year to other causes, were "**primarily due**" to government and retailer changes related to "**unstructured market activity**," which Defendants admit refers to *daigou*. *See* Mot. at 10, 20; ¶¶225-235. It was not until Defendants identified *daigou* as the primary cause of Lauder's travel retail sales declines that investors learned the true extent of Lauder's *daigou* involvement, as evidenced by the long-term effects of Lauder being unable to use the gray market as a major sales artery. *See* ¶¶225-227.

## III.   LEAD PLAINTIFF HAS ADEQUATELY STATED A § 10(b) CLAIM

To state a claim for securities fraud under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5(b), a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

On a motion to dismiss, a court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (citation omitted). Additionally, "'[F]act-specific

question[s] cannot be resolved on the pleadings.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (citation omitted).  Finally, Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") "do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).  Rather, an "alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original).[4]

### A.     LEAD PLAINTIFF SUCCESSFULLY PLEADS FALSE AND MISLEADING STATEMENTS

Under the PSLRA and Rule 9(b), falsity is alleged if the plaintiff "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).  To assess whether falsity is adequately alleged, the court must review defendants' statements in context and taken together.  *See Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014) (the misstatements "must be read in the context of the further disclosure").  Whether a statement is materially false or misleading "is generally a question reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017).  It is inappropriate to resolve such disputes on a motion to dismiss, "unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines

---

[4] Defendants improperly ask this Court to consider documents that were not cited in the Complaint for the truth of their contents.  *See* Mot. at 4 n.1.  However, judicial notice is used "not to prove the truth of their contents but only to determine what the documents stated." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

that reasonable minds could not differ on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *Id.*

Defendants incorrectly argue that this case "rests entirely" on Defendants' failure to disclose that the *daigou* crackdowns would impact Lauder's travel retail sales "at some unspecified point in the future." *See* Mot. at 11. Defendants misconstrue the Complaint's theory of fraud in several respects. First, Defendants made several misstatements during the Class Period about the time **prior to the crackdowns**—when *daigou* was the true source of Lauder's travel retail success—and misleadingly attributed sales growth to factors such as "***continued strength of our brands***." *See* ¶¶130, 143, 159. Second, Defendants' misstatements discussing Lauder's travel retail performance following the *daigou* crackdowns continued to positively tout Hainan and its strength despite **already knowing** that Lauder could not generate sales through *daigou*. *See* ¶¶145, 162, 164, 166, 168, 171. Third, the alleged statements separately attributed travel retail sales downturns to other factors, while **omitting the impact** of losing *daigou* as a critical revenue stream. *See id.* Defendants' arguments ignore not only a plain reading of the Complaint, but also simple logic that no reasonable investor could assess sales results from an undisclosed sales practice.

Rather than address the well-pled theory of fraud head-on, Defendants create strawman arguments premised on self-created factors cobbled together from unrelated cases. Mot. at 12 (declaring, without precedent, that Lead Plaintiff "must" demonstrate that Lauder (1) was "heavily reliant" on *daigou,* and (2) "knew the steps the Chinese government would take" to enforce *daigou* restrictions). However, Defendants do not get to invent their own rubric for the Complaint, while ignoring and distorting the key factual and legal grounds pled therein. *See* Mot. at 11-22.

**1.    Defendants' Attack on the Complaint's Allegations by Anonymous Former Employees Ignores Applicable Precedent and Is Unjustified**

Defendants' attack on falsity centers on the factual accounts provided by three anonymous former employees ("FE") of Lauder.[5]  Mot. at 12-19.  Throughout this argument, Defendants fail to evaluate that the Complaint's allegations demonstrate falsity as a whole and in context.  *See id.*

**a.    Each FE Is Credible and Possesses a Sufficient Basis of Knowledge as to Her Allegations**

In asking the Court to "decline to credit" the allegations of the FEs in the Complaint (Mot. at 12), Defendants cite to *Novak*, which simply requires FEs to be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (finding the FE credible).  Indeed, the standard for credibility is not onerous under the weight of authority within this Circuit.  *See In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at *9 (S.D.N.Y. Jan. 20, 2015) (finding description of "the [FEs] by their positions and dates of employment" sufficient for credibility); *Wallace v. IntraLinks*, 2013 WL 1907685, at *1 (S.D.N.Y. May 8, 2013) (accepting allegations that "provide[] sufficient information about each [FE's] position and to whom they reported, to support the probability that they possessed the alleged information").  The Complaint's particularized allegations overcome this hurdle.  *See* ¶¶54-56.

With respect to FE-1, Defendants' argument ignores several portions of her description that bolster her credibility.  *See* Mot. at 12-14.  Most notably, Defendants ignore the actual description of her job responsibilities and reporting lines.  ¶54 ("FE-1 also attended regular sales meetings, composed 'action plans' for her department, and participated in monthly meetings with

---

[5] Defendants contend that the FE allegations must meet a "two-part test" in this jurisdiction to survive dismissal.  Mot. at 12.  Defendants, however, provide no citation to a case imposing this requirement, and instead piece together quotes from cases addressing different aspects of confidential witness allegations and their sufficiency.  *Id.*

Lauder brand General Managers and Vice Presidents and Presidents of Travel Retail APAC, along with relevant employees from the sales and marketing teams."). Defendants also erroneously discount FE-1's bullseye proximity to *daigou*-related activity by way of working in Asia travel retail for both Lauder and her previous employer. ¶54. *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 407-08 (S.D.N.Y. 2020) (crediting FEs that "were present for some or all of the change in policy, and were in a position to comment on its potential risks" and "also had extensive experience working as salespeople in [the] industry.")

Defendants next attack FE-1 based on the fact that her knowledge is purportedly limited to "only two" of the over 15 brands in Lauder's brand portfolio. Mot. at 12. This argument fails because one of the brands that FE-1 worked for was La Mer, which put her in an ideal position to speak on *daigou*, as La Mer's "hero" products were ripe for distribution into the gray market, as corroborated by other FEs. *See* ¶¶60-61, 94 ("FE-2 also advised that Lauder's brands with the biggest business in China were the higher-priced, more prestige brands, such as . . . La Mer."), 98 ("FE-2 further advised . . . La Mer products (as examples) would be pincoded in Estée Lauder's systems to trace where they came from and if they ended up in an unusual place."). Defendant Freda also singled out La Mer when denying that *daigou* is a "problem" for Lauder during the Class Period. ¶264 ("Our brands, particularly La Mer . . . are in the top of the . . . desirability of the Chinese consumers . . . We check this every month by the way.").

With respect to FE-2, Defendants' challenges to her credibility are largely based on her employment predating the Class Period. *See* Mot. at 15-17. Defendants' argument ignores FE-2's robust description, which details "more than ten years" with the Company, which included "overseeing demand planning and store replenishment functions," "attend[ing] monthly demand planning and financial review meetings for her region," and work on "special projects to improve

12

various aspects of Lauder's business planning capabilities, including supply chain, demand planning, and financial planning." *See* ¶55. With respect to the timeframe of FE-2's employment, as alleged in the Complaint, Defendants' misrepresentations and omissions within the Class Period were done to avoid revealing to investors the extent and impact of Lauder's *daigou* involvement **in years prior**. ¶¶1, 128; *see New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 123-24 (2d Cir. 2013) (crediting FE testimony by regional employees who worked for defendant during all or part of the operative period preceding the release of allegedly misleading offering documents). Defendants' misguided attempt to discredit FE-2 is part and parcel of their fervent commitment to misconstruing the theory of fraud set forth in the Complaint, which arises from Lauder concealing that it relied on *daigou* to generate travel retail sales **prior to the Class Period**. ¶¶81-103. Indeed, the Second Circuit has held that "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *See Blanford*, 794 F.3d at 307.

Finally, Defendants' challenges to FE-3's credibility arise from similar contentions that her role description is "not credible or particularized." Mot. at 17. Far from being the type of "low level" or "rank-and-file" position described in Defendants' Motion, FE-3 was a member of the Company's "Senior Leadership" in Travel Retail EM[E]A. ¶56. In this role, FE-3 "attended monthly meetings with members of the leadership team" where she received information directly from monthly meetings "that occurred between Worldwide leadership attended by the Global President TR WW and the regional general managers." *Id.* Defendants' allegations that FE-3 lacks a basis for her knowledge is belied by the robust description of her role and reporting lines. *See* ¶¶56, 84, 86, 90, 96-97. Finally, Defendants argue that FE-3 working in EMEA "*undermines* her knowledge about ELC's operations in Hainan, China." Mot. at 18 (emphasis in original).

13

However, the Complaint describes how Lauder reports all travel retail sales in the EMEA region in its SEC filings.  ¶67.  Defendants' Motion concedes that Hainan is a critical part of Lauder's travel retail business and would be reported in the EMEA region.  *See* Mot. at 4.  This puts FE-3 in a position to have knowledge of the impact of Hainan on Lauder's travel retail business.  *See id.*

### b.    The FEs' Allegations Demonstrate Falsity

Defendants' argument that the FEs' allegations are insufficient to show falsity reflects an unsuccessful tactic: (1) cherry-pick allegations, (2) evaluate them in isolation, and (3) conclude that dismissal is warranted without analyzing the statements pled.[6]  *See* Mot. at 12-19.  In doing so, Defendants' analysis of the FE allegations fails to view the corroborative effect of the whole Complaint through the other FEs, public events, external facts, and Defendants' own statements. *See In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *5 (S.D.N.Y. Feb. 17, 2022) (finding complaint alleged facts to corroborate the confidential sources relied on); *Cornwall v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (crediting the statements of an FE who alleged that "everyone knew about problems with unconfirmed trades"); *In re Dynex Cap., Inc. Sec. Litig.*, 2009 WL 3380621, at *7 (S.D.N.Y. Oct. 19, 2009) (finding corroboration among observations of FEs sufficient to credit their allegations).

Defendants first contend that FE-1's allegations are "wildly speculative" because she purportedly lacked involvement or access to information regarding sales.  Mot. at 13.  Defendants' arguments ignore FE-1's allegations that describe Lauder's "biggest issue during her tenure was 'high' stock holdings of retailers in Hainan, China" (¶86), Lauder being "'much looser' when it came to 'loading' retailers with stock in comparison to its competitors," (¶87), that "Lauder's gains

---

[6] Defendants' citation to *Voxx* is distinguishable because Lead Plaintiff's claims do not relate to overstatement or overvaluation.  *See* Mot. at 12; *Galestan v. Onemain Holdings, Inc.*, 348 F. Supp. 3d 282, 299 (S.D.N.Y. 2018) (describing *Voxx* as applicable to "situations in which quantification is necessary to illustrate the alleged fraud").

in its market share came from *daigou* business," and Lauder seeing "repercussions" from its "reliance on *daigou* during this period." *Id*. Far from conclusory or speculative, these allegations reflect the manner in which Lauder's statements falsely attributed its travel retail sales—including its sales success and market share gains—to factors other than *daigou*, which is clear when analyzed in context. *See* ¶¶54, 130, 143, 159. For example, FE-1's allegations support the falsity of Defendants' June 2, 2022 statement that "***the incredible results in travel retail*** during the COVID Western lockdowns [were] ***because Hainan was more than substituting the amount of travelers in airports around the world***" (¶159) and May 3, 2023 statement claiming "***what we were experiencing before with our travel retail business is the volatility related to just some of the COVID restrictions and the flow of traffic in travel and people's comfort with travel***" (¶169).

With respect to FE-2, Defendants similarly overlook her allegations as a whole and in relationship to the statements pled. *See* Mot. at 16. Engaging in the requisite in-context analysis, FE-2's allegations concerning "counterintuitive" travel retail growth during the initial outbreak of the COVID-19 pandemic (¶88) and her fulsome description of the manner in which "the Company and its leadership could see sales spikes which were attributed to *daigou* practices" (¶¶92-95), speak directly to Lauder's travel retail sales during the pandemic being attributable to *daigou*—a material omission by the Company to investors. FE-2's allegations support falsity by demonstrating that Defendants knew *daigou* drove its travel retail sales prior to the crackdowns. *See* ¶¶83, 85, 88-89, 92-95, 98. Indeed, FE-2 recalled that she could not "'square' certain things she observed" with respect to sales growth. *See* ¶88. FE-2 also noted her understanding that the Company was "using the gray market of *daigou* resellers" to achieve sales growth. *See* ¶89. FE-2 confirmed that Lauder's use of *daigou* to improve sales was evident because the Company had "'clear visibility' in its sales" and "very detailed sell-through and sales reporting information from

15

its retail partners." ¶92. FE-2 recalled how this information allowed her to "see sales spikes in key stores and/or key items that were out of sync with historic norms," which made it "clear" that those sales "were for *daigou*." ¶93. FE-2's allegations therefore support the falsity of Defendants' statements, including those attributing Lauder's travel retail sales growth to the "**strength of our brands with the Chinese consumer**" (¶130) and "**continued growth from Asia/Pacific**" (¶143), when it was generated through *daigou*. *See* ¶¶83, 85, 88-89, 92-95, 98.

Finally, Defendants make similar, conclusory arguments that FE-3's allegations are "generalized assertions" that "lack particularity." Mot. at 18. This is patently untrue, even for the statements that Defendants cherry-pick in their brief, including FE-3's allegation that "the movement of product into *daigou* channels was 'overseen,' 'approved,' and 'activated' by" Lauder's Head of Travel Retail Worldwide, Israel Assa. *See* Mot. at 19. FE-3 goes on to describe the manner in which Lauder would "switch on the *daigou* market if needed" to generate sales. *See* ¶¶90, 96. When read in context—and collectively with the other FE allegations—FE-3's allegations establish the falsity of Defendants' statements, including that Lauder's dwindling sales resulted from "**volatility related to just some of the COVID restrictions and the flow of traffic in travel and people's comfort with travel**," rather than *daigou*. *See* ¶¶169-170.

In sum, the FE allegations provide detailed, first-hand accounts of the manner in which Lauder funneled product into *daigou* to compensate for lagging travel retail sales, despite having assured investors that Lauder was "**never benefiting**" from the gray market. *See* ¶¶80, 130-172.

### 2. On November 1, 2023, Lauder Admitted that *Daigou* Was a Primary Driver of Sales in Its Asia Travel Retail Business

Defendants' argument that their November 1, 2023 final disclosure does not support falsity fails as a matter of logic. *See* Mot. at 19-20. This disclosure revealed that Lauder's net sales decline was "**primarily due to our and our retailers' actions to reset retailer inventory levels,**

16

**and changes in government and retailer policies related to unstructured market activity**," which Lauder concedes refers to *daigou*. *See* Mot. at 10, 20; ¶¶41, 125, 225. Accordingly, this disclosure admits that Lauder benefited from *daigou* during the Class Period (as no downturn would have otherwise occurred)—a fact Defendants concealed from investors. *See* Mot. at 10; ¶¶41, 80, 125, 225. In turn, Lauder's statements during the Class Period omitting that *daigou* impacted its travel retail sales were false and misleading. ¶¶128-172.

To avoid this obvious inference, Defendants clumsily interpret this disclosure through two separate Company filings. *See* Mot. at 20. Defendants first highlight the Company's 8-K, issued the same day, citing *daigou* as "one among a number of factors driving the decline in sales," which purportedly shows that *daigou* was not "the sole *primary* basis" for sales declines. *Id*. (emphasis in original). However, this argument reinforces the fraud alleged in the Complaint—that Defendants concealed that *daigou* drove Lauder's sales **at all**. *See id*.; ¶¶145-172. Defendants then cite their August 18, 2023 disclosure in an attempt to cabin the period that Lauder's inability to access *daigou* affected the Company.[7] *See id*. However, for Lauder's sales to deteriorate "following the enforcement actions to control *daigou* activity," requires that Lauder was generating sales through the undisclosed practice during the Class Period. *See* Mot. at 21. Because investors were in the dark as to Lauder's advantageous use of *daigou*, this argument fails.

### 3. The *Daigou* Crackdowns Matter Because of Defendants' Statements Concerning Lauder's Reliance on the Prohibited Sales Practice

Defendants argue that the Complaint is lacking detail with respect to China's regulations cracking down on *daigou*. Mot. at 20-21. This argument misses the mark because this case is

---

[7] Defendants also attempt to play a game of "gotcha" by alleging that Lead Plaintiff did "not challenge as false" Lauder's August 18, 2023 disclosure because it did not specifically allege that the date parameter of "May and June" was the false and misleading portion of the statement. *See* Mot. at 20. However, Lead Plaintiff pled Defendants' statements on August 18, 2023 as false and misleading (¶¶ 171-172) and also as a partial corrective disclosure (¶¶ 213-224).

about Defendants' material omission that Lauder benefited from *daigou* by generating travel retail sales through the gray market. *See* ¶¶80, 81-98. For example, several of the statements pled are false because Defendants attributed increased travel retail sales to factors other than *daigou*, during the period **prior to** the crackdowns, when Lauder was still profiting from the illicit sales practice. *See* ¶¶130, 143, 159. To this point, notably absent from Defendants' attempt to undermine the fraud alleged is any mention of Hainan's duty-free policy, which Lauder exploited to pump significant product into the *daigou* gray market during the pandemic. ¶¶99-103. Ultimately, China's *daigou* crackdowns could only affect Lauder's sales if it was relying on the gray market in the first place. *See* ¶¶80, 81-98. In any event, a plain reading of the Complaint reveals a particularized description of the Chinese government and CDFG's (Lauder's largest customer) clear plan to "resolutely crack down on illegal *daigou*." ¶¶99-103.

### 4.    The Statements that Defendants Contest as Forward-Looking Are Not Entitled to Safe Harbor Under the PSLRA

Defendants argue that certain statements pled are forward-looking and protected by the safe-harbor provision of the PSLRA. Mot. at 22-23; ¶¶145, 162, 164, 166, 169, 171.[8] However, the false and misleading aspect of these statements lies in Defendants' omission that Lauder relied on *daigou* **in the past**, which affected its present representations. *See* ¶¶145, 162, 164, 166, 169, 171. Accordingly, the statements challenged are neither forward-looking nor entitled to safe harbor. *See id.*; *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017) ("neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions").

For example, on August 18, 2022, Defendants stated that "***the power of Hainan in the future remain[s] intact, and we have strong presence and market share in this operation***." ¶162

---

[8] Several statements pled in the Complaint that look back on the period prior to the *daigou* crackdowns have not been challenged by Defendants as forward-looking. *See* ¶¶ 130, 143, 159.

(underline emphasis added).  First, this statement is not forward-looking because its second clause speaks in the present tense about Lauder's contemporaneous market share in Hainan.  *See id.*; *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at \*8 (S.D.N.Y. May 24, 2018) ("'[I]t is well recognized that . . . when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply'" to the non-forward-looking aspect).  Additionally, the statement materially omits that Hainan's "power" and Lauder's "market share" were generated through its use of *daigou*.  *See* ¶¶81-98, 162 (stating that the future "remain[s] intact," which encompasses past and present activity); *see Wilson*, 2017 WL 7052046, at \*3.  The same is true for the other alleged misstatements that make concrete representations about past and current performance while omitting that Lauder over relied on *daigou* prior to when the statements were made.

Notwithstanding the foregoing, even if the statements are considered forward-looking (they are not), they are still actionable.  Forward-looking statements are only protected by the safe harbor if they are: (1) "identified and accompanied by meaningful cautionary language," or (2) "immaterial," or (3) where plaintiffs fail to prove the statement was "made with actual knowledge that it was false or misleading."  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  First, Defendants' argument that boilerplate warnings concerning "changes in laws, regulations, and policies" in its risk disclosures constitute "meaningful cautionary language" is quickly proven wrong by applicable law and facts.  *See* Mot. at 22.  Far from "precise," Defendants' generic risk disclosures said nothing meaningful or targeted about *daigou* or gray market activity but simply referenced unspecified regulations.  *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) (quoting *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996)) ("Vague disclosures of general risks will not protect defendants from liability.  Instead, the

19

relevant cautionary language must be 'prominent and specific,' and must directly address 'exactly the risk that plaintiffs claim was not disclosed.'").  Indeed, investors understood that they had no reason to be concerned with changes in Chinese *daigou* regulations because Defendant Freda previously stated that Company did not see the "impact" of *daigou* regulations in 2019 and was "**never benefiting**" from the prohibited sales practice.[9]  *See* ¶80.

Second, Lauder's statements were made with actual knowledge that the Chinese government and CDFG had already committed publicly to eradicate *daigou* and that Lauder could no longer rely on *daigou* to boost sales.  *See* Section III.B, *infra*; ¶¶145, 162, 164, 166, 169, 171; *Freudenberg*, 712 F. Supp. 2d at 194 ("Because Defendants are alleged to have made knowingly false statements[,] they are not protected by the PSLRA safe harbor provision.").  Additionally, Defendants singularly knew that the risk of the *daigou* crackdowns had already come to pass at the time the alleged statements were made rendering any warning about them useless to investors. *See* ¶¶104-109; *see Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) ("[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit (citation omitted)").

### 5.    The Purported Statements of Opinion Are Actionable

Defendants seek to dismiss several statements on the basis that they constitute nonactionable opinions.[10]  Mot. at 23 n.9 (citing to Mot. at 22 n.6 and ¶¶164, 166, 169, 171).

---

[9] Defendants do not argue materiality, thereby conceding it.  *See* Mot. at 22-23.
[10] Lead Plaintiff notes that between Sections I.A.2 (forward-looking statements) and I.A.3 (opinions) of Defendants' Motion, Defendants do not challenge two statements pled in the Complaint as inactionable under either argument.  *See* Mot. at 22-25; ¶¶ 130, 143.

However, the statements Defendants attempt to improperly morph into opinions express no subjective beliefs or judgments but, rather, are expressions based on contemporaneous facts and knowledge conveyed by the speaker.  *Compare In re Y-mAbs Therapeutics Sec. Litig.*, 2024 WL 451691, at *8-9 (S.D.N.Y. Feb. 5, 2024) (finding "broad" statements expressing hope, optimism, or progress regarding FDA approval to be nonactionable opinions, though lacking qualifiers like "I believe"), *with* ¶171 ("***we have no concerns whatsoever about travel retail growing with traveling consumers*. . . . *it's having <u>a timing issue that's having a big short-term temporary impact for us</u>***") (expressing targeted present knowledge) (emphasis added).  Further, Defendants allege that two statements are opinions because they contain qualifiers like "I think" or "I believe." ¶¶159, 162.  However, Defendants improperly attempt to transpose those qualifiers to the entire alleged statement, even though the actionable portion of the statements are not couched in any such subjective language.  *See* ¶159 (showing "I believe" appears several sentences prior to the language alleged as false and misleading); ¶162 (showing language expressing "belief" in a preceding clause that does not qualify the phrase alleged as false and misleading).

In any event, even if the challenged statements are opinion statements (they are not), they are nonetheless actionable under *Omnicare* because: (i) Defendants did not subjectively believe the opinion; (ii) the opinion contained one or more embedded factual statements that was false; or (iii) the statement failed to provide "critical context," meaning that the speaker implied he or she had a reasonable basis for the opinion but in fact did not.  *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (citing *Omnicare, Inc. v. Laborers Dist. Council Indus. Pension Fund*, 575 U.S. 175, 185-90 (2015)).

First, contrary to Defendants' argument, the Complaint "suggests that the Individual Defendants did not genuinely hold the opinions they expressed." *See* Mot. at 24; ¶¶28, 134.  For

example, the Complaint is replete with allegations that the Individual Defendants did not subjectively believe that Hainan remained "***unchanged***" after CDFG and the Chinese government pledged to eradicate *daigou*.  ¶¶28, 134, 145-158.  Second, there are indeed "embedded facts" in the alleged opinion statements that are false—including that Lauder's travel retail sales results during the pandemic were attributable to Hainan "***more than substituting the amount of travelers in airports around the world***" (¶159), when really those sales were driven by *daigou*—not actual travelers—as demonstrated by Lauder's November 1, 2023 admission.  ¶¶15-41, 135.  Third, Defendants failed to provide investors with the critical context that *daigou* drove its travel retail sales in Hainan.  *See* ¶80 (assuring investors that Lauder was "**never benefiting**" from *daigou*).  During the Class Period, Defendants perpetuated this deceit while publicly speaking on Hainan's success and omitting the manner in which gray market resale contributed to sales results.  ¶¶80, 159, 162.  *See Abramson*, 965 F.3d at 175 (finding that liability may follow "when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted").  For example, Defendants' representation that the "***we have a strong presence and market share***" omits critical context that Lauder's market share in Hainan was previously driven by *daigou*, an unsustainable sales practice that Defendants explicitly denied engaging in.  *See* ¶¶15-41, 80, 162; Section III.B, *infra*.

### 6.   Defendants Do Not Challenge Certain Statements as Forward-Looking or Opinion Statements

Defendants argue a final point via footnote.  *See* Mot. at 24 n.10 (arguing that several statements purportedly express "optimism about future performance" and do not "'state nor imply anything' about *daigou*'s impact on ELC's revenues that would mislead a reasonable investor") (citing ¶¶130, 143, 145, 159, 162).  However, this argument is directly contradicted by Defendants' pre-Class Period statements that Lauder was "never benefiting" from *daigou* and took concrete

22

steps to "limit any risk of gray market." *See* ¶¶80, 130, 143, 145, 159, 162; *In re Van der Moolen*, 405 F. Supp. 2d at 400 (finding that when a company puts at issue the cause of its financial success, "the alleged failure to disclose the true sources of such revenue could give rise to liability under Section 10(b)"). In short, Defendants' fraud lies in the fact that they publicly denied engaging in *daigou*. *See* ¶¶80, 130, 143, 145, 159, 162; *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 760, 768-69 (S.D.N.Y. 2019) (finding liability where defendant failed to disclose that growth of net sales resulted from "deceptive marketing and lobbying tactics"); *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *15 (S.D.N.Y. Sept. 27, 2019) (finding liability where defendant omitted "a material basis for the company's achievements" via alleged collusion to fix prices).

## B.    THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

Scienter may be pled either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. Recklessness occurs when Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306 (citation omitted). Evidence of "'[a]n egregious refusal to see the obvious, or to investigate the doubtful" may also give rise to an inference of recklessness. *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 361 (S.D.N.Y. 2006). The test is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights., Ltd.*, 551 U.S. 308, 322-23 (2007). The scienter allegations need not be "irrefutable" or "of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Rather, the allegations must be merely "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

23

That is, "a tie on scienter goes to the plaintiff." *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *6 (S.D.N.Y. June 21, 2021) (citation omitted).

### 1. Defendants Had Actual Knowledge, or, at Minimum, Acted with Recklessness When They Made the Misstatements

Defendants' attempt to combat the Complaint's strong inference of scienter focuses on their purported "inability to predict that *daigou* regulations may be enforced and could impact its net sales *at some point in the future*." Mot. at 25-26 (emphasis in original). However, Defendants could easily "predict" whether *daigou* regulations "could impact" net sales based on whether Lauder inflated sales through *daigou* in the first place. This is the material omission from which Defendants' fraud springs—as it directly contradicts both Freda's pre-Class Period assurances that Lauder was "never benefiting" from *daigou* and renders Defendants' subsequent statements omitting that *daigou* contributed to Lauder's travel retail sales false and misleading. *See* ¶80. Moreover, Defendants ignore the Supreme Court's instructions in *Tellabs*, to assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23; Mot. at 25-28; ¶¶257-264. When viewed holistically, as the Court must, the Complaint's scienter allegations are cogent and at least as compelling as any opposing inference.[11]

**FE Allegations**: The Complaint details the manner in which the Individual Defendants closely tracked sales, forecasting, and pricing data that provided "clear visibility" into the source of Company sales. ¶¶237-246. For example, FE-2's allegations detail the manner in which Defendants could see "sales spikes in key stores and/or key items that were out of sync with

---

[11] Defendants inaptly argue that the Complaint does not plead motive. Mot. at 26-27. However, motive is not required to establish scienter. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *Tellabs*, 551 U.S. at 325 ("absence of a motive . . . is not fatal."). The circumstantial evidence of conscious misbehavior or recklessness alleged here are independently sufficient to demonstrate scienter. *See ATSI*, 493 F.3d at 99.

historic norms" and "clear that they were for *daigou*." ¶¶240-243.  FE-2 also detailed the manner in which pricing databases within the Company were "used to prepare slide decks and reports which were presented to the company's senior executives, including Defendant Freda, who were briefed on these pricing differentials." ¶243.  FE-3 likewise corroborated Defendants' knowledge of *daigou* being used to generate travel retail sales by describing an internal team "that specifically analyzed the *daigou* market" and that "the movement of product into *daigou* channels was 'overseen,' 'approved,' and 'activated' by" Lauder's Head of Travel Retail Worldwide, Israel Assa." ¶¶244-245; *see Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 616 (S.D.N.Y. 2015) (finding it "highly probable that the regional director of sales in a region, who has interacted directly with a President of that unit in the past, would be well-positioned to attest to the participation of the individual defendants in promoting certain sales practices in that region") (citation omitted).  FE-1 further corroborated the manner in which Defendants used "tracking codes in order to exercise 'market control.'" ¶246; *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (scienter found where "strong circumstantial evidence that [defendants] were receiving some form of specific information" on the topic existed); *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 387 (E.D.N.Y. 2009) (upholding scienter based on meetings where defendants "received . . . monthly sales projection and monthly inventory reports").  Indeed, Defendants themselves acknowledged that they tracked the gray market and its effect on their brands, which supports an inference of scienter.  ¶264 (quoting Freda discussing internal tracking of *daigou* impact, stating "[w]e check this every month"); *see Novak*, 216 F.3d at 311-12 (finding statements that inventory levels were under control or giving false explanations for inventory growth, despite knowing the true reasons for rising inventory levels, sufficient to plead scienter); *see Cornwell*, 689 F. Supp. 2d. at 637

25

(upholding scienter where "executives reviewed specific reports that should have alerted them to the problems they allegedly misrepresented").

**Core Operations**:  As discussed in the Complaint, travel retail accounted for nearly one-third of Lauder's total revenue during the Class Period, a nearly six-fold jump, while global travel was depressed during the global pandemic.  ¶¶247-253.  Indeed, the core operations doctrine bolsters the inference of scienter where, as here, it would be "absurd to suggest" that Defendants were unaware of the source of their travel retail success during the global pandemic, when travel had essentially ground to a halt.  *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *8 (S.D.N.Y. May 1, 2024) (crediting core operations allegations where the business unit was "key to the company's profits" and the defendants constantly touted its importance); *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *31 (S.D.N.Y. Oct. 10, 2018) ("a court may infer 'that a company and its senior executives have knowledge of information concerning the core operations of a business,' such as 'events affecting a significant source of income.'" (citation omitted)).

**The Pre-Class Period SEC Inquiry**:  Defendants also fielded an inquiry from the SEC concerning the reason for its net sales increase during the COVID-19 pandemic.  ¶¶247-256.  The SEC's inquiry broadly centered on Lauder's "significant changes in net sales" between 2020 and 2021, when the Complaint alleges that Defendants reaped the benefits of *daigou* by exploiting Hainan's duty-free policy and funneling product into the gray market.  ¶¶254-256.  Given this inquiry and Defendants' response thereto, Defendants knew, or were reckless in not knowing, that *daigou* was a driver of its net sales increases.  *See City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, 2019 WL 719751, at *7-8 (S.D.N.Y. Feb. 19, 2019) (finding that the defendants' response to an SEC inquiry was one of many allegations that raise an inference of scienter); *New*

26

*Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (pleading scienter where inventory levels were "key to measuring Celestica's financial performance and [were] a subject about which investors and analysts often inquired").

### 2.    Defendants Ignore Plaintiffs' Other Alleged Indicia of Scienter

In addition to the reasons set forth above, the Complaint alleges additional indicia of scienter that Defendants failed to address.  ¶¶247-256.  It is well settled that when Defendants speak in detail on a topic—here, Defendants repeated discussion of *daigou*, China, Hainan, and travel retail sales results—it supports an inference of scienter.  ¶¶257-264; *see Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("[a]ctively communicating with the public about [an] issue demonstrates defendants' sensitivity to it"); *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *9 (S.D.N.Y. Sept. 24, 2018) (inferring CEO and CFO's scienter where they spoke specifically to the issues on earnings calls); *In re Gen. Elec. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) (drawing inference of knowledge where CFO made misleading statements about the portion of the business he was responsible for). More specifically, Defendants often spoke on government and retailer policy changes in China, which raises a compelling inference of scienter.  *See* ¶¶262-264.

At bottom, the far stronger inference is that Defendants engaged in an undisclosed gray market practice to take advantage of the pandemic in order to inflate its sales at that time and did not tell investors because of the admitted negative impacts that engaging in such practices can have on a luxury brand's long-term viability.  ¶¶1-3.  But instead of telling investors from the beginning, Defendants concealed the practice and left investors to suffer losses when that practice became unsustainable.  Viewed holistically, the Complaint alleges a strong inference of scienter.

27

### C.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Plaintiff's burden of pleading loss causation "is not a heavy one." *Loreley Fin. (Jersey)*, 797 F.3d at 187 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). "The complaint must simply give [d]efendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Id.* At the motion to dismiss stage, Lead Plaintiff "need not establish that the disclosure of the truth underlying the alleged fraud was the sole cause of their losses nor must they conclusively rule out the role of potentially intervening events in the causal chain, as those are issues of proof reserved for the merits stage of the case." *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 266 (S.D.N.Y. 2021) (citing *Loreley Fin. (Jersey)*, 797 F.3d at 187, 189). Moreover, loss causation allegations are subject to less stringent Rule 8 pleading requirements. *Id.* at 266 n.7 ("[T]he vast majority of courts in this district have required that loss causation only meet the requirements of Rule 8").

The Complaint details how Defendants' false and misleading statements injured investors through a series of five partial disclosures. ¶¶173-235. Defendants argue that the first three partial corrective disclosures had "nothing" to do with the alleged fraud. Mot. at 29. However, this argument fails because these three partial disclosures revealed downturns in travel retail sales, which Defendants misleadingly attributed to specific factors while omitting the effect of the *daigou* crackdowns. *See* ¶¶181-212. Such disclosures revealed new information to investors about the viability of Lauder's travel retail sector. While those revelations caused Lauder's stock price to decline, it also remained artificially inflated because Defendants misleadingly reassured investors about the real reason for the sales declines (i.e., *daigou*) and the extent of the issues given that the Company's ability to rely on *daigou* had evaporated. *See* ¶¶80, 164-170, 181-212.

Defendants then argue that Defendants' fourth partial corrective disclosure "did not reveal anything new to the market." Mot. at 29-30. This argument is similarly unavailing. This

disclosure, dated August 18, 2023, revealed "**steeply negative**" sales trends following *daigou* enforcement actions, while reassuring investors that these were nothing more than "***short-term headwinds***," leaving the stock price artificially inflated. *See* ¶¶213-224. At this stage, a plaintiff need not show that a "specific corrective disclosure . . . exposed the precise extent of [the] alleged fraud," so long as the plaintiff's "theory of loss causation nevertheless rest[s] on the revelation of the truth," *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 232, 262 (2d Cir. 2016), and "there is no requirement that the disclosure take a particular form or be of a particular quality." *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) (citation omitted). By failing to disclose its reliance on *daigou*, investors did not learn until November 1, 2023 that gray market resale was "**primarily**" responsible for Lauder's travel negative retail sales results. *See* ¶¶225-235. This final disclosure revealed for the first time the previously concealed relationship between Lauder's negative travel retail sales results and *daigou* and exposed the false and misleading nature of Defendants' statements throughout the Class Period. *See* ¶¶181-212.

The five alleged corrective disclosures are also adequately pled as a materialization of an undisclosed risk. *Omega Healthcare Invs.*, 563 F. Supp. 3d at 266-71 (finding that plaintiff adequately pled loss causation through both corrective disclosures and materialization of concealed risk). Specifically, Defendants (and only Defendants) knew that there was a foreseeable risk that China's crackdown on *daigou* and the loss of CDFG would have a negative impact on its travel retail sector. *See In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *13 (S.D.N.Y. Apr. 1, 2015) (upholding materialization of the risk theory, noting that "[t]he risk that caused the loss . . . was within the 'zone of risk *concealed* by the misrepresentations'") (emphasis in original) (citation omitted). Those risks materialized over the course of the five alleged corrective

29

disclosures wherein Defendants reported negative travel retail results, injuring investors. ¶¶181-235.

Defendants attempt to argue that because some of the disclosures do not expressly mention *daigou* they cannot establish loss causation. *See* Mot. at 29. But this argument defies common sense. Taken to its logical conclusion, Defendants could avoid securities fraud liability by simply not mentioning the *specific* or *real* reason for negative results. Accordingly, the Complaint alleges that the disclosure dates were accompanied by false and misleading statements which perpetuated Defendants' fraud until November 1, 2023 when Defendants finally admitted that *daigou* was the "primary" reason for Lauder's negative travel retail results. ¶¶181-235.

## IV.    LEAD PLAINTIFF HAS ADEQUATELY STATED A § 20(a) CLAIM

Because Lead Plaintiff states a § 10(b) claim, the Court should also sustain the § 20(a) claim.[12] If the Court finds Lead Plaintiff's falsity, scienter, or loss causation allegations wanting in any way, Lead Plaintiff respectfully requests the opportunity to amend the Complaint to cure any deficiency.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.

---

[12] Defendants' improperly claim that Plaintiffs must show that the Individual Defendants "culpably participated" in a Section 10(b) violation. Even if the Court applied Defendants' preferred standard, the Complaint pleads culpable participation in addition to control over the Company and the statements. *See* Section III.B.

Dated:  June 3, 2024

Respectfully Submitted,

**LABATON KELLER SUCHAROW LLP**

By: /s/ *Michael P. Canty*
Michael P. Canty
James T. Christie
Guillaume Buell
Jacqueline R. Meyers
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
Email:   mcanty@labaton.com
             jchristie@labaton.com
             gbuell@labaton.com
             jmeyers@labaton.com

*Lead Counsel for Lead Plaintiff Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System and the Proposed Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**

Thomas C. Michaud (*pro hac vice forthcoming*)
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
Email:   tmichaud@vmtlaw.com

*Liaison Counsel for Lead Plaintiff Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System and the Proposed Class*