# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

IN RE THE ESTÉE LAUDER CO., INC.
SECURITIES LITIGATION

Civil Action No. 1:23-cv-10669-AS

# LEAD PLAINTIFFS' MEMORANDUM OF LAW
# IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, APPOINTMENT
# AS CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................... iii

I.    INTRODUCTION .......................................................................................... 1

II.   STATEMENT OF FACTS COMMON TO THE CLASS ................................. 4

    A.    Estée Lauder's Travel Retail Business ..................................................... 4

    B.    *Daigou*..................................................................................................... 5

    C.    Defendants Misled Investors about Estée Lauder's Reliance on *Daigou* for Sales Growth ......................................................................................... 6

    D.    The Truth Is Revealed .............................................................................. 6

    E.    The Proposed Class Representatives ......................................................... 7

III.  THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE CERTIFIED....... 7

    A.    The Proposed Class Satisfies the Requirements of Rule 23(a)............................. 8

        1.    Numerosity Is Established ........................................................... 8

        2.    Commonality Is Established ....................................................... 9

        3.    Typicality Is Established.............................................................. 10

        4.    Adequacy Is Established ............................................................. 11

    B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)........................ 12

        1.    Predominance Is Established ................................................... 13

            a.    Lead Plaintiffs Are Entitled to the Fraud-on-the-Market Presumption of Reliance ............................................... 14

            b.    The *Cammer* and *Krogman* Factors Support a Finding of Market Efficiency ............................................... 16

                i.    *Cammer* Factor 1: Average Weekly Trading Volume...... 17

                ii.    *Cammer* Factor 2: Analyst Coverage............................... 17

                iii.    *Cammer* Factor 3: Market Makers.................................... 18

iv.   *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ......... 19

v.    *Cammer* Factor 5: Cause and Effect Relationship
      Between Company Information and Stock Prices ............ 19

vi.   *Krogman* Factor 1: Market Capitalization ....................... 21

vii.  *Krogman* Factor 2: Bid-Ask Spread ................................ 22

viii. *Krogman* Factor 3: Public Float......................................... 22

ix.   Additional Factor: Institutional Ownership ...................... 23

c.    Damages Will Be Calculated Using a Common Methodology .... 24

2.    Superiority Is Established ......................................................................... 25

3.    The Court Should Appoint Labaton as Class Counsel............................. 26

IV.   CONCLUSION...................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
  406 U.S. 128 (1972) ..........................................................................................13, 23

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) ...................................................................................23

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .......................................................................................................12

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ..................................................................................8, 13, 14, 23

*In re Aphria, Inc. Sec.Litig.*,
  342 F.R.D. 199 (S.D.N.Y. 2022) .....................................................................................9

*Ashe v. Arrow Fin. Corp.*,
  2025 WL 487427 (N.D.N.Y. 2025) ................................................................................9

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d. Cir. 2000) ...................................................................................11, 12

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) .....................................................................................24

*Barrows v. Becerra*,
  24 F.4th 116 (2d Cir. 2022) ..........................................................................................10

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1998) ...........................................................................................4, 13, 14

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ...................................................................................17

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  2023 WL 2932485 (D. Conn. 2023) .............................................................................24

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ...............................................................16, 17, 18, 19

*Carpenters Pension Trust Fund of St Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ...............................................................................16, 19

iii

*Cent. States SE & SW Areas Health & Welfare Fund v. Marck-Medco Managed*
    *Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007)......................................................................................8

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)..................................................................................................23

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006)....................................................................................11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) (*Halliburton I*)................................................................13, 14

*Erickson v. Jernigan Cap., Inc.*,
    692 F. Supp. 3d 114 (S.D.N.Y. 2023)..................................................8, 9, 11, 25

*In re Global Brokerage, Inc.*,
    2021 WL 1160056 (S.D.N.Y. 2021).......................................................................22

*Halliburton Co. v. Erica P. John Fund Inc.*,
    573 U.S. 258 (2014) (*Halliburton II*)............................................................ *passim*

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
    338 F.R.D. 205 (S.D.N.Y. 2021) ....................................................................11,  23

*Hunter v. Blue Ridge Bankshares, Inc.*,
    346 F.R.D. 16 (E.D.N.Y. 2024)..............................................................................26

*In re JP Morgan Chase & Co. Sec. Litig.*,
    2015 WL 10433433 (S.D.N.Y. 2015)......................................................................16

*Katz v. Curis Pharmacy, LLC*,
    2023 WL 5769499 (S.D.N.Y. 2023)..........................................................................8

*Katz v. Image Innovations*,
    2010 WL 2926196 (S.D.N.Y. 2010).......................................................................13

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .................................................................. *passim*

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011)....................................................................................12

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)....................................................................................10

*Micholle v. Ophthotech Corp.*,
    2018 WL 1307285 (S.D.N.Y. 2018)................................................................12

*Pa. Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co.*,
    772 F.3d 111 (2d Cir. 2014)....................................................................8

*In re Parmalat Sec. Litig.*,
    2008 WL 3895539 (S.D.N.Y. 2008).............................................................11

*Passman v. Peloton Interactive, Inc.*,
    671 F. Supp. 3d 417 (S.D.N.Y. 2023)....................................................7, 10

*Pearlstein v. Blackberry Ltd.*,
    2021 WL 253453 (S.D.N.Y. 2021)...........................................................21

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017)........................................................16, 17, 21

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ............................................................13, 25

*Roach v. TL.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)......................................................................24

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084 (S.D.N.Y. 2019) .............................................. *passim*

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
    552 U.S. 148 (2008).................................................................................13

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) .............................................................15

*Vasquez v. A+ Staffing LLC*,
    746 F. Supp. 3d 26 (E.D.N.Y. 2024) .......................................................25

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)............................................................ *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)....................................................................................9

*Wilson v. Comtech Telecomms. Corp.*,
    648 F.2d 88 (2d Cir. 1981).........................................................................23

*Wilson v. LSB Indus., Inc.*,
    2018 WL 3913115 (S.D.N.Y. 2018)...........................................10, 11, 23

*In re Winstar Commc'ns Sec. Litig.*,
  290 F.R.D. 437 (S.D.N.Y. 2013) ...................................................................17, 18

**Statutes**

Securities Exchange Act of 1934
  Securities Exchange Act Section 10(b)...............................................1, 10, 14, 23

Private Securities Litigation Reform Act (PSLRA)............................................12

**Rules and Regulations**

Federal Rules of Civil Procedure

  Rule 23 ...........................................................................................................2, 7

  Rule 23(a)........................................................................................... *passim*

  Rule 23(a)(1) ...................................................................................................8

  Rule 23(a)(2)....................................................................................................9

  Rule 23(a)(3) ..................................................................................................10

  Rule 23(a)(4) ..................................................................................................11

  Rule 23(b) ........................................................................................................7

  Rule 23(b)(3)...................................................................................... *passim*

  Rule 23(g) ..................................................................................................1, 26

  Rule 23(g)(1)(A) ............................................................................................26

H.R. Conf. Rep. No. 104-369 (1995)................................................................12

SEC Rule 10b-5 ..................................................................................................2

Lead Plaintiffs Macomb County Employees' Retirement System ("Macomb County ERS"), Macomb County Retiree Health Care Fund ("Macomb County RHC"), and Wayne County Employees' Retirement System ("Wayne County ERS," collectively with Macomb County ERS and Macomb County RHC, "Lead Plaintiffs" or the "Michigan Funds") respectfully submit this memorandum of law in support of their Motion for Class Certification, requesting that, pursuant to Federal Rules of Civil Procedure ("Rules") 23(a), 23(b)(3), and 23(g), the Court: (i) certify this case as a class action; (ii) appoint Lead Plaintiffs as Class Representatives;  and (iii) appoint Labaton Keller Sucharow LLP ("Labaton") as Class Counsel.[1]

## I.    INTRODUCTION

This is a federal securities fraud class action (the "Action") against The Estée Lauder Companies Inc. ("Estée Lauder" or the "Company"), Fabrizio Freda ("Freda"), and Tracey T. Travis ("Travis") (the "Individual Defendants," and collectively with Estée Lauder, "Defendants").  On February 20, 2024, the Court appointed the Michigan Funds as lead plaintiffs and Labaton as lead counsel.  ECF No. 38.  Lead Plaintiffs purchased or otherwise acquired Estée Lauder's common stock during the Class Period.  *See* Macomb County ERS Decl. ¶3; Macomb County RHC Decl. ¶3; Wayne County ERS Decl. ¶3.  On March 31, 2025, the Court denied Estée Lauder's motion to dismiss (ECF No. 58), thus sustaining the Consolidated Amended Class Action Complaint (ECF No. 47) (the "Complaint").  The Complaint alleges that between February 3, 2022 and October 31, 2023 (the "Class Period"), Defendants violated Section 10(b) of the Exchange

---

[1] In support of this Motion, Lead Plaintiffs submit this memorandum of law; the Declaration of James T. Christie ("Christie Decl."); the Expert Report of Matthew D. Cain, Ph.D. ("Cain Rpt.," Christie Decl. at Ex. A); the Declaration of Stephen Smigiel on behalf of Macomb County ERS ("Macomb County ERS Decl.," Christie Decl. at Ex. B); the Declaration of Stephen Smigiel on behalf of Macomb County RHC ("Macomb County RHC Decl.," Christie Decl. at Ex. C); the Declaration of Gerard Grysko on behalf of Wayne County ERS ("Wayne County ERS Decl.," Christie Decl. at Ex D);  Labaton's firm resume (Christie Decl. at Ex. E); and a proposed order.

Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder and the Individual Defendants violated Section 20(a) of the Exchange Act, by making materially false and misleading statements and omissions regarding source and sustainability of sales and demand in Estée Lauder's travel retail business, specifically concerning Estée Lauder's undisclosed reliance on a type of gray-market resale known as *daigou*.[2]

Lead Plaintiffs request certification pursuant to Rule 23 on behalf of a class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Estée Lauder during the period from February 3, 2022 through October 31, 2023, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class").[3]  Lead Plaintiffs also move the Court for an order appointing Lead Plaintiffs as Class Representatives and appointing Labaton as Class Counsel.

This Action is a paradigmatic example of the type of case that is appropriately certified as a class action.  Under Rule 23(a), certification of an action for class treatment is proper where:

> (1) the class is so numerous that joinder of all members is impracticable ["numerosity"]; (2) there are questions of law or fact common to the class ["commonality"]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and (4) the representative parties will fairly and adequately protect the interests of the class ["adequacy"].

---

[2] *Daigou* directly translates from its Chinese origin (代购) to English as "buy on behalf of." *Daigou* are resellers that purchase luxury goods at reduced, duty-free prices and resell them to end-consumers in mainland China at a price below retail but high enough to profit.  ¶1, n.3.

[3] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of Estée Lauder during the Class Period and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Estée Lauder's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, subsidiaries, trusts, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

Fed. R. Civ. P. 23(a).  Further, "common" issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be "superior" to other methods of adjudication.  Fed. R. Civ. P. 23(b)(3).

Here, the proposed Class easily satisfies the requirements of Rule 23(a):  (i) the Class is sufficiently numerous, given that between 231 million and 233 million shares of Estée Lauder's common stock were outstanding throughout the Class Period, during which time the average weekly trading volume for Estée Lauder's common stock was 9.3 million shares on the New York Stock Exchange ("NYSE"), *see infra* Section III.A.1; (ii) the Complaint raises significant questions of law and fact common to all members of the proposed Class, including whether Defendants made material misrepresentations and omissions in the Company's filings with the Securities and Exchange Commission ("SEC") and other public disclosures during the Class Period, Defendants acted with scienter, the price of Estée Lauder's common stock was artificially inflated and/or artificially maintained during the Class Period by Defendants' fraudulent conduct, and Class members suffered damages*, see infra* Section III.A.2; (iii) Lead Plaintiffs' claims are typical because, like all Class members, Lead Plaintiffs purchased or acquired Estée Lauder's common stock at prices that were artificially inflated or maintained by Defendants' misstatements, omissions, and deceptive conduct, and suffered damages when Defendants' fraud was revealed*, see infra* Section III.A.3; and (iv) Lead Plaintiffs are adequate because their interests are directly aligned with the interests of the Class, and they have retained attorneys with considerable experience in securities class actions and complex litigation*, see infra* Section III.A.4.

This Action also satisfies the elements of Rule 23(b)(3).  Predominance is satisfied in this Action because common questions of law and fact predominate over Class members' potential individual issues.  Indeed, the elements of the claims in this Action—falsity, materiality, scienter,

loss causation, and damages—all stem from common questions of law and fact. Reliance, the only possible individualized issue, is uniformly addressed through the fraud-on-the-market doctrine established by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1998), and reaffirmed in *Halliburton Co. v. Erica P. John Fund Inc.*, 573 U.S. 258, 276 (2014) (*Halliburton II*), *see infra* Section III.B.1. Indeed, *Basic* and *Halliburton II* permit the presumption of reliance in this case because, as established in the accompanying Expert Report of Matthew D. Cain, Ph.D., the market for Estée Lauder's common stock, which traded on the NYSE, was efficient throughout the Class Period. *See* Cain Rpt. ¶112.

Further, maintaining this Action as a class action is superior to any alternate means of dispute resolution because thousands of geographically dispersed investors who purchased Estée Lauder's common stock during the Class Period were harmed by Defendants' misconduct. Due to litigation costs, it is highly unlikely that investors who lost small amounts of money would file individual actions; it is desirable to hear all such claims in one court; and there is no difficulty in maintaining this case as a class action, *see infra* Section III.B.2.

For these reasons, Lead Plaintiffs respectfully request that the Court grant this Motion, appoint Lead Plaintiffs as Class Representatives, and appoint Labaton as Class Counsel.

## II.   STATEMENT OF FACTS COMMON TO THE CLASS

### A.   Estée Lauder's Travel Retail Business

Estée Lauder is a leading prestige beauty company that manufactures, markets, and sells skincare, makeup, fragrance, and hair care products worldwide.[4] ¶4. Prestige beauty is a competitive business industry so maintaining market position and public perception as an industry leader is crucial to Estée Lauder's business. ¶5. The "channels" or venues that Estée Lauder

---

[4] Citations to "¶__" refer to paragraphs of the Complaint. Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the Complaint.

distributes its products are critical to is sales and public perception as an industry leader.  ¶6. Travel retail is one of Estée Lauder's most important and profitable sales channels.  ¶¶7,8.

Travel retail comprises duty-free shops, including those at airports or on cruise ships.  ¶7. Products sold through Estée Lauder's travel retail channels are in high demand by international travelers because they are exempt from import and sales taxes.  *Id*.  Estée Lauder has a large appeal in Asian markets due to price differentials on certain beauty products, immense demand for prestige beauty products, and the lack of availability of certain brands in certain countries.  ¶8.

## B.  *Daigou*

*Daigou*, which translates from Chinese to English as "buy on behalf of," is also known as surrogate shopping.  ¶73.  After a modest start in the 2000's, *daigou* operations have grown increasingly commercial or "corporate" and facilitate their gray market resale through online applications. ¶74.  Certain geographic locations, particularly in Asia, became hotspots for *daigou* activity and, critically, Estée Lauder had the ability to control the flow of its products to these locations where *daigou* proliferated.  ¶¶76-77.  Notably, *daigou* has been subject to numerous regulations and regulatory crackdowns by the Chinese government, including laws passed in 2019. ¶77.  In sum, *daigou* presents a myriad of known risk: volatile regulatory landscapes, unpredictable enforcement, geographic overconcentration, trade interruptions, unstable demand, inventory surplus, consumer discount dependency, dilution of brand equity, and loss of price control.  ¶78.

Prior to the Class Period, in 2019, Estée Lauder assured investors that the Company had policies in place that would limit the number of products a customer can purchase at travel retail counters and that the Company "**was never benefitting from a lot of *daigou* business**." ¶¶78-80. However, Estée Lauder grew increasingly reliant on *daigou* sales in 2020 as the COVID-19 pandemic set in.  ¶¶81-98.  Specifically, to generate travel retail sales through *daigou*, Estée Lauder exploited expanded duty-free purchasing policies meant to stimulate growth, most notably those

in Hainan, China.  *Id.*  Then, in early 2022, China foreseeably cracked down on *daigou* gray market sales, where substantial sales for Estée Lauder occurred.  ¶102.

### C.    Defendants Misled Investors about Estée Lauder's Reliance on *Daigou* for Sales Growth

Throughout the Class Period, Defendants made a series of misrepresentations and omissions to investors concerning Estée Lauder's reliance on *daigou*.  ¶¶128-172.  For example, on February 3, 2022, after market close, Defendants touted the strength of their Travel Retail business and highlighted sales in China, stating "[n]et sales increased in our travel retail business in both periods, reflecting continued strength of our brands with the Chinese consumer."  ¶130. However, far from continued strength in demand, in reality, Estée Lauder's net sales increase was due to *daigou*.  *Id*.  Moreover, the Company knew that it had become heavily dependent on the *daigou* gray market and would lose sales because they could no longer divert large amount of product to the *daigou* market.  ¶¶131-142.  On August 18, 2022, during an earnings call, Defendants stated "[T]he power of Hainan in the future remain[s] intact, and we have strong presence and market share in this operation."  ¶162.  Unbeknownst to investors, Estée Lauder could no longer divert massive quantities of product to the *daigou* market to inflate net sales.  ¶34.

### D.    The Truth Is Revealed

Estée Lauder began to reveal facts about the extent of its reliance on *daigou* sales on May 3, 2023, when it lowered guidance and disclosed "the shape of recovery from the pandemic for Asia travel retail comes into better focus, it is proving to be both far more volatile than we expected and more gradual relative to what we experienced in other regions."  ¶37.  In response to this news, shares of Estée Lauder's common stock dropped 17%, a reduction of $42.52, bringing the share price down to $202.70.  *Id*.  However, instead of disclosing the full extent for the decline of Asia travel retail, Defendants did not reveal their overreliance on *daigou* was the cause for the decline

in sales.  On August 18, 2023, Estée Lauder finally admitted that its travel retail "sales trends deteriorated and turned steeply negative from the enforcement actions to control *daigou* activity." ¶39.  This led to the Company's share price dropping 3.3% to close at $156.69.  *Id.*  On November 1, 2023, the full truth was revealed when the Company disclosed that its sales decline was due to a decline in Asia travel retail business and changes in government and retailer policies related to "unstructured market activity."  ¶41.  The Company's use of "unstructured market activity" refers to *daigou* gray market sales.  *Id.*  On this news, the Company's share price fell $24.36, or nearly 19 percent, to close at $104.51 per share on November 1, 2023.  *Id.*

### E.    The Proposed Class Representatives

Since their appointment, Lead Plaintiffs and Lead Counsel have vigorously prosecuted this Action through the review and filing of documents with the Court, propounding and producing discovery, and ongoing negotiations with opposing counsel.  Lead Plaintiffs have reviewed and monitored the progress of this litigation and regularly conferred with Lead Counsel concerning the prosecution of this Action.  *See* Macomb County ERS Decl. ¶¶5-6; Macomb County RHC Decl.¶¶5-6; Wayne County ERS Decl. ¶¶5-6.  For example, Lead Plaintiffs have received and reviewed periodic updates and other correspondence from Lead Counsel regarding all aspects of the case, including the progress of discovery and the filing of significant pleadings (*i.e.*, the Complaint and Motion to Dismiss) and Court orders.  *Id.*

In sum, Lead Plaintiffs are committed to vigorously prosecuting this litigation and intend to obtain the largest recovery for the class consistent with good faith and sound judgment.  *See* Macomb County ERS Decl. ¶7; Macomb County RHC Decl.¶7; Wayne County ERS Decl. ¶7.

### III.    THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE CERTIFIED

Certification is appropriate where a putative class meets all four requirements of Rule 23(a) and one requirement of Rule 23(b).  *See Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d

417, 435 (S.D.N.Y. 2023). Though "a court's class-certification analysis must be 'rigorous' . . . Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013). For this reason, "[a] motion for class certification should not become a minitrial on the merits." *Erickson v. Jernigan Cap., Inc.*, 692 F. Supp. 3d 114, 125 (S.D.N.Y. 2023); *Amgen, Inc.*, 568 U.S. at 465 (class members need not prove materiality of the alleged misstatements in a securities fraud class action prior to the class certification stage).

"If the Court finds that the requirements of Rule 23 have been met, the Court may, in its discretion, certify the [C]lass." *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *7 (S.D.N.Y. 2019). The Second Circuit has construed Rule 23 liberally and directed district courts to err on the side of granting class certification. *Katz v. Curis Pharmacy, LLC*, 2023 WL 5769499, at *2 (S.D.N.Y. 2023) ("doubts concerning the proprietary of class certification should be resolved in favor of class certification").

### A. The Proposed Class Satisfies the Requirements of Rule 23(a)

#### 1. Numerosity Is Established

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity "does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States SE & SW Areas Health & Welfare Fund v. Marck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). The Second Circuit has recognized that "[n]umerosity is presumed for classes larger than forty members." *Pa. Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). In securities class actions, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period. *Erickson*, 692 F. Supp. 3d at 125-26

(numerosity requirement satisfied when class consisted of owners of over 22 million shares traded on the NYSE); *Signet*, 2019 WL 3001084, at *8 (numerosity satisfied when between 60.5 and 80.5 million shares outstanding and average of 1.34 million shares traded daily).

Here, the Class is so numerous that joinder would be impractical. During the Class Period, there were between 231 million and 233 million shares of Class A common stock outstanding and the average weekly trading volume of Estée Lauder's common stock on the NYSE was 9.3 million shares. Cain Rpt. ¶¶ 38, 90. Based on the frequency of stock transactions in which investors buy and sell shares, one can infer that there are many thousands of Class members who purchased stock at various times during the Class Period. The numerosity requirement is therefore easily satisfied.

### 2.    Commonality Is Established

Rule 23(a)(2) requires that "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2). The inquiry is considered "a low hurdle easily surmounted." *Erickson*, 692 F. Supp. 3d at 126 (citation omitted). A single common question of fact or law suffices to satisfy the element. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Common questions of law or fact are present where the alleged fraud involves "material misrepresentations and omissions in documents circulated to the investing public, press releases and statements provided to the investment community and the media, and investor conference calls." *Ashe v. Arrow Fin. Corp.*, 2025 WL 487427, at *4 (N.D.N.Y. 2025) (citation omitted).

Here, the commonality requirement is met. The Complaint raises significant questions common to the proposed Class, including whether: (1) Estée Lauder violated the federal securities laws; (2) Estée Lauder's statements made during the Class Period were false or misleading; (3) Estée Lauder acted with scienter; (4) the price of Estée Lauder's common stock during the Class Period was artificially inflated or artificially maintained because of Estée Lauder's conduct complained of in the Complaint; and (5) the proper measure of damages. ¶269. *See In re Aphria,*

*Inc. Sec.Litig.*, 342 F.R.D. 199, 204-05 (S.D.N.Y. 2022) (commonality is satisfied in a securities fraud suit because class members were injured by similar material misrepresentations and omissions).

### 3.    Typicality Is Established

Rule 23(a)(3) requires that the representative party's claims be "typical" of the claims of the class.  Fed. R. Civ. P. 23(a)(3).  The typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (citation omitted).  The typicality requirement "is not highly demanding" and does not require plaintiffs' claims to be identical, only that they share the same essential characteristics. *Passman*, 671 F. Supp. 3d at 441 (citation omitted).

Here, typicality is easily met.  Lead Plaintiffs' claims arise out of the same alleged facts and legal theories as the claims of all other Class members—*i.e.*, Lead Plaintiffs allege that Defendants made materially false and misleading public statements and omissions, in violation of Section 10(b) of the Exchange Act and the Individual Defendants violated Section 20(a) of the Exchange Act.  ¶42.  *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *4-5 (S.D.N.Y. 2018) (typicality established in case arising under federal securities laws).  Moreover, the injury Lead Plaintiffs suffered is alleged to be the same as the injury suffered by the proposed Class—*i.e.*, Lead Plaintiffs purchased Estée Lauder's common stock at artificially inflated and/or artificially maintained prices during the Class Period, suffering losses when the truth about Estée Lauder's overreliance on *daigou* market gray sales was revealed to the market, just like all other Class members.  ¶¶35, 36, 37, 39, 41.  Thus, Lead Plaintiffs' claims are typical of—if not identical to— those of other members of the Class.  *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (typicality requires that the claims of the class representatives be typical of those of the class, and

is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability).[5]

### 4.    Adequacy Is Established

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement seeks to ensure that Lead Plaintiffs' interests are not antagonistic to those of the Class, and that Lead Plaintiffs' attorneys are qualified, experienced, and able to conduct the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d. Cir. 2000). The purpose of this inquiry is to ensure that the named representatives will "have an interest in vigorously pursuing the claims of the class, and . . . have no interests antagonistic to the interests of other class members." *Wilson*, 2018 WL 3913115, at *7 (citation omitted). "A conflict or potential conflict alone will not defeat class certification—the conflict must be fundamental." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). "[D]enial of class certification on the grounds of inadequacy should only occur in the most extreme instances." *Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 212 (S.D.N.Y. 2021).

The adequacy requirement is satisfied here. Lead Plaintiffs' interests are not antagonistic to those of the proposed Class. Lead Plaintiffs, like all Class members, purchased Estée Lauder's common stock at inflated market prices during the Class Period and were injured by the same material misrepresentations and omissions, and subsequent stock price declines. Lead Plaintiffs' interests in establishing Defendants' liability and maximizing recovery are aligned with those of

---

[5] Further bolstering their typicality, Lead Plaintiffs are not subject to unique defenses. *Erickson.*, 692 F. Supp. 3d at 127 (a proposed class representative who is subject to unique defenses that could impact the materiality determination and threaten to become a focus of the litigation is not adequate or typical); *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *5 (S.D.N.Y. 2008) (the unique defense rule "is not rigidly applied in this Circuit," and "is intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit") (citation modified)).

absent Class members.  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (adequate class representative must not have interests antagonistic to the interests of other class members); *see* Macomb County ERS Decl. ¶8; Macomb County RHC Decl.¶8; Wayne County ERS Decl. ¶8.  Moreover, Lead Plaintiffs have already proven their willingness and ability to serve as Class Representatives by actively supervising and monitoring this litigation, participating in discussions with counsel concerning case developments, responding to discovery requests from Defendants, and receiving regular case status reports from counsel. Lead Plaintiffs intend to continue to perform similar activities, including participating in discovery and trial preparation.  Lead Plaintiffs understand their duty to the Class and are committed to prosecuting this Action to maximize the recovery of all Class members.[6]

Finally, Lead Plaintiffs have engaged competent counsel that is "qualified, experienced and able to conduct this litigation."  *Baffa*, 222 F.3d at 60.  Labaton has extensive experience litigating securities class actions throughout the country and has successfully prosecuted hundreds of securities class actions on behalf of injured investors.  *See* Christie Decl. at Ex. E (Labaton Firm Resume).  The interests of the Class are therefore protected.

### B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

The proposed Class also satisfies Rule 23(b)(3)'s requirements that common questions of law or fact predominate and that a class action be the superior method to adjudicate this dispute. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

---

[6] Further, as institutional investors, Lead Plaintiffs are particularly well-qualified to serve as Class Representative.  The PSLRA was intended "to increase the likelihood that institutional investors will serve as lead plaintiffs." *See* H.R. Conf. Rep. No. 104-369, at 34 (1995) (Conf. Rep.); *Micholle v. Ophthotech Corp.*, 2018 WL 1307285, at *6 (S.D.N.Y. 2018) (same).

### 1.    Predominance Is Established

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (citation omitted).  "Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Katz v. Image Innovations*, 2010 WL 2926196, at *5 (S.D.N.Y. 2010) (citation omitted).

The analysis of whether common questions predominate "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) ("*Halliburton I*").  The elements of Lead Plaintiffs fraud claims are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or commission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

Falsity, materiality, scienter, and loss causation are common issues to a class, which means that whether common questions of law or fact predominate in a securities fraud action "often turns on the element of reliance." *See Halliburton I*, 563 U.S. at 810; *Amgen*, 568 U.S. at 474-75; *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) ("All of these elements, other than reliance . . . are subject to class wide proof in securities litigation[.]").  Here, Lead Plaintiffs and the Class are entitled to a presumption of class-wide reliance under the fraud-on-the-market theory set forth in *Basic Inc.*, 485 U.S. 224, and reaffirmed in *Halliburton II*, 573 U.S. at 276, or set forth in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972).  As set forth below, damages will also be determined on a class-wide basis using the same formula and measure of artificial inflation attributable to Defendants' conduct.  Accordingly, the predominance requirement is satisfied.

a.    **Lead Plaintiffs Are Entitled to the Fraud-on-the-Market Presumption of Reliance**

Lead Plaintiffs may invoke the fraud-on-the-market presumption of reliance because Estée Lauder's common stock traded in an efficient market. The fraud-on-the-market doctrine recognizes that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentation." *Halliburton II*, 573 U.S. at 270 (quoting *Basic*, 485 U.S. at 246). To invoke the *Basic* presumption of reliance, plaintiffs must show that: "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 277-78. In *Basic*, the Supreme Court held that investors could satisfy the reliance element of Section 10(b) by invoking a rebuttable presumption of reliance. 485 U.S. at 245-49. The *Basic* presumption of reliance is premised on the fact that "the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458; *Basic*, 485 U.S. at 229-30 (concluding that anyone who buys or sells stock at the market price may be considered to have relied on material misstatements).

Lead Plaintiffs may invoke the presumption by establishing that "the alleged misrepresentations were publicly known . . . , that [Estée Lauder's] stock traded on an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed." *Halliburton I*, 563 U.S. at 811 (citation omitted). Once the *Basic* presumption of reliance is invoked (as is the case here), "the burden then shifts" and

14

Defendants "bear the burden of persuasion [under *Halliburton II*] to rebut the *Basic* presumption by a preponderance of the evidence." *Signet*, 2019 WL 3001084, at *11 (citation omitted).[7]

Here, Lead Plaintiffs have successfully invoked the *Basic* presumption.  **First**, Lead Plaintiffs allege that Defendants made material misrepresentations and omissions in their public statements to investors through Estée Lauder's SEC filings and press releases, as well as during earnings conference calls and investor conferences, that artificially inflated and/or artificially maintained the market price of Estée Lauder's common stock.  ¶¶ 130, 145, 159, 162, 164, 166, 169, 171.  **Second**, with respect to the market timing, Lead Plaintiffs allege that it, like other members of the proposed Class, bought Estée Lauder's common stock during the Class Period at artificially inflated prices and suffered losses when that inflation was removed upon the disclosure of the truth. ¶¶173-235. **Third**, as alleged and as detailed below and in the Cain Report, the market for Estée Lauder's common stock was efficient at all relevant times during the Class Period.  ¶¶ 271-275; Cain Rpt. ¶ 112.

Dr. Cain's report demonstrates Estée Lauder's common stock traded in an efficient market. Cain Rpt. ¶¶22-93.  Moreover, where a company's stock trades on an open and developed exchange, like the NYSE, courts need not conduct any further analysis to determine whether market efficiency exists.  Estée Lauder's listing on the NYSE alone supports a presumption of market efficiency.  *Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 n.68 (S.D.N.Y. 2016) ("[t]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national

---

[7] "To meet [their] burden, [D]efendants must 'do more than merely produce evidence that *might* result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the [company's] stock's price by a preponderance of the evidence." *Signet*, 2019 WL 3001084, at *11 (citing *Waggoner*, 875 F.3d at 101).  Moreover, Defendants must "sever the link between the misrepresentation and the price received or paid" in order to rebut the *Basic* presumption of reliance, *Waggoner*, 875 F.3d at 101 (citing *Halliburton II*, 573 U.S. at 280-82), and in so attempting, "must demonstrate a lack of price impact by a preponderance of the evidence at the class certification stage rather than merely meet a burden of production." *Waggoner*, 875 F.3d at 101.

market is a good indicator of efficiency" (citation omitted)); *Carpenters Pension Trust Fund of St Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015) (collecting cases noting that some courts presume securities traded on national markets to be efficient).  At a minimum, Estée Lauder's trading on a national exchange provides a "strong indication" of efficiency.  *In re JP Morgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *7 (S.D.N.Y. 2015); *see also* Cain Rpt. ¶50.

In evaluating this showing, courts apply the five-factor analysis set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), to determine whether stock is traded in an efficient market.  The Second Circuit has held that the burden to show market efficiency at class certification "is not an onerous one."  *In re Petrobras Sec. Litig.*, 862 F.3d 250, 278 (2d Cir. 2017). Instead, it is a flexible inquiry for which the Second Circuit has declined to adopt any particular test, instead directing "a holistic analysis based on the totality of the evidence presented." *Waggoner*, 875 F.3d at 94, 96-97 (citation omitted).  As detailed herein and in the accompanying Cain Report, Lead Plaintiffs have established that the market for Estée Lauder's common stock was efficient at all relevant times, triggering the presumption of reliance.

### b.    The *Cammer* and *Krogman* Factors Support a Finding of Market Efficiency

The "prevailing tests for market efficiency" are the factors set forth in *Cammer*, 711 F. Supp. at 1286-87, and *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)—known as the *Cammer* and *Krogman* factors.  *Signet*, 2019 WL 3001084, at *11.  The five *Cammer* factors are (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price.  *Id*.  The

three *Krogman* factors are: "(1) the market capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders." *Id.*

Courts are clear that these factors should be used "as an analytical tool rather than as a checklist," *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 60 (S.D.N.Y. 2012), and should be analyzed holistically "based on the totality of the evidence presented." *Petrobras*, 862 F.3d at 277. A holistic consideration of the *Cammer* and *Krogman* factors overwhelmingly supports a finding that the market for Estée Lauder's common stock was efficient during the Class Period.

### i.    *Cammer* Factor 1: Average Weekly Trading Volume

Estée Lauder's common stock average weekly trading volume supports a showing of market efficiency. Cain Rpt. ¶¶35-38. The first *Cammer* factor, stock trading volume, was defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated, "[t]urnover measured by average weekly trading volume of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[8] *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) ("Average weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security"). Estée Lauder's common stock average weekly trading volume of 4.0% of common stock outstanding over the Class Period easily exceeds both the 1%-2% thresholds established by the *Cammer* court. Cain Rpt. ¶37.

### ii.    *Cammer* Factor 2: Analyst Coverage

The second *Cammer* factor looks at the amount of analyst coverage the company at issue receives. *Id.* ¶39. An analyst is someone, usually working for a financial institution such as a

---

[8] *Cammer*, 711 F. Supp. at 1293.

brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry to provide company assessments and forecasts of future operating performance. *Id*. Analyst coverage "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market." *Winstar*, 290 F.R.D. at 446; *Cammer*, 711 F. Supp. at 1286 ("[I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period").

Analysts from 38 different firms including Evercore, Wells Fargo, RBC, J.P. Morgan, and Piper Sandler issued 556 reports on Estée Lauder during the Class Period. Cain Rpt. ¶41. Indeed, Dr. Cain observed that this high degree of analyst coverage is greater than that of most other publicly traded firms. *Id*. ¶42. Dr. Cain's report also found that Estée Lauder's high level of analyst coverage placed it above the 95th percentile when compared with all companies listed on the NASDAQ and NYSE from 2016-2018, per an academic study assessing companies in that time frame. *Id*. Additionally, Dr. Cain identified over 2,100 unique articles published throughout the Class Period from leading news outlets concerning Estée Lauder, including *Dow Jones Newswires*, *Reuter's News*, *Business Wire*, and *The Wall Street Journal* among others. *Id*. ¶43. The analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about Estée Lauder support the conclusion that the Company's common stock traded in a well-developed and informationally efficient market throughout the Class Period.

### iii.    *Cammer* Factor 3: Market Makers

Under *Cammer*, the existence of "ten market makers for a security" is sufficient to invoke the "presumption that the market for the security is an efficient one." *Cammer*, 711 F. Supp. at 1293; Cain Rpt. ¶¶46-47. Courts in this Circuit "have found that anywhere between six and twenty

market makers is sufficient to support a finding of market efficiency." *Carpenters*, 310 F.R.D. at 92. Here, Estée Lauder had at least 130 market makers and brokers providing similar activity over the Class Period. Cain Rpt. ¶49. Additionally, Estée Lauder's common stock traded on the NYSE, a well-developed and established national exchange, which courts typically view as informationally efficient. *Id*. ¶50. Finally, Dr. Cain observes that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading. *Id*. ¶51. Estée Lauder's common stock was held by over 2,300 unique institutional investors during the Class Period, who owned an average of 209.2 million shares, or 90.2% of Estée Lauder's common stock outstanding. *Id*.

### iv. *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

As the *Cammer* court explained, "it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was . . . [not] because the minimum stock requirements set forth in the instructions to Form S-3 were not met." *Cammer*, 711 F. Supp. at 1287. Dr. Cain found that Estée Lauder made required filings with the SEC in a timely manner and satisfied the other Form S-3 requirements throughout the Class Period. Cain Rpt. ¶56. This factor therefore supports a finding of market efficiency.

### v. *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

The fifth *Cammer* factor relates to how the price of a security reacts to the release of new, company-specific news events. The Second Circuit has held that the fifth *Cammer* factor allows, but does not require, plaintiffs to submit "direct evidence" demonstrating a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Waggoner*, 875 F.3d at 94 (citation omitted). Alternatively, a strong showing

of market efficiency through indirect evidence, as demonstrated by the first four *Cammer* factors, will suffice. *See Waggoner*, 875 F.3d at 97-98. Lead Plaintiffs have demonstrated through indirect evidence that Estée Lauder's common stock traded in an efficient market during the Class Period, which is sufficient to satisfy *Cammer*, and the Cain Report further supplements that showing with direct evidence of market efficiency.

The relationship between news events and security price changes is typically analyzed through a statistical regression analysis, commonly referred to as an "event study," "that seek[s] to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 573 U.S. at 280. Dr. Cain performed an event study where he "compared the behavior of Estée Lauder's Common Stock on days when potential value-relevant news was issued via earnings releases with its behavior on days when no such news was issued," and found a strong causal connection between new-company-specific events and movements in the market price as evidence of market efficiency. Cain Rpt. ¶¶58, 72, 78. To assess whether Estée Lauder's common stock responded to the release of new Estée Lauder -specific news during the Class Period, Dr. Cain analyzed whether the price of Estée Lauder's common stock reacted differently on the eight earnings releases days that occurred during the Class Period as compared to the 276 days without any Estée Lauder -specific news. *Id*. ¶¶73-74. Dr. Cain found that six out of the eight Estée Lauder earnings releases that occurred during the Class Period caused stock price movements that were statistically significant. *Id*. ¶75 (noting that disclosures caused stock movements that were statistically significant 95% of the time). In contrast, Dr. Cain discovered that statistically significant stock price movements occurred on just 6.52% of the days without any Estée Lauder -specific news. *Id*. ¶76.

The conclusion of Dr. Cain's analysis demonstrates that relative to days that contained the least news during the Class Period, days that contained news day events "resulted in a greater proportion of statistically significant stock price movements at the 95% confidence level, higher absolute abnormal returns, and greater trading volumes, and these differences are all statistically significant." *Id.* ¶78. "[A]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship." *Petrobras*, 862 F.3d at 278 (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008)). Therefore, Estée Lauder's common stock price reacted to company-specific news, and thus further supports the conclusion that Estée Lauder common stock traded in an efficient market throughout the Class Period." Cain Rpt. ¶78.

### vi. *Krogman* Factor 1: Market Capitalization

During the Class Period, the market capitalization for Estée Lauder's common stock averaged $53.0 billion. *Id.* ¶81. This supports a finding of market efficiency. *See, e.g., Pearlstein v. Blackberry Ltd.*, 2021 WL 253453 at *16 (S.D.N.Y. 2021) ($6.45 billion market cap, larger than 90% of publicly-traded companies, supports market efficiency). Moreover, Estée Lauder's total market capitalization places it above the 95th percentile of all companies on the NASDAQ and NYSE from 2016-2018, as per an academic study analyzing publicly traded companies' market capitalization in that time span. Cain Rpt. ¶81. Dr. Cain concluded that Estée Lauder's "market capitalization, shares outstanding available for trading, and its sizeable float . . . are consistent with the conclusion that the Common Stock traded in an efficient market during the Class Period." *Id.* ¶82.

### vii.    *Krogman* Factor 2: Bid-Ask Spread

The bid-ask spread is the difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares.  *Id*. ¶84.  Dr. Cain concluded that the bid-ask spread of Estée Lauder's common stock during the Class Period averaged 0.02%.  *Id*. ¶85. This is well within what courts have found indicative of market efficiency.  *See In re Global Brokerage, Inc.*, 2021 WL 1160056, at *18 (S.D.N.Y. 2021) (bid-ask spread averaging .28% is consistent with efficiency); *Signet*, 2019 WL 3001084, at *12 (the average bid-ask spread for all stocks trading on the NYSE and NASDAQ was .68%).  Estée Lauder's bid-ask spread supports the conclusion that its common stock traded in an efficient market throughout the Class Period. Cain Rpt. ¶87.

### viii.    *Krogman* Factor 3: Public Float

A stock's public float is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities.  A higher public float indicates greater market efficiency. *Krogman*, 202 F.R.D. at 478.  Here, Estée Lauder's public float during the Class Period was more than 99% of shares outstanding.  Cain Rpt.  ¶90.  This equates to an average public float of $50.4 billion during the Class Period.  *Id*.  The large size and high percentage of Estée Lauder's float supports a finding of market efficiency.  *See Signet*, 2019 WL 3001084, at *12 (public float of 99.4 and 99.8% "weigh[s] heavily in favor of a finding of market efficiency"); Cain Rpt. ¶90.[9]  Dr. Cain concluded that the large degree of public float for Estée Lauder's common stock supports the conclusion that it traded in an efficient market throughout the Class Period.  *Id*. ¶91.

---

[9] Moreover, Estée Lauder's public float greatly exceeded the $75 million minimum for S-3 filing eligibility. *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf; SEC Form F-3, available at https://www.sec.gov/files/formf-3.pdf.

### ix.    Additional Factor: Institutional Ownership

Dr. Cain's Report also addresses an additional factor that demonstrates market efficiency: the presence of institutional investors. *Id.* ¶¶92-93. Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. *Id* ¶92. Courts consider high institutional ownership indicative of market efficiency. *See, e.g. In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008); *see also Wilson*, 2018 WL 3913115, at *12) (finding ownership of company stock by at least 251 major institutions supported efficiency). Dr. Cain noted that the presence of these institutional shareholders can be an indicator of market efficiency because they "can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, causing the new information to be quickly impounded into stock prices." Cain Rpt. ¶92. Here, at least 2,361 institutions held Estée Lauder's common stock at some point during the Class Period. *Id.* ¶93.

Because all the *Cammer* and *Krogman* factors, as well as additional market analyses, demonstrate here that the market for Estée Lauder's common stock was efficient during the Class Period, Lead Plaintiffs are entitled to rely on the fraud-on-the-market presumption of reliance.[10]

---

[10] Reliance is also presumed under *Affiliated Ute*, 406 U.S. 128 (1972). Where, as here, a claim "involv[es] primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Id.* at 153. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id.* at 153-54. The *Affiliated Ute* presumption reflects the reality that where no positive statements exist "'reliance as a practical matter is impossible to prove.'" *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981). Furthermore, because materiality itself is a common question, plaintiffs need not prove materiality in order to invoke the *Affiliated Ute* presumption at the class certification stage; it need only be alleged. *See Amgen*, 568 U.S. at 465-6. The Complaint includes numerous allegations regarding what Defendants failed to disclose. *E.g.*, ¶¶130-31, 159-60. Under these circumstances, a showing of reliance on the omissions is unnecessary, even if Lead Plaintiffs also allege that Estée Lauder disseminated affirmative misstatements. *Haw. Structural Ironworkers*, 338 F.R.D. at 216 (*Affiliated Ute* applied where §10(b) claims focused on the omission of material information).

### c.    Damages Will Be Calculated Using a Common Methodology

In the Second Circuit, a court's decision to certify a class does not require "a finding that damages are capable of measurement on a classwide basis," and it is "well-established" that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (discussing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)).  All that is required under *Comcast* is that "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Waggoner*, 875 F.3d at 106 (citation omitted); *see also Signet*, 2019 WL 3001084, at *20 ("Plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability.").

As with virtually all securities class actions, damages in this case are subject to an "out-of-pocket" damages model that can easily be applied class-wide using a common formula.  Cain Rpt. ¶96.  Courts in this Circuit have recognized that a model applying out-of-pocket damages "is entirely consistent with [a plaintiff's] theory of Section 10(b) liability and would be measurable on a class-wide basis." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105–06 (S.D.N.Y. 2016) (alterations in original); *see also Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *14 (D. Conn. 2023) (collecting cases).

Moreover, while not necessary for class certification, damages in this case can be calculated on a class-wide basis using a common methodology.  Cain Rpt. ¶¶ 95-105,111.  Dr. Cain explains that class-wide damages can be calculated using standard tools of valuation to measure the difference between the amount of price inflation when Class members purchased shares of Estée Lauder's common stock and the amount of inflation at the time of sale, subject to

certain uniform limitations. *Id*. at ¶95-105. This calculation of per-share artificial inflation can be applied class-wide and is universally accepted. *Id*.

Accordingly, common questions of law and fact predominate, and the first prong of Rule 23(b)(3) is satisfied.

### 2.    Superiority Is Established

Four factors are relevant when determining whether a class action is superior to other methods for fair and efficient adjudication: (1) the interests of members of the class in "individually controlling the prosecution of defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). Generally, class actions are considered superior to individual cases in securities cases. *Erickson*, 692 F. Supp. 3d at 134. Indeed, each of the superiority factors is satisfied here.

*First*, the proposed Class consists of hundreds, if not thousands, of potential Class members. "[P]roceeding as a class will preserve judicial resources by consolidating common issues of fact and law, and avoid repetitive proceedings and inconsistent adjudications." *Vasquez v. A+ Staffing LLC*, 746 F. Supp. 3d 26, 51 (E.D.N.Y. 2024). *Second*, Lead Plaintiffs are unaware of any other related securities litigation commenced by Class members. *Third*, "concentrating the litigation in this forum would promote judicial economy." *In re Pfizer Inc.*, 282 F.R.D. at 53. *Fourth*, Lead Plaintiffs do not foresee any management difficulties that will preclude this Action from being maintained as a class action. Indeed, there is a risk of inconsistent judgments if there were multiple actions challenging the same common issues of fact and law. *Erickson*, 692 F. Supp. 3d at 134. Therefore, a class action is superior to other methods of adjudication.

### 3.    The Court Should Appoint Labaton as Class Counsel

Under Rule 23(g)(1)(A), the Court must appoint counsel who will fairly and adequately represent the Class and, to that end, consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. *See Hunter v. Blue Ridge Bankshares, Inc.*, 346 F.R.D. 16, 26 (E.D.N.Y. 2024) (lead counsel appointed after court considered its experience handling over 75 securities class actions).

Labaton has investigated and vigorously pursued the Class's claims in this Action and will continue to do so.  For example, Labaton conducted an extensive investigation of the claims; developed a detailed plan for the prosecution of the case; prepared a detailed operative Complaint and successfully defended that Complaint from a Rule 12(b)(6) dismissal; propounded substantial discovery on Defendants; responded to Defendants' discovery requests; and is now pursuing class certification.  Additionally, as discussed above, and as supported by its firm resume, *see* Christie Decl. at Ex. E, Labaton has consistently demonstrated its ability to litigate securities cases, has extensive knowledge of the securities laws, and has proven its willingness to commit substantial time and resources to representing the Class.  Finally, Labaton has no known conflicts that would prevent them from fairly and adequately representing the Class.  Lead Plaintiffs respectfully request that the Court appoint Labaton as Class Counsel pursuant to Rule 23(g).

## IV.    CONCLUSION

Lead Plaintiffs respectfully request that the Court certify the proposed Class, appoint the Lead Plaintiffs as Class Representatives, and appoint Labaton as Class Counsel.

Dated: July 25, 2025

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

By: */s/ James T. Christie*
Michael P. Canty
James T. Christie
Guillaume Buell
Jacqueline R. Meyers
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
Email:   mcanty@labaton.com
             jchristie@labaton.com
             gbuell@labaton.com
             jmeyers@labaton.com

*Lead Counsel for Lead Plaintiffs the Michigan
Funds and the Proposed Class*

**VANOVERBEKE MICHAUD & TIMMONY
P.C.**

Thomas C. Michaud (*pro hac vice forthcoming*)
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
Email:   tmichaud@vmtlaw.com

*Liaison Counsel for Lead Plaintiffs the Michigan
Funds and the Proposed Class*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel for Lead Plaintiffs certify that this brief contains 8,520 words, which complies with the word limit of L.R. 7.1(c).

Dated: July 25, 2025                                  */s/ James T. Christie*
                                                     James T. Christie