UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                    :
                                                    :
                                                    :       No.  1:23-cv-10669-AS
IN RE THE ESTÉE LAUDER CO., INC.                    :
SECURITIES LITIGATION                               :
                                                    :
                                                    :
------------------------------------------------------------- X

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

**ORAL ARGUMENT REQUESTED**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Fax: (212) 351-4035

*Attorneys for Defendants The Estée
Lauder Companies Inc., Fabrizio
Freda, and Tracey T. Travis*

January 23, 2026

1

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................................ 1

II.   FACTUAL BACKGROUND................................................................................................... 3

    A.    Travel Retail.................................................................................................................. 3

    B.    Daigou Is Well-Known and Widespread...................................................................... 4

    C.    ELC Discloses Risks..................................................................................................... 6

    D.    ELC Encounters the Perfect Storm and Revises Guidance .......................................... 6

    E.    The Evidence ................................................................................................................ 7

III.  LEGAL STANDARD............................................................................................................. 8

IV.   ARGUMENT .......................................................................................................................... 9

    A.    The Proposed Class Does Not Satisfy the Predominance Requirements of Rule 23(b)(3) Because Plaintiffs Are Not Entitled to the *Basic* Presumption of Reliance.............................. 9

        1.    Plaintiffs' Alleged Misrepresentations Did Not Impact ELC's Stock Price. .................. 9

            a.    There Is a Mismatch Because the Alleged Misrepresentations Are Too Generic to Be Corrected by the Specific Nature of the Alleged Corrective Disclosures.......................... 11

            b.    Any Truthful But Equally Generic Substitute for the Alleged Misstatements Would Not Have Impacted ELC's Stock Price.............................................................................. 13

        2.    Plaintiffs Have Failed to Meet Their Burden to Show Market Efficiency.................... 16

    B.    The Proposed Class Does Not Satisfy the Predominance Requirements of Rule 23(b) Because Plaintiffs Fail to Show Damages Consistent with Their Theory of Liability Can Be Calculated on a Classwide Basis.................................................................................... 18

        1.    Cain's Model Fails to Offer a Tangible Method to Isolate the Incremental Loss Attributable to the Disclosure of a Previously Concealed Illegal Daigou Reliance Risk..... 19

        2.    Cain's Model Fails to Offer a Tangible Method to Disaggregate Confounding Information. ........................................................................................................................ 21

        3.    Cain's Out-Of-Pocket Damages Model Is Not an Appropriate Vehicle for Assessing Damages Under Plaintiffs' Theories of Liability. ................................................................. 21

        4.    Cain's Model Does Not Provide a Methodology for Accounting for Individualized Damages............................................................................................................................. 22

    C.    The Proposed Class Representatives Do Not Satisfy the Typicality or Adequacy Requirements of Rule 23(a). ................................................................................................ 26

        1.    A Class Cannot Be Certified When Plaintiffs' Investment Manager Valued ELC Shares Independent of the Market. ................................................................................................. 26

        2.    Plaintiffs Are Not Adequate for Purposes of Rule 23(a)............................................. 30

V.    CONCLUSION ..................................................................................................................... 31

i

## TABLE OF AUTHORITIES

### Cases

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972) ................................................................................................15

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) ...................................................................18, 21, 22

*Arkansas Teacher Retirement Sys. v. Goldman Sachs Grp.*,
    77 F.4th 74 (2d Cir. 2023) .........................................................................10, 11, 13

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) ................................................................................23, 24

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000) ......................................................................................26

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ...................................................................................................9

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) .............................................................................16

*City of Phila. v. Banc of Am. Sec. LLC*,
    2025 WL 2180607 (Aug. 1, 2025) .............................................................................2

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .............................................................................................8, 18

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ....................................................................................29

*Starr ex rel. Est. of Sampson v. Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005) ....................................................................................15

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ......................................................................................18

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014) ...............................................................18, 20, 22

*GAMCO Investors, Inc. v. Vivendi Universal, S.A.*,
    838 F.3d 214 (2d Cir. 2016) ..............................................................................27, 28

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    594 U.S. 113 (2021) ......................................................................................2, 9, 11, 12

*In re Grupo Televisa* Sec. Litig.,
  2020 WL 3050550 (S.D.N.Y. June 8, 2020) ........................................................................29

*Hall-Landers v. N.Y.U.*,
  2025 WL 919195 (S.D.N.Y. Mar. 26, 2025) .......................................................................31

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014).................................................................................................................9

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
  2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023)...................................................................22

*Jaeger v. Zillow Group, Inc.*,
  2025 WL 2741642 (9th Cir. Sept. 25, 2025) .......................................................................12

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
  2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ......................................10, 11, 12, 13, 14, 15, 16

*Koss v. Wachenhut Corp.*,
  2009 WL 928087 (S.D.N.Y. Mar. 30, 2009) .......................................................................30

*Levitt v. J.P. Morgan Securities, Inc.*,
  710 F.3d 454 (2d Cir. 2013)..............................................................................................9, 18

*Ludlow v. BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015) .........................................................................................22, 25

*Manela v. Garantia Banking Ltd.*,
  5 F. Supp. 2d 165 (S.D.N.Y. 1998).....................................................................................15

*Mulderrig v. Amyris, Inc.*,
  340 F.R.D. 575 (N.D. Cal. 2021).........................................................................................22

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
  993 F.3d 774 (9th Cir. 2021), *aff'd en banc*, 31 F.4th 651 (9th Cir. 2022).......................23, 24

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
  725 F.3d 244 (D.C. Cir. 2013).........................................................................................23, 24

*Rocco v. Nam Tai Elec., Inc.*,
  245 F.R.D. 131 (S.D.N.Y. 2007) ...............................................................................26, 29, 30

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
  349 F.R.D. 606 (S.D.N.Y. 2025) ....................................................................................23, 25

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
  798 F. Supp. 3d 416 (S.D.N.Y. 2025)..................................................................................14

*Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*,
  2013 WL 1286078 (S.D.N.Y. Mar. 28, 2013) .....................................................................30

*Stadium Capital LLC v. Co-Diagnostics, Inc.*,
  2026 WL 100576 (Jan. 14, 2026) ..................................................................................12

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016)..........................................................................................................2

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  2018 WL 2958361 (S.D.N.Y. June 13, 2018) ................................................................26, 29

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017).............................................................................................15, 25

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).........................................................................................................8

*In re Waste Mgmt. Sec. Litig.*,
  775 F. Supp. 3d 742 (S.D.N.Y. 2025)...............................................................................17

Defendants The Estee Lauder Companies Inc. ("ELC" or the "Company"), Fabrizio Freda, and Tracey T. Travis (collectively, "Defendants") respectfully submit this memorandum of law in opposition to Lead Plaintiffs' Motion for Class Certification, ECF 83 (the "Motion" or "Mot.").

## I.      PRELIMINARY STATEMENT

Lead Plaintiffs' ("Plaintiffs")[1] theory of alleged securities fraud is that Defendants lied about illegal sales to daigou—specifically, that ELC's public statements regarding its Travel Retail sales and growth in the Asia-Pacific region were misleading because the Company failed to disclose the extent to which those results were fueled by daigou activity—a purportedly "prohibited gray market." At the motion-to-dismiss stage, the Court held the allegations sufficient to plead a claim under Section 10(b) and Rule 10b-5, accepting Plaintiffs' theory as true as the Court was required to do. That assumption no longer applies.

Now, the evidence matters. To certify the proposed class, Plaintiffs must affirmatively demonstrate, through admissible evidence, that (i) the market trading ELC stock was efficient and that they are thus entitled to a presumption of reliance, and (ii) damages are capable of measurement on a classwide basis using a methodology consistent with Plaintiffs' theory. Plaintiffs fail on both fronts.

Discovery has exposed Plaintiffs' theory as a litigation construct untethered from market reality. Daigou is not a hidden, illicit backchannel or unique to ELC. It is a long-standing, widely understood, and often lawful feature of travel retail in Asia Pacific markets—openly discussed by analysts, competitors, and regulators for years. Plaintiffs' own investment manager, Edgewood—who was also ELC's largest outside shareholder during the Class Period—testified that daigou was

---

[1] Unless otherwise noted, all defined terms are consistent with those in Plaintiffs' Motion.

"just part of doing business in China and Korea," and that ELC's challenges stemmed from unforeseeable macroeconomic forces unleashed by COVID-19, not concealed misconduct.

Once the Court considers "*all* probative evidence … aided by a good dose of common sense," *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021) ("*Goldman I*"), Plaintiffs' bid for class certification collapses.  Defendants submit extensive contemporaneous market evidence and multiple expert reports demonstrating that the so-called "corrective disclosures" did not reveal previously concealed illegal daigou sales, did not correct any alleged misstatements, and did not impact ELC's stock price.  Analysts instead attributed ELC's stock movements to disclosed and widely understood factors—COVID-related travel restrictions, inventory tightening, the withdrawal of industry accommodations in Korea, evolving enforcement in China, and a slower-than-expected recovery in Travel Retail.

Even assuming the market for ELC's stock was efficient, Plaintiffs cannot establish price impact, they are not entitled to the *Basic* presumption of reliance, and Rule 23(b)(3) predominance fails.  Class certification independently fails because there is no evidence that damages can be reliably measured on a classwide basis consistent with Plaintiffs' theory of liability.  Plaintiffs' putative expert offers only a boilerplate damages model—literally cut and paste from at least three prior reports—that lacks any analysis around whether losses attributable to the alleged nondisclosure of illegal or illicit daigou sales can be disaggregated from confounding information.[2] Plaintiffs have not even ascertained a method for identifying and excluding purchasers of ELC securities, like Edgewood, that suffered no injury.

---

[2] Defendants are filing a concurrent motion to exclude portions of Cain's report and exclude all related opinions and testimony.  Defs. Mot. to Exclude; *see City of Phila. v. Banc of Am. Sec. LLC*, 2025 WL 2180607, at *3 (2d Cir. Aug. 1, 2025) (Summary Order) (acknowledging that weight and admissibility are assessed separately at the class-certification stage (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016)).

2

In short, the theory that Plaintiffs used to survive dismissal is not compatible with class certification and cannot withstand the evidentiary scrutiny now required.

Moreover, Plaintiffs are uniquely defective class representatives. Plaintiffs delegated full trading authority to Edgewood, which valued ELC based on its own intrinsic-value analysis. Neither Edgewood nor Plaintiffs relied on ELC's public statements or price. Edgewood expressly rejected Plaintiffs' theory of wrongdoing under oath and even continued purchasing shares after the so-called "corrective disclosures." Plaintiffs' discovery failures and unprepared Rule 30(b)(6) witnesses further undermine their adequacy.

## II.    FACTUAL BACKGROUND

### A.    Travel Retail

Travel retail is an important sales channel for prestige beauty companies like ELC. Ex. A ¶¶26-36. Following China's economic liberalization and growth, Chinese demand for luxury goods surged, contributing to rapid growth in the Asia travel retail market. *Id.* ¶¶37-42; Ex. B ¶¶38-40, 42-43. As that market grew, so too did ELC's Travel Retail sales. Ex. C ¶52. ELC, like its competitors, strategically expanded into Asia travel retail. Industry commentators knew about and viewed these efforts favorably. *See, e.g.*, Ex. A ¶¶36, 41; Ex. C ¶¶ 59, 65-66.

In 2009, ELC expanded into Hainan, an island province off the southern coast of China. Ex. B ¶16. China designated Hainan a duty-free zone consistent with "China's broader effort to compete in the travel retail market" and "bring luxury spending outside of China into the country through duty-free incentives." Ex. A ¶¶43-45. Duty-free sales in Hainan exploded in the 2010s as China enacted policies aimed at making Hainan a duty-free shopping destination. *Id.*; *see also* Ex. B ¶¶33, 131. Industry analysts recognized Hainan's intended role for the luxury beauty industry. Ex. C ¶¶60, 65-67.

ELC Travel Retail also expanded into South Korea, another major travel retail destination. Ex. B ¶¶17, 103-04.  In the mid-2010s, the Korean government implemented policies focused on expanding travel retail.  *Id.* ¶¶103, 105.  Combined with a simultaneous surge in Chinese tourism, Korea became the world's leading travel retail market, *id.* ¶¶103-05, and a key target for ELC's strategic expansion in Asia.

### B.    Daigou Is Well-Known and Widespread

Daigou (Mandarin for "buy[ing] on behalf of") is a component of the Chinese and Korean luxury beauty industries.  Ex. B ¶¶25-27; Ex. C ¶114; Ex. A ¶¶48-51.  Daigou generally refers to the practice of intermediaries buying products from retailers outside mainland China, and re-selling those products.  *See* Ex. B ¶25; Ex. A ¶48.  Daigou has a long history in Korea and other Asian destinations, as Chinese travelers began purchasing goods abroad in the 2000s.  Ex. B ¶¶31-35, 57.  Concerns about product safety and authenticity reinforced demand for daigou.  *Id.* ¶¶41, 52-53, 57, 76, 77; Ex. A ¶49.

Daigou is a widespread and well-known practice.  *See, e.g.*, Ex. B ¶¶24, 93-100; Ex. C ¶¶88-90.  Daigou's role in the luxury beauty industry is regularly discussed in industry publications, financial analyst reports, and by luxury beauty companies.  *E.g.*, Ex. B ¶¶95-100, 110 (industry reports); Ex. C ¶¶88-90 (analyst reports); Ex. D 10-11 (L'Oréal Q3 2021 earnings call); Ex. S 142:14-143:15.  The lead ELC analyst at Edgewood confirmed that daigou is "a known practice that comes with doing business in China and Korea."  Ex. E 169:15-18.  Investors in the industry understood that daigou was a significant feature of Asia travel retail.  Ex. C ¶¶72-92.

Daigou is not inherently illegal or improper.  Ex. B ¶¶26-27, 79-85; Ex. A ¶51; Ex. S 32:20-34:3.  Daigou includes a range of permissible commercial arrangements, such as registered cross-border e-commerce platforms, documented duty-free export programs, and customs-authorized bulk-purchase mechanisms, Ex. B ¶¶23(b), 81-82; Ex. A ¶51, with daigou intermediaries

4

responsible for complying with applicable customs, tax, or commercial regulations, Ex. B ¶81; Ex. A ¶51.

Significantly, Korea allowed "large scale and online purchases by … foreign customers, including daigou shoppers," before and during the Class Period to encourage duty-free sales in times of economic hardship.  Ex. B ¶¶83, 103-12.  In 2020, Korea further relaxed regulations on bulk cargo exports, online cross-border sales, and individual purchase limits in response to the unprecedented economic pressures of COVID-19, which led to a surge in daigou.  *Id.*  While China sought to regulate daigou activity, including in Hainan, its laws were constantly changing and sporadically enforced.  *Id.* ¶¶138-47.  During COVID-19, however, when Chinese consumers could only travel domestically, to stimulate economic growth, China enacted measures to promote luxury sales in Hainan, like increasing duty-free purchase limits and expanding duty-free licenses. Ex. A ¶65.  This growth increased both daigou and non-daigou sales in Hainan during that time. *Id.* ¶¶66-67.

Despite its prevalence, it is exceedingly difficult for brands to ascertain the proportion of sales attributable to daigou to any reasonable degree of certainty given "the nature of daigou" and brands' limited insight into retailer sales.  Ex. A ¶¶54-60; Ex. S 35:23-36:16, 123:14-124:8.  "[I]t would not be feasible for brands to fully avoid daigou if they wanted to grow in Asian and specifically Chinese markets" given market dynamics and the lack of visibility and control suppliers have over retailers.  Ex. A ¶¶52-53.  Analysts themselves occasionally published best-guess estimates of the size of the daigou trade in various markets, but commentary throughout the relevant period confirms investors recognized the difficulty brands faced in quantifying sales attributable to daigou.  *Id.* ¶¶66-67; Ex. C ¶¶105-108; *see also* Ex. E 167:20-168:2 (lead Edgewood

analyst confirming "quantify[ing] any excess inventory that daigou is carrying" "would be a very impossible task").

### C.    ELC Discloses Risks

The COVID-19 pandemic, international travel restrictions, local government lockdowns, changing regulatory regimes, and shifting consumer preferences upended the travel retail industry. Still, ELC remained optimistic about the long term in China and Travel Retail due primarily to the strength of the Chinese consumer's affinity for luxury goods, including ELC's products.  Ex. F 10.

This strategy was not without risks, which ELC repeatedly disclosed.  Ex. C ¶¶37-41, 51-58.  For example, ELC cautioned that COVID-19 "has continued to significantly disrupt our operating environment, including … travel retail"; that "[e]vents that impact consumers' willingness or ability to travel … may impact our business, including travel retail, a significant contributor to our overall results, and our strategy to market and sell products to international travelers at their destinations" and ELC's "global operations are subject to many risks and uncertainties, including … concentration of sales growth or profitability in one or more countries (e.g., China)," Ex. G 18, 20, 21.  Analyst commentary confirms the market understood these disclosed risks.  Ex. C ¶¶42-44, 59-61, 97.

### D.    ELC Encounters the Perfect Storm and Revises Guidance

ELC's strategy initially led to strong growth.  Ex. G 37, 41.  In FY2023 and early FY2024, however, a perfect storm of confounding factors dramatically affected ELC's sales.  ELC transparently and timely disclosed these developments each step of the way.

*First*, in August 2022, COVID-19 lockdowns in Hainan led to decreased traffic and key Travel Retail partners tightening their inventory, two developments ELC disclosed with its Q1 FY2023 financial results in November 2022.  Ex. H 3, 16; Ex. S 104:16-109:18.  *Second*, in January 2023, Korea unexpectedly announced the end to supportive policies adopted to promote

6

economic activity during the pandemic, Ex. B ¶¶113-119, which ELC disclosed with its Q2 FY2023 financial results in February 2023, Ex. I 3, 8. *Third*, on May 6, 2023, Hainan authorities unexpectedly announced stricter enforcement of duty-free regulations. Ex. B ¶¶141-145. ELC disclosed this new enforcement approach with its next earnings release. Ex. J 17. These developments were widely covered in the press, and investors knew these regulatory changes and enforcement activities could not be predicted. Ex. C ¶¶102-04, 118. Indeed, Edgewood's lead ELC analyst confirmed daigou and potential regulatory risks were "a hot topic in the spring of 2023." Ex. E 170:13-171:4. ELC nonetheless disclosed the relevant risks as they materialized.

ELC revised its guidance with each of these developments affecting Travel Retail. Edgewood's lead ELC analyst acknowledged ELC was a "victim" of macroeconomic market forces in China. Ex. E 334:11-336:1. Neither ELC, nor any other market participants, could have predicted this confluence of events.

### E.    The Evidence

In support of their Motion, Plaintiffs offer only the report of purported expert economist Dr. Matthew Cain, who concluded the market was efficient, and opined that an out-of-pocket damages model should be capable of measuring damages on a classwide basis. Cain Rep. ¶3. Cain, however, did not consider the key issues here—travel retail, daigou, and what the market understood about both—or even how those issues would affect his copy-paste damages model. Ex. K 41-46, 114-120, 191-196; Ex. L 114:21-115:8. Cain did not consider whether, or how, his model could measure damages on a classwide basis consistent with Plaintiffs' theory of liability, ignoring the necessary apportionment of price decline attributable only to illicit daigou, let alone any basis for such apportioning, or how his model could exclude shareholders who suffered no damages. He does not even know what the theory of liability is, refusing to agree with his own

7

characterization of the theory—that ELC failed to disclose the extent to which it relied on prohibited daigou sales.  Ex. L 72:11-76:23.

Defendants, in contrast, submit the following:

- Expert report of **Dr. Jennifer Marietta-Westberg**, who opines that the alleged corrective disclosures are not economic evidence of price impact, Cain has failed to propose a methodology consistent with Plaintiffs' theory of liability, and Cain's event study—which underpins his market efficiency opinion—is fatally flawed.  Ex. M.

- Expert report of **Dr. John Zhang**, who explains daigou's long-history and the complicated evolution of regulatory and market developments in Korea and China impacting the travel retail industry.  Ex. B.

- Expert report of **Claire Kent**, who explains that investors understood ELC's reliance on China and Travel Retail and the associated risks, knew about daigou activity and associated risks, and that hypothetical corrections of the alleged misstatements would not have impacted stock price.  Ex. C.

- Expert report of **Dr. Daniel Langer**, who confirms that daigou was well-known and widespread, that it was exceedingly difficult for companies to ascertain what percentage of sales comprised daigou, and that companies could not have predicted the effect on sales of regulatory enforcement in Hainan.  Ex. A.

- Testimony from the lead ELC analyst at Edgewood—ELC's largest outside shareholder and Plaintiffs' investment manager—who confirmed daigou is "just part of doing business in China and Korea," and that ELC was a "victim" of macroeconomic changes in China.  Ex. E.

- Testimony from Plaintiffs, raising questions about case oversight and adequacy to represent the class.

- Testimony from ELC's Rule 30(b)(6) witness Nick Lai, who confirmed the Company's strategy, the genuineness of its disclosures, and daigou's widely known—but exceedingly difficult to quantify—presence.

### III.    LEGAL STANDARD

A class certification motion must be subject to "rigorous analysis" because "actual, not presumed, conformance" with Rule 23 is "indispensable."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  "Rule 23 requirements must be established by at least a preponderance of the evidence," and "[t]he burden of proving compliance with all of the requirements of Rule 23

rests with the party moving for certification." *Levitt v. J.P. Morgan Securities, Inc.*, 710 F.3d 454, 465 (2d Cir. 2013); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

## IV.     ARGUMENT

### A.     The Proposed Class Does Not Satisfy the Predominance Requirements of Rule 23(b)(3) Because Plaintiffs Are Not Entitled to the *Basic* Presumption of Reliance.

Plaintiffs contend they are entitled to the fraud-on-the-market presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), which provides a rebuttable presumption that plaintiffs relied on a defendant's alleged misstatements or omissions when making trading decisions, *Goldman I*, 594 U.S. at 118.  Plaintiffs' argument suffers from a fatal logical inconsistency.  Plaintiffs ask the Court to believe (i) the market for ELC's stock was efficient, *but that* (ii) investors in this market were unaware of daigou, a well-known luxury beauty channel—a channel so *embedded* in Asia-based travel retail that widely-reported regulations were implemented at different times to outright encourage the practice, and at other times to curb it in targeted locations.  Plaintiffs cannot have it both ways.

Plaintiffs cannot rely on *Basic* for two distinct reasons: (1) the evidence overwhelmingly shows that there was no price impact from the corrective disclosures, and (2) Plaintiffs failed to establish market efficiency.

### 1.     Plaintiffs' Alleged Misrepresentations Did Not Impact ELC's Stock Price.

Plaintiffs cannot invoke the *Basic* presumption because the evidence overwhelmingly shows "that the particular misrepresentation[s] at issue did not affect the stock market's price." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014).  Plaintiffs rely on a price maintenance theory, alleging that: (1) the purported misrepresentations maintained (rather than increased) the stock price at artificially high levels throughout the Class Period, and (2) the artificial inflation is shown by the decline in price following corrective disclosures.  Mot. 15.  For

9

this theory to work, there must be a basis to infer that the back-end price (post-corrective disclosures) equals the front-end inflation.  But there is no basis for such an inference when there is a "mismatch," or "gap in specificity" between the alleged misstatements and corrective disclosures.  *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at \*11 (S.D.N.Y. Mar. 29, 2024) (quoting *Arkansas Teacher Retirement Sys. v. Goldman Sachs Grp.*, 77 F.4th 74, 102 (2d Cir. 2023) ("*Goldman II*")).  The fit between the alleged misstatements and corrective statements must be close, an even "closer fit" than otherwise required (e.g., to prove loss causation).  *Goldman II*, 77 F.4th at 99 n.11.  Where there is a "mismatch," the link between back-end price and front-end inflation is severed, and the *Basic* presumption is defeated.  *Goldman II*, 77 F.4th at 104-05; *Kirkland*, 2024 WL 1342800, at \*12.

The evidence here shows a fatal mismatch.  "[A] searching price impact analysis" must occur where "(1) 'there is a considerable gap' in genericness between the earlier statement and the subsequent disclosure, (2) the corrective disclosure does not directly refer to the alleged misstatement, and (3) the plaintiff claims the earlier generic statement was misleading by omission." *Kirkland*, 2024 WL 1342800, at \*7 (quoting *Goldman II*, 77 F.4th at 102).  When all three circumstances are present, courts must engage in the two-step *Goldman* analysis.

Those circumstances are self-evident here.  A plain comparison of the earlier statements and later disclosures reveals a considerable gap.  Plaintiffs do not allege that the corrective disclosures directly refer to the misstatements; and they do allege that ELC made misleading statements by omitting supposed reliance on illicit daigou.

The two-step *Goldman* analysis is warranted.  This Court must (1) "determine how generic the alleged misrepresentations are and whether there is a gap in specificity between the corrective disclosures and the earlier statements," and (2) if there is a gap, then "ask ... whether a truthful—

but equally generic—substitute for the alleged misrepresentation would have impacted the stock price." *Id.* at \*7.

In such a "searching" analysis, "all probative evidence on th[e] question [of price impact]—qualitative as well as quantitative" must be considered, "aided by a good dose of common sense." *Id.* at \*6 (quoting *Goldman I*, 594 U.S. at 122). As the Supreme Court recently reaffirmed, "*all* record evidence relevant to price impact" must be considered, even if it "overlaps with materiality or any other merits issues." *Goldman I*, 594 U.S. at 114.

> **a.      There Is a Mismatch Because the Alleged Misrepresentations Are Too Generic to Be Corrected by the Specific Nature of the Alleged Corrective Disclosures.**

Plaintiffs' bid for class certification fails first because there is a mismatch in specificity. Where the alleged misstatements are generic, there can be no "fit" with later corrective statements that address more specific matters. *Kirkland*, 2024 WL 1342800, at \*6-7. For example, in *Goldman II*, the Second Circuit concluded that statements that the defendant "ha[d] extensive procedures and controls that [we]re designed to identify and address conflicts of interest" were too generic to be "corrected" by statements that the SEC and DOJ commenced investigations regarding an alleged failure to disclose conflicts. 77 F.4th at 82-84, 105. Even more recently, in *Kirkland*, the court concluded statements "regarding [the company's] focus on organic growth" and "production levels and costs targets [the company] would apply in assessing a potential asset acquisition" were too generic to match with a later alleged corrective disclosure announcing the company's acquisition of another company. 2024 WL 1342800, at \*12.

The alleged misstatements here are similarly too generic to fit their supposed corrections. The alleged front-end misstatements addressed the "strength of [ELC's] brands with the Chinese consumer" and ELC's confidence in the anticipated growth of the Hainan market, noting ELC's continuing "confidence into Hainan['s] future" and the "power of Hainan in the future." Am.

Compl. ¶¶32-34.  The alleged back-end corrective disclosures, however, addressed the lowering of FY2023 guidance for very specific reasons, including "tighter inventory management in Asia travel retail," "disruption to travel and staffing levels in Hainan that slowed the expected normalization of inventory," "volatility" resulting from the "recovery from the pandemic for Asia travel retail," and "enforcement actions to control daigou activity" and "related to unstructured market activity."  Am. Compl. ¶¶35-37, 39, 41.  Like news of an acquisition in *Kirkland* that was insufficient to match a front-end statement regarding a focus on organic growth, news of unexpected inventory management difficulties and post-pandemic recovery measures do not match an earlier statement regarding general confidence in potential for regional growth.  Rather, these mimic the specific back-end disclosures such as "our fourth quarter earnings did not meet expectations" that the Supreme Court in *Goldman I* noted could not be properly linked to a generic "we have faith in our business model" front-end statement.  594 U.S. at 123.[3]  The alleged misstatements here are *exactly* the kinds of "broad and generic statements about the company's growth strategy," *Kirkland*, 2024 WL 1342800, at *8, that courts find too generic to sustain the many inferences required in a price maintenance theory-based case.

---

[3] For this reason, this case is distinct from recent cases in which courts have determined that a specificity match exists where, even though the back-end disclosures provide new information, both the front-end and back-end disclosures provide information regarding the same product.  *See, e.g.*, *Jaeger v. Zillow Group, Inc.*, 2025 WL 2741642 (9th Cir. Sept. 25, 2025); *Stadium Capital LLC v. Co-Diagnostics, Inc.*, 2026 WL 100576 (S.D.N.Y. Jan. 14, 2026).  The Ninth Circuit's decision in *Zillow* is consistent with Defendants' argument that the mismatch here does not satisfy *Goldman*. Plaintiffs in *Zillow* alleged defendant misrepresented the quality of the forecasting used in its home-buying program, stating that it had made "progress … in strengthening [its] pricing models."  *Jaeger*, 2025 WL 2741642, at *2.  Zillow later shuttered that same business, stating it did so because "it had been 'unable to accurately forecast future home prices,' and its pricing algorithm's 'observed error rate' was 'far more volatile than … expected.'"  *Id.*  The court concluded that Zillow's back-end disclosures showed the extent of its home-pricing struggles and were therefore sufficiently related to alleged misrepresentations.  Similarly, in *Stadium Capital*, the company stated "it's not necessarily a demand issue we're seeing" in response to an Earnings Call question about whether the company was seeing a decline in customer orders of a specific test—a statement too tied to the later "specific" statements—that "lower volumes for" that same test drove the company's decline in revenue—to create a mismatch.  2026 WL 100576, at *1, *7.  But the alleged misrepresentations in *Zillow* and *Stadium Capital* were far more specific than those here: generalized statements about the growth trajectory of Asia Travel Retail, followed by disclosures related primarily to inventory and pandemic recovery.  App. A.

12

> **b.** **Any Truthful But Equally Generic Substitute for the Alleged Misstatements Would Not Have Impacted ELC's Stock Price.**

Given the mismatch outlined above, the Court must also consider "whether … truthful—but equally generic—substitute[s] for the alleged misrepresentation would have impacted the stock price." *Kirkland*, 2024 WL 1342800, at *7.  They would not.

The alleged corrective disclosures cannot substantively be linked to the alleged front-end misstatements here.  In this second step of the *Goldman* analysis, courts consider "[e]vidence from contemporaneous analyst reports" to determine whether there was an absence of price impact.  *Id.* at *9; *see also, e.g.*, *Goldman II*, 77 F.4th at 104 (expert "analysis of 880 analyst reports published during the Class Period … none of which reference[d] the conflicts disclosure" was evidence of a mismatch).  "[C]redible, but potential, alternative explanations for the price decline" are sufficient to sever the link, and courts consider evidence relevant to such explanations.  *Kirkland*, 2024 WL 1342800, at *9-10.  In *Kirkland*, for example, the Court considered record evidence such as contemporaneous analyst reports, an industry expert report, and an economic expert report supporting alternative explanations for the price decline.  This all contributed to the court's determination that "a truthful, but equally generic, substitute for the [alleged front-end misstatements] would not have impacted the stock price." *Id.* at *9.  ELC, at four-times Kirkland's market capitalization, and receives far more analyst coverage, has an even richer set of data showing equally generic statements would not have impacted the stock price.

First, Plaintiffs ignore that the first three supposed corrective disclosures fail to mention *daigou* at all.  App. A.  In an efficient market, if those corrective disclosures were somehow code for illicit or prohibited daigou sales, analyst reports and discussion would reference it.  Ex. M ¶¶37, 47.  Dr. Jennifer Marietta-Westberg, economist and former Chair of the SEC Investor Advisory Committee, reviewed over 100 analyst reports following the November 2, 2022, February 2, 2023,

13

and May 3, 2023 alleged corrective disclosures and concluded analysts did not attribute ELC's performance to any reliance on illicit daigou or governmental crackdowns. Ex. M ¶¶31-81. Instead, per Marietta-Westberg, analysts attributed the declines to:

- November 2, 2022: (1) continued challenges from COVID-related travel restrictions in China and Hainan, including their impact on inventory management, (2) tighter inventory management by U.S. retailers, (3) recession concerns and increased inflation; (4) currency headwinds due to foreign exchange rates and a higher tax rate; (5) costs related to license terminations; and (6) the impact of the Russia/Ukraine conflict. *Id*. ¶¶42-45, Exhibit 1.A.

- February 2, 2023: (1) a delayed improvement in Chinese travel, including to Hainan, (2) the recently-announced potential roll-back of pandemic-related supportive measures in Korea, (3) currency headwinds, (4) uncertain macro-economic conditions, (5) a higher tax rate, (6) lower-than-anticipated restocking in the U.S., and (7) license terminations. *Id*. ¶¶60-62, Exhibit 2.A.

- May 3, 2023: (1) Korean transition to post-COVID regulations; (2) slower-than-expected resumption of travel; (3) continued inventory tightening by retailers in Hainan; and (4) weaker-than-expected recovery in demand for prestige beauty products. *Id*. ¶¶69-75.

It is thus clear that "[t]he record shows that no analysts … drew the inference that" a reliance on illicit daigou was the cause of price drops. *Kirkland*, 2024 WL 1342800, at *9.

Even the August and November 2023 disclosures say nothing about a prior or ongoing overreliance on *illicit or prohibited* daigou. Analysts certainly mention daigou—it was a hot topic following mid-May 2023 developments. Ex. M ¶69; Ex. B ¶144. But "commentary touching on the same subject matter … cannot be enough" to establish a link. *Kirkland*, 2024 WL 1342800, at *12.[4] Indeed, it is unsurprising that *none* of the analyst commentary following *any corrective disclosures* discuss an impact of ELC's alleged reliance on *illicit daigou*. Dr. John Zhang, who has devoted decades to studying and teaching pricing and channels in these very markets,

---

[4] In the event the Court determines that price impact is rebutted only for the November 2022, February 2023, and May 2023 alleged corrective disclosures, at a minimum a class should not be certified for those three dates. *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 798 F. Supp. 3d 416, 469 (S.D.N.Y. 2025).

14

explained that regulations fluctuated wildly between relevant markets, and the market understood the enforcement risk that materialized in China in mid-May 2023.  Ex. B ¶¶120-146.

Unsurprisingly, when considering "a truthful, but equally generic, substitute for the [alleged front-end misstatements]," *Kirkland*, 2024 WL 1342800, at *9, no price impact can reasonably be expected.  Claire Kent, an expert in prestige/luxury industry investor analysis, considered hypothetical "truthful, but equally generic, substitute[s]," *id.*, for the alleged front-end misstatements given Plaintiffs' theory of liability.  For the alleged misstatements, Kent considered a hypothetical alternative statement: "a portion of [ELC's] sales in Travel Retail goes through unregulated channels and may be subject to the risk of regulatory enforcement, but the precise amount is not known."  Ex. C ¶¶115, 119, 125.  After reviewing contemporaneous industry and analyst reports, Kent found that "daigou was a well-known part of prestige beauty distribution, and investors understood that sales to daigou operators were prevalent, particularly for luxury brands," and concluded those hypothetical disclosures would not "have impacted investors' assessment of [ELC's] outlook (and hence its share price)."  Ex. C ¶¶114-115, 119, 125.[5]

Cain did not consider these factors.  Ex. L 84:14-85:16.  Like the plaintiffs' expert in *Kirkland*, Cain "base[d] his understanding of [ELC] investors' prior expectations on the assumption that the factual allegations contained in the Complaint are completely true—even those

---

[5] Plaintiffs' assertion that they are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), fails.  *See* Mot. 13, 23 n.10.  Where alleged omissions merely "exacerbated the misleading nature of [] affirmative statements," the *Affiliate Ute* presumption does not apply.  *Starr ex rel. Est. of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005); *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017).  To establish the misleading nature of the alleged misrepresentation, Plaintiffs point to affirmative statements about Travel Retail sales in the Asia Pacific region as misleading for failure to disclose those sales were driven by illicit daigou.  Order dated Mar. 31, 2025, ECF 58 at 1-3.  *Waggoner*, 875 F.3d at 96.  Plaintiffs are, therefore, not entitled to the *Affiliate Ute* presumption.  *Id.*; *Starr*, 412 F.3d at 109 n.5.  Further, the *Affiliate Ute* presumption may be rebutted" where a defendant can establish "that the plaintiff did not rely on the omission in making the investment decision."  *Manela v. Garantia Banking Ltd.*, 5 F. Supp. 2d 165, 172-73 (S.D.N.Y. 1998).  Defendants' evidence shows that investors did not so rely here because daigou was well known to investors.  Ex. C ¶¶70-125; Ex. B ¶¶120-146; Ex. A ¶¶48-60; Ex. M ¶¶31-81, 151; Ex. E 184:16-185:12, 208:22-211:1, 212:11-213:16**.**

15

allegations that have subsequently been disproven." *Kirkland*, 2024 WL 1342800, at \*10 (citations omitted).

Plaintiffs' arguments ignore critical realities, including the market's standing awareness of the risk of regulatory changes, even changes expressly permitting daigou. Ex. M ¶¶54-57; Ex. B ¶¶120-146; Ex. C ¶¶93-108. The only "common sense" conclusion is that the preponderance of the evidence shows that "a truthful, but equally generic, substitute for the [alleged misstatements] would not have impacted the stock price," *Kirkland*, 2024 WL 1342800, at \*7, 9, and therefore that the alleged misstatements did not actually impact ELC's stock price.

### 2.    Plaintiffs Have Failed to Meet Their Burden to Show Market Efficiency.

Plaintiffs have not adequately proved the efficiency of the market for ELC stock, either. Courts consider eight factors in determining market efficiency, but only one—"*Cammer* 5"— involves *direct* evidence of market efficiency. *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989). For that reason, the Second Circuit considers *Cammer* 5 "the *most important*" factor "in certain cases because it assesses 'the essence of an efficient market and the foundation for the fraud on the market theory.'" *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017)).

For *Cammer* 5, Plaintiffs offer an event study Cain conducted, which "compar[es] the behavior of [ELC Class A common stock] on" "News Days"—or "days when potential value-relevant company-specific news [was] disclosed"—with its behavior on "No News Trading Days," Cain Rpt. ¶¶69, 72-74. Cain defines "News Days" as only the *eight* days on which ELC had "quarterly earnings releases during the Analysis Period," ignoring dozens of trading days in which there was value-relevant news. Cain Rpt. ¶73; Ex. L 228:6-19, 230:22-231:12, 233:13-19; *see also* Ex. M ¶151 (discussing other potential sources of relevant information). To limit the effect of news in his control data, Cain defines "No News Trading Days" as days on which there were no News Day events, no alleged revelations of the relevant truth, no SEC filings, and no articles

16

published by Dow Jones that discussed ELC. Cain Rpt. ¶ 74. Cain concludes ELC Class A common stock experienced significantly abnormal returns on "News Days" more than No News Trading Days, and the difference in the rate of abnormal returns was statistically significant—supporting a finding of market efficiency. *Id.* ¶76.

Cain's event study lacks credibility, *see supra* n.2, because its design suggests a predetermined outcome. Cain concedes his analysis covers only "56% of the trading days (248 of 439) in the Analysis Period," meaning 44% of the trading days in the Analysis Period—191 trading days—are *arbitrarily excluded* from his event study. Cain Rpt. ¶74 n.74; Ex. L 228:11-229:4. Cain refers to the 191 days he did not address as "*Other Days*," suggesting they are neither News Days nor No News Trading Days; this makes no sense. These so-called "Other Days" include days on which ELC-related news was publicized, including ELC filing SEC disclosures and analysts and Dow Jones reporting on ELC. Cain provides no credible explanation for why he excluded them from his analysis—instead conceding that the news that "likely" issued on those "Other Days" could have contained information that was value-relevant. Ex. L 230:11-232:7, 233:20-235:11, 237:18-239:19.

Cain's overly simplistic (at best, biased at worst) methodology carries "limit[ed] statistical power." *In re Waste Mgmt. Sec. Litig.*, 775 F. Supp. 3d 742, 760-61 (S.D.N.Y. 2025). Even assuming Cain's opinion is admissible (and it is not, *see* Defs. Mot. to Exclude), it provides woefully insufficient support for market efficiency. Excluding the five "News Days" with alleged corrective disclosures from Cain's analysis to reduce the event study's bias leaves only *three* News Days—*only one of which had a statistically significant price movement.* Ex. L 250:17-251:8. Marietta-Westberg opines that after removing the five dates that introduce bias, Cain's event study would *not* have shown a statistically significant difference between "News Days" and "No News

17

Trading Days"—to say nothing of the comparison involving purportedly "Other Days."  Ex. M ¶152 & n.360.  Cain's event study falls apart, and Plaintiffs fail to propound any credible direct evidence of efficiency.

**B.    The Proposed Class Does Not Satisfy the Predominance Requirements of Rule 23(b) Because Plaintiffs Fail to Show Damages Consistent with Their Theory of Liability Can Be Calculated on a Classwide Basis.**

Class certification is not appropriate where, as here, Plaintiffs fail to show that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34-35.  Under *Comcast*, the proposed damages model must furnish a methodology to "measure only those damages attributable" to Plaintiffs' theory of liability.  *Id.*  There must be a coherent "linkage between" the two, "even where the inquiry overlaps with, or is pertinent to, the merits determination."  *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141 (S.D.N.Y. 2014); *see also Levitt*, 710 F.3d at 464-65 (same).  Plaintiffs must proffer a damages model capable of disaggregating market, industry, and company-specific confounders.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35-36, 40-41 (2d Cir. 2009). "A flawed model may result in denial of class certification" where "the model … fails to demonstrate with scientific rigor that classwide impact can be established through common proof."  *In re Aluminum Warehousing Antitrust Litig.,* 336 F.R.D. 5, 48-49 (S.D.N.Y. 2020).  In summary, "[n]o damages model, no predominance, no class certification."  *Id.*

Plaintiffs have failed to proffer such a model here.  Cain's model: (1) fails to offer a tangible method to isolate the incremental loss attributable to the disclosure of an allegedly previously concealed illicit daigou reliance risk from daigou-related regulatory risk already incorporated into the stock price; (2) fails to offer a tangible method to disaggregate confounding information provided to the market on the alleged corrective disclosure dates; (3) is not an appropriate vehicle for assessing damages under both Plaintiffs' corrective disclosure and materialization-of-the-risk

18

theories; and (4) fails to propose any method to assess individualized damages.  Each of these reasons independently precludes class certification.

### 1.    Cain's Model Fails to Offer a Tangible Method to Isolate the Incremental Loss Attributable to the Disclosure of a Previously Concealed Illegal Daigou Reliance Risk.

Plaintiffs offer no model that can properly disaggregate unrelated price declines in ELC stock.  Cain ignores critical market realities and fails to identify any method to reliably disaggregate the risk of illicit daigou from other risks associated with Travel Retail sales.

*First*, Cain fails to propose any methodology that could reliably disaggregate the risk related to legal daigou from risk related to "*illegal*" or "*illicit*" daigou.  Plaintiffs describe daigou activities as "illicit," suggesting it was an "illegitimate backchannel."  Am. Compl. ¶¶33, 112, 132.  This is false.  *Supra* II.B.  Daigou is not inherently illegal or improper.  Ex. B ¶¶24-27, 81-87; Ex. A ¶48.  Daigou includes a range of permissible commercial arrangements, and daigou intermediaries are responsible for complying with applicable customs, tax, or commercial regulations.  Ex. B ¶86; Ex. A ¶51.

Plaintiffs' theory of liability is that ELC failed to disclose its reliance on *illegal* or *illicit* daigou—not that it failed to disclose reliance on permissible daigou.  Am. Compl. ¶¶33, 112, 132.  But Cain fails to propose a methodology that would separate the allegedly undisclosed risk and expected severity of an enforcement crackdown on *illicit* daigou from the risk that market participants should have known and, indeed, did know through the Class Period.  The market understood the risk of enforcement changes, and there was shared uncertainty about the degree and timing of enforcement actions.  Without considering these circumstances, Cain merely *copied and pasted* his report and methodology from previous cases having nothing to do with daigou, with no thought to the complicated circumstances here.  Ex. L 267:25-277:25; *see also id.* 277:3-6 ("[M]y description of the out-of-pocket damages methodology is nearly identical across reports

19

because it's the same methodology."); Ex. K.  Regardless of an expert's "confiden[ce] in his ability to apply a model" consistent with the theory of liability, an expert's "say-so" is an insufficient basis for a court to "conclude that there is a damages model that will permit the calculation of damages on a class-wide basis." *Fort Worth Employees' Ret. Fund*, 301 F.R.D. at 141-42.

*Second*, daigou and the changing regulatory landscape—including diverse regulatory approaches, from facilitating and promoting daigou to limiting the practice to certain circumstances—were well-known to the market.  Daigou was indeed an expected feature of travel retail.  Ex. A ¶48; Ex. C ¶¶72-75; Ex. E 169:20-171:4.  ELC also repeatedly disclosed risks related to Travel Retail sales.  Ex. C ¶21.  Given the breadth of information available, public discussion of daigou practices, and information ELC provided regarding its Travel Retail sales—in a purportedly efficient market—those disclosed risks would have been incorporated into the stock price.  *Id.* ¶109.  Yet Cain proposes no methodology to disaggregate them.

*Third*, daigou is incredibly difficult to track or measure reliably.  Ex. A ¶¶54-60.  While ELC could track the retailers it sold to, ELC could not measure whether—or at what volume—those retailers sold to daigou resellers.  *Id.* ¶¶55-58.  This was true for all luxury beauty brands, including ELC's largest competitor, L'Oreal.  *See, e.g.*, Ex. N 24 (CEO stating: "As far as the weight of Daigous, frankly, it's very hard to know because … it's managed by the operators themselves").  Even the lead ELC analyst at Edgewood confirmed "quantify[ing] any excess inventory that daigou is carrying" "would be a very impossible task."  Ex. E 167:20-168:2.  This means that, although any daigou-related risk was factored into the market price, it would be *exceedingly difficult, even impractical, to accurately quantify and then disaggregate* that risk from the broader risks associated with Travel Retail, let alone consistently over the period.  Had Cain read a *single* analyst report, he would have understood analysts themselves have no reliable way

of estimating the proportion of ELC's sales attributable to daigou.  Ex. C ¶119.  For this same reason, Cain does not—and cannot—propose a method to disaggregate the impact of the materialization of disclosed risks from the allegedly undisclosed risk of ELC's reliance on prohibited daigou.

### 2. Cain's Model Fails to Offer a Tangible Method to Disaggregate Confounding Information.

Cain also fails to offer a methodology capable of disaggregating confounding information on the alleged corrective disclosure dates.  Even setting aside market reactions to the unprecedented global pandemic and related events, *all* of the alleged corrective disclosures took place on dates when ELC released financial results.  Multiple pieces of confounding information, such as financial results, were released at the same time.  Ex. M ¶¶21, 86, 139-142 (detailing numerous confounding factors).  Cain offers no methodology to account for the impact of that additional information.  Instead, Cain references a grab bag of "methodologies" he may employ to determine the impact of "confounding information"; the same grab bag he uses in every case.  Cain Rep. ¶100.  These passing references, without more, cannot stand up under the court's "rigorous[] examin[ation]" of the proposed model's ability to "disaggregate [unrelated] losses."  *See In re Aluminum Warehousing*, 336 F.R.D. at 4.

### 3. Cain's Out-Of-Pocket Damages Model Is Not an Appropriate Vehicle for Assessing Damages Under Plaintiffs' Theories of Liability.

Cain fails to explain how an out-of-pocket damages model is an appropriate vehicle for assessing damages under *both* Plaintiffs' corrective disclosure and materialization-of-the-risk theories.  Plaintiffs set forth two bases for their theory of liability, asserting: (1) alleged price inflation dissipated as the market received information "correct[ing]" Defendants' alleged misstatements, Am. Compl. ¶175; and (2) a materialization of the risk theory—that the alleged price inflation dissipated as the "concealed risk" allegedly materialized, Am. Compl. ¶¶180-81,

184.    Although Cain makes a conclusory assertion that the "out-of-pocket damages methodology … is [] consistent with Plaintiffs' liability theory," Cain Rep. ¶94, he "omit[s] any consideration of how to factor in the risk on which Plaintiff[s] base[] [their] materialization-of-the-risk theory" into his out-of-pocket damages methodology, *Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at \*24 (M.D. Tenn. Feb. 24, 2023).  Nor does Cain explain why an out-of-pocket damages model is appropriate where Plaintiffs purport to rely on two distinct theories.  This failure to connect the out-of-pocket models to both theories is fatal to certification. *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 590 (N.D. Cal. 2021) (denying class certification "because the proposed [out-of-pocket] damages model does not attribute damages to a materialization of the risk theory"); *Indiana Pub.*, 2023 WL 2592134, at \*25 (denying class certification where no showing that out-of-pocket model was consistent with materialization of the risk theory).

### 4.    Cain's Model Does Not Provide a Methodology for Accounting for Individualized Damages.

Finally, Cain fails to offer a methodology to account for class members with individualized damages.  Some proposed class members, such as individual investors with a lower risk tolerance, may have decided not to purchase ELC stock at all, while others with greater risk tolerance may have still purchased ELC stock, but at a lower or the same price, knowing the true risk.  Cain's proposed model provides a windfall to those who would have bought ELC stock even with the knowledge of an increased risk of daigou enforcement, "by compensat[ing them] for the materialization of a risk [they] may have been willing to take."  *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 690 (5th Cir. 2015); *see also In re Aluminum Warehousing*, 336 F.R.D. at 63 ("[W]ith injury provable only via individualized inquiries keyed to each particular purchaser, individual determinations of injury will predominate."); *Fort Worth Employees' Ret. Fund*, 301 F.R.D. at 142

22

(denying class certification where plaintiffs did not provide "a damages calculation method that w[ould] be usable for all class members' claims").

This deficiency in Cain's model is thrown into stark relief given the unusual facts of this case. Cain's model includes no mechanism to exclude purported class members that have no claim or who otherwise suffered no injury. Predominance cannot be met "[i]f a substantial number of class members 'in fact suffered no injury'" because "the 'need to identify those individuals will predominate.'" *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 791 (9th Cir. 2021) (quoting *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018)), *aff'd en banc*, 31 F.4th 651 (9th Cir. 2022). "If injury cannot be proved or disproved through common evidence, then 'individual trials are necessary to establish whether a particular [class member] suffered harm from the [alleged misconduct],' and class treatment under Rule 23 is accordingly inappropriate." *Id.* (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252 (D.C. Cir. 2013)).

This is the "rare," if not unique, securities case in which "purchasers suffering no injury are intermingled with those properly in the class." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 349 F.R.D. 606, 611 (S.D.N.Y. 2025). As discussed below, Edgewood, the investment manager for all Plaintiffs, as well as ELC's largest single shareholder during the Class Period, pursued an idiosyncratic trading strategy. Edgewood's trading model and strategy as the lead ELC analyst at Edgewood testified, did not take ELC market price into consideration. Ex. E 208:22-211:1, 212:11-213:16. Edgewood's investment team firmly believed that ELC's results and guidance changes were caused by the materialization of disclosed risks, including market developments in travel retail and Asia outside of ELC's control. *See, e.g.*, *id.* 293:14-19, 276:4-22 (referring to ELC's guidance as "always conservative" or "incredibly conservative"); *id.* 208:22-

23

211:1, 212:11-213:16 (discussing Edgewood's proprietary discounted cash flow ('DCF') model used to "calculate [the] present value per share for [ELC] shares."). Edgewood was aware of "risk associated with any major macroeconomic event or industry slowdown in prestige cosmetics," and knew that "the risk of an industry slowdown in prestige cosmetics materialized in part because of government regulations." *Id*. 234:17-239:11. Edgewood simply was not injured here because it traded, not in reliance on ELC's stock price or even its statements, but based on its own valuation models which in turn were based on ELC's actual financial results, which no one has suggested were ever false.

These facts and their implication for certification are extraordinarily rare, if not unique: the investment manager to which *every* Lead Plaintiff delegated trading discretion was also the *largest ELC outside investor* during the Class Period. And that same investment manager repeatedly stated on the record that it *did not rely* on ELC's public statements in making trading decisions. *See, e.g.*, Ex. E 334:11-335:15, 184:16-185:12, 208:22-211:1, 212:11-213:16. Not only does Cain provide no method for differentiating damages based on such individualized circumstances, but given the portion of ELC's investors either represented by—or consisting of—Edgewood investors, the "need to identify" such "individuals will predominate" the litigation, *Asacol*, 907 F.3d at 53, as that portion would easily surpass "the upper bound of what is *de minimis,*" *Olean*, 993 F.3d at 793; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("When a case turns on individualized proof of injury, separate trials are in order.").

\*     \*     \*

Each of the above deficiencies are fatal to class certification. Cain's methodology does not, as it must, show how damage from a decline in daigou sales due to declining Chinese consumer interest can be distinguished and disentangled from a decline in daigou sales due to sporadic

enforcement activity in particular markets.  Plaintiffs did not do, for example, what the court found supported class certification in *Waggoner*, 875 F.3d, at 106.  Here, Plaintiffs fail to proffer a damages model that "isolate[ed] company-specific events from market and industry events," submitted evidence ruling out potentially confounding events, and "accounted for calculating the damages for individual class members based on their investment history."  *Id.*  Cain's methodology does none of these things—the relevant confounding factors analysts discussed in the wake of the alleged corrective disclosures are not tied to Plaintiffs' theory, and Cain has no basis to say otherwise, having read none of their reports.  Ex. M ¶144.  The proposed methodology does not isolate company-specific events from market and industry events, and Cain, again, did not endeavor such a comparison.  Nor does the method account for the risk already disclosed to the market or account for individual class members' investment history, because again, Cain considered no such history.[6]

This case is far more comparable to *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 690 (5th Cir. 2015), the seminal case addressing certification and materialization of the risk theories.  There, the court rightly noted that plaintiffs' theory "hinge[d] on a determination that each plaintiff would not have bought BP stock at all were it not for the alleged misrepresentations—a determination not derivable as a common question, but rather one requiring individualized inquiry."  *Id.* at 690.

---

[6] The facts at issue here are also notably distinct from those at issue in *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 349 F.R.D. 606, 614 (S.D.N.Y. 2025), and other cases within this Circuit in which courts have permitted class certification.  Unlike in *Dentsply*, Cain's proposed damages methodology "indisputably fail[s] to measure" Plaintiffs' sole theory of liability.  *Id.* at 611 (quoting *Waggoner*, 875 F.3d at 105-06).  For example, the confounding factors analysts discussed in the wake of the alleged corrective disclosures included COVID-related travel restrictions, recessionary concerns, increased inflation, currency headwinds, license terminations and restrictions, the Russia/Ukraine conflict—numerous impacts to ELC's price "other than the strain of injury related to defendants' alleged misstatements."  *Id.* at 612.  These factors cannot be tied to Plaintiffs' theory of liability, and Cain has not demonstrated that his model is capable of disaggregating them properly, as is required in order to certify a class.  Unlike in *Dentsply*, where this Court criticized defendants' attack on Cain's model as "attacks common to the class," here Defendants can point to a specific infirmity—individualized risk appetite—that makes Cain's model inoperable on a classwide basis.  *Id.* at 611.

25

Plaintiffs have failed to propose a damages methodology sufficient to measure *only* the damages resulting from Plaintiffs' theory of liability, nor have they offered admissible or sufficient proof that such a method is achievable. These failures warrant denial of the motion.

## C. The Proposed Class Representatives Do Not Satisfy the Typicality or Adequacy Requirements of Rule 23(a).

### 1. A Class Cannot Be Certified When Plaintiffs' Investment Manager Valued ELC Shares Independent of the Market.

Plaintiffs do not meet the typicality requirement of Rule 23(a) because they are subject to several "unique" defenses that "threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000). The issue of unique defenses cuts across the Rule 23(a) analysis to ensure that some issue unique to the lead plaintiff cannot turn into a sideshow, "divert[ing] attention from the substance of the [common] claim." *Rocco v. Nam Tai Elec., Inc.*, 245 F.R.D. 131, 135 (S.D.N.Y. 2007).

As a threshold matter, courts in the Second Circuit "may look to a non-party investment adviser's knowledge in determining reliance, where that investment adviser invests on behalf of institutional plaintiffs." *Villella v. Chem. & Mining Co. of Chile Inc.*, 2018 WL 2958361, *4-5 (S.D.N.Y. June 13, 2018) (collecting cases). All three Plaintiffs engaged Edgewood as an external investment manager, and each Plaintiff delegated complete investment discretion to Edgewood. *See* Ex. O 2.

This is critical, because Edgewood itself acknowledged numerous times that *it was not defrauded*. During the Class Period and beyond, key members of Edgewood's investment team wrote repeatedly that they did not take ELC's public statements at face value and confirmed that they believed ELC's revisions to its earnings guidance were caused by the materialization of disclosed risks, including market developments in travel retail and Asia outside of ELC's control. *See, e.g.*, Ex. E 257:2-258:12, 276:4-22; *id*. 299:14-300:23 (stating prepared remarks on earnings

26

calls were a "waste [of] 40 minutes" and that "nobody believe[d]" ELC). The lead ELC analyst at Edgewood testified that Edgewood was aware of "risk associated with any major macroeconomic event or industry slowdown in prestige cosmetics," and confirmed that "the risk of an industry slowdown in prestige cosmetics materialized in part because of government regulations." *Id.* 233:16-239:11. In direct contravention of Plaintiffs' theory of liability, Edgewood went so far as to refer to ELC as a "victim" that was "run over by th[e] much bigger macro issue" of consumer behavior changes in China. *Id*. 337:17-338:22.

Edgewood also pursued an idiosyncratic trading approach that disqualifies Plaintiffs as class representatives under binding authority. In *GAMCO*, the Second Circuit affirmed that a plaintiff is not entitled to the *Basic* presumption when the "purchasing decisions relied in large part on an independent valuation of the worth of [the defendant's] securities that was separate and distinct from the market price." *GAMCO Investors, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 218 (2d Cir. 2016). In reaching its determination, the Second Circuit also noted that plaintiff bought defendant's securities even after the "alleged fraud came to light." *Id.* at 218-220.

*All* the key factual findings that contributed to the Second Circuit's finding of nonreliance in *GAMCO* are present here. As in *GAMCO*, the record here shows that Edgewood "would have purchased [ELC] securities even had it known of [ELC's] alleged fraud," and that Edgewood's determination to invest in ELC was "separate and distinct from market price." *Id.* at 218. Edgewood built a proprietary DCF model to "calculate [the] present value per share for [ELC] shares." *See, e.g.*, Ex. E 208:22-211:1, 212:11-213:16; *compare GAMCO*, 838 F.3d at 218 ("GAMCO would begin by calculating a 'Private Market Value[ ]' ('PMV') for a given security" referred to as "the 'intrinsic value' of the stock"). Like the PMV in *GAMCO*, Edgewood's

27

"intrinsic value" calculation "does not rely on the share price."  Ex. E 212:19-215:18; *compare GAMCO*, 838 F.3d at 218.

ELC's share price was also only used as a comparator with Edgewood's intrinsic value measurement.  *Compare* Ex. E 215:20-25 *with GAMCO*, 838 F.3d at 218.  Edgewood invested in ELC because its intrinsic value for ELC stock was higher than the market price, and Edgewood believed there was a growth opportunity.  *Compare* Ex. E 210:23-214:1; 212:11-18 *with GAMCO*, 838 F.3d at 218.  In fact, Edgewood's investment thesis had it investing "contra" to the market, "adding to its position" when "many large investors had already sold" because Edgewood "continued to have conviction in the investment at a time when other people had less conviction." *See* Ex. E 184:16-185:12; *GAMCO*, 838 F.3d at 218.  Showing the strength of Edgewood's conviction that ELC was a sound investment, even following the alleged corrective disclosures, Edgewood's president referred to himself as an "Estée alcoholic," meaning he was "addicted to believing in Estée."  Ex. E 307:5-308:19.

As in *GAMCO*, the fact that Edgewood "continued to buy [ELC] securities as the full extent of [ELC]'s alleged fraud came to light … reasonably suggest[s] … that [Edgewood] still believed a catalyst to be on the horizon (and thus demonstrated that the [regulation of daigou] had not altered, and would not have altered, [its] conclusion."  *GAMCO*, 838 F.3d at 220-21; *see* Ex. E 224:3-10 (confirming that based on the 13F numbers it was "fair to say that between 2022 and 2023, Edgewood added to its position in Estée Lauder"); *see also id.* at 311:23-312:15 (confirming it was "fair to say" that "Peter Jennison and Alan Breed, as of May 7, 2023, had 100 percent confidence in Mr. Freda and his plans for the company").  Edgewood made its investment decisions based on its own investment thesis, not on ELC's public statements.  Ex. E 115:21-116:9; 184:20-185:5.  Even its selling decision was divorced from market price.  Edgewood eventually sold its ELC

positions because idiosyncratic restrictions in its trading thesis limited its overall holdings to *twenty-two stocks in its portfolio at any given time*. *Id*. 316:17-317:21.

Edgewood's unique trading strategy is imputed to Plaintiffs for purposes of assessing their knowledge, their nonreliance on Defendants' statements, and their nonreliance on the market's views. *See Villella*, 2018 WL 2958361, at *5 (collecting cases); Ex. P 93:7-19; Ex. Q 140:25-141:2. As a matter of law, the Court should not certify a class with Plaintiffs as class representatives. *See Rocco*, 245 F.R.D. at 136 (declining to certify a class representative where evidence suggested he "was relying not on the market, but on his own assessment of the value of the stock").

Finally, despite Defendants' probing requests, Plaintiffs have not met their burden to confirm that they did not hold investments in funds that shorted ELC Class A common stock during the relevant period. The Macomb County entities admit that they "held shares of commingled funds that had the ability to invest in short equity positions." Ex. R 2. But they refuse to produce records of short sales that could relate to ELC, despite those records being within their custody and control. *See* Ex. P 239:25-240:12, 242:4-243:13, 244:8-245:2.

This deficiency implicates both the typicality and adequacy analyses. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 257-68 (2d Cir. 2006). Evidence that Plaintiffs held short positions relating to ELC would preclude certification. If any Lead Plaintiff, "[a]s an economic reality," had an interest in short positions that caused its "net worth [to] increase[]" from the changes in stock price, its interests were diametrically opposed assuming the change damaged other class members. *See In re Grupo Televisa* Sec. Litig., 2020 WL 3050550, at *7-8 (S.D.N.Y. June 8, 2020). In refusing to produce discovery confirming that they did not hold short positions, Plaintiffs failed to

meet their burden of demonstrating that they were not enriched in a manner "not typical of the class." *Id.*

### 2.    Plaintiffs Are Not Adequate for Purposes of Rule 23(a).

Plaintiffs and their counsel are inadequate class representatives under Rule 23(a).  Courts routinely conclude that a lead plaintiff is not adequate where it "fail[ed] to properly comply with discovery requests and document production in a timely fashion." *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 136-37 (S.D.N.Y. 2007); *see also Koss v. Wachenhut Corp.*, 2009 WL 928087, at *8 (S.D.N.Y. Mar. 30, 2009).

*First*, Plaintiffs failed to prepare adequately their designated representatives.  Plaintiffs were required to "make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to prepare those persons in order that they can answer fully, completely, [and] unevasively, the questions posed" on the deposition topics.  *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 2013 WL 1286078, at *2 (S.D.N.Y. Mar. 28, 2013).

Plaintiffs made no such effort here.  The representative for Macomb County testified he reviewed only 25-30 documents, and spoke only with counsel and not anyone at the Macomb County entities.  Ex. P 26:7-27:19, 50:23-51:4; 55:17-22.  The Wayne County representative similarly testified that he only "reviewed documents," could "not tell [Defendants' counsel] how many," and failed to speak with anyone at Wayne County.  Ex. Q 26:24-27:2.  The representatives were consequently unable to answer basic questions, even those falling squarely within the deposition notices and central to Plaintiffs' bid for class certification.  *See, e.g.*, Ex. P 42:24-43:18; 166:22-167:24; 310:6-316:11, 340:9-18; Ex. Q 185:12-187:13; 187:17-190:13.

*Second*, a plaintiff's lack of credibility also "may …. serve as a basis for finding a class representative inadequate" "when the success of the legal claim is substantively jeopardized by the

30

inconsistent testimony at issue." *Hall-Landers v. N.Y.U.*, 2025 WL 919195, at *6 (S.D.N.Y. Mar. 26, 2025) (internal quotation omitted). Plaintiffs' lack of involvement in the preparation of discovery resulted in serious inconsistencies with the Rule 30(b)(6) testimony. The Macomb County representative testified that the amended initial disclosures are incomplete (missing individuals with discoverable information); that it did not assist in preparing interrogatory responses or certifications, resulting in errors and omissions in both; and neither Macomb County nor Wayne County verified their interrogatory responses. *See, e.g.*, Ex. P 177:7-185:18, 189:8-13, 202:5-6, 204:10-208:21, 209:4-213:12, 346:20-355:24; Ex. Q at 97:3-100:4.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny the Motion.

Dated:  New York, New York
        January 23, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:    */s/ Monica Loseman*

Monica K. Loseman
GIBSON, DUNN & CRUTCHER LLP
1900 Lawrence Street
Suite 3000
Denver, CO 80202-2211
Telephone: 303.298.5784
Facsimile: 303.313.2828
MLoseman@gibsondunn.com

Barry H. Berke
Mary Beth Maloney
Laura K. O'Boyle
David M. Kusnetz
Justine Y. Drohan
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue

New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035
BBerke@gibsondunn.com
MMaloney@gibsondunn.com
LOBoyle@gibsondunn.com
DKusnetz@gibsondunn.com
JDrohan@gibsondunn.com

*Attorneys for Defendants*

**ATTORNEY CERTIFICATION PURSUANT TO LOCAL RULE 7.1(c)**

I, Monica K. Loseman, hereby certify that the attached document complies with the word count limit set forth in Local Rule 7.1(c) and the Court's Order issued on January 22, 2026, ECF 101, as it contains 9,951 words, excluding the caption, table of contents, table of authorities, and signature blocks.  In preparing this certification, I have relied on the word count of the word-processing system used to prepare the attached document.

Dated: January 23, 2026

By: _____/s/ Monica Loseman___
Monica K. Loseman