# EXHIBIT E



**Page 1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————x

IN RE THE ESTE LAUDER CO., INC.    No. 1:23-cv-10669-AS
SECURITIES LITIGATION

———————————————x

VIDEO-RECORDED DEPOSITION OF JANET LYNNE KNOPF

New York, New York

Tuesday, November 18, 2025

Reported by:
Jeffrey Benz, CRR, RMR

Job No. J13778603

**Page 2**

VIDEO-RECORDED DEPOSITION of JANET LYNNE KNOPF, taken by Defendants, at the offices of Gibson, Dunn & Crutcher, LLP, 200 Park Avenue, New York, New York, on November 18, 2025, commencing at 10:13 a.m., before Jeffrey Benz, a Certified Realtime Reporter, Registered Merit Reporter and Notary Public within and for the State of New York.

**Page 3**

APPEARANCES:
COUNSEL FOR PLAINTIFF:
LABATON KELLER SUCHAROW, LLP
BY: JAMES CHRISTIE, ESQ.
BY: STEPHEN C. BOSCOLO, ESQ.
   140 Broadway
   New York, NY 10005
   (212) 907-0700
   jchristie@labaton.com
   sboscolo@labaton.com

COUNSEL FOR DEFENDANTS:

GIBSON, DUNN & CRUTCHER, LLP
BY: DAVID M. KUSNETZ, ESQ.
BY: MEGAN R. MURPHY, ESQ.
BY: HARLEY BELMONT, ESQ.
BY: LAURA K. O'BOYLE, ESQ.
   200 Park Avenue
   New York, NY 10166-0193
   (212) 351-2657
   dkusnetz@gibsondunn.com
   mmurphy2@gibsondunn.com
   hbelmont@gibsondunn.com
   loboyle@gibsondunn.com

COUNSEL FOR NONPARTY EDGEWOOD MANAGEMENT AND THE DEPONENT:

GAGE SPENCER & FLEMING LLP
BY: WILLIAM B. FLEMING, ESQ.
   410 Park Avenue
   New York, New York 10022
   (212)766-4900
   wfleming@gagespencer.com

ALSO PRESENT:

DEREK ROSE, Videographer
DIANE KONZ, Estée Lauder
SPENCER SMUL, Estée Lauder

**Page 4**

INDEX

JANET LYNNE KNOPF

| Examination by: | Page |
| --- | --- |
| MR. KUSNETZ: | 9 |
| MR. CHRISTIE: | 349 |

EXHIBITS

| Number | Description | Page |
| --- | --- | --- |
| Exhibit 1 | Subpoena for the deposition of Janet Lynn Knopf, with cover letter and complaint | 13 |
| Exhibit 2 | Email dated February 15, 2023, Bates stamped EW0016267 | 39 |
| Exhibit 3 | Presentation by Edgewood Management LLC, titled "Third Quarter 2024 Update," Bates number ESTEELAUDER_WAYNE_00005659 | 51 |
| Exhibit 4 | Document titled "Edgewood Portfolio Overview," slide deck, dated June 2022, "June 2022 Update," Bates number ESTEELAUDER_WAYNE_4061 | 78 |
| Exhibit 5 | Article in Vogue magazine, dated April 7, 2021, titled "China's Daigou Personal Shoppers Aren't Going Away" | 139 |

**Page 5**

Exhibit 6 Barclays Equity Research 152 Report, dated March 29, 2023, titled "Travel Retail Takeaways from Expert Call"

Exhibit 7 September 26, 2023, email, 182 between Ms. Mancini and Ms. Travis, Bates numbered ELC_SEC_LIT 239456

Exhibit 8 Email dated 8-6-24 from 185 Ms. Mancini to Ms. Knopf

Exhibit 9 Email from Alan Breed to 194 William Lauder on May 2, 2024, Bates numbers ELC_SEC_LIT 254825

Exhibit 10 Email with several 201 attachments, sent from Ms. Knopf to Ms. Knopf, on May 25, 2021, Bates stamped EW8299, subject: EL Model and Docs

Exhibit 11 Document with Bates number 207 EW8433, spreadsheets

Exhibit 12 Email from Janet Knopf to 255 analyst team at Edgewood, cc'ing Bloomberg Edgewood research, and bcc'ing a number of folks at Edgewood, Bates-stamped EW11358

Exhibit 13 Email dated 2-7-22 from 261 the analysts' team at Edgewood cc'ing Bloomberg Edgewood Research

Exhibit 14 November 2, 2022, email 270 from Janet Knopf to Alexander Farman-Farmaian, Bates-stamped EW14574

**Page 6**

Exhibit 15 Email from Janet Knopf to 275 the analyst team on February 3, 2023, Bates-stamped EW16082

Exhibit 16 Email Bates No. EW17123 282 from Ms. Knopf to Mr. Yager at Edgewood

Exhibit 17 Email dated August 21, 285 2023 ,from Ms. Knopf to Analyst Tea

Exhibit 18 March 5, 2024 ,email from 291 Alex Farman-Farmaian to Fabrizio Freda and Rainey Mancini, copying Janet Knopf, Bates-stamped ELC_SEC_LIT 249665

Exhibit 19 Global Relay chat starting 293 and ending on May 1, 2024, produced by Edgewood, Bates-stamped Edgewood 25125

Exhibit 20 Earnings call transcript 295 for Q32024, on May 1, 2024

Exhibit 21 Document created by 296 defendants' counsel matching up the recording of the earnings call to the time of the chats between Ms. Knopf and Mr. Breed

Exhibit 22 Email chain between Alan 310 Breed and Fabrizio Freda on May 7, 2023, regarding Nelson Peltz, Bates-stamped ELC_SEC_LIT 249558

Exhibit 23 Email from Rainey Mancini 318 to Janet Knopf on August 19, 2024, subject: Drinks, Bates number ELC_SEC_LIT 250732

**Page 7**

Exhibit 24 Email chain, with first 321 email from Alex Farman-Farmaian on August 19, 2024, to Fabrizio Freda, first page Bates-stamped ELC_SEC_LIT 249662

Exhibit 25 Email from Mehra Romezi at 325 EstÈe Lauder to Rainey Mancini at EstÈe Lauder on August 19, 2024, Bates-stamped ELC_SEC_LIT 239462

Exhibit 26 Email chain between 343 Fabrizio Freda and Alan Breed, Bates number ELC_SEC_LIT 249562

**Page 8**

THE VIDEOGRAPHER: Good morning. We are now on the record. The time is 10:13 a.m. on November 18, 2025. This begins Media Number 1 to the videotaped deposition of Janet Lynne Knopf, taken In Re the EstÈe Lauder Company, Inc., Securities Litigation.

My name is Derek Rose. I am your videographer today. The court reporter is Jeffrey Benz. We are representing Esquire Deposition Solutions.

Will counsel please introduce yourselves and affiliations, and then the witness will be sworn in.

MR. KUSNETZ: David Kusnetz, Gibson, Dunn & Crutcher, on behalf of the defendants, and I'm joined here by my colleagues, Laura O'Boyle, Megan Murphy, and Harley Belmont, of Gibson, Dunn, as well as Spencer Smul and Diane Konz of EstÈe Lauder.

MR. CHRISTIE: James Christie, Labaton Keller Sucharow, on behalf of lead plaintiffs and the proposed class, and with me today is Stephen Boscolo, also from

Page 113

of, quote/unquote, How We Invest, correct?

A. Correct.

Q. And would it surprise you that your website says, We hold these positions for the long term?

A. No.

Q. That sounds correct, right?

A. That sounds correct.

Q. And would it surprise you if your website -- that your website says, We are extremely valuation sensitive and typically have three- to five-year holding period?

A. That does not surprise me.

Q. Is that correct in practice?

A. Yes.

Q. And is that -- and so -- fair to say that Edgewood was extremely valuation sensitive with respect to its investment in EstÈe Lauder during the EstÈe Lauder -- during the Edgewood investment period?

A. I would characterize "extremely" as a marketing term and not a technical term.

Q. But you don't disagree with the veracity of the statement as written on your website, correct?

Page 114

MR. FLEMING: Object to form.

A. No, I don't disagree, but I don't know how to define "extremely" in the context of making actual investment decisions.

Q. Understand.

You didn't write it, correct?

A. Correct.

Q. So when you're looking at the long-term -- withdrawn.

When Edgewood is looking at the long-term horizon, if a company has a bad quarter, you're not just selling on that information alone. Correct?

A. Correct.

MR. FLEMING: Objection.

Q. Right? So it's fair to say Edgewood is not -- is not buying or selling stocks based on short-term changes in price. Correct?

MR. FLEMING: Object to form.

A. Not based -- not typically based on short-term changes in price.

Q. So that's correct?

A. Can you repeat your question.

Q. Let me -- yeah, I'll rephrase it.

So it's fair to say that Edgewood is

Page 115

typically not buying or selling stocks based on short-term changes in the market price, correct?

A. No, that's not fair. A short-term change in the price could cause us to act quickly to buy more of the stock.

Q. Okay. That's helpful.

And when you buy more of the stock, as you said, you're following your own investment thesis for that stock, correct?

MR. CHRISTIE: Objection.

A. Yes.

Q. And that investment thesis is unique to that particular stock. Correct?

MR. FLEMING: Object to form.

A. Typically.

Q. Fair to say that investment thesis is developed by the investment committee?

A. The investment thesis is developed by the research analyst conducting the research on the company.

Q. So, is it fair to say that you developed the investment thesis for EstÈe Lauder during the Edgewood investment period?

A. Primarily.

Q. And in your own words, what was that

Page 116

investment thesis?

A. The investment thesis was that it was a diversified portfolio of luxury prestige beauty brands that was seeing outsized growth because of growth in the category, strength in consumer preferences towards beauty and cosmetics, the rise of social media, and the new younger brands that they had recently added to the portfolio.

Q. How often are companies removed from the 22 list of portfolio companies?

A. I believe our disclosures say something around 2 to 3 stock turnover per year on average for the last 10 or 15 years.

So that means two or three new investments, then that means two or three that leave.

Q. So when Edgewood determined to exit its positions in EstÈe Lauder, is it fair to say that another stock took EstÈe Lauder's place?

A. Yes. We wanted to buy Vertex.

Q. What is Vertex?

A. Vertex Pharmaceuticals is a leading manufacturer of cystic fibrosis drugs.

Q. And are you a research analyst

Page 165

Korean government was giving.

Q. Right.

Do you recall specifically, sitting here today, when Edgewood became aware of the easing of the Korean policy?

A. No.

Q. Any reason to doubt it was in December of '22 or January of '23?

A. I would need to check my notes.

Q. What notes would those be?

A. I take detailed research notes on my findings.

Q. And are those notes memorialized in your emails?

A. Sometimes.

Q. Memorialized on your computer in some sort of folder?

A. Yes.

Q. Okay.

Right. Fair to say that if a shopper can engage in daigou by buying something online in a manner that's authorized by the government to spur increased sale during COVID, that's not illicit behavior, correct?

MR. CHRISTIE: Objection. Foundation.

Page 166

MR. FLEMING: And calls for a legal conclusion.

A. Can you repeat the question?

Q. Fair to say that if someone can engage in daigou by buying something online and that ability to buy online is authorized by the government, that's not illicit behavior, correct?

MR. CHRISTIE: Same objections.

A. I don't know what the terms of sale are for reselling, which is typically not, like, encouraged. When you buy a product online there's typically, like, you can't sell this to someone else without the company or the store being aware of it.

So, I don't know.

Q. Okay. So you can't agree with that statement?

A. You included the word daigou, yeah. I think if people are buying it online with support from the government, that is not illicit, but if it's daigou, there's an area where I don't know what the terms and conditions of the sale online were.

Q. Understood.

Page 167

If you go to the last paragraph on this page, last -- second-to-last sentence, Barclays writes, Mr. Raymond believes the bigger issue at hand is that daigou is carrying excess inventory and there's no way to quantify how much or when this will end. Importantly, Mr. Raymond sees this dynamic as temporary and less about end market demand being troubled.

Do you see that?

A. Yes.

Q. And you don't disagree with that, correct?

MR. CHRISTIE: Objection. Foundation.

A. No, I --

MR. FLEMING: I'd just object to the form. But go ahead.

A. I agree with that. During COVID there was constant issues that were temporary inventory.

Q. And you're not aware of any method to quantify any excess inventory that daigou is carrying, correct?

A. I would think that would be a very impossible task.

Q. Impossible for Estèe Lauder to do as

Page 168

well?

A. Or an industry analyst.

Q. So, impossible for Estèe Lauder or an industry analyst, correct?

MR. FLEMING: Objection. Foundation.

A. I think it would be very difficult.

Q. I mean, you said "impossible task," so I'm just using your words. So --

A. I think I said nearly impossible, actually.

Q. I'm going by what I'm seeing here, but maybe that was missed by the court reporter.

So, fair to say it's a nearly impossible task?

A. Fair to say.

Q. Okay. And fair to say it's a nearly impossible task for Estèe Lauder, correct?

MR. CHRISTIE: Objection. Foundation.

MR. FLEMING: And I object to form.

A. I don't know what sources or information that they would have, so I can't say how hard it would be for them, but for me, personally it would be very challenging.

Q. Okay. And you would expect it to be very challenging for the company as well,

Page 169

correct?

MR. CHRISTIE: Same objections.

A. Based on my understanding of daigou, which is individuals, it would be hundreds or thousands of individuals, so yes, I think that would be very difficult.

Q. So fair to say that daigou was a widespread practice that came with doing business in China and Korea for prestige beauty brands, correct?

MR. FLEMING: Object to form.

MR. CHRISTIE: Objection. Foundation.

A. I don't know how much you mean by "widespread."

Q. It was a known practice that came with doing business in China and Korea, correct?

MR. CHRISTIE: Objection.

A. Correct.

MR. FLEMING: I object too.

Q. And you would agree that daigou activity in EstÈe Lauder's products and associated potential regulatory risks related to daigou were known to sophisticated investors during the Edgewood investment period. Correct?

MR. FLEMING: Object to form.

Page 170

MR. CHRISTIE: Objection. Foundation. Calls for legal conclusion.

A. As we discussed earlier, it became a more prevalent process later in our investment period, so I would not characterize that it was a known risk or issue throughout our entire investment period.

Q. Understood.

And I'm focusing on the -- let me break it down then. So --

A. During COVID, the problem became more apparent and was more known.

Q. So during -- during COVID, it's fair to say that daigou activity in EstÈe Lauder's products and the associated potential regulatory risks related to daigou was well known to sophisticated investors during COVID. Correct?

MR. FLEMING: Object to form, and mischaracterizes past testimony.

MR. CHRISTIE: Also objection to foundation.

And calls for a legal conclusion.

A. It was a hot topic in the spring of 2023. I have a -- I struggle to assign like an importance at -- more -- other more specifically

Page 171

time periods. So...

Q. It was a hot topic industry-wide, correct?

A. During this period, correct.

Q. Okay. You can set that document aside.

Have you reviewed, in the course of your work at Edgewood, any of the investment management agreements between Edgewood and any of the Michigan funds?

A. No. Not that I'm aware of.

Q. Not part of your job responsibilities?

A. That is not part of my job responsibilities.

Q. Would that be part of Mr. Breed's job responsibility?

A. I don't know.

Q. Whose responsibility would it be at Edgewood to review and agree to investment management agreements with clients?

MR. FLEMING: Foundation.

A. Really don't know.

Qur chief legal officer, or – I really don't know. I'm guessing.

Q. Okay.

Page 172

Is it fair to say, based on your understanding, that during the Edgewood investment period, Edgewood had complete discretion to make investment decisions on behalf of the Michigan funds?

MR. FLEMING: Objection. Foundation.

A. I don't know.

Q. Did you ever have to consult with anyone at the Michigan funds before making a trade?

A. I don't make trades.

Q. Thank you for clarifying.

Did you ever have to consult with anyone at the Michigan funds in connection with your recommendations regarding making trades with respect to EstÈe Lauder?

A. I make recommendations to the investment committee. That's where my purview begins and ends.

Q. And you're not aware of any communications by the investment committee with the Michigan funds in connection with making trades.

A. I'm not aware of them, but as I've outlined, those types of communications would

Page 181

A.   Yes, I'm aware of that.

Q.   And no reason to doubt that by late September 2023, Edgewood was EstÈe Lauder's largest active shareholder outside of the Lauder family?

A.   What was the difference between the prior question?

Q.   I -- a date.

A.   So you're saying more generally and then specifically at that time?  I don't know at that time.

Q.   Okay.

Would it surprise you if Edgewood was the largest active shareholder at that time, in September of 2023?

A.   I know at one period we were.  I don't know which period.

Q.   Okay.

I'm going to show you what's going to be marked as Exhibit 7?

MR. KUSNETZ:  This is going to be Tab 25.

MR. FLEMING:  How are you doing, okay?

THE WITNESS:  Uh-huh.

Q.   If you need to take a break, whenever

Page 182

you need.

A.   Okay.

(September 26, 2023, email, between Ms. Mancini and Ms. Travis, Bates numbered ELC_SEC_LIT 239456, was marked Knopf Exhibit 7 for identification, as of this date.)

Q.   Okay.  Do you see what's been marked as Exhibit 7 before you?

A.   Yes.

Q.   Okay.

This is a September 26, 2023, email, between Ms. Mancini and Ms. Travis, Bates numbered ELC_SEC_LIT 239456.

MR. FLEMING:  And Mr. Freda.

MR. KUSNETZ:  And Mr. Freda.  Thank you.

MR. FLEMING:  Okay.

Q.   You see that?

A.   I see this.

Q.   So this a -- what appears to be an internal EstÈe Lauder email, correct?

A.   Yes, I have not seen this before.

Q.   Okay.  Ms. Mancini writes to Ms. Travis and Mr. Freda, looking at the last sentence of the first paragraph, Investors were

Page 183

already clear on the volatility around inventory across the beauty industry in China travel retail, and then this is all incremental to that.

Do you see that?

A.   I see that.

Q.   Okay.  And then Ms. Mancini continues, That said, I'm still having very productive conversations with investors that are interesting in buying or adding to positions.

You see that?

A.   Yes.

Q.   And then, she writes, I had dinner with Janet from Edgewood last week, and they have continued to add (thank you, Fabrizio, for all the time you spent with them a few weeks ago).

You see that?

A.   Yes.

Q.   Do you recall having dinner with Ms. Mancini in September of 2023?

A.   Yes.

Q.   Okay.  And around September of 2023, Edgewood continued to add to its position at EstÈe Lauder, correct?

Page 184

A.   Based on what it says in this email.

Q.   Do you have any reason to doubt that?

A.   No.

Q.   And Ms. Mancini continues, They are now our largest active shareholder (Janet characterized it as a scary place to be, but they are committed with a really long horizon.)

Do you see that?

A.   I see that.

Q.   Okay.  Do you recall characterizing it as being a scary place to be, the largest active shareholder of EstÈe Lauder?

MR. CHRISTIE:  Objection.

A.   I don't remember saying those exact words.

Q.   Well, was Edgewood trying to become the largest active shareholder of EstÈe Lauder?  Was it like a goal?

A.   No.

Q.   It just happened, because Edgewood was continuing to buy shares in EstÈe Lauder based on its investment thesis, correct?

A.   Yes.  Based on the fact many other large investors had already sold.

Q.   And meaning that many large inventors

Page 185

had already sold while Edgewood was adding to its position in EstÈe Lauder at this time. Correct?

A. Correct. It was a contra -- you know, sort of differentiated idea.

Q. And that was in line with the investment thesis, correct?

A. It was never our investment thesis to be the largest shareholder or to be against what everyone else in the market thought, but we continued to have conviction in the investment at a time when other people had less conviction.

Q. Right, because you -- withdrawn.

Okay. You can set that document aside.

MR. KUSNETZ: Tab 26.

Q. I'm going to show you what's going to be marked as Knopf Exhibit 8.

A. Okay.

(Email dated 8-6-24 from Ms. Mancini to Ms. Knopf was marked Knopf Exhibit 8 for identification, as of this date.)

MR. FLEMING: You mean 7? Was the last one 6?

MR. KUSNETZ: No, this one is 8.

Page 186

MR. CHRISTIE: Last one was 7. Okay.

A. Barclays was 6.

MR. FLEMING: Got it.

A. Rainey email was 7.

Q. Qkay. Looking at Knopf Exhibit 8.

A. Yup.

Q. Going down to the first email in the chain, which is at the bottom of the first page --

A. Qkay.

Q. -- you see it's an email from Ms. Mancini to you cc'ing other folks at EstÈe Lauder.

A. Yes.

Q. And the Bates number here is ELC_SEC_LIT 250796. You see this email to you from Ms. Mancini is on August 6, 2024, correct?

A. Yes.

Q. Qkay. And Ms. Mancini writes to you, Janet, I'm scheduling the half hour block with Fabrizio after earnings, and wanted to see if you guys were interested in having 30 minutes with him.

Do you see that?

A. Yes.

Page 187

Q. And it was common for Ms. Mancini to offer time with Mr. Fabrizio after earnings calls for Edgewood to meet with him, correct?

MR. CHRISTIE: Objection.

A. Very common.

Q. Ms. Mancini writes, I've -- I believe you have continued to add to your position, so thought the conversation could be helpful to you.

Do you have any reason to doubt that statement?

MR. CHRISTIE: Objection. Foundation.

A. I have reason to doubt that we continued to add to the position, given that this is the day we dedicated to sell it.

Q. You sure that this is the day that you decided to sell?

A. I know that we sold in August of '24, and Rainey was probably using only shareholder figures. They have, like, a lagging database typically for the IR teams.

Q. So, up until this point is it fair to say that Edgewood was adding to the position?

A. No, that's not fair to say.

Q. Up to this point.

Page 188

MR. FLEMING: Asked and answered.

A. No.

Q. So you think Ms. Mancini is going off of lagged information. Is that correct?

A. I don't know what information she is stating, but I disagree with what she's saying.

Q. Okay. Well, if you look at your response to that email that you sent --

A. Yeah.

Q. -- 40-something minutes later, Hi. Thank you so much. This is perfect. We really appreciate.

You see that?

A. Yup.

Q. Okay. And in your email, you do not correct Ms. Mancini, correct?

A. I don't typically correct IR teams on an item or statement that they would put in an email like that.

Q. So you felt no -- no reason to correct Ms. Mancini about continuing to add to the position?

A. I would not correct an IR team either way. I don't disclose typically what we're doing, unless they ask me directly or unless I

Page 205

inputs, correct?

A. Yes.

The inputs changed.

Q. Okay.

A. The guidance from the management team, things like that.

Q. Understood.

And was it your responsibility during the Edgewood investment period to keep the model up to date?

A. Yes, but during 2019 to 2021, while I was at school, there were other people that helped me, and their responsibilities were less clear since I was technically on a sabbatical, but I was also helping out and working and sort of it was more -- a shared responsibility during that time period.

Q. Understood. And so it's fair to say that during 2019 and 2021, when you were at business school, you stayed connected but didn't have primary responsibility over the EstÈe Lauder account, correct?

A. Yes. That's a fair assessment. I was staying in the loop reading my emails, but I wasn't attending all of the Edgewood meetings or

Page 206

all of the internal meetings at Edgewood. I did not have bandwidth for that.

Q. Understood. And do you recall who would have done that in your place?

A. I think we already went over. I believe Alan and Alex took over the primary point of contact and responsibility, but there may have been other analysts helping them.

Q. Okay. Is this Gmail your personal email address?

A. Yes. I believe my computer wouldn't print. There was some type of issue, since I was moving, so --

Q. Understood. Do you --

A. I'm not allowed -- no, I'm not allowed to use it for Edgewood purposes.

Q. Okay. So this is an aberration, correct?

A. Yes.

Q. Okay. I won't tell anyone. I promise.

If you -- I'm going to go through some of the attachments.

A. Okay.

Q. One of the attachments is what you had

Page 207

mentioned, the ELEW model dated September 10, 2018. And it's an Excel file.

A. Okay.

Q. The Bates number of that is EW8433. So if you turn to the last page here, the very last page.

A. Very last page.

Q. Yeah. This is placeholder for it. And you can see on the back of the page there's some metadata that we pulled from the document itself.

So it was produced to us in native form, meaning like as a file, like as an Excel file.

A. Yeah, December 19, 2017.

Q. So I'm going to show you some sheets from that Excel file.

A. Okay.

MR. KUSNETZ: I'm going to mark that as Knopf Exhibit 11.

(Document with Bates number EW8433, spreadsheets, was marked Knopf Exhibit 11 for identification, as of this date.)

Q. Okay. I'm handing you what's been marked Knopf Exhibit 11.

Page 208

Do you see that it has that same Bates number, EW8433, that was on that slip sheet back at the end of the email and its attachments?

A. Yeah.

Q. Okay.

So these are printouts of sheets from the model. I represent that to you.

A. Okay.

Q. If you look down at the bottom, do you see the different headings for the sheets?

A. Yes.

Q. Okay. And does that comport with your recollection of what would -- of the different sheets that are in the -- this model?

A. Yes.

Q. Okay.

So the first one you're seeing here is "Income Statement."

Do you see that?

A. Yes.

Q. Okay.

I'm going to direct your attention to the sheet that's labeled "DCF Model."

A. Okay.

Q. So that appears on page -- it's a

Page 209

little out of order, but --

A. 4?

Q. 4. Yeah. And it's over the -- here we are.

You got to flip it over.

You see that?

A. Yes.

Q. Okay. And does this appear to be -- does this -- does this look like the DCF model that would -- does this look like the DCF model that would be within the model filed that you would normally expect to see?

A. Typically.

Q. Okay.

And looking at this, is it -- did you create this DCF model, like all of the formulas and figures that are on this page?

A. Most likely.

Q. This is a proprietary Edgewood document, right? You didn't borrow a model from some other firm, right?

A. Correct.

Q. And looking at DCF, does that refer to discounted cash flow?

A. Yes.

Page 210

Q. Okay. And does Edgewood create models like this for all 22 of its investments?

A. Yes. Typically.

Q. Now, this model is pretty big. There's lots of different sheets, lots of data here. Fair to say it's fairly intricate?

A. I would think so.

Q. It takes a lot of time to put something like this together, correct?

A. Correct.

Q. Multiple different data sources, correct?

A. Correct.

Q. Do you recall how long it took you to make this model?

A. No.

Q. Can you -- do you have an estimate for how long it took you?

A. A couple of weeks.

Q. Okay. So this is not something you could just do in an afternoon, correct?

A. Correct.

Q. And Edgewood attempts to buy stocks that are trading for less than their intrinsic worth, correct?

Page 211

A. Correct.

Q. Right. Fair to say Edgewood is a value investor?

A. No. Value investors and growth investor -- there can be similarities, but we, if you look at our track record of investing, are not considered a value investor.

Q. Okay. Interesting.

So what is -- what is your definition of a value investor?

A. Value investors typically look for significantly lower multiples and valuations, and sort of lower growth dynamics than what Edgewood typically invests in.

So it's a slight distinction, people call us growth at a reasonable price. A GARP investor may be more likely, but value investors look for, like, deeply cyclical businesses or we -- we are not a -- we consider valuation, but under, like, an industry term, we are not a value investor.

Q. That's -- that's helpful.

So fair to say that Edgewood is a GARP investor?

MR. FLEMING: Objection. Misstates

Page 212

testimony.

A. I said that we're closer to that. We are a -- we are a growth investor. That is, like, our -- you put us in a definition in a bucket, we are growth, so we are looking for growth. So the primary objective of a growth investor is top line and earnings growth.

Q. Yeah, because who wants to be called a GARP, right?

A. Yeah.

Q. And looking at -- or building on this -- your testimony of Edgewood being a growth investor, when I say -- withdrawn.

So Edgewood is looking for companies that trade below their intrinsic value to invest in, with the idea that they will grow over time. Correct?

A. Correct.

Q. And when I say "intrinsic value," that intrinsic value is determined by Edgewood, correct?

A. Correct.

Q. Right. And this model allows Edgewood to determine an intrinsic value for EstÈe Lauder, correct?

Page 213

A.  This is one way that we use.

Q.  Okay.

And looking at the discounted cash flow model, if you go to the box in the middle of the page, do you see a reference to PV?

A.  Yup.

Q.  What does that stand for?

A.  Present value.

Q.  Okay.

And so this model -- and if you go down to Row 26, you see it says, PV per share?

A.  Yes.

Q.  So this model helps Edgewood calculate present value per share for EstÈe Lauder shares, correct?

A.  Correct.

Q.  So it's fair to say that Edgewood used a discounted cash flow model approach to calculate a present value per share for EstÈe Lauder.  Correct?

MR. CHRISTIE:  Objection.

A.  As one method.

Q.  As one method of --

A.  We -- DCF is not the only method we'll use.  We will triangulate an earnings multiple,

Page 214

a revenue multiple, comparables analysis, and a DCF model.

Q.  Okay.

A.  It's not the Bible.

Q.  But it is -- it's one methodology?

A.  It's one methodology.

Q.  That's -- thank you for clarifying.

And the present value of the company, which is calculated in this DCF model, is an independent valuation of the share price for EstÈe Lauder from the market price.  Correct?

A.  Based on my analysis.

Q.  Right.  So this -- this independent valuation is distinct from the market price, correct?

A.  Yes.  The market price is below it at Row 27.

Q.  Right.  So there's a separate row for the market price as a comparable, correct?

A.  Correct.

Q.  And Edgewood would rely on its intrinsic value of EstÈe Lauder when making trading decisions in EstÈe Lauder.  Correct?

MR. FLEMING:  Object to form.

A.  Yes.

Page 215

Q.  And if you're looking at Rows 26 through 28, this is Edgewood comparing its intrinsic value of EstÈe Lauder's shares to the share price of the day.  Correct?

A.  Yes.

Q.  So this DCF calculation does not rely on the market share price.  Correct?

MR. FLEMING:  Object to form.

Q.  Let me rephrase.

So this DCF calculation for present value per share does not rely on the share price, correct?

MR. FLEMING:  Object to form.

MR. CHRISTIE:  Objection.  Misstates the document.

Q.  I can rephrase if it's --

A.  It does not rely on the share price, no.

Q.  Okay.  Thank you.

And here, there's this "Upside Downside" row, on Row 28.

A.  Yes.

Q.  What does that refer to?

A.  The difference in our estimated value versus where the stock was trading.

Page 216

Q.  Okay.  So the difference in Edgewood's estimated value versus the market.  Correct?

A.  Correct.

Q.  And here, as of at least this day, which is September 10, 2018 -- well, actually, let me go back.

So it shows a share price today as 140.

You see that?

A.  Yes.

Q.  Okay.

A.  I don't know when this model was last saved when you pulled this --

Q.  So let's look at the stock --

A.  -- version.

Q.  -- price.  There's a stock price sheet on page 7.

You see that?

A.  Yes.

Q.  So if you go to the top, there's the date, August 29, 2018.

You see that?

A.  Yup.

Q.  And so last price, 140.

A.  So that was probably when the model

Page 221

investment outlook or any of that was for the company.

Q. Understood.

So --

A. When something is being reunderwritten, we can't change the position size, so that can take up months.

Q. That's interesting. So you're saying that when that period of revaluation is occurring, is that the same thing as underwritten that you're talking --

A. Yes.

Q. -- about, reunderwritten?

A. Yes, reunderwriting or reevaluation.

Q. What you're saying is during that period of reevaluation, the ability of Edgewood to trade in the stock is frozen.

A. No. You have to differentiate. Like a new account that was opened during that period is given the model portfolio. The model portfolio has it frozen in time, so we have inflows and outflows that result in trading every single day. But then if we are awaiting allocation, the decision on how much of the portfolio should be in a company is typically

Page 222

paused. We don't change things while we are reassessing them.

Q. Oh, okay. Sorry. So that's really helpful. So what you're saying is that Edgewood doesn't change the allocation of a stock in its portfolio while a reevaluation is underway. Correct?

A. Typically --

Q. Okay.

A. -- we decide to wait and see what the new assessment is.

Q. So you wouldn't be adding or subtracting from your position, correct?

A. Other than maintaining new accounts and closing accounts and things like that.

Q. Understood.

And how long was that period of reevaluation, to the best of your recollection?

A. I don't know. I don't remember.

Q. Okay.

Do you have any reason to doubt that, according to Edgewood's 13F filing, that in December 31, 2022, it had 6.2 million shares?

A. No.

Q. And do you have any reason to doubt

Page 223

that, according to Edgewood's 13F filing, in December of -- December 31, 2023, Edgewood had 8.25 million shares of Estée Lauder?

A. No.

Q. Okay.

A. There was massive market recovery that year, though. And inflows and -- there was, like, multiple factors that would have contributed to that change in numbers.

Q. Right. But fair to say that between the end of 2022 and the end of 2023, Edgewood added to its portfolio of shares of Estée Lauder, correct?

MR. FLEMING: Object to form of the question.

A. If -- yeah. If the numbers suggest that we have more shares, but I'm saying that the reasons for having more shares could have been, like, the broader move of the market, and the recovery of the market and, like, the inflows to our fund and not necessarily because of a trading decision like from the investment committee.

Q. Okay. That's helpful. So it's fair to say that, but --

Page 224

A. I don't know. Yeah, I don't know what are the reasons that drove that increase.

Q. But, aside from the reasons, fair to say that between 2022 and 2023, Edgewood added to its position in Estée Lauder, correct?

MR. CHRISTIE: Objection. Misstates the testimony.

MR. FLEMING: It kind of does, so I agree.

A. Based on the 13F numbers that you just read me, yes.

Q. Are you aware that this lawsuit was originally filed on December 7, 2023, not the amended complaint but the initial complaint?

A. No, I'm not aware of that.

Q. Are you aware that the initial lawsuit filed on December 7, 2023, alleged that Estée Lauder failed to disclose the risks they faced with respect to market conditions and inventory levels?

A. I'm not aware of the -- the conditions of the complaint.

Q. Okay. Now, that complaint was filed during the Edgewood investment period. Correct?

A. What was the date?

Page 233

correct?

A. Correct.

Q. Allowing Estèe Lauder to pick only the winners, correct?

A. Yes.

Q. And Mr. Freda also shut down and divested several underperforming divisions, correct?

A. Correct.

Q. So he was focusing the brand -- withdrawn.

He was focusing the company in a way that Edgewood thought was favorable to long-term growth. Correct?

A. Correct.

Q. And going to page 8302, to Number 6, Growth in Global Travel, it says, A fast-growing and increasingly important distribution channel for Estèe Lauder is the travel retail segment.

Do you see that?

A. Yes.

Q. Right. And so pre-COVID, it was the investment thesis for Estèe Lauder that it was -- withdrawn.

Pre-COVID, Edgewood's investment

Page 234

thesis for Estèe Lauder had Estèe Lauder as a fast-growing -- withdrawn.

Let me rephrase the whole thing.

A fast-growing and increasingly important distribution channel for Estèe Lauder was the travel retail segment. Correct?

A. Correct.

Q. And post-COVID, that increasingly important distribution channel was significantly altered by the global pandemic, correct?

MR. CHRISTIE: Objection. Calls for speculation.

A. Post-COVID, the channel had been impacted.

Q. By the global pandemic, correct?

A. Correct.

Q. Okay. I'm looking at the -- looking at the page 8306 and the conclusion. Do you see where it states, Estèe Lauder is a high-quality, stable, and industry-dominant business that could fit nicely within the Edgewood portfolio.

You see that?

A. Yes.

Q. Okay. And the investment committee agreed. Correct?

Page 235

A. Correct.

Q. Its top leadership had -- has proven successful and remains highly incentivized to continue to beat and exceed expectations.

Do you see that?

A. Yes.

Q. And the investment committee agreed with that, correct?

MR. FLEMING: Object to form.

A. By initiating a position, they, I guess, implicitly agreed. I don't know which lines of this conclusion the investment committee would agree with or disagree with.

Q. Understood.

Did the investment committee ask you to alter your conclusion in connection -- prior to its vote?

A. We don't alter these types of memos before we invest.

Q. Understood.

You wrote, a couple sentences down, While I believe there is risk associated with any major macroeconomic event or industry slowdown in prestige cosmetics, the business is far more diversified than it was even just

Page 236

two years ago, and continued expansion efforts and emerging markets in e-commerce should mute these threats.

Do you see that?

A. Yes.

Q. Okay. And I detect that you chuckled a little bit. Is that correct?

A. Well, anytime you read a memo like this, I mean, obviously knowing what you know now would be helpful.

Q. Hindsight is 20/20, correct?

A. Correct.

Q. Right. And so you were correct that there was a risk associated with any major macroeconomic event or industry slowdown, correct?

MR. CHRISTIE: Objection. Foundation.

A. Yes, that is typically a risk associated with any investment.

Q. And it's fair to say that during the Edgewood investment period, that risk materialized with the COVID-19 pandemic, correct?

A. Correct.

Q. And as a result, that materialized

Page 237

risk of the COVID-19 pandemic had a negative impact on EstÈe Lauder.  Correct?

MR. CHRISTIE:  Objection.  Form.

A.   Yes.

Q.   Another macroeconomic event was restrictions put in place by China and Korea with respect to reselling or daigou.  Correct?

MR. FLEMING:  Object to form.

A.   Another major macroeconomic event?

Q.   Yes.

A.   I would not characterize that as a major macroeconomic event, no.

Q.   Would you characterize it as a government -- would you characterize it as a structural -- withdrawn.

Would you characterize government policies impacting a market as a macroeconomic event?

MR. FLEMING:  Object to form.

A.   No.

Q.   What would you characterize the impact of a government policy on -- with respect to the market?

A.   A change in government policy.

Q.   Okay.  So would that be like a

Page 238

structural change?

A.   Industry change.

Q.   An industry change?

Okay.

A.   I don't know.

Q.   Within this risk that you're talking about here, when you say, Risk associated with any major macroeconomic event or industry slowdown, when you're talking about an industry slowdown and prestige cosmetics that could include government -- changing in government regulations, correct?

MR. CHRISTIE:  Object to form.

A.   Yes.

Q.   Right.  And it's fair to say that during the Edgewood investment period, the risk of an industry slowdown and prestige cosmetics materialized, in part, because of government regulations.  Correct?

MR. CHRISTIE:  Same objection.

A.   My language, industry slowdown and prestige cosmetics, as I intended it when I wrote this document, would be more like a change in consumer behavior.

Q.   Okay.  And did government regulations

Page 239

restricting the use of daigou change consumer behavior?

A.   I guess indirectly.

Q.   So, is it fair to say that during the Edgewood investment period, the risk of an industry slowdown in prestige cosmetics materialized in part because of government regulations?

MR. FLEMING:  Objection.  Asked and answered.

A.   Yes.

Q.   Let's look at another attachment in this document.

A.   Okay.

Q.   Bates number EW8309.  It's the next one after the blue page.

A.   The slide?

Q.   The slides, exactly.

So, this slide deck, which is titled "EstÈe Lauder EL, August 30, 2018," this is the slide deck that you prepared for the investment committee when considering the initial investment in EstÈe Lauder?

A.   Yes.  It was made to accompany my investment memo.

Page 240

Q.   Understood.

And if you look at page 3, it says, Looks like a EW stock, up and to the right, and then there's a circle, on a chart.

Do you see that?

A.   Yes.

Q.   Okay.  So when you say, Looks like an EW stock, what did you mean at the time?

A.   The title is a bit tongue in cheek, but I'm joking that it's been a great stock, so it would be a good fit for Edgewood.

Q.   Understood.

If you look at Slide 5.  These charts right here.

Do you see where you write, EstÈe Lauder has navigated a major distribution shift?

A.   Yes.

Q.   Okay.  And so the distribution shift on this slide shows that between 2005 and 2018, EstÈe Lauder was distributing less of its product proportionally to North American department stores, correct?

A.   Yes, Macy's had been a major customer.

Q.   Okay.  And another change was that the percentage of distribution to travel retail

Page 257

points so far.

Do you see that?

A.   Yes.

Q.   And you note that their stock is down 15 percent year to date, correct?

A.   Correct.

Q.   And down versus the S&P 500, correct?

A.   Correct.

Q.   You then write, Street expectations for the quarter are within company guidance, although at the very top end as usual, given Tracey's ever-present conservatism.

What does that mean?

A.   The CFO was known for being a conservative guider that liked to beat the expectations.

Q.   So, the CFO Tracey Travis, was known to give conservative guidance so that the company could then beat that guidance?

MR. CHRISTIE:  Objection.  Misstates testimony.

A.   So that they could deliver, meet, or exceed.

Q.   Understood.

So fair to say you took -- fair to say

Page 258

Edgewood took Tracey Travis's guidance with a grain of salt, correct?

MR. FLEMING:  Object to form.

A.   False.  I support it by the rest of the sentence, Revenue has beaten consensus 17 out of the last 20 quarters.  That is the evidence for which I am making that statement.

Q.   Oh.  I see.  I see.

So, you're saying that Ms. Travis is conservative and that her conservatism was justified as a result of what revenue was?

A.   No, it just leads to revenue beating the street expectations.  I'm talking about the street expectations.  That's how I start the sentence.

Q.   Right.  And street expectations are not Edgewood expectations, correct?

A.   That is correct.

Q.   And what are -- if you go down, Street Whispers, do you see that?  Street Whispers are that a reiteration of fiscal year '22 guidance is good enough for the buy side.

A.   Yes.

Q.   What's a "street whisper"?

A.   It is a rumor or a speculation that is

Page 259

from maybe more investors versus what's put in print by the sell-side analysts.

Q.   Understood.

And then you're asking if the team has any questions and you have a call back with the CFO Tracey Travis, and you're in the process of setting up your annual meeting with the CEO, Fabrizio Freda.  That would be after the earnings call, correct?

A.   Correct.

Q.   When -- during the Edgewood investment period, did you review each 10-Q that the company filed?

A.   Typically.

Q.   Okay.

Would there be a reason if you did not?

A.   You mean, I can occasionally miss something, miss a filing, or I was at school for two years, so I wasn't filing -- closely following the filings at that period.

Q.   Aside from the time that you were in school, is it fair to say that it was your normal practice to review Estée Lauder's 10-Q filing each quarter?

Page 260

A.   Yes.

Q.   And would you expect that while you were getting your MBA, folks at Edgewood also reviewed Estée Lauder's 10-Qs each quarter?

A.   I would find that less likely.

Q.   Why is that?

A.   Because 10-Qs are lengthy documents that require a lot of time, and that requires resource -- you know, resources from the research analyst.

Q.   So, it's fair to say that Mr. Breed and Mr. Farman-Farmaian and while you were getting your MBA were looking to other sources of information with respect to the investment in Estée Lauder.  Correct?

MR. CHRISTIE:  Objection.

MR. FLEMING:  Object to form.

MR. CHRISTIE:  Misstates testimony.  Foundation.

A.   I'm just not sure if they were reviewing the 10-Qs or not.  That's typically the role of an analyst, not a portfolio manager.

Q.   Okay.  Right.  And you were the lead analyst and were not closely following 10-Qs while you were getting your MBA between 20- --

Page 273

MR. CHRISTIE: Object to form.

A. On November 2.

Q. Sorry. Yeah. I'm -- withdrawn.

Fair to say that you reviewed -- fair to say that you listened in to the earnings call on February 2, 2023?

MR. CHRISTIE: Object to form.

A. You're saying February, but this is referring --

Q. I'm -- I'm -- yeah, I'm changing the question. I mean, I got my dates wrong.

Let me -- we just --

A. Please repeat.

Q. I'll repeat.

We just talked about November of 2022. Correct?

A. We are talking about that here.

Q. Yes. Now you can set that document aside.

A. Okay.

Q. Let's talk about February 2, 2023. Do you recall listening to an earnings call on that date?

A. Most likely.

Q. Fair to say it was likely that you

Page 274

would have listened to it, correct?

MR. FLEMING: Objection.

A. Correct.

Q. And is it also fair to say that you would have reviewed the quarterly earnings press release issued on February 2, 2023? Correct?

MR. FLEMING: Object to form.

A. If that was the day that they reported.

Q. And if that was the day that they reported, it's fair to say you -- you would review the press release in the -- in the quarterly report, correct?

A. Yes.

MR. FLEMING: Object to form.

A. Their press release comes out at 6:00 a.m., and then the call is at 9:30, so you have three and a half hours to review the documents before you join the call.

Q. Okay. I'm going to show you what's going to be marked as Knopf Exhibit 15.

(Email from Janet Knopf to the analyst team on February 3, 2023, Bates-stamped EW16082, was marked Knopf Exhibit 15 for identification, as of this date.)

Page 275

Q. You've been handed a document marked Exhibit 15, Bates number EW16082. It's an email from you to the analyst team, on February 3, 2023.

You see that?

A. I see that.

Q. Okay. And this is an email in response to the earnings disclosure that was issued the day before. Correct?

A. Yes. We already established I wrote a report after the earnings calls.

Q. Okay.

And then, the first sentence says, EL reported slightly better than expected F2Q24 yesterday and gave a pretty moderated outlook for the second half of their fiscal year.

Do you see that?

A. Yes.

Q. You note that, The stock was flat, which says a lot about the trust people have in management to navigate these headwinds.

What do you mean by that?

A. In my opinion, that they gave better numbers but the stock did not react says that people are questioning the numbers.

Page 276

Q. Okay.

A. That's my professional read on the situation.

Q. And then, if you look at the next paragraph, it says, The CFO Tracey Travis is being incredibly conservative: I will push at the meeting on February 15 about why she is reluctant to guide margins back to 20 percent in fiscal year 2024.

Do you see that?

A. Yes.

Q. Okay. So at this point, based on what was the financial reporting by the -- from the company, you thought Tracey Travis was being incredibly conservative, correct?

A. In my opinion, I thought her margin guidance was conservative.

Q. And then you were going to push her on a subsequent meeting about why you thought her margin guidance was conservative. Correct?

A. To understand why, yes.

Q. Okay.

So, fair to say that if you thought that certain guidance was conservative, you had the ability to ask questions directly to the CFO

Page 293

figures we were seeing at the retail.

There was -- there was a period of destocking, and this is -- he wants to get past the period of destocking.

Understood.

Okay.

Let's -- you can set that aside.

(Global Relay chat starting and ending on May 1, 2024, produced by Edgewood, Bates-stamped Edgewood 25125, was marked Knopf Exhibit 19 for identification, as of this date.)

Q. Knopf Exhibit 19 is a Global Relay chat produced by Edgewood, Edgewood 25125.

Do you see that?

A. Yes.

Q. And the chat itself started on May 1, 2024, and finished that same day?

A. It appears.

Q. And it was a 21 minutes, correct?

A. It appears.

Q. And it shows the participants were you and Alan Breed, correct?

A. Yes.

Q. Okay. And on this day, there was an

Page 294

earnings release. Is that correct?

A. Based on my interpretation of the messages we were sending.

Q. Okay.

A. I don't specifically remember the day of the earnings.

Q. Was it common for you and Mr. Breed to chat on Global Relay in real time during an earnings call?

A. Yes. We chat every day.

Q. Okay. So fair to say for all the other earnings calls that we discussed, there were likely chats between you and others on the investment team, correct?

A. No, because at -- I don't remember the period that we established Global Relay as our, like, main communications method, because we used email prior.

Q. Was Global -- okay.

So fair to say that after each earnings call -- withdrawn.

Fair to say that during earnings calls, you would either chat or email with other Edgewood employees about the content of the earnings call, correct?

Page 295

A. Correct.

Q. Okay. And at least -- do you recall after coming back from your MBA, is that when the firm started using Global Relay?

A. I don't remember specifically. I know by 2024, we were using Global Relay extensively.

Q. Okay. I understand.

All right. I'm going to -- keep that next to you. I'm going to mark Knopf Exhibit 20.

(Earnings call transcript for Q32024, on May 1, 2024, was marked Knopf Exhibit 20 for identification, as of this date.)

Q. Do you see this is an earnings call transcript for Q32024 on May 1, 2024?

A. Yes.

Q. Okay. Same date as your chat with Mr. Breed?

A. Yup.

Q. Okay. So, I'm going to show you one more exhibit. Keep all three in front of you.

MR. KUSNETZ: Tab 66.

A. What is "UTC"?

Q. The time -- the time zone.

A. But what would that be in New York

Page 296

time?

Q. It's five years ahead or something -- five hours ahead.

A. So -- 9, 10, 12, 10 -- yeah, 9.

Q. Are you still -- can I -- can he mark the exhibit? Are you still --

A. Yeah, ready for the next exhibit.

(Document created by defendants' counsel matching up the recording of the earnings call to the time of the chats between Ms. Knopf and Mr. Breed was marked Knopf Exhibit 21 for identification, as of this date.)

Q. He has to type whenever you're saying something.

Knopf Exhibit 21 is a --

MR. FLEMING: Oh, there's two of them? Oh, yeah, okay.

Q. -- document created by us. And it is -- I represent to you, matches up the recording of the earnings call, as you can see on the top left, to the time of the chats between you and Mr. Breed.

Do you see that?

A. Well, that's what I'm trying to figure out, because the calls typically took place at

Page 297

9:30, and if this is five hours ahead, then this would be 9:00 o'clock. So we're speaking before the call has begun.

So, I don't necessarily agree with -- because I'm looking at something in UTC, I don't necessarily agree with the lining up of this chat and this transcript.

Q. Four hours, sorry.

A. So this would be at 10:02, which would be 26 minutes into the call.

Q. Yeah.

A. Okay.

Q. Does that sound --

A. More reasonable.

Q. More reasonable. Okay.

A. Yes.

Q. Sorry. Megan unfortunately screwed up Daylight Savings Time. Thanks, Megan.

No.

Thank you, Megan, for pointing that out, I would have no idea.

So, I'm going to use this side by side.

A. Yeah.

Q. But to the extent you want to look at

Page 298

the source information, it's in front of you.

A. Great.

Q. Fair?

A. Yeah.

Q. Just want to speed things up by using it this way.

A. Sounds --

MR. CHRISTIE: I just want to put on the record that this document was created by counsel, correct?

MR. KUSNETZ: I said that on the record.

MR. CHRISTIE: Thank you.

Q. And -- okay.

So Ms. Travis writes, on the first page here -- sorry. Ms. Travis is speaking on the call regarding operating expenses and expense management.

Do you see this?

A. I see that.

Q. Okay. And then Mr. Breed writes, in response, I need a meeting but there's a lot to like here.

Do you see that?

A. Yes.

Page 299

Q. Okay. And then you reply that you and Mr. Farman-Farmaian are seeing Tracey the first week of June in Paris at a conference, correct?

A. At a conference.

Q. And then you're having dinner with Rainey as well.

A. Yes.

Q. But that you couldn't promise to get an hour with Fabrizio, correct?

A. Correct.

Q. Okay. And then if you go to the next page, Ms. Travis is stating, In closing, our expected second-half results.

Do you see that?

A. Yes.

Q. Okay. And so that's the prepared remark section of the earnings call usually, right?

A. Yes.

Q. Okay. And you write, in response, they shouldn't waste 40 minutes of an hour on prepared remarks.

Do you see that?

A. Yes.

Q. Okay. Because fair to say the

Page 300

prepared remarks are a waste of time. Is that what you're saying?

A. No. That information is typically already provided in the press release. So it's information that the investors have already been given, so it's duplicative, versus a standard industry best practice is to spend less time on that and more time on the questions from investors.

Q. Okay. So Ms. Travis was wasting time; is that correct?

MR. FLEMING: Object to form. Asked and answered.

A. I write in this message they shouldn't waste this much time.

Q. Okay. And Mr. Breed agrees with you, correct?

A. Yes.

Q. Okay. And then he writes, after Ms. Travis concludes the prepared remarks, Nobody believes them.

Do you see that?

A. I see that.

Q. And then he writes, China still tough. You see that?

JANET LYNNE KNOPF
ESTÉE LAUDER CO., INC. SECURITIES LITIGATION

November 18, 2025
305–308

Page 305

Mr. Jennison is in your office listening on this call?

A. Yes.

Q. And Mr. Jennison wanted to call Tracey out on her nonsense on the callback, meaning that when there would be a subsequent phone call, Mr. Jennison wanted to confront Tracey on what she said, correct?

MR. CHRISTIE: Objection. Form.

A. I am, in this message, warning Alan, because we have a bit of a hot head or a reactionary PM, and I didn't want to disrupt our call, so I'm letting him know, because I'm not in a position to tell a portfolio manager what they can or cannot say on a management call, so I'm hoping that Alan will step in and tell him to please not speak on the call.

Q. Understood.

Fair to say that Mr. Jennison thought that what Tracey Travis was saying in response to this analyst was, quote/unquote, nonsense?

A. I don't know what he was thinking or -- I'm just repeating a quote. This is a direct quote that he said. I don't know what he thinks.

Page 306

Q. Yeah. That was my question. Oh, sorry. No. I said thought.

Fair to say Mr. Jennison called what Ms. Travis said in response to this Bank of America analyst nonsense?

MR. FLEMING: Object to form.

A. I don't know if he was referring to this Bank of America analyst. It could have been him referring to anything on the call.

Q. Okay.

Then if -- you see Mr. FF is speaking. So that's a reference to Fabrizio Freda, correct?

A. Correct.

Q. So, Mr. Freda is discussing global travel retail here.

Do you see that?

A. I see that.

Q. Okay. Then you say to Mr. Breed, Call me crazy, but I kind of want to add.

Do you see that?

A. I see that.

Q. Okay. And then you say, Maybe I'm delusional.

A. I see that.

Page 307

Q. And then Mr. Breed writes on the next page, At this price, I agree.

Do you see that?

A. I see that.

Q. Right. So, fair to say that you and Mr. Breed agree that the intrinsic value of the company is higher than the market price at this point, correct?

MR. CHRISTIE: Objection.

A. Correct.

Q. And then Ms. Travis then speaks talking about this profit recovery plan, and Mr. Breed writes, My name is Alan, and I am an EstÈe alcoholic.

Do you see that?

A. Yes.

Q. And you say, Ha-ha, retweet. And you say, I must accept the things I cannot change.

A. I see that.

Q. It's fair to say that you too, at the time, were an EstÈe alcoholic?

MR. CHRISTIE: Objection.

MR. FLEMING: Object to form.

A. We are joking. This is a joke. So, I don't agree to that.

Page 308

Q. Okay. Fair to say that you two were a -- still a fan of EstÈe Lauder, correct?

MR. CHRISTIE: Objection. Misstates the document.

MR. FLEMING: And it misstates testimony, too.

A. I think that the -- the prior messages say that we are both saying that we, at this price, feel that the market price and our assessment of the validation of the company are different.

Q. What do you understand "EstÈe alcoholic" to mean?

MR. FLEMING: Objection. Asked and answered.

A. It's a joke.

Q. Meaning the -- he's -- Mr. Breed is joking that he's, like, addicted --

A. Addicted to believing in EstÈe.

Q. Understood.

And were you addicted to believing in EstÈe as well?

MR. CHRISTIE: Objection. Form.

A. No. That's why I'm saying I don't agree to it. I -- we are -- this is a joke, so

Page 309

I would not make my responses, like -- predicated on, like, the fact that I'm believing what I'm saying. I'm just joking.

Q. Understood.

And you say, I must accept the things I cannot change like Tracey Travis's terribly inaccurate guidance.

Do you see that?

A. Yes, I do see that.

Q. Okay. So you are again critiquing Ms. Travis's guidance as terribly inaccurate, correct?

A. Correct.

Q. And Alan replies, She's not helping this company.

Do you see that?

A. I see that.

Q. Okay. So, Mr. Breed agreed with your statement, correct?

A. He agreed that her guidance is inaccurate.

Q. Okay.

You can set that document aside.

MR. KUSNETZ: Okay. I'm getting very close to the end. I'd like to take a very

Page 310

quick break.

MR. CHRISTIE: Fantastic.

THE WITNESS: Great.

THE VIDEOGRAPHER: The time is 5:44 p.m. We're going off the record.

(A recess was taken from 5:44 to 5:54.)

THE VIDEOGRAPHER: The time is 5:54 p.m. We're going back on the record.

MR. KUSNETZ: Thank you.

Q. Ms. Knopf, I'm going to show you what's going to be marked as Exhibit 22.

(Email chain between Alan Breed and Fabrizio Freda on May 7, 2023, regarding Nelson Peltz, Bates-stamped ELC_SEC_LIT 249558, was marked Plaintiffs' Exhibit 22 for identification, as of this date.)

Q. Do you see this is an email chain between Alan Breed and Fabrizio Freda, on March 7 -- May 7, 2023, regarding Nelson Peltz.

Do you see that?

A. Yes.

Q. And the Bates number is ELC_SEC_LIT 249558.

Mr. Breed writes, I want -- I wanted to let you know, as Peter mentioned when we

Page 311

spoke, we have 100 percent confidence in you and your plans for the company.

Do you see that?

A. Yes.

Q. Qkay.

We support you and would be against any initiative he might put forward that would involve changing management or selling the company.

Do you see that?

A. Yes.

Q. And he's referring to a potential plan by Nelson Peltz to do that, correct?

A. He's referring to the earlier exhibit that we already talked about that Alex had forwarded me.

Q. Right.

A. The TradeTheNews.com article.

Q. Right. And again, about Nelson Peltz, correct?

A. I -- that is in the email.

Q. Great.

So, as of May 7, 2023, it's fair to say that Edgewood had 100 percent confidence in Mr. Freda and his plans for the company.

Page 312

Correct?

MR. FLEMING: Qbject to form.

A. No. Alan had 100 percent confidence.

Q. He mentions, As Peter mentioned when we spoke. That's a reference to Peter Jennison, correct?

A. Yes.

Q. So, fair to say --

A. Peter and I, we have confidence in you.

Q. Qkay. So it's fair to say that Peter Jennison and Alan Breed, as of May 7, 2023, had 100 percent confidence in Mr. Freda and his plans for the company, correct?

A. Correct.

Q. And Mr. Breed was the CEO of Edgewood at the time, correct?

A. Correct.

Q. Mr. Breed writes, The future of EstÈe Lauder is bright with you as CEO. You have our full confidence and support.

Do you see that?

A. I see that.

Q. Okay. So, when he refers to "our full confidence," that is a reference to him and

JANET LYNNE KNOPF

ESTÉE LAUDER CO., INC. SECURITIES LITIGATION

November 18, 2025

313–316

Page 313

Mr. Jennison, correct?

A.   I didn't write this email.  I don't know who "our" is referring to.

Q.   Okay.  You don't know if he's referring to the royal "our" like all of Edgewood?

MR. CHRISTIE:  Objection.  Foundation.

A.   He could be.

Q.   Okay.  Well, very least, it's fair to say that as of May 7, 2023, Mr. Breed believed that the future of EstÈe Lauder is bright with Mr. Freda as CEO and that Mr. Freda has his full confidence and support, correct?

MR. CHRISTIE:  Objection.  Foundation.

A.   Based on this email.

Q.   That's correct?

A.   Correct.

MR. CHRISTIE:  Same objection.

Q.   And Mr. Breed writes, We bought another 1 million shares last week as a sign of our commitment.

Do you see that?

A.   I see that.

Q.   So when he says "we bought," that is a reference to Edgewood, correct?

Page 314

A.   To the best of my understanding.

Q.   Okay.  Or shares controlled by Edgewood.  Correct?

MR. CHRISTIE:  Objection.  Foundation.

A.   Yeah, I'm not sure.

Q.   Okay.

Edgewood increased its position by 1 million shares, correct?

MR. CHRISTIE:  Objection.  Foundation.

A.   I believe so.

Q.   Okay.

But it's not Mr. Breed himself buying 1 million shares, right?

MR. CHRISTIE:  Objection.  Foundation.

A.   No.

Q.   Right.  So when he says, We bought another 1 million shares last week as a sign of our commitment, in fact, Mr. Breed, the CEO of Edgewood, is speaking on behalf of Edgewood, correct?

MR. CHRISTIE:  Objection.  Foundation.

MR. FLEMING:  Object to form.

A.   I would be speculating.  I'm reading the email, as you are.

I didn't write this email.

Page 315

Q.   Well, the message that Mr. Breed is giving to Mr. Freda, it's fair to say that that message he's delivering from Edgewood, correct?

MR. FLEMING:  Argumentative.

MR. CHRISTIE:  Asked and answered.

MR. FLEMING:  Asked and answered.

A.   Yes.

Q.   So, as of May 7, 2023, Edgewood bought another 1 million shares the prior week as a sign of Edgewood's commitment --

MR. FLEMING:  Asked --

Q.   -- to EstÈe Lauder.  Correct?

MR. FLEMING:  Asked and answered.

MR. CHRISTIE:  The document speaks for itself.  Objection.

A.   Yes.

Q.   Okay.  You can set that aside.

Going back briefly to Exhibit 3, it should be in your pile.

It's the third quarter 2024 update.

Do you see that?

A.   I'm pulling it as quickly as I can.

Q.   Thank you.

A.   Okay.

Exhibit 3, what page?

Page 316

Q.   All right.  If you go to the page that's Bates number 5670.

So, we've established, based on this document, that the large cap growth portfolio sold out of its position in EstÈe Lauder companies in August 2024.  Correct?

A.   Correct.

Q.   Okay.  And then if you go to this change in capital allocation and transactions, what does this document -- what does this slide depict?

A.   It shows that we sold EstÈe Lauder. It shows our trade activity for the quarter.

Q.   Understood.

So, that quarter, for example, you bought -- withdrawn.

That quarter Edgewood bought Vertex Pharmaceuticals, Incorporated.

Do you see that?

A.   Yes.

Q.   And sold EstÈe Lauder companies.

A.   Yes.

Q.   Correct?

A.   Yes.  That was the trade we did in August.

JANET LYNNE KNOPF
ESTÉE LAUDER CO., INC. SECURITIES LITIGATION

Page 317

Q.   Understood.
So, earlier in the deposition, I asked you, when Edgewood determined to exit its positions in EstÈe Lauder, is it fair to say that another stock took EstÈe Lauder's place.
And you testified, Yes, we wanted to buy Vertex.  Do you recall that?
A.   Yes.
MR. CHRISTIE:  Objection.  Misstates testimony.
Q.   Okay.  So, the portfolio, according to Edgewood's model, is fixed at 22 companies.  Correct?
A.   Yes.
Q.   So if Edgewood wanted to add Vertex, it had to sell one of the other 22 companies.  Correct?
A.   Correct.
Q.   And so here, to add Vertex, Edgewood sold EstÈe Lauder.  Correct?
A.   Correct.
Q.   Because you can't add Vertex if you still have EstÈe Lauder plus the other 21 companies, correct?
MR. CHRISTIE:  Objection.  Asked and

Page 318

answered.
A.   We had to sell one of the 22.
Q.   And so the sacrificial lamb was EstÈe Lauder; is that fair to say?
MR. CHRISTIE:  Qbjection.  Form.
A.   No, I wouldn't call it a sacrificial lamb.  The most compelling risk/reward adjusted decision was EstÈe Lauder.
Q.   Qkay.
You can set that document aside.
I'm going to hand you what's being marked as Exhibit 23.
(Email from Rainey Mancini to Janet Knopf on August 19, 2024, subject:  Drinks, Bates number ELC_SEC_LIT 250732, was marked Knopf Exhibit 23 for identification, as of this date.)
Q.   This is Bates number ELC_SEC_LIT 250732.  It is an email from Rainey Mancini, sent to you on August 19, 2024, with the subject, "Drinks."
Do you see this?
A.   I see this.
Q.   Qkay.  And Rainey writes to you, I hope we still get to execute on a private club

Page 319

drink circuit.
A.   Yes.
Q.   Okay.  And she's writing this to you when she learned that Edgewood exited its investment in EstÈe Lauder.  Correct?
A.   Yes.  We had a callback.  This was the day, I believe, or around the period that EstÈe would have reported, and we spoke to the management team and said that we wished them the best, that we had sold our position.
Q.   Understood.
And you write in response, Yes, I was going to send you a separate note.  Unfortunately, my hands were tied and our portfolio structure just does not allow for the timing on this one.
Do you see this?
A.   I see that.
Q.   Okay.  So, when you say your hands were tied and your portfolio structure does not allow for the timing on this one, what does that mean exactly?
A.   Well, my hands were tied refers to the fact that I don't have a vote, as we've established.  The portfolio managers make the

Page 320

vote, not me.
The portfolio structure does not allow us to own 23 stocks, as you just established.  We wanted to buy Vertex.  So that's what that means.
Q.   Understood.
So it was -- you're telling Ms. Mancini that it was the portfolio structure that drove the decision to sell at this time.  Correct?
MR. FLEMING:  Object to form.  Misstates testimony.
A.   We were wanting to end the relationship on a positive note, despite the unfortunate circumstances.  And I was choosing to focus on the Edgewood portfolio structure as one reason to cite.
Q.   Understood.
And you write, We will be rooting for the turnaround from the sidelines.
You see that?
A.   I do see that.
Q.   Okay.  And you note that you developed a personal friendship with Ms. Mancini and with Beth, one of her colleagues, correct?

Page 333

A.  Correct.

Q.  So the -- what the representative of Edgewood is saying is that the timing for the turnaround does not jive with Edgewood's investment horizon.  Correct?

MR. FLEMING:  I object to form.  And does assume facts.

A.  No, I don't agree with that.

Q.  Okay.

Well, help me clarify it, then.

A.  The new turnaround that they've outlined does not line up with the timeline that we want to be invested in the company.

Q.  Understood.

And then, two sentences later it says, We just want to be upfront with you.  When you walked into our office and told us you were going to put inventory in the channel for the China reopening, we thought it was logical.  Apparently the board did as well.

Do you see that?

A.  I see that.

Q.  Do you recall that as something that was said by a representative of Edgewood on this call?

Page 334

MR. CHRISTIE:  Objection.  Foundation.

A.  I don't recollect if that was something that was said on this particular call or not, but it was something that we had discussed internally, so it would seem reasonable.

Q.  Okay.

And then the Edgewood representative continues, Nobody could have thought they'd postpone the reopening and then had such a lackluster reopening.  China has been a disappointment not just to you, you've been a victim in a way, but lots of global companies.

Do you see that?

A.  I see that.

Q.  Do you recall that language being used on this call?

MR. CHRISTIE:  Objection.

A.  I don't --

MR. CHRISTIE:  Foundation.  Misstates the document.  And assumes facts not in evidence.

A.  I don't remember the specific -- the specifics of this call.

Q.  Do you have any reason to doubt that

Page 335

this specific language was used on this call by a representative of Edgewood?

A.  No.

Q.  And it was -- withdrawn.

China was a disappointment to Edgewood in respect to how it impacted Edgewood's overall portfolio, correct?

MR. FLEMING:  Object to form.

A.  China had affected several Edgewood companies.

Q.  And China had a negative impact on Estée Lauder as an investment by Edgewood, correct?

MR. CHRISTIE:  Objection.  Form.

A.  Correct.

Q.  Right.  And when the representative of Edgewood states that Estée Lauder has been a victim in a way, he is referring to the impact of China on the overall company.  Is that correct?

MR. CHRISTIE:  Objection.  Misstates the document.  Assumes facts not in evidence.

And foundation.

A.  I think he's referring to Estée Lauder

Page 336

being a victim of COVID.

Q.  Same with lots of global companies, correct?

MR. CHRISTIE:  Objection.  Foundation.

A.  That's what it says here.

Q.  He continues, We see it.  We have those companies in our portfolio too.

Meaning the representative from Edgewood is saying the global companies impacted by COVID and China are also in Edgewood's portfolio, correct?

A.  I just stated --

MR. FLEMING:  Object --

A.  -- several of our portfolio companies were affected by COVID-19 in China.

MR. FLEMING:  Object -- and I object to the form of that question.

MR. CHRISTIE:  Yeah, same objections --

Q.  The --

MR. CHRISTIE:  -- as I --

Q.  The --

MR. CHRISTIE:  -- stated earlier, too.

I'm not done objecting.

Thank you.  You can continue.

Page 337

MR. KUSNETZ:  Thank you.

Q.  The Edgewood representative states here, It begs the question of if this is structural issue for China and will it last a lot longer.  We ask this too.

Do you see that?

A.  I see it.

MR. FLEMING:  Object to the form of the question.

Q.  Okay.  What is a structural issue for China, do you understand that to be?

MR. CHRISTIE:  Objection.  Foundation.

A.  It's differentiating between a temporary issue and a more permanent structural issue.

Q.  Okay.

Next sentence, ELC was caught in that, run over by this much bigger macro issue.

You see that?

A.  I see that.

Q.  Okay.  And so what the representative from Edgewood is saying is that ELC was run over by a much bigger macro issue.

Do you see that?

A.  I see it.

Page 338

MR. FLEMING:  Object to the form of the question.

Q.  Okay.

MR. FLEMING:  Again.

Q.  Do you have any reason to doubt that was said on this call?

MR. CHRISTIE:  Objection.  Same running objections that I've been making.

A.  I mean, I don't have a reason to doubt that.  I don't remember this call, as I've said.

Q.  You don't remember --

A.  The specifics that were discussed on this call.

Q.  Understood.

None of us thought this would be the reaction.  Even if the recovery was delayed, thought inventory would burn through quickly.

Do you see that?

A.  I see that.

Q.  And that's a reference to the inventory issues that we previously discussed today, correct?

MR. CHRISTIE:  Objection.  Foundation.

A.  Yes, apparently.

Q.  The Edgewood representative says,

Page 339

We've enjoyed working with you and appreciate your time and transparency.

Do you understand that to be a reference to Mr. Freda?

MR. CHRISTIE:  Same objections.

MR. FLEMING:  Object to form.

A.  Yes.

Q.  So, the representative from Edgewood is informing Mr. Freda, as of August 2024, that they appreciated Mr. Freda's transparency.  Correct?

MR. FLEMING:  Object to form.  Asked and answered.

A.  That's what the notes from the investor relations say.

Q.  Okay.

THE COURT REPORTER:  I think I missed your second objection.

MR. FLEMING:  Asked and answered.

O.  And then it says, And we'll be rooting for you.

Do you see that?

A.  I see it.

O.  Okay.  Now, the "and we'll be rooting for you" language is similar to what you wrote,

Page 340

for example, to Ms. Mancini, correct?

A.  Similar.

Q.  Right.  You said "rooting for the turnaround from the sidelines."  Correct?

A.  Something like that.

Q.  And do you recall -- and let's look back at the prior exhibit, I think Exhibit 24.  That's the email from Mr. Farman-Farmaian.

A.  Yup.

Q.  Okay.

So, when Mr. Farman-Farmaian writes, As I mentioned, the China slowdown and non-rebound that no one could expect nor foresee is something we are trying to get our arms around across the whole portfolio.

Do you see that?

A.  I see that.

Q.  And so, he says, "As I mentioned."  So, does that indicate that it is Mr. Farman-Farmaian who is making this statement on the call?

MR. CHRISTIE:  Objection.  Foundation.  Assumes facts not in evidence.

A.  I'm speculating because I don't remember who spoke on the call.

Page 353

THE VIDEOGRAPHER: The time -- do you have any more questions?

MR. KUSNETZ: No, we're good.

THE VIDEOGRAPHER: The time is 6:39 p.m. This concludes today's deposition. We're going off the record.

(Time noted: 6:39 p.m.)

Page 354

ACKNOWLEDGEMENT

I, JANET LYNNE KNOPF, hereby certify, I have read the transcript of my testimony taken under oath in my deposition of November 18, 2025; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

_____
JANET LYNNE KNOPF
Subscribed and sworn to before me on this _____ day of _____, 2025

_____
NOTARY PUBLIC

Page 355

CERTIFICATE

STATE OF NEW YORK    )
                     ) Ss.:
COUNTY OF NEW YORK   )

I JEFFREY BENZ, a Certified Realtime Reporter, Registered Merit Reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn by me and that this transcript of such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th of November, 2025.

_____
JEFFREY BENZ, CRR, RMR