# EXHIBIT K

# ~~EXHIBIT 2~~Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DOCGO INC., STAN VASHOVSKY, ANTHONY CAPONE, and ANDRE OBERHOLZER,<br><br>Defendants. IN RE THE ESTÉE LAUDER CO., INC. SECURITIES LITIGATION | Civil Action No.<br>1:23-cv-09476-10669-KPFAS |

EXPERT REPORT OF MATTHEW D. CAIN, PH.D.

July 2125, 2025

**Table of Contents**

I.    **Scope of Report and Opinions** ................................................................ 1

II.   **Qualifications** ....................................................................................... 2

III.  **Case Background** ................................................................................. ~~5~~4

IV.  **Bases for Opinions on Market Efficiency** ............................................. 7

V.   **Evaluation of Market Efficiency Factors for ~~DocGo's~~Estée Lauder's Common Stock** ~~9~~10

     A.   *Cammer* Factor 1:  Average Weekly Trading Volume ................... ~~11~~12

     B.   *Cammer* Factor 2:  Analyst Coverage ......................................... 13

     C.   *Cammer* Factor 3:  Market Makers ............................................. 16

     D.   *Cammer* Factor 4:  SEC Form S-3 Filing Eligibility ................... ~~18~~19

     E.   *Cammer* Factor 5:  Cause and Effect Relationship Between Company Information and Stock Prices ................................................... 20

     F.   *Krogman* Factor 1:  Market Capitalization ................................ ~~28~~29

     G.   *Krogman* Factor 2:  Bid-Ask Spread ........................................ ~~29~~30

     H.   *Krogman* Factor 3:  Public Float ............................................. ~~30~~31

     I.   Additional Factor:  Institutional Ownership .............................. ~~31~~32

VI.  **Ability to Calculate Damages on a Class-Wide Basis** ......................... ~~32~~33

     A.   Calculation of Damages for Violation of §§ 10(b) and 20(a) of the Exchange Act ................................................................... ~~33~~34

     B.   Damages Methodology is Flexible and can Incorporate Alternative Findings ............................................................................. 37

VII. **Conclusion** ...................................................................................... ~~38~~39

i

## I.    Scope of Report and Opinions

1.    Lead ~~Plaintiff Genesee~~Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System ("~~Plaintiff~~collectively, "Plaintiffs"), through their attorneys ~~has~~have asked me to determine whether the market for ~~DocGo Inc. ("DocGo" or the "Company")~~Class A common stock ("Common Stock") of The Estée Lauder Companies Inc. ("Estée Lauder" or the "Company") was efficient during the period from ~~April 29~~February 3, 2022 ~~to September 15~~through October 31, 2023, inclusive (the "Class Period"). [1]

2.    In addition, ~~Plaintiff has~~Plaintiffs have asked me to opine on whether damages for investors trading in ~~DocGo's~~Estée Lauder's Common Stock during the Class Period can be calculated using a common methodology for all Class members that is consistent with ~~Plaintiff's~~Plaintiffs' claims under: (i) § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§ 10(b) claims"); and (ii) § 20(a) of the Exchange Act.[2]

3.    Based on my analysis to date and the evaluation of the factors described throughout this Report, I have formed the following opinions:

---

[1]  ~~I understand that the~~See: Consolidated Amended Class Action Complaint for ~~Violations~~Violation of the Federal Securities Laws (Doc. ~~43~~47) ("Complaint")~~, as limited to the remaining actionable alleged misrepresentations per the~~; Opinion and Order, dated March ~~28~~31, 2025, (Doc. ~~77~~58) ("MTD Opinion")~~alleges a Class Period that begins with DocGo's proxy statement issued and filed on SEC Form DEF 14A on April 29, 2022. Because this proxy statement was issued prior to market open, I analyze a class period beginning on that same day, April 29, 2022~~.

[2] *See* Complaint. I understand ~~defendants to include DocGo and Anthony Capone, DocGo's former CEO ("Defendants")~~Defendants to be Estée Lauder, Inc., Defendant Freda (Estée Lauder's former Chief Executive Officer) and Defendant Travis (Estée Lauder's former Chief Financial Officer).

a.  The market for ~~DocGo's~~Estée Lauder's Common Stock was efficient throughout the Class Period.

b.  The *Cammer* and *Krogman* factors accepted and applied by courts to assess market efficiency corroborate that ~~DocGo's~~Estée Lauder's Common Stock traded in an efficient market.

c.  Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting Common Stock price movements (which I analyze under the fifth *Cammer* factor) supports the conclusion that ~~DocGo's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

d.  Damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for ~~Plaintiff's~~Plaintiffs' pending claims.  In particular, the out-of-pocket damages methodology, which is routinely used in § 10(b) securities class actions, is appropriate and applicable here.

4.    The remainder of my Report is organized as follows:  **Section II** describes my qualifications.  **Section III** summarizes the case background.  **Section IV** briefly explains the bases for the reliance requirement and the "fraud-on-the-market" theory relating to market efficiency.  **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period.  **Section VI** addresses how damages can be calculated on a class-wide basis subject to a common methodology under §§ 10(b) and 20(a).  **Section VII** summarizes my conclusions.

## II.    Qualifications

5.    I hold a Ph.D. in Finance from Purdue University and am a Senior Fellow at the New York University School of Law.  I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.

6.    My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information,

and shareholder activism.  I previously held fellowships with the Berkeley Center for Law and Business at UC Berkeley, Vanderbilt Law School, and the Harvard Law School Program on Corporate Governance, where I participated in teaching, research, and academic seminars.

7.      Before my current roles, I worked at the SEC between 2014 and 2018 as a Financial Economist.  During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, improper revenue recognition practices, and disclosure violations.  I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities law violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

8.      Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame.  I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics.  I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

9.      Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007.  Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private

3

placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes.  I received a B.S. in Finance from Grove City College in 2001.

10.     In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law.  I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

11.     I have published research in leading peer-reviewed journals in the fields of finance, accounting, law, and economics, including:  *Journal of Financial Economics, Journal of Law and Economics*, *Journal of Accounting and Economics, Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis*.  My curriculum vitae, attached as **Appendix A**, further details my publications.

12.     In addition to my teaching, research, and academic responsibilities, I provide consulting services and expert testimony in a variety of matters through my LLC, Cleveland Analytics, as well as in conjunction with other consulting firms.  As an expert in financial economics, I have conducted analyses or presented expert opinions related to market efficiency, valuation, securities trading, corporate disclosures, and loss causation/damages in over 60 cases. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

13.     The materials I have considered in forming my opinions are listed and summarized in **Appendix B**.  My time is billed at a rate of $1,100 per hour for my work on this matter.  I have been assisted in this matter by my staff at Fideres Partners LLP, working under my direction, and I receive additional compensation based upon their billings.  My compensation is in no way contingent on the outcome of this case.

14.    My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

### III.    Case Background

15.    ~~DocGo is a technology and healthcare company that provides medical transportation services and mobile health services, including testing, vaccinations, and event services in the United Kingdom and the United States.³During the Class Period, the Company focused on leveraging its technology and proprietary artificial intelligence platform to secure government contracts and efficiently provide healthcare services.⁴DocGo's~~Estée Lauder is a prestige beauty company that manufactures, markets and sells skincare, makeup, fragrance and hair care products worldwide. ³ Estée Lauder distributes its products in approximately 150 countries and territories under many brand names, including Estée Lauder, La Mer, Origins, M·A·C, Le Labo and Bobbi Brown. ⁴ In January 2024 Estée Lauder was the second largest beauty company in the world. ⁵ Estée Lauder's Common Stock traded on the ~~NASDAQ~~New

---

³ ~~Complaint ¶ 2.  The following overview section summarizes the allegations in the Complaint as context for Plaintiff's claims.  I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.~~

⁴ ~~Complaint ¶¶ 2, 3.~~

³ Complaint ¶ 4. The following overview section summarizes the allegations in the Complaint as context for Plaintiffs' claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.

⁴ Complaint ¶ 4.

⁵ Complaint ¶ 4.

5

York Stock Exchange ("NYSE") under the ticker symbol ~~DCGO~~"EL" throughout the Class Period.[5][6]

16.    During the Class Period, one of Estée Lauder's most profitable sales channels was travel retail, including duty-free shops.[7] Of these travel retail channels, those in China and South Korea were critical sources of revenue for Estée Lauder during the Class Period and were closely monitored by the Company and its investors.[8] The Complaint alleges that Defendants ~~misled investors primarily through statements made by DocGo CEO Anthony Capone.  Specifically, the Complaint alleges that Capone fabricated his educational background.[6]During the Class Period, Capone's official biography claimed that he had a master's degree in artificial intelligence, and he repeatedly touted this degree in communications with investors, including at industry conferences and discussions with investment analysts.[7]However, Capone later admitted that he did not have any master's degree from any institution.[8]The Complaint further alleges that this was significant because DocGo emphasized its technological capabilities, particularly its AI platform, as a major differentiator from its peers, with Capone presented as central to its development~~concealed the fact that Estée Lauder's sales growth in the Company's Asia travel retail segment was driven by the prohibited gray market resale industry in China and South Korea, known as *daigou*, from investors.[9]

---

[5] ~~*Id.*~~[6] Complaint ¶ ~~13~~48.

[7] Complaint ¶ 7.

[8] Complaint ¶ 8.

[6] ~~*Id.*¶ 4.~~

[7] ~~*Id.*¶ 45.~~

[8] ~~*Id.*¶ 45.~~

[9] ~~*Id.*~~Complaint ¶¶ ~~34-35~~ 1.

17.    The Complaint ~~also~~further alleges that ~~Defendants misled investors about DocGo's performance and prospects, particularly by claiming that the Company was diversifying its income stream through enrolling asylum seekers in Medicaid.[10]Capone allegedly stated that DocGo had signed up over 3,000 individuals under its care for New York State Medicaid through UnitedHealthcare, and claimed this would lead to future business for the Company's Mobile Health segment.[11]In reality, DocGo had not enrolled anyone in Medicaid programs and did not have any contracts with UnitedHealthcare.[12]~~Estée Lauder's ability to rely on *daigou* as a revenue stream ended following a July 1, 2021 pledge by its customer, China Duty Free Group, to eradicate *daigou* activity, as well as the January 1, 2022 implementation of China's prohibitions on *daigou* activity. [10] Despite a decline in net sales attributable to the absence of gray market transactions generated by *daigou* activity, Defendants allegedly made a series of misrepresentations concerning the overall impact of this absence on the Company's Asia travel retail business.[11]

18.    The ~~relevant truth was allegedly partially revealed on September 10, 2023, when the Times Union reported that DocGo's statements about Medicaid sign-ups were false. [13]The relevant truth was further allegedly revealed on September 14, 2023, when the Times Union~~

---

~~[10] *Id.*§§ IV.B.~~

~~[11] *Ibid.*~~

~~[12] *Id.*¶¶ 6, 60-62.~~

[10] Complaint ¶ 2.

[11] Complaint ¶¶ 104 and 128.

~~[13] *Id.*¶ 68.   This article also revealed that DocGo's contract with the U.S. Customs and Border Protection ("CBP") was worth less than half of the previously reported $4 billion value.   I understand that this component of Plaintiff's allegations is no longer actionable per the MTD Opinion.~~

7

~~published an article revealing that Capone did not possess a master's degree, a fact which Capone admitted to.[14] The following day, after market close on September 15, 2023, the relevant truth was allegedly further revealed when DocGo released a Form 8-K announcing Capone's immediate resignation.[15]~~ Complaint alleges that the relevant truth was partially revealed on November 2, 2022, February 2, 2023, and May 3, 2023, when Estée Lauder published its first, second and third quarter 2023 financial results. The published results revealed sales declines in the Estée Lauder's travel retail business and the negative impact that these declines were having on the Company's financial outlook. [12] However, on each of these dates Defendants offered reassurances to investors that sales would recover, which were false and misleading because Defendants failed to disclose that the Company was no longer able to rely on *daigou* sales.[13]

19.    The Complaint alleges that the relevant truth was further revealed on August 18, 2023, when Estée Lauder disclosed in its fourth quarter 2023 earnings that its travel retail "sales trend deteriorated and turned steeply negative from the enforcement actions to control *daigou* activity." [14] Again, Defendants allegedly continued to mislead investors as they did not disclose that the primary cause of its declining sales was their falling *daigou* sales. [15]

20.    The Complaint alleges that the relevant truth was further revealed on November 1, 2023, when Estée Lauder disclosed in its first quarter 2024 earnings that its sales declines

---

~~[14] Complaint ¶ 96.~~

~~[15] *Id.* ¶ 97.~~

[12] Complaint ¶¶ 35-37.

[13] Complaint ¶¶ 35-37.

[14] Complaint ¶ 39.

[15] Complaint ¶ 40.

were "primarily due to…changes in government and retailer policies related to unstructured market activity."[16]

~~19~~21. The Complaint alleges that, as a result of Defendants' materially false and misleading statements and material omissions, investors allegedly traded ~~DocGo's~~Estée Lauder's Common Stock at artificially inflated prices during the Class Period.~~16~~ [17] **Exhibit 1** graphs the closing stock price and trading volume for ~~DocGo's~~Estée Lauder's Common Stock shares throughout the Class Period.

## IV.    Bases for Opinions on Market Efficiency

~~20~~22. I understand that, with respect to their claims under § 10(b) ~~Plaintiff asserts~~Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance, i.e., that all persons and entities who purchased or otherwise acquired ~~DocGo~~Estée Lauder Common Stock during the Class Period relied on the alleged misrepresentations and omissions through their effect of stock prices in an informationally efficient market.~~17~~[18]

~~21~~23. As courts, including the Supreme Court, have repeatedly explained, the "fraud-on- the-market" theory of class-wide reliance holds that investors who purchase securities traded in an informationally efficient market during a class period rely on any public misrepresentations or material omissions of fact made during the class period because those statements or material omissions of fact are incorporated into the value of each class member's purchase price.  As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material

---

[16] Complaint ¶ 41.

[16] *~~Id.~~*~~¶ 100~~[17] Complaint ¶¶ 128-129, 173, 177.

[17] *~~Id.,~~*[18] Complaint ¶¶ ~~101-103~~271-275 (including additional *Affiliated Ute* presumption on alleged omissions).

9

information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[19]

24. The Supreme Court reaffirmed the availability of this theory to satisfy § 10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[20]

25. A market is considered informationally efficient when the market price of securities begins to respond quickly to publicly available information.[21] Economic research and literature support the concept of market efficiency for publicly traded securities. For example, Nobel Prize winner Eugene Fama has observed that "[t]he evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory

---

[19] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[20] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[21] Academics often consider more stringent forms of market efficiency, *e.g.*, defining an efficient market as one in which prices reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs. Eugene F. Fama, 1991, *Efficient Capital Markets: II*, Journal of Finance 46, at 1575 (1991).

evidence is sparse,"21 22 and that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."2223

2426.   Markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, are frequently granted a presumption of efficiency for virtually all securities traded on them.23 24 The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other rules for these exchanges practically guarantee a liquid market for securities traded on these exchanges.24 25 The fact that DocGo'sEstée Lauder's Common Stock traded on the NASDAQNYSE leads to a strong presumption of market efficiency.

2527.   In securities fraud cases, courts have endorsed the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purpose of establishing the presumption of class-wide reliance.25 26 Courts also accept additional factors for evaluating market efficiency, such as those in the widely-cited *Krogman v. Sterritt* opinion.2627

2628.   Principles of economics and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.27 28 However, as explained below, it is

---

21 22 Eugene F. Fama, *Efficient Capital Markets:  A Review of Theory and Empirical Work*, Journal of Finance 25, at 383, 416 (1970).

22 23 Eugene F. Fama, *Efficient Capital Markets:  II*, Journal of Finance 46, at 1575, 1576 (1991).

23 24 *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*") ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there:  the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.'") (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).

24 25 *Id.*

25 26 *Cammer*, 711 F. Supp. at 1264, 1286 – 1287.

26 27 *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

27 28 *See, e.g.*, Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements:  The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance

11

important to understand that an assessment of market efficiency does not turn on any one single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.[28][29]

**V.    Evaluation of Market Efficiency Factors for ~~DocGo's~~Estée Lauder's Common Stock**

~~27~~29.   In the following section, I discuss the *Cammer*, *Krogman*, and other factors and evaluate them in relation to ~~DocGo's~~Estée Lauder's Common Stock.[29][30] In doing so, I compare the factors' application to ~~DocGo's~~Estée Lauder's Common Stock against:  (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

~~28~~30.   As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that ~~DocGo's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

~~29~~31.   One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[30][31] In this peer-reviewed study, these authors examined two samples of firms.  One sample included companies that eventually lost all analyst coverage (the "MRK Previously Covered

---

*Announcements:  The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

[28][29] *Id.*, at 204-205.

[29][30] In addition to the *Cammer* and *Krogman* factors, I also note that the Company a) had call and put options traded on the Common Stock, and b) did not have a statistically significant autocorrelation coefficient on abnormal stock returns during the Class Period from my event study in Section V.E. These findings further support my conclusion that ~~DocGo~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

[30][31] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, *Is There Life After the Complete Loss of Analyst Coverage?*, Accounting Review 88, at 667-705 (2013).

Companies"); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage.  The second sample included the analyst-covered firms (the "MRK Covered Companies"), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[31][32]

3032.  The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year.  We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock.  . . .  Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[32][33]

3133.  The authors describe these variables as reflective of investor interest:  after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[33][34] Therefore, I interpret the sample of MRK Covered Companies as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets.

---

[31][32] MRK Study at 678, 681-682.

[32] *Id.*[33] MRK Study at 667.

[33] *Id.*[34] MRK Study at 681 (footnotes omitted).

3234.   Below, I compare several of ~~DocGo's~~Estée Lauder's market efficiency factors to the samples of firms in the MRK Study, to samples of firms in other academic studies, and to the benchmarks set forth by courts, to assess whether ~~DocGo's~~Estée Lauder's characteristics are consistent with firms operating in efficient markets.

### A.  *Cammer* Factor 1:  Average Weekly Trading Volume

3335.   Trading volume refers to the number of shares of a security transacted between market participants.  The greater the amount of buying and selling activity in a security, the more likely it is that new information will be quickly incorporated into the price of that security.~~34~~[35] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.~~35~~[36] Similarly, "[t]rading volume was also considered as an eligibility standard [for exchange listing] because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."~~36~~[37]

3436.   The first *Cammer* factor, stock trading volume, was defined by the *Cammer* court using average weekly trading volume relative to shares outstanding.  In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of
> the outstanding shares would justify a strong presumption that the

---

[~~34~~35] *See, e.g.*, Bharat Bhole, Sunita Surana, and Frank Torchio, *Benchmarking Market Efficiency Indicators for Securities Litigation*, University of Illinois Law Review Online, at 101-102 (2020) (the "Bhole Study"); Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63, at 108 (2000); MRK Study at 681.

[~~35~~36] *Id.*

[~~36~~37] Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63, at 108 (2000).

market for the security is an efficient one; 1% would justify a substantial presumption.[37][38]

35 37.  **Exhibit 2** graphs DocGo's Estée Lauder's Common Stock weekly trading volume as a percentage of shares outstanding throughout the Class Period.[38] [39] The average weekly trading volume was 3.9 4.0% of DocGo's Estée Lauder's Common Stock outstanding over the Class Period.  This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court.   As a result, DocGo's Estée Lauder's level of stock trading volume throughout the Class Period supports the conclusion that DocGo's Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

36 38.   I also note that the average weekly trading volume of DocGo's Estée Lauder's Common Stock over the Class Period was 49.3 million shares on the NASDAQ NYSE.  This is a far larger weekly trading volume than was found for the MRK Previously Covered Companies (just 0.034 million shares), as well as the MRK Covered Companies (0.215 million shares).[39] [40] Additionally, DocGo's Estée Lauder's daily turnover rate of 0.77 0.8% during the Class Period placed it above the 50th percentile median of all companies listed on the NYSE and the NASDAQ.[40] [41] This further supports the conclusion that DocGo's Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

---

[37][38] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg, § 8.6).

[38][39] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[39][40] MRK Study at 678 (Table 3). The median annual trading volume for MRK Previously Covered Companies was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK Covered Companies was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

[40][41] According to the Bhole Study at 102, the 50th percentile of median daily turnover for the 2016-2018 sample period is 0.71%. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

### B. *Cammer* Factor 2:  Analyst Coverage

3739.  The second *Cammer* factor looks at the amount of analyst coverage the company at issue receives.  An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry.  Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.

3840.  Analyst coverage can be indicative of market efficiency since research analysts help to disseminate new important company-specific information to investors, thus impounding new information into stock prices quickly and efficiently.  The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period.  The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[4142]

3941.  In **Exhibit 3,** I review the analyst coverage of ~~DocGo~~Estée Lauder over the Class Period.  I identified a total of ~~102~~556 reports issued by analysts at ~~10~~38 separate firms during that period.[42 43] The list of analyst reports that I was able to identify includes reports by firms such as ~~Canaccord Genuity, Deutsche Bank, and Cantor Fitzgerald~~Evercore, Wells Fargo, RBC, J.P. Morgan, and Piper Sandler, among others.  Collectively, this is a significant degree of

---

[4142] *Cammer*, 711 F. Supp. at 1286.

[4243] I obtained a list of analyst reports from Investext. These statistics represent a lower bound of the analyst coverage of ~~DocGo~~Estée Lauder because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

analyst coverage which served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

4042.   Empirically, this degree of analyst coverage is greater than that of most other publicly traded firms as documented by academic research.  For example, the MRK Study noted that 19% of U.S. firms covered by the Institutional Brokers' Estimate System ("I/B/E/S") received no analyst coverage in a given year. [4344] Charles M.C.  Lee and Eric So documented that, on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[44][45] Barber et al. found that coverage by one or two analysts strengthened the presumption of market efficiency.[45] [46] Moreover, DocGo'sEstée Lauder's high level of analyst coverage also placed it above the 50th95th percentile when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[46][47] The significant analyst coverage of DocGoEstée Lauder during the Class Period supports the conclusion that DocGo'sEstée Lauder's Common Stock traded in an efficient market throughout the Class Period.

4143.   While the *Cammer* court specifically discussed analyst coverage as indicating wide dissemination of information about a given company, thus supporting market efficiency,

---

[4344] MRK Study at 668.

[4445] Charles M.C. Lee and Eric C. So, *Uncovering Expected Returns:  Information in Analyst Coverage Proxies*, Journal of Financial Economics 124, at 336 (see Table 1, Panel B – "COV") (2017).

[4546] Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks'EfficiencyStocks' Efficiency*, Journal of Corporate Law 19, at 302 and 310-311 (1994).

[4647] Bhole Study at 104 (50th95th percentile defined as 6.226.0 analysts). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

individual and institutional investors also had access to a variety of other sources of information about ~~DocGo~~Estée Lauder available during the Class Period.  For example, I conducted a search of press and news articles about ~~DocGo~~Estée Lauder using Factiva, a well-known provider of access to business news across a comprehensive set of publications.  This search identified ~~345~~2,155 unique articles published throughout the Class Period from leading news outlets, including *Dow Jones ~~Institutional News, The New York Times~~Newswires*, *Reuter's News*, *~~Times Union, and~~ Business Wire*, *and The Wall Street Journal* among others.[~~47~~48]

~~42~~44.  Moreover, ~~DocGo~~Estée Lauder produced numerous filings containing Company information that were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period.

~~43~~45.  As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about ~~DocGo~~Estée Lauder supports the conclusion that its Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

## C.  *Cammer* Factor 3:  Market Makers

~~44~~46.  The third *Cammer* factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[~~48~~49]  Market makers are present on major exchanges as well as over-the-counter markets.  In

---

[~~47~~ ~~515~~48] ~~3,607~~ English language articles were identified through a Factiva search, including ~~DocGo's~~Estée Lauder's company tag over all available sources. After excluding potential duplicates, ~~345~~2,155 unique news articles were identified by this search.

[~~48~~49] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[4950]

45 47.    In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[5051]

48.    The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

46.    DocGo 49.    Estée Lauder had at least 77 130 market makers and brokers facilitating the buying and selling of the Common Stock over the Class Period.[51 52] Further,

---

[4950] Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks'Efficiency Stocks' Efficiency*, Journal of Corporate Law 19, at 291 (1994).

[5051] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. Dec. 22, 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

[5152] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact . . . RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested,

~~DocGo's~~Estée Lauder's Common Stock traded on the ~~NASDAQ~~NYSE throughout the Class Period. Similar to other large, national exchanges, the ~~NASDAQ~~NYSE reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient.~~52~~ [53] The *Cammer* court stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.~~53~~[54]

~~47~~50. I understand that courts typically view large, established stock exchanges with market makers (such as the NYSE and NASDAQ) as being informationally efficient.[54] ~~DocGo's~~

---

so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow.").

[52] ~~See http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades).~~[53] The NYSE Market Model, *NYSE*, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry- specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery."

[53][54] *Cammer*, 711 F. Supp. at 1292.

[54] ~~See, e.g., Billhofer v. Flamel Techs., S.A., 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (citation omitted); In re Initial Pub. Offering Sec. Litig., 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency").~~

55 Estée Lauder's public listing on the ~~NASDAQ~~NYSE, a well-developed and established national exchange, thus satisfies this market maker *Cammer* factor.

~~48~~51.    Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading.~~55~~ 56 Academic research has similarly found that institutional investors can facilitate trading liquidity.  ~~DocGo's~~Estée Lauder's Common Stock was held by at least ~~268~~2,361 unique institutional investors during the Class Period, who owned an average of ~~50.5~~209.2 million shares, or ~~49.23~~90.2% of ~~DocGo's~~Estée Lauder's Common Stock outstanding.~~56~~57

~~49~~52.    In sum, ~~DocGo~~Estée Lauder easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for ~~DocGo's~~Estée Lauder's Common Stock throughout the Class Period.

---

55 *See, e.g., Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (citation omitted); *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency").

~~55~~56 *See, e.g.*, *In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of ~~market makers~~market- makers and arbitrageurs:  large investors, with more money at stake, may be more likely to inform themselves well before trading." (citations omitted)); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

~~56~~57 *See* **Exhibit 10**. By comparison, the MRK Study found that the MRK Previously Covered Companies had a median of only nine institutional investors while the MRK Covered Companies had a median of 40 institutional investors (p. 678 – Table 3).  ~~DocGo's~~Estée Lauder's institutional ownership base greatly exceeds both of these levels.

### D. *Cammer* Factor 4:  SEC Form S-3 Filing Eligibility

5053.  The fourth *Cammer* factor is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, ***such ineligibility was only because of timing factors*** rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met.  Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[5758]

5154.  Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information.  This eligibility includes the following requirements:  the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has a float of at least $75 million, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[5859]  The logic and intuition behind this factor, as discussed by the *Cammer* court, is that investors in a company that makes timely financial filings with regulators will have ready and ample access to publicly available information about the issuer.

5255.  As shown in **Exhibit 8**, DocGo'sEstée Lauder's market capitalization averaged $870.4 million53.0 billion over the Class Period.  Moreover, **Exhibit 10** demonstrates significant public float of DocGo'sEstée Lauder's public shares available for trading, with the number of shares held by investors other than insiders averaging 96.9233.8 million over the Class Period.  Multiplying these shares by DocGo'sEstée Lauder's closing stock price on each quarter-end date

---

[5758] *Cammer*, 711 F. Supp. at 1287 (emphasis added).

[5859] *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf.

indicates that the value of ~~DocGo's~~Estée Lauder's public float ranged from $~~554.6 million~~33.9 billion to $~~960.2 million~~63.6 billion during the Class Period, with an average of $~~763.1 million~~50.4 billion.   Thus, at all times during the Class Period, the value of ~~DocGo's~~Estée Lauder's public float far exceeded the S-3's minimum eligibility requirement of $75 million.

~~53.~~    ~~DocGo~~56.    Estée Lauder also regularly filed financial reports with the SEC throughout the Class Period.  The financial information in ~~DocGo's~~Estée Lauder's SEC filings, supplemented by information conveyed by research analysts and news coverage, provided investors with access to financial information about ~~DocGo~~Estée Lauder on a continuous basis throughout the Class Period.  Based on my research, ~~DocGo~~Estée Lauder made required filings with the SEC in a timely manner and satisfied the other Form S-3 requirements throughout the Class Period.   As a result, this factor is consistent with the efficiency of the market for ~~DocGo~~Estée Lauder Common Stock throughout the Class Period.

**E.   *Cammer* Factor 5:   Cause and Effect Relationship Between Company Information and Stock Prices**

~~54~~57.   The fifth Cammer factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information.  The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[~~59~~60]

~~55~~58.  Below, I summarize my empirical analysis, which finds that ~~DocGo's~~Estée Lauder's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*.  As part of my analysis, I compared the behavior of ~~DocGo's~~Estée Lauder's Common Stock on days when

---

[~~59~~60] *Cammer*, 711 F. Supp. at 1291.

potential value-relevant news was issued via earnings releases with its behavior on days when no such news was issued.  This analysis demonstrates that DocGo'sEstée Lauder's Common Stock price reacted to company-specific news, and thus further supports the conclusion that DocGo'sEstée Lauder's Common Stock traded in an efficient market throughout the Classperiod from February 3, 2022 to November 1, 2023, inclusive (the "Analysis Period").[61]

> i.    *Event Study Methodology*

5659.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study.

5760.    Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.60[62] As Professor Eugene F. Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns.  When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration.  As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance.  The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions.  This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information.  More important, the research uncovers empirical regularities, many

---

[61] The Analysis Period extends one trading day beyond the Class Period to capture the market reaction to the Company's first quarter 2024 earnings, which were announced on the final day of the Class Period.

60[62] *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 13 (1997).

surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[6163]

61. To determine whether ~~DocGo's~~Estée Lauder's Common Stock price movements on any given date were statistically significant, I performed an event study using generally accepted econometric methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

62. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to ~~company- specific~~company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (*i.e.*, the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the company's stock price return such that simple random movement can be rejected as the cause.

63. I applied these widely used and generally accepted econometric methodologies to perform my event study here. Specifically, in order to isolate the impact of company-specific news on ~~DocGo's~~Estée Lauder's Common Stock price during the ~~Class~~Analysis Period, I performed regression analyses to measure the relationship between ~~DocGo's~~Estée Lauder's Common Stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact

---

[6163] Eugene F. Fama, *Efficient Capital Markets: II*, Journal of Finance 46, at 1607 (1991).

stocks in ~~DocGo's~~Estée Lauder's industry.  By modeling how ~~DocGo's~~Estée Lauder's Common Stock price returns moved relative to an overall market index and an industry index, I was also able to measure the response of ~~DocGo's~~Estée Lauder's Common Stock to announcements of company-specific news.

~~61~~64.   I conducted my regression analysis over the ~~Class~~Analysis Period.  For each trading day, I constructed a regression model using data from the prior 120 trading days (*i.e.*, six calendar months) of trading days (the "Estimation Window").[~~62~~64]

~~62~~65.   To study the relationship between ~~DocGo's~~Estée Lauder's Common Stock price returns and overall market factors, I used the ~~NASDAQ Composite Total Return~~S&P 500 Index (the "Market Index").  To study the relationship between ~~DocGo's~~Estée Lauder's Common Stock price returns and changes in industry-wide factors that would be expected to impact all stocks in ~~DocGo's~~Estée Lauder's particular industry, I used the S&P 500 ~~Healthcare Sector~~Consumer Staples Index (the "Industry Index").[~~63~~65]

---

[~~62~~64] I utilized an Estimation Window of 120 trading days, which equates to approximately six calendar months. This allowed my regression approach to adapt to the changing volatility of stock returns over time. *See, e.g.*, Mark L. Mitchell and Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases:  Applications at the Securities and Exchange Commission*, The Business Lawyer 49 (1994); A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 35, at 15 (1997) ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates."). The Estimation Windows exclude the alleged revelations of the relevant truth dates~~,~~ and the News Days identified in **Exhibit 6**~~, and DocGo's earnings releases~~.

[~~63~~65] The index includes various ~~healthcare companies such as Johnson & Johnson, Pfizer Inc., UnitedHealth Group Inc., and Abbott Laboratories~~companies classified as members of the GICS consumer staples sector such as The Proctor & Gamble Company, Walmart Inc., The Coca-Cola Company, and Costco Wholesale Corporation, among others. The index had ~~between 63 and 65~~32 members ~~throughout~~at the start of the Analysis Period and 38 members at the end of the Class Period, and Estée Lauder was a member of the index. I removed the impact of Estée Lauder's returns from the daily returns on the index.

26

66. I established the relationship between the daily return of ~~DocGo's~~Estée Lauder's Common Stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[66] As shown in **Exhibit 4**, the event study models revealed an evolving relation between the daily returns of ~~DocGo's~~Estée Lauder's Common Stock and those of the overall stock Market and Industry Indices throughout the ~~Class~~Analysis Period.  In other words, movements of the Market Index and the Industry Index help explain movements in ~~DocGo's~~Estée Lauder's Common Stock price.

67. Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of ~~DocGo's~~Estée Lauder's Common Stock on any given date within the ~~Class~~Analysis Period that controlled for that day's market and industry returns.  Again, in accordance with standard ~~event study~~event-study methodology, I then subtracted this predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

68. Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in ~~DocGo's~~Estée Lauder's Common Stock price return.  An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model.  In other words, the standard deviation of errors provides a metric for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of ~~DocGo's~~Estée Lauder's Common

---

[66] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 35 (1997); Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, *Good News, Bad News, Volatility, and Betas*, Journal of Finance 50, at 1597 (1995).

Stock after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the ~~Class~~Analysis Period.

      ii.    *Cause and Effect Analysis Comparing ~~DocGo's~~Estée Lauder's Common Stock Price Behavior on News Days versus No News Days*

~~66~~69. A generally accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on days when potential value-relevant ~~company- specific~~company-specific news is disclosed ("news days") with its behavior on other days with relatively little or no such news.~~65~~[67] A showing that a security's price is statistically significantly more volatile on "news days" than on "no news days" is considered powerful evidence that the security responds promptly to news and, therefore, strongly supports a finding of efficiency.~~66~~[68]

~~67~~70. Importantly, research has shown that in an efficient market, it is possible for a security to exhibit some large price movements despite the absence of news and, conversely, for one to observe news without large price movements.~~67~~[69] For instance, a company may announce earnings (or a lack thereof) that are in line with investor expectations – and while such an expected announcement is clearly important to investors, it may not elicit a statistically

---

[67] Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

[68] *Id.*

[69] *See* Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, *Information, Trading, and Volatility: Evidence from Firm-Specific News*, Review of Financial Studies 32, at 1004 (2019); Ray Fair, *Events That Shook the Market*, Journal of Business 75, at 713, 714 (2002).

significant stock price movement.  Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again could result in no statistically significant price movement.  Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level.

6871.  Accordingly, a generally accepted, peer-reviewed methodology also accepted by numerous courts is to compare (i) a subject company's stock price behavior on a *group* of "news days" to (ii) its stock price behavior on a *group* of "no news days."[6870]

6972.  Here, I performed such an analysis comparing the behavior of DocGo'sEstée Lauder's Common Stock on news days versus no news days.  My analysis demonstrates that the price of DocGo'sEstée Lauder's Common Stock was statistically significantly more volatile on news days than on no news days.  This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in stock price" for DocGo'sEstée Lauder's Common Stock during the Class Period and, thus, further supports a finding of market efficiency.[6971]

7073.  To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I identified dates on which there were any

---

[6870] Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements:  The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021). This approach has been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See, e.g.*, *In re Teva Securities Litigation*, 2021 WL 872156, at *21 (D.Conn. 2021); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F.Supp.3d 415, 429 (S.D.N.Y. 2014); *In re:  Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 311-12 (D. Md. 2022); *Bond v. Clover Health Invs., Corp.*, 2023 WL 1999859, at *22 (M.D. Tenn. Feb. 14, 2023); *In re:  QuantumScape Sec. Class Action Litig.*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

[6971] *Cammer*, 711 F. Supp. at 1291.

~~news articles available on Factiva tagged with DocGo or on which DocGo submitted a filing to the SEC~~Estée Lauder's quarterly earnings releases during the Analysis Period (the "News Days"). [72] These types of announcements represent a potential opportunity for the public release of new value-relevant Company information to investors.  As shown in **Exhibit 6**, in total, ~~there were 170 days~~Estée Lauder issued eight earnings releases during the ~~Class Period on which an article relating to DocGo was published.[70]~~Analysis Period.[73]

~~71~~74.   I then compared the stock returns and trading volume of ~~DocGo's~~Estée Lauder's Common Stock on these News Days versus those metrics on trading days that contained the least news during the ~~Class~~Analysis Period (the "No News Trading Days").  I identified No News Trading Days as days on which there were no News Day events, no alleged revelations of the relevant truth, ~~and~~ no SEC filings, and no Dow Jones articles on Factiva tagged to Estée Lauder. The No News Trading Days provide a benchmark measurement of days on which relatively little or no new ~~DocGo-specific~~Estée Lauder- specific information was provided to the market.  If ~~DocGo's~~Estée Lauder's Common Stock prices tend to move more significantly on News Days than on No News Trading Days, this would support a conclusion of market efficiency.  As discussed below, there were ~~177~~240 No News Trading Days during the ~~Class~~Analysis Period.[71][74]

---

[72] If the release was issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day.

[70] If a headline or filing was published after the close of the market, the relevant headline day is appropriately deemed to have occurred on the next trading day.

[73] The last earnings release was after market close on October 31, 2023, the last day of the Class Period. Estée Lauder's common stock responded to this earnings announcement on November 1, 2023, the first day following the end of the class period.

[71][74] The ~~170~~eight News Days and ~~177~~240 No News Trading Days combined cover ~~100~~56% of the trading days (~~347~~248 of ~~347~~439) in the ~~Class~~Analysis Period.

7275.    **Exhibit 6** reports the list of ~~170~~eight News Days.  It also reports the results of my event study using ~~DocGo's~~Estée Lauder's Common Stock returns.  The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study~~,~~ and the p-value corresponding to statistical significance.  Overall, ~~19 out of 170 DocGo~~six out of eight Estée Lauder earnings releases—*i.e.*  News Days—observed stock price movements that were statistically significant at the 95% confidence level or above.  I compare this rate with that on the No News Trading Days in **Exhibit 7**.

7376.    **Exhibit 7** summarizes the statistical comparison of ~~DocGo's~~Estée Lauder's Common Stock returns and trading volume on the ~~170~~eight News Days versus these metrics as measured on the ~~177~~240 No News Trading Days.  As shown in **Exhibit 7**, ~~11.18~~75% of the News Day disclosures caused stock movements that were statistically significant at the 95% level.  This compares to ~~3.39~~6.25% of the No News Trading Days with statistically significant stock price movements.  The difference between these two percentages is statistically significant at a level of greater than 99%.[7275]

7477.    These results provide strong evidence of a cause-and-effect relationship between new information and ~~DocGo's~~Estée Lauder's Common Stock price movements.  Moreover, relative to the No News Trading Days, the News Days had a higher average absolute abnormal return and greater trading volume, with these differences being statistically significant at a level greater than ~~99~~95%.[7376]

7578.    In summary, relative to No News Trading Days, ~~DocGo's~~Estée Lauder's News Days resulted in a greater proportion of statistically significant stock price movements at the

---

[7275] Based on a Fisher's Exact Test.

[7376] Based on a t-test for difference of means.

9995% confidence level, higher absolute abnormal returns, and greater trading volumes, and these differences are all statistically significant.  These results establish a clear cause-and-effect relationship between the release of new company-specific information and ~~DocGo's~~Estée Lauder's Common Stock price movements.  As a result, this analysis of *Cammer* factor five supports the conclusion that ~~DocGo's~~Estée Lauder's Common Stock traded in an efficient market during the Analysis Period, and therefore the Class Period.

### F. *Krogman* Factor 1:  Market Capitalization

~~76~~79.   I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization.  The *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[~~74~~77]

~~77~~80.   Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors – such as relatively small market capitalization – that indicate that their shares trade in less developed and efficient markets.  The median market capitalization of the MRK Previously Covered Companies – those that eventually lost all analyst coverage – was $27.91 million.[~~75~~78]  By contrast, the MRK Covered Companies – those with analyst-coverage – had a median market capitalization of $243.97 million.[~~76~~ 79]  This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

---

[~~74~~77] *Krogman*, 202 F.R.D. at 478.

[~~75~~78] MRK Study at 678 (Table 3).

[~~76~~ *Ibid*79] MRK Study at 678 (Table 3).

7881.   **Exhibit 8** reports ~~DocGo's~~Estée Lauder's market capitalization throughout the Class Period.~~77~~ [80] This market capitalization averaged $~~870.4 million~~53.0 billion over the Class Period.  ~~DocGo's~~Estée Lauder's total market capitalization places it above the ~~50th~~95th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.~~78DocGo's~~ [81] Estée Lauder's market capitalization also exceeded the median MRK Previously Covered Companies and MRK Covered Companies on an inflation- adjusted basis.~~79~~82

~~79.~~   ~~DocGo's~~82.   Estée Lauder's market capitalization, shares outstanding available for trading, and its sizeable float, as discussed below, are consistent with the conclusion that the Common Stock traded in an efficient market during the Class Period.

## G. *Krogman* Factor 2:  Bid-Ask Spread

~~80~~83.   The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency:  "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."~~80~~83

~~81~~84.   The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid).  This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example, relative to the bid-ask midpoint.  A narrow bid-ask spread indicates

---

~~77~~80 Source:  Bloomberg.

~~78~~ ~~Bhole Study at 107 (50th percentile of market capitalization defined as $781 million).  I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.~~

[81] Bhole Study at 107 (95th percentile of market capitalization defined as $28.8 billion). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

~~79~~82   U.S.   Bureau   of   Labor   Statistics,   CPI   Inflation   Calculator,   available   at https://www.bls.gov/data/inflation_calculator.htm.

~~80~~83 *Krogman*, 202 F.R.D. at 478.

lower transaction costs to trade in a given stock and is indicative of a more informationally efficient market.  A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

~~82~~85.   I analyzed the bid-ask spread of ~~DocGo's~~Estée Lauder's Common Stock during the Class Period.  **Exhibit 9** reports ~~DocGo's~~Estée Lauder's bid-ask spread as a percentage of the bid-ask midpoint.~~81~~[84] This spread averaged ~~0.17~~0.02% over the Class Period.

~~83~~86.   By way of comparison, the MRK Study found that the MRK Previously Covered Companies had a median bid-ask spread of 4.55%, while the MRK Covered Companies had a median bid-ask spread of 1.69%.~~[82]DocGo's~~ [85] Estée Lauder's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade ~~DocGo's~~Estée Lauder's Common Stock at very low relative cost.  Additionally, ~~DocGo's~~Estée Lauder's average bid-ask spread over the Class Period places it ~~below the 75th percentile~~in line with the 5th and 10th percentiles of all companies listed on the NASDAQ and the NYSE from 2016-2018 (lower percentile rankings correspond to smaller bid-ask spreads).~~[83]~~[86]

~~84~~87.   As a result, ~~DocGo's~~Estée Lauder's bid-ask spread also supports the conclusion that ~~DocGo's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

---

~~[81]~~[84] Source:  Bloomberg.

~~[82] MRK Study at 678 (Table 3).~~

[85] MRK Study at 678 (Table 3).

~~[83]~~[86] Bhole Study at 105 (~~75th percentile~~5th and 10th percentiles of bid-ask spread are both defined as ~~0.75~~0.02%). I note that the ~~20162018~~2016-2018 subsample time period is the most recent period reported in the Bhole Study.

## H. *Krogman* Factor 3:  Public Float

85~~88~~.    The *Krogman* court also considered the public float of a company in weighing market efficiency.[84][87]

86~~89~~.    The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders.  Even if a company has a large market capitalization, if the majority of the equity is held by its C-suite employees and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

87~~90~~.    **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for ~~DocGo's~~Estée Lauder's Common Stock during the Class Period.  During the Class Period, ~~DocGo's~~Estée Lauder's had between ~~101~~231 million and ~~104~~233 million shares of Common Stock outstanding.  As shown in the exhibit, ~~DocGo's~~Estée Lauder's insiders held ~~13.68~~0.53% of the Common Stock during the Class Period, meaning that over ~~85~~99% of ~~DocGo's~~Estée Lauder's Common Stock was held by non-insiders.  This equates to an average public float of $~~763.1 million~~50.4 billion during the Class Period.  Overall, between ~~89~~232 million and ~~104~~235 million shares of ~~DocGo~~Estée Lauder Common Stock were available for trading in the public float during the Class Period.~~85~~ [88]  Moreover, ~~DocGo's~~Estée Lauder's public float greatly exceeded the $75 million minimum set by the SEC for S-3 filing eligibility.[86][89]

---

[84][87] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

[85][88] Given the statistics demonstrating over ~~100~~230 million shares outstanding, significant public float, sizeable ownership by over ~~200~~2,300 unique institutions, and millions of shares traded weekly throughout the Class Period, ~~DocGo's~~Estée Lauder's Common Stock ownership was numerous and was likely held and traded by thousands of individual investors.

[86][89] *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf.

8891.   The large public float of ~~DocGo's~~Estée Lauder's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.

### I.   Additional Factor:  Institutional Ownership

8992.   I also analyze an additional indicator of market efficiency:   the presence of institutional investors.~~87~~[90] Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions.  These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, causing the new information to be quickly impounded into stock prices.  Thus, the presence of institutional shareholders can be an indicator of market efficiency.

9093.   I report the total institutional ownership of ~~DocGo~~Estée Lauder Common Stock in **Exhibit 10,** which shows that at least ~~268~~2,361 institutions held the stock at some point during the Class Period.  By comparison, the MRK Study found that the MRK Previously Covered Companies had a median of only 9 institutional investors while the MRK Covered Companies had a median of 40 institutional investors.~~88DocGo's~~[91] Estée Lauder's institutional ownership base greatly exceeds both of these levels.  On average, institutional investors held ~~49.24~~90.2% of ~~DocGo's~~Estée Lauder's Common Stock outstanding during the Class Period.  This level placed it ~~between~~above the ~~25th and 50th~~75th percentile of NYSE and NASDAQ traded companies.[89]

---

[87][90] *See, e.g.*, *In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

[88] ~~MRK Study at 678 (Table 3).~~

[91] MRK Study at 678 (Table 3).

[92] ~~91.~~  Thus, the significant institutional ownership base for ~~DocGo's~~Estée Lauder's Common Stock supports the conclusion that ~~DocGo~~Estée Lauder traded in an efficient market throughout the Class Period.

## VI.    Ability to Calculate Damages on a Class-Wide Basis

~~92~~94.  I have also been asked to opine on whether per-share damages for traders of ~~DocGo's~~Estée Lauder's Common Stock can be assessed for all Class members based upon a methodology common to all Class members and consistent with ~~Plaintiff's~~Plaintiffs' theory of liability.  As discussed below, damages for each of ~~Plaintiff's~~Plaintiffs' claims can be calculated on a class-wide basis through a common methodology, the out-of-pocket damages methodology, which is also consistent with ~~Plaintiff's~~Plaintiffs' liability theory.

### A.  Calculation of Damages for Violation of §§ 10(b) and 20(a) of the Exchange Act

~~93~~95.  The Complaint alleges that, as a result of Defendant's materially misleading statements, omissions, and undisclosed risks, investors traded ~~DocGo's~~Estée Lauder's Common Stock at artificially inflated prices during the Class Period.[90]~~Plaintiff~~ [93] Plaintiffs also claim certain defendants are liable as control persons under § 20(a).[91][94]

---

[89] ~~Bhole Study, at 106:  25th percentile defined as institutional ownership of 33.58% of shares outstanding; 50th percentile defined as 68.26%.  I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.~~

[92] Bhole Study, at 106:  75th percentile defined as 88.89%. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[90] ~~Complaint, ¶¶ 147, 198-207, 250.~~

[93] Complaint, ¶¶ 129, 173-180, 272, 284, 288, 291.

[91][94] *Id,* ¶¶ ~~21-23, 124-127~~51-53, 130, 143, 288, 291. § 20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. See 15 U.S.C. § 78t(a). Given § 20(a)'s derivative nature, ~~Plaintiff has~~Plaintiffs have instructed me to assume that § 20(a) damages can be calculated using the same methodologies for assessing § 10(b) damages.

94 96.   The "out-of-pocket" method of calculating damages represents a standard and well- accepted methodology under § 10(b) of the Exchange Act.   This approach calculates investor damages formulaically as the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale.   If shares are not sold prior to the full revelation of the fraud, then the Private Securities Litigation Reform Act of 1995 caps these investors' damages at the difference between the purchase price for the security and the "mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 92 95 This cap on damages is also applied class-wide.

95 97.   The claims process produces information necessary for the calculation of damages for each Class member as inputs to the formula above, including the purchase and sale information for each Class member's trades (including transaction dates and quantity of shares traded).   This information is available from brokerage statements, trade blotters, and/or other documentation of securities transactions.

96 98.   Another input to the above formula, the quantification of an artificial inflation ribbon per share, is based upon a detailed loss causation analysis.   I have not been asked to perform a loss causation analysis at this time, and such analysis often incorporates information produced during discovery.   Nonetheless, the method employed to eventually calculate artificial inflation can be applied Class-wide as an input to the out-of-pocket formula.   For example, event studies are also widely employed to calculate artificial inflation.   Event studies measure stock price reactions to corrective disclosures and materializations of the risks which revealed the

---

92 95 15 U.S.C. § 78u-4(e)(1).

38

relevant truth that was concealed by alleged fraudulent misrepresentations, and do not rely on individual class member- specific information.[93][96]

[97][99]. Separately, valuation models can also be relied upon to estimate artificial inflation. For example, the widely-used discounted cash flow analysis ("DCF") valuation approach estimates changes to firm value based on changes in future expected cash flows. As Fama and French explain: "A stock's price can always be expressed as the present value of expected future cash flows discounted at the expected return on the stock."[94][97] Discounting the changes in future expected cash flows resulting from alleged misrepresentations, omissions, and/or schemes to the net present value ("NPV") based on a firm's risk-adjusted discount rate can provide an alternative, reliable measure of artificial inflation as the input to the out-of-pocket damages methodology.[95][98] Such changes in valuation are also commonly measured through multiples analysis, in which a company's valuation is expressed as a multiple of financial performance, such as sales or earnings.[96][99]

[98][100]. To the extent that reliable evidence is introduced to show that a significant portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud-related factors, the impact of such "confounding information" on the price of DocGo'sEstée Lauder's Common Stock can be determined on a common,

---

[93][96] For purposes of this Report, I conducted an event study to assist with the evaluation of market efficiency. My event study in this Report was not intended to quantify artificial inflation.

[94][97] Eugene F. Fama and Kenneth R. French, *The Capital Asset Pricing Model: Theory and Evidence,* Journal of Economic Perspectives 18, at 41 (2004).

[95][98] *See, e.g.*, Frank Partnoy, *Market Prices vs. Fundamental Value: The Case for Using Discounted Cash Flow Analysis in Securities Class Actions,* The Business Lawyer 77, at 1060-1063 (2022).

[96][99] Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, John Wiley & Sons, Inc. (Hoboken), at p. 11 (2009).

Class-wide basis using various accepted methodologies, such as event study analysis, valuation analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances present in the case.

99101. A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period. That analysis and determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery. Regardless of how artificial inflation is quantified, the level of artificial inflation remains the same across all Class members at any given point in time.

100102.    One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per-share inflation equaled a constant dollar amount above the correct share price over the Class Period. This input to the out-of-pocket damages formula often calculates artificial inflation based upon the abnormal dollar value of a stock price decline utilizing an event study conducted around one or more corrective disclosures.

101103.    Alternatively, one can measure "constant percentage inflation," which assumes that each day's share price was inflated by a constant percentage amount above the correct stock price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal percentage return in the stock price as calculated through an event study around one or more corrective disclosures.

102104.    In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of

40

these approaches, the calculations of artificial inflation and any potential disaggregation of confounding information are based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.[97]

~~103~~105.       All of these loss causation calculations can be performed on a Class-wide basis and are not dependent upon individual Class member identities or circumstances.  This is because, as noted above, the level of artificial inflation remains the same across all Class members at any given point in time, regardless of how it is calculated.

**B. Damages Methodology is Flexible and can Incorporate Alternative Findings**

~~104~~106.       The damages methodology I have laid out above is flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period.  The methodology can be modified based on the specific findings the finder of fact may make, including, but not limited to:  (1) the presence and degree of confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) when the first actionable fraudulent conduct or misstatement occurred.

~~105~~107.       First, irrespective of what the jury ultimately determines is the appropriate amount of abnormal return that can be attributed to the release of corrective versus confounding information, that percentage can easily be inserted into the standard out-of-pocket damages

---

[97] ~~For example, the September 10, 2023 corrective event allegedly revealed that DocGo's statements about Medicaid sign-ups were false, but also that DocGo's contract with the CBP was worth less than half of the previously reported $4 billion value.  Because this latter disclosure pertains to an allegation that I understand is no longer actionable per the MTD Opinion, I could rely on the techniques described above to disaggregate the valuation impact of confounding information on this date, if any.~~

41

model that I have described above.  Thus, regardless of whether a jury finds that the analysis I may conduct results in the most appropriate inflation figure, or they determine that based upon the evidence, a different amount is more appropriate, that finding can and will be an input into the formulaic out- of-pocket damages calculation.

106108.    Second, should the jury determine that the true economic inflation in DocGo'sEstée Lauder's Common Stock price evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a Class-wide basis.

107109.    Third, should the jury decide that the first actionable misstatement or otherwise actionable fraudulent conduct happened at an alternative date other than the current start of the Class Period, this is easily accounted for in an out-of-pocket damages calculation. Prior to such date, inflation in the stock price could simply be set to zero.

108110.    Additionally, if the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

109111.    To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record.  Based on my experience and qualifications and my understanding of the nature of the claims in this matter, however, I conclude that DocGo'sEstée Lauder's Common Stock damages in this case can be calculated using a standard and well-established methodology applied on a Class-wide basis.

## VII.    Conclusion

110112.    Based on my analyses of the market efficiency factors considered by courts, economists, and in academia, it is my opinion that DocGo'sEstée Lauder's Common

Stock traded in an efficient market throughout the Class Period.  Moreover, it is my opinion that Common Stock damages in this matter under §§ 10(b) and 20(a) can be calculated on a class-wide basis utilizing common methodologies.

Respectfully Submitted,

_____

Matthew D. Cain

**Appendix A**

| | |
|---|---|
| **Matthew D. Cain, Ph.D.** | July 2025 |

E-mail:  mdcain@outlook.com
Mobile:  574-485-8065

## Education

| | |
|---|---|
| Ph.D., Finance, August 2007 | Purdue University, West Lafayette, IN |
| B.S., Finance, May 2001 | Grove City College, Grove City, PA |

## Professional and Academic Experience

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process:  Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity:  The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison:  Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made:  The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game:  The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises:  Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks:  Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92- 128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts:  A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

## Presentations

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity:  The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania; Napa
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School

- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management*, *Journal of Empirical Legal Studies*, *Financial Management*, *North American Journal of Economics and Finance*, *International Review of Law & Economics*, *Managerial and Decision Economics*, *Annals of Finance*, *Journal of Economics and Business*

## Teaching Experience

UC Berkeley School of Law
   LAW 246.31:  Economic Expert Witnesses:  Depositions and Testimony, Spring 2022-2025
   LAW 251.52:  Economics of Corporate and Securities Litigation, Fall:  2020-2023

University of Notre Dame, Mendoza College of Business
   FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall:  2008-2013
   FIN 40410:  Mergers and Acquisitions, Fall:  2008-2013

Purdue University, Krannert School of Management
   MGMT 412:  Financial Markets and Institutions, Spring:  2006 & 2008
   MGMT 610:  Financial Management I (MBA Core), Fall:  2007

## Expert Witness Experience

- *Genesee County Employees' Retirement System, et al., v. DocGo Inc., et al.*, Case No. 1:23-cv-09476 (S.D. N.Y.).  Report July 2025.

- *YVONNE DOLBEC c. BANK OF MONTREAL, et al*., Case No. 500-06-001335-245 (Province of Quebec, District of Montreal).  Report May 2025.

- *In re National Instruments Corporation Securities Litigation*, Case No. 1:23-cv-10488 (S.D. N.Y.).  Report May 2025.  Deposition June 2025.

- *MOUVEMENT D'ÉDUCATION ET DE DÉFENSE DES ACTIONNAIRES c. CAE INC., MARC PARENT, and SONYA BRANCO*, Case No. 500-06-001312-244, (Province of Quebec, District of Montreal).  Report April 2025.

- *In re StoneCo Ltd. Securities Litigation*, Case No. 1:21-cv-09620 (S.D. N.Y.).  Report April 2025.

- *In re UiPath, Inc. Securities Litigation*, Case No. 1:23-cv-07908 (S.D. N.Y.).  Report February 2025.

A-4

- *Ali Diabat, et al., v. Credit Suisse Group AG, et al.*, Case No. 1:23-cv-5874 (S.D. N.Y.). Report December 2024. Rebuttal Report January 2025.

- *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.*, Case No. 1:22-cv- 06339 (S.D. N.Y.). Report November 2024. Rebuttal Report February 2025.

- *Steven Leventhal, et al. v. Chegg, Inc., et al.*, Case No. 5:21-cv-09953 (N.D. Ca.). Declaration November 2024.

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024. Rebuttal Report October 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv- 01491 (S.D. N.Y.). Report June 2024. Declaration November 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21- cv-02770-WJM-SKC (D. Co.). Report May 2024. Rebuttal Report October 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024. Rebuttal Report October 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024. Rebuttal Report December 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024. Report February 2025.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

A-5

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023. Report December 2024. Deposition March 2025.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024. Rebuttal Report November 2024. Deposition January 2025.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re:  QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re:  2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21- 0002-2009 (Amer. Arb. Assoc.).  Report December 2021.  Arbitration March 2022.

- *In re:  Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.).  Report November 2021.  Deposition December 2021.  Report April 2023.  Rebuttal Report June 2023.  Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca).  Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.).  Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re:  Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv- 01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re:  Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021.

A-7

Deposition September 2021. Rebuttal Report March 2024. Report September 2024. Deposition November 2024. Rebuttal Report January 2025.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM- C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv- 00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020.  Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.).  Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.).  Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017.  Deposition May 2017.  Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.).  Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015.  Declaration October 2015.  Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

A-8

**Appendix B**

**Documents Considered**

**Court Documents:**

- Consolidated Amended Class Action Complaint for ~~Violations~~Violation of the Federal Securities Laws, dated March ~~20~~22, 2024, Case No. 1:23-cv-~~09476~~-10669-~~KPF~~AS (Doc. ~~43~~47).

- Opinion and Order, dated March ~~28~~31, 2025, Case No. 1:23-cv-~~09476~~-10669-~~KPF~~AS (Doc. ~~77~~58).

**Court Decisions and Securities Law:**

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012).

- *Bond v. Clover Health Invs., Corp.*, 2023 WL 1999859, at *22 (M.D. Tenn. Feb. 14, 2023).

- *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D.Ca. 2016).

- *In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009).

- *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009).

- *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008).

- *In re: QuantumScape Sec. Class Action Litig.*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

- *In re Teva Securities Litigation*, 2021 WL 872156, at *21 (D.Conn. 2021).

- *In re: Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 311-12 (D. Md. 2022).

- *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

- *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

- *McIntire v. China MediaExpress Holdings, Inc.*, 38 F.Supp.3d 415, 429 (S.D.N.Y. 2014).

- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

**Academic Literature:**

- Barber, Brad M., Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporate Law* 19, 285-312.

- Bhole, Bharat, Sunita Surana, and Frank Torchio, 2020, Benchmarking Market Efficiency Indicators for Securities Litigation, *University of Illinois Law Review Online*, 101-118.

- Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, Information, Trading, and Volatility:  Evidence from Firm-Specific News, *Review of Financial Studies* 32, 983-1018.

- Braun, Phillip A., Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50, 1575-1603.

- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, §8.6 (Aug. 1988).

- Fair, Ray C., 2002, Events That Shook the Market, *Journal of Business* 75, 713-731.

- Fama, Eugene F., 1970, Efficient Capital Markets:  A Review of Theory and Empirical Work, *The Journal of Finance* 25.2, 383-417.

- Fama, Eugene F., 1991, Efficient Capital Markets:  II, *Journal of Finance* 46, 1575-1617.

- Fama, Eugene F., and Kenneth R. French, 2004, The Capital Asset Pricing Model: Theory and Evidence, *Journal of Economic Perspectives* 18, 25-46.

- Lee, Charles M. C., and Eric C. So, 2017, Uncovering Expected Returns:  Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124, 331-351.

- MacKinlay, A. Craig, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, 13-39.

- Mitchell, Mark L., and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases:  Applications at the Securities and Exchange Commission, *The Business Lawyer* 49, 545-590.

- Mola, Simona, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *The Accounting Review* 88, 667-705.

- Partnoy, Frank, 2022, Market Prices vs. Fundamental Value:  The Case for Using Discounted Cash Flow Analysis in Securities Class Actions, *The Business Lawyer* 77, 1055-1082.

- Rosenbaum, Joshua, and Joshua Pearl, 2009, Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions, John Wiley & Sons, Inc. (Hoboken).

- Thomas, Randall S., and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63, 105-139.

- Villanueva, Miguel O., and Steven Feinstein, 2021, Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors, *Review of Quantitative Finance and Accounting* 57, 111-144.

**Data Sources:**

- Bloomberg Terminal.

- Dow Jones Factiva.

- Investext.

- S&P Capital IQ.

- SEC Edgar Online.

- DoeGoEstée Lauder Earnings Releases and SEC Filings.

**Other:**

- https://www.bls.gov/data/inflation_calculator.htm.

- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

- http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess.

- https://www.sec.gov/files/forms-3.pdf.

- All data and documents cited throughout this report.

**Exhibit 1**

<del>DocGo</del>**Estée Lauder** Common Stock Closing Price and Daily Trading Volume
<del>April 29</del>**February 3**, 2022 – <del>September 15</del>**October 31**, 2023



Data Source:  Bloomberg

**Exhibit 2**



**~~DocGo~~Estée Lauder Common Stock Weekly Volume**
**~~April 29~~February 3, 2022 – ~~September 15~~October 31, 2023**



Data ~~Sources~~Source:  Bloomberg~~, SEC Edgar~~

Note:  Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period.  The weekly trading volume for the week of ~~September 14~~October 27, 2023, has been scaled by a factor of 5/~~2~~3 as the final week of the Class Period contained only ~~2~~3 trading days.

**Exhibit 3**

**Analyst Coverage**
**~~April 29~~February 3, 2022 – ~~September 15~~October 31, 2023**

| Analyst Name | Reports Issued During the Class Period | Analyst Name | Reports Issued During the Class Period |
|---|---|---|---|
| EVERCORE ISI | 101 | ~~Canaccord Genuity~~Cowen and Company | ~~23~~8 |
| Wells Fargo Securities, LLC | 37 | ~~Northland Securities~~Sadif Analytics Prime | ~~21~~8 |
| BuySellSignals Research | 31 | ~~BuySellSignals Research~~Wright Reports | ~~19~~8 |
| RBC Capital Markets | 30 | ~~Needham & Company Inc.~~Argus Research Corporation | ~~14~~7 |
| Telsey Advisory Group | 30 | ~~Deutsche Bank~~Validea | ~~8~~7 |
| JPMorgan | 29 | ValuEngine, Inc | ~~6~~7 |
| Zacks Equity Research | 28 | Samsung Securities | 6 |
| Piper Sandler Companies | 26 | ~~Cantor Fitzgerald~~TD Cowen | 4 |
| Credit Suisse | 25 | ~~BTIG~~The Insight Partners | 3 |
| ~~Validea~~ | ~~3~~ | ~~3~~ | |
| Deutsche Bank | 23 | Hanwha Securities Co., Ltd. | 2 |
| Oppenheimer & Co., Inc. | 22 | EQUISIGHTS | 1 |
| CapitalCube | 18 | ~~CapitalCube~~JPMorgan Econ & FI | 1 |
| Canaccord Genuity | 17 | New Constructs, LLC | 1 |
| PriceTarget Research | 17 | NH Investment & Securities (Previously Woori Research) | 1 |
| D.A. Davidson & Company | 16 | Probes Reporter | 1 |
| Societe Generale | 11 | Sadif Analytics | 1 |
| Berenberg | 9 | The Business Research Company | 1 |
| Trefis | 9 | Trust Investment SAS | 1 |
| Baptista Research | 8 | Vermilion Technical Research | 1 |
| | | **Total** | **~~102~~556** |

Data Source: Investext

E-3

**Exhibit 4**

**Coefficients from Rolling Event Study Regressions**
**~~April 29~~February 3, 2022 – ~~September 15~~November 1, 2023**



Data Sources:  Bloomberg, S&P Capital IQ, SEC Edgar, ~~Factiva~~Complaint

Note:  Regression models described in notes below **Exhibit 7**.

**Exhibit 5**

**Root Mean Squared Error (RMSE) from Rolling Event Study Regressions**
**~~April 29~~February 3, 2022 – ~~September 15~~November 1, 2023**



Data Sources:  Bloomberg, S&P Capital IQ, SEC Edgar, ~~Factiva~~Complaint

Note:  Regression models described in notes below **Exhibit 7**.

~~E-5~~

**Exhibit 6**

DoeGo**Estée Lauder** **News Days and Common Stock Abnormal Returns**
April 29, 2022 – September 15, 2023

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | p-Value | Sig Level |
|---|---|---|---|---|---|---|
| [1] | Apr 29, 2022 | -1.40% | 5.01% | $0.36 | 0.218 | |
| [2] | May 02, 2022 | 1.14% | -2.09% | -$0.15 | 0.606 | |
| [3] | May 03, 2022 | -4.93% | -5.34% | -$0.38 | 0.190 | |
| [4] | May 05, 2022 | -4.04% | 3.89% | $0.27 | 0.339 | |
| [5] | May 06, 2022 | -3.76% | -1.55% | -$0.10 | 0.703 | |
| [6] | May 09, 2022 | -0.47% | 6.03% | $0.39 | 0.140 | |
| [7] | May 10, 2022 | -0.31% | -2.03% | -$0.13 | 0.618 | |
| [8] | May 11, 2022 | -17.64% | -12.40% | -$0.79 | 0.003 | *** |
| [9] | May 13, 2022 | 6.08% | -0.39% | -$0.02 | 0.924 | |
| [10] | May 16, 2022 | -5.56% | -3.45% | -$0.20 | 0.403 | |
| [11] | May 17, 2022 | 5.54% | 1.00% | $0.06 | 0.809 | |
| [12] | May 23, 2022 | 3.73% | 0.90% | $0.06 | 0.828 | |
| [13] | May 24, 2022 | 4.84% | 8.58% | $0.55 | 0.040 | ** |
| [14] | May 31, 2022 | 0.67% | 0.55% | $0.04 | 0.891 | |
| [15] | Jun 14, 2022 | 6.10% | 4.74% | $0.31 | 0.230 | |
| [16] | Jun 21, 2022 | -0.26% | -3.72% | -$0.29 | 0.344 | |
| [17] | Jun 23, 2022 | -2.09% | -4.23% | -$0.32 | 0.282 | |
| [18] | Jun 24, 2022 | -4.81% | -10.11% | -$0.76 | 0.011 | ** |
| [19] | Jun 27, 2022 | -2.10% | -1.09% | -$0.08 | 0.783 | |
| [20] | Jul 07, 2022 | -0.13% | -3.97% | -$0.31 | 0.300 | |
| [21] | Jul 22, 2022 | -3.35% | -1.10% | -$0.08 | 0.765 | |
| [22] | Jul 27, 2022 | 4.11% | -1.78% | -$0.13 | 0.630 | |
| [23] | Jul 28, 2022 | 0.13% | -1.64% | -$0.12 | 0.657 | |
| [24] | Aug 03, 2022 | 3.88% | 0.06% | $0.01 | 0.986 | |
| [25] | Aug 08, 2022 | 0.57% | 0.36% | $0.03 | 0.922 | |
| [26] | Aug 09, 2022 | 3.54% | 4.77% | $0.42 | 0.202 | |
| [27] | Aug 10, 2022 | 3.75% | -0.48% | -$0.04 | 0.898 | |

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | p-Value | Sig Level |
|---|---|---|---|---|---|---|
| [28] | Aug 11, 2022 | 3.61% | 3.95% | $0.37 | 0.289 | |
| [29] | Aug 15, 2022 | 0.20% | -1.04% | -$0.11 | 0.778 | |
| [30] | Aug 16, 2022 | 0.39% | 0.22% | $0.02 | 0.954 | |
| [31] | Aug 22, 2022 | 3.03% | 5.96% | $0.59 | 0.105 | |
| [32] | Aug 30, 2022 | 0.58% | 1.36% | $0.14 | 0.712 | |
| [33] | Sep 07, 2022 | 0.31% | -2.88% | -$0.28 | 0.428 | |
| [34] | Sep 13, 2022 | -1.61% | 3.70% | $0.37 | 0.298 | |
| [35] | Sep 14, 2022 | 3.07% | 1.74% | $0.17 | 0.624 | |
| [36] | Sep 19, 2022 | 0.62% | -0.78% | -$0.08 | 0.825 | |
| [37] | Sep 20, 2022 | -2.97% | -2.38% | -$0.23 | 0.497 | |
| [38] | Sep 28, 2022 | 5.63% | 2.86% | $0.28 | 0.422 | |
| [39] | Oct 04, 2022 | 8.59% | 4.41% | $0.44 | 0.215 | |
| [40] | Oct 11, 2022 | 3.84% | 4.61% | $0.49 | 0.188 | |
| [41] | Oct 20, 2022 | 0.91% | 0.87% | $0.10 | 0.802 | |
| [42] | Oct 26, 2022 | -2.68% | -0.78% | -$0.08 | 0.821 | |
| [43] | Oct 27, 2022 | -6.69% | -5.58% | -$0.57 | 0.108 | |
| [44] | Nov 01, 2022 | 3.03% | 3.48% | $0.34 | 0.314 | |
| [45] | Nov 02, 2022 | -6.96% | -4.29% | -$0.44 | 0.215 | |
| [46] | Nov 03, 2022 | -2.63% | -1.42% | -$0.13 | 0.681 | |
| [47] | Nov 07, 2022 | -4.27% | -5.30% | -$0.45 | 0.140 | |
| [48] | Nov 08, 2022 | -3.59% | -4.35% | -$0.35 | 0.225 | |
| [49] | Nov 09, 2022 | -5.78% | -3.90% | -$0.30 | 0.276 | |
| [50] | Nov 10, 2022 | 5.99% | -1.07% | -$0.08 | 0.764 | |
| [51] | Nov 11, 2022 | 2.96% | 0.64% | $0.05 | 0.857 | |
| [52] | Nov 14, 2022 | 6.37% | 7.08% | $0.57 | 0.049 | ** |
| [53] | Nov 15, 2022 | -3.40% | -5.15% | -$0.44 | 0.151 | |
| [54] | Nov 17, 2022 | -7.28% | -7.26% | -$0.56 | 0.046 | ** |
| [55] | Nov 22, 2022 | 1.96% | 0.95% | $0.06 | 0.763 | |
| [56] | Nov 23, 2022 | 0.00% | -0.83% | -$0.06 | 0.794 | |
| [57] | Dec 02, 2022 | 1.25% | 1.41% | $0.10 | 0.649 | |
| [58] | Dec 06, 2022 | -4.68% | -3.16% | -$0.22 | 0.313 | |
| [59] | Dec 07, 2022 | 3.83% | 4.54% | $0.30 | 0.147 | |

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | p-Value | Sig Level |
|---|---|---|---|---|---|---|
| [60] | Dec 19, 2022 | -3.60% | -2.52% | -$0.17 | 0.406 | |
| [61] | Dec 20, 2022 | -4.19% | -4.20% | -$0.28 | 0.167 | |
| [62] | Dec 23, 2022 | 0.73% | 0.50% | $0.03 | 0.872 | |
| [63] | Dec 29, 2022 | 4.76% | 2.84% | $0.18 | 0.362 | |
| [64] | Dec 30, 2022 | 3.67% | 3.69% | $0.25 | 0.237 | |
| [65] | Jan 03, 2023 | 4.53% | 5.05% | $0.36 | 0.107 | |
| [66] | Jan 04, 2023 | -2.98% | -3.52% | -$0.26 | 0.259 | |
| [67] | Jan 09, 2023 | 0.69% | -0.09% | -$0.01 | 0.976 | |
| [68] | Jan 10, 2023 | 0.14% | -0.59% | -$0.04 | 0.849 | |
| [69] | Jan 12, 2023 | 6.78% | 6.18% | $0.45 | 0.049 | ** |
| [70] | Jan 13, 2023 | 7.51% | 6.98% | $0.54 | 0.026 | ** |
| [71] | Jan 17, 2023 | 0.36% | 0.13% | $0.01 | 0.966 | |
| [72] | Jan 23, 2023 | 4.97% | 3.08% | $0.28 | 0.321 | |
| [73] | Jan 24, 2023 | -2.11% | -2.23% | -$0.21 | 0.472 | |
| [74] | Jan 25, 2023 | 2.04% | 2.03% | $0.19 | 0.512 | |
| [75] | Jan 27, 2023 | 0.61% | -0.74% | -$0.07 | 0.811 | |
| [76] | Feb 01, 2023 | -0.10% | -2.08% | -$0.21 | 0.495 | |
| [77] | Feb 03, 2023 | -0.20% | 0.93% | $0.09 | 0.761 | |
| [78] | Feb 06, 2023 | -1.88% | -1.50% | -$0.15 | 0.624 | |
| [79] | Feb 07, 2023 | -1.11% | -2.82% | -$0.28 | 0.358 | |
| [80] | Feb 14, 2023 | 0.11% | -0.98% | -$0.09 | 0.745 | |
| [81] | Feb 21, 2023 | 0.00% | 1.56% | $0.14 | 0.589 | |
| [82] | Feb 22, 2023 | -1.41% | -1.83% | -$0.17 | 0.524 | |
| [83] | Feb 27, 2023 | 0.99% | 0.15% | $0.01 | 0.960 | |
| [84] | Feb 28, 2023 | 0.00% | -0.39% | -$0.04 | 0.893 | |
| [85] | Mar 07, 2023 | -1.10% | -0.84% | -$0.08 | 0.767 | |
| [86] | Mar 10, 2023 | -2.40% | -1.21% | -$0.11 | 0.658 | |
| [87] | Mar 13, 2023 | 1.75% | 1.75% | $0.15 | 0.520 | |
| [88] | Mar 14, 2023 | -3.22% | -4.71% | -$0.41 | 0.085 | * |
| [89] | Mar 15, 2023 | -1.90% | -2.03% | -$0.17 | 0.456 | |
| [90] | Mar 21, 2023 | 4.31% | 3.24% | $0.26 | 0.228 | |
| [91] | Mar 23, 2023 | 3.80% | 2.84% | $0.24 | 0.290 | |

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | p-Value | Sig Level |
|---|---|---|---|---|---|---|
| [92] | Mar 28, 2023 | 3.27% | 3.40% | $0.28 | 0.198 | |
| [93] | Mar 29, 2023 | 0.23% | -1.07% | -$0.09 | 0.686 | |
| [94] | Mar 31, 2023 | 0.70% | -0.02% | $0.00 | 0.993 | |
| [95] | Apr 04, 2023 | -3.14% | -2.64% | -$0.23 | 0.313 | |
| [96] | Apr 05, 2023 | -2.76% | -0.97% | -$0.08 | 0.710 | |
| [97] | Apr 10, 2023 | 1.98% | 2.02% | $0.16 | 0.426 | |
| [98] | Apr 14, 2023 | -7.74% | -7.77% | -$0.65 | 0.002 | *** |
| [99] | Apr 17, 2023 | 2.19% | 1.94% | $0.15 | 0.441 | |
| [100] | Apr 20, 2023 | -0.75% | -0.16% | -$0.01 | 0.948 | |
| [101] | Apr 21, 2023 | 8.10% | 8.41% | $0.66 | 0.001 | *** |
| [102] | Apr 24, 2023 | -3.51% | -2.92% | -$0.25 | 0.242 | |
| [103] | Apr 25, 2023 | -2.67% | -1.37% | -$0.11 | 0.583 | |
| [104] | Apr 26, 2023 | 0.56% | -0.32% | -$0.03 | 0.899 | |
| [105] | Apr 27, 2023 | 2.29% | 0.61% | $0.05 | 0.807 | |
| [106] | Apr 28, 2023 | 3.03% | 2.91% | $0.24 | 0.244 | |
| [107] | May 02, 2023 | -0.85% | -0.02% | $0.00 | 0.992 | |
| [108] | May 03, 2023 | 5.52% | 5.99% | $0.49 | 0.018 | ** |
| [109] | May 04, 2023 | -1.05% | -0.87% | -$0.07 | 0.729 | |
| [110] | May 05, 2023 | -1.18% | -2.52% | -$0.21 | 0.316 | |
| [111] | May 08, 2023 | 0.24% | 0.13% | $0.01 | 0.959 | |
| [112] | May 09, 2023 | 4.98% | 5.34% | $0.45 | 0.035 | ** |
| [113] | May 10, 2023 | -2.71% | -3.33% | -$0.29 | 0.185 | |
| [114] | May 17, 2023 | 3.79% | 2.91% | $0.25 | 0.253 | |
| [115] | May 19, 2023 | 2.44% | 2.95% | $0.27 | 0.247 | |
| [116] | May 24, 2023 | 2.47% | 2.78% | $0.25 | 0.272 | |
| [117] | May 25, 2023 | -2.63% | -4.56% | -$0.42 | 0.073 | * |
| [118] | May 26, 2023 | 1.69% | -0.19% | -$0.02 | 0.941 | |
| [119] | May 30, 2023 | -1.55% | -2.06% | -$0.19 | 0.417 | |
| [120] | Jun 02, 2023 | 0.76% | 0.65% | $0.06 | 0.798 | |
| [121] | Jun 07, 2023 | -1.06% | 0.02% | $0.00 | 0.993 | |
| [122] | Jun 09, 2023 | -0.84% | -0.77% | -$0.07 | 0.756 | |
| [123] | Jun 12, 2023 | -0.53% | -1.60% | -$0.15 | 0.521 | |

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | p-Value | Sig Level |
|---|---|---|---|---|---|---|
| [124] | Jun 14, 2023 | -1.38% | -2.39% | -$0.23 | 0.337 | |
| [125] | Jun 15, 2023 | 1.61% | 1.60% | $0.15 | 0.522 | |
| [126] | Jun 16, 2023 | -4.56% | -3.82% | -$0.36 | 0.126 | |
| [127] | Jun 20, 2023 | 3.77% | 3.92% | $0.35 | 0.117 | |
| [128] | Jun 21, 2023 | 5.03% | 6.30% | $0.59 | 0.012 | ** |
| [129] | Jun 22, 2023 | -3.46% | -3.87% | -$0.38 | 0.122 | |
| [130] | Jun 23, 2023 | 2.32% | 3.17% | $0.30 | 0.204 | |
| [131] | Jun 26, 2023 | -4.64% | -3.82% | -$0.37 | 0.126 | |
| [132] | Jun 30, 2023 | 1.52% | 0.94% | $0.09 | 0.705 | |
| [133] | Jul 20, 2023 | -5.06% | -2.25% | -$0.21 | 0.382 | |
| [134] | Jul 21, 2023 | -3.75% | -2.87% | -$0.25 | 0.264 | |
| [135] | Jul 24, 2023 | 0.35% | 0.31% | $0.03 | 0.904 | |
| [136] | Jul 25, 2023 | -1.06% | -1.41% | -$0.12 | 0.583 | |
| [137] | Jul 26, 2023 | 0.95% | 1.25% | $0.11 | 0.625 | |
| [138] | Jul 28, 2023 | 4.04% | 2.67% | $0.22 | 0.299 | |
| [139] | Jul 31, 2023 | -4.11% | -4.43% | -$0.39 | 0.086 | * |
| [140] | Aug 01, 2023 | 1.19% | 1.58% | $0.13 | 0.540 | |
| [141] | Aug 02, 2023 | 0.94% | 3.17% | $0.27 | 0.219 | |
| [142] | Aug 03, 2023 | 1.52% | 1.61% | $0.14 | 0.532 | |
| [143] | Aug 04, 2023 | 2.87% | 3.37% | $0.29 | 0.191 | |
| [144] | Aug 07, 2023 | 1.79% | 1.99% | $0.18 | 0.439 | |
| [145] | Aug 08, 2023 | 11.86% | 13.15% | $1.20 | 0.000 | *** |
| [146] | Aug 09, 2023 | 2.65% | 3.91% | $0.40 | 0.130 | |
| [147] | Aug 10, 2023 | 0.38% | 0.47% | $0.05 | 0.853 | |
| [148] | Aug 11, 2023 | -4.48% | -3.51% | -$0.37 | 0.173 | |
| [149] | Aug 14, 2023 | 2.09% | 1.51% | $0.15 | 0.557 | |
| [150] | Aug 15, 2023 | -0.29% | 0.81% | $0.08 | 0.753 | |
| [151] | Aug 16, 2023 | -1.96% | -1.06% | -$0.11 | 0.678 | |
| [152] | Aug 17, 2023 | -6.29% | -5.36% | -$0.54 | 0.039 | ** |
| [153] | Aug 18, 2023 | -4.90% | -4.51% | -$0.42 | 0.081 | * |
| [154] | Aug 21, 2023 | -0.34% | -1.48% | -$0.13 | 0.563 | |
| [155] | Aug 22, 2023 | -1.46% | -1.46% | -$0.13 | 0.570 | |

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | p-Value | Sig Level |
|---|---|---|---|---|---|---|
| [156] | Aug 23, 2023 | 0.80% | -0.29% | -$0.03 | 0.909 | |
| [157] | Aug 25, 2023 | 0.91% | 0.55% | $0.05 | 0.830 | |
| [158] | Aug 28, 2023 | -0.79% | -1.23% | -$0.11 | 0.631 | |
| [159] | Aug 30, 2023 | 1.02% | 0.73% | $0.06 | 0.774 | |
| [160] | Aug 31, 2023 | 0.34% | -0.16% | -$0.01 | 0.951 | |
| [161] | Sep 01, 2023 | -2.35% | -1.97% | -$0.18 | 0.441 | |
| [162] | Sep 05, 2023 | -6.58% | -6.75% | -$0.59 | 0.009 | *** |
| [163] | Sep 06, 2023 | -7.53% | -6.63% | -$0.54 | 0.011 | ** |
| [164] | Sep 07, 2023 | -5.56% | -4.27% | -$0.32 | 0.097 | * |
| [165] | Sep 08, 2023 | -0.98% | -0.86% | -$0.06 | 0.738 | |
| [166] | Sep 11, 2023 | -7.79% | -8.26% | -$0.58 | 0.002 | *** |
| [167] | Sep 12, 2023 | -3.84% | -2.74% | -$0.18 | 0.285 | |
| [168] | Sep 13, 2023 | -3.35% | -3.38% | -$0.21 | 0.188 | |
| [169] | Sep 14, 2023 | 6.78% | 6.38% | $0.39 | 0.014 | ** |
| [170] | Sep 15, 2023 | 11.76% | -10.47% | -$0.68 | 0.000 | |

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | p-Value | Sig Level | Description |
|---|---|---|---|---|---|---|---|
| [1] | Feb 03, 2022 | -5.03% | -2.00% | -$6.39 | 0.110 | | Q2 2022 Earnings Release |
| [2] | May 03, 2022 | -5.80% | -6.39% | -$16.66 | 0.000 | *** | Q3 2022 Earnings Release |
| [3] | Aug 18, 2022 | 1.84% | 1.51% | $4.19 | 0.264 | | Q4 2022 Earnings Release |
| [4] | Nov 02, 2022 | -8.13% | -5.22% | -$10.79 | 0.000 | *** | Q1 2023 Earnings Release |
| [5] | Feb 02, 2023 | -4.41% | -6.51% | -$18.27 | 0.001 | *** | Q2 2023 Earnings Release |
| [6] | May 03, 2023 | -17.34% | -16.64% | -$40.80 | 0.000 | *** | Q3 2023 Earnings Release |
| [7] | Aug 18, 2023 | -3.31% | -3.13% | -$5.07 | 0.020 | ** | Q4 2023 Earnings Release |
| [8] | Nov 01, 2023 | -18.90% | -20.15% | -$25.96 | 0.000 | *** | Q1 2024 Earnings Release |

Data Sources:  Bloomberg, S&P Capital IQ, SEC Edgar, ~~Factiva~~Complaint

~~Notes~~Note:  Regression models described in notes below **Exhibit 7**.  "*", "**", "***" denotes statistical significance at the 90%, 95%, and 99% confidence levels, respectively.

**Exhibit 7**

**Comparison of Statistical Significance ~~on DocGo~~of Estée Lauder Common Stock
Abnormal Returns for News Days vs. No News Trading Days During the ~~Class~~Analysis Period**

|  | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | ~~170~~8 | ~~177~~240 |  |
| Significant Days at 95% Confidence Level | ~~19~~6 | ~~6~~15 |  |
| % Significant Days at 95% Confidence Level | ~~11.18~~75.00% | ~~3.39~~6.25% | ~~0.004~~0.000 |
| Average Absolute Abnormal Return | ~~2.85~~7.69% | ~~2.09~~1.09% | ~~0.001~~0.031 |
| Average Volume (Millions) | ~~0.91~~7.38 | ~~0.68~~1.64 | ~~0.001~~0.016 |

Data ~~Sources~~sources:  Bloomberg, S&P Capital IQ, SEC Edgar, Factiva, Complaint

Notes:  The event study estimations are based on ~~a 120-day~~ rolling ~~regression estimation window~~regressions of the 120 trading days preceding each date of analysis.  The regression models control for the ~~NASDAQ Composite Total Return Index~~S&P 500 ("Market Index") and the S&P 500 ~~Health Care Sector Index~~Consumer Staples excluding Estée Lauder ("Industry Index").  The Estimation Windows for each rolling regression exclude the ~~market impact dates of any~~ alleged ~~corrective disclosures and~~revelations of the relevant truth dates and the News Days identified in **Exhibit 6**.  The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact Test.  The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume (Millions)" are based on t-tests for difference of means.

**Exhibit 8**

**~~DoeGo~~Estée Lauder Common Stock Market Capitalization**
**~~April 29~~February 3, 2022 – ~~September 15~~October 31, 2023**



Data ~~Sources~~source:  Bloomberg~~, SEC Edgar~~

E-13

**Exhibit 9**

~~DocGo~~**Estée Lauder** Common Stock Average Bid-Ask Spread
~~April 29~~**February 3**, 2022 – ~~September 15~~**October 31**, 2023

Data ~~Sources~~source:  Bloomberg

Notes:  The percentage bid-ask spread was calculated as the a) the closing ask quote less the closing bid quote divided by b) the average of the closing bid and ask quotes.

**Exhibit 10**

~~DocGo~~**Estée Lauder** Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings
~~June 30~~**March 31**, 2022 – ~~September 30~~**December 31**, 2023

| Quarter End | Shares Outstanding (mil) | Total Institutions Owning Stock | Insider Holdings (mil) | Short Interest (mil) | Public Float (mil) [6] = [2] + [5] - [4] | Insider Holdings as % of Shares Outstanding [7] = [4] / [2] | Inst. Holdings (mil) | Inst. Holdings as % of Shares Outstanding [9] = [8] / [2] | Inst. ~~Holding~~**Holdings** as % of Public Float [10] = [8] / [6] |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | | [7] = [4] / [2] | [8] | [9] = [8] / [2] | |
| Mar 31, 2022 | 232.42 | 1,627 | 1.19 | 2.19 | 233.43 | 0.51% | 209.00 | 89.92% | 89.54% |
| Jun 30, 2022 | ~~100.53~~231.81 | ~~115~~1,573 | ~~17.04~~1.23 | ~~8.05~~3.43 | ~~91.54~~234.01 | ~~16.95~~0.53% | ~~37.78~~211.29 | ~~37.57~~91.15% | ~~41.27~~90.29% |
| Sep 30, 2022 | ~~101.02~~231.55 | ~~145~~1,541 | ~~18.23~~1.25 | ~~6.28~~2.66 | ~~89.07~~232.96 | ~~18.05~~0.54% | ~~44.50~~208.91 | ~~44.05~~90.22% | ~~49.96~~89.68% |
| Dec 31, 2022 | ~~102.83~~231.27 | ~~163~~1,601 | ~~13.31~~0.91 | ~~6.43~~3.75 | ~~95.95~~234.11 | ~~12.95~~0.39% | ~~49.43~~211.01 | ~~48.07~~91.24% | ~~51.52~~90.13% |
| Mar 31, 2023 | ~~102.51~~231.68 | ~~179~~1,636 | ~~13.40~~0.89 | ~~8.95~~2.83 | ~~98.05~~233.62 | ~~13.07~~0.39% | ~~53.18~~209.68 | ~~51.88~~90.51% | ~~54.23~~89.75% |
| Jun 30, 2023 | ~~103.47~~231.87 | ~~189~~1,545 | ~~11.56~~0.95 | ~~10.57~~2.64 | ~~102.48~~233.56 | ~~11.18~~0.41% | ~~56.86~~207.00 | ~~54.95~~89.27% | ~~55.49~~88.63% |
| Sep 30, 2023 | ~~103.79~~232.30 | ~~179~~1,412 | ~~10.24~~0.91 | ~~10.50~~3.49 | ~~104.05~~234.88 | ~~9.86~~0.39% | ~~61.12~~206.89 | ~~58.89~~89.06% | ~~58.74~~88.09% |
| Dec 31, 2023 | 232.30 | 1,392 | 2.59 | 4.17 | 233.89 | 1.11% | 209.84 | 90.33% | 89.72% |
| **Averages Over Class Period** | ~~102.36~~231.90 | | ~~13.97~~1.24 | ~~8.46~~3.15 | ~~96.86~~233.81 | ~~13.68~~0.53% | ~~50.48~~209.20 | ~~49.24~~90.21% | ~~51.87~~89.48% |
| **Total Unique Institutions:** | | ~~268~~2,361 | | | | | | | |

Data Sources:  Bloomberg, S&P Capital IQ, SEC Edgar

E-15

| | |
|---|---|
| **Summary report:**<br>**Litera Compare for Word 11.10.1.2 Document comparison done on 11/8/2025 7:56:53 PM** | |
| **Style name:** GDCv11Rendering | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Z:\!_Doc Processing\B48714-1 Freire, Andrew\2. WIP\2. Completed (Ready for QC)\Completed\2025.07.21 Cain Report - DocGo.docx | |
| **Modified filename:** Z:\!_Doc Processing\B48714-1 Freire, Andrew\2. WIP\2. Completed (Ready for QC)\Completed\ELC - Expert Report of Matthew D. Cain.docx | |
| **Changes:** | |
| Add | 745 |
| Delete | 742 |
| Move From | 8 |
| Move To | 8 |
| Table Insert | 35 |
| Table Delete | 2 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 6 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1546 |

# ~~EXHIBIT~~Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ~~STONECO LTD~~THE ESTÉE LAUDER CO., INC. SECURITIES LITIGATION | ~~Case~~ No. ~~E1:21~~1:23-cv-~~09620(GHW)(OTW)~~10669-AS |

EXPERT REPORT OF MATTHEW D. CAIN, PH.D.

~~April 4~~July 25, 2025

**Table of Contents**

I.      Scope of Report and Opinions ........................................................ ~~2~~1

II.     Qualifications ............................................................................... ~~3~~2

III.    Case Background ........................................................................... ~~5~~4

IV.     Bases for Opinions on Market Efficiency ....................................... 7

V.      Evaluation of Market Efficiency Factors for ~~StoneCo's~~Estée Lauder's Common Stock .......................................................................................... 10

    A.    *Cammer* Factor 1:  Average Weekly Trading Volume ................... 12

    B.    *Cammer* Factor 2:  Analyst Coverage .......................................... ~~14~~13

    C.    *Cammer* Factor 3:  Market Makers .............................................. ~~17~~16

    D.    *Cammer* Factor 4:  SEC Form S-3 Filing Eligibility .................... 19

    E.    *Cammer* Factor 5:  Cause and Effect Relationship Between Company Information and Stock Prices ............................................................ ~~21~~20

    F.    *Krogman* Factor 1:  Market Capitalization .................................. 29

    G.    *Krogman* Factor 2:  Bid-Ask Spread ........................................... ~~31~~30

    H.    *Krogman* Factor 3:  Public Float ................................................. ~~32~~31

    I.    Additional Factor:  Institutional Ownership .................................. ~~33~~32

VI.     Ability to Calculate Damages on a Class-Wide Basis ...................... ~~34~~33

    A.    Calculation of Damages for Violation of ~~Section~~§§ 10(b) and 20(a) of the Exchange Act ............................................................................ 34

    B.    Damages Methodology is Flexible and can Incorporate Alternative Findings ................................................................................... ~~38~~37

VII.    Conclusion ................................................................................... 39

## I.  Scope of Report and Opinions

1.  ~~Court appointed Lead Plaintiff Indiana Public~~<u>Lead Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees'</u> Retirement System (~~"Plaintiff~~<u>collectively, "Plaintiffs"</u>"), through ~~its~~<u>their</u> attorneys~~,~~ ~~has~~ <u>have</u> asked me to determine whether the market for ~~StoneCo Ltd. ("StoneCo" or the "Company")~~<u>Class A</u> common stock ("Common Stock") <u>of The Estée Lauder Companies Inc. ("Estée Lauder" or the "Company")</u> was efficient during the period ~~May 27, 2020 to November 16, 2021~~<u>from February 3, 2022 through October 31, 2023</u>, inclusive (the "Class Period"). [1]

2.  In addition, ~~Plaintiff has~~<u>Plaintiffs have</u> asked me to opine on whether damages for investors trading in ~~StoneCo's~~<u>Estée Lauder's</u> Common Stock during the Class Period can be calculated using a common methodology for all Class members that is consistent with ~~Plaintiff's~~<u>Plaintiffs'</u> claims under ~~Section~~<u>: (i) §</u> 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§ 10(b) claims")~~.~~<u>; and (ii) § 20(a) of the Exchange Act.</u>[2]

3.  Based on my analysis to date and the evaluation of the factors described throughout this Report, I have formed the following opinions:

---

[1] ~~I understand that the~~<u>See</u>: <u>Consolidated</u> Amended Class Action Complaint for ~~Violations~~<u>Violation</u> of the Federal Securities Laws (Doc. ~~55~~<u>47</u>) ("Complaint")~~, limited to the remaining actionable alleged misrepresentations per the Memorandum~~<u>;</u> Opinion ~~&~~<u>and</u> Order, dated ~~September 25~~<u>March 31</u>, ~~2024~~<u>2025</u>, (Doc. ~~76~~<u>58</u>) ("MTD Opinion")~~ alleges a class period that began with StoneCo's press release announcing the Company's first quarter 2020 financial results, issued and filed on SEC Form 6-K on May 26, 2020. Because this press release was issued after the close of regular trading hours, I analyze a Class Period beginning the next trading day, May 27, 2020~~.

[2] <u>See Complaint. I understand Defendants to be Estée Lauder, Inc., Defendant Freda (Estée Lauder's former Chief Executive Officer) and Defendant Travis (Estée Lauder's former Chief Financial Officer).</u>

1

a.   The market for ~~StoneCo's~~Estée Lauder's Common Stock was efficient throughout the Class Period.

b.   The *Cammer* and *Krogman* factors accepted and applied by courts to assess market efficiency corroborate that ~~StoneCo's~~Estée Lauder's Common Stock traded in an efficient market.

c.   Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting Common Stock price movements (which I analyze under the fifth *Cammer* factor) supports the conclusion that ~~StoneCo's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

d. Damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for ~~Plaintiff's~~Plaintiffs' pending claims.  In particular, the out-of-pocket damages methodology, which is routinely used in ~~virtually all Section~~§ 10(b) securities class actions, is appropriate and applicable here.

4.       The remainder of my Report is organized as follows:  **Section II** describes my qualifications.  **Section III** summarizes the case background.  **Section IV** briefly explains the bases for the reliance requirement and the "fraud-on-the-market" theory relating to market efficiency.  **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period.  **Section VI** addresses how damages can be calculated on a class-wide basis subject to a common methodology under ~~Section~~§§ 10(b) and 20(a).  **Section VII** summarizes my conclusions.

## II.    Qualifications

5.       I hold a Ph.D. in Finance from Purdue University and am a Senior Fellow at the New York University School of Law.  I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.

6.       My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information,

and shareholder activism.  I previously held fellowships with the Berkeley Center for Law and Business at UC Berkeley, Vanderbilt Law School, and the Harvard Law School Program on Corporate Governance, where I participated in teaching, research, and academic seminars.

7.    Before my current roles, I worked at the ~~U.S. Securities and Exchange Commission ("SEC")~~ between 2014 and 2018 as a Financial Economist.  During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, improper revenue recognition practices, and disclosure violations.  I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities law violations, revenue recognition practices, and corporate governance issues.  Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

8.    Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame.  I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics.  I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

9.    Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007.  Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private

3

placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

10.    In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

11.    I have published research in leading peer-reviewed journals in the fields of finance, accounting, law, and economics, including: *Journal of Financial Economics, Journal of Law and Economics*, *Journal of Accounting and Economics, Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications.

12.    In addition to my teaching, research, and academic responsibilities, I provide consulting services and expert testimony in a variety of matters through my LLC, Cleveland Analytics, as well as in conjunction with other consulting firms. As an expert in financial economics, I have conducted analyses or presented expert opinions related to market efficiency, valuation, securities trading, corporate disclosures, and loss causation/damages in over 60 cases. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

13.    The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $1,100 per hour for my work on this matter. I have been assisted in this matter by my staff at ~~Cleveland Analytics, LLC~~Fideres Partners LLP, working under my direction, and I receive additional compensation based upon their billings. My compensation is in no way contingent on the outcome of this case.

4

14.     My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

### III.    Case Background

15.     ~~StoneCo was founded in 2012 as a provider of financial technology ("Fintech") payment processing services, including online software and physical point-of-sale ("POS") devices.  The Company generates revenues by charging its customers processing fees on transactions utilizing its POS or online software.  StoneCo is one of Brazil's largest Fintech and payment processing providers, with over 652,600 active customers in Brazil as of December 2020.[2]~~ Estée Lauder is a prestige beauty company that manufactures, markets and sells skincare, makeup, fragrance and hair care products worldwide.[3] Estée Lauder distributes its products in approximately 150 countries and territories under many brand names, including Estée Lauder, La Mer, Origins, M·A·C, Le Labo and Bobbi Brown.[4] In January 2024 Estée Lauder was the second largest beauty company in the world.[5] Estée Lauder's Common Stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "EL" throughout the Class Period.[6]

16.     ~~The Complaint alleges that Defendant made material misrepresentations and/or omissions asserting that StoneCo's credit scoring system had become more selective and its~~

---

[2] ~~Complaint ¶¶ 2-3.~~

[3] Complaint ¶ 4. The following overview section summarizes the allegations in the Complaint as context for Plaintiffs' claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.

[4] Complaint ¶ 4.

[5] Complaint ¶ 4.

[6] Complaint ¶ 48.

credit distribution was becoming more conservative over time. In contrast, StoneCo had allegedly made decisions that lowered borrowing standards, such as reducing the look-back period of recurring sales for evaluating client stability from six to three months, and ending third-party due diligence, which meant that StoneCo could no longer conduct real-time credit verification. StoneCo's credit scoring system thus allegedly utilized *less* data and history, in direct contrast to Defendant's statements about the product being improved and enhanced.[3] During the Class Period, one of Estée Lauder's most profitable sales channels was travel retail, including duty-free shops.[7] Of these travel retail channels, those in China and South Korea were critical sources of revenue for Estée Lauder during the Class Period and were closely monitored by the Company and its investors.[8] The Complaint alleges that Defendants concealed the fact that Estée Lauder's sales growth in the Company's Asia travel retail segment was driven by the prohibited gray market resale industry in China and South Korea, known as *daigou*, from investors.[9]

17. The Complaint alsofurther alleges that Defendant made material misrepresentations and/or omissions asserting that rising customer delinquency rates were due to a new registry system in Brazil and COVID-19. In fact, Defendant allegedly knew the delinquency problems were caused by StoneCo's loosened credit standards and associated collectability challenges.[4] Estée Lauder's ability to rely on *daigou* as a revenue stream ended following a July 1, 2021 pledge by its customer, China Duty Free Group, to eradicate *daigou*

---

[3] *Id.*, ¶¶ 81-89, 162, 167, 171, 173, 178; *see also*, MTD Opinion, at pp. 13, 24.

[7] Complaint ¶ 7.

[8] Complaint ¶ 8.

[9] Complaint ¶ 1.

[4] Complaint ¶¶ 129-130, 151-152; *see also*, MTD Opinion, at pp. 25-27.

activity, as well as the January 1, 2022 implementation of China's prohibitions on *daigou* activity. [10] Despite a decline in net sales attributable to the absence of gray market transactions generated by *daigou* activity, Defendants allegedly made a series of misrepresentations concerning the overall impact of this absence on the Company's Asia travel retail business. [11]

18.    The Complaint alleges that the ~~concealed risks materialized and the~~ relevant truth was ~~revealed to investors through multiple corrective events.  First, on August 25, 2021, StoneCo published a "teach-in" paper revealing that the Company:  (i) had decided to temporarily stop disbursing credit, (ii) was reducing recovery rate estimates on its non-performing credit portfolio, and (iii) was updating the way it reported credit metrics.[5]~~ partially revealed on November 2, 2022, February 2, 2023, and May 3, 2023, when Estée Lauder published its first, second and third quarter 2023 financial results.  The published results revealed sales declines in the Estée Lauder's travel retail business and the negative impact that these declines were having on the Company's financial outlook. [12] However, on each of these dates Defendants offered reassurances to investors that sales would recover, which were false and misleading because Defendants failed to disclose that the Company was no longer able to rely on *daigou* sales. [13]

19.    ~~Second, on August 30, 2021, StoneCo reported its second quarter 2021 financial results, revealing mixed results "primarily driven by a challenging short-term scenario in [StoneCo's] credit product," lower revenues and income caused by credit fair value adjustments~~

---

[10] Complaint ¶ 2.

[11] Complaint ¶¶ 104 and 128.

~~[5] Complaint ¶¶ 208-211.~~

[12] Complaint ¶¶ 35-37.

[13] Complaint ¶¶ 35-37.

7

~~and significantly lower credit disbursements, and that 35% of its credit clients were unable to pay back any principal in the last 60 days and at least 19% were unable to pay either interest or principal, which was significantly worse than investor expectations.[6]~~The Complaint alleges that the relevant truth was further revealed on August 18, 2023, when Estée Lauder disclosed in its fourth quarter 2023 earnings that its travel retail "sales trend deteriorated and turned steeply negative from the enforcement actions to control *daigou* activity."[14] Again, Defendants allegedly continued to mislead investors as they did not disclose that the primary cause of its declining sales was their falling *daigou* sales. [15]

20.    ~~Third, on November 16, 2021, StoneCo reported its third quarter 2021 financial results, revealing that the percentage of non-performing loans had increased from 35% to 48% and that the Company was making a further downward adjustment to the fair value of its loan portfolio. In response to an analyst question about when the Company expected credit volume to return to the levels it was at prior to the halting of credit originations, the Company responded that it was "not ready to provide a specific guidance in terms of scaling the credit."[7]~~The Complaint alleges that the relevant truth was further revealed on November 1, 2023, when Estée Lauder disclosed in its first quarter 2024 earnings that its sales declines were "primarily due to…changes in government and retailer policies related to unstructured market activity."[16]

21.    The Complaint alleges that, as a result of ~~Defendant's~~Defendants' materially false and misleading statements~~,~~ and material omissions, ~~and undisclosed risks,~~ investors allegedly

---

[6] ~~*Id.*, ¶¶ 214-218.~~

[14] Complaint ¶ 39.

[15] Complaint ¶ 40.

[7] ~~*Id.*, ¶¶ 221-228.~~

[16] Complaint ¶ 41.

traded ~~StoneCo's~~Estée Lauder's Common Stock at artificially inflated prices during the Class Period.~~8~~ [17] **Exhibit 1** graphs the closing stock price and trading volume for ~~StoneCo's~~Estée Lauder's Common Stock shares throughout the Class Period.

## IV.    Bases for Opinions on Market Efficiency

22.    I understand that, with respect to their claims under § 10(b)~~, Plaintiff asserts~~ Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance, i.e., that all ~~StoneCo shareholders~~persons and entities who purchased or otherwise acquired Estée Lauder Common Stock during the Class Period relied on the alleged misrepresentations and omissions through their effect ~~on~~of stock prices in an informationally efficient market.~~9~~[18]

23.    As courts, including the Supreme Court, have repeatedly explained, the "fraud-on- the-market" theory of class-wide reliance holds that investors who purchase securities traded in an informationally efficient market during a class period rely on any public misrepresentations or material omissions of fact made during the class period because those statements or material omissions of fact are incorporated into the value of each class member's purchase price.  As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business   Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements   The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.~~10~~[19]

---

~~8~~ ~~*Id.*, ¶¶ 147, 198-207, 250~~[17] Complaint ¶¶ 128-129, 173, 177.

~~9~~ ~~*Id.*,~~[18] Complaint ¶¶ ~~249-251~~271-275 (including additional *Affiliated Ute* presumption on alleged omissions).

~~10~~[19] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

24.    The Supreme Court reaffirmed the availability of this theory to satisfy ~~Section~~§ 10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.  We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[~~11~~20]

25.    A market is considered informationally efficient when the market price of securities begins to respond quickly to publicly available information.[~~12~~21]  Economic research and literature support the concept of market efficiency for publicly traded securities.  For example, Nobel Prize winner Eugene Fama has observed that "[t]he evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse,"[~~13~~22] and that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[~~14~~23]

~~26.    Indeed, research continues to support the empirical soundness of the efficient market hypothesis, as modern scholars have concluded that, in fact, "capital markets are more~~

---

[~~11~~20] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[~~12~~21] Academics often consider more stringent forms of market efficiency, *e.g.*, defining an efficient market as one in which prices reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs. Eugene F. Fama, 1991, *Efficient Capital Markets:  II*, Journal of Finance 46, at 1575 (1991).

[~~13~~22] Eugene F. Fama, *Efficient Capital Markets:  A Review of Theory and Empirical Work*, Journal of Finance 25, at 383, 416 (1970).

[~~14~~23] Eugene F. Fama, *Efficient Capital Markets:  II*, Journal of Finance 46, at 1575, 1576 (1991).

efficient than previously recognized."¹⁵Academic research thus provides ample support for the concept of market efficiency for public exchange-traded securities.

2726.  Markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, are frequently granted a presumption of efficiency for virtually all securities traded on them.16 [24] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other rules for these exchanges practically guarantee a liquid market for securities traded on these exchanges.17 [25] The fact that StoneCo'sEstée Lauder's Common Stock traded on the NASDAQNYSE leads to a strong presumption of market efficiency.

2827.  In securities fraud cases, courts have endorsed the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purpose of establishing the presumption of class-wide reliance.18 [26] Courts also accept additional factors for evaluating market efficiency, such as those in the widely-cited *Krogman v. Sterritt* opinion.19[27]

2928.  Principles of economics and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.20 [28] However, as explained below, it is

---

[15] *See, e.g.*, Kewei Hou, Chen Xue, and Lu Zhang, *Replicating Anomalies*, Review of Financial Studies 33, at 2071 (2020).

[16][24] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*") ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there:  the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.'") (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).

[17][25] *Id.*

[18][26] *Cammer*, 711 F. Supp. at 1264, 1286 – 1287.

[19][27] *Krogman v. Sterritt,* 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[20][28] *See, e.g.*, Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements:  The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

11

important to understand that an assessment of market efficiency does not turn on any one single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.~~21~~29

## V.    Evaluation of Market Efficiency Factors for ~~StoneCo's~~Estée Lauder's Common Stock

~~30~~29.    In the following section, I discuss the *Cammer*, *Krogman*, and other factors and evaluate them in relation to ~~StoneCo's~~Estée Lauder's Common Stock.~~22~~ [30] In doing so, I compare the factors' application to ~~StoneCo's~~Estée Lauder's Common Stock against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

~~31~~30.    As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that ~~StoneCo's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

~~32~~31.    One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."~~23~~ [31] In this peer-reviewed study, these authors examined two samples of firms. One sample included companies that eventually lost all analyst coverage (the "MRK Previously Covered

---

~~21~~29 *Id.*, at 204-205.

~~22~~30 In addition to the *Cammer* and *Krogman* factors, I also note that the Company a) had call and put options traded on the Common Stock, and b) did not have a statistically significant autocorrelation coefficient on abnormal stock returns during the Class Period from my event study in Section V.E. These findings further support my conclusion that ~~StoneCo~~Estée Lauder's Common Stock traded in an efficient market throughout the Class ~~period~~Period.

~~23~~31 Simona Mola, P. Raghavendra Rau, and Ajay Khorana, *Is There Life After the Complete Loss of Analyst Coverage?*, Accounting Review 88, at 667-705 (2013).

Companies"); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage.  The second sample included the analyst-covered firms (the "MRK Covered Companies"), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[2432]

33 32.    The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year.  We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock.  Firms that lose all analyst coverage continue
>
>  to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[2533]

34 33.    The authors describe these variables as reflective of investor interest:  after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[26 34] Therefore, I interpret the sample of MRK Covered Companies as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets.

---

[2432] MRK Study at 678, 681-682.

[2533] MRK Study at 667.

[2634] MRK Study at 681 (footnotes omitted).

34. Below, I compare several of ~~StoneCo's~~Estée Lauder's market efficiency factors to the samples of firms in the MRK Study, to samples of firms in other academic studies, and to the benchmarks set forth by courts, to assess whether ~~StoneCo's~~Estée Lauder's characteristics are consistent with firms operating in efficient markets.

### A. *Cammer* Factor 1: Average Weekly Trading Volume

35. Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity in a security, the more likely it is that new information will be quickly incorporated into the price of that security.[35] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.[36] Similarly, "[t]rading volume was also considered as an eligibility standard [for exchange listing] because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[37]

36. The first *Cammer* factor, stock trading volume, was defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of
> the outstanding shares would justify a strong presumption that the

---

[35] *See, e.g.*, Bharat Bhole, Sunita Surana, and Frank Torchio, *Benchmarking Market Efficiency Indicators for Securities Litigation*, University of Illinois Law Review Online, at 101-102 (2020) (the "Bhole Study"); Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63, at 108 (2000); MRK Study at 681.

[36] *Id.*

[37] Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63, at 108 (2000).

14

market for the security is an efficient one; 1% would justify a substantial presumption.[30][38]

3837.   **Exhibit 2** graphs ~~StoneCo's~~Estée Lauder's Common Stock weekly trading volume as a percentage of shares outstanding throughout the Class Period.[31][39] The average weekly trading volume was ~~6.1~~4.0% of ~~StoneCo's~~Estée Lauder's Common Stock outstanding over the Class Period.  This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court.  As a result, ~~StoneCo's~~Estée Lauder's level of stock trading volume throughout the Class Period supports the conclusion that ~~StoneCo's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

3938.   I also note that the average weekly trading volume of ~~StoneCo's~~Estée Lauder's Common Stock over the Class Period was ~~14.0~~9.3 million shares on the ~~NASDAQ~~NYSE.  This is a far larger weekly trading volume than was found for the MRK Previously Covered Companies (just 0.034 million shares), as well as the MRK Covered Companies (0.215 million shares).[32][40] Additionally, ~~StoneCo's~~Estée Lauder's daily turnover rate of ~~1.2~~0.8% during the Class Period placed it above the ~~75th percentile~~median of all companies listed on the NYSE and the NASDAQ.[33][41] This further supports the conclusion that ~~StoneCo's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

---

[30][38] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg, § 8.6).

[31][39] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[32][40] MRK Study at 678 (Table 3). The median annual trading volume for MRK Previously Covered Companies was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK Covered Companies was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

[33][41] According to the Bhole Study at 102, the ~~75th percentile of~~median daily turnover for the 2016-2018 sample period is ~~1.17~~0.71%. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

15

**B.** *Cammer* **Factor 2:  Analyst Coverage**

~~40~~39.  The second *Cammer* factor looks at the amount of analyst coverage the company at issue receives.  An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry.  Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.

~~41~~40.  Analyst coverage can be indicative of market efficiency since research analysts help to disseminate new important company-specific information to investors, thus impounding new information into stock prices quickly and efficiently.  The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period.  The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.~~34~~42

~~42~~41.  In **Exhibit 3,** I review the analyst coverage of ~~StoneCo~~Estée Lauder over the Class Period.  I identified a total of ~~168~~556 reports issued by analysts at ~~24~~38 separate firms during that period.~~35~~ 43 The list of analyst reports that I was able to identify includes reports by firms such as ~~Susquehanna, BTG, Morgan Stanley, UBS~~Evercore, Wells Fargo, RBC, J.P. Morgan, and ~~Evercore~~Piper Sandler, among others.  Collectively, this is a significant degree of

---

~~34~~42 *Cammer*, 711 F. Supp. at 1286.

~~35~~ ~~Plaintiff's Counsel provided me with analyst reports.~~ 43 I ~~also~~ obtained a ~~cite~~ list of analyst reports from ~~LSEG Refinitiv~~Investext. These statistics represent a lower bound of the analyst coverage of ~~StoneCo~~Estée Lauder because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

analyst coverage which served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

4342.  Empirically, this degree of analyst coverage is greater than that of most other publicly traded firms as documented by academic research.  For example, the MRK Study noted that 19% of U.S. firms covered by the Institutional Brokers' Estimate System ("I/B/E/S (the Institutional Brokers' Estimate System") received no analyst coverage in a given year.36 [44] Charles M.C.  Lee and Eric So documented that, on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.37 [45] Barber et al. found that coverage by one or two analysts strengthened the presumption of market efficiency.38 [46] Moreover, StoneCo'sEstée Lauder's high level of analyst coverage also placed it above the 90th95th percentile when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.39 [47] The significant analyst coverage of StoneCoEstée Lauder during the Class Period supports the conclusion that StoneCo'sEstée Lauder's Common Stock traded in an efficient market throughout the Class Period.

4443.  While the *Cammer* court specifically discussed analyst coverage as indicating wide dissemination of information about a given company, thus supporting market efficiency,

---

[3644] MRK Study at 668.

[3745] Charles M.C. Lee and Eric C. So, *Uncovering Expected Returns:  Information in Analyst Coverage Proxies*, Journal of Financial Economics 124, at 336 (see Table 1, Panel B – "COV") (2017).

[3846] Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, Journal of Corporate Law 19, at 302 and 310-311 (1994).

[3947] Bhole Study at 104 (90th95th percentile defined as 20.126.0 analysts). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

individual and institutional investors also had access to a variety of other sources of information about ~~StoneCo~~Estée Lauder available during the Class Period.  For example, I conducted a search of press and news articles about ~~StoneCo~~Estée Lauder using Factiva, a well-known provider of access to business news across a comprehensive set of publications.  This search identified ~~over 350~~2,155 unique articles published throughout the Class Period from leading news outlets, including *Dow Jones ~~Institutional News, Investor's Business Daily~~Newswires*, *Reuter's News*, ~~and~~ *Business Wire*, and *The Wall Street Journal* among others.[~~40~~48]

~~45~~44.  Moreover, ~~StoneCo~~Estée Lauder produced numerous filings containing Company information that were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period.

~~46~~45.  As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about ~~StoneCo~~Estée Lauder supports the conclusion that its Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

### C. *Cammer* Factor 3:  Market Makers

~~47~~46.  The third *Cammer* factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[~~41~~49] Market makers are present on major exchanges as well as over-the-counter markets.  In

---

[~~40~~ ~~508~~48 3,607] English language articles were identified through a Factiva search, including ~~StoneCo's~~Estée Lauder's company tag over all available sources. After excluding potential duplicates, ~~355~~2,155 unique news articles were identified by this search.

[~~41~~49] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices."                                        *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[42][50]

48 47.    In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[43][51]

48.    The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

49.    StoneCo Estée Lauder had at least 122 130 market makers and brokers providing similar activity facilitating the buying and selling of the Common Stock over the Class Period.[44][52] Further, StoneCo's Estée Lauder's Common Stock traded on the NASDAQ NYSE throughout

---

[42][50] Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, Journal of Corporate Law 19, at 291 (1994).

[43][51] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. Dec. 22, 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

[44][52] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact . . . RANK provides the equity market share data that is critical to helping buy-side firms

19

the Class Period.  Similar to other large, national exchanges, the ~~NASDAQ~~NYSE reports volume, prices, ~~bid- ask~~bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient.~~45~~ [53] The *Cammer* court stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there:  the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.~~46~~[54]

50.    I understand that courts typically view large, established stock exchanges with market makers (such as the NYSE and NASDAQ) as being informationally efficient.~~[47]StoneCo's~~

---

identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow.").

[45] ~~See:   http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess:   "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders.  There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services.  Definition of a Market Maker:  A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades).~~[53] The NYSE Market Model, *NYSE*, available at:  https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry- specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery."

[46][54] *Cammer*, 711 F. Supp. at 1292.

[47] ~~See, e.g., Billhofer v. Flamel Techs., S.A., 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (citation omitted); In re Initial Pub. Offering Sec. Litig., 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency").~~

20

[55] Estée Lauder's public listing on the ~~NASDAQ~~NYSE, a well-developed and established national exchange, thus satisfies this market maker *Cammer* factor.

51.     Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading.~~48~~ [56] Academic research has similarly found that institutional investors can facilitate trading liquidity.  ~~StoneCo's~~Estée Lauder's Common Stock was held by ~~over 750~~at least 2,361 unique institutional investors during the Class Period, who owned an average of ~~202.0~~209.2 million shares, or ~~88.4~~90.2% of ~~StoneCo's~~Estée Lauder's Common Stock outstanding.~~49~~[57]

52.     In sum, ~~StoneCo~~Estée Lauder easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for ~~StoneCo's~~Estée Lauder's Common Stock throughout the Class Period.

---

[55] *See, e.g., Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (citation omitted); *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency").

~~48~~[56] *See, e.g., In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market- makers and arbitrageurs:  large investors, with more money at stake, may be more likely to inform themselves well before trading." (citations omitted)); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

~~49~~[57] *See* **Exhibit 10**. By comparison, the MRK Study found that the MRK Previously Covered Companies had a median of only nine institutional investors while the MRK Covered Companies had a median of 40 institutional investors (p. 678 – Table 3).  ~~StoneCo's~~Estée Lauder's institutional ownership base greatly exceeds both of these levels.

21

**D.** *Cammer* **Factor 4:  SEC Form S-3 Filing Eligibility**

53.    The fourth *Cammer* factor is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, ***such ineligibility was only because of timing factors*** rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met.  Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[50][58]

54.    Form S-3 (and Form F-3 with respect to foreign issuers) filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information.  This eligibility includes the following requirements:  the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has a float of at least $75 million, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[51][59] The logic and intuition behind this factor, as discussed by the *Cammer* court, is that investors in a company that makes timely financial filings with regulators will have ready and ample access to publicly available information about the issuer.

55.    As shown in **Exhibit 8**, StoneCo'sEstée Lauder's market capitalization averaged $13.653.0 billion over the Class Period.  Moreover, **Exhibit 10** demonstrates significant public float of StoneCo'sEstée Lauder's public shares available for trading, with the number of shares held by investors other than insiders averaging 235.0233.8 million over the Class Period.

---

[50][58] *Cammer*, 711 F. Supp. at 1287 (emphasis added).

[51][59] *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf; SEC Form F-3, available at https://www.sec.gov/files/formf-3.pdf.

22

Multiplying these shares by ~~StoneCo's~~Estée Lauder's closing stock price on each quarter-end date indicates that ~~StoneCo had a~~the value of Estée Lauder's public float ~~ranging~~ranged from $~~4.0~~33.9 billion to $~~19.5~~63.6 billion during the Class Period, with an average of $~~11.1~~50.4 billion.  Thus, at all times during the Class Period, ~~StoneCo's~~the value of Estée Lauder's public float far exceeded the S-~~3's and F~~-3's minimum eligibility requirement of $75 million.

56.    ~~StoneCo~~Estée Lauder also regularly filed financial reports with the SEC throughout the Class Period.  The financial information in ~~StoneCo's~~Estée Lauder's SEC filings, supplemented by information conveyed by research analysts and news coverage, provided investors with access to financial information about ~~StoneCo~~Estée Lauder on a continuous basis throughout the Class Period.  Based on my research, ~~StoneCo~~Estée Lauder made required filings with the SEC in a timely manner and satisfied the other Form ~~F~~S-3 requirements throughout the Class Period.  ~~Moreover, StoneCo filed a Form F-3ASR during the Class Period.[52]~~As a result, this factor is consistent with the efficiency of the market for ~~StoneCo~~Estée Lauder Common Stock throughout the Class Period.

**E.  *Cammer* Factor 5:  Cause and Effect Relationship Between Company Information and Stock Prices**

57.    The fifth Cammer factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information.  The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[~~53~~60]

---

[52]  ~~StoneCo Ltd., SEC Form F-3ASR, filed August 11, 2020, available at https://www.sec.gov/Archives/edgar/data/1745431/000119312520216476/0001193125-20-216476-index.htm.~~

[~~53~~60]  *Cammer*, 711 F. Supp. at 1291.

23

58.    Below, I summarize my empirical analysis, which finds that ~~StoneCo's~~Estée Lauder's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer*.  As part of my analysis, I compared the behavior of ~~StoneCo's~~Estée Lauder's Common Stock on days when potential value-relevant news was issued via earnings releases with its behavior on days when no such news was issued.  This analysis demonstrates that ~~StoneCo's~~Estée Lauder's Common Stock price reacted to company-specific news, and thus further supports the conclusion that ~~StoneCo's~~Estée Lauder's Common Stock traded in an efficient market throughout the ~~Class~~period from February 3, 2022 to November 1, 2023, inclusive (the "Analysis Period").[61]

i.    *Event Study Methodology*

59.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study.

60.    Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.~~54~~[62] As Professor Eugene F. Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns.  When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration.

---

[61] The Analysis Period extends one trading day beyond the Class Period to capture the market reaction to the Company's first quarter 2024 earnings, which were announced on the final day of the Class Period.

~~54~~[62] *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 13 (1997).

As a result, event studies can give a clear picture of the speed of adjustment of prices to information.

There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[55][63]

61. To determine whether StoneCo'sEstée Lauder's Common Stock price movements on any given date arewere statistically significant, I performed an event study using generally accepted economiceconometric methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

62. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company- specificcompany-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (*i.e.*, the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the Companycompany's stock price return such that simple random movement can be rejected as the cause.

---

[55][63] Eugene F. Fama, *Efficient Capital Markets: II*, Journal of Finance 46, at 1607 (1991).

25

63.    I applied these widely used and generally accepted econometric methodologies to perform my event study here.  Specifically, in order to isolate the impact of company-specific news on ~~StoneCo's~~Estée Lauder's Common Stock price during the ~~Class~~Analysis Period, I performed regression analyses to measure the relationship between ~~StoneCo's~~Estée Lauder's Common Stock price returns and:  (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in ~~StoneCo's~~Estée Lauder's industry.  By modeling how ~~StoneCo's~~Estée Lauder's Common Stock price returns moved relative to an overall market index and an industry index, I was also able to measure the response of ~~StoneCo's~~Estée Lauder's Common Stock to announcements of company-specific news.

64.    I conducted my regression analysis over the ~~Class~~Analysis Period.  For each trading day, I constructed a regression model using data from the prior 120 trading days (*i.e.*, six calendar months) of trading days (the "Estimation Window").[~~56~~64]

65.    To study the relationship between ~~StoneCo's~~Estée Lauder's Common Stock price returns and overall market factors, I used the ~~NASDAQ Composite Total Return~~S&P 500 Index

---

[~~56~~64] I utilized an Estimation Window of 120 trading days, which equates to approximately six calendar months. This allowed my regression approach to adapt to the changing volatility of stock returns over time. *See, e.g.*, Mark L. Mitchell and Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases:  Applications at the Securities and Exchange Commission*, The Business Lawyer 49 (1994); A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 35, at 15 (1997) ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates."). The ~~estimations~~Estimation Windows exclude the alleged revelations of the relevant truth dates~~,~~ and the News Days identified in **Exhibit 6**~~, and StoneCo's earnings release with a market impact date of March 3, 2020~~.

26

(the "Market Index").  To study the relationship between ~~StoneCo's~~Estée Lauder's Common Stock price returns and changes in ~~industry- wide~~industry-wide factors that would be expected to impact all stocks in ~~StoneCo's~~Estée Lauder's particular industry, I used the ~~Solactive FinTech~~S&P 500 Consumer Staples Index (the "Industry Index").[~~57~~65]

66.    I established the relationship between the daily return of ~~StoneCo's~~Estée Lauder's Common Stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[~~58~~ 66] As shown in **Exhibit 4**, the event study models revealed an evolving relation between the daily returns of ~~StoneCo's~~Estée Lauder's Common Stock and those of the overall stock Market and Industry Indices throughout the ~~Class~~Analysis Period.  In other words, movements of the Market Index and the Industry Index help explain movements in ~~StoneCo's~~Estée Lauder's Common Stock price.

67.    Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of ~~StoneCo's~~Estée Lauder's Common Stock on any given date within the ~~Class~~Analysis Period that controlled for that day's market and industry returns.  Again, in accordance with standard event-study methodology, I then subtracted this predicted return from the actual return to get the

---

[~~57~~65] The index includes various ~~FinTech companies such as LendingClub Corp., SoFi Technologies Inc., Coinbase Global Inc., and Pagseguro Digital Ltd.~~companies classified as members of the GICS consumer staples sector such as The Proctor & Gamble Company, Walmart Inc., The Coca-Cola Company, and Costco Wholesale Corporation, among others. The index had ~~44~~32 members at the start of the ~~Class~~Analysis Period and ~~52~~38 members at the end of the Class Period, and ~~StoneCo~~Estée Lauder was a member of the index. I removed the impact of ~~StoneCo's~~Estée Lauder's returns from the daily returns ~~of~~on the index.

[~~58~~66] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 35 (1997); Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, *Good News, Bad News, Volatility, and Betas*, Journal of Finance 50, at 1597 (1995).

"abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

68. Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in ~~StoneCo's~~Estée Lauder's Common Stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of ~~StoneCo's~~Estée Lauder's Common Stock after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the ~~Class~~Analysis Period.

> ii. *Cause and Effect Analysis Comparing ~~StoneCo's~~Estée Lauder's Common Stock Price Behavior on News Days versus No News Days*

69. A generally accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on days when potential value-relevant ~~company-specific~~company-specific news is disclosed ("news days") with its behavior on other days with relatively little or no such news.~~59~~[67] A showing that a security's price is statistically significantly more volatile on "news days" than on "no news days" is considered powerful evidence that the security responds promptly to news and, therefore, strongly supports a finding

---

~~59~~[67] Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

of efficiency.~~60In this case, I considered StoneCo's earnings announcements as the "news days."~~68

70.    Importantly, research has shown that in an efficient market, it is possible for a security to exhibit some large price movements despite the absence of news and, conversely, for one to observe news without large price movements.~~61~~69 For instance, a company may announce earnings (or a lack thereof) that are in line with investor expectations – and while such an expected announcement is clearly important to investors, it may not elicit a statistically significant stock price movement.  Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again could result in no statistically significant price movement.  Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level.

71.    Accordingly, a generally accepted, peer-reviewed methodology also accepted by numerous courts is to compare (i) a subject company's stock price behavior on a *group* of "news days" to (ii) its stock price behavior on a *group* of "no news days."~~62~~70

---

~~60~~ *Id.*

68 *Id.*

~~61~~69 *See* Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, *Information, Trading, and Volatility:  Evidence from Firm-Specific News*, Review of Financial Studies 32, at 1004 (2019); Ray Fair, *Events That Shook the Market*, Journal of Business 75, at 713, 714 (2002).

~~62~~70 Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements:  The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021). This approach has been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See, e.g.*, *In re Teva Securities Litigation*, 2021 WL 872156, at *21 (D.Conn. 2021); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F.Supp.3d 415, 429 (S.D.N.Y. 2014); *In re:  Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 311-12 (D. Md. 2022); *Bond v. Clover Health Invs., Corp.*, 2023 WL 1999859, at *22 (M.D. Tenn. Feb. 14, 2023); *In re:  QuantumScape Sec. Class Action Litig.*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

72.    Here, I performed such an analysis comparing the behavior of ~~StoneCo's~~Estée Lauder's Common Stock on news days versus no news days.  My analysis demonstrates that the price of ~~StoneCo's~~Estée Lauder's Common Stock was statistically significantly more volatile on news than on no news days.  This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in stock price"[63] for ~~StoneCo's~~Estée Lauder's Common Stock during the Class Period and, thus, further supports a finding of market efficiency.[71]

73.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I identified ~~StoneCo's~~Estée Lauder's quarterly earnings releases ~~filed on SEC Form 6-Ks,~~ during the ~~Class~~Analysis Period (the "News Days").[72] These types of announcements represent a potential opportunity for the public release of new value-relevant Company information to investors.  As shown in **Exhibit 6**, in total, ~~StoneCo~~Estée Lauder issued ~~seven~~eight earnings releases during the ~~Class~~Analysis Period. ~~I then classified each day on which such earnings release was first issued as a News Day.~~[64][73]

74.    I then compared the stock returns and trading volume of ~~StoneCo's~~Estée Lauder's Common Stock on these News Days versus those metrics on trading days that contained the least news during the ~~Class~~Analysis Period (the "No News Trading Days").  I identified No News

---

[63] ~~*Cammer*, 711 F. Supp. at 1291.~~

[71] *Cammer*, 711 F. Supp. at 1291.

[72] If the release was issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day.

[64] ~~If the~~[73] The last earnings release was ~~issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day~~after market close on October 31, 2023, the last day of the Class Period. Estée Lauder's common stock responded to this earnings announcement on November 1, 2023, the first day following the end of the class period.

Trading Days as days on which there were no News Day eventevents, no alleged revelations of the relevant truth, and no SEC filings (such as other Company press releases filed on Form 6-K), and no Dow Jones articles on Factiva tagged to Estée Lauder. The No News Trading Days provide a benchmark measurement of days inon which relatively little or no new StoneCo-specificEstée Lauder- specific information was provided to the market. If StoneCo'sEstée Lauder's Common Stock prices tend to move more significantly on News Days than on No News Trading Days, this would support a conclusion of market efficiency. As discussed below, there were 330240 No News Trading Days during the ClassAnalysis Period.[6574]

75.    **Exhibit 6** reports the list of seveneight News Days— i.e., their market impact dates and corresponding earnings releases. It also reports the results of my event study using StoneCo'sEstée Lauder's Common Stock returns. The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, and the p-value corresponding to statistical significance. Overall, four out of seven StoneCosix out of eight Estée Lauder earnings releases—i.e. News Days—causedobserved stock price movements that were statistically significant at the 95% confidence level or betterabove. I compare this rate with that on the No News Trading Days in **Exhibit 7**.

76.    **Exhibit 7** summarizes the statistical comparison of StoneCo'sEstée Lauder's Common Stock returns and trading volume on the 7eight News Days versus these metrics as measured on the 330240 No News Trading Days. As shown in **Exhibit 7**, 57.175% of the News Day disclosures caused stock movements that were statistically significant at the 95% level.

---

[6574] The 7eight News Days and 330240 No News Trading Days combined cover 9056% of the trading days (337248 of 375439) in the ClassAnalysis Period.

This compares to ~~5.2~~6.25% of the No News Trading Days with statistically significant stock price movements.  The difference between these two percentages is statistically significant at a level of greater than 99%.[~~66~~75]

77.    These results provide strong evidence of a cause-and-effect relationship between new information and ~~StoneCo's~~Estée Lauder's Common Stock price movements.  Moreover, relative to the No News Trading Days, the News Days had a higher average absolute abnormal return and greater trading volume, with these differences being statistically significant at a level greater than ~~99~~95%.[~~67~~76]

78.    In summary, relative to No News Trading Days, ~~StoneCo's~~Estée Lauder's News Days resulted in a greater proportion of statistically significant stock price movements at the 95% confidence level, higher absolute abnormal returns, and greater trading volumes, and these differences are all statistically significant.  These results establish a clear cause-and-effect relationship between the release of new company-specific information and ~~StoneCo's~~Estée Lauder's Common Stock price movements.  As a result, this analysis of Cammer factor five ~~analysis~~ supports the conclusion that ~~StoneCo's~~Estée Lauder's Common Stock traded in an efficient market during the Analysis Period, and therefore the Class Period.

F.  *Krogman* Factor 1:  Market Capitalization

79.    I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization.  The *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the

---

[~~66~~75] Based on a Fisher's Exact Test.

[~~67~~76] Based on a t-test for difference of means.

prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[68][77]

80.     Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors – such as relatively small market capitalization – that indicate that their shares trade in less developed and efficient markets.  The median market capitalization of the MRK Previously Covered Companies – those that eventually lost all analyst coverage – was $27.91 million.[69][78] By contrast, the MRK Covered Companies – those with analyst-coverage – had a median market capitalization of $243.97 million.[70] [79] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

81.     **Exhibit 8** reports ~~StoneCo's~~Estée Lauder's market capitalization throughout the Class Period.[71][80] This market capitalization averaged $~~13.6~~53.0 billion over the Class Period. ~~StoneCo's~~Estée Lauder's total market capitalization places it above the ~~90th~~95th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.[72]~~StoneCo's~~ [81] Estée Lauder's market capitalization also exceeded the median MRK Previously Covered Companies and MRK Covered ~~firms on an inflation-adjusted~~Companies on an inflation- adjusted basis.[73][82]

---

[68][77] *Krogman*, 202 F.R.D. at 478.

[69][78] MRK Study at 678 (Table 3).

[70][79] MRK Study at 678 (Table 3).

[71][80] Source:  Bloomberg.

[72] ~~Bhole Study at 107 (90th percentile of market capitalization defined as $12.9 billion).  I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.~~

[81] Bhole Study at 107 (95th percentile of market capitalization defined as $28.8 billion). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[73][82]  U.S.  Bureau  of  Labor  Statistics,  CPI  Inflation  Calculator,  available  at https://www.bls.gov/data/inflation_calculator.htm.

82.      ~~StoneCo's~~Estée Lauder's market capitalization, shares outstanding available for trading, and its sizeable float, as discussed below, are consistent with the conclusion that the Common Stock traded in an efficient market during the Class Period.

### G. *Krogman* Factor 2:  Bid-Ask Spread

83.      The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency:  "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[~~74~~83]

84.      The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid).  This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example, relative to the bid-ask midpoint.  A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally efficient market.  A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

85.      I analyzed the bid-ask spread of ~~StoneCo's~~Estée Lauder's Common Stock during the Class Period.  **Exhibit 9** reports ~~StoneCo's~~Estée Lauder's bid-ask spread as a percentage of the bid-ask midpoint.[~~75~~84] This spread averaged ~~0.11~~0.02% over the Class Period.

86.      By way of comparison, the MRK Study found that the MRK Previously Covered Companies had a median bid-ask spread of 4.55%, while the MRK Covered Companies had a

---

[~~74~~83] *Krogman*, 202 F.R.D. at 478.

[~~75~~84] Source:  Bloomberg.

median bid-ask spread of 1.69%.[~~76~~][85] ~~StoneCo's~~ Estée Lauder's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade ~~StoneCo's~~Estée Lauder's Common Stock at very low relative cost.  Additionally, ~~StoneCo's~~Estée Lauder's average bid-ask spread over the Class Period places it ~~below the 50th percentile~~in line with the 5th and 10th percentiles of all companies listed on the NASDAQ and the NYSE from 2016-2018 (lower percentile rankings correspond to smaller bid-ask spreads).[~~77~~][86]

87.    As a result, ~~StoneCo's~~Estée Lauder's bid-ask spread also supports the conclusion that ~~StoneCo's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

## H. *Krogman* Factor 3:  Public Float

88.    The *Krogman* court also considered the public float of a company in weighing market efficiency.[~~78~~][87]

89.    The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders.  Even if a company has a large market capitalization, if the majority of the equity is held by its ~~c-suite~~C-suite employees and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

---

[~~76~~] ~~MRK Study at 678 (Table 3).~~

[85] MRK Study at 678 (Table 3).

[~~77~~][86] Bhole Study at 105 (~~50th percentile~~5th and 10th percentiles of bid-ask spread are both defined as ~~0.14~~0.02%). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[~~78~~][87] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

90.     **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for ~~StoneCo's~~Estée Lauder's Common Stock during the Class Period.  During the Class Period, ~~StoneCo~~Estée Lauder's had between ~~178~~231 million and ~~264~~233 million shares of ~~Class A~~ Common Stock outstanding.  As shown in the exhibit, ~~StoneCo~~Estée Lauder's insiders held ~~1.3~~0.53% of the Common Stock during the Class Period, meaning that over ~~98~~99% of ~~StoneCo's~~Estée Lauder's Common Stock was held by non-insiders.  This equates to an average public float of $~~11.1~~50.4 billion during the Class Period.  Overall, between ~~185~~232 million and ~~276~~235 million shares of ~~StoneCo~~Estée Lauder Common Stock were available for trading in the public float during the Class Period. [88] Moreover, ~~StoneCo's~~Estée Lauder's public float greatly exceeded the $75 million minimum set by the SEC for S-3 ~~and F-3~~ filing eligibility.[~~79~~89]

91.     ~~This~~The large ~~degree of~~ public float ~~for StoneCo's~~of Estée Lauder's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.

## I. Additional Factor:  Institutional Ownership

92.     I also analyze an additional indicator of market efficiency:  the presence of institutional investors.[~~80~~90] Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources

---

[88] Given the statistics demonstrating over 230 million shares outstanding, significant public float, sizeable ownership by over 2,300 unique institutions, and millions of shares traded weekly throughout the Class Period, Estée Lauder's Common Stock ownership was numerous and was likely held and traded by thousands of individual investors.

[~~79~~89] *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf~~; SEC Form F-3, available at https://www.sec.gov/files/formf-3.pdf~~.

[~~80~~90] *See, e.g., In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

36

to allocate to investing decisions.  These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, ~~thus~~ causing the new information to be quickly impounded into stock prices.  Thus, the presence of institutional shareholders can be an indicator of market efficiency.

93.     I report the total institutional ownership of ~~StoneCo~~Estée Lauder Common Stock in **Exhibit 10,** which shows that at least ~~751~~2,361 institutions held the stock at some point during the Class Period.  By comparison, the MRK Study found that the MRK Previously Covered Companies had a median of only 9 institutional investors while the MRK Covered Companies had a median of 40 institutional investors.[81]~~StoneCo's~~ [91] Estée Lauder's institutional ownership base greatly exceeds both of these levels.  On average, institutional investors held ~~88.4~~90.2% of ~~StoneCo's~~Estée Lauder's Common Stock outstanding during the Class Period. This level placed it ~~between~~above the ~~50th and~~ 75th percentile of NYSE and NASDAQ traded companies.~~82~~ [92] Thus, the significant institutional ownership base for ~~StoneCo's~~Estée Lauder's Common Stock supports the conclusion that ~~StoneCo~~Estée Lauder traded in an efficient market throughout the Class Period.

**VI.      Ability to Calculate Damages on a Class-Wide Basis**

94.     I have also been asked to opine on whether per-share damages for traders of ~~StoneCo's~~Estée Lauder's Common Stock can be assessed for all Class members based upon a methodology common to all Class members and consistent with ~~Plaintiff's~~Plaintiffs' theory of

---

[81] ~~MRK Study at 678 (Table 3).~~

[91] MRK Study at 678 (Table 3).

~~82~~[92] Bhole Study, at 106:  ~~50th percentile defined as institutional ownership of 68.26% of shares outstanding;~~ 75th percentile defined as 88.89%. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

liability.  As discussed below, damages for each of ~~Plaintiff's~~Plaintiffs' claims can be calculated on a class-wide basis through a common methodology, the out-of-pocket damages methodology, which is also consistent with ~~Plaintiff's~~Plaintiffs' liability theory.

A. **Calculation of Damages for Violation of ~~Section~~§§ 10(b) and 20(a) of the Exchange Act**

95.    The Complaint alleges that, as a result of Defendant's materially misleading statements, omissions, and undisclosed risks, investors traded ~~StoneCo's~~Estée Lauder's Common Stock at artificially inflated prices during the Class Period.~~83~~ [93] Plaintiffs also claim certain defendants are liable as control persons under § 20(a).[94]

96.    The "out-of-pocket" method of calculating damages represents a standard and well- accepted methodology under § 10(b) of the Exchange Act.  This approach calculates investor damages formulaically as the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale.  If shares are not sold prior to the full revelation of the fraud, then the Private Securities Litigation Reform Act of 1995 caps these investors' damages at the difference between the purchase price for the security and the "mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."~~84~~ [95] This cap on damages is also applied class-wide.

---

[83] ~~*Id.*, ¶¶ 147, 198-207, 250~~[93] Complaint, ¶¶ 129, 173-180, 272, 284, 288, 291.

[94] *Id,* ¶¶ 51-53, 130, 143, 288, 291. § 20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. See 15 U.S.C. § 78t(a). Given § 20(a)'s derivative nature, Plaintiffs have instructed me to assume that § 20(a) damages can be calculated using the same methodologies for assessing § 10(b) damages.

[~~84~~95] 15 U.S.C. § 78u-4(e)(1).

97.     The claims process produces information necessary for the calculation of damages for each Class member as inputs to the formula above, including the purchase and sale information for each Class member's trades (including transaction dates and quantity of shares traded).  This information is available from brokerage statements, trade blotters, and/or other documentation of securities transactions.

98.     Another input to the above formula, the quantification of an artificial inflation ribbon per share, is based upon a detailed loss causation analysis.  I have not been asked to perform a loss causation analysis at this time, and such analysis often incorporates information produced during discovery.  Nonetheless, the method employed to eventually calculate artificial inflation can be applied Class-wide as an input to the out-of-pocket formula.  For example, event studies are also widely employed to calculate artificial inflation.  Event studies measure stock price reactions to corrective disclosures and materializations of the risks which revealed the relevant truth that was concealed by alleged fraudulent misrepresentations, and do not rely on individual class member- specific information.[85][96]

99.     Separately, valuation models can also be relied upon to estimate artificial inflation.  For example, the widely-used discounted cash flow analysis ("DCF") valuation approach estimates changes to firm value based on changes in future expected cash flows.  As Fama and French explain:  "A stock's price can always be expressed as the present value of expected future cash flows discounted at the expected return on the stock."[86][97] Discounting the changes in future expected cash flows resulting from alleged misrepresentations, omissions,

---

[85][96] For purposes of this Report, I conducted an event study to assist with the evaluation of market efficiency. My event study in this Report was not intended to quantify artificial inflation.

[86][97] Eugene F. Fama and Kenneth R. French, *The Capital Asset Pricing Model:  Theory and Evidence,* Journal of Economic Perspectives 18, at p. 41 (2004).

and/or schemes to the net present value ("NPV") based on a firm's risk-adjusted discount rate can provide an alternative, reliable measure of artificial inflation as the input to the out-of-pocket damages methodology.~~87~~ [98] Such changes in valuation are also commonly measured through multiples analysis, in which a company's valuation is expressed as a multiple of financial performance, such as sales or earnings.~~88~~[99]

100.    To the extent that reliable evidence is introduced to show that a significant portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud-related factors, the impact of such "confounding information" on the price of ~~StoneCo's~~Estée Lauder's Common Stock can be determined on a common, Class-wide basis using various accepted methodologies, such as event study analysis, valuation analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research.  The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation.  This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances present in the case.

101.    A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period.  That analysis and determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced

---

~~87~~[98] *See, e.g.*, Frank Partnoy, *Market Prices vs. Fundamental Value:  The Case for Using Discounted Cash Flow Analysis in Securities Class Actions,* The Business Lawyer 77, at ~~pp.~~ 1060-1063 (2022).

~~88~~[99] Joshua Rosenbaum and Joshua Pearl, *Investment Banking:  Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, John Wiley & Sons, Inc. (Hoboken), at p. 11 (2009).

40

through discovery. Regardless of how artificial inflation is quantified, the level of artificial inflation remains the same across all Class members at any given point in time.

102. One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per-share inflation equaled a constant dollar amount above the correct share price over the Class Period. This input to the out-of-pocket damages formula often calculates artificial inflation based upon the abnormal dollar value of a stock price decline utilizing an event study conducted around one or more corrective disclosures.

103. Alternatively, one can measure "constant percentage inflation," which assumes that each day's share price was inflated by a constant percentage amount above the correct stock price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal percentage return in the stock price as calculated through an event study around one or more corrective disclosures.

104. In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculations of artificial inflation and any potential disaggregation of confounding information are based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

105. All of these loss causation calculations can be performed on a Class-wide basis and are not dependent upon individual Class member identities or circumstances. This is because, as noted above, the level of artificial inflation remains the same across all Class members at any given point in time, regardless of how it is calculated.

**B. Damages Methodology is Flexible and can Incorporate Alternative Findings**

41

106.    The damages methodology I have laid out above is flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period.  The methodology can be modified based on the specific findings the finder of fact may make, including, but not limited to:  (1) the presence and degree of confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) when the first actionable fraudulent conduct or misstatement occurred.

107.    First, irrespective of what the jury ultimately determines is the appropriate amount of abnormal return that can be attributed to the release of corrective versus confounding information, that percentage can easily be inserted into the standard out-of-pocket damages model that I have described above.  Thus, regardless of whether a jury finds that the analysis I may conduct results in the most appropriate inflation figure, or they determine that based upon the evidence, a different amount is more appropriate, that finding can and will be an input into the formulaic out- of-pocket damages calculation.

108.    Second, should the jury determine that the true economic inflation in ~~StoneCo's~~Estée Lauder's Common Stock price evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a Class-wide basis.

109.    Third, should the jury decide that the first actionable misstatement or otherwise actionable fraudulent conduct happened at an alternative date other than the current start of the Class Period, this is easily accounted for in an out-of-pocket damages calculation.  Prior to such date, inflation in the stock price could simply be set to zero.

110.    Additionally, if the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

111.    To summarize, I have not been asked to calculate damages in this matter.  Such analysis would depend on information produced in discovery and development of the case record.  Based on my experience and qualifications and my understanding of the nature of the claims in this matter, however, I conclude that ~~StoneCo's~~Estée Lauder's Common Stock damages in this case can be calculated using a standard and well-established methodology applied on a Class-wide basis.

## VII.    Conclusion

112.    Based on my analyses of the market efficiency factors considered by courts, economists, and in academia, it is my opinion that ~~StoneCo's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.  Moreover, it is my opinion that Common Stock damages in this matter ~~for Plaintiff's Section~~under §§ 10(b) ~~claims~~and 20(a) can be calculated on a ~~Class-wide~~class-wide basis utilizing ~~the~~ common ~~out- of-pocket damages methodology~~methodologies.

~~I declare under the penalty of perjury that the foregoing is true and correct.~~

Respectfully Submitted,

_____

Matthew D. Cain

43

**Appendix A**

**Matthew D. Cain, Ph.D.** ~~April~~<u>July</u> 2025

E-mail: mdcain@outlook.com
Mobile: 574-485-8065

## Education

Ph.D., Finance, August 2007          Purdue University, West Lafayette, IN
B.S., Finance, May 2001              Grove City College, Grove City, PA

## Professional and Academic Experience

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

A-1

Retail Shareholder Participation in the Proxy Process:  Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity:  The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison:  Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made:  The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game:  The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises:  Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks:  Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92- 128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

A-2

Earnouts:  A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity:  The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania; Napa
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School

A-3

- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management*, *Journal of Empirical Legal Studies*, *Financial Management*, *North American Journal of Economics and Finance*, *International Review of Law & Economics*, *Managerial and Decision Economics*, *Annals of Finance*, *Journal of Economics and Business*

## Teaching Experience

UC Berkeley School of Law
    LAW 246.31:  Economic Expert Witnesses:  Depositions and Testimony, Spring 2022-2025
    LAW 251.52:  Economics of Corporate and Securities Litigation, Fall:  2020-2023

University of Notre Dame, Mendoza College of Business
    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall:  2008-2013
    FIN 40410:  Mergers and Acquisitions, Fall:  2008-2013

Purdue University, Krannert School of Management
    MGMT 412:  Financial Markets and Institutions, Spring:  2006 & 2008
    MGMT 610:  Financial Management I (MBA Core), Fall:  2007

## Expert Witness Experience

- *Genesee County Employees' Retirement System, et al., v. DocGo Inc., et al.*, Case No. 1:23-cv-09476 (S.D. N.Y.).  Report July 2025.

- *YVONNE DOLBEC c. BANK OF MONTREAL, et al.*, Case No. 500-06-001335-245 (Province of Quebec, District of Montreal).  Report May 2025.

- *In re National Instruments Corporation Securities Litigation*, Case No. 1:23-cv-10488 (S.D. N.Y.).  Report May 2025.  Deposition June 2025.

- *MOUVEMENT D'ÉDUCATION ET DE DÉFENSE DES ACTIONNAIRES c. CAE INC., MARC PARENT, and SONYA BRANCO*, Case No. 500-06-001312-244, (Province of Quebec, District of Montreal).  Report April 2025.

- *In re StoneCo Ltd. Securities Litigation*, Case No. 1:21-cv-09620 (S.D. N.Y.).  Report April 2025.

- *In re UiPath, Inc. Securities Litigation*, Case No. 1:23-cv-07908 (S.D. N.Y.).  Report February 2025.

A-4

- *Ali Diabat, et al., v. Credit Suisse Group AG, et al.*, Case No. 1:23-cv-5874 (S.D. N.Y.). Report December 2024.  Rebuttal Report January 2025.

- *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.*, Case No. 1:22-cv- 06339 (S.D. N.Y.).  Report November 2024.  Rebuttal Report February 2025.

- *Steven Leventhal, et al. v. Chegg, Inc., et al.*, Case No. 5:21-cv-09953 (N.D. Ca.). Declaration November 2024.

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.).  Declaration September 2024.  Rebuttal Report October 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.).  Report June 2024.  Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv- 01491 (S.D. N.Y.).  Report June 2024.  Declaration November 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21- cv-02770-WJM-SKC (D. Co.).  Report May 2024.  Rebuttal Report October 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.).  Report February 2024.  Deposition April 2024.  Rebuttal Report June 2024. Report July 2024.  Hearing August 2024.  Rebuttal Report October 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.).  Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.).  Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024.  Deposition April 2024.  Rebuttal Report December 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.).  Report January 2024.  Deposition March 2024.  Rebuttal Report July 2024.  Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024.  Report February 2025.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.).  Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.).  Report November 2023.  Deposition January 2024.  Rebuttal Report March 2024.  Report July 2024.  Deposition August 2024.  Rebuttal Report September 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.).  Report November 2023.  Deposition January 2024.  Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.).  Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.).  Report October 2023.  Report December 2024.  Deposition March 2025.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.).  Report August 2023.  Deposition October 2023.  Rebuttal Report January 2024.  Report September 2024.  Rebuttal Report November 2024. Deposition January 2025.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.).  Rebuttal Report April 2023.  Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.).  Report March 2023.  Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.).  Report February 2023.  Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.).  Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.).  Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.).  Declaration November 2022.

- *In re:  CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.).  Report August 2022.  Deposition October 2022.  Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.).  Report July 2022.  Deposition February 2023.  Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21- 0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv- 01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021.

A-7

Deposition September 2021. Rebuttal Report March 2024. Report September 2024. Deposition November 2024. Rebuttal Report January 2025.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM- C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv- 00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020.  Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.).  Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.).  Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017.  Deposition May 2017.  Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.).  Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015.  Declaration October 2015.  Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

A-8

**Appendix B**

**Documents Considered**

**Court Documents:**

- ~~Consolidated~~ Amended Class Action Complaint for ~~Violations~~Violation of the Federal Securities Laws, dated ~~August 8~~March 22, ~~2022~~2024, Case No. 1:~~21~~23-cv-~~9620~~10669-AS (Doc. ~~55~~47).

- ~~Memorandum~~ Opinion ~~&~~and Order, dated ~~September 25~~March 31, ~~2024~~2025, Case No. 1:~~21~~23-cv-~~9620~~10669-~~GHW~~AS (Doc. ~~76~~58).

**Court Decisions and Securities Law:**

- ~~*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).~~

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012).

- ~~*Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud*, §8.6. (Aug. 1988).~~

- *Bond v. Clover Health ~~Investments~~Invs., Corp.~~, et al.~~*, 2023 WL 1999859, at *22 (M.D. Tenn. Feb. 14, 2023).

- *Cammer v. Bloom*, 711 F. Supp. 1264, ~~1286-1287, 1291-1293~~1292 (D.N.J. 1989).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *Hayes v. MagnaChip Semiconductor Corp.*, ~~2016 WL 7406418, at *6~~Case No. 14-cv-01160-JST (N.D.~~Cal~~Ca. 2016).

- *In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009).

- *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009).

- *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008).

- *In re: QuantumScape Sec. Class Action Litig.*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

- *In re Teva Securities Litigation*, 2021 WL 872156, at *21 (D.Conn. 2021).

- *In re: Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 311-12 (D. Md. 2022).

- *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

B-1

- *Krogman v. Sterritt*, 202 F.R.D. 467, 477, 478 (N.D. Tex. 2001).

- *McIntire v. China MediaExpress Holdings, Inc.*, 38 F.Supp.3d 415, 429 (S.D.N.Y. 2014).

- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

**Academic Literature:**

- A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 13 (1997).

- Barber, Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporate Law* 19 (1994), 285-312.

- Bharat Bhole, Bharat, Sunita Surana, and Frank Torchio, 2020, Benchmarking Market Efficiency Indicators for Securities Litigation, *University of Illinois Law Review Online* (2020), 101-118.

- Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, Information, Trading, and Volatility:  Evidence from Firm-Specific News, *Review of Financial Studies* 32, 983-1018.

- Braun, Phillip A., Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50, 1575-1603.

- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, §8.6 (Aug. 1988).

- Charles M.C. Lee and Eric C. So, *Uncovering Expected Returns:  Information in Analyst Coverage Proxies*Fair, Ray C., 2002, Events That Shook the Market, *Journal of Financial Economics 124 (2017)Business* 75, 713-731.

- Fama, Eugene F. Fama, 1970, Efficient Capital Markets:  A Review of Theory and Empirical Work, *The Journal of Finance* 25 (1970)25.2, 383-417.

- Fama, Eugene F. Fama, 1991, Efficient Capital Markets:  II, *Journal of Finance* 46 (1991), 1575-1617.

- Fama, Eugene F. Fama, and Kenneth R. French, 2004, The Capital Asset Pricing Model:  Theory and Evidence, *Journal of Economic Perspectives* 18 (2004), 25-46.

- Lee, Charles M. C., and Eric C. So, 2017, Uncovering Expected Returns:  Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124, 331-351.

- MacKinlay, A. Craig, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, 13-39.

B-2

- Mitchell, Mark L., and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases:  Applications at the Securities and Exchange Commission, *The Business Lawyer* 49, 545-590.

- Mola, Simona, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *The Accounting Review* 88, 667-705.

- ~~Frank~~ Partnoy, Frank, 2022, Market Prices vs. Fundamental Value:  The Case for Using Discounted Cash Flow Analysis in Securities Class Actions, *The Business Lawyer* 77 ~~(2022)~~, 1055-1082.

- ~~Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, *Information, Trading, and Volatility:  Evidence from Firm-Specific News*, Review of Financial Studies 32 (2019).~~

- ~~Joshua~~ Rosenbaum, Joshua, and Joshua Pearl, 2009, Investment Banking:  Valuation, Leveraged Buyouts, and Mergers & Acquisitions, John Wiley & Sons, Inc. ~~at p.11~~ (~~2009~~ Hoboken).

- ~~Kewei Hou, Chen Xue, and Lu Zhang, *Replicating Anomalies*, Review of Financial Studies 33 (2020).~~ Thomas, Randall S., and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63, 105-139.

- ~~Mark L. Mitchell and Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases:  Applications at the Securities and Exchange Commission*, The Business Lawyer 49 (1994).~~

- Villanueva, Miguel O. ~~Villanueva~~, and Steven Feinstein, 2021, Stock Price Reactivity to Earnings Announcements:  The Role of the Cammer/Krogman Factors, *Review of Quantitative Finance and Accounting* 57 ~~(2021)~~, 111-144.

- ~~Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, *Good News, Bad News, Volatility, and Betas*, Journal of Finance 50 (1995).~~

- ~~Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63 (2000).~~

- ~~Ray Fair, *Events That Shook the Market*, Journal of Business 75 (2002).~~

- ~~Simona Mola, P. Raghavendra Rau, and Ajay Khorana, *Is There Life After the Complete Loss of Analyst Coverage?*, Accounting Review 88 (2013).~~

**~~Analyst Reports:~~**

- ~~Analyst Reports from Plaintiff's Counsel.~~

- Analyst Report Cite List from LSEG Refinitiv.

**Data Sources:**

- Bloomberg Terminal.

- Dow Jones Factiva News.

- Investext.

- S&P Capital IQ.

- SEC Edgar Online.

- StoneCoEstée Lauder Earnings Releases and SEC Filings.

**Other:**

- https://www.bls.gov/data/inflation_calculator.htm.

- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

- http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess.

- https://www.sec.gov/files/formf-3.pdf.

- https://www.sec.gov/files/forms-3.pdf.

- All data and documents cited throughout this report.

**Exhibit 1**



**~~StoneCo~~Estée Lauder Common Stock Closing ~~Stock~~ Price and Daily Trading Volume**
**~~May 27, 2020 – November 16, 2021~~February 3, 2022 – October 31, 2023**

E-1

Data ~~source~~Source:  Bloomberg~~.~~

B-2

**Exhibit 2**

~~StoneCo~~<u>Estée Lauder Common Stock</u> Weekly ~~Trading~~ Volume

~~May 27, 2020 – November 16, 2021~~<u>February 3, 2022 – October 31, 2023</u>

Data ~~source~~<u>Source</u>:  Bloomberg~~.~~

Note:  Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period.  The weekly trading volume for the week of October 27, 2023, has been scaled by a factor of 5/3 as the final week of the Class Period contained only 3 trading days.

B-4

**Exhibit 3**

**Analyst Coverage**
**February 3, 2022 – October 31, 2023**

~~Class Period: May 27, 2020 - November 16, 2021~~

| Analyst Name | ~~Contributor Name~~Reports Issued During the Class Period | Analyst Name | Reports Issued During the Class Period |
|---|---|---|---|
| EVERCORE ISI | [1] ~~Susquehanna~~101 | Cowen and Company | ~~15~~8 |
| Wells Fargo Securities, LLC | [2] ~~BTG Pactual~~37 | Sadif Analytics Prime | ~~13~~8 |
| [3] ~~Morgan Stanley~~ | | | ~~13~~ |
| BuySellSignals Research | [4] ~~BuySellSignals Research~~31 | Wright Reports | ~~12~~8 |
| RBC Capital Markets | [5] ~~UBS~~30 | Argus Research Corporation | ~~12~~7 |
| Telsey Advisory Group | [6] ~~J.P. Morgan~~30 | Validea | ~~11~~7 |
| JPMorgan | 29 | ValuEngine, Inc | 7 |
| Zacks Equity Research | [7] ~~BofA Global Research~~28 | Samsung Securities | ~~9~~6 |
| Piper Sandler Companies | [8] ~~Guggenheim~~26 | TD Cowen | ~~9~~4 |
| Credit Suisse | [9] ~~Credit Suisse~~25 | The Insight Partners | ~~8~~3 |
| Deutsche Bank | [10] ~~HSBC~~23 | Hanwha Securities Co., Ltd. | ~~8~~2 |
| Oppenheimer & Co., Inc. | [11] ~~Itau BBA~~22 | EQUISIGHTS | ~~7~~1 |
| [12] ~~Evercore ISI~~ | | | ~~6~~ |
| CapitalCube | [13] ~~GlobalData~~18 | JPMorgan Econ & FI | ~~6~~1 |
| [14] ~~ValuEngine~~ | | | ~~6~~ |
| Canaccord Genuity | [15] ~~Corporate Watchdog Reports~~17 | New Constructs, LLC | ~~5~~1 |
| [16] ~~Crispidea~~ | | | ~~5~~ |
| [17] ~~Wright Reports~~ | | | ~~5~~ |
| PriceTarget Research | [18] ~~New~~ | NH Investment & | ~~4~~1 |

| | Street Research 17 | Securities (Previously Woori Research) | |
|---|---|---|---|
| D.A. Davidson & Company | [19] Santander 16 | Probes Reporter | 4 1 |
| Societe Generale | [20] CapitalCube 11 | Sadif Analytics | 3 1 |
| [21]    Validea | | 3 | |
| Berenberg | [22]    Citi Research 9 | The Business Research Company | 2 1 |
| Trefis | [23]    Stephens Inc. 9 | Trust Investment SAS | 1 |
| Baptista Research | [24]    William O'Neil + Co. 8 | Vermilion Technical Research | 1 |
| | **Total Reports Issued** | **Total** | **168 556** |

Data Source:  LSEG (Refinitiv), Counsel. Investext

**Exhibit 4**

### Coefficients from Rolling Event Study Regressions
### ~~May 27~~February 3, ~~2020~~2022 – November ~~16~~1, ~~2021~~2023



Data ~~sources~~Sources:  Bloomberg, S&P Capital IQ, SEC ~~filings, Factiva~~Edgar, Complaint.~~~~

Note:  Regression models described in notes below **Exhibit 7**.

~~E-7~~

**Exhibit 5**

**Root Mean Squared Error (RMSE) from Rolling Event Study Regressions**
**~~May 27~~February 3, ~~2020~~2022 – November ~~16~~1, ~~2021~~2023**



Data ~~sources~~Sources:  Bloomberg, S&P Capital IQ, SEC ~~filings, Factiva~~Edgar, Complaint.

~~E-8~~

Note:  Regression models described in notes below **Exhibit 7**.

**Exhibit 6**

### ~~StoneCo~~Estée Lauder News Days and Common Stock Abnormal Returns

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($~~USD~~) | ~~t-Statistic~~p-Value | ~~p-Value~~Sig Level | ~~News Day~~Description |
|---|---|---|---|---|---|---|---|
| [1] | ~~5/27/20~~Feb 03, 2022 | ~~27.4~~-5.03% | ~~30.2~~-2.00% | -$~~8.06~~6.39 | ~~8.18~~0.110 | ~~(0.000)~~ | ~~1Q 2020~~Q2 2022 Earnings Release |
| [2] | ~~8/12/20~~May 03, 2022 | ~~-5.9~~-5.80% | ~~-7.1~~-6.39% | -$~~3.73~~16.66 | ~~-1.77~~0.000 | ~~(0.080)~~ *** | ~~2Q 2020~~Q3 2022 Earnings Release |
| [3] | ~~10/30/20~~Aug 18, 2022 | ~~-5.4~~1.84% | ~~-2.2~~1.51% | -$~~1.25~~4.19 | ~~-0.75~~0.264 | ~~(0.454)~~ | ~~3Q 2020~~Q4 2022 Earnings Release |
| [4] | ~~3/12/21~~Nov 02, 2022 | ~~-6.0~~-8.13% | ~~-6.1~~-5.22% | -$~~4.63~~10.79 | ~~-3.11~~0.000 | ~~(0.002)~~ *** | ~~4Q 2020~~Q1 2023 Earnings Release |
| [5] | ~~6/2/21~~Feb 02, 2023 | ~~1.4~~-4.41% | ~~1.3~~-6.51% | -$~~0.86~~18.27 | ~~0.70~~0.001 | ~~(0.483)~~ *** | ~~1Q 2021~~Q2 2023 Earnings Release |
| [6] | ~~8/31/21~~May 03, 2023 | ~~-6.0~~-17.34% | ~~-6.5~~-16.64% | -$~~3.24~~40.80 | ~~-3.77~~0.000 | ~~(0.000)~~ *** | ~~2Q 2021~~Q3 2023 Earnings Release |
| [7] | ~~11/17/21~~Aug 18, 2023 | ~~-34.6~~-3.31% | ~~-29.8~~-3.13% | -$~~9.43~~5.07 | ~~-13.11~~0.020 | ~~(0.000)~~ ** | ~~3Q 2021~~Q4 2023 Earnings Release |
| [8] | Nov 01, 2023 | -18.90% | -20.15% | -$25.96 | 0.000 | *** | Q1 2024 Earnings Release |

Data ~~sources~~Sources:  Bloomberg, S&P Capital IQ, SEC ~~filings~~Edgar, Complaint.

Note:  Regression models described in notes below **Exhibit 7**. "*", "**", "***" denotes statistical significance at the 90%, 95%, and 99% confidence levels, respectively.

~~E-10~~

**Exhibit 7**

**Comparison of Statistical Significance ~~on StoneCo~~of Estée Lauder Common Stock
Abnormal Returns for News Days vs. No News Trading Days During the ~~Class~~Analysis Period**

| ~~Statistic~~ | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | ~~7~~8 | ~~330~~240 | |
| Significant Days at 95% Confidence Level | ~~4~~6 | ~~17~~15 | |
| % Significant Days at 95% Confidence Level | ~~57.1~~75.00% | ~~5.2~~6.25% | ~~(0.000)~~ |
| Average Absolute Abnormal Return | ~~11.9~~7.69% | ~~1.7~~1.09% | ~~(0.000)~~0.031 |
| Average Volume (Millions) | ~~14.6~~7.38 | ~~2.6~~1.64 | ~~(0.000)~~0.016 |

Data sources:  Bloomberg, S&P Capital IQ, SEC ~~filings~~Edgar, Factiva~~.~~, Complaint

Notes:  The event study estimations are based on rolling regressions of the 120 trading days preceding each date of analysis.  The regression models control for the ~~NASDAQ Composite Total Return Index~~S&P 500 ("Market Index") and the ~~Solactive FinTech Index~~S&P 500 Consumer Staples excluding ~~Stoneco~~Estée Lauder ("Industry Index").  The ~~estimations~~Estimation Windows for each rolling regression exclude the ~~dates~~alleged revelations of the relevant truth ~~was allegedly revealed,~~dates and the News Days identified in **Exhibit 6**~~, and StoneCo's earnings release market impact date of March 3, 2020~~.  The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact Test.  The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume (Millions)" are based on t-tests for difference of means.

**Exhibit 8**

**~~StoneCo~~Estée Lauder Common Stock Market Capitalization**
**~~May 27, 2020 – November 16, 2021~~February 3, 2022 – October 31, 2023**

Data source:  Bloomberg~~.~~

**Exhibit 9**

**~~StoneCo~~Estée Lauder Common Stock Average Bid-Ask Spread**
**~~May 27, 2020 – November 16, 2021~~February 3, 2022 – October 31, 2023**



Data source:  Bloomberg~~.~~

~~E-13~~

Notes:  The percentage bid-ask spread was calculated as the a) the closing ask quote less the closing bid quote divided by b) the average of the closing bid and ask quotes.

E-14

**Exhibit 10**

**~~StoneCo~~Estée Lauder Common Stock ~~Public Float~~Shares Outstanding, Insider Holdings, and Institutional ~~Ownership~~Holdings**
**March 31, 2022 – December 31, 2023**

| Quarter End | Shares Outstanding (~~mm~~mil) | Total Institutions (#) Owning Stock | Insider Holdings (~~mm~~mil) | Short Interest (~~mm~~mil) | Public Float (~~mm~~mil) [6] = [2] + [5] - [4] | Insider Holdings as % of Shares Outstanding [7] = [4] / [2] | Inst. Holdings (~~mm~~mil) | Inst. Holdings as % of Shares Outstanding [9] = [8] / [2] | Inst. Holdings as % of Public Float [10] = [8] / [6] |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [2] + [5] - [4] | = [4] / [2] | [8] | = [8] / [2] | = [8] / [6] |
| ~~3/31/20~~Mar 31, 2022 | ~~178.44~~232.42 | ~~274~~1,627 | ~~3.85~~1.19 | ~~10.43~~2.19 | ~~185.02~~233.43 | ~~2.2~~0.51% | ~~143.96~~209.00 | ~~80.7~~89.92% | ~~77.8~~89.54% |
| ~~6/30/20~~Jun 30, 2022 | ~~179.68~~231.81 | ~~306~~1,573 | ~~3.75~~1.23 | ~~13.88~~3.43 | ~~189.82~~234.01 | ~~2.1~~0.53% | ~~157.64~~211.29 | ~~87.7~~91.15% | ~~83.1~~90.29% |
| ~~9/30/20~~Sep 30, 2022 | ~~225.84~~231.55 | ~~343~~1,541 | ~~3.75~~1.25 | ~~10.32~~2.66 | ~~232.41~~232.96 | ~~1.7~~0.54% | ~~189.96~~208.91 | ~~84.1~~90.22% | ~~81.7~~89.68% |
| ~~12/31/20~~Dec 31, 2022 | ~~226.38~~231.27 | ~~435~~1,601 | ~~2.73~~0.91 | ~~9.15~~3.75 | ~~232.80~~234.11 | ~~1.2~~0.39% | ~~220.88~~211.01 | ~~97.6~~91.24% | ~~94.9~~90.13% |
| ~~3/30/21~~Mar 31, 2023 | ~~226.38~~231.68 | ~~437~~1,636 | ~~2.53~~0.89 | ~~0.00~~2.83 | ~~223.85~~233.62 | ~~1.1~~0.39% | ~~226.93~~209.68 | ~~100.2~~90.51% | ~~101.4~~89.75% |
| ~~6/30/21~~Jun 30, 2023 | ~~264.04~~231.87 | ~~453~~1,545 | ~~2.53~~0.95 | ~~8.19~~2.64 | ~~269.70~~233.56 | ~~1.0~~0.41% | ~~230.95~~207.00 | ~~87.5~~89.27% | ~~85.6~~88.63% |
| ~~9/30/21~~Sep 30, 2023 | ~~264.04~~232.30 | ~~386~~1,412 | ~~2.53~~0.91 | ~~8.87~~3.49 | ~~270.37~~234.88 | ~~1.0~~0.39% | ~~230.38~~206.89 | ~~87.3~~89.06% | ~~85.2~~88.09% |
| ~~12/31/21~~Dec 31, 2023 | ~~262.89~~232.30 | ~~341~~1,392 | ~~0.33~~2.59 | ~~13.07~~4.17 | ~~275.63~~233.89 | ~~0.1~~1.11% | ~~215.03~~209.84 | ~~81.8~~90.33% | ~~78.0~~89.72% |
| Averages Over ~~Class~~Class Period~~:~~ | ~~228.46~~231.90 | | ~~2.75~~1.24 | 3.15 | ~~234.95~~233.81 | ~~1.3~~0.53% | ~~201.97~~209.20 | ~~88.4~~90.21% | ~~86.0~~89.48% |
| Total Unique Institutions: | | ~~751~~ 2,361 | | | | | | | |

Data ~~sources~~Sources:  Bloomberg, S&P Capital IQ~~.~~, SEC Edgar

| Summary report:<br>Litera Compare for Word 11.10.1.2 Document comparison done on<br>11/8/2025 7:56:18 PM | |
|---|---|
| **Style name:** GDCv11Rendering | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Z:\!_Doc Processing\B48714-1 Freire, Andrew\2. WIP\2. Completed (Ready for QC)\Completed\2025.04.04 Cain Report - StoneCo.docx | |
| **Modified filename:** Z:\!_Doc Processing\B48714-1 Freire, Andrew\2. WIP\2. Completed (Ready for QC)\Completed\ELC - Expert Report of Matthew D. Cain.docx | |
| **Changes:** | |
| Add | 929 |
| Delete | 858 |
| Move From | 17 |
| Move To | 17 |
| Table Insert | 42 |
| Table Delete | 6 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 6 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1875 |

# ~~EXHIBIT~~Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ~~UIPATH~~THE ESTÉE LAUDER CO., INC. SECURITIES LITIGATION | ~~Case~~ No. 1:23-cv-~~07908~~-10669-~~DLC~~ AS~~CLASS ACTION~~ |

EXPERT REPORT OF MATTHEW D. CAIN, PH.D.

~~February 28~~July 25, 2025

# Table of Contents

I.      Scope of Report and Opinions ................................................................... ~~2~~1

II.     Qualifications ............................................................................................. ~~3~~2

III.    Case Background ........................................................................................ ~~5~~4

IV.     Bases for Opinions on Market Efficiency ................................................. 7

V.      Evaluation of Market Efficiency Factors for ~~UiPath's~~Estée Lauder's Common Stock ....................................................................................................... 10

    A.    *Cammer* Factor 1:  Average Weekly Trading Volume ...................... 12

    B.    *Cammer* Factor 2:  Analyst Coverage ............................................... ~~14~~13

    C.    *Cammer* Factor 3:  Market Makers .................................................... 16

    D.    *Cammer* Factor 4:  SEC Form S-3 Filing Eligibility ........................ 19

    E.    *Cammer* Factor 5:  Cause and Effect Relationship Between Company Information and Stock Prices .......................................................... ~~21~~20

    F.    *Krogman* Factor 1:  Market Capitalization ....................................... ~~30~~29

    G.    *Krogman* Factor 2:  Bid-Ask Spread ................................................ ~~31~~30

    H.    *Krogman* Factor 3:  Public Float ...................................................... ~~32~~31

    I.    *~~Winstar~~*Additional Factor:  Institutional Ownership .......................... ~~33~~32

VI.     Ability to Calculate Damages on a Class-Wide Basis .............................. ~~34~~33

    A.    Calculation of Damages for Violation of ~~Section~~§§ 10(b) and 20(a) of the Exchange Act ..................................................................................... ~~35~~34

    B.    Damages Methodology is Flexible and can Incorporate Alternative Findings .............................................................................................. ~~38~~37

VII.    Conclusion ................................................................................................. 39

## I. Scope of Report and Opinions

1. ~~Court-appointed Lead Plaintiff Paul Severt ("Plaintiff~~Lead Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System (collectively, "Plaintiffs"), through ~~his~~their attorneys~~,~~ ~~has~~ have asked me to determine whether the market for ~~UiPath, Inc. ("UiPath" or the "Company")~~Class A common stock ("Common Stock")[1] of The Estée Lauder Companies Inc. ("Estée Lauder" or the "Company") was efficient during the period ~~March 31~~from February 3, 2022 ~~to September 27, 2022~~through October 31, 2023, inclusive (the "Class Period").~~2~~ [1]

2. In addition, ~~Plaintiff has~~Plaintiffs have asked me to opine on whether damages for investors trading in ~~UiPath's~~Estée Lauder's Common Stock during the Class Period can be calculated using a common methodology for all Class members that is consistent with ~~Plaintiff's~~Plaintiffs' claims under ~~Section~~: (i) § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§ 10(b) claims")~~.3~~; and (ii) § 20(a) of the Exchange Act.[2]

---

[1] ~~Throughout this report, I refer to UiPath's Class A Common Stock. The Company also had Class B Common Stock during the Class Period, but this stock did not trade on a public exchange and is not included within my opinions. See UiPath, Inc., SEC Form 10-K for Fiscal Year Ending January 31, 2022, filed Apr. 4, 2022, available at: https://www.sec.gov/Archives/edgar/data/1734722/000173472222000006/0001734722-22-000006-index.htm.~~

[2] ~~I understand that the Second[1]~~ See: Consolidated Amended Class Action Complaint for ~~Violations of~~Violation of the Federal Securities Laws (Doc. ~~194~~47) ("Complaint")~~ alleged a class period that began with UiPath's initial public offering on April 21, 2021 and that the Court's November 4, 2024~~; Opinion and Order~~ on Defendants' motion to dismiss~~, dated March 31, 2025, (Doc. ~~210~~58) (~~the ~~"MTD ~~Order") found the first actionable misstatement on March 30, 2022 during the Company's Q4 2022 earnings call, which began after the close of regular trading that day~~Opinion").

[3] ~~See SAC; MTD Order. I understand that following the MTD Opinion, the defendants in this action include UiPath and Daniel Dines (UiPath's former CEO). See id.~~

[2] See Complaint. I understand Defendants to be Estée Lauder, Inc., Defendant Freda (Estée Lauder's former Chief Executive Officer) and Defendant Travis (Estée Lauder's former Chief

---

3.      Based on my analysis to date and the evaluation of the factors described throughout this Report, I have formed the following opinions:

a.  The market for ~~UiPath's~~Estée Lauder's Common Stock was efficient throughout the Class Period.

b.  The *Cammer* and *Krogman* factors accepted and applied by courts to assess market efficiency corroborate that ~~UiPath's~~Estée Lauder's Common Stock traded in an efficient market.

c.  Though not necessary for a finding of market efficiency, the cause-and-effect relationship between new Company disclosures and resulting Common Stock price movements (which I analyze under the fifth *Cammer* factor) supports the conclusion that ~~UiPath's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

d.  Damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology for ~~Plaintiff's~~Plaintiffs' pending claims.  In particular, the out-of-pocket damages methodology, which is routinely used in ~~virtually all Section~~§ 10(b) securities class actions, is appropriate and applicable here.

4.      The remainder of my Report is organized as follows:  **Section II** describes my qualifications.  **Section III** summarizes the case background.  **Section IV** briefly explains the bases for the reliance requirement and the "fraud-on-the-market" theory relating to market efficiency.  **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period.  **Section VI** addresses how damages can be calculated on a class-wide basis subject to a common methodology under ~~Section~~§§ 10(b) and 20(a).  **Section VII** summarizes my conclusions.

## II.      Qualifications

5.      I hold a Ph.D. in Finance from Purdue University and am a Senior Fellow at the New York University School of Law.  I teach courses, deliver guest lectures, participate in

---

Lauder's former Chief Executive Officer) and Defendant Travis (Estée Lauder's former Chief Financial Officer).

academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.

6.    My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism.  I previously held fellowships with the Berkeley Center for Law and Business at UC Berkeley, Vanderbilt Law School, and the Harvard Law School Program on Corporate Governance, where I participated in teaching, research, and academic seminars.

7.    Before my current roles, I worked at the ~~U.S. Securities and Exchange Commission ("SEC")~~ between 2014 and 2018 as a Financial Economist.  During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, improper revenue recognition practices, and disclosure violations.  I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities law violations, revenue recognition practices, and corporate governance issues.  Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

8.    Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame.  I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics.  I have been engaged in academic research for over a decade

3

and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

9.    Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007.  Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes.  I received a B.S. in Finance from Grove City College in 2001.

10.    In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law.  I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

11.    I have published research in leading peer-reviewed journals in the fields of finance, accounting, law, and economics, including:  *Journal of Financial Economics, Journal of Law and Economics*, *Journal of Accounting and Economics, Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis*.  My curriculum vitae, attached as **Appendix A**, further details my publications.

12.    In addition to my teaching, research, and academic responsibilities, I provide consulting services and expert testimony in a variety of matters through my LLC, Cleveland Analytics, as well as in conjunction with other consulting firms.  As an expert in financial economics, I have conducted analyses or presented expert opinions related to market efficiency, valuation, securities trading, corporate disclosures, and loss causation/damages in over 60 cases. My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

13.     The materials I have considered in forming my opinions are listed and summarized in **Appendix B**.  My time is billed at a rate of $~~950~~1,100 per hour for my work on this matter.  I have been assisted in this matter by my staff at ~~Peregrine Economics, LLC~~Fideres Partners LLP, working under my direction, and I receive additional compensation based upon their billings.  My compensation is in no way contingent on the outcome of this case.

14.     My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

### III.    Case Background

15.     ~~UiPath was founded in 2005, and was one of the first companies to offer robotic process automation software.  This software automated various tasks that people would carry out on computers, programs, and related systems.  As a result of the Company's head start in this market, UiPath experienced "hyper growth" in its early years of operations.[4]~~Estée Lauder is a prestige beauty company that manufactures, markets and sells skincare, makeup, fragrance and hair care products worldwide. [3] Estée Lauder distributes its products in approximately 150 countries and territories under many brand names, including Estée Lauder, La Mer, Origins, M·A·C, Le Labo and Bobbi Brown. [4] In January 2024 Estée Lauder was the second largest

---

[4] ~~Complaint ¶¶ 22, 25.~~

[3] Complaint ¶ 4. The following overview section summarizes the allegations in the Complaint as context for Plaintiffs' claims. I make no findings or opinions as to these allegations, and the opinions I reach in other sections of this report regarding market efficiency and the calculation of damages are not tied to any specific allegations summarized herein.

[4] Complaint ¶ 4.

beauty company in the world. [5] Estée Lauder's Common Stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "EL" throughout the Class Period.[6]

16.    ~~The Complaint alleges that in 2020, Microsoft entered this market with robots that were designed to exploit weaknesses with UiPath's products.  The Complaint alleges that by the start of~~During the Class Period, ~~Microsoft was offering competing robots that were easier for customers to integrate, easier to use, and cheaper than UiPath's, while still able to effectively perform the tasks that customers wanted, and that due to this superior value proposition Microsoft was winning customers from UiPath while expanding through the market.⁵However, the~~one of Estée Lauder's most profitable sales channels was travel retail, including duty-free shops. [7] Of these travel retail channels, those in China and South Korea were critical sources of revenue for Estée Lauder during the Class Period and were closely monitored by the Company and its investors. [8] The Complaint alleges that Defendants ~~made false and misleading statements concealing how much competition they were seeing from Microsoft and that such competition was increasing.⁶~~concealed the fact that Estée Lauder's sales growth in the Company's Asia travel retail segment was driven by the prohibited gray market resale industry in China and South Korea, known as *daigou*, from investors.[9]

---

[5] Complaint ¶ 4.
[6] Complaint ¶ 48.
~~⁵ *Id.*, ¶¶ 64, 83-84.~~
[7] Complaint ¶ 7.
[8] Complaint ¶ 8.
~~⁶ *Id.*, ¶¶ 193-194.~~
[9] Complaint ¶ 1.

17.    The Complaint further alleges that Estée Lauder's ability to rely on *daigou* as a revenue stream ended following a July 1, 2021 pledge by its customer, China Duty Free Group, to eradicate *daigou* activity, as well as the January 1, 2022 implementation of China's prohibitions on *daigou* activity.[10] Despite a decline in net sales attributable to the absence of gray market transactions generated by *daigou* activity, Defendants allegedly made a series of misrepresentations concerning the overall impact of this absence on the Company's Asia travel retail business.[11]

18.    The Complaint alleges that the relevant truth was partially revealed on November 2, 2022, February 2, 2023, and May 3, 2023, when Estée Lauder published its first, second and third quarter 2023 financial results.  The published results revealed sales declines in the Estée Lauder's travel retail business and the negative impact that these declines were having on the Company's financial outlook.[12] However, on each of these dates Defendants offered reassurances to investors that sales would recover, which were false and misleading because Defendants failed to disclose that the Company was no longer able to rely on *daigou* sales.[13]

19.    The Complaint alleges that the relevant truth was further revealed on August 18, 2023, when Estée Lauder disclosed in its fourth quarter 2023 earnings that its travel retail "sales trend deteriorated and turned steeply negative from the enforcement actions to control *daigou*

---

[10] Complaint ¶ 2.

[11] Complaint ¶¶ 104 and 128.

[12] Complaint ¶¶ 35-37.

[13] Complaint ¶¶ 35-37.

activity." [14] Again, Defendants allegedly continued to mislead investors as they did not disclose that the primary cause of its declining sales was their falling *daigou* sales. [15]

20.    The Complaint alleges that the relevant truth was further revealed on November 1, 2023, when Estée Lauder disclosed in its first quarter 2024 earnings that its sales declines were "primarily due to…changes in government and retailer policies related to unstructured market activity."[16]

~~17.    The Complaint alleges that the concealed risks materialized and the relevant truth was revealed to investors through multiple corrective events, including:~~

- ~~After the market closed on September 6, 2022, UiPath reported its 2Q 2023 financial results, revealing slowing revenue and Annualized Renewal Run-rate ("ARR") growth, and downward revised FY 2023 guidance; and announced that Defendants were "strategically repositioning the Company to increase velocity, efficiency and customer centricity."[7]~~

- ~~During an Evercore ISI conference on the morning of September 7, 2022, Defendants confirmed that Microsoft was impacting how UiPath sold and positioned itself.[8]~~

- ~~Just before markets closed on September 27, 2022, UiPath hosted an Analyst/Investor Day, where Defendants revealed significant, longstanding problems with UiPath's sales and changes the Company would attempt to make to fix these problems; and announced slowing fiscal year 2024 expected revenues and ARR growth.[9]~~

~~18~~21.    The Complaint alleges that, as a result of Defendants' materially false and misleading statements and ~~undisclosed risks~~material omissions, investors allegedly traded

---

[14] Complaint ¶ 39.

[15] Complaint ¶ 40.

[16] Complaint ¶ 41.

~~[7] *Id*., ¶¶ 241-242.~~

~~[8] *Id*., ¶¶ 243-245.~~

~~[9] *Id*., ¶¶ 246-250.~~

8

~~UiPath's~~ Estée Lauder's Common Stock at artificially inflated prices during the Class Period.~~10~~ [17]

**Exhibit 1** graphs the closing stock price and trading volume for ~~UiPath's~~ Estée Lauder's Common Stock shares throughout the Class Period.

## IV.    Bases for Opinions on Market Efficiency

~~19~~ 22.    I understand that, with respect to their claims under § 10(b)~~, Plaintiff asserts~~ Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance, i.e., that all ~~UiPath shareholders~~ persons and entities who purchased or otherwise acquired Estée Lauder Common Stock during the Class Period relied on the alleged misrepresentations and omissions through their effect ~~on~~ of stock prices in an informationally efficient market.~~11~~ [18]

~~20~~ 23.    As courts, including the Supreme Court, have repeatedly explained, the "fraud-on- the-market" theory of class-wide reliance holds that investors who purchase securities traded in an informationally efficient market during a class period rely on any public misrepresentations or material omissions of fact made during the class period because those statements or material omissions of fact are incorporated into the value of each class member's purchase price.  As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business   Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements   The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.~~12~~ [19]

---

~~10 *Id.*, ¶¶ 276-286~~ [17] Complaint ¶¶ 128-129, 173, 177.

~~11 *Id.*, ¶¶ 276-286~~ [18] Complaint ¶¶ 271-275 (including additional *Affiliated Ute* presumption on alleged omissions).

~~12~~ [19] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

9

~~21~~24.   The Supreme Court reaffirmed the availability of this theory to satisfy ~~Section~~§ 10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.  We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[~~13~~20]

~~22~~25.   A market is considered informationally efficient when the market price of securities begins to respond quickly to publicly available information.[~~14~~21] Economic research and literature support the concept of market efficiency for publicly traded securities.   For example, Nobel Prize winner Eugene Fama has observed that "[t]he evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse," [~~15~~22] and that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[~~16~~23]

~~23.   Indeed, research continues to support the empirical soundness of the efficient market hypothesis, as modern scholars have concluded that, in fact, "capital markets are more~~

---

[~~13~~20] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[~~14~~21]  Academics often consider more stringent forms of market efficiency, *e.g.*, defining an efficient market as one in which prices reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs. Eugene F. Fama, 1991, *Efficient Capital Markets:  II*, Journal of Finance 46, at 1575 (1991).

[~~15~~22]  Eugene F. Fama, *Efficient Capital Markets:  A Review of Theory and Empirical Work*, Journal of Finance 25, at 383, 416 (1970).

[~~16~~23]  Eugene F. Fama, *Efficient Capital Markets:  II*, Journal of Finance 46, at 1575, 1576 (1991).

efficient than previously recognized."[17]Academic research thus provides ample support for the concept of market efficiency for public exchange-traded securities.

2426. Markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, are frequently granted a presumption of efficiency for virtually all securities traded on them.[18] [24] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other rules for these exchanges practically guarantee a liquid market for securities traded on these exchanges.[19] [25] The fact that UiPath'sEstée Lauder's Common Stock traded on the NYSE leads to a strong presumption of market efficiency.

2527. In securities fraud cases, courts have endorsed the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purpose of establishing the presumption of class-wide reliance.[20] [26] Courts also accept additional factors for evaluating market efficiency found in two other, such as those in the widely-cited opinions, *Krogman v. Sterritt*,[21]and *In re Winstar Comme'ns Sec. Litig.*[22] opinion.[27]

---

[17] *See, e.g.*, Kewei Hou, Chen Xue, and Lu Zhang, *Replicating Anomalies*, Review of Financial Studies 33, at 2071 (2020).

[18][24] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*") ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.'") (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).

[19][25] *Id.*

[20][26] *Cammer*, 711 F. Supp. at 1264, 1286 – 1287.

[21] 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[22] 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

[27] *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

~~26~~28.    Principles of economics and finance support the factors cited by the *Cammer*~~,~~ and *Krogman*~~, and Winstar~~ courts as indicators of market efficiency.~~23~~ [28] However, as explained below, it is important to understand that an assessment of market efficiency does not turn on any one single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.~~24~~[29]

V.    **Evaluation of Market Efficiency Factors for ~~UiPath's~~Estée Lauder's Common Stock**

~~27~~29.    In the following section, I discuss the *Cammer*, *Krogman*, and ~~*Winstar*~~other factors and evaluate them in relation to ~~UiPath's~~Estée Lauder's Common Stock.~~25~~ [30] In doing so, I compare the factors' application to ~~UiPath's~~Estée Lauder's Common Stock against:  (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

~~28~~30.    As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that ~~UiPath's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

---

[23][28] *See, e.g.*, Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements:  The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

[24][29] *Id.*, at 204-205.

[25][30] In addition to the *Cammer*~~,~~ and *Krogman*~~, and Winstar~~ factors, I also note that the Company a) had call and put options traded on the Common Stock, and b) did not have a statistically significant autocorrelation coefficient on abnormal stock returns during the Class Period from my event study in Section V.E. These findings further support my conclusion that ~~UiPath~~Estée Lauder's Common Stock traded in an efficient market throughout the Class ~~period~~Period.

2931.   One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."26[31] In this peer-reviewed study, these authors examined two samples of firms.  One sample included companies that eventually lost all analyst coverage (the "MRK Previously Covered Companies"); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage.  The second sample included the analyst-covered firms (the "MRK Covered Companies"), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.2732

3032.   The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year.  We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock.  Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.2833

3133.   The authors describe these variables as reflective of investor interest:  after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to

---

2631 Simona Mola, P. Raghavendra Rau, and Ajay Khorana, *Is There Life After the Complete Loss of Analyst Coverage?*, Accounting Review 88, at 667-705 (2013).

2732 MRK Study at 678, 681-682.

2833 MRK Study at 667.

[analyst-]covered peers."29 34 Therefore, I interpret the sample of MRK Covered Companies as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets.

3234.    Below, I compare several of UiPath'sEstée Lauder's market efficiency factors to the samples of firms in the MRK Study, to samples of firms in other academic studies, and to the benchmarks set forth by courts, to assess whether UiPath'sEstée Lauder's characteristics are consistent with firms operating in efficient markets.

### A. *Cammer* Factor 1:  Average Weekly Trading Volume

3335.    Trading volume refers to the number of shares of a security transacted between market participants.  The greater the amount of buying and selling activity in a security, the more likely it is that new information will be quickly incorporated into the price of that security.30 35 Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.31 36 Similarly, "[t]rading volume was also considered as an eligibility standard [for exchange listing] because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."3237

---

29 34 MRK Study at 681 (footnotes omitted).

30 35 *See, e.g.*, Bharat Bhole, Sunita Surana, and Frank Torchio, *Benchmarking Market Efficiency Indicators for Securities Litigation*, University of Illinois Law Review Online, at 101-102 (2020) (the "Bhole Study"); Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63, at 108 (2000); MRK Study at 681.

31 36 *Id.*

32 37 Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63, at 108 (2000).

3436.  The first *Cammer* factor, stock trading volume, was defined by the *Cammer* court using average weekly trading volume relative to shares outstanding.  In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[3338]

3537.  **Exhibit 2** graphs ~~UiPath's~~Estée Lauder's Common Stock weekly trading volume as a percentage of shares outstanding throughout the Class Period.~~34~~[39] The average weekly trading volume was ~~8.30~~4.0% of ~~UiPath's~~Estée Lauder's Common Stock outstanding over the Class Period.  This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court.  As a result, ~~UiPath's~~Estée Lauder's level of stock trading volume throughout the Class Period supports the conclusion that ~~UiPath's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

3638.  I also note that the average weekly trading volume of ~~UiPath's~~Estée Lauder's Common Stock over the Class Period was ~~38.4~~9.3 million shares on the NYSE.  This is a far larger weekly trading volume than was found for the MRK Previously Covered Companies (just 0.034 million shares), as well as the MRK Covered Companies (0.215 million shares).~~35~~[40] Additionally, ~~UiPath's~~Estée Lauder's daily turnover rate of ~~1.66~~0.8% during the Class Period placed it above the ~~75th  percentile~~median of all companies listed on the NYSE and the

---

3338 *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg, § 8.6).

3439 In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week. ~~Shares outstanding obtained from UiPath's SEC Filings~~.

3540 MRK Study at 678 (Table 3). The median annual trading volume for MRK Previously Covered Companies was 1.75 million shares. 1.75 million divided by 52 weeks is approximately

NASDAQ.~~36~~41 This further supports the conclusion that ~~UiPath's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

## B. *Cammer* Factor 2:  Analyst Coverage

~~37~~39.   The second *Cammer* factor looks at the amount of analyst coverage the company at issue receives.  An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry.  Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.

~~38~~40.   Analyst coverage can be indicative of market efficiency since research analysts help to disseminate new important company-specific information to investors, thus impounding new information into stock prices quickly and efficiently.  The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period.  The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.~~37~~42

~~39~~41.   In **Exhibit 3,** I review the analyst coverage of ~~UiPath~~Estée Lauder over the Class Period.  I identified a total of ~~167~~556 reports issued by analysts at ~~33~~38 separate firms during

---

0.034 million shares. The median annual trading volume for MRK Covered Companies was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

~~36~~41 According to the Bhole Study at 102, the ~~75th~~ ~~percentile of~~median daily turnover for the 2016-2018 sample period is ~~1.17~~0.71%. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

~~37~~42 *Cammer*, 711 F. Supp. at 1286.

that period.~~38~~ [43] The list of analyst reports that I was able to identify includes reports by firms such as ~~Barclays, Cowen~~Evercore, Wells Fargo, RBC, J.P. Morgan, ~~KeyBanc Capital Markets, Macquarie, Canaccord Genuity, and Evercore~~and Piper Sandler, among others. Collectively, this is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

~~40~~42. Empirically, this degree of analyst coverage is greater than that of most other publicly traded firms as documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by the Institutional Brokers' Estimate System ("I/B/E/S ~~(the Institutional Brokers' Estimate System~~") received no analyst coverage in a given year.~~39~~ [44] Charles M.C. Lee and Eric So documented that, on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.~~40~~ [45] Barber et al. found that coverage by one or two analysts strengthened the presumption of market efficiency.~~41~~ [46] Moreover, ~~UiPath's~~Estée Lauder's high level of analyst coverage also placed it above the 95th percentile when compared with all companies listed on the

---

~~38  Plaintiff's Counsel provided me with analyst reports.~~[43] I ~~also~~ obtained a ~~cite~~ list of analyst reports from ~~S&P Capital IQ~~Investext. These statistics represent a lower bound of the analyst coverage of ~~UiPath~~Estée Lauder because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

~~39~~[44] MRK Study at 668.

~~40~~[45] Charles M.C. Lee and Eric C. So, *Uncovering Expected Returns: Information in Analyst Coverage Proxies*, Journal of Financial Economics 124, at 336 (see Table 1, Panel B – "COV") (2017).

~~41~~[46] Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, Journal of Corporate Law 19, at 302 and 310-311 (1994).

17

NASDAQ and the NYSE from 2016-2018.~~42~~ 47 The significant analyst coverage of ~~UiPath~~Estée Lauder during the Class Period supports the conclusion that ~~UiPath's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

~~41~~43.    While the *Cammer* court specifically discussed analyst coverage as indicating wide dissemination of information about a given company, thus supporting market efficiency, individual and institutional investors also had access to a variety of other sources of information about ~~UiPath~~Estée Lauder available during the Class Period.  For example, I conducted a search of press and news articles about ~~UiPath~~Estée Lauder using Factiva, a well-known provider of access to business news across a comprehensive set of publications.  This search identified ~~over 500~~2,155 unique articles published throughout the Class Period from leading news outlets, including *Dow Jones ~~Institutional News, The Wall Street Journal~~Newswires*, *Reuter's News*, *Business ~~Insider, MarketWatch, and Barron's,~~Wire, and The Wall Street Journal* among others.~~43~~48

~~42~~44.    Moreover, ~~UiPath~~Estée Lauder produced numerous filings containing Company information that were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period.

~~43~~45.    As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about ~~UiPath~~Estée

---

~~42~~47 Bhole Study at 104 (95th percentile defined as 26.0 analysts). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

~~43~~ ~~559~~48 3,607 English language articles were identified through a Factiva search, including ~~UiPath's~~Estée Lauder's company tag over all available sources. After excluding potential duplicates, ~~over 500~~2,155 unique news articles were identified by ~~my~~this search.

Lauder supports the conclusion that its Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

## C. *Cammer* Factor 3: Market Makers

46. The third *Cammer* factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[49] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[50]

47. In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[51]

---

[49] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[50] Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, Journal of Corporate Law 19, at 291 (1994).

[51] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. Dec. 22, 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

48. The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

~~46.~~ ~~UiPath~~49. Estée Lauder had at least ~~103~~130 market makers and brokers ~~providing similar activity~~facilitating the buying and selling of the Common Stock over the Class Period~~, including the NYSE-assigned Designated Market Maker, discussed below.[47]~~

.[52] ~~47.~~ Further, ~~UiPath's~~Estée Lauder's Common Stock traded on the NYSE throughout the Class Period. Similar to other large, national exchanges, the NYSE reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient. [53] The *Cammer* court stated:

---

[47] ~~*See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact . . . RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow.").~~

[52] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact . . . RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow.").

[53] The NYSE Market Model, *NYSE*, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[48][54]

48 50. I understand that courts typically view large, established stock exchanges with market makers (such as the NYSE and NASDAQ) as being informationally efficient.[49]These market makers include the presence of a Designated Market Maker for NYSE listings.[50]During the Class Period, UiPath's Designated Market Maker was Citadel Securities.[51]UiPath's [55] Estée

periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry- specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery."

[48][54] *Cammer*, 711 F. Supp. at 1292.

[49] *See, e.g., Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (citation omitted); *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency").

[50] The NYSE Market Model, *NYSE*, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry- specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery." *See also*: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."

[51] *See* "Designated Market Maker (DMM)," Citadel Securities, https://www.citadelsecurities.com/what-we-do/equities/designated-market-maker-dmm.

Lauder's public listing on the NYSE, a well-developed and established national exchange, thus satisfies this market maker *Cammer* factor.

49 51. Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading.52 56 Academic research has similarly found that institutional investors can facilitate trading liquidity. UiPath's Estée Lauder's Common Stock was held by over 500 at least 2,361 unique institutional investors during the Class Period, who owned an average of 252.4 209.2 million shares, or 54.5 90.2% of UiPath's Estée Lauder's Common Stock outstanding.53 57

50 52. In sum, UiPath Estée Lauder easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting

---

[55] *See, e.g., Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (citation omitted); *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency").

[52][56] *See, e.g., In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market- makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading." (citations omitted)); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

[53][57] *See* **Exhibit 10**. By comparison, the MRK Study found that the MRK Previously Covered Companies had a median of only nine institutional investors while the MRK Covered Companies had a median of 40 institutional investors (p. 678 – Table 3). UiPath's Estée Lauder's institutional ownership base greatly exceeds both of these levels.

22

the efficiency of the market for ~~UiPath's~~Estée Lauder's Common Stock throughout the Class Period.

### D. *Cammer* Factor 4:  SEC Form S-3 Filing Eligibility

~~51~~53.   The fourth *Cammer* factor is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, ***such ineligibility was only because of timing factors*** rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met.  Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[54][58]

~~52~~54.   Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information.   This eligibility includes the following requirements:   the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has a float of at least $75 million, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.~~55~~[59] The logic and intuition behind this factor, as discussed by the *Cammer* court, is that investors in a company that makes timely financial filings with regulators will have ready and ample access to publicly available information about the issuer.

~~53~~55.   As shown in **Exhibit 8**, ~~UiPath's~~Estée Lauder's market capitalization averaged $~~8.46~~53.0 billion over the Class Period.  Moreover, **Exhibit 10** demonstrates significant public float of ~~UiPath's~~Estée Lauder's public shares available for trading, with the number of shares

---

[54][58] *Cammer*, 711 F. Supp. at 1287 (emphasis added).

[55][59] *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf.

held by investors other than insiders ~~exceeding 396~~<u>averaging 233.8</u> million over the Class Period.  Multiplying these shares by ~~UiPath's~~<u>Estée Lauder's</u> closing stock price on each quarter-end date indicates that ~~UiPath had a~~<u>the value of Estée Lauder's</u> public float ~~ranging~~<u>ranged</u> from $~~5.0~~<u>33.9</u> billion to $~~8.5~~<u>63.6</u> billion during the Class Period, with an average of $~~6.8~~<u>50.4</u> billion.  Thus, at all times during the Class Period, ~~UiPath's~~<u>the value of Estée Lauder's</u> public float far exceeded the S-3's minimum eligibility requirement of $75 million.

~~54.~~    ~~UiPath~~<u>56.</u>    <u>Estée Lauder</u> also regularly filed financial reports with the SEC throughout the Class Period.  The financial information in ~~UiPath's~~<u>Estée Lauder's</u> SEC filings, supplemented by information conveyed by research analysts and news coverage, provided investors with access to financial information about ~~UiPath~~<u>Estée Lauder</u> on a continuous basis throughout the Class Period.  Based on my research, ~~UiPath~~<u>Estée Lauder</u> made required filings with the SEC in a timely manner and satisfied the other Form S-3 requirements throughout the Class Period.  As a result, this factor is consistent with the efficiency of the market for ~~UiPath~~<u>Estée Lauder</u> Common Stock throughout the Class Period.

### E. *Cammer* Factor 5:  Cause and Effect Relationship Between Company Information and Stock Prices

~~55~~<u>57</u>.  The fifth Cammer factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information.  The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[~~56~~60]

~~56~~<u>58</u>.  Below, I summarize my empirical analysis, which finds that ~~UiPath's~~<u>Estée Lauder's</u> Common Stock exhibited the type of cause-and-effect relationship between

---

[~~56~~60] *Cammer*, 711 F. Supp. at 1291.

company-specific information flow and price movement described in *Cammer*.  As part of my analysis, I compared the behavior of ~~UiPath's~~Estée Lauder's Common Stock on days when ~~company-specific~~potential value-relevant news was issued via earnings releases with its behavior on days when no such news was issued.  This analysis demonstrates that ~~UiPath's~~Estée Lauder's Common Stock price reacted to company-specific news, and thus further supports the conclusion that ~~UiPath's~~Estée Lauder's Common Stock traded in an efficient market throughout the ~~Class~~period from February 3, 2022 to November 1, 2023, inclusive (the "Analysis Period").[61]

   i. *Event Study Methodology*

~~57~~59.  To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study.

~~58~~60.  Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.~~57~~[62] As Professor Eugene F. Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns.  When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration.  As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance.  The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend

---

[61] The Analysis Period extends one trading day beyond the Class Period to capture the market reaction to the Company's first quarter 2024 earnings, which were announced on the final day of the Class Period.

~~57~~[62] *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 13 (1997).

changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[63]

59 61. To determine whether ~~UiPath's~~Estée Lauder's Common Stock price movements on any given date ~~are~~were statistically significant, I performed an event study using generally accepted ~~economic~~econometric methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

60 62. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movements (*i.e.*, the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the ~~Company~~company's stock price return such that simple random movement can be rejected as the cause.

61 63. I applied these widely used and generally accepted econometric methodologies to perform my event study here. Specifically, in order to isolate the impact of company-specific news on ~~UiPath's~~Estée Lauder's Common Stock price during the ~~Class~~Analysis Period, I performed regression analyses to measure the relationship between ~~UiPath's~~Estée Lauder's

---

[63] Eugene F. Fama, *Efficient Capital Markets: II*, Journal of Finance 46, at 1607 (1991).

Common Stock price returns and:  (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in ~~UiPath's~~Estée Lauder's industry.  By modeling how ~~UiPath's~~Estée Lauder's Common Stock price returns moved relative to an overall market index and an industry index, I was also able to measure the response of ~~UiPath's~~Estée Lauder's Common Stock to announcements of company-specific news.

~~62~~64.  I conducted my regression analysis over the ~~Class~~Analysis Period.  For each trading day, I constructed a regression model using data from the prior 120 trading days (*i.e.*, six calendar months) of trading days (the "Estimation Window").[~~59~~64]

~~63~~65.  To study the relationship between ~~UiPath's~~Estée Lauder's Common Stock price returns and overall market factors, I used the S&P 500 ~~Total Return~~ Index (the "Market Index"). To study the relationship between ~~UiPath's~~Estée Lauder's Common Stock price returns and changes in industry-wide factors that would be expected to impact all stocks in ~~UiPath's~~Estée Lauder's particular industry, I used the S&P 500 ~~Information Technology (Sector) Total Return~~Consumer Staples Index (the "Industry Index").  ~~UiPath itself benchmarked its Common~~

---

[~~59~~64] I utilized an Estimation Window of 120 trading days, which equates to approximately six calendar months. This allowed my regression approach to adapt to the changing volatility of stock returns over time. *See, e.g.*, Mark L. Mitchell and Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases:  Applications at the Securities and Exchange Commission*, The Business Lawyer 49 (1994); A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 35, at 15 (1997) ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates."). The ~~estimations~~Estimation Windows exclude the ~~remaining actionable~~ alleged revelations of the relevant truth dates~~,~~ and the News Days identified in **Exhibit 6**~~, as well as UiPath's Fiscal Q3 earnings release market date on December 9, 2021~~.

27

Stock performance against both of these indices in its Form 10-K annual reports issued both before and after the Class Period.⁶⁰65

6466.    I established the relationship between the daily return of UiPath'sEstée Lauder's Common Stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.61 66 As shown in **Exhibit 4**, the event study models revealed an evolving relation between the daily returns of UiPath'sEstée Lauder's Common Stock and those of the overall stock Market and Industry Indices throughout the ClassAnalysis Period.  In other words, movements of the Market Index and the Industry Index help explain movements in UiPath'sEstée Lauder's Common Stock price.

6567.  Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of

---

⁶⁰ *See* UiPath, Inc., SEC Form 10-K for Fiscal Year Ending January 31, 2022, at 53-54, filed Apr. 4, 2022, available at: https://www.sec.gov/Archives/edgar/data/1734722/000173472222000006/0001734722-22-000006-index.htm; UiPath, Inc., SEC Form 10-K for Fiscal Year Ending January 31, 2023, at 55, filed Mar. 24, 2023, available at https://www.sec.gov/Archives/edgar/data/1734722/000173472223000017/0001734722-23-000017-index.htm; UiPath, Inc., SEC Form 10-K for Fiscal Year Ending January 31, 2024, at 59, filed Mar. 27, 2024, available at https://www.sec.gov/Archives/edgar/data/1734722/000173472224000011/0001734722-24-000011-index.htm. I confirmed that the index movements reported within these 10-Ks ("S&P 500 Technology Index") match those of the S&P 500 Information Technology (Sector) Total Return Index and the S&P 500 Index.⁶⁵ The index includes various companies classified as members of the GICS consumer staples sector such as The Proctor & Gamble Company, Walmart Inc., The Coca-Cola Company, and Costco Wholesale Corporation, among others. The index had 32 members at the start of the Analysis Period and 38 members at the end of the Class Period, and Estée Lauder was a member of the index. I removed the impact of Estée Lauder's returns from the daily returns on the index.

6166 My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 35 (1997); Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, *Good News, Bad News, Volatility, and Betas*, Journal of Finance 50, at 1597 (1995).

~~UiPath's~~Estée Lauder's Common Stock on any given date within the ~~Class~~Analysis Period that controlled for that day's market and industry returns.  Again, in accordance with standard event-study methodology, I then subtracted this predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

~~66~~68.  Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in ~~UiPath's~~Estée Lauder's Common Stock price return.  An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model.  In other words, the standard deviation of errors provides a metric for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of ~~UiPath's~~Estée Lauder's Common Stock after controlling for the Market Index and the Industry Index.  **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the ~~Class~~Analysis Period.

> ii.    *Cause and Effect Analysis Comparing ~~UiPath's~~Estée Lauder's Common Stock Price Behavior on News Days versus No News Days*

~~67~~69.  A generally accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on days when potential value-relevant company-specific news is disclosed ("news days") with its behavior on other days with relatively little or no such news.~~62~~ [67] A showing that a security's price is statistically significantly more

---

~~62~~[67] Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements:  The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

volatile on "news days" than on "no news days" is considered powerful evidence that the security responds promptly to news and, therefore, strongly supports a finding of efficiency.[~~63~~68]

~~68~~70.   Importantly, research has shown that in an efficient market, it is possible for a security to exhibit some large price movements despite the absence of news and, conversely, for one to observe news without large price movements.[~~64~~ 69] For instance, a company may announce earnings (or a lack thereof) that are in line with investor expectations – and while such an expected announcement is clearly important to investors, it may not elicit a statistically significant stock price movement.  Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again could result in no statistically significant price movement.  Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level.

~~69~~71.   Accordingly, a generally accepted, peer-reviewed methodology also accepted by numerous courts is to compare (i) a subject company's stock price behavior on a *group* of "news days" to (ii) its stock price behavior on a *group* of "no news days."[~~65~~70]

---

[~~63~~68] *Id.*

[~~64~~69] *See* Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, *Information, Trading, and Volatility:  Evidence from Firm-Specific News*, Review of Financial Studies 32, at 1004 (2019); Ray Fair, *Events That Shook the Market*, Journal of Business 75, at 713, 714 (2002).

[~~65~~70] Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements:  The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021). This approach has been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See, e.g.*, *In re Teva Securities Litigation,* *2021 WL 872156, at \*21 (D.Conn. 2021); McIntire v. China MediaExpress Holdings, Inc.,* 38 *F.Supp.3d 415, 429 (S.D.N.Y. 2014); In re*:  *Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, ~~311- 12~~311-12 (D. Md. 2022); *Bond v. Clover Health Invs., Corp.*, 2023 WL 1999859, at \*22 (M.D. Tenn. Feb. 14, 2023); *In re:  QuantumScape Sec. Class Action Litig.*, 2022 WL 17974629, at \*10 (N.D. Cal. Dec. 19, 2022).

70~~72~~.  Here, I performed such an analysis comparing the behavior of ~~UiPath's~~Estée Lauder's Common Stock on news days versus no news days.  My analysis demonstrates that the price of ~~UiPath's~~Estée Lauder's Common Stock was statistically significantly more volatile on news than on no news days.  This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in stock price" [66]for ~~UiPath's~~Estée Lauder's Common Stock during the Class Period and, thus, further supports a finding of market efficiency.[71]

71~~73~~.  To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I identified ~~UiPath's~~Estée Lauder's quarterly earnings releases ~~and financial updates, filed under Item 2.02 in SEC Form 8-Ks,~~ during the ~~Class~~Analysis Period (the "News Days").[72] These types of announcements represent a potential opportunity for the public release of new value-relevant Company information to investors.  As shown in **Exhibit 6**, in total, ~~UiPath~~Estée Lauder issued ~~three~~eight earnings releases during the ~~Class~~Analysis Period.  ~~I then classified each day on which such earnings release was first issued as a News Day.~~[67][73]

72~~74~~.  I then compared the stock returns and trading volume of ~~UiPath's~~Estée Lauder's Common Stock on these News Days versus those metrics on trading days that contained the least

---

[66] *Cammer*, 711 F. Supp. at 1291.

[71] *Cammer*, 711 F. Supp. at 1291.

[72] If the release was issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day.

[67] ~~If the~~[73] The last earnings release was ~~issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day~~after market close on October 31, 2023, the last day of the Class Period. Estée Lauder's common stock responded to this earnings announcement on November 1, 2023, the first day following the end of the class period.

news during the ~~Class~~Analysis Period (the "No News Trading Days").  I identified No News Trading Days as days on which there were no ~~Dow Jones news stories in the Factiva database tagged to UiPath, no conference presentations made by UiPath reflected in the Bloomberg events calendar, no remaining actionable~~News Day events, no alleged revelations of the relevant truth, ~~and no News Day events~~no SEC filings, and no Dow Jones articles on Factiva tagged to Estée Lauder.  The No News Trading Days provide a benchmark measurement of days ~~in~~on which relatively little or no new ~~UiPath-specific~~Estée Lauder- specific information was provided to the market.  If ~~UiPath's~~Estée Lauder's Common Stock prices tend to move more significantly on News Days than on No News Trading Days, this would support a conclusion of market efficiency.  As discussed below, there were ~~84~~240 No News Trading Days during the ~~Class~~Analysis Period.[68][74]

~~73~~75.  **Exhibit 6** reports the list of ~~three~~eight News Days~~—i.e., their market impact dates and corresponding earnings releases~~.  It also reports the results of my event study using ~~UiPath's~~Estée Lauder's Common Stock returns.  The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study~~, the t-statistic,~~ and the p-value corresponding to statistical significance.

~~74.~~  Overall, ~~three out of three UiPath~~six out of eight Estée Lauder earnings releases—i.e. News Days ~~caused~~observed stock price movements that were statistically significant at the 95% confidence level or ~~better~~above.  I compare this rate with that on the No News Trading Days in **Exhibit 7**.

---

[68][74] The ~~3~~eight News Days and ~~84~~240 No News Trading Days combined cover ~~70.2~~56% of the trading days (~~87 of 124) in the Class Period. The remaining 29.8% of days in the Class Period are excluded from both categories, because they did not correspond to News Day earnings releases, but had some other potential type of news that caused them to be excluded from the No News Trading Days~~248 of 439) in the Analysis Period.

32

~~75~~76. **Exhibit 7** summarizes the statistical comparison of ~~UiPath's~~Estée Lauder's Common Stock returns and trading volume on the ~~three~~eight News Days versus these metrics as measured on the ~~84~~240 No News Trading Days.

~~76.~~ As shown in **Exhibit 7**, ~~100~~75% of the News Day disclosures caused stock movements that were statistically significant at the 95% level ~~(and indeed, at greater than the 99% level)~~. This compares to ~~6.0~~6.25% of the No News Trading Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at a level of greater than 99%.[~~69~~75]

77. These results provide strong evidence of a cause-and-effect relationship between new information and ~~UiPath's~~Estée Lauder's Common Stock price movements. Moreover, relative to the No News Trading Days, the News Days had a higher average absolute abnormal return and greater trading volume, with these differences being statistically significant at a level greater than ~~99~~95%.[~~70~~76]

78. In summary, relative to No News Trading Days, ~~UiPath's~~Estée Lauder's News Days resulted in a greater proportion of statistically significant stock price movements at the 95% confidence level, higher absolute abnormal returns, and greater trading volumes, and these differences are all statistically significant. These results establish a clear cause-and-effect relationship between the release of new company-specific information and ~~UiPath's~~Estée Lauder's Common Stock price movements. As a result, this analysis of *Cammer* factor five ~~analysis~~ supports the conclusion that ~~UiPath's~~Estée Lauder's Common Stock traded in an efficient market during the Analysis Period, and therefore the Class Period.

---

[~~69~~75] Based on a Fisher's Exact Test.

[~~70~~76] Based on a t-test for difference of means.

33

### F. *Krogman* Factor 1: Market Capitalization

79.    I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[71][77]

80.    Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors – such as relatively small market capitalization – that indicate that their shares trade in less developed and efficient markets. The median market capitalization of the MRK Previously Covered Companies – those that eventually lost all analyst coverage – was $27.91 million.[72][78] By contrast, the MRK Covered Companies – those with analyst-coverage – had a median market capitalization of $243.97 million.[73][79] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

81.    **Exhibit 8** reports ~~UiPath's~~Estée Lauder's market capitalization throughout the Class Period.[74][80] This market capitalization averaged $~~8.46~~53.0 billion over the Class Period. ~~UiPath's~~Estée Lauder's total market capitalization places it above the ~~75th~~95th percentile of all

---

[71][77] *Krogman*, 202 F.R.D. at 478.

[72][78] MRK Study at 678 (Table 3).

[73][79] MRK Study at 678 (Table 3).

[74] ~~Market capitalization is calculated as the daily closing price of UiPath's Common Stock multiplied by the shares outstanding as of that date, obtained from UiPath's SEC Filings~~[80] Source: Bloomberg.

companies listed on the NASDAQ and the NYSE from 2016-2018.[75]UiPath's [81] Estée Lauder's

market capitalization also exceeded the median MRK Previously Covered Companies and MRK

Covered firms on an inflation-adjustedCompanies on an inflation- adjusted basis.[76][82]

82.    UiPath'sEstée Lauder's market capitalization, shares outstanding available for

trading, and its sizeable float, as discussed below, are consistent with the conclusion that the

Common Stock traded in an efficient market during the Class Period.

### G. *Krogman* Factor 2:  Bid-Ask Spread

83.    The *Krogman* court considered the bid-ask spread as another factor that can

indicate market efficiency:  "[a] large bid-ask spread is indicative of an inefficient market,

because it suggests that the stock is too expensive to trade."[77][83]

84.    The bid-ask spread is the difference between the price at which an investor could

purchase a stock (the ask) and the price at which an investor could sell the stock (the bid).  This

spread can be expressed as the difference between these prices in their quoted currency, or as a

percentage – for example, relative to the bid-ask midpoint.  A narrow bid-ask spread indicates

lower transaction costs to trade in a given stock and is indicative of a more informationally

efficient market.  A wider bid-ask spread will cause investors to pay more money to buy and sell

a given stock, and these higher transaction costs can discourage trading and price discovery, thus

indicating a less liquid and less efficient market.

---

[75] Bhole Study at 107 (75th percentile of market capitalization defined as $3.2 billion). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[81] Bhole Study at 107 (95th percentile of market capitalization defined as $28.8 billion). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[76][82] U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm.

[77][83] *Krogman*, 202 F.R.D. at 478.

85.    I analyzed the bid-ask spread of ~~UiPath's~~Estée Lauder's Common Stock during the Class Period.  **Exhibit 9** reports ~~UiPath's~~Estée Lauder's bid-ask spread as a percentage of the bid-ask midpoint.~~78~~[84] This spread averaged ~~0.08~~0.02% over the Class Period.

86.    By way of comparison, the MRK Study found that the MRK Previously Covered Companies had a median bid-ask spread of 4.55%, while the MRK Covered Companies had a median bid-ask spread of 1.69%.~~[79]UiPath's~~ [85] Estée Lauder's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade ~~UiPath's~~Estée Lauder's Common Stock at very low relative cost.  Additionally, ~~UiPath's~~Estée Lauder's average bid-ask spread over the Class Period places it ~~below the 50th percentile~~in line with the 5th and 10th percentiles of all companies listed on the NASDAQ and the NYSE from 2016-2018 (lower percentile rankings correspond to smaller bid-ask spreads).~~[80]~~[86]

87.    As a result, ~~UiPath's~~Estée Lauder's bid-ask spread also supports the conclusion that ~~UiPath's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.

## H. *Krogman* Factor 3:  Public Float

88.    The *Krogman* court also considered the public float of a company in weighing market efficiency.~~[81]~~[87]

---

~~[78]~~[84] Source:   Bloomberg ~~daily reported "AVERAGE_BID_ASK_SPREAD_%" variable, Daily Periodicity~~.

~~[79] MRK Study at 678 (Table 3).~~

[85] MRK Study at 678 (Table 3).

~~[80]~~[86] Bhole Study at 105 (~~50th percentile~~5th and 10th percentiles of bid-ask spread are both defined as ~~0.14~~0.02%). I note that the ~~2016- 2018~~2016-2018 subsample time period is the most recent period reported in the Bhole Study.

~~[81]~~[87] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

89.    The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders.  Even if a company has a large market capitalization, if the majority of the equity is held by its ~~c-suite~~C-suite employees and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

90.    **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for ~~UiPath's~~Estée Lauder's Common Stock during the Class Period.  During the Class Period, ~~UiPath~~Estée Lauder's had between ~~459~~231 million and ~~468~~233 million shares of ~~Class A~~ Common Stock outstanding.  As shown in the exhibit, ~~UiPath~~Estée Lauder's insiders held ~~20.2~~0.53% of the Common Stock during the Class Period, meaning that ~~79.8~~over 99% of ~~UiPath's~~Estée Lauder's Common Stock ~~were~~was held by non-insiders.  This equates to an average public float of $~~6.8~~50.4 billion during the Class Period.  Overall, between ~~380~~232 million and ~~397~~235 million shares of ~~UiPath's~~Estée Lauder Common Stock were available for trading in the public float during the Class Period. [88] Moreover, ~~UiPath's~~Estée Lauder's public float greatly exceeded the $75 million minimum set by the SEC for S-3 filing eligibility.~~82~~89

91.    ~~This~~The large ~~degree of~~ public float ~~for UiPath's~~of Estée Lauder's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.

I.    ~~*Winstar*~~Additional Factor:  Institutional Ownership

---

[88] Given the statistics demonstrating over 230 million shares outstanding, significant public float, sizeable ownership by over 2,300 unique institutions, and millions of shares traded weekly throughout the Class Period, Estée Lauder's Common Stock ownership was numerous and was likely held and traded by thousands of individual investors.

~~82~~89 *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf.

92.    I also analyze an additional ~~indicators~~indicator of market efficiency ~~from the Winstar opinion~~:  the presence of institutional investors.~~83~~ [90] Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions.  These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, ~~thus~~ causing the new information to be quickly impounded into stock prices.  Thus, the presence of institutional shareholders can be an indicator of market efficiency.

93.    I report the total institutional ownership of ~~UiPath~~Estée Lauder Common Stock in **Exhibit 10,** which shows that at least ~~511~~2,361 institutions held the stock at some point during the Class Period.  By comparison, the MRK Study found that the MRK Previously Covered Companies had a median of only 9 institutional investors while the MRK Covered Companies had a median of 40 institutional investors.~~84~~~~UiPath's~~ [91] Estée Lauder's institutional ownership base greatly exceeds both of these levels.  On average, institutional investors held ~~54.5~~90.2% of ~~UiPath's~~Estée Lauder's Common Stock outstanding during the Class Period.  This level placed it ~~between~~above the ~~25th  and  50th~~75th percentile of NYSE and NASDAQ traded companies.~~85~~ [92]

---

~~83~~ [90] *See, e.g., In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

~~84~~ ~~MRK Study at 678 (Table 3).~~

[91] MRK Study at 678 (Table 3).

~~85~~ [92] Bhole Study, at 106: ~~25th~~ 75th percentile defined as ~~institutional ownership of 33.58% of shares outstanding; 50th~~ percentile defined as ~~68.26~~88.89%. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

Thus, the significant institutional ownership base for ~~UiPath's~~Estée Lauder's Common Stock supports the conclusion that ~~UiPath~~Estée Lauder traded in an efficient market throughout the Class Period.

## VI.    Ability to Calculate Damages on a Class-Wide Basis

94.    I have also been asked to opine on whether per-share damages for traders of ~~UiPath's~~Estée Lauder's Common Stock can be assessed for all Class members based upon a methodology common to all Class members and consistent with ~~Plaintiff's~~Plaintiffs' theory of liability.  As discussed below, damages for each of ~~Plaintiff's~~Plaintiffs' claims can be calculated on a class-wide basis through a common methodology, the out-of-pocket damages methodology, which is also consistent with ~~Plaintiff's~~Plaintiffs' liability theory.

### A.  Calculation of Damages for Violation of ~~Section~~§§ 10(b) and 20(a) of the Exchange Act

95.    ~~Plaintiff~~The Complaint alleges that ~~Defendants' material misrepresentations~~, as a result of Defendant's materially misleading statements, omissions, and undisclosed risks ~~artificially inflated the market price of UiPath's Common Stock, causing Class members to purchase UiPath's Common~~, investors traded Estée Lauder's Common Stock at artificially inflated prices.[86] during the Class Period.[93] Plaintiffs also claim certain defendants are liable as control persons under § 20(a).[94]

---

[86] ~~Complaint, ¶¶ 276-286.~~

[93] Complaint, ¶¶ 129, 173-180, 272, 284, 288, 291.

[94] *Id,* ¶¶ 51-53, 130, 143, 288, 291. § 20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. See 15 U.S.C. § 78t(a). Given § 20(a)'s derivative nature, Plaintiffs have instructed me to assume that § 20(a) damages can be calculated using the same methodologies for assessing § 10(b) damages.

96.     The "out-of-pocket" method of calculating damages represents a standard and well- accepted methodology under § 10(b) of the Exchange Act.  This approach calculates investor damages formulaically as the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale.  If shares are not sold prior to the full revelation of the fraud, then the Private Securities Litigation Reform Act of 1995 caps these investors' damages at the difference between the purchase price for the security and the "mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."87 95 This cap on damages is also applied class-wide.

97.     The claims process produces information necessary for the calculation of damages for each Class member as inputs to the formula above, including the purchase and sale information for each Class member's trades (including transaction dates and quantity of shares traded).  This information is available from brokerage statements, trade blotters, and/or other documentation of securities transactions.

98.     Another input to the above formula, the quantification of an artificial inflation ribbon per share, is based upon a detailed loss causation analysis.  I have not been asked to perform a loss causation analysis at this time, and such analysis often incorporates information produced during discovery.  Nonetheless, the method employed to eventually calculate artificial inflation can be applied Class-wide as an input to the out-of-pocket formula.  For example, event studies are also widely employed to calculate artificial inflation.  Event studies measure stock price reactions to corrective disclosures and materializations of the risks which revealed the

---

87 95 15 U.S.C. § 78u-4(e)(1).

relevant truth that was concealed by alleged fraudulent misrepresentations, and do not rely on individual class member- specific information.~~88~~96

99.    Separately, valuation models can also be relied upon to estimate artificial inflation.  For example, the widely-used discounted cash flow analysis ("DCF") valuation approach estimates changes to firm value based on changes in future expected cash flows.  As Fama and French explain:  "A stock's price can always be expressed as the present value of expected future cash flows discounted at the expected return on the stock."~~89~~97 Discounting the changes in future expected cash flows resulting from alleged misrepresentations, omissions, and/or schemes to the net present value ("NPV") based on a firm's risk-adjusted discount rate can provide an alternative, reliable measure of artificial inflation as the input to the out-of-pocket damages methodology.~~90~~98 Such changes in valuation are also commonly measured through multiples analysis, in which a company's valuation is expressed as a multiple of financial performance, such as sales or earnings.~~91~~99

100.    To the extent that reliable evidence is introduced to show that a significant portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud-related factors, the impact of such "confounding information" on the price of ~~UiPath's~~Estée Lauder's Common Stock can be determined on a common,

---

~~88~~96 For purposes of this Report, I conducted an event study to assist with the evaluation of market efficiency. My event study in this Report was not intended to quantify artificial inflation.

~~89~~97 Eugene F. Fama and Kenneth R. French, *The Capital Asset Pricing Model:  Theory and Evidence,* Journal of Economic Perspectives 18, at ~~p.~~41 (2004).

~~90~~98 *See, e.g.*, Frank Partnoy, *Market Prices vs. Fundamental Value:  The Case for Using Discounted Cash Flow Analysis in Securities Class Actions,* The Business Lawyer 77, at ~~pp.~~ 1060-1063 (2022).

~~91~~99 Joshua Rosenbaum and Joshua Pearl, *Investment Banking:  Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, John Wiley & Sons, Inc. (Hoboken), at p. 11 (2009).

Class-wide basis using various accepted methodologies, such as event study analysis, valuation analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research.  The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation.  This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances present in the case.

101.    A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period.  That analysis and determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery.  Regardless of how artificial inflation is quantified, the level of artificial inflation remains the same across all Class members at any given point in time.

102.    One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per-share inflation equaled a constant dollar amount above the correct share price over the Class Period.  This input to the out-of-pocket damages formula often calculates artificial inflation based upon the abnormal dollar value of a stock price decline utilizing an event study conducted around one or more corrective disclosures.

103.    Alternatively, one can measure "constant percentage inflation," which assumes that each day's share price was inflated by a constant percentage amount above the correct stock price over the Class Period.  This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal percentage return in the stock price as calculated through an event study around one or more corrective disclosures.

104.    In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements.  In any of

42

these approaches, the calculations of artificial inflation and any potential disaggregation of confounding information are based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

105.    All of these loss causation calculations can be performed on a Class-wide basis and are not dependent upon individual Class member identities or circumstances.  This is because, as noted above, the level of artificial inflation remains the same across all Class members at any given point in time, regardless of how it is calculated.

**B.  Damages Methodology is Flexible and can Incorporate Alternative Findings**

106.    The damages methodology I have laid out above is flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period.  The methodology can be modified based on the specific findings the finder of fact may make, including, but not limited to:  (1) the presence and degree of confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) when the first actionable fraudulent conduct or misstatement occurred.

107.    First, irrespective of what the jury ultimately determines is the appropriate amount of abnormal return that can be attributed to the release of corrective versus confounding information, that percentage can easily be inserted into the standard out-of-pocket damages model that I have described above.  Thus, regardless of whether a jury finds that the analysis I may conduct results in the most appropriate inflation figure, or they determine that based upon the evidence, a different amount is more appropriate, that finding can and will be an input into the formulaic out- of-pocket damages calculation.

43

108.    Second, should the jury determine that the true economic inflation in ~~UiPath's common stock~~Estée Lauder's Common Stock price evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a Class-wide basis.

109.    Third, should the jury decide that the first actionable misstatement or otherwise actionable fraudulent conduct happened at an alternative date other than the current start of the Class Period, this is easily accounted for in an out-of-pocket damages calculation.  Prior to such date, inflation in the stock price could simply be set to zero.

110.    Additionally, if the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

111.    To summarize, I have not been asked to calculate damages in this matter.  Such analysis would depend on information produced in discovery and development of the case record.  Based on my experience and qualifications and my understanding of the nature of the claims in this matter, however, I conclude that ~~UiPath's~~Estée Lauder's Common Stock damages in this case can be calculated using a standard and well-established methodology applied on a Class-wide basis.

## VII.    Conclusion

112.    Based on my analyses of the market efficiency factors considered by courts, economists, and in academia, it is my opinion that ~~UiPath's~~Estée Lauder's Common Stock traded in an efficient market throughout the Class Period.  Moreover, it is my opinion that Common Stock damages in this matter ~~for Plaintiff's Section~~under §§ 10(b) ~~claims~~and 20(a) can

be calculated on a ~~Class-wide~~class-wide basis utilizing ~~the~~ common ~~out- of-pocket damages methodology~~methodologies.

~~I declare under the penalty of perjury that the foregoing is true and correct.~~

Respectfully Submitted,

_____

Matthew D. Cain

45

**Appendix A**

**Matthew D. Cain, Ph.D.**                                              ~~February~~July 2025

E-mail:  mdcain@outlook.com
Mobile:  574-485-8065

## Education

Ph.D., Finance, August 2007                 Purdue University, West Lafayette, IN
B.S., Finance, May 2001                     Grove City College, Grove City, PA

## Professional and Academic Experience

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

## Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process:  Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity:  The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison:  Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made:  The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game:  The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises:  Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks:  Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92- 128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts:  A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

## Presentations

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity:  The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania; Napa
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School

- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

## Teaching Experience

UC Berkeley School of Law
LAW 246.31:  Economic Expert Witnesses:  Depositions and Testimony, Spring 2022-2025
LAW 251.52:  Economics of Corporate and Securities Litigation, Fall:  2020-2023

University of Notre Dame, Mendoza College of Business
FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall:  2008-2013
FIN 40410:  Mergers and Acquisitions, Fall:  2008-2013

Purdue University, Krannert School of Management
MGMT 412:  Financial Markets and Institutions, Spring:  2006 & 2008
MGMT 610:  Financial Management I (MBA Core), Fall:  2007

## Expert Witness Experience

- *Genesee County Employees' Retirement System, et al., v. DocGo Inc., et al.*, Case No. 1:23-cv-09476 (S.D. N.Y.).  Report July 2025.

- *YVONNE DOLBEC c. BANK OF MONTREAL, et al*., Case No. 500-06-001335-245 (Province of Quebec, District of Montreal).  Report May 2025.

- *In re National Instruments Corporation Securities Litigation*, Case No. 1:23-cv-10488 (S.D. N.Y.).  Report May 2025.  Deposition June 2025.

- *MOUVEMENT D'ÉDUCATION ET DE DÉFENSE DES ACTIONNAIRES c. CAE INC., MARC PARENT, and SONYA BRANCO*, Case No. 500-06-001312-244, (Province of Quebec, District of Montreal).  Report April 2025.

- *In re StoneCo Ltd. Securities Litigation*, Case No. 1:21-cv-09620 (S.D. N.Y.).  Report April 2025.

- *In re UiPath, Inc. Securities Litigation*, Case No. 1:23-cv-07908 (S.D. N.Y.).  Report February 2025.

A-4

- *Ali Diabat, et al., v. Credit Suisse Group AG, et al.*, Case No. 1:23-cv-5874 (S.D. N.Y.). Report December 2024. Rebuttal Report January 2025.

- *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.*, Case No. 1:22-cv- 06339 (S.D. N.Y.). Report November 2024. Rebuttal Report February 2025.

- *Steven Leventhal, et al. v. Chegg, Inc., et al.*, Case No. 5:21-cv-09953 (N.D. Ca.). Declaration November 2024.

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024. Rebuttal Report October 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv- 01491 (S.D. N.Y.). Report June 2024. Declaration November 2024.

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21- cv-02770-WJM-SKC (D. Co.). Report May 2024. Rebuttal Report October 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024. Rebuttal Report October 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024. Rebuttal Report December 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024. Report February 2025.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

A-5

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023. Report December 2024. Deposition March 2025.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024. Rebuttal Report November 2024. Deposition January 2025.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21- 0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv- 01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021.

A-7

Deposition September 2021. Rebuttal Report March 2024. Report September 2024. Deposition November 2024. Rebuttal Report January 2025.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM- C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv- 00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020.  Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.).  Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.).  Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017.  Deposition May 2017.  Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.).  Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015.  Declaration October 2015.  Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

A-8

**Appendix B**

**Documents Considered**

**Court Documents:**

- ~~Second~~Consolidated Amended Class Action Complaint for ~~Violations of~~Violation of the Federal Securities Laws, dated March 22, 2024, Case No. 1:23-cv-~~07908~~-10669-~~DLC~~AS (Doc. ~~194~~47).

- Opinion and Order, dated ~~November 4, 2024~~March 31, 2025, Case No. 1:23-cv-10669-AS (Doc. ~~210~~58).

**Court Decisions and Securities Law:**

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012).

- ~~*Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, §8.6. (Aug. 1988).*~~

- *Bond v. Clover Health ~~Investments~~Invs., Corp.~~, et al.~~*, 2023 WL 1999859, at \*22 (M.D. Tenn. Feb. 14, 2023).

- *Cammer v. Bloom*, 711 F. Supp. 1264, ~~1286-1287, 1291-1293~~1292 (D.N.J. 1989).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *Hayes v. MagnaChip Semiconductor Corp.*, ~~2016 WL 7406418, at \*6~~Case No. 14-cv-01160-JST (N.D.~~Cal~~Ca. 2016).

- *In re Countrywide Fin.l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009).

- *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009).

- *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008).

- *In re: QuantumScape Sec. Class Action Litig.*, 2022 WL 17974629, at \*10 (N.D. Cal. Dec. 19, 2022).

- *In re Teva Securities Litigation, 2021 WL 872156, at \*21 (D.Conn. 2021).*

- *In re: Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 311-12 (D. Md. 2022).

- *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

- *Krogman v. Sterritt*, 202 F.R.D. 467, 477,~~478~~ (N.D. Tex. 2001).

- *McIntire v. China MediaExpress Holdings, Inc*., 38 F.Supp.3d 415, 429 (S.D.N.Y. 2014).

- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

**Academic Literature:**

- A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 13 (1997).

- Barber, Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporate Law* 19 (1994), 285-312.

- Bharat Bhole, Bharat, Sunita Surana, and Frank Torchio, 2020, Benchmarking Market Efficiency Indicators for Securities Litigation, *University of Illinois Law Review Online* (2020), 101-118.

- Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, Information, Trading, and Volatility:  Evidence from Firm-Specific News, *Review of Financial Studies* 32, 983-1018.

- Braun, Phillip A., Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50, 1575-1603.

- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, §8.6 (Aug. 1988).

- Charles M.C. Lee and Eric C. So, *Uncovering Expected Returns:  Information in Analyst Coverage Proxies*Fair, Ray C., 2002, Events That Shook the Market, *Journal of* Financial Economics 124 (2017)*Business* 75, 713-731.

- Fama, Eugene F. Fama, 1970, Efficient Capital Markets:  A Review of Theory and Empirical Work, *The Journal of Finance* 25 (1970)25.2, 383-417.

- Fama, Eugene F. Fama, 1991, Efficient Capital Markets:  II, *Journal of Finance* 46 (1991), 1575-1617.

- Fama, Eugene F. Fama, and Kenneth R. French, 2004, The Capital Asset Pricing Model: Theory and Evidence, *Journal of Economic Perspectives* 18 (2004), 25-46.

- Lee, Charles M. C., and Eric C. So, 2017, Uncovering Expected Returns:  Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124, 331-351.

- MacKinlay, A. Craig, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, 13-39.

- Mitchell, Mark L., and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases:  Applications at the Securities and Exchange Commission, *The Business Lawyer* 49, 545-590.

- Mola, Simona, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *The Accounting Review* 88, 667-705.

- ~~Frank~~ Partnoy, Frank, 2022, Market Prices vs. Fundamental Value:  The Case for Using Discounted Cash Flow Analysis in Securities Class Actions, *The Business Lawyer* 77 ~~(2022)~~, 1055-1082.

- ~~Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, *Information, Trading, and Volatility:  Evidence from Firm-Specific News*, Review of Financial Studies 32 (2019).~~

- ~~Joshua~~ Rosenbaum, Joshua, and Joshua Pearl, 2009, Investment Banking:  Valuation, Leveraged Buyouts, and Mergers & Acquisitions, John Wiley & Sons, Inc. ~~at p.11~~ (~~2009~~ Hoboken).

- ~~Kewei Hou, Chen Xue, and Lu Zhang, *Replicating Anomalies*, Review of Financial Studies 33 (2020).~~ Thomas, Randall S., and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63, 105-139.

- ~~Mark L. Mitchell and Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases:  Applications at the Securities and Exchange Commission*, The Business Lawyer 49 (1994).~~

- Villanueva, Miguel O. ~~Villanueva~~, and Steven Feinstein, 2021, Stock Price Reactivity to Earnings Announcements:  The Role of the Cammer/Krogman Factors, *Review of Quantitative Finance and Accounting* 57 ~~(2021)~~, 111-144.

- ~~Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, *Good News, Bad News, Volatility, and Betas*, Journal of Finance 50 (1995).~~

- ~~Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63 (2000).~~

- ~~Ray Fair, *Events That Shook the Market*, Journal of Business 75 (2002).~~

- ~~Simona Mola, P. Raghavendra Rau, and Ajay Khorana, *Is There Life After the Complete Loss of Analyst Coverage?*, Accounting Review 88 (2013).~~

**~~Analyst Reports:~~**

- ~~Analyst Reports from Plaintiff's Counsel.~~

- ~~Analyst Report Cite List from S&P Capital IQ.~~

**Data Sources:**

- Bloomberg Terminal.

- Dow Jones Factiva ~~News~~.

- Investext.

- S&P Capital IQ.

- SEC Edgar Online.

- ~~UiPath~~Estée Lauder Earnings Releases and SEC Filings.

**Other:**

- https://www.bls.gov/data/inflation_calculator.htm.

- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

- http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess.

- ~~https://www.nyse.com/market-model~~

- https://www.sec.gov/files/forms-3.pdf.

- ~~https://www.citadelsecurities.com/what-we-do/equities/designated-market-maker-dmm~~

- All data and documents cited throughout this report.

**Exhibit 1**

~~UiPath~~ **Estée Lauder** Common Stock **Closing** Price ~~&~~**and Daily Trading** Volume
~~3/31/2022 - 9/27/2022~~**February 3, 2022 – October 31, 2023**



Data Sources: Complaint and S&P Capital IQ.

Data Source:  Bloomberg

E-1

**Exhibit 2**

~~UiPath~~ <u>Estée Lauder</u> Common Stock ~~Average~~ Weekly ~~Trading~~ Volume
~~as a Percentage of Shares Outstanding~~
~~3/31/2022 - 9/27/2022~~<u>February 3, 2022 – October 31, 2023</u>



~~Data Sources:  S&P Capital IQ and SEC filings.~~
~~Note:~~
<u>Data Source:  Bloomberg</u>

~~(1)~~<u>Note:</u>  Average weekly trading volume is calculated by analyzing each <u>group of</u> five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period ~~on March 31, 2022 through September 27, 2022.  The last week consists of four trading days (i.e., 9/22/2022, 9/23/2022, 9/26/2022, and 9/27/2022), and therefore, the average of the daily trading volume for these four days is multiplied by five to get a comparable measure for the average~~.  <u>The</u> weekly trading volume ~~as a percentage of shares outstanding~~<u>for the week of October 27, 2023, has been scaled by a factor of 5/3 as the final week of the Class Period contained only 3 trading days</u>.

E-2

**Exhibit 3**
~~Research Analyst Coverage of UiPath~~

**Analyst Coverage**
**February 3, 2022 – October 31, 2023**

| Analyst Name | ~~Analyst Name~~Reports Issued During the Class Period | Analyst Name | Reports Issued During the Class Period ~~3/31/2022 – 9/27/2022~~ |
|---|---|---|---|
| EVERCORE ISI | 101 | Cowen and Company | 8 |
| Wells Fargo Securities, LLC | 37 | Sadif Analytics Prime | 8 |
| BuySellSignals Research | [1] ~~CFRA Equity Research~~31 | Wright Reports | ~~35~~8 |
| RBC Capital Markets | [2] ~~RBC Capital Markets~~30 | Argus Research Corporation | ~~11~~7 |
| [3] ~~Barclays~~ | ~~10~~ | | |
| Telsey Advisory Group | [4] ~~Cowen~~30 | Validea | 7 |
| JPMorgan | [5] ~~Macquarie Research~~29 | ValuEngine, Inc | 7 |
| Zacks Equity Research | [6] ~~Credit Suisse~~28 | Samsung Securities | 6 |
| Piper Sandler Companies | [7] ~~S&P Global Compustat~~26 | TD Cowen | ~~6~~4 |
| Credit Suisse | [8] ~~Evercore ISI~~25 | The Insight Partners | ~~5~~3 |
| Deutsche Bank | [9] ~~J.P. Morgan~~23 | Hanwha Securities Co., Ltd. | ~~5~~2 |
| [10] ~~Marktfeld~~ | ~~5~~ | | |
| [11] ~~Needham & Company~~ | ~~5~~ | | |
| [12] ~~BofA Securities~~ | ~~5~~ | | |
| Oppenheimer & Co., Inc. | [13] ~~Morgan Stanley~~22 | EQUISIGHTS | ~~5~~1 |
| CapitalCube | [14] ~~Mizuho Securities~~18 | JPMorgan Econ & FI | ~~5~~1 |
| Canaccord Genuity | [15] ~~Canaccord Genuity~~17 | New Constructs, LLC | ~~4~~1 |
| PriceTarget Research | [16] ~~Quant IP GmbH~~17 | NH Investment & Securities (Previously Woori Research) | ~~4~~1 |

E-3

| | | | |
|---|---|---|---|
| ~~[17] Wells Fargo Securities, LLC~~ | | | ~~4~~ |
| ~~[18] Wolfe Research, LLC.~~ | | | ~~4~~ |
| ~~[19] SMBC Nikko Securities America, Inc.~~ | | | ~~4~~ |
| D.A. Davidson & Company | ~~[20] KeyBanc~~16 | Probes Reporter | ~~4~~1 |
| ~~[21] BMO Capital Markets~~ | | | ~~3~~ |
| ~~[22] FBN Securities, Inc.~~ | | | ~~3~~ |
| ~~[23] Oppenheimer & Co. Inc.~~ | | | ~~3~~ |
| Societe Generale | ~~[24] Truist Securities~~11 | Sadif Analytics | ~~3~~1 |
| Berenberg | ~~[25] GlobalData~~9 | The Business Research Company | ~~2~~1 |
| ~~[26] Summit Insights Group~~ | | | ~~2~~ |
| ~~[27] BuySellSignals~~ | | | ~~2~~ |
| ~~[28] Cleveland Research~~ | | | ~~2~~ |
| ~~[29] Validea~~ | | | ~~2~~ |
| Trefis | ~~[30] 451 Research~~9 | Trust Investment SAS | 1 |
| Baptista Research | ~~[31] Plunkett Research, Ltd.~~8 | Vermilion Technical Research | 1 |
| ~~[32] ValuEngine~~ | | | ~~1~~ |
| ~~[33] Wright Reports~~ | | | ~~1~~ |
| | ~~Total~~ | **Total** | ~~167~~556 |

~~Data Sources:  Counsel and S&P Capital IQ.~~

Data Source:  Investext

**Exhibit 4**

**Coefficients from Rolling Event Study** ~~Regression for UiPath Common Stock 3/31/2022 - 9/27/2022~~Regressions
**February 3, 2022 – November 1, 2023**



Data Sources: ~~Complaint~~Bloomberg, S&P Capital IQ, SEC ~~Filings, Factiva.~~Edgar, Complaint

Note: ~~The event study methodology is~~Regression models described in notes below **Exhibit 7**.

~~E-5~~

**Exhibit 5**

**Root Mean Squared Error (RMSE) from Rolling Event Study Regressions**
~~Regression for UiPath Common Stock~~
~~3/31/2022 – 9/27/2022~~February 3, 2022 – November 1, 2023



Data Sources: ~~Complaint~~Bloomberg, S&P Capital IQ, SEC ~~Filings, Factiva.~~Edgar, Complaint

Note: ~~The event study methodology is~~Regression models described in notes below **Exhibit 7**.

E-6

**Exhibit 6**

~~UiPath~~ Estée Lauder News Days ~~and Common Stock~~ Abnormal Returns

| | Event Study Results | | | | | | |
|---|---|---|---|---|---|---|---|
| | Market Impact Date | Raw Return | ~~Abn~~Abnormal Return | ~~Abn. Dollar~~Abnormal Return ($) | t-Statistic~~e~~ | p-Value | Sig Level ~~(2)~~ | ~~Event~~Description |
| [1] | Feb 03, 2022 | -5.03% | -2.00% | -$6.39 | | 0.110 | | Q2 2022 Earnings Release |
| ~~1~~[2] | ~~3/31/2022~~May 03, 2022 | ~~-25.65~~-5.80% | ~~-22.90~~-6.39% | -$~~6.65~~16.66 | ~~-6.52~~ | ~~0.00~~0.000 | *** | Q3 2022 Earnings Release ~~for Fiscal Q4 and FY 2022~~ |
| [3] | Aug 18, 2022 | 1.84% | 1.51% | $4.19 | | 0.264 | | Q4 2022 Earnings Release |
| ~~2~~[4] | ~~6/2/2022~~Nov 02, 2022 | ~~16.70~~-8.13% | ~~13.60~~-5.22% | -$~~2.29~~10.79 | ~~3.68~~ | ~~0.00~~0.000 | *** | Q1 2023 Earnings Release ~~for Fiscal Q1 2023~~ |
| ~~3~~[5] | ~~9/7/2022~~Feb 02, 2023 | ~~-11.23~~-4.41% | ~~-13.35~~-6.51% | -$~~2.08~~18.27 | ~~-3.87~~ | ~~0.00~~0.001 | *** | Q2 2023 Earnings Release ~~for Fiscal Q2 2023~~ |
| [6] | May 03, 2023 | -17.34% | -16.64% | -$40.80 | | 0.000 | *** | Q3 2023 Earnings Release |
| [7] | Aug 18, 2023 | -3.31% | -3.13% | -$5.07 | | 0.020 | ** | Q4 2023 Earnings Release |
| [8] | Nov 01, 2023 | -18.90% | -20.15% | -$25.96 | | 0.000 | *** | Q1 2024 Earnings Release |

Data Sources:  Bloomberg, S&P Capital IQ, SEC ~~Filings, and Factiva.~~
~~Notes:~~Edgar, Complaint

~~(1) The event study methodology is described below Exhibit 7.~~
~~(2) I identified News Days as UiPath earnings releases and financial updates, filed under Item 2.02 in SEC Form 8-Ks, during the Class Period.~~

~~(3) "***" Denotes statistical significance at the 99% confidence level or greater.  "**" Denotes statistical significance at the 95% confidence level or greater.  "*" Denotes~~Note:  Regression models described in notes below **Exhibit 7**. "*", "**", "***" denotes statistical significance at the 90%, 95%, and 99% confidence ~~level or greater~~levels, respectively.

E-8

**Exhibit 7**

~~Statistical~~ Comparison ~~on~~of Statistical Significance of Estée Lauder Common Stock Abnormal Returns for News Days vs. No News Trading Days During the Analysis Period

| | News Days | No News ~~Trading~~ Days | ~~P-Value for Differences~~ | ~~Significance Level~~p-Value of Difference |
|---|---|---|---|---|
| | | | **Class Period** | |
| N | ~~3~~8 | ~~84~~240 | | |
| ~~# of~~ Significant Days at 95% Confidence Level | ~~3~~6 | ~~5~~15 | | |
| % ~~of~~ Significant Days at 95% Confidence Level | ~~100.0~~75.00% | ~~6.0~~6.25% | ~~0.00~~ | ~~>99%~~0.000 |
| Average Absolute Abnormal Return | ~~16.6~~7.69% | ~~2.7~~1.09% | ~~0.00~~ | ~~>99%~~0.031 |
| Average Volume (Millions) | ~~39.2~~7.38 | ~~6.7~~1.64 | ~~0.00~~ | ~~>99%~~0.016 |

Data ~~Sources:~~ sources:  Bloomberg, S&P Capital IQ, SEC ~~Filings, and~~Edgar, Factiva~~.~~
~~Notes:~~, Complaint

~~(1) No News Trading Days are defined as dates on which there were no Dow Jones news stories in the Factiva database tagged to UiPath, no conference presentations made by UiPath reflected in the Bloomberg events calendar, no alleged revelations of the relevant truth, or no News Day events. (2) The results~~Notes:  The event study estimations are based on ~~a~~ rolling ~~regression~~regressions of the 120 trading days preceding each date of analysis.  The regression ~~model controls for a broad Market Index (S&P 500 Total Return Index) and an Industry Index.  The Industry Index is the S&P Information Technology Total Return Index, which UiPath compares its performance to in its FY 2022 10-K, filed on April 4, 2022.  The estimations~~ models control for the S&P 500 ("Market Index") and the S&P 500 Consumer Staples excluding Estée Lauder ("Industry Index").  The Estimation Windows for each rolling regression exclude the ~~remaining actionable~~ alleged revelations of the relevant truth dates~~,~~ and the News Days identified in **Exhibit 6**~~, and UiPath's Fiscal Q3 earnings release market date on December 9, 2021. (3)~~.  The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact Test.  The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume (Millions)" are based on t-tests for difference of means.

**Exhibit 8**

**~~UiPath~~ Estée Lauder Common Stock Market Capitalization**
**~~3/31/2022 – 9/27/2022~~February 3, 2022 – October 31, 2023**



Data source:  Bloomberg

Data Sources:  Complaint, SEC Filings, and S&P Capital IQ.

**Exhibit 9**



**~~UiPath~~ Estée Lauder Common Stock Average ~~Monthly~~ Bid-Ask ~~Percentage~~ Spread
~~3/31/2022 - 09/27/2022~~February 3, 2022 – October 31, 2023**

Data source: Bloomberg

Notes: The percentage bid-ask spread was calculated as the a) the closing ask quote less the closing bid quote divided by b) the average of the closing bid and ask quotes.

~~E-13~~

Data Source:  Bloomberg "AVERAGE_BID_ASK_SPREAD_%" Variable, Daily Periodicity.
Notes:
(1) March 2022 and September 2022 data are limited to the Class Period.
(2) Bloomberg "AVERAGE_BID_ASK_SPREAD_%" is the "average of all bid/ask spreads taken as a percentage of the mid price."

E-14

# Exhibit 10

~~UiPath~~ <u>Estée Lauder</u> Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings<br><u>March 31, 2022 – December 31, 2023</u>

| ~~Date~~<u>Quarter End</u> | ~~Total~~ Shares Outstanding (~~in 000s~~<u>mil</u>) | Total Institutions Owning Stock | Insider Holdings (~~in 000s~~<u>mil</u>) | Short Interest (~~in 000s~~<u>mil</u>) | Public Float (~~in 000s~~<u>mil</u>) | Insider Holdings <u>as</u> % of Shares Outstanding | ~~Total Institutional~~<u>Inst.</u> Holdings (~~in 000s~~<u>mil</u>) | ~~Institutional~~ <u>Inst.</u> Holdings <u>as</u> % of Shares Outstanding | ~~Institutional~~ <u>Inst.</u> Holdings <u>as</u> % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | [6] = [2] + [5] - [4] | | | | |
| [1] | [2] | [3] | [4] | [5] | [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| ~~3/31/22~~<u>Mar 31, 2022</u> | ~~459,635~~232.42 | ~~366~~1,627 | ~~84,680~~1.19 | ~~17,643~~2.19 | ~~392,597~~233.43 | ~~18.4~~0.51% | ~~237,466~~209.00 | ~~51.7~~89.92% | ~~60.5~~89.54% |
| ~~6/30/22~~<u>Jun 30, 2022</u> | ~~462,279~~231.81 | ~~386~~1,573 | ~~98,922~~1.23 | ~~16,864~~3.43 | ~~380,221~~234.01 | ~~21.4~~0.53% | ~~252,788~~211.29 | ~~54.7~~91.15% | ~~66.5~~90.29% |
| ~~9/30/22~~<u>Sep 30, 2022</u> | ~~467,154~~231.55 | ~~378~~1,541 | ~~97,392~~1.25 | ~~26,596~~2.66 | ~~396,357~~232.96 | ~~20.8~~0.54% | ~~266,989~~208.91 | ~~57.2~~90.22% | ~~67.4~~89.68% |
| <u>Dec 31, 2022</u> | <u>231.27</u> | <u>1,601</u> | <u>0.91</u> | <u>3.75</u> | <u>234.11</u> | <u>0.39%</u> | <u>211.01</u> | <u>91.24%</u> | <u>90.13%</u> |
| <u>Mar 31, 2023</u> | <u>231.68</u> | <u>1,636</u> | <u>0.89</u> | <u>2.83</u> | <u>233.62</u> | <u>0.39%</u> | <u>209.68</u> | <u>90.51%</u> | <u>89.75%</u> |
| <u>Jun 30, 2023</u> | <u>231.87</u> | <u>1,545</u> | <u>0.95</u> | <u>2.64</u> | <u>233.56</u> | <u>0.41%</u> | <u>207.00</u> | <u>89.27%</u> | <u>88.63%</u> |
| <u>Sep 30, 2023</u> | <u>232.30</u> | <u>1,412</u> | <u>0.91</u> | <u>3.49</u> | <u>234.88</u> | <u>0.39%</u> | <u>206.89</u> | <u>89.06%</u> | <u>88.09%</u> |
| <u>Dec 31, 2023</u> | <u>232.30</u> | <u>1,392</u> | <u>2.59</u> | <u>4.17</u> | <u>233.89</u> | <u>1.11%</u> | <u>209.84</u> | <u>90.33%</u> | <u>89.72%</u> |
| <u>Averages Over Class Period</u> | <u>231.90</u> | | <u>1.24</u> | <u>3.15</u> | <u>233.81</u> | <u>0.53%</u> | <u>209.20</u> | <u>90.21%</u> | <u>89.48%</u> |
| Total Unique Institutions: | | ~~511~~<u>2,361</u> | | ~~Class Period Average:~~ | | ~~20.2%~~ | ~~252,414~~ | ~~54.5%~~ | ~~64.8%~~ |

Data Sources: <u>Bloomberg,</u> S&P Capital IQ ~~and~~<u>,</u> SEC ~~Filings.~~
~~Note: S&P Capital IQ updates short interest every two weeks while updates to institutional holdings via 13-F filings are quarterly; timing differences in data reporting may cause institutional holdings to appear to exceed shares outstanding and public float.~~<u>Edgar</u>

E-15

E-16

| Summary report: Litera Compare for Word 11.10.1.2 Document comparison done on 11/8/2025 7:55:12 PM | |
|---|---|
| **Style name:** GDCv11Rendering | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Z:\!_Doc Processing\B48714-1 Freire, Andrew\2. WIP\2. Completed (Ready for QC)\Completed\2025.02.28 Cain Report - UiPath.docx | |
| **Modified filename:** Z:\!_Doc Processing\B48714-1 Freire, Andrew\2. WIP\2. Completed (Ready for QC)\Completed\ELC - Expert Report of Matthew D. Cain.docx | |
| **Changes:** | |
| Add | 897 |
| Delete | 838 |
| Move From | 23 |
| Move To | 23 |
| Table Insert | 50 |
| Table Delete | 28 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 6 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1865 |