# EXHIBIT L

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------x

IN RE THE ESTÉE LAUDER CO.,    Case No.

INC. SECURITIES LITIGATION    1:23-cv-10669-AS

------------------------------x

DEPOSITION OF MATTHEW D. CAIN, Ph.D.

December 17, 2025

Reported by:

MARY F. BOWMAN, RPR, CRR

JOB NO. J13938057

**Page 3**

APPEARANCES:

LABATON KELLER SUCHAROW LLP

Attorneys for Plaintiffs

140 Broadway

New York, NY 10005

BY:    JAMES T. CHRISTIE, ESQ.

JACQUELINE MEYERS, ESQ.

MICHAEL CANTY, ESQ.

GIBSON DUNN & CRUTCHER, LLP

Attorneys for Defendants

200 Park Avenue

New York, New York

BY:    MONICA LOSEMAN, ESQ.

ANDREW FREIRE, ESQ.

MICHELLE GERY, ESQ.

DAVID KUSNETZ, ESQ.

JOHN W.F. CHESLEY, ESQ.

Also present:

Charlie Bowman, Legal Videographer

**Page 2**

December 17, 2025

9:30 a.m.

Deposition of MATTHEW D. CAIN, Ph.D., held at Gibson Dunn & Crutcher, LLP, 200 Park Avenue, New York, New York, before Mary F. Bowman, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the States of New Jersey and New York.

**Page 4**

M. Cain

THE VIDEOGRAPHER: We are now on the record. The time is 9:37 a.m. on December 17, 2025.

This begins the videotaped deposition of Dr. Matthew D. Cain taken in the matter of In re: The Estee Lauder Company, Inc. Securities Litigation, filed in the United States District Court, Southern District of New York, Case Number 1:23-cv-10669-AS.

My name is Charlie Bowman, and I'm your videographer today. The court reporter is Mary Bowman. We are representing Esquire Deposition Solutions.

All appearances will be noted on the stenographic record.

Will the court reporter please swear in the witness.

- - - -



Page 69

M. Cain

these sentences, I'm pointing to the allegations in the complaint. It's not an opinion that I have formed or evaluated but rather just summarizing the complaint.

Q. And, thank you. You anticipated my next question I was going to ask you.

And you're pointing to the complaint and summarizing your understanding of the theory of liability set forth in the complaint, is that right?

A. Yes.

Q. And you go on to write, "Of these travel retail channels, those in China and South Korea were critical sources of revenue for Estee Lauder during the Class Period and were closely monitored by the Company and its investors."

Is that an accurate summary of your understanding of the allegations cited there in the complaint?

A. To the best of my recollection, that is an accurate summary of what I'm pointing to within the complaint.

Q. And then in the next sentence, you summarize your understanding of the theory of

Page 70

M. Cain

liability asserted in the complaint, that defendants -- and I quote, "concealed the fact that Estee Lauder's sales growth in the Company's Asia travel retail segment was driven by the prohibited gray market resale industry in China and South Korea, known as 'daigou,' from investors."

Is that right?

A. Well, I would disagree, I think, with the very beginning of your question. I'm certainly not claiming that I am able to articulate the entire theory of liability within one sentence, but I do think that this is a high-level summary of the allegations that are related to the theory of liability in the complaint.

Q. And your high-level summary of the theory of liability articulated in the complaint is that Estee Lauder, while disclosing it's revenue in the Asia travel retail segment or market, Estee Lauder failed to disclose that its sales were driven by prohibited gray market resale activity, is that right?

A. Again, I would say my summary of the

Page 71

M. Cain

theory of liability is the entire Section 3 of my report. I would not limit it just to one sentence.

Q. Well, do you understand the theory of liability to be centered on the contention that gray market resale activity was prohibited?

MR. CHRISTIE: Objection, form.

A. I think -- I guess the way that I -- if you really are pushing me to attempt to summarize the theory of liability in one sentence, I would go with the first sentence of paragraph 95, which is that because of defendants' allegedly misleading statements and omissions, investors traded the stock at artificially inflated prices during the class period.

I'm not comfortable attempting to take a complaint that's over 100 pages and condense it down into one sentence, but in terms of your particular question, whether it's centered on whether the resale industry was prohibited, I recall in both the complaint and the motion to dismiss order various adjectives that were used to describe the daigou market and

Page 72

M. Cain

discussions about, you know, regulations from China, internal company policies at Estee Lauder and statements that the defendants made both during the class period and prior to the start of the class period regarding those company policies.

So I -- I do recall various adjectives being used to describe that gray market.

Q. And I want to be clear, I am not pushing you to attempt to describe the theory of liability in one sentence, so I want to be clear about that. I'm really just trying to get at the essence -- your understanding of the essence of the theory of liability since it is so critically important to evaluating whether artificial inflation can be determined or is capable of being constructed on this theory of liability.

So I want to be clear about that.

Is it your understanding that the theory of liability is that Estee Lauder failed to disclose prohibited sales in gray market sales, or daigou sales, it's the prohibited

ESQUIRE
DEPOSITION SOLUTIONS

Page 73

M. Cain

nature of the sales that was not disclosed.

MR. CHRISTIE: Objection --

Q.   Is that your understanding?

MR. CHRISTIE: Objection, asked and answered and form.

A.   So just to be clear, I would disagree with your characterization of the purpose of my analysis. It's not to assess whether artificial inflation is calculated in a certain way.

But moving beyond that, in terms of a question about whether the theory of liability hinges on the word "prohibited," it's not my recollection that the theory of liability is contingent on one word of, quote, prohibited.

Q.   Well – so you mentioned seeing other words in the court's order, for example.

Do you recall seeing the words "illegal" or "illicit"?

MR. CHRISTIE: Objection.

You can answer.

A.   I do recall those words being discussed in the order.

Q.   So is your understanding of the

Page 74

M. Cain

theory of liability asserted in the amended complaint that the company failed to disclose travel retail sales in the APAC region that were prohibited by local regulations, illegal or even illicit in nature --

MR. CHRISTIE: Object --

Q.   -- is that your understanding of the theory of liability?

MR. CHRISTIE: Objection, form.

A.   Again, my description of the theory of liability is not contingent on one sentence or one word. It's really focused around allegations that due to alleged misrepresentations the stock price was inflated artificially and that that artificial inflation was dissipated subsequently through multiple alleged corrective disclosures and that those alleged misrepresentations and alleged corrective disclosures are economically connected in terms of talking about the drivers for the company's financial performance relating to daigou.

But it's not contingent on a certain adjective in terms of whether that market is

Page 75

M. Cain

accurately described as illegal or illicit or prohibited or inconsistent with the company's own internal policies.

Again, many of those different terms are used in both the complaint and the motion to dismiss order.

Q.   I'm certainly not trying to trap you into the use of one adjective. I'm really trying to understand your understanding of the theory of liability alleged in the complaint, and you used the term "prohibited gray market resale industry" in your report.

Is there any other way in which you would describe your understanding of the theory of liability alleged in the complaint?

MR. CHRISTIE: Objection, asked and answered.

A.   Again, I would point you to my – the discussion in Section 3 covers a number of different paragraphs in which I'm laying out my high-level summary of plaintiffs' theory of liability, and it also picks up again in that later paragraph, I think 95, talking about the alleged artificial inflation in the stock price

Page 76

M. Cain

as a result of the alleged misstatements.

So I guess I would just stick with all the different paragraphs in which I'm summarizing a very long complaint -- I think it is over 100 pages long -- and obviously that sets forth in far greater detail the allegations that plaintiffs have in the case.

Q.   Is paragraph 16 incorrect in any way?

A.   I'm not aware of any incorrect statements in paragraph 16 of my report.

Q.   Is it incomplete in any way in terms of setting forth your understanding of the theory of liability?

A.   Well, it's like I've said several times now, I'm not attempting to articulate plaintiffs' entire theory of liability in just one sentence or one paragraph. I talk about it in a number of different paragraphs but repeatedly pointing back to the complaint, which sets forth the entire theory of liability as far as I understand it.

Q.   Do you know whether gray market resale, or daigou activity, was, in fact,



Page 81

M. Cain

interact within an expert report sometimes.

Q. So if I am hearing you correctly, you believe you would be qualified to quantify the economic impact of certain components, but you would have to rely on someone else to conclude as to whether those sales were prohibited or not, is that fair to say?

MR. CHRISTIE: Objection, misstates. You can answer.

A. I would definitely be relying on things like the complaint's allegations and other sources, and I would not be -- I would not expect that I would be opining on whether something was, in fact, illegal.

Q. Have you ever been exposed to the travel retail industry previously?

A. From an expert standpoint do you mean?

Q. Sure, let's start there, from an expert standpoint.

A. Nothing comes to mind off the top of my head.

Q. Have you been exposed to the travel retail industry in any other context?

Page 82

M. Cain

A. Well, I travel, and I -- so at a personal level, I walk by stores while traveling, but I'm not a big shopper. So I don't have much experience on the personal side either.

Q. Do you have any experience on the personal side shopping in travel retail in the Asia-Pacific region?

A. No, I don't believe so.

Q. Would you agree that you are not an industry expert in travel resale?

A. Yes.

Q. And would you agree you are not an industry expert in Prestige Beauty?

A. Yes.

Q. Have you ever encountered the concept of daigou previously?

A. Not prior to working on this case.

Q. Would you agree you are not an expert in the concept of daigou?

A. Well, I certainly have more familiarity with the concept as an expert after working on this case.

But separate and apart from the

Page 83

M. Cain

case, I do not have any specific expertise on daigou.

Q. Is it fair to say your familiarity with the concept of daigou is formed from your review of the amended complaint and the court's order on the defendants' motion to dismiss that complaint?

A. Yes, it was informed by those documents.

Q. Was it informed by anything else?

A. Well, I -- I reviewed the earnings announcements that we discussed earlier in the company's SEC filings.

But beyond that, I believe that would be about it.

Q. So, for example, the court decisions in securities law you reference in your Appendix B, none of that dealt with the topic or concept of daigou, did it?

A. I don't believe so.

Q. And the academic literature you cite, none of that dealt with the topic or concept of daigou, is that right?

A. Not specifically. It would include

Page 84

M. Cain

companies, such as this company and some of those academic samples, but it was not specifically focused on daigou.

Q. And the data sources and the other items, none of that was focused on the concept or topic of daigou, is that fair to say?

A. Not beyond the focus on Estee Lauder.

Q. Did you consider the opinion or views of any other expert in the travel retail industry?

A. No.

Q. What about sale of luxury goods in Asia-Pacific regions, did you consider the expert views or opinion of anyone else on that topic?

MR. CHRISTIE: Objection, form.

A. Not specifically.

I think one additional source that I just would note is that I summarized analyst coverage of the company, and they talk about these concepts in their reports, but I was not specifically focused on reviewing them with specific questions about daigou for purposes of



Page 85

M. Cain

this report.

Q. I'm sorry, you said you summarized coverage of the company.

What specific coverage of the company are you referencing?

A. I'm sorry.

That's listed in Exhibit 3, and that's the analyst coverage during the class period in terms of the number of analyst reports that were issued by the various research analysts.

Q. Did you review those analyst reports?

A. I did not review the substance or content of those reports.

Q. Would you agree that any inflation in the stock price through the class period attributable to permitted gray market resale, or daigou activity, in China and South Korea must necessarily be excluded from any out-of-pocket measure of purported damages?

MR. CHRISTIE: Objection, form.

A. Not necessarily.

Q. Why is that?

Page 86

M. Cain

A. For a couple of reasons.

First of all, I've not attempted to form any specific opinions at this point in time regarding exactly what is and is not required to be disaggregated. That's an analysis that I would do if asked at a later stage of a case, the loss causation and damages stage of a case.

My recollection is that both the complaint and the motion to dismiss order point back to I think statements by the CEO in 2019 regarding the company's own internal policies relating to daigou, and so I think answering that question down the road could depend on a much more careful analysis and understanding of the theory of liability and how that interacts with the alleged misrepresentations in this case.

Q. If the theory of liability is that the company failed to disclose reliance on prohibited illegal or illicit gray market sales, or daigou sales activity, would you agree that at that -- assuming that to be the theory of liability, any inflation in the stock price attributable to permitted gray market retail

Page 87

M. Cain

activity, or daigou sales, must be excluded in measuring the artificial inflation?

MR. CHRISTIE: Objection, incomplete hypothetical, assumes facts, form.

A. Again, not necessarily.

Q. In that hypothetical -- strike that.

Why do you say, "not necessarily"?

MR. CHRISTIE: Objection, asked and answered.

You can answer.

A. It would be for the same reasons that I described earlier. I would want to undertake a careful analysis at the loss causation and damages phase of a case to really understand how that hypothetical scenario would interact with the information environment in order to reach a determination about the specific information that is fraud related and not fraud related.

Q. In that hypothetical, assuming the theory of liability is that the company failed to disclose reliance on prohibited, illegal or illicit gray market sales, or daigou sales activity, is it your testimony that the extent

Page 88

M. Cain

to which such sales were permitted during the class period is irrelevant to constructing an artificial inflation ribbon?

MR. CHRISTIE: Objection, incomplete hypothetical, assumes facts and form.

You can answer.

A. Not necessarily.

Q. So it may be relevant, is that right?

MR. CHRISTIE: Same objection.

A. It is possible. Standing here today, I don't know how -- exactly how I would form opinions in that hypothetical scenario.

Q. Could be critically relevant, couldn't it?

MR. CHRISTIE: Same objections.

A. Again, I don't know since I've not attempted to evaluate that hypothetical scenario.

Q. If the theory of liability is that the company failed to disclose prohibited illegal or illicit gray market sales, or daigou sales activity, and, in fact, a fact finder determined that such sales were entirely



Page 113

M. Cain

A. That's correct.

Q. Are you an expert in investing in the luxury goods and retail industries?

A. I would include investing as part of my expertise in finance and economics, and whenever someone is investing, it has to be in some sort of industry or company or area.

So I do think there is -- there are many elements of finance and economics that would apply to a variety of industries, including this one.

Q. Did you conduct any research into investing in the luxury goods and retail industry in connection with this matter to date?

A. Not separate and apart from what I've articulated within the report here.

Q. Have you ever worked as an analyst in the luxury goods sector?

A. I have worked as an analyst before.

I don't recall working on specific transactions within the luxury goods sector as part of my work as an analyst.

Q. Have you worked as an analyst in the Prestige Beauty sectors?

Page 114

M. Cain

A. I don't believe that my work covered those sectors either.

Q. And forgive me if I asked this earlier today, but is it fair to say that you did not consider or read any analyst reports in either of the luxury goods industry or Prestige Beauty industry in connection with your work in this matter?

A. Like I described earlier, I do summarize account of analyst coverage of Estee Lauder in Exhibit 3.

But beyond that, I have not undertaken any sort of review of the substance or content of those analyst reports.

Q. And just so the record is clear, when you say you summarized a count, is that literally the number of analyst reports that you located during the class period at issue here?

A. As reflected in Exhibit 3, yes.

Q. And outside of reading the complaint referenced to public statements in the complaint and the order on the motion to dismiss, do you have any knowledge of daigou outside of that research?

Page 115

M. Cain

A. And I think I mentioned earlier today that I also reviewed some earnings announcements for purposes of my Cammer 5, which also interact with that concept.

But outside the scope of those documents that I reviewed in connection with this case, I don't have any knowledge of daigou.

Q. So is it fair to say you are not aware that daigou has evolved substantially leading up to the class period and even throughout the class period?

A. I recall the complaint talking about changes over time and the regulatory environment pertaining to daigou. So I do recall some discussion about that and interacting with Covid travel restrictions and things like that.

Q. Are you aware that daigou can encompass a wide range of practices ranging from a single individual seller bringing in items for resale to family and friends to book sellers and even syndicates?

MR. CHRISTIE: Objection, form.

A. That's consistent with the general understanding of daigou that I have based on my

Page 116

M. Cain

review of these documents.

Q. What is your definition of "daigou"? What do you understand it to be?

A. It's not something that I have attempted to define. I just point to the complaint's allegations, which include references to daigou.

Q. Did you consider the possibility that daigou is a practice consistent with applicable laws and regulations during the class period?

MR. CHRISTIE: Objection, legal conclusion.

A. I've not really attempted to assess the extent to which it's consistent or inconsistent with various laws or regulations.

Q. Did you consider the possibility that changes in applicable laws and regulations were meant to promote duty-free sales to non-travelers during the class period?

MR. CHRISTIE: The same objection.

A. I considered the allegations in the complaint, and I do recall the complaint talking about changes in regulations.



Page 225

M. Cain
arrived at the no news trading days categories, you considered the alleged corrective disclosures in the complaint, SEC filings, and Dow Jones articles on Factiva tagged to the company, is that right?

A. Yes.

And I forgot to mention that also, by definition, they also do not include the news days, the earnings announcements, but yes.

Q. Thank you. Fair enough.

But in identifying news days, the approach is a bit different. You identified days on which earnings were announced within the analysis period, is that right?

A. Yes.

Q. And then it's a matter of conducting the event study and observing whether a security's price tends to more move more significantly on news days versus no news trading days, is that fair to say?

A. Yes.

Q. In the analysis period that you identified here, that extends one trading day beyond the class period, is that right?

Page 226

M. Cain
A. Yes, it does.

Q. And why is that?

A. I frequently will extend it one day beyond the class period so that I can also include the last earnings announcement that occurred on the last day of the class period. But because it occurred after hours, the market impact date occurs on the very next trading day.

So that's what the -- what I am referring to.

Q. Okay. And so then within the analysis period you used here, you define "news days" to include the eight days on which Estee Lauder released quarterly earnings, is that right?

A. Yes.

Q. Okay. And then in the next paragraph, 74, you define "no news trading days" as days on which there were no news day events, no alleged corrective disclosures, no SEC filings and no Dow Jones articles, is that right?

A. Yes.

Q. And was there a reason that you

Page 227

M. Cain
focused on Dow Jones articles versus other articles?

A. My recollection is that this company, like many large, international companies, have a certain degree of media articles coming out on -- essentially every day. And so it's impossible to come up -- or maybe not impossible but very difficult to come up with a large sample of days in which there were literally no media articles about the company like this.

And so I narrow the focus down to this higher bar of a news article being disseminated through Dow Jones. Those are typically articles that are focused towards investors as opposed to like a magazine article.

The Factiva universe of media is very large and very wide, and it includes many, many articles that may be aimed at consumers, whereas the Dow Jones tag is filtering to a smaller -- much smaller subset of articles that are focused often more towards investors.

Q. Then Exhibit 7 is the statistical comparison -- or the comparison of the --

Page 228

M. Cain
whether there was a statistically significant price reaction following the news day versus non-news day, is that right?

A. Yes.

Q. And this is your only analysis comparing the behavior of Estee Lauder's common stock on news days versus other days or no news days, is that right?

A. Just Exhibit 6 and 7, yes.

Q. Now, this collection of news days and no news trading days, that covered only approximately 56 percent of the trading days in the analysis period, is that right?

A. Yes, that's correct.

Q. And the other 44 percent of trading days in the analysis period, they're not included in your comparison, is that right?

A. That's correct.

Q. Did you assess the price reaction of Estee Lauder's stock on those other days --

A. No.

Q. -- at any point in time?

A. No, I did not.

Q. Did you ask your team to assess the



Page 229

M. Cain

price reaction of Estee Lauder's stock on those other days?

A. No.

Q. Sitting here today, do you know the price reaction of Estee Lauder's stock on those other days?

A. I certainly don't have the event study output memorized.

But when running the event study and producing the output, I do produce the abnormal return calculations for every day that falls within the analysis period. So that would be included in the output and the turnover documents that we submitted to you in conjunction with my report, but I did not review that with an eye towards looking at specific returns on any specific dates, other than Exhibit 6 and 7.

Q. So then is it fair to say you do not know what percentage of other days' observed stock price movements were statistically significant at the 95 percent confidence level on? You don't know one way or another?

A. That's correct, I don't know what

Page 230

M. Cain

that proportion would be.

Q. Did you compare the price reaction on these other days to the price reaction on non-news days?

A. No, I did not.

Q. And the other days are not reflected on Exhibit 6 or 7 of your report, is that right?

A. Correct, they're not part of the test.

Q. Now, these other days include days on which the company released SEC filings, is that right?

A. Yes -- well, I believe so. Again, I haven't checked to evaluate those, but I do exclude from the no news day bucket days in which SEC filings were released.

So it is very likely that this other bucket of days that does not fall into either buckets would likely include some days on which SEC filings were released.

Q. And these other days, do they include days on which there are non-Dow Jones articles on Factiva tagged to the company?

A. They likely do, yes.

Page 231

M. Cain

Q. Well, do you know whether they do given you conducted a search of Factiva for articles tagged to the company?

A. So my search of Factiva was focused on the Dow Jones flags.

So I've not evaluated any specific days to research this question, but it is likely -- based on my just general experience studying companies, it is likely that there would be some days that we would have non-Dow Jones articles issued.

Q. Well, in connection with your analysis of Cammer Factor 2, you identified 2,155 unique articles concerning Estee Lauder that were published during the class period from leading news outlets, is that correct?

A. That's my recollection, yes.

Q. And those include articles other than from Dow Jones, is that correct?

A. Yes.

Q. And you do not know whether the other days -- so this category of other days in the analysis period, they are not defined in your report as news days or non-news days.

Page 232

M. Cain

You do not know to what extent those other days include reports published by publishers other than Dow Jones through the analysis period, is that right?

A. Yeah, ultimately, I have not attempted to research that particular question.

Q. And other than looking to the Dow Jones articles, you did not attempt to assess or consider whether any of the 2,155 unique articles that came out through the class period, which overlaps with the analysis period but for one day, you did not attempt to determine whether any of those days should be categorized as news or non-news days in your market -- or in your event study, is that right?

A. Nothing beyond the categories that I used to flag the news days and the no news days.

So I guess to give a more fulsome response, in my experience, this other category of days that are not included in the Cammer 5 test, it will often include days where there was no disclosure of information but it may include some days where there are important disclosures of information but that they don't fall under



Page 233

M. Cain

the definition of "news days," meaning earnings announcements.

So I'm certainly not giving an opinion that this other category is somehow irrelevant or was not informative to investors but simply that this category does not fit into the objective set of criteria that is applied to form the two main buckets used to carry out the Cammer 5 test.

Q.   Right.  In determining how to -- well, strike that.

In determining the design of the event study for your Cammer Factor 5 analysis, you essentially ignored the non-Dow Jones articles in terms of deciding what were news days and what were non-news days during the analysis period, is that fair to say?

A.   That's correct, yes.

Q.   Is it also true that your definition of "news days" does not include days on which analyst reports were released?

A.   Well, there certainly may be many analyst reports issued on the news days because these are earnings announcements, but that's –

Page 234

M. Cain

so there is certainly a correlation, but we know that analyst reports tend to cluster around earnings announcements.

So it's very likely that there is that clustering, but beyond that, it's not a -- it's not a consideration in terms of the definition of these dates.

Q.   Do you know what percentage of the 556 analyst reports you observed from 38 separate firms during the class period, do you know to what extent those reports were released on news days versus non-news days as defined in your event study?

A.   No, I've not attempted to calculate that percentage.

Q.   And did you conduct any analysis of the other days here, as we've been using that term, to determine whether announcements occurring on those days represent a potential opportunity for the public release of new value-relevant company information to investors?

MR. CHRISTIE:  Object to form.

A.   Well, I think my conclusion is that the market was efficient throughout the entire

Page 235

M. Cain

class period, and so information could be disclosed through a variety of sources at any point during the class period, not only on -- I certainly wouldn't limit that to only the news days as defined in the context of earnings announcements.

But I've not attempted to research or identify every date during the class period on which information was disclosed to investors that they found value relevant.

Q.   Okay.  So it could be but you have not conducted an analysis of the other days to determine whether announcements on those days represent the public release of new value-relevant company information to investors, is that right?

A.   Nothing beyond what I described previously.

Q.   And you've provided no explanation in your report as to why you excluded these other days from the analysis period, other than your definition of "news days" and "no news trading days," is that fair to say?

MR. CHRISTIE:  Objection to form.

Page 236

M. Cain

A.   Well, I think the definition of the "news days" and "no news trading days" does also explain why all the other days fall outside of those two buckets.  So I do think there is a clear explanation of that.

(Exhibit 4, spreadsheet, marked for identification, as of this date.)

Q.   Sir, you've been handed a document marked as Cain Exhibit 4.

MR. CHRISTIE:  Monica, can we just establish for the record that this is a counsel-created document or --

Q.   No, I was just going to --

MR. CHRISTIE:  Okay.

Q.   -- for the record note that this is a printout of back-up materials provided for your -- by your counsel that I believe was titled "Regression_With_News."

A.   Okay.

Q.   And feel free to look at this document.

Does it look familiar to you?

A.   Yes, I do believe this is the event study output that I was talking about



MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

December 17, 2025
237–240

Page 237

M. Cain

previously.

Q.   Did you create this document?

A.   This was created by the event study code that I've worked with the Fideres staff to create that code.

So I definitely have had a part in creating the code that produces this output.

Q.   Okay.  So you – you've had a part in creating the code that produces this output.

Did you produce this output in this particular instance?

A.   They ran the code that I worked on with them, and they produced the – I believe it was Excel spreadsheet output that you've printed out here.

Q.   Got it.

So if you turn to August 30, 2023, and I believe it's on page 16.

A.   Okay.

Q.   And that line item references a headline of a press release, and I'll quote, "The Estee Lauder Companies should participate in the Barclays Global Consumer Staples Conference," and then in parens "Dow Jones

Page 238

M. Cain

Institutional News Factiva."

Do you see that?

A.   I do.

Q.   For purposes of your event study, you would not consider this to be a public release of new value-relevant company information to investors, is that right?

A.   No, I've never offered that type of opinion.

Q.   In constructing your event study, did you include this day in the "Other Days" category?

A.   I believe so.

Q.   Yet would you agree with me that this non-news day has a statistically significant price reaction?

A.   So this is not – again, this is not a non-news day.  This is a day in which there is at least one news headline on Dow Jones.  There may be other headlines.  There was an SEC filing.

But I do agree that there was a stock price movement that was significant at the -- roughly the 93 percent level.

Page 239

M. Cain

Q.   So you believe this particular day was excluded from the "Other" category and included in the Non-News Day category, is that right?

A.   No, it was excluded from the "No News Day" category and it was put into the "Other" category, as – you can see that from the column with the heading "Day Type," and it says, "Other."

So that's not in -- it's not in the news days and it's not in the no news days.  It's in the "Other" category.

Q.   Got it.

Am I reading this correct that there was a statistically significant movement in the company's stock price?

A.   At the -- at roughly the 93 percent level of statistical significance, yes.

Q.   All right.  Let's look at February 4, 2022.

A.   Okay.

Q.   That February 4, 2022 is included in the "Other" category.

Do I have that right?

Page 240

M. Cain

A.   Yes.

Q.   And the public press articles identified on this date concern analyst reports that were published in response to the February 3 earnings announcement, is that right?

A.   It looks like it does include some coverage of analyst reports that were published.  It's unclear on the exact timing of the analyst report publication, but it looks like the news coverage of those reports occurred with the market impact dating of February 4, yes.

Q.   And this "Other" day has a statistically significant price reaction, is that right?

A.   Yes.

Q.   Was the price reaction on February 3, following the earnings announcement, was it statistically significant?

A.   It was significant at roughly the 89 percent level.

Q.   Not at the 95 percent confidence level?

A.   That is correct.

Q.   If the stock price's reaction on the



Page 241

M. Cain

following day, February 4, is a delayed reaction to the company's earnings results released on the prior day, would that be consistent with a stock that responds quickly to publicly available information?

A.   I would need to conduct a more comprehensive analysis of the information environment over that time period in order to assess the extent to which the stock price was reacting to various forms of information in order to form any sorts of opinions about the price movements.

Q.   And you have not conducted that analysis or assessment with respect to the stock price reaction on February 3 and February 4 following the earnings announcement, is that right?

A.   Not outside the context of the Cammer 5 analysis that I have undertaken.

Q.   Well, have you done any analysis inside or outside the context of the Cammer 5 analysis here regarding the price reaction on February 3 and the stock price reaction on February 4 and whether the price reaction on

Page 242

M. Cain

February 4 is a delayed reaction to the company's earnings results?

A.   Well, February 3 is one of the news days included in Exhibit 6 and 7.

But beyond that, I've not undertaken any sorts of analyses regarding any other questions, including a question of whether there was any sort of delayed reaction.

Q.   If we look at November 16, 2022.

A.   Okay.

Q.   Do you see there that Estee Lauder announced a 2.8 billion-dollar acquisition of the Tom Ford brand?

A.   I see that.

Q.   And I believe you said earlier today that mergers -- or merger news may be relevant to estimating valuation impact or impact on a stock price.

Do I recall that correctly?

A.   I was talking -- I mentioned that, yes, in the context of target and acquirer company evaluations, yes.

Q.   Would you consider news of a multi-billion-dollar brand acquisition to be

Page 243

M. Cain

value relevant to – or value-relevant information to investors in Estee Lauder stock?

A.   I've not considered that question as it relates to Estee Lauder.

In general, and based on my professional experience, when an acquirer pays a premium to acquire a target company, it's publicly traded, that is almost always value relevant and economically material information for target company shareholders.

The answer is much more complicated in assessing the question as it relates to the value impact on the acquirer's stock price for multiple reasons.

Q.   There was no price reaction to Estee Lauder's stock following this news, is that right?

A.   Well, the stock price did move but not by a statistically significant amount on November 16.

Q.   And sitting here today, do you know why there was no statistically significant price reaction to the announcement of that Tom Ford acquisition?

Page 244

M. Cain

A.   Well, based on my professional experience in mergers and acquisitions, there could be a variety of reasons, like I was mentioning earlier, including one such reason can be that investors, based on the current information that they have at their disposal, they could view the price that's being paid for the target company to be essentially equivalent to the value of that company and, therefore, there is no movement up or down in acquirer's stock price if they are paying the fair value for a target company.  So that's one thing that we see for acquirers.

Another reason can be just differences in relative size.  So even if investors feel that they're getting a great deal for a target company or overpaying for a target company, either paying too much or too little, if the target company is relatively small relative to the size of the acquirer, then it may still trigger a valuation impact on the acquirer's stock price but the movement may be small enough from a valuation standpoint that it does not rise to a certain level of statistical



Page 249

M. Cain

owns in Russia released on that day?

A. Yes.

Q. Would you consider that to be value-relevant information to investors in Estee Lauder?

A. I've not attempted to form an opinion one way or another on that particular article.

Q. And is there a statistically significant price reaction following that news?

A. Yes.

Q. Let's turn to your expert report, which should be Exhibit 1.

A. Okay.

Q. And directing your attention to Exhibit 6, the list of news days.

A. Okay.

Q. And we discussed a moment ago that you added November 1, 2023, given the company releases -- the timing of when the company released its earnings news, is that right?

A. Yes.

Q. Did you know whether a statistically significant change in the price of the stock

Page 250

M. Cain

would be observed on November 1, before you determined the analysis period?

A. No.

Q. And of the eight days that are listed here, five of these eight days are days on which the amended complaint alleges corrective disclosures were made, is that right?

A. I believe that is correct in terms of the market impact dates, yes.

Q. And all five of those dates in which the amended complaint alleges corrective disclosures were made, all five of those days have a statistically significant price reaction, is that right?

A. Yes.

Q. And if you remove those five news days, that leaves only three news days left in your event study, is that right?

A. Well, I wouldn't throw out those five earnings announcements, but I would agree that there are three other remaining earnings announcements outside of those five earnings announcements.

Q. And if you excluded those five days

Page 251

M. Cain

on which corrective disclosures were allegedly made, it leaves three days, and only one day on which a statistically significant change in the company's stock price occurred, is that right?

A. One of those three other earnings announcements does have a statistically significant stock price movement, yes.

Q. Now, you're aware from the allegations in the amended complaint that, at least according to the complaint, the highly negative price changes on the five days that were alleged to be corrective are because they were corrective, right?

MR. CHRISTIE: Objection to form.

A. I'm not really following your question.

Q. Well, are you aware from the allegations in the complaint that there were highly negative price changes on the five days that were alleged to be corrective events?

A. That is consistent with my recollection of the complaint.

Q. For example, if you look at the complaint, at paragraph 185, it alleges that the

Page 252

M. Cain

stock price declined over 8 percent because corrective disclosures were made. On that particular date, on November 2, 2022.

A. I see that, yes.

Q. And then at paragraph 196, it alleges that the price of Estee Lauder stock declined 4.41 percent because of the corrective disclosures made on February 2, 2023, right?

A. Yes.

Q. And, again, with respect to the remaining alleged corrective disclosures at paragraph 208, the complaint alleges the stock declined over 17 percent. At paragraph 218, the complaint alleges the stock declined over 3.3 percent. And at paragraph 231, the complaint alleges the price of the stock declined by 19 percent on November 1, 2023.

And all of those price declines are alleged to be as a result of corrective disclosures made on those days, right?

A. Yes.

Q. Is it true that the negative price changes of that magnitude increased the likelihood that these dates would have



Page 265

M. Cain

exclusively focus on earnings announcements, but they do talk about earnings announcements in many of those studies.

Q. Do any of those studies discuss the appropriateness of including earnings announcements that are alleged in the subject litigation to be dates on which corrective disclosures were made?

MR. CHRISTIE: Objection to form.

A. It's likely that they do, but I would have to go back and review each study because I don't have each one memorized.

Q. Sitting here today, you don't recall whether any of those studies address this topic, the inclusion of earnings dates in event studies like the one you have conducted that are alleged to be dates that the corrective disclosures were made, is that fair to say?

MR. CHRISTIE: Same objection.

A. I'll just stick with my prior answer.

Q. I believe you had said earlier today you recall spending -- and correct me if I am wrong -- between 10 to 20 hours of the

Page 266

M. Cain

preparation of your report in this case, is that right?

A. That's my best estimate of the amount of time I spent working on the report.

Q. And forgive me, am I correct that you cannot recall how much time your team spent on the report?

A. That's correct, I don't know what amount of time they spent.

Q. Do you expect it was more than five hours?

A. Yes.

Q. Would you expect it to be more than 20 hours?

A. Yes.

Q. Would you expect it to be more than 40?

A. Yes.

Q. How about 100 hours, would you expect the amount of time your team spent on preparing your report in this case and any associated work to exceed 100 hours?

A. Beyond 40 hours? I don't know how much higher it would be beyond 40 or 100.

Page 267

M. Cain

Q. You previously provided a report in a case entitled In re: StoneCo, is that right?

A. Yes.

Q. And I think you briefly referenced it earlier today.

What was that case about?

A. My recollection is that I provided a market efficiency assessment of StoneCo.

Beyond that, I'm not able to recall the specific details of the case off the top of my head without going back and reviewing my records.

Q. Do you recall that you provided an opinion there concerning market efficiency?

A. I believe I did, yes.

Q. And did you also provide an opinion in that matter concerning the ability of plaintiff to prove damages on a class-wide basis?

A. I don't recall opining on their ability to prove damages, but it's likely that I had an opinion regarding the damages methodology that would apply class wide.

Q. Your report in that case was based

Page 268

M. Cain

on the plaintiffs' theory of liability alleged in the operative complaint in that case, is that right?

A. I believe so.

Q. Do you know how your report in that case compares to your report in this case?

A. No, I don't recall.

(Exhibit 5, report, dated July 25, 2025, marked for identification, as of this date.)

Q. Dr. Cain, you've been handed a document marked as Cain Exhibit 5, and I will represent for the record that this is a redline counsel -- we have run comparing your report in this matter to your report in the StoneCo matter with the comparison being from the perspective of your report in this matter.

Do you have that in front of you?

A. Yes.

Q. Would you agree with me just by review of the redline that Section 1, the scope of report and opinions, is nearly identical, save substituting the class period and the name of the defendants and the lead plaintiffs?



MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

December 17, 2025
269–272

Page 269

M. Cain

MR. CHRISTIE: Objection to form.

A. No.

Q. In what other way is the Scope of Report and Opinions section different as compared between your report in this matter and your report in the StoneCo matter?

A. Well, there's different footnotes. There's different details regarding the class period, the claims that I'm considering.

But ultimately I was asked to render -- or the scope of the questions I was asked were the same questions regarding a different company, different class period, different claims.

So I would agree that my descriptions of those scope and opinions are similar across the two cases.

Q. At least in the Scope of Report and Opinions section, the only changes are the identification of the parties in the two proceedings and the particular claims asserted, is that right?

A. No.

Q. In paragraph 1 and 2, the difference

Page 270

M. Cain

observed here -- observable here from the redline is the difference in the parties as between the two proceedings, is that fair to say?

A. It includes those things.

Q. It also includes that there is a Section 20(a) claim in this case, is that right?

A. Which -- in paragraph 1?

Can you point me to that?

Q. Yes. In paragraph -- at the end of paragraph 2.

A. Oh, sorry.

I see that in paragraph 2.

Q. And then on the next page, at the top of the page, StoneCo is redlined for the name of this defendant company, here Estee Lauder, right?

A. I see that change, yes.

Q. And there is another change to note the plural of lead plaintiffs in this case as it compared to the singular of plaintiff in the StoneCo case, is that right?

A. I see that.

Q. There is also a reference or a

Page 271

M. Cain

characterization added in paragraph D on page 2 to the out-of-pocket damages methodology being routinely used in Section 10b cases, is that right?

A. I see that.

Q. Instead of used in virtually all Section 10b cases, is that right?

A. Yes.

Q. Why did you describe it as routinely here instead of describing it as being used in virtually all Section 10b cases in the StoneCo case?

A. I don't recall the specifics of my consideration in the StoneCo case, so I don't have any recollection of reasonings for using a different wording relative to the StoneCo case.

Q. And then on the next page in paragraph 7, the full name of the U.S. Securities & Exchange Commission is struck and SEC is used.

Do you see that?

A. I do.

Q. So other than those changes, there is the scope, and the report and opinion section

Page 272

M. Cain

is identical between the two reports, isn't that fair?

A. No.

Q. And then we have the Case Background section. Those are different.

A. I would say entirely different between -- almost entirely different in terms of consideration of the theory of liability across those two cases, yes.

Q. And in both cases, you rely on the complaints and the applicable proceedings for the Case Background section.

A. I do.

Q. And then we get to Section 4, "Bases for opinions on market efficiency."

A. Yes.

Q. Would you agree that section of these two reports is substantially identical?

A. No.

Q. In paragraph 22, again, there is a difference between reference to a singular plaintiff versus multiple plaintiffs, and the reference to StoneCo shareholders is instead in the Estee Lauder report a reference to persons



Page 273

M. Cain

and entities who purchased and otherwise acquired Estee Lauder common stock during the class period, is that right?

A. I see that.

Q. And than there is an addition of omissions, I see.

Do you see that?

A. Yes.

Q. And then you -- there is a paragraph that appeared in the StoneCo report, if you look at page 10 of the redline, that does not appear in the Estee Lauder report.

Do you recall why you removed that reference to research included in your StoneCo report?

A. I don't recall the specific context of the StoneCo report, and so I'm not able to recall the rationale for any differences between these two reports.

Q. And there is also a footnote in connection with that paragraph citing a report by Kewei Hou, Chen Xue, and Lu Zhang that's removed.

Do you recall why you removed

Page 274

M. Cain

reference to that report?

A. I think because that was included in the sentence that was removed from the report your asking.

Q. And then for the next several pages, at least through page 14, the difference appears to be in the name of the subject company, is that right?

A. Yes.

Q. And then on page 2, the difference appears to be reference to the subject company as well as the --

A. Which page are you at?

Q. I'm sorry, page 15?

A. Okay.

Go ahead.

Q. As well as change to the actual weekly trading volume, for example, in paragraph 37.

Do you see that?

A. Yes. So I see that all of the calculations and statistics are different because of the difference in the companies that I'm analyzing across the two reports.

Page 275

M. Cain

Q. Right. But other than those, the change -- or reference to the specific company and reference to the specific data or statistical item, the text is otherwise identical, isn't it?

A. I would say the text, when I'm describing a given factor, I'm describing the same factor in the same way across reports, but I'm doing the calculations in a -- with the data that's unique and particular to each company, which is different across the companies.

Q. And is that a fair description of the difference in the Cammer Factor 2 analysis between the two reports?

In other words, you use the same text --

A. Yes, I do --

Q. -- in describing the factor?

A. -- I do describe the same factor in the same way across reports, but the actual calculations and statistics are specific and unique to each company and class period.

Q. Is that the same with respect to the Cammer 3 section, same explanation for the

Page 276

M. Cain

difference between the two reports?

A. Yes, I think so.

Q. And is that the same explanation for the difference in the Cammer Factor 4 section?

A. Yes.

Q. The same explanation for the Cammer 5 section?

A. Yes.

Q. And how about the Krogman Factor 1 section on page 32, same explanation?

A. Yes.

Q. Same explanation for all the other Krogman factors?

A. Yes.

Q. And then we get to Section 6, "Ability to calculate damages on a class-wide basis," on page 37 of the redline.

Do you see that?

A. I do.

Q. And would you agree, other than changing the name of the company and the additional claim at issue in the Estee Lauder case, the description of how you conclude damages could be calculated or capable of being



Page 277

M. Cain

calculated on a class-wide basis is identical?

A.   I think that my description of the out-of-pocket damages methodology is nearly identical across reports because it's the same methodology, but there is one very important difference in the sense that each case I evaluate and consider the theory of liability.

And as we discussed earlier, almost that entire section is completely different across the two reports because the theories of liability are quite different across the two cases.

Q.   And understanding the theory of liability in any particular case is critically important to your opinion on whether an out-of-pocket damages methodology is capable of measuring damages on a class-wide basis, is that right?

A.   In terms of the -- as I -- the way that I described it previously today.

Obviously I explained that the complaint is a very long document.  I don't copy and paste the entire complaint but rather cite and refer back to the complaint.

Page 278

M. Cain

But understanding this question of whether there is an economic connection between the alleged misrepresentations and alleged corrective disclosures, that is an important consideration that I undertake when forming the opinion that damages are capable of being calculated class-wide.

Q.   Let me ask my question again because I don't think you answered it.

Understanding the theory of liability in any particular case, it is a critically important part of your opinion on whether an out-of-pocket damages methodology is capable of measuring damages on a class-wide basis, isn't that right?

MR. CHRISTIE:  Objection to form and asked and answered.

A.   I guess -- I think my previous answer was responsive to your question.

But to the extent that you disagree, could you explain what you mean by "understanding the theory of liability"?

Q.   Well, I'm talking about your understanding of the theory of liability in any

Page 279

M. Cain

particular case.

In order to opine that an out-of-pocket measure of damages could be constructed on a class-wide basis, you must understand the theory of liability in the complaint, right?

A.   In the ways that I have previously described today, yes.

Q.   So in order to reach that opinion, you must first develop an understanding of the theory of liability in the complaint?

A.   I do first develop an understanding of the theory of liability in any case, yes.

Q.   And you did that here in the Estee Lauder case, and you developed your own personal understanding of the theory of liability alleged in the amended complaint, is that fair to say?

MR. CHRISTIE:  Objection to form.

A.   I sought to understand it.  It's obviously laid out in the complaint, so I'm not forming any elements of the -- that theory.  But I am seeking to make sure that I understand at a high level the way that I've described that previously today.

Page 280

M. Cain

Q.   And I'm not asking for your legal opinion or even whether you are right or wrong on whether the theory of liability is consistent with what's set forth in the complaint or is valid.

I'm just simply asking is it necessarily the first step in reaching an opinion on whether classified -- on whether damages can be measured on a class-wide basis, isn't a necessary first step developing an understanding of the theory of liability set forth in the complaint?

MR. CHRISTIE:  Objection to form.

A.   Well, I think one of the initial steps that I explained earlier today is assessing market efficiency because that's a key element of the out-of-pocket damages methodology.

But I also explained that reviewing the complaint and the motion to dismiss order so that I understand plaintiffs' theory of liability is also an initial step and consideration in forming this opinion.

Q.   I'm going to move to strike that



MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

December 17, 2025
301–304

**Page 301**

M. Cain

NAME OF CASE:  In Re: Estee Lauder Securities Litigation

DATE OF DEPOSITION:  12.17.25

NAME OF WITNESS:  MATTHEW D. CAIN, Ph.D.

ACKNOWLEDGEMENT OF DEPONENT

I, MATTHEW D. CAIN, Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____
MATTHEW D. CAIN, Ph.D.        Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

**Page 302**

M. Cain

INDEX:

| WITNESS | EXAM BY: | PAGE: |
|---|---|---|
| M. Cain | Ms. Loseman | 5 |

EXHIBIT INDEX:

| NUMBER | DESCRIPTION | PAGE: |
|---|---|---|
| Exhibit 1 | Expert Report of Matthew D. Cain, Ph.D., dated July 25, 2025, | 18 |
| Exhibit 2 | document entitled "Opinion and Order," | 58 |
| Exhibit 3 | document entitled "Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws," | 174 |
| Exhibit 4 | spreadsheet, | 236 |
| Exhibit 5 | report dated July 25, 2025, | 268 |

**Page 303**

M. Cain

CERTIFICATE

STATE OF NEW JERSEY )
                    )ss:
COUNTY OF UNION     )

I, MARY F. BOWMAN, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New Jersey, do hereby certify:

That MATTHEW D. CAIN, Ph.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 22nd day of December, 2025.

_____
MARY F. BOWMAN, RPR, CRR

**Page 304**

M. Cain

* * *ERRATA SHEET* * *

NAME OF CASE:  In Re: Estee Lauder Securities Litigation

DATE OF DEPOSITION:  12.17.25

NAME OF WITNESS:  MATTHEW D. CAIN, Ph.D.

Reason codes:
1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

_____
MATTHEW D. CAIN, Ph.D.

