# EXHIBIT 2

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------x

IN RE THE ESTÉE LAUDER CO.,    Case No.

INC. SECURITIES LITIGATION    1:23-cv-10669-AS

-------------------------------x


DEPOSITION OF MATTHEW D. CAIN, Ph.D.

December 17, 2025


Reported by:

MARY F. BOWMAN, RPR, CRR

JOB NO. J13938057

**Page 2**

December 17, 2025

9:30 a.m.


Deposition of MATTHEW D. CAIN, Ph.D., held at Gibson Dunn & Crutcher, LLP, 200 Park Avenue, New York, New York, before Mary F. Bowman, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public of the States of New Jersey and New York.

**Page 3**

APPEARANCES:


LABATON KELLER SUCHAROW LLP

Attorneys for Plaintiffs

140 Broadway

New York, NY 10005

BY:    JAMES T. CHRISTIE, ESQ.

JACQUELINE MEYERS, ESQ.

MICHAEL CANTY, ESQ.


GIBSON DUNN & CRUTCHER, LLP

Attorneys for Defendants

200 Park Avenue

New York, New York

BY:    MONICA LOSEMAN, ESQ.

ANDREW FREIRE, ESQ.

MICHELLE GERY, ESQ.

DAVID KUSNETZ, ESQ.

JOHN W.F. CHESLEY, ESQ.


Also present:

Charlie Bowman, Legal Videographer

**Page 4**

M. Cain

THE VIDEOGRAPHER:  We are now on the record.  The time is 9:37 a.m. on December 17, 2025.

This begins the videotaped deposition of Dr. Matthew D. Cain taken in the matter of In re:  The Estee Lauder Company, Inc. Securities Litigation, filed in the United States District Court, Southern District of New York, Case Number 1:23-cv-10669-AS.

My name is Charlie Bowman, and I'm your videographer today.  The court reporter is Mary Bowman.  We are representing Esquire Deposition Solutions.

All appearances will be noted on the stenographic record.

Will the court reporter please swear in the witness.

- - - -



Page 21

M. Cain

points on the CV, I see one other case that I recall being retained by Labaton.

It's possible that there are additional ones that I'm not recalling, but I recognize one additional bullet point on the CV with Labaton.

Q.   Which one is that?

A.   That's on page A-4, StoneCo.

Q.   Have you been deposed in the StoneCo matter yet?

A.   I believe that the -- I believe that that case is in the process of settling or has settled, but that's my recollection, and I don't believe that I was deposed in that matter.

Q.   Has a court ever excluded your expert testimony in any matter?

A.   Not on the basis of the substance or content of my opinions.

I've had two cases in which on procedural grounds the court ignored reports. So there was one case involving Toshiba in which the court said that a surreply report was filed after the deadline for the filing of reports. So the court ignored it because it was after

Page 22

M. Cain

that deadline.

And then there was a case involving Facebook in which plaintiffs I believe attached or attempted to attach a declaration of mine to their complaint, and the court said that plaintiffs were not permitted to attach an expert declaration to a complaint and ignored it on that -- those procedural grounds.

Q.   How many times have you been retained to evaluate whether a stock traded in an efficient market?

A.   My best guess would be somewhere around the ballpark of 30 times.

Q.   And in any of those cases have you ever concluded that the market for a security was not efficient?

A.   I have done efficiency analyses and concluded that securities did not trade efficiently.

Those cases did not ultimately end up with the sides continuing with any retention of me to the best of my recollection in those cases.

Q.   So out of those 30 in which you were

Page 23

M. Cain

retained to evaluate market efficiency, approximately how many did you conclude did not trade in an efficient market?

A.   In terms of the ones that have proceeded to the point of public disclosure, I believe all of these I concluded that the market did trade efficiently.

And like I said before, there were a handful of times on which I concluded that the stock did not -- stock or other securities did not trade efficiently, but those did not proceed to the point of public disclosure of an expert report.

Q.   So the 30 number that you mentioned, are those -- were those 30 instances in which you were disclosed as an expert or is it 30 you were retained to evaluate market efficiency?

MR. CHRISTIE:   Objection, form.

A.   I would -- well, it depends on how you, I guess, define "retention" because there are times when I do an analysis before signing an official engagement letter, although I would consider that a -- still a potential retention without an engagement letter.

Page 24

M. Cain

But I would -- in terms of the 30 -- I don't know, I would have to go through and count up the bullet points to give a more precise number, but I was including both those that have proceeded to the point of public disclosure as well as those that have not.

Q.   In every engagement in which your retention has been publicly disclosed, have you concluded the market for that particular stock was efficient?

A.   If I was asked to form an opinion on market efficiency, I believe that all of those I did conclude that the market was efficient during the given class period.

Q.   And approximately how many times -- I believe you said a handful.

Can you be more precise about the number of times you took a look at a matter and concluded you could not reach that efficiency conclusion?

A.   I would estimate around five times.

Q.   And what did those matters involve?

A.   I recall a couple of matters involving cannabis companies a number of years



Page 57

M. Cain

Do you see that?

A. Yes.

Q. And I believe you testified that you did review that in connection with your work on this matter, is that correct?

A. Yes.

Q. And did you rely upon that order in connection with your work?

MR. CHRISTIE: Objection, form.

A. Yes.

Q. You understand that the court assumed factual allegations in the amended complaint -- assumed them to be true for purposes of evaluating whether to dismiss the complaint?

MR. CHRISTIE: Objection, calls for a legal conclusion.

You can answer.

A. That's my general understanding of how these cases work.

Q. So your -- is it fair to say your general understanding is that the court's order on the motion to dismiss did not equate to findings of fact in this matter?

Page 58

M. Cain

MR. CHRISTIE: Same objection.

A. I'm not really sure what all would be characterized as a finding of fact.

But like I described earlier, I do recall the ultimate opinion was of denying a dismissal of the case, and that was the primary opinion that I recall from the motion.

Q. Did you understand any portion of the court's order to be a finding of fact?

MR. CHRISTIE: Same objection.

A. Again, I'm not a lawyer. So I'm not really sure what you mean when you say, "a finding of fact" here.

(Exhibit 2, document entitled "Opinion and Order," marked for identification, as of this date.)

Q. Dr. Cain, you've been handed a document marked Cain Exhibit 2, which is a copy of Judge Subramanian's opinion and order on the defendants' motion to dismiss in this matter.

Do you have that in front of you?

A. Yes.

Q. And is this the order that's referenced in court documents -- the Court

Page 59

M. Cain

Documents section of Appendix B to your report?

A. Yes.

Q. Do you understand what "finding of fact" means?

MR. CHRISTIE: Objection, form.

A. I don't have a clear definition of what that means, no.

Q. Well, you refer in your own report to fact-finding determinations.

Do you recall those references generally?

A. I do recall talking about that in the Damages Methodology section of my report.

Q. What do you mean by that?

A. What I'm explaining in that section of my report is that ultimately, if I were to put forward a damages report -- loss causation and damages report with an artificial inflation ribbon, even if the jury were to adjust that artificial inflation ribbon or come to a different conclusion regarding certain corrective disclosures or how artificial inflation evolved over the course of the class period, those alternative findings, to the

Page 60

M. Cain

extent that they differ from my findings, would simply plug into the out-of-pocket damages methodology and would not be problematic in any way in terms of its common calculation across class members.

Q. Did you consider anything in Cain Exhibit 2, the court's opinion, to be a finding of fact relevant to your analysis?

MR. CHRISTIE: Same objection as earlier.

A. Well, like I said before, the way that I considered it was in terms of defining the class period and whether it limited the theory of liability.

And I don't know whether you would consider those findings of fact or not, but those are the ways that I was relying on the motion to dismiss order here.

Q. Do you know what evidence the court considered, if any, in reaching the conclusions set forth in Cain Exhibit 2?

MR. CHRISTIE: Objection to form.

A. That's -- that's not any sort of question that I've looked into at this point.



Page 61

M. Cain

Q.   So sitting here today, is it fair to say you do not know whether there are any findings of fact contained in Cain Exhibit 2?

MR. CHRISTIE:  Same objection.

A.   Again, nothing beyond the things that I've pointed to previously.

Q.   Did you review any documents or information following the submission of your report on July 25, 2025?

MR. CHRISTIE:  Objection, asked and answered.

You can answer.

A.   Like I said earlier, I did review the things that are -- some of the things that are listed here in preparation for the deposition today, but I don't recall considering anything that's not listed in the Appendix B here.

Q.   So you did not review any deposition transcripts, is that right?

A.   I don't recall reviewing any deposition transcripts in this case.

Q.   And you did not review any documents produced in discovery, is that right?

Page 62

M. Cain

A.   I believe that is correct.

Q.   Have you asked plaintiffs' counsel to request any documents or information in discovery in this matter?

A.   Nothing that I can recall.

Q.   Is there anything that you requested from plaintiffs' counsel that you did not receive?

A.   No.

Q.   All right.  Let's turn to page 32 of your report.

You note in this paragraph that you were asked to opine on whether per-share damages for traders of the company's common stock can be assessed for all class members based upon a common method, is that right?

MR. CHRISTIE:  Which paragraph are we referring to?

MS. LOSEMAN:  Paragraph 94.

MR. CHRISTIE:  Okay.

A.   Yes.

Q.   And you conclude -- you concluded here that damages for each of plaintiffs' claims can be calculated on a class-wide basis through

Page 63

M. Cain

a common method, is that right?

A.   Yes.

Q.   And reference -- you reference specifically there the out-of-pocket damages methodology, is that correct?

A.   Yes.

Q.   And you further conclude that the measure -- that damages can be calculated for plaintiffs and all class members through a common methodology that is also consistent with plaintiffs' liability theory, is that right?

A.   Yes.

Q.   Would you agree that there is circumstances under which out-of-pocket damage -- the out-of-pocket damage method cannot be used to estimate damages in a 10b-5 case?

MR. CHRISTIE:  Objection, form.

A.   I'm able to think of one scenario in which it may not be capable, and that is if I were to conclude that the market is not efficient and, therefore, a common artificial inflation ribbon may not be feasible if stock prices do not reflect information for a given company.

Page 64

M. Cain

Q.   Is there any scenario you can conceive of where you conclude the market for the subject stock is efficient where you could not use the out-of-pocket method as a common measurement of damages?

MR. CHRISTIE:  Objection, form.

A.   I think another scenario could be if there are allegations of misrepresentations but no alleged corrective disclosures for those alleged misrepresentations.

So, therefore -- so the key input to the out-of-pocket damages methodology is the artificial inflation on any date during the class period because that's what's used to calculate the damage for an investor who bought and sold at different points in time.

So if there is no allegation that the misrepresentations were actually corrected leading to the dissipation of artificial inflation, then this methodology would not -- would not work in that type of hypothetical.

Q.   Any other scenario come to mind?

MR. CHRISTIE:  Same objection.

A.   Off the top of my head, those are

MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

Page 73

M. Cain

nature of the sales that was not disclosed.

MR. CHRISTIE: Objection --

Q. Is that your understanding?

MR. CHRISTIE: Objection, asked and answered and form.

A. So just to be clear, I would disagree with your characterization of the purpose of my analysis. It's not to assess whether artificial inflation is calculated in a certain way.

But moving beyond that, in terms of a question about whether the theory of liability hinges on the word "prohibited," it's not my recollection that the theory of liability is contingent on one word of, quote, prohibited.

Q. Well -- so you mentioned seeing other words in the court's order, for example.

Do you recall seeing the words "illegal" or "illicit"?

MR. CHRISTIE: Objection.

You can answer.

A. I do recall those words being discussed in the order.

Q. So is your understanding of the

Page 74

M. Cain

theory of liability asserted in the amended complaint that the company failed to disclose travel retail sales in the APAC region that were prohibited by local regulations, illegal or even illicit in nature --

MR. CHRISTIE: Object --

Q. -- is that your understanding of the theory of liability?

MR. CHRISTIE: Objection, form.

A. Again, my description of the theory of liability is not contingent on one sentence or one word. It's really focused around allegations that due to alleged misrepresentations the stock price was inflated artificially and that that artificial inflation was dissipated subsequently through multiple alleged corrective disclosures and that those alleged misrepresentations and alleged corrective disclosures are economically connected in terms of talking about the drivers for the company's financial performance relating to daigou.

But it's not contingent on a certain adjective in terms of whether that market is

Page 75

M. Cain

accurately described as illegal or illicit or prohibited or inconsistent with the company's own internal policies.

Again, many of those different terms are used in both the complaint and the motion to dismiss order.

Q. I'm certainly not trying to trap you into the use of one adjective. I'm really trying to understand your understanding of the theory of liability alleged in the complaint, and you used the term "prohibited gray market resale industry" in your report.

Is there any other way in which you would describe your understanding of the theory of liability alleged in the complaint?

MR. CHRISTIE: Objection, asked and answered.

A. Again, I would point you to my -- the discussion in Section 3 covers a number of different paragraphs in which I'm laying out my high-level summary of plaintiffs' theory of liability, and it also picks up again in that later paragraph, I think 95, talking about the alleged artificial inflation in the stock price

Page 76

M. Cain

as a result of the alleged misstatements.

So I guess I would just stick with all the different paragraphs in which I'm summarizing a very long complaint -- I think it is over 100 pages long -- and obviously that sets forth in far greater detail the allegations that plaintiffs have in the case.

Q. Is paragraph 16 incorrect in any way?

A. I'm not aware of any incorrect statements in paragraph 16 of my report.

Q. Is it incomplete in any way in terms of setting forth your understanding of the theory of liability?

A. Well, it's like I've said several times now, I'm not attempting to articulate plaintiffs' entire theory of liability in just one sentence or one paragraph. I talk about it in a number of different paragraphs but repeatedly pointing back to the complaint, which sets forth the entire theory of liability as far as I understand it.

Q. Do you know whether gray market resale, or daigou activity, was, in fact,

ESQUIRE
DEPOSITION SOLUTIONS

MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

Page 77

M. Cain

prohibited during the class period?

A.   I recall there being discussions in both the complaint and the motion to dismiss order in terms of regulations from China, in terms of references to the company's own internal policies and statements that they made I think as far back as 2019 regarding their policies relating to daigou.

But beyond that, I've certainly not attempted to form any opinions one way or another at this point in time regarding whether it was, in fact, illegal.

Q.   Okay. So at this point in time, you have not, in fact, formed any opinion as to whether gray market resale, or daigou activity, was, in fact, prohibited at any particular point in the class period, is that right?

MR. CHRISTIE: Objection, form.

A.   That's correct. I'm just pointing to the allegations in the complaint.

Q.   And would you agree you're not qualified to reach any such conclusions?

A.   Well, I'm certainly qualified to interpret evidence if -- and rely on evidence

Page 78

M. Cain

regarding allegations to the extent that those down the road interact with opinions that may relate to loss causation or damages.

But certainly from a legal standpoint, I would agree that I'm not qualified to render a legal opinion about whether or not a certain activity is illegal.

Q.   Well, whether it is a legal opinion or not, are you qualified in any form to offer an expert opinion as to whether gray market resale, or daigou activity, was prohibited at any particular point in the class period?

MR. CHRISTIE: Objection, asked and answered.

A.   So, again, hypothetically, if I am working on a loss causation report and I'm summarizing what analysts -- what research analysts are saying, I may copy and paste quotes from analyst reports that talk about that type of question, and those may be relevant to the opinions that I'm offering on loss causation, economic materiality, damages.

But I'm certainly doing so in reliance on those types of documents. They may

Page 79

M. Cain

interact with my opinions, but I don't anticipate attempting to form an expert opinion on a question of whether or not this market was, in fact, illegal.

Q.   So you're making room, is it fair to say, to rely on the conclusions of others, whether that's an analyst or someone else, with respect to whether gray market activity, or daigou activity, is, in fact, prohibited, is that right?

MR. CHRISTIE: Objection, misstates.

You can answer.

A.   Yeah, what I am saying is that those types of questions may -- they could interact down the road with expert work that I could do hypothetically.

Q.   But you would agree that you are not qualified to reach a conclusion in the first instance as to whether gray market sales, or daigou sales, are or are not prohibited at any point during the alleged class period here --

MR. CHRISTIE: Objection, form.

Q.   -- is that fair to say?

A.   Again, what I said before is from a

Page 80

M. Cain

legal standpoint, I would agree that I am not qualified to render any sort of legal opinions.

But beyond that, it's not a question that I've put any thought into at this point in time.

Q.   What in your professional background would qualify you to render such an opinion?

A.   So there could be an extent to which there are questions about let's say disaggregation, for example, and whether certain portions of financial results are fraud related versus not fraud related.

If I were asked hypothetically that type of question, I would rely on the allegations of the case and the complaint and use my expertise to break down the portion of financial results that were allegedly illegal versus not illegal.

Again, I would not be opining from a legal standpoint on whether anything was, in fact, illegal, but yeah, quantifying the economic impact of certain components that were fraud related.

So that's how those things can



Page 81

M. Cain

interact within an expert report sometimes.

Q. So if I am hearing you correctly, you believe you would be qualified to quantify the economic impact of certain components, but you would have to rely on someone else to conclude as to whether those sales were prohibited or not, is that fair to say?

MR. CHRISTIE: Objection, misstates. You can answer.

A. I would definitely be relying on things like the complaint's allegations and other sources, and I would not be -- I would not expect that I would be opining on whether something was, in fact, illegal.

Q. Have you ever been exposed to the travel retail industry previously?

A. From an expert standpoint do you mean?

Q. Sure, let's start there, from an expert standpoint.

A. Nothing comes to mind off the top of my head.

Q. Have you been exposed to the travel retail industry in any other context?

Page 82

M. Cain

A. Well, I travel, and I -- so at a personal level, I walk by stores while traveling, but I'm not a big shopper. So I don't have much experience on the personal side either.

Q. Do you have any experience on the personal side shopping in travel retail in the Asia-Pacific region?

A. No, I don't believe so.

Q. Would you agree that you are not an industry expert in travel resale?

A. Yes.

Q. And would you agree you are not an industry expert in Prestige Beauty?

A. Yes.

Q. Have you ever encountered the concept of daigou previously?

A. Not prior to working on this case.

Q. Would you agree you are not an expert in the concept of daigou?

A. Well, I certainly have more familiarity with the concept as an expert after working on this case.

But separate and apart from the

Page 83

M. Cain

case, I do not have any specific expertise on daigou.

Q. Is it fair to say your familiarity with the concept of daigou is formed from your review of the amended complaint and the court's order on the defendants' motion to dismiss that complaint?

A. Yes, it was informed by those documents.

Q. Was it informed by anything else?

A. Well, I -- I reviewed the earnings announcements that we discussed earlier in the company's SEC filings.

But beyond that, I believe that would be about it.

Q. So, for example, the court decisions in securities law you reference in your Appendix B, none of that dealt with the topic or concept of daigou, did it?

A. I don't believe so.

Q. And the academic literature you cite, none of that dealt with the topic or concept of daigou, is that right?

A. Not specifically. It would include

Page 84

M. Cain

companies, such as this company and some of those academic samples, but it was not specifically focused on daigou.

Q. And the data sources and the other items, none of that was focused on the concept or topic of daigou, is that fair to say?

A. Not beyond the focus on Estee Lauder.

Q. Did you consider the opinion or views of any other expert in the travel retail industry?

A. No.

Q. What about sale of luxury goods in Asia-Pacific regions, did you consider the expert views or opinion of anyone else on that topic?

MR. CHRISTIE: Objection, form.

A. Not specifically.

I think one additional source that I just would note is that I summarized analyst coverage of the company, and they talk about these concepts in their reports, but I was not specifically focused on reviewing them with specific questions about daigou for purposes of

Page 133

M. Cain

fraud.

So that could include concealed risks, it could include alleged misstatements, alleged omissions, the impact of the fraud, or a scheme even, and the impact that that has on stock prices.

Q. Right. But would you agree artificial inflation cannot include, for example, disclosed risks?

MR. CHRISTIE: Object to form.

A. I would really need to understand the particular facts and circumstances in order to answer that type of scenario.

Q. Well, are there any circumstances in which artificial inflation would appropriately include value related to disclosed risks?

A. So there are times when -- let's say a company has a general risk disclosure that they repeat across multiple annual reports and 10-K filings that says that our risk could be harmed if some sort of bad event happens in the future, but at the same time that they're making that risk disclosure, the company knows that, in fact, that bad event has already materialized.

Page 134

M. Cain

And then a corrective disclosure comes out in the future revealing the relevant truth that's tied to that bad event, the stock price dropped, you could still say that the drop is related to a disclosed risk, and yet, the allegation may be that, at the time of disclosing a risk factor, defendants in a case, in fact, knew that that had already materialized and taken place.

So you can still have artificial inflation around the relevant truth that is related to the disclosed risk. So I think there are times when these things are related to one another.

Q. Would you agree that you would have to consider the disclosed risk and assess whether there was -- it's related to -- I suppose the subsequent disclosure or alleged revelation of truth?

MR. CHRISTIE: Objection, form.

A. I would agree that in every case in which I'm measuring artificial inflation, I do consider both the alleged misrepresentations, omissions, disclosed risks as well as the

Page 135

M. Cain

corrective information and the relevant truth that comes out subsequently.

Q. Would you agree that an event study methodology designed to measure artificial inflation must account for and disaggregate distinct causes of movements in the price of the subject firm's stock?

MR. CHRISTIE: Objection to form.

A. I'm not really sure what you mean by that.

Q. Well, in constructing an event study to measure artificial inflation, would you at all need to account for any distinct causes of movements in the subject firm stock?

MR. CHRISTIE: Same objection.

A. So the event study controls for certain pieces of information, including overall stock market movements and industry-wide movements that occurred during the event window.

And then part of the calculation of artificial inflation using the results of an event study will also consider whether some part of a stock drop was caused my non-fraud-related information that goes beyond market-wide or

Page 136

M. Cain

industry-wide movements.

So those would be examples of individual causes of company-specific stock price movements that would be considered as part of an artificial inflation calculation.

Q. Do you agree that in order to measure artificial inflation associated with a non-disclosed risk, one would need to assess the true likelihood of the risk prior to materialization of that particular risk?

MR. CHRISTIE: Objection to form.

A. Not necessarily.

Q. In what circumstances would you not?

A. I would go back to the hypothetical that I used previously where the company might have a disclosed risk at -- while for some time knowing that a bad outcome has already materialized.

And they know that just in essence with -- you could think of that as knowing it with 100 percent probability because they know it.

And so looking at a subsequent corrective disclosure does not necessarily



MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

December 17, 2025
137–140

Page 137

M. Cain

require a consideration of probabilities.

Q. Are there any other circumstances one would not need to consider or to assess the true likelihood of the risk materializing prior to the actual materialization of that risk?

A. There could be. It just -- each case involves its own loss causation and damages analysis, which begins with a consideration of the information environment and the allegations in the case.

Q. And sitting here today, can you think of any other particular circumstance?

A. I'm sure that many prior loss causation and damages reports and analyses that I've done would fit within that characterization in which it was not necessary to consider probabilities or probability adjustments even though the corrective information related to alleged materializations of risks.

Q. Would you agree that in order to measure artificial inflation, an expert would need to assess the risk that had been already incorporated into the market price of the stock?

MR. CHRISTIE: Objection to form.

Page 138

M. Cain

A. I think it depends on the individual facts and circumstances.

Q. Well, would an expert need to assess the market's perceived likelihood of the risk materializing, for example?

MR. CHRISTIE: Same objection and asked and answered.

A. Again, it depends on the individual set of facts and circumstances.

Q. In what circumstances would the expert not need to assess the market's perceived likelihood of the risk materializing prior to the materialization of that risk?

A. Well, going back to your prior question, to the extent that that's already publicly disclosed and investors understand that there was a publicly disclosed risk, then that -- we would expect that to be reflected in the stock price if the market is efficient.

And then when the truth comes out subsequently, that affects the incremental change to the information environment that was not placed into the stock price.

So there may be no need to consider

Page 139

M. Cain

any changes in probabilities based on those two different events.

Q. Well, let's assume the market was aware of the extent of daigou sales in the luxury goods industry during the class period. Let's just assume that.

A. Of Estee Lauder's -- the exact amount of Estee Lauder's daigou sales during the class period, is that what you are representing?

Q. No. Let's start out -- just let's assume that the market is aware that daigou sales are pervasive in the luxury goods market in China.

A. So not limited to Estee Lauder but just talking about some definition of an overall industry?

Q. Right, the luxury goods?

A. Okay.

Q. Let's just assume that.

Would an expert need to assess the markets -- well, would that figure into assessing the artificial inflation?

MR. CHRISTIE: Objection to form, incomplete hypothetical, assumes facts.

Page 140

M. Cain

A. I would need to undertake a much more exhaustive loss causation analysis in order to determine whether that would merit consideration or adjustment to the calculations.

Q. And if the market contemporaneously estimated the percentage of Estee Lauder's sales attributable to daigou sales, is that something you would have to take into consideration?

MR. CHRISTIE: Same objections.

A. It would be the same answer as before, I would need to undertake an exhaustive loss causation analysis in order to determine whether any consideration or adjustment would be warranted.

Q. And sitting here today, you have not considered any information suggesting 80 percent of the luxury goods market in China was attributable to daigou sales, is that right?

MR. CHRISTIE: Objection, asked and answered and the same objections as earlier.

A. I have not attempted to research that question whatsoever at this point in time.

Q. And have you similarly not attempted



MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

December 17, 2025
141–144

Page 141

M. Cain

to research the question as to what the market was contemporaneously estimating the percentage of Estee Lauder's travel retail sales attributable to daigou sales to be?

MR. CHRISTIE: Same objection.

A.   Well, the same as before, I have not attempted to research or answer that question at this point in time.

Q.   But that would be relevant, right, no doubt, to a loss causation analysis?

A.   Like I said before, I would need to conduct an exhaustive loss causation analysis in order to even assess whether or not that would be relevant.

Q.   You certainly wouldn't ignore those facts, would you, in constructing a loss causation analysis?

MR. CHRISTIE: Same objections.

A.   Since I haven't even attempted to consider a loss causation analysis, I've not even thought at this point in time about what would or would not be relevant in terms of those specific pieces of information.

Q.   Let's assume hypothetically that

Page 142

M. Cain

regulations during the class period prohibited daigou sales.  Let's just for purposes of this hypothetical assume that there are regulations during the class period that prohibited daigou sales.

In order to measure artificial inflation, would an expert need to assess the total value impact at the risk of enforcement of those regulations?

MR. CHRISTIE: Objection, incomplete hypothetical, assumes facts.

You can answer.

A.   Like I said before, I would need to undertake an exhaustive loss causation analysis in order to assess whether that would be important to consider or control for.

Q.   So sitting here today, you don't know one way or the other whether an expert would need to assess the total value impact of the risk of enforcement of any regulation in order to measure artificial inflation in this case, is that right?

MR. CHRISTIE: Same objection.

A.   At this point in time, I've not

Page 143

M. Cain

attempted to evaluate that question.

Q.   Would you agree an expert would also need to assess the market's perceived likelihood of daigou-related enforcement activity at different points in time in the class period?

MR. CHRISTIE: Same objection.

A.   Like I said before, I would need to undertake an exhaustive loss causation analysis in order to assess whether that would be relevant or important to consider or control for.

Q.   Okay. So you haven't considered that at this point in time, is that right?

MR. CHRISTIE: Asked and answered.

A.   I've not attempted to undertake a loss causation analysis or any sort of calculation of artificial inflation at this point in time.

Q.   Have you attempted to measure how any perceived likelihood of enforcement activity changed throughout the class period?

MR. CHRISTIE: Same objections.

A.   Not at this point in time.

Q.   And have you reviewed any investor

Page 144

M. Cain

testimony to date regarding awareness of daigou or associated regulatory risk during the class period?

MR. CHRISTIE: Asked and answered, same objections.

A.   No.

Q.   Have you done any work to estimate the company's perceived likelihood of a daigou-related enforcement action at any point during the purported class period?

MR. CHRISTIE: Same objections.

A.   No.

Q.   If the market was aware that Estee Lauder was subject to the risk of regulatory enforcement at any point during the purported class period, would you agree that any price reaction that reflects materialization of the known risk should be removed from damages?

MR. CHRISTIE: Same objections.

A.   Not necessarily.

Q.   Would you agree that the risk of regulatory enforcement only applies to sales that are in violation of an applicable regulation?



Page 205

M. Cain

provide coverage of, but that despite that systematic bias, that their reports and changes in things like price targets or recommendations can still convey new information to investors.

Q. Well, in assessing Cammer Factor 2, did you undertake any assessment of whether the analyst coverage you have relied on here was, in fact, biased in favor of management?

A. No, I have not.

Q. Would you agree that one way of dissecting whether statistically significant price returns are due to confounding information is by considering information disseminated through analyst coverage?

A. Can you repeat the question again?

Q. Sure.

Would you agree that one way of dissecting or determining whether statistically significant price returns are due to confounding information is by considering information disseminated through analyst coverage through these analyst reports?

A. That can be part of the process of identifying confounding information in certain

Page 206

M. Cain

instances.

Q. If information about a company is new and value relevant, would you expect analysts to discuss it in that coverage?

A. Sometimes they do and sometimes they do not. It depends on the context.

Q. Is it fair to say though you assumed in assessing the extent of analyst coverage in relation to examining Cammer Factor 2 the analysts did, in fact, consider and disseminate new, important company-specific information to investors?

A. I do assume that they played a role in that overall process, yes.

Q. Do you have a typical process -- when you prepare a loss causation or damages report, do you have a typical process for selecting analyst reports and their commentary?

A. In a loss causation and damages report, I will typically -- I'll frequently review all of the analyst reports over the course of the relevant information environment, and then I will often copy and paste certain quotes that are indicative of things like

Page 207

M. Cain

economic materiality, whether they discussed or talked about things like financial results.

That could be in connection with assessing economic materiality of alleged misrepresentations. It can also be in connection with the interpretation of corrective disclosures. And like we discussed earlier, sometimes it can be in relation to disaggregation of confounding information.

So those would be some ways in which I will point to analyst reports.

Q. Would you agree that worsening macroeconomic conditions in the United States are unrelated to the alleged misrepresentations in this case?

MR. CHRISTIE: Objection to form.

A. That's not a question that I've researched or attempted to form an opinion on at this point in time.

Q. So sitting here today, you don't know to what extent worsening macroeconomic conditions in the United States impacted Estee Lauder's stock price at any point in the class period?

Page 208

M. Cain

MR. CHRISTIE: Same objection.

A. That's correct, I've not researched that question, right, at this point in time.

Q. Would you agree that slower-than-expected growth in China's macro economy is unrelated to the alleged misrepresentations in this case?

MR. CHRISTIE: Object to form.

A. That's also something that I've not attempted to research or form an opinion on at this point in time.

Q. So sitting here today, is it fair to say you do not know to what extent changes in China's macro economy during the class period impacted Estee Lauder's stock price?

MR. CHRISTIE: Same objection.

A. That's correct, I've not attempted to assess that question at this point.

Q. What about projected growth in China's Prestige Beauty market, did you consider that during the class period?

MR. CHRISTIE: Object to form.

A. No, I've not attempted to research that element in forming my current opinions.



MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

Page 209

M. Cain

Q.   So is it fair to say that, sitting here today, you do not know to what extent projected growth or changes in that projected growth of China's Prestige Beauty market impacted Estee Lauder's stock price during the class period?

MR. CHRISTIE:  The same objection.

A.   That's correct, I do not know what ultimate price impact those things had during the class period.

Q.   And same for Covid-related lockdowns, you do not know, sitting here today, to what extent Covid-related lockdowns or changes in Covid-related lockdowns in China or elsewhere in the world impacted Estee Lauder's stock price during the class period?

A.   Similarly, I've not researched that question or attempted to form any opinions.

Q.   What about the spending patterns or behavior of Chinese consumers through the class period, do you have any understanding whether, to what extent those changes impacted Estee Lauder's stock price through the class period?

MR. CHRISTIE:  Objection to form.

Page 210

M. Cain

A.   That's also something that I have not researched or attempted to form any opinions on at this point in time.

Q.   Do you know whether Estee Lauder experienced any supply chain issues during the class period?

A.   It's not something that I've researched or looked into or formed any opinions on as of today.

Q.   And do you know or would you agree that Estee Lauder's supply chain issues are unrelated to the alleged misrepresentations in this case?

MR. CHRISTIE:  And I object to form.

A.   Again, I would need to conduct an exhaustive loss causation analysis in order to assess that question.

Q.   And so then is it fair to say that you have no view, sitting here today, as to whether or to what extent supply chain issues impacted Estee Lauder's stock price through the class period?

MR. CHRISTIE:  The same objection.

A.   That's correct, I've not formed any

Page 211

M. Cain

views one way or another at this point in time.

Q.   What about increased competition or the loss of market share to competitors in the Prestige Beauty or luxury industry, first, do you believe those to be related in any way to the alleged misrepresentations in this case?

MR. CHRISTIE:  Object to form.

A.   Well, my recollection is that the relevant truth does pertain to financial results that relate to sales declines in the travel retail business.

And so one implication of that, if you were to think about a company operating within an industry, if they have a decline in their sales, if competitors do not have a similar decline, then that would certainly mechanically alter their proportional sales or their market share calculations.

So I do think it's possible that that type of information could be connected to the allegations in this case.

Q.   Well, have you undertaken to -- any assessment to compare Estee Lauder's sales through daigou channels to competitors' sales

Page 212

M. Cain

through daigou's channels during the class period?

A.   No, I've not done any such analysis as of this point in time.

Q.   And have you done any analysis or undertaken -- to understand whether any decline in sales was attributable to a change in channels or instead increased competition for a preference by Chinese consumers for a competitor's product during the class period?

MR. CHRISTIE:  Objection to form.

A.   No, I've ultimately not attempted to research or answer that type of question as of this point in time.

Q.   What about fluctuations in exchange rates, do you understand those to be related in way, shape or form to the alleged misrepresentations here?

MR. CHRISTIE:  Same objection.

A.   I would need to conduct a loss causation analysis in order to assess whether those are related.

Q.   Do you know whether fluctuations in exchange rate had any impact on the value of



Page 213

M. Cain

Estee Lauder's stock price through the class period --

A.   I don't know --

Q.   -- sitting here today?

A.   At this point this time, I don't know because I've not researched that question.

Q.   What about the conflict between Ukraine and Russia, do you know to what extent that conflict impacted the price of Estee Lauder's stock through the class period?

MR. CHRISTIE:  Object to form.

A.   No, I don't.

Q.   Do you know to what extent analysts commented on the impact of that conflict on the price of Estee Lauder's stock or its results?

A.   No, I've not researched that question.

Q.   Do you know to what extent the impact of that conflict on Estee Lauder differed as compared to the impact of that conflict on anyone else in the industry?

A.   No, I've not researched that question.

Q.   What about the impact of the

Page 214

M. Cain

Israel/Gaza conflict on the price of Estee Lauder stock during the class period, have you considered that?

A.   Similarly, I've not researched that question.

Q.   Would you agree those are all items you would assess -- would need to assess in a loss causation or damages opinion to isolate the impact -- the value impact on Estee Lauder's stock price consistent with a theory of liability in the complaint?

MR. CHRISTIE:  Objection to form.

A.   I would need to conduct a loss causation analysis in order to determine whether it would be necessary or relevant to consider those factors.

Q.   Would you agree you would at least need to think about each of those factors and consider whether they impacted the price of Estee Lauder's stock in the class period?

MR. CHRISTIE:  Same objection.

A.   The starting point for me would be to understand the information environment and the company itself and then that would lead to

Page 215

M. Cain

subsequent lines of inquiry that may or may not include those types of things.

Q.   Sitting here today, any reason to believe each of those items would not be part of the information environment an expert should consider in assessing loss causation and damages?

MR. CHRISTIE:  Same objection.

A.   Again, I've not looked at the information environment, so I'm not familiar enough with it to say assess whether those would be meaningful components of that information environment.

Q.   Your market efficiency section of your report, another item you noted was Factiva as a provider of access to business news across a comprehensive set of publications.

Do you recall generally that reference?

A.   Yes.

Q.   And you agree Factiva includes reference to a comprehensive set of publications, including, for example, Dow Jones Newswire, Reuters News, Wall Street Journal, the

Page 216

M. Cain

Business Wire, among other publications, is that right?

A.   Yes.

Q.   And you conducted -- in connection with the work leading to the conclusions expressed in the report, you conducted a search of press and news articles about Estee Lauder using Factiva, is that right?

A.   Yes.

Q.   And did you identify over 2,100 unique articles about Estee Lauder during the class period?

A.   Yes.

Q.   And, of course, another source of publicly available information about the company came from Estee Lauder itself, is that right?

A.   Yes.

Q.   You reference, for example, in paragraph 44 the fact that Estee Lauder produced numerous filings with the Securities & Exchange Commission that were immediately disseminated to the public?

A.   Yes.

Q.   And you found that the analyst



Page 221

M. Cain

Q.   So I want to understand this approach broadly first.

Is the first step to identify an analysis period?

A.   I think the first step is really to understand an information environment for a given company and ask what are the types of disclosures that would be expected to provide value-relevant information to investors?

So, for example, considering the nature of a company, its information environment and then, for example, concluding that earnings announcements represent a reasonable testing ground because they are objective and widely considered by academic research to provide value-relevant information to investors when those companies have meaningful earnings.

And then the next step sometimes is to form a longer analysis period if the -- for example, if the class period is relatively short and there are not very many earnings announcements, then sometimes I'll use a longer analysis period to capture additional earnings announcements.

Page 222

M. Cain

Q.   When you say, "The first step is to understand the information environment," what do you do to understand a company's information environment?

A.   I review the complaint and the company's SEC filings to understand the nature of the company and its business.

Q.   Anything else?

A.   Those are typically the steps that I take.

There could be certain situations, like I discussed earlier today, where based on that initial review it flags that this is not a typical company that has normal, meaningful earnings announcements and then that might lead to some additional research into what are other types of information announcements or disclosures that would be relevant for a given company.

Q.   And when you say you look at a company's SEC's filings, do you look at earnings or quarterly filings only or do you look at all such filings -- all SEC filings?

A.   I attempt to identify the

Page 223

M. Cain

disclosures of earnings, and that could include an earnings announcement or a preliminary announcement. Often those are flagged on form 8-K under item 2.02. So that may be a formal earnings announcement or just like a revenue guidance update or something like that.

So that's typically what I'm looking for with those SEC filings.

Q.   Okay. So step 1 is understanding the information environment.

Is step 2 then determining the analysis period for the event study?

A.   I think after -- again, that's done in conjunction with identifying the relevant news days and the quantity of those news days that fall within the class period, but then that next step is generally to set an analysis period, yes.

Q.   So somewhere in there between understanding the information environment and assessing the analysis period, you determine how news days will be captured or defined?

A.   Yes.

Q.   Is that fair?

Page 224

M. Cain

A.   Yes.

Q.   And then do you determine all non-news days within the analysis period, or I'll -- strike that.

Do you determine every other day in the analysis period other than news days, do you deem those to be non-news days?

A.   No.

Q.   Okay. How do you identify non-news days?

A.   So I've got a definition of those in paragraph 74 of my report. And in this case -- and it, again, is -- just like the news days, the "no news days" definition is very company specific because there is significant variation across companies.

But for this particular case, I defined the "no news days" as having no alleged revelations of the relevant truth or, in other words, the market impact dates of the alleged corrective disclosures, no SEC filings and no news articles in Factiva that fall under the Dow Jones category and tagged to the company itself.

Q.   Okay. So if I understand how you

MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

December 17, 2025
225–228

Page 225

M. Cain

arrived at the no news trading days categories, you considered the alleged corrective disclosures in the complaint, SEC filings, and Dow Jones articles on Factiva tagged to the company, is that right?

A. Yes.

And I forgot to mention that also, by definition, they also do not include the news days, the earnings announcements, but yes.

Q. Thank you. Fair enough.

But in identifying news days, the approach is a bit different. You identified days on which earnings were announced within the analysis period, is that right?

A. Yes.

Q. And then it's a matter of conducting the event study and observing whether a security's price tends to more move more significantly on news days versus no news trading days, is that fair to say?

A. Yes.

Q. In the analysis period that you identified here, that extends one trading day beyond the class period, is that right?

Page 226

M. Cain

A. Yes, it does.

Q. And why is that?

A. I frequently will extend it one day beyond the class period so that I can also include the last earnings announcement that occurred on the last day of the class period. But because it occurred after hours, the market impact date occurs on the very next trading day.

So that's what the -- what I am referring to.

Q. Okay. And so then within the analysis period you used here, you define "news days" to include the eight days on which Estee Lauder released quarterly earnings, is that right?

A. Yes.

Q. Okay. And then in the next paragraph, 74, you define "no news trading days" as days on which there were no news day events, no alleged corrective disclosures, no SEC filings and no Dow Jones articles, is that right?

A. Yes.

Q. And was there a reason that you

Page 227

M. Cain

focused on Dow Jones articles versus other articles?

A. My recollection is that this company, like many large, international companies, have a certain degree of media articles coming out on -- essentially every day. And so it's impossible to come up -- or maybe not impossible but very difficult to come up with a large sample of days in which there were literally no media articles about the company like this.

And so I narrow the focus down to this higher bar of a news article being disseminated through Dow Jones. Those are typically articles that are focused towards investors as opposed to like a magazine article.

The Factiva universe of media is very large and very wide, and it includes many, many articles that may be aimed at consumers, whereas the Dow Jones tag is filtering to a smaller -- much smaller subset of articles that are focused often more towards investors.

Q. Then Exhibit 7 is the statistical comparison -- or the comparison of the --

Page 228

M. Cain

whether there was a statistically significant price reaction following the news day versus non-news day, is that right?

A. Yes.

Q. And this is your only analysis comparing the behavior of Estee Lauder's common stock on news days versus other days or no news days, is that right?

A. Just Exhibit 6 and 7, yes.

Q. Now, this collection of news days and no news trading days, that covered only approximately 56 percent of the trading days in the analysis period, is that right?

A. Yes, that's correct.

Q. And the other 44 percent of trading days in the analysis period, they're not included in your comparison, is that right?

A. That's correct.

Q. Did you assess the price reaction of Estee Lauder's stock on those other days --

A. No.

Q. -- at any point in time?

A. No, I did not.

Q. Did you ask your team to assess the



Page 229

M. Cain

price reaction of Estee Lauder's stock on those other days?

A. No.

Q. Sitting here today, do you know the price reaction of Estee Lauder's stock on those other days?

A. I certainly don't have the event study output memorized.

But when running the event study and producing the output, I do produce the abnormal return calculations for every day that falls within the analysis period. So that would be included in the output and the turnover documents that we submitted to you in conjunction with my report, but I did not review that with an eye towards looking at specific returns on any specific dates, other than Exhibit 6 and 7.

Q. So then is it fair to say you do not know what percentage of other days' observed stock price movements were statistically significant at the 95 percent confidence level on? You don't know one way or another?

A. That's correct, I don't know what

Page 230

M. Cain

that proportion would be.

Q. Did you compare the price reaction on these other days to the price reaction on non-news days?

A. No, I did not.

Q. And the other days are not reflected on Exhibit 6 or 7 of your report, is that right?

A. Correct, they're not part of the test.

Q. Now, these other days include days on which the company released SEC filings, is that right?

A. Yes -- well, I believe so. Again, I haven't checked to evaluate those, but I do exclude from the no news day bucket days in which SEC filings were released.

So it is very likely that this other bucket of days that does not fall into either buckets would likely include some days on which SEC filings were released.

Q. And these other days, do they include days on which there are non-Dow Jones articles on Factiva tagged to the company?

A. They likely do, yes.

Page 231

M. Cain

Q. Well, do you know whether they do given you conducted a search of Factiva for articles tagged to the company?

A. So my search of Factiva was focused on the Dow Jones flags.

So I've not evaluated any specific days to research this question, but it is likely -- based on my just general experience studying companies, it is likely that there would be some days that we would have non-Dow Jones articles issued.

Q. Well, in connection with your analysis of Cammer Factor 2, you identified 2,155 unique articles concerning Estee Lauder that were published during the class period from leading news outlets, is that correct?

A. That's my recollection, yes.

Q. And those include articles other than from Dow Jones, is that correct?

A. Yes.

Q. And you do not know whether the other days -- so this category of other days in the analysis period, they are not defined in your report as news days or non-news days.

Page 232

M. Cain

You do not know to what extent those other days include reports published by publishers other than Dow Jones through the analysis period, is that right?

A. Yeah, ultimately, I have not attempted to research that particular question.

Q. And other than looking to the Dow Jones articles, you did not attempt to assess or consider whether any of the 2,155 unique articles that came out through the class period, which overlaps with the analysis period but for one day, you did not attempt to determine whether any of those days should be categorized as news or non-news days in your market -- or in your event study, is that right?

A. Nothing beyond the categories that I used to flag the news days and the no news days.

So I guess to give a more fulsome response, in my experience, this other category of days that are not included in the Cammer 5 test, it will often include days where there was no disclosure of information but it may include some days where there are important disclosures of information but that they don't fall under



Page 233

M. Cain

the definition of "news days," meaning earnings announcements.

So I'm certainly not giving an opinion that this other category is somehow irrelevant or was not informative to investors but simply that this category does not fit into the objective set of criteria that is applied to form the two main buckets used to carry out the Cammer 5 test.

Q.   Right.  In determining how to -- well, strike that.

In determining the design of the event study for your Cammer Factor 5 analysis, you essentially ignored the non-Dow Jones articles in terms of deciding what were news days and what were non-news days during the analysis period, is that fair to say?

A.   That's correct, yes.

Q.   Is it also true that your definition of "news days" does not include days on which analyst reports were released?

A.   Well, there certainly may be many analyst reports issued on the news days because these are earnings announcements, but that's --

Page 234

M. Cain

so there is certainly a correlation, but we know that analyst reports tend to cluster around earnings announcements.

So it's very likely that there is that clustering, but beyond that, it's not a -- it's not a consideration in terms of the definition of these dates.

Q.   Do you know what percentage of the 556 analyst reports you observed from 38 separate firms during the class period, do you know to what extent those reports were released on news days versus non-news days as defined in your event study?

A.   No, I've not attempted to calculate that percentage.

Q.   And did you conduct any analysis of the other days here, as we've been using that term, to determine whether announcements occurring on those days represent a potential opportunity for the public release of new value-relevant company information to investors?

MR. CHRISTIE:  Object to form.

A.   Well, I think my conclusion is that the market was efficient throughout the entire

Page 235

M. Cain

class period, and so information could be disclosed through a variety of sources at any point during the class period, not only on -- I certainly wouldn't limit that to only the news days as defined in the context of earnings announcements.

But I've not attempted to research or identify every date during the class period on which information was disclosed to investors that they found value relevant.

Q.   Okay.  So it could be but you have not conducted an analysis of the other days to determine whether announcements on those days represent the public release of new value-relevant company information to investors, is that right?

A.   Nothing beyond what I described previously.

Q.   And you've provided no explanation in your report as to why you excluded these other days from the analysis period, other than your definition of "news days" and "no news trading days," is that fair to say?

MR. CHRISTIE:  Objection to form.

Page 236

M. Cain

A.   Well, I think the definition of the "news days" and "no news trading days" does also explain why all the other days fall outside of those two buckets.  So I do think there is a clear explanation of that.

(Exhibit 4, spreadsheet, marked for identification, as of this date.)

Q.   Sir, you've been handed a document marked as Cain Exhibit 4.

MR. CHRISTIE:  Monica, can we just establish for the record that this is a counsel-created document or --

Q.   No, I was just going to --

MR. CHRISTIE:  Okay.

Q.   -- for the record note that this is a printout of back-up materials provided for your -- by your counsel that I believe was titled "Regression_With_News."

A.   Okay.

Q.   And feel free to look at this document.

Does it look familiar to you?

A.   Yes, I do believe this is the event study output that I was talking about

Page 237

M. Cain

previously.

Q. Did you create this document?

A. This was created by the event study code that I've worked with the Fideres staff to create that code.

So I definitely have had a part in creating the code that produces this output.

Q. Okay. So you -- you've had a part in creating the code that produces this output.

Did you produce this output in this particular instance?

A. They ran the code that I worked on with them, and they produced the -- I believe it was Excel spreadsheet output that you've printed out here.

Q. Got it.

So if you turn to August 30, 2023, and I believe it's on page 16.

A. Okay.

Q. And that line item references a headline of a press release, and I'll quote, "The Estee Lauder Companies should participate in the Barclays Global Consumer Staples Conference," and then in parens "Dow Jones

Page 238

M. Cain

Institutional News Factiva."

Do you see that?

A. I do.

Q. For purposes of your event study, you would not consider this to be a public release of new value-relevant company information to investors, is that right?

A. No, I've never offered that type of opinion.

Q. In constructing your event study, did you include this day in the "Other Days" category?

A. I believe so.

Q. Yet would you agree with me that this non-news day has a statistically significant price reaction?

A. So this is not -- again, this is not a non-news day. This is a day in which there is at least one news headline on Dow Jones. There may be other headlines. There was an SEC filing.

But I do agree that there was a stock price movement that was significant at the -- roughly the 93 percent level.

Page 239

M. Cain

Q. So you believe this particular day was excluded from the "Other" category and included in the Non-News Day category, is that right?

A. No, it was excluded from the "No News Day" category and it was put into the "Other" category, as -- you can see that from the column with the heading "Day Type," and it says, "Other."

So that's not in -- it's not in the news days and it's not in the no news days. It's in the "Other" category.

Q. Got it.

Am I reading this correct that there was a statistically significant movement in the company's stock price?

A. At the -- at roughly the 93 percent level of statistical significance, yes.

Q. All right. Let's look at February 4, 2022.

A. Okay.

Q. That February 4, 2022 is included in the "Other" category.

Do I have that right?

Page 240

M. Cain

A. Yes.

Q. And the public press articles identified on this date concern analyst reports that were published in response to the February 3 earnings announcement, is that right?

A. It looks like it does include some coverage of analyst reports that were published. It's unclear on the exact timing of the analyst report publication, but it looks like the news coverage of those reports occurred with the market impact dating of February 4, yes.

Q. And this "Other" day has a statistically significant price reaction, is that right?

A. Yes.

Q. Was the price reaction on February 3, following the earnings announcement, was it statistically significant?

A. It was significant at roughly the 89 percent level.

Q. Not at the 95 percent confidence level?

A. That is correct.

Q. If the stock price's reaction on the



Page 245

M. Cain

significance within this type of event study context.

You could still measure that through other techniques like valuation analysis. But those are just general things that I have taught in my classes and in my own research but I've not undertaken any sort of analysis as it pertains to this particular date.

Q. So is it fair to say there is some possible explanations for the lack of a statistically significant stock price following this news, but sitting here today, you have not assessed that particular date or lack of change in stock price or the reasons therefore, is that fair to say?

A. Right. That's not one of the news days that I was studying based on my objective criteria of studying the earnings announcements.

Q. What about July 19, 2023?

News reports came out that day that Estee Lauder was the victim of a cybersecurity hack that disrupted its business operations.

Do you consider that news to be value-relevant company information to investors?

Page 246

M. Cain

A. That's not a question that I've researched or attempted to form an opinion on at this point in time.

Q. And that particular day is categorized as an "Other" day for purposes of your event study, is that right?

A. Yes.

Q. And was there any statistically significant price reaction following that news?

A. There was a stock price movement, but it was not statistically significant.

Q. What about August 16, 2023?

A. Okay.

Q. Do you see there reference to news reports regarding Estee Lauder's big bet on China is looking not so pretty?

A. Yes.

Q. Would you consider that to be value-relevant company information to investors?

A. It's not a question that I've researched at this point in time.

Q. And you included this date in the "Others" category, is that right?

A. Yes.

Page 247

M. Cain

Q. And was there a statistically significant price -- stock price reaction following the release of this news report?

A. There was a stock price movement, but it was not statistically significant.

Q. Can credit rating events been value-relevant information to investors?

A. Yes, particularly investors in the securities that are subject to those credit rating changes, like bonds.

Q. Now, if we look at September 6, 2023.

A. Okay.

Q. There is "no news" noted there, is that right?

A. Correct.

Q. No news picked up through this Factiva search?

A. Well, through the subsample of Factiva articles, yes.

Q. And when you say, "subsample of Factiva articles," is that focusing in on the Dow Jones articles?

A. Correct, yup.

Page 248

M. Cain

Q. And there was no statistically significant price reaction on that day, is that right?

A. That's right. There was a stock price movement, but it was not statistically significant on that day.

Q. Are you aware that on September 6, 2023, Moody released a report revising its outlook on Estee Lauder to negative?

MR. CHRISTIE: September 26 or 6?

Q. I'm sorry, September 6, 2023.

A. On the company or on the debt securities, when you're characterizing the Moody's report?

Q. Well, were you aware of the Moody's report on either of the company or its debt securities on that day?

A. Off the top of my head, I don't recall one way or another whether there was a report on that date.

Q. What about March 8, 2022?

A. Okay.

Q. Do you see reference to an article that Estee Lauder is to close all the stores it

Page 249

M. Cain

owns in Russia released on that day?

A. Yes.

Q. Would you consider that to be value-relevant information to investors in Estee Lauder?

A. I've not attempted to form an opinion one way or another on that particular article.

Q. And is there a statistically significant price reaction following that news?

A. Yes.

Q. Let's turn to your expert report, which should be Exhibit 1.

A. Okay.

Q. And directing your attention to Exhibit 6, the list of news days.

A. Okay.

Q. And we discussed a moment ago that you added November 1, 2023, given the company releases -- the timing of when the company released its earnings news, is that right?

A. Yes.

Q. Did you know whether a statistically significant change in the price of the stock

Page 250

M. Cain

would be observed on November 1, before you determined the analysis period?

A. No.

Q. And of the eight days that are listed here, five of these eight days are days on which the amended complaint alleges corrective disclosures were made, is that right?

A. I believe that is correct in terms of the market impact dates, yes.

Q. And all five of those dates in which the amended complaint alleges corrective disclosures were made, all five of those days have a statistically significant price reaction, is that right?

A. Yes.

Q. And if you remove those five news days, that leaves only three news days left in your event study, is that right?

A. Well, I wouldn't throw out those five earnings announcements, but I would agree that there are three other remaining earnings announcements outside of those five earnings announcements.

Q. And if you excluded those five days

Page 251

M. Cain

on which corrective disclosures were allegedly made, it leaves three days, and only one day on which a statistically significant change in the company's stock price occurred, is that right?

A. One of those three other earnings announcements does have a statistically significant stock price movement, yes.

Q. Now, you're aware from the allegations in the amended complaint that, at least according to the complaint, the highly negative price changes on the five days that were alleged to be corrective are because they were corrective, right?

MR. CHRISTIE: Objection to form.

A. I'm not really following your question.

Q. Well, are you aware from the allegations in the complaint that there were highly negative price changes on the five days that were alleged to be corrective events?

A. That is consistent with my recollection of the complaint.

Q. For example, if you look at the complaint, at paragraph 185, it alleges that the

Page 252

M. Cain

stock price declined over 8 percent because corrective disclosures were made. On that particular date, on November 2, 2022.

A. I see that, yes.

Q. And then at paragraph 196, it alleges that the price of Estee Lauder stock declined 4.41 percent because of the corrective disclosures made on February 2, 2023, right?

A. Yes.

Q. And, again, with respect to the remaining alleged corrective disclosures at paragraph 208, the complaint alleges the stock declined over 17 percent. At paragraph 218, the complaint alleges the stock declined over 3.3 percent. And at paragraph 231, the complaint alleges the price of the stock declined by 19 percent on November 1, 2023.

And all of those price declines are alleged to be as a result of corrective disclosures made on those days, right?

A. Yes.

Q. Is it true that the negative price changes of that magnitude increased the likelihood that these dates would have



MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

Page 253

M. Cain

statistically significant returns?

A.   I'm not really following your question.

Q.   Then I'll withdraw it.

Did you understand when you constructed your event study that each of the alleged corrective disclosures took place on the same day as quarterly earnings announcements?

A.   Oh, that is consistent with my recollection of the allegations of the complaint, yes.

Q.   Would you agree that a large stock movement driven by a known unique disclosure is not random, and including it in a sample could over estimate how much the stock typically moves by random chance?

MR. CHRISTIE:  Object to form.

A.   I think I would need some more context to evaluate that type of sentence.

Q.   What context would you need?

A.   I would like to read the -- if that's from an article, I would like to read the article to see what they're talking about.

Q.   Would you agree that removing

Page 254

M. Cain

outliers caused by company-specific announcements brings the analysis closer to the actual null hypothesis of testing against random chance?

MR. CHRISTIE:  Object to form.

A.   Again, I would like to see the context of that.

But I guess in terms of both of these questions, what I would explain is that, for an objective Cammer 5 analysis of testing earnings announcements, that's an objective set of criteria for which to test statistical significance in stock price movements.

I do exclude those outlier events from the regression of controls in order to have a baseline of the estimated volatility from day to day.

I would also say that typically when we talked about the -- if we are talking about a null hypothesis of random stock price movements, the reality is that in the real world, we don't ever have any days where prices move randomly in the absence of information or trading by market participants.

Page 255

M. Cain

The reality is on every day that markets are open and trading, information is coming out through a variety of sources and people are trading, and both the information and the trading behavior moves stock prices.

So I think it's important to define all of these terms and how people are using them because I've seen many people misinterpret like the null hypothesis or what it means for stock prices to move randomly and things like that.

So that's kind of what I am referring to in terms of understanding the context of what people are talking about.

Q.   Would you agree that implementing a common step can improve an event study's power excluding outlier event days from the estimation window that involved company-specific announcements that are likely to impact the stock price?

MR. CHRISTIE:  Object to form.

A.   I guess I would say that event study analysis is known to have low power to detect abnormal returns, and one of the ways to correct for that low power issue is to exclude the

Page 256

M. Cain

market impact dates from the disclosures that one is testing, just in the way that I've done with the news days in this regression and event study analysis.

MR. CHRISTIE:  Monica, we have been going over an hour 15.

MS. LOSEMAN:  Oh, let's take a break.

MR. CHRISTIE:  Yeah.

THE VIDEOGRAPHER:  Off the record at 4:51 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are on the record at 5:10 p.m.

BY MS. LOSEMAN:

Q.   Welcome back, Dr. Cain.

If you could take out -- I believe it's Exhibit 3 is the copy of the amended complaint in this matter.

A.   Okay.

Q.   Do I have it right that as part of your process in assessing the sort of informational context before you constructed your event study or decided how to construct



MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

Page 257

M. Cain

your event study, you read the complaint, right?

A.   Yes, I did.

Q.   Okay.  And if we look at paragraphs 80 through 81.

Sorry, pages 80 through 81.

Do you see the allegations regarding that final corrective disclosure on November 1, 2023?

A.   I do.

Q.   And in paragraph 231, that splits the page between 80 and 81, do you see that plaintiffs -- the lead plaintiffs allege that as a direct and proximate result of the corrective disclosure made that day, the price of the company's stock declined approximately 19 percent?

A.   I see that.

Q.   That's a substantial decline in the price of the company stock, right?

MR. CHRISTIE:  Objection to form.

A.   What I would say was when I read the complaint, I had no context to evaluate the extent to which that was substantial or even certainly statistically significant.

Page 258

M. Cain

Q.   Well, setting aside statistical significance, you would agree that 19 percent is a substantial decline, wouldn't you?

MR. CHRISTIE:  Objection to form.

A.   I would say based on the results of my event study, that does indicate that it was statistically significant and not quite substantial based on that output.

Q.   Well, when you read the complaint, isn't it fair to say you had reason to believe the decline in the company stock price would turn out to be statistically significant given it dropped 19 percent that day?

MR. CHRISTIE:  Objection to form.

A.   No, that was not part of my consideration in terms of setting forth the Cammer 5 analysis.

Q.   Is it your testimony that when you read this allegation, that lead plaintiffs alleged the stock price declined by 19 percent as a result of the disclosures, that you would find a decline in the company's stock price to be not statistically significant that day?

A.   Again, at the time of forming my

Page 259

M. Cain

Cammer 5 analysis, I had no idea of whether or not the stock price change after this date would be statistically significant.

But after having run my Cammer 5 analysis and looking at the output, I am able to look at that output and conclude that the stock price movement was statistically significant.

Q.   Is it fair to say, just reading this paragraph in the complaint, it's more likely than not a statistically significant change in the company's stock price would be observed on that day?

A.   I don't form opinions about statistical significance just from reading one paragraph of a complaint.  I actually do an event study and look at the output to assess statistical significance.

So that's just not a question that I was asking myself.

Q.   Well, in deciding which days to identify as news days for purposes of your event study, did you consider the fact that plaintiffs alleged a significant decline was a direct and proximate result of a corrective disclosure

Page 260

M. Cain

alleged in the complaint?

A.   No, that was not part of my consideration in setting up the Cammer 5 test.

Q.   So you did not consider in setting up the Cammer 5 test whether you should exclude from the construction of your event study days on which alleged corrective disclosures occurred?

A.   That's correct.  If I am going to articulate an objective criteria, then I carry out that objective criteria without inserting subjective decisions in terms of modifying it.

So I've used earnings announcements as the Cammer 5 context in a wide variety of market efficiency reports, and I do not exclude from those samples an earnings announcement date merely because it was an alleged corrective disclosure in a given complaint.

Q.   Have you ever constructed an event study in which over 50 percent of the news days were alleged corrective disclosure dates?

A.   It's possible that I have.  I'd have to go back and look at my prior efficiency reports.

 ESQUIRE
DEPOSITION SOLUTIONS

Page 273

M. Cain

and entities who purchased and otherwise acquired Estee Lauder common stock during the class period, is that right?

A. I see that.

Q. And than there is an addition of omissions, I see.

Do you see that?

A. Yes.

Q. And then you -- there is a paragraph that appeared in the StoneCo report, if you look at page 10 of the redline, that does not appear in the Estee Lauder report.

Do you recall why you removed that reference to research included in your StoneCo report?

A. I don't recall the specific context of the StoneCo report, and so I'm not able to recall the rationale for any differences between these two reports.

Q. And there is also a footnote in connection with that paragraph citing a report by Kewei Hou, Chen Xue, and Lu Zhang that's removed.

Do you recall why you removed

Page 274

M. Cain

reference to that report?

A. I think because that was included in the sentence that was removed from the report your asking.

Q. And then for the next several pages, at least through page 14, the difference appears to be in the name of the subject company, is that right?

A. Yes.

Q. And then on page 2, the difference appears to be reference to the subject company as well as the --

A. Which page are you at?

Q. I'm sorry, page 15?

A. Okay.

Go ahead.

Q. As well as change to the actual weekly trading volume, for example, in paragraph 37.

Do you see that?

A. Yes. So I see that all of the calculations and statistics are different because of the difference in the companies that I'm analyzing across the two reports.

Page 275

M. Cain

Q. Right. But other than those, the change -- or reference to the specific company and reference to the specific data or statistical item, the text is otherwise identical, isn't it?

A. I would say the text, when I'm describing a given factor, I'm describing the same factor in the same way across reports, but I'm doing the calculations in a -- with the data that's unique and particular to each company, which is different across the companies.

Q. And is that a fair description of the difference in the Cammer Factor 2 analysis between the two reports?

In other words, you use the same text --

A. Yes, I do --

Q. -- in describing the factor?

A. -- I do describe the same factor in the same way across reports, but the actual calculations and statistics are specific and unique to each company and class period.

Q. Is that the same with respect to the Cammer 3 section, same explanation for the

Page 276

M. Cain

difference between the two reports?

A. Yes, I think so.

Q. And is that the same explanation for the difference in the Cammer Factor 4 section?

A. Yes.

Q. The same explanation for the Cammer 5 section?

A. Yes.

Q. And how about the Krogman Factor 1 section on page 32, same explanation?

A. Yes.

Q. Same explanation for all the other Krogman factors?

A. Yes.

Q. And then we get to Section 6, "Ability to calculate damages on a class-wide basis," on page 37 of the redline.

Do you see that?

A. I do.

Q. And would you agree, other than changing the name of the company and the additional claim at issue in the Estee Lauder case, the description of how you conclude damages could be calculated or capable of being



Page 277

M. Cain

calculated on a class-wide basis is identical?

A. I think that my description of the out-of-pocket damages methodology is nearly identical across reports because it's the same methodology, but there is one very important difference in the sense that each case I evaluate and consider the theory of liability.

And as we discussed earlier, almost that entire section is completely different across the two reports because the theories of liability are quite different across the two cases.

Q. And understanding the theory of liability in any particular case is critically important to your opinion on whether an out-of-pocket damages methodology is capable of measuring damages on a class-wide basis, is that right?

A. In terms of the -- as I -- the way that I described it previously today.

Obviously I explained that the complaint is a very long document. I don't copy and paste the entire complaint but rather cite and refer back to the complaint.

Page 278

M. Cain

But understanding this question of whether there is an economic connection between the alleged misrepresentations and alleged corrective disclosures, that is an important consideration that I undertake when forming the opinion that damages are capable of being calculated class-wide.

Q. Let me ask my question again because I don't think you answered it.

Understanding the theory of liability in any particular case, it is a critically important part of your opinion on whether an out-of-pocket damages methodology is capable of measuring damages on a class-wide basis, isn't that right?

MR. CHRISTIE: Objection to form and asked and answered.

A. I guess -- I think my previous answer was responsive to your question.

But to the extent that you disagree, could you explain what you mean by "understanding the theory of liability"?

Q. Well, I'm talking about your understanding of the theory of liability in any

Page 279

M. Cain

particular case.

In order to opine that an out-of-pocket measure of damages could be constructed on a class-wide basis, you must understand the theory of liability in the complaint, right?

A. In the ways that I have previously described today, yes.

Q. So in order to reach that opinion, you must first develop an understanding of the theory of liability in the complaint?

A. I do first develop an understanding of the theory of liability in any case, yes.

Q. And you did that here in the Estee Lauder case, and you developed your own personal understanding of the theory of liability alleged in the amended complaint, is that fair to say?

MR. CHRISTIE: Objection to form.

A. I sought to understand it. It's obviously laid out in the complaint, so I'm not forming any elements of the -- that theory. But I am seeking to make sure that I understand at a high level the way that I've described that previously today.

Page 280

M. Cain

Q. And I'm not asking for your legal opinion or even whether you are right or wrong on whether the theory of liability is consistent with what's set forth in the complaint or is valid.

I'm just simply asking is it necessarily the first step in reaching an opinion on whether classified -- on whether damages can be measured on a class-wide basis, isn't a necessary first step developing an understanding of the theory of liability set forth in the complaint?

MR. CHRISTIE: Objection to form.

A. Well, I think one of the initial steps that I explained earlier today is assessing market efficiency because that's a key element of the out-of-pocket damages methodology.

But I also explained that reviewing the complaint and the motion to dismiss order so that I understand plaintiffs' theory of liability is also an initial step and consideration in forming this opinion.

Q. I'm going to move to strike that



Page 281

M. Cain

last answer as nonresponsive.

Would you be able to opine that damages can be calculated on a class-wide basis without developing an understanding of the theory of liability in any particular case?

MR. CHRISTIE: Object to form.

A.    That's not a question that I've attempted to answer in a universal way.

But what I can tell you is that in every case for which I put forward the out-of-pocket damages methodology, I have considered the theory of liability before reaching that opinion.

Q.    Earlier today I asked you whether you understood the theory of liability here to be that the company failed to disclose daigou sales or instead whether the company failed to disclose daigou sales that were prohibited by existing regulations.

Do you recall that?

A.    I do.

Q.    And you testified that your recollection of the complaint and the motion to dismiss order is that they both use a variety of

Page 282

M. Cain

adjectives, including "illegal," "illicit," "prohibited," "inconsistent with internal company policy."

Do you recall that generally?

A.    I think also I referred to public company statements going back to 2019 referring, for example, to them never benefiting from a lot of the daigou business.

But I referred to all of those things, yes.

Q.    Right, right, inconsistent with statements regarding internal company policy.

A.    Or just inconsistent with public company statements about the extent to which they relied on daigou, yes.

Q.    Now, you chose to use the word "prohibited" when describing your understanding of the theory of liability, that the company failed to disclose reliance on prohibited daigou sales, is that right?

MR. CHRISTIE: Objection, it misstates testimony and form.

A.    So I think you're circling back to a line of questioning that we've covered multiple

Page 283

M. Cain

times today, so I'm going to repeat what I've said multiple times since you're asking again.

I'm not articulating the theory of liability in this one sentence or one word of "prohibited," but rather more holistically across Section 3 and a later section of the report here, and it's not conditional or contingent on one single word in one sentence that you're -- you repeatedly tried to cherrypick out of my report.

Q.    Well, I don't think I ever got a straight answer to my question, so I'm going to try it again.

If you look to Exhibit 1, your report, and specifically page 5, right at the outset of the Case Background section.

A.    I see that, yes.

Q.    You have that in front of you?

A.    I do.

Q.    And you chose to use the word "prohibited gray market resale" there in describing the case background, is that right?

A.    No. That word comes paragraph 1 of the complaint.

Page 284

M. Cain

Like I said many times today, I'm really just giving a very concise summary of a complaint that is roughly 100 pages long. Many different words and adjectives are used throughout the complaint. In this particular sentence, footnote 9 is pointing to the first paragraph of the complaint.

Q.    Paragraph 9 is pointing to the very first paragraph of the amended complaint, is that right?

A.    Footnote 9 --

Q.    I'm sorry, footnote 9.

A.    -- is pointing to paragraph number 1 of the complaint, yes.

And the word "prohibited" is taken directly out of the paragraph in the complaint.

Q.    Did you just cut and paste it from the complaint?

MR. CHRISTIE: Objection to form.

A.    No, that's not cut and pasted, but it is referring to the language from the complaint.

Q.    And the language you used in summarizing the case background is identical to


ESQUIRE
DEPOSITION SOLUTIONS

Page 285

M. Cain

the language used in the very first paragraph of the complaint, is that right?

MR. CHRISTIE: Objection, misstates the document.

A.   I -- the word "prohibited" is in my report and the complaint, but there are other differences in terms of the wordings.

Q.   Now, you didn't pick the word "prohibited," did you?

A.   I didn't write the complaint, so if that's what you are asking.

Q.   You don't cite to anything else in summarizing your understanding of the case, right, just the complaint?

A.   I do refer to the complaint, and as we discussed earlier today, I also considered the motion to dismiss order.

Q.   The complaint refers to daigou as -- daigou as illegal, isn't that right?

MR. CHRISTIE: Objection to form.

A.   Like I said many times today, I've seen various adjectives thrown around, including "prohibited," "illegal," "illicit," "gray market," and inconsistent with internal company

Page 286

M. Cain

policy or with statements that the company made in describing the driver of its sales going back at least to 2019.

Q.   Right. And earlier today, you asked to look at the complaint, so feel free to if it's helpful to you in answering my questions.

Is it true that the complaint refers to daigou as illegal?

MR. CHRISTIE: Object to form.

A.   I don't see the word "illegal" in the first three paragraphs of the complaint, but I'm happy to continue reading through the complaint.

Q.   Well, if you look at paragraph 29.

MR. CHRISTIE: I'll just note for the record that the word "illegal" appears in a quote, just so it's clear.

A.   I see a reference in paragraph 29 to Chinese policy commentators, and the quote does have -- does refer to a crack down on illegal daigou and smuggling.

MS. LOSEMAN: Counsel, I'll ask you to contain your objections to form.

Q.   What about paragraph 102, do you see

Page 287

M. Cain

the characterization there, use of the word "illegal"?

MR. CHRISTIE: I'm going to make the same note for the record.

A.   I see the same quote that we were referring to in the previous paragraph.

Q.   Do you see daigou described as illicit in the complaint?

MR. CHRISTIE: Monica, perhaps it would be better to help him out again? Again, if you know where it says, "illicit," rather than having him read from page 1 again?

Q.   Paragraph 2.

A.   Okay.

I do see the word "illicit" in paragraph 2.

Q.   Do you see the word "unsustainable" in paragraph 2?

A.   Yes.

Q.   Do you see in paragraph 34 reference to it as an illicit resale practice?

A.   So at the end of paragraph 34, I see the phrase "illicit resale practice."

Page 288

M. Cain

Q.   Paragraph 112, do you see reference to illicit cheap resale?

A.   Yes.

Q.   What about paragraph 132, do you see reference there to illicit daigou activity?

A.   Yes, I do.

Q.   What about paragraph 75, where it's referred to as underground resale?

A.   I see that.

Q.   What about the reference in paragraph 206 to back alley daigou gray market resale?

A.   I see that.

Q.   Are you aware of any description in daigou in the complaint that refers to daigou as legal?

A.   I don't have the complaint memorized, but I would be happy to either read through it or have you point me to examples.

Q.   Well, feel free to read through the complaint, but are you aware of any description of daigou in the complaint that refers to daigou as legal, consistent with regulations, permitted, even promoted --



MATTHEW D. CAIN PH.D.
In Re: The Estee Lauder Co.

December 17, 2025
301–304

Page 301

M. Cain

NAME OF CASE:  In Re: Estee Lauder Securities Litigation

DATE OF DEPOSITION:  12.17.25

NAME OF WITNESS:  MATTHEW D. CAIN, Ph.D.

ACKNOWLEDGEMENT OF DEPONENT

I, MATTHEW D. CAIN, Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____
MATTHEW D. CAIN, Ph.D.         Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

Page 302

M. Cain

INDEX:

| WITNESS | EXAM BY: | PAGE: |
|---|---|---|
| M. Cain | Ms. Loseman | 5 |

EXHIBIT INDEX:

| NUMBER | DESCRIPTION | PAGE: |
|---|---|---|
| Exhibit 1 | Expert Report of Matthew D. Cain, Ph.D., dated July 25, 2025, | 18 |
| Exhibit 2 | document entitled "Opinion and Order," | 58 |
| Exhibit 3 | document entitled "Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws," | 174 |
| Exhibit 4 | spreadsheet, | 236 |
| Exhibit 5 | report dated July 25, 2025, | 268 |

Page 303

M. Cain

CERTIFICATE

STATE OF NEW JERSEY )
                    )ss:
COUNTY OF UNION     )

I, MARY F. BOWMAN, a Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New Jersey, do hereby certify:

That MATTHEW D. CAIN, Ph.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 22nd day of December, 2025.

_____
MARY F. BOWMAN, RPR, CRR

Page 304

M. Cain
* * *ERRATA SHEET* * *

NAME OF CASE:  In Re: Estee Lauder Securities Litigation

DATE OF DEPOSITION:  12.17.25

NAME OF WITNESS:  MATTHEW D. CAIN, Ph.D.

Reason codes:
1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

Page _____ Line _____ Reason_____
From _____ to_____

_____
MATTHEW D. CAIN, Ph.D.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com