UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                       :

                                       :     No.  1:23-cv-10669-AS

IN RE THE ESTÉE LAUDER CO., INC.     :
SECURITIES LITIGATION              :

                                       :

                                       :
------------------------------------------------------------- X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE OPINIONS IN THE EXPERT REPORT OF MATTHEW D. CAIN, PH.D. AND RELATED TESTIMONY

## ORAL ARGUMENT REQUESTED

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Fax: (212) 351-4035

*Attorneys for Defendants The Estée
Lauder Companies Inc., Fabrizio
Freda, and Tracey T. Travis*

January 23, 2026

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................................................ 1

II.      BACKGROUND ........................................................................................................ 3

     A.    Plaintiffs' Allegations ................................................................................................ 3

     B.    Cain's Report and Opinions ................................................................................... 3

         1.    Cain's Opinion on Market Efficiency ................................................................ 4

         2.    Cain's Opinion on a Damages Model ................................................................ 5

         3.    Cain's Deposition Testimony ............................................................................. 6

III.      LEGAL STANDARD ................................................................................................ 8

IV.      ARGUMENT ............................................................................................................. 9

     A.    Cain's Opinions Are Plaintiffs' Sole Evidentiary Support for Class Certification. ............ 9

     B.    Cain's Opinion on Market Efficiency Rests on an Unreliable Event Study and Should Be Excluded. .................................................................................................... 10

         1.    Cain's Unreliable and Impermissibly Biased Event Study Is Inadmissible Under Rule 702 and *Daubert*. ................................................................................. 10

         2.    Cain Identifies No Justification for Ignoring 44% of Days in the Analysis Period for His Market-Efficiency Event Study. ................................................................ 11

         3.    Cain's Cherry-Picked News Days Are Impermissibly Biased Toward a Finding of Market Efficiency. ........................................................................................ 15

     C.    Cain's Opinion Regarding a Classwide Damages Methodology Is Not Helpful and Should Be Excluded Because It Does Not Account for Case-Specific Factors. ................ 18

V.      CONCLUSION .......................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Access Business Grp. Int'l, LLC v. Refresco Beverages US Inc.*,
  2023 WL 8280139 (S.D.N.Y. Nov. 30, 2023) ..............................................................8

*In re Aluminum Warehousing Antitrust Litig.*,
  336 F.R.D. 5 (S.D.N.Y. 2020) ........................................................................................8

*Andrews v. Sazerac Co.*,
  2025 WL 1808797 (S.D.N.Y. July 1, 2025) ...............................................................8

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................................1, 4, 9

*Bell v. Ascendant Solutions, Inc.*,
  2004 WL 1390009 (N.D. Tex. July 1, 2004) ...........................................................15, 16

*Bond v. Clover Health Investments Corp.*,
  2023 WL 1999859, at *11 (M.D. Tenn. Feb. 14, 2023) ........................................14

*Bratya SPRL v. Bed Bath & Beyond Corp.*,
  752 F. Supp. 3d 34 (D.D.C. 2024) ..............................................................................14

*Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA)
  LLC*,
  752 F.3d 82 (1st Cir. 2014) ......................................................................................16, 18

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ...........................................................................4, 10, 11

*City of Phila. v. Banc of Am. Sec. LLC*,
  2025 WL 2180607 (2d Cir. Aug. 1, 2025) ..............................................................3

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ........................................................................................1, 8, 19

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
  594 U.S. 113 (2021) ......................................................................................................1, 9

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ..............................................................................4, 10

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................................................................8

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018) ......................................................................14, 21

*Malriat v. QuantumScape Corp.*,
  2022 WL 178974629 (N.D. Cal. Dec. 19, 2022) ....................................................14

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415, 428-31 (S.D.N.Y. 2014) ...........................................................................14

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) .........................................................................11

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc) .....................................................................................3

*In re Petrobras Securities*,
  862 F.3d 250 (2d Cir. 2017).................................................................................................10, 19

*In re PolyMedica Corp. Sec. Litig.*,
  453 F. Supp. 2d 260 (D. Mass. 2006) .......................................................................................11

*Set Capital LLC v. Credit Suisse Grp. AG*,
  2025 WL 486254 (S.D.N.Y. Feb. 11, 2025)................................................................................9

*In re Teva Sec. Litig.*,
  2021 WL 872156 (D. Conn. Mar. 9, 2021) ....................................................................12, 13, 17

*In re Under Armour Sec. Litig.*,
  631 F. Supp. 3d 285 (D. Md. 2022) ..........................................................................................14

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)....................................................................................9, 10, 11, 19

*In re Waste Mgmt. Sec. Litig.*,
  775 F. Supp. 3d 742 (S.D.N.Y. 2025)..................................................................................11, 15

## Rules

Fed. R. Evid. 702 ...............................................................................................................1, 8, 18

Fed. R. Evid. 702(a)...................................................................................................................18

Rule 23(b)(3)................................................................................................................................9

Defendants The Estée Lauder Companies Inc. ("ELC" or "the Company"), Fabrizio Freda, and Tracey T. Travis (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to exclude opinions in the report of Lead Plaintiffs' ("Plaintiffs") expert witness, Dr. Matthew D. Cain, Ph.D., and related testimony, for purposes of ruling on Plaintiffs' Motion for Class Certification, Appointment as Class Representatives, and Appointment of Class Counsel, ECF 83 (the "Motion" or "Mot.").[1]

## I.    PRELIMINARY STATEMENT

Purporting to satisfy their burden on Rule 23(b)'s predominance requirement in support of the Motion, the only support Plaintiffs can muster are the proposed expert opinions of Dr. Cain. Beyond that, Plaintiffs offer no "probative evidence" for the Court to consider. *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021) ("*Goldman I*").  Plaintiffs instead hang their hat on Cain's report to: (1) argue that issues common to the class will predominate because the market for ELC Class A securities was efficient, so they are entitled to benefit from the presumption of classwide reliance recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and (2) demonstrate that any damages can be calculated on a classwide basis.  Mot. at 13.  But Cain's opinion on market efficiency rests on an unreliably conducted event study.  And his opinion that damages can be calculated on a classwide basis is not remotely tailored to the theory of liability Plaintiffs articulate in this case, rendering it "not relevant" to resolving the questions before the Court "and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993).  Both opinions are inadmissible under Rule 702 of the Federal Rules of Evidence and should be excluded from consideration in connection with the Motion.

---

[1]    Unless otherwise noted, all defined terms are consistent with those in the Motion.  Unless otherwise noted, references to "ECF _" refer to the docket in this case.

Attempting to show ELC's Class A securities traded in an efficient market, Cain conducted an event study comparing stock price movements on "News Days" and "No News Trading Days," over the 439 days of his "Analysis Period"—which comprises the putative Class Period *plus* the trading day after the Class Period ended.  Cain chose as "News Days" only the *eight days* in the Analysis Period where ELC released its quarterly financial results, and as "No News Trading Days" a set of 240 days on which certain events did not occur.  As a result, Cain *excludes* 191 days, *or 44%* of the Analysis Period, from his event study.  But Cain does not (and cannot) deny that these 191 days contained news relevant to ELC.  That means Cain failed to consider the movement of ELC's stock price in response to ELC-related news on 44% of days within the Analysis Period.  That was not an inadvertent oversight.  Rather, Cain's event study strongly suggests it was designed to meet a pre-determined outcome.

Cain's opinion that damages can be calculated on a classwide basis is also inadmissible as unhelpful, and therefore irrelevant.  Cain did nothing to tether his damages model to the facts of the case.  He formed his opinion based only on the Amended Complaint, an order of this Court, and certain of ELC's earnings announcements.  He did not consider the abundant market commentary on daigou, the  legal status of daigou, or how he would disaggregate permissible from impermissible daigou activity, let alone whether and how he would adjust damages for other confounding factors during the putative Class Period.  Simply put, Cain's copy-pasted damages model cannot be relied upon to demonstrate that damages can be reliably measured on a classwide basis consistent with Plaintiffs' theory of liability.

The Court should exclude Cain's opinions in Paragraphs 3, 29-30, 58-78, 94-112 and Exhibits 4 through 7 of the Report, and related testimony.

2

## II.  BACKGROUND

### A.      Plaintiffs' Allegations

As relevant here,[2] Plaintiffs allege that ELC concealed, during most of calendar years 2022 and 2023, that sales growth in the Asia Pacific region of its Travel Retail business was driven by sales activity in the "prohibited gray market resale industry … called daigou." *E.g.*, ECF 47 ¶¶1, 10, 30; Mot. at 1-2.  Specifically, Plaintiffs allege that Defendants made a series of public misrepresentations and omissions regarding illegal or illicit daigou-driven sales, ECF 47 ¶¶128-172, only gradually disclosing the extent to which that illicit daigou was driving sales, *id.* ¶¶181-235, and that each of these statements had an effect on ELC's stock price to the detriment of Plaintiffs and other investors who purportedly relied on ELC's alleged misrepresentations.  *Id.* ¶¶173, 273.  The purported "truth" of ELC's reliance on illicit daigou, according to Plaintiffs, was fully revealed in ELC's announcement of quarterly earnings on November 1, 2023.  *Id.* ¶225.  On behalf of a putative class of investors in ELC Class A common stock, who traded in that ELC stock between February 3, 2022 and October 31, 2023 (the putative "Class Period"), Plaintiffs seek damages for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.

### B.      Cain's Report and Opinions

Plaintiffs moved for class certification under Rule 23 on July 25, 2025.  ECF 82.  To satisfy their burden under Rule 23(b), Plaintiffs argue that issues common to a class of investors will

---

[2]      A more fulsome statement of the background for Plaintiffs' Motion is included in Defendants' Memorandum of Law in Opposition (the "Opposition"), filed concurrently herewith.  For the reasons stated in the Opposition, the Court should deny Plaintiffs' Motion.  Defendants separately file this motion to exclude Dr. Cain's opinions and related testimony to comport with recent precedent.  *See City of Phila. v. Banc of Am. Sec. LLC*, 2025 WL 2180607, at *3 (2d Cir. Aug. 1, 2025) (summary order), *petition for cert. filed*, Dec. 1, 2025 (acknowledging that weight and admissibility of expert evidence are assessed separately at the class-certification stage (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016)); *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc) ("Where … a defendant did not raise a *Daubert* challenge to the expert evidence before the district court, the defendant forfeits the ability to argue on appeal that the evidence was inadmissible.").

predominate in the litigation because they are entitled to the presumption of classwide reliance recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and because any damages they can prove will be capable of determination on a classwide basis.  Mot. at 13.  In support of their predominance arguments, Plaintiffs submit the report of a proposed expert witness, Dr. Matthew D. Cain.  Ex. 1, ¶5.

Cain offers the opinion that the market for ELC Class A common stock was informationally efficient during the alleged Class Period, meaning that the "market price of [the stock] begins to respond quickly to publicly available information," Ex. 1, ¶¶25, 30—a prerequisite for Plaintiffs to demonstrate entitlement to the *Basic* presumption.  As to measuring damages, he opines that any damages attributable to Plaintiffs' theory of liability "can be calculated on a class-wide basis through a common methodology" known as the "out-of-pocket damages methodology." *Id*. ¶94.

### 1.    Cain's Opinion on Market Efficiency

Cain's conclusion that the market was informationally efficient is premised on his assessment of the direct and indirect factors of market efficiency outlined in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).  Ex. 1, ¶¶27, 29-91.  While he addresses all eight *Cammer* and *Krogman* factors, Cain devotes most of his analysis to the fifth *Cammer* factor, which tests the existence of "a cause and effect relationship between company disclosures and resulting movements in stock price."  *Id*. ¶¶57-78; *Cammer*, 711 F. Supp. at 1291.  Cain tests the alleged cause-and-effect relationship through an event study, a "regression model" that should allow calculation of the "'abnormal' return in the company's daily stock price movement" attributable to "company-specific news," and assessment of the degree to which the abnormal return is statistically significant.  Ex. 1, ¶¶61-62.

Cain's event study proceeds in four steps.  First, he identifies an "Analysis Period": the time period over which he assesses the stock price's reaction to news.  Ex. 1, ¶58.  The Analysis

Period Cain used here "extends one trading day beyond the Class Period to capture the market reaction to the Company's first quarter 2024 earnings, which were announced on the final day of the Class Period."  *Id*. ¶58 n.61.  Second, Cain defines the days in the Analysis Period that he considers News Days and No News Trading Days.  Cain defines "News Days" as the eight days on which ELC had "quarterly earnings releases during the Analysis Period"; he defines "No News Trading Days" as the 240 days in the Analysis Period on which there were "no News Day events, no alleged revelations of the relevant truth, no SEC filings, and no Dow Jones articles on Factiva tagged to Estée Lauder."  *Id*. ¶¶73, 74.  Together, the News Days and No News Trading Days make up just *56%* of the trading days in Cain's Analysis Period, with the remaining *44%* of trading days isolated in a residual category not addressed by Cain's event study, which he prosaically refers to as "Other Days."  *Id.* ¶¶74 n.74; Ex. 2 at 224:6-9, 228:11-24, 236:7-237:16, 238:11-14; *see also* Ex. 6 (category "other" in column labeled "day_type").  Third, Cain calculates the common stock's price reaction, or the statistical significance of the abnormal return, for each trading day.  Ex. 1 ¶¶68, 75.  Finally, Cain compares the common stock's price reaction for News Days to the common stock's price reaction for No News Trading Days.  *Id*. ¶¶74, 76.  Cain concludes that ELC Class A common stock experienced significantly abnormal returns on News Days more often than on No News Trading Days, and the difference in the rate of abnormal returns was itself statistically significant—supporting his opinion of market efficiency.  *Id.* ¶76.  Cain does not include the "Other Days" in his comparison of stock price reactions.

### 2.    Cain's Opinion on a Damages Model

Cain opines that if Plaintiffs' theory of liability were established on a classwide basis, damages for each claim could be calculated across the class using the "out-of-pocket damages methodology," which he describes as "consistent with Plaintiffs' liability theory."  Ex. 1, ¶94.  In the out-of-pocket methodology, damages for each injured class member are calculated

5

"formulaically," as "the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale," subject to a cap for shares not sold before any misrepresentations were fully corrected. *Id.* ¶96. Cain opines broadly and generically on the existence of methods that may be used to quantify the artificial inflation in a stock price over time, whether static or changing over time; on "various accepted methodologies" for quantifying the impact of unrelated "confounding information" on changes in the stock price; and on the extent to which his proposed out-of-pocket model is "flexible" and subject to modification "based on the specific findings the finder of fact may make." *Id.* ¶¶98-110.

Cain does not purport to assess whether the alleged inflation in ELC Class A common stock was static or changed over time, or what the most appropriate method for calculating the alleged artificial inflation would be; he also does not identify or assess any potential sources of confounding information, for which a damages model must account in this case, nor does he demonstrate familiarity with any facts of the case that may require adjustments to the out-of-pocket model. *See generally id.* He only briefly mentions "materializations of … risks" and does not explain how his out-of-pocket damages model would distinguish known risks related to so-called "illicit daigou," which were well known to the market, from genuinely unknown risks, or how his model would value different investors' different tolerance for risk in investment. *See generally id.*; *see also id.* ¶98.

### 3.    Cain's Deposition Testimony

Defendants deposed Cain on December 17, 2025. Ex. 2. Cain testified that other than providing the amended complaint and the Court's order on the motion to dismiss, counsel for Plaintiffs did not provide Cain any "facts or assumptions" on which to form his opinions, *id.* at 29:15-30:3, and Cain spent "somewhere between 10 and 20 hours" working on this case before his report was filed as the sole evidentiary support of Plaintiffs' Motion, *id.* at 36:8-14.

As to his background, Cain acknowledged that he does not have "much experience" with travel retail, he is not an "industry expert," and he is not an expert in "[p]restige [b]eauty." Ex. 2 at 81:16-82:16. "[P]rior to working on this case," Cain had not "encountered the concept of daigou," and his limited "familiarity with the concept of daigou" in this case was informed only by his review of the amended complaint, this Court's motion to dismiss order, and "earnings announcements … in the company's SEC filings." *Id.* at 82:17-83:16. He did not "attempt[] to form any opinions one way or another" regarding the legal status of daigou during the relevant period. *Id.* at 76:24-77:13. He also did not review the "substantive elements" of any analyst reports regarding daigou in the alleged Class Period or assess the extent to which daigou was a practice "known" to the market generally or to any ELC investors, that "came with doing business in China and Korea" during the alleged Class Period. *Id.* at 121:18-122:24.

More generally, in *every* case where he has offered an opinion on market efficiency, Cain admits he has concluded without fail "that the market did trade efficiently." Ex. 2 at 22:10-23:14. Cain recalled that "in every case [in which he has] produced a market efficiency report, the *Cammer* 5 result"—that is, the result of an event study—is "pointed toward efficiency." *Id.* at 201:20-202:6.

Cain acknowledged that the calculation of artificial inflation in a securities class action "depends on the theory of liability" in the case. *Id.* at 67:18-23. But in each case where he has provided a public report or testimony on whether damages are calculable on a classwide basis, Cain recalled that his conclusion was he would be "capable of calculating damages on a class-wide basis." *Id.* at 26:5-15. He acknowledged just two hypothetical scenarios in which he would be reluctant to opine that an out-of-pocket damages model would be workable for a shareholder class

action: "if [he] were to conclude that the market is not efficient," or if the case involved alleged misstatements but did not allege *any* corrective disclosures. *Id.* at 63:14-64:22.

### III.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence imposes a critical "gatekeeping role" on the district court receiving evidence from a witness proffered as an expert, to ensure that any purported "expert[] testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (recognizing that this "gatekeeping obligation applies … to all expert testimony"). Rule 702 permits opinion testimony from a witness "qualified as an expert by knowledge, skill, experience training, or education," if the proponent of the testimony demonstrates that the opinions offered are relevant to the case, "based on sufficient facts or data," and grounded in "reliable principles and methods" that are "reliabl[y] appli[ed]" to the facts at hand. Fed. R. Evid. 702. As a recent amendment to Rule 702 emphasizes, the proponent of the evidence bears the burden of demonstrating—by a preponderance of the evidence—that the rule's requirements are met by the proffered expert testimony. *Access Business Grp. Int'l, LLC v. Refresco Beverages US Inc.*, 2023 WL 8280139, at *1 n.1 (S.D.N.Y. Nov. 30, 2023).

District courts in the Second Circuit "regularly 'subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 28-29 (S.D.N.Y. 2020) (citation omitted) (collecting cases); *see also Andrews v. Sazerac Co.*, 2025 WL 1808797, at *8 (S.D.N.Y. July 1, 2025) (observing that the Supreme Court "has suggested in *dicta* that such an analysis is appropriate" and considering admissibility under Rule 702 at the class certification stage).

8

## IV.    ARGUMENT

### A.    Cain's Opinions Are Plaintiffs' Sole Evidentiary Support for Class Certification.

Plaintiffs rely exclusively on Cain's event study and his opinions on damages methodology to meet their burden to show this case is suited to proceed as a class action.  In moving for class certification, Plaintiffs bear the burden of proving that their proposed class satisfies the requirements in Rule 23(b) by a preponderance of the evidence.  *Set Capital LLC v. Credit Suisse Grp. AG*, 2025 WL 486254, at *4 (S.D.N.Y. Feb. 11, 2025).   To meet the predominance requirement of Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," Plaintiffs attempt to invoke the presumption of classwide reliance recognized by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  They also argue that the extent of damages in the case can be measured on a classwide basis, rather than for individual stockholders.  *See* Mot. at 12-25.  For both of these arguments in favor of predominance, Plaintiffs rely entirely on the opinions of Cain.

When it applies, the *Basic* presumption allows proponents of a class action to avoid proving direct reliance on a purportedly misleading statement on an individual basis.  *Goldman I*, 594 U.S. at 118.  In order to benefit from the presumption, Plaintiffs must demonstrate—among other things—that ELC's stock traded in an efficient market during the alleged Class Period.  *Id.*; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 99 n.29 (2d Cir. 2017) (recognizing the "securities of large publicly traded companies" do not "always trade in an efficient market").  Assuming Plaintiffs could demonstrate market efficiency during the purported Class Period, Defendants would then have the opportunity to rebut that presumption "by showing 'that [the] alleged misrepresentation[s] did not actually affect the market price of the stock.'"  *Id.* at 119 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014)).

Plaintiffs' invocation of the *Basic* presumption fails even before it requires rebuttal. Plaintiffs' argument that ELC stock traded in an efficient market rests entirely on the opinion of Cain, which in turn rests on an event study that incorporates unreliable and unscientific premises. *See* Mot. at 15 (citing "Cain Rpt. ¶¶22-93" as support that ELC "stock traded in an efficient market"); *see also generally* Mot. at 12-23 (citing Cain Report as sole evidentiary support).

Plaintiffs' damages argument likewise falters for its exclusive reliance on Cain's inadmissible opinions. Plaintiffs argue that any damages in this case will be capable of calculation on a classwide basis, using a common methodology that "actually measure[s] damages that result from the class's asserted theory of injury." *See* Mot. at 24-25; *Waggoner*, 875 F.3d at 106. Cain's opinion on the suitability of a damages model is Plaintiffs' only evidence in support of this argument. Mot. at 24-25 (citing Ex. 1, ¶¶95-105, 111).

**B.    Cain's Opinion on Market Efficiency Rests on an Unreliable Event Study and Should Be Excluded.**

**1.    Cain's Unreliable and Impermissibly Biased Event Study Is Inadmissible Under Rule 702 and *Daubert*.**

Cain's event study is impermissibly engineered to reach a pre-determined result in favor of the Plaintiffs who retained him. Specifically, Cain cherry-picked the dates in his event study in two ways. First, he arbitrarily removed 44% of trading days, which he calls "Other Days"—dates on which news relevant to ELC occurred—from his analysis. Second, he engineered his definition of "News Days" to include a majority of dates with predictably significant price impact. Each flaw undermines the reliability of his report and renders it inadmissible under Rule 702.

In the Second Circuit, courts assessing market efficiency "routinely appl[y]" the analysis outlined in *Cammer*, 711 F. Supp. at 1286–87, and *Krogman*, 202 F.R.D. at 478. *In re Petrobras Securities*, 862 F.3d 250, 276 (2d Cir. 2017). Of the eight factors those cases collectively list as relevant to market efficiency, only one—the fifth *Cammer* factor, or "*Cammer* 5"—considers

10

*direct* evidence of market efficiency. *Cammer*, 711 F. Supp. at 1287. For that reason, the Second Circuit considers *Cammer* 5 as "the *most important*" factor "in certain cases because it assesses 'the essence of an efficient market and the foundation for the fraud on the market theory.'" *Waggoner*, 875 F.3d at 97 (emphasis added).

Plaintiffs here, like "[p]laintiffs generally[,] attempt to satisfy *Cammer* 5 by submitting an event study." *See id.* at 94. In this case, Cain "compar[es] the behavior of [ELC Class A common stock] on" "News Days"—or "days on which potential value-relevant company-specific news [was] disclosed"—with its behavior on "No News Trading Days," Ex. 1, ¶¶69, 72-74. His failure to analyze the "Other Days"—44% of the Analysis Period—constitutes a significant departure from recognized event-study design. Cain provides no explanation grounded in scientific analysis or the facts of this case for why that departure is warranted.

### 2.    Cain Identifies No Justification for Ignoring 44% of Days in the Analysis Period for His Market-Efficiency Event Study.

Cain presents no authority, precedent, or logic to justify his event study's use of a third, residual category of "Other Days," in addition to news days and no-news days, which effectively removes 44% of his Analysis Period from the analysis and renders his study unscientific and unreliable. Courts have recognized that "[t]o approach usefulness, an analysis should statistically compare *all* news days with *all* non-news days." *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 270 (D. Mass. 2006) (emphasis added). This is the case because a "small sample size[]" results in "limit[ed] statistical power," *In re Waste Mgmt. Sec. Litig.*, 775 F. Supp. 3d 742, 760-61 (S.D.N.Y. 2025), and an "event study with too few 'events' is incapable of distinguishing whether stock price movements are the probable result of news events or simply random variation." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *4 (N.D. Ohio Aug. 14, 2018), *rev'd and remanded on other grounds*, 64 F.4th 731 (6th Cir. 2023). A gold-standard,

11

recognized method for an event study is one in which the author "sort[s] *all* the trading days of a class period into news and non-news days, determine[s] the proportion of each set of days associated with a statistically significant excess price return, and then compare[s] those results to see if the difference itself is statistically significant." *In re Teva Sec. Litig.*, 2021 WL 872156, at *21 (D. Conn. Mar. 9, 2021).

Cain's event study comes nowhere close to this recognized methodology. In his telling, Cain's study "compar[ed] the behavior of [ELC Class A common stock] on" "News Days"—or "days on which potential value-relevant company-specific news [was] disclosed"—with its behavior on "No News Trading Days," Ex. 1, ¶¶69, 72-74. The problem is that Cain limits "News Days" to only the *eight* days on which ELC had "quarterly earnings releases during the Analysis Period," excluding from "News Days" nearly 200 days over the 438-trading-day Class Period in which news articles about ELC were published that may have been value-relevant. Ex. 2 at 228:6-19, 230:22-231:12, 233:13-19. Cain further limits his data set by defining his control set, "No News Trading Days," to include only the 240 days in the Analysis Period on which there were no News Day events (as he defined them), no alleged revelations of the purported "truth," no SEC filings, and no articles published by Dow Jones covering ELC. Ex. 1, ¶¶73, 74. The remaining 191 days in the Analysis Period are labeled "Other Days" and are excluded from Cain's analysis of the differences in price reaction—notwithstanding that those 191 "Other Days" "likely" include dates on which Dow Jones news articles about ELC were published and other value-relevant events occurred. Ex. 2 at 228:11-229:4, 230:11-233:19. For example, on August 20, 2023—which Cain classified as an "Other Day"—ELC issued a press release, at least one headline on Dow Jones involved ELC, "there was an SEC filing," and a statistically significant price movement occurred. *See* Ex. 2 at 237:21-239:19. In another example, on August 16, 2023—which Dr. Cain also

12

classified as an "Other Day"—news reports regarding ELC were issued and there was a stock price movement that was not statistically significant. *Id.* at 246:13-247:6. With his inputs cabined to exclude these "Other Days," Cain's analysis covers only "56% of the trading days (248 of 439) in the Analysis Period"—meaning that the remaining 44% of trading days in the Analysis Period are excluded from his event study. Ex. 1, ¶74 n.74; Ex. 2 at 228:11-19.

Plaintiffs, through Cain, have identified no authority supporting an analysis of little more than half the relevant period as permissible support for a valid market efficiency analysis. Cain suggests that testing barely half the days in an analysis period is a "generally accepted, peer-reviewed methodology … accepted by numerous courts." *See* Ex. 1, ¶71 & n.70. But none of the sources he cites in support embraces an event study where news days *and* non-news days combined cover barely half of the period being analyzed. The article Cain cites[3] recognizes that a "group of non-news days may include some days with important information," which do not fit the "criteria for inclusion in the defined news day sample." Ex. 3 at 4-5. It assumes that the "days with important information … included among non-news days will … be few," assuming an appropriate selection of news days. *Id.* But the article says nothing suggesting that an event study may involve a large, residual "Other" category for dates that do not fit the criteria of "News Days" but that the author wishes to exclude from the control group of no-news days. *See id.*

Cain's reference to case law as a source of authority for his methodology (Ex. 1, ¶71 & n.70) fares no better, as the cases he cites either do not discuss his current methodology or are otherwise distinguishable. Neither *In re Teva Securities Litigation* nor *McIntire v. China MediaExpress Holdings, Inc.* endorsed a methodology that ignores *any* dates in an analysis period

---

[3]    O. Miguel Villanueva & Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the* Cammer/Krogman *Factors*, Rev. Quant. Fin. & Accounting (Oct. 22, 2020). *See generally* Ex. 3. As a district court in Connecticut considered in *In re Teva Securities Litigation*, the authors of this study are "potential[ly] biase[d]" by virtue of the fact that they "frequently testify for plaintiffs." 2021 WL 872156, at *26 n.26.

as "Other"—let alone 44% of those dates.  *See Teva*, 2021 WL 872156, at *22-23 (discussing event studies run with "four different sets of news and non-news dates" but no suggestion that any dates were ignored entirely); *McIntire*, 38 F. Supp. 3d 415, 428-31 (S.D.N.Y. 2014) (analyzing distinct alleged methodological flaws).  In *Bond v. Clover Health Investments Corp.*, the court considered only whether Cain's event study involved too small a sample size, based on its selected news days; it did not address the appropriate scope of the non-news-day control period or endorse the use of a residual "Other" category.  2023 WL 1999859, at *11 (M.D. Tenn. Feb. 14, 2023).  The remaining cases cited by Cain either did not involve a challenge to the reliability of his event-study methodology, *Malriat v. QuantumScape Corp.*, 2022 WL 178974629, at *12 (N.D. Cal. Dec. 19, 2022), or did not analyze an event study at all, *see In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 312 (D. Md. 2022).

Cain offers no other credible explanation for why he excluded 44% of trading days from his analysis as "Other Days."  When asked directly at his deposition, Cain could not explain why other, additional dates in the alleged Class Period should not have been analyzed either as News Days or as No News Trading Days.  *See* Ex. 2 at 235:20-236:6.  Cain's tightly constrained definitions of News Days and No News Trading Days are indefensible, unmoored from any established methodology or any justification related to the facts of this case.  *See* Marietta-Westberg Rpt., ¶¶151-152.  *See also Bratya SPRL v. Bed Bath & Beyond Corp.*, 752 F. Supp. 3d 34, 63 (D.D.C. 2024) (discounting Cain's event study that incorporated a "malleable definition" of news days and non-"standard methodology" for date selection).  Although an event study may be a "generally accepted technique," Cain's implementation "nonetheless render[s] it unreliable as applied," *In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR")*, 299 F. Supp. 3d 430,

14

505-06 (S.D.N.Y. 2018), and incapable of offering support for Plaintiffs' argument on market efficiency.

The extent of Cain's event study chicanery is made clearest by comparison to the radically different approach he himself has taken in some other recent cases. For example, in a report he filed in another case in this District just *four days* before Plaintiffs filed his report here,[4] Cain defined "News Days" as "dates on which there were any news articles available on Factiva tagged with [the company] or on which [the company] submitted a filing to the SEC." Ex. 4, ¶70. As a result, Cain's analysis there covered "100% of the trading days (347 of 347) in the Class Period." *Id.* ¶71 n.71. But later the same week, Plaintiffs filed Cain's report in this case, which neither acknowledges that he had recently conducted the *DocGo* event study differently or purports to explain why 100% of trading days could not or should not be covered here. Ex. 1, ¶74 n.74. Though Cain declined to explain the reason for his approach here, that unexplained change in methodology alone suggests that Cain's dates in this case were selected for reasons other than scientific validity or reliability.

### 3. Cain's Cherry-Picked News Days Are Impermissibly Biased Toward a Finding of Market Efficiency.

In artificially limiting No News Trading Days (*see supra* at 12-15) and in his selection of News Days, Cain generates an event study skewed toward statistical significance and, accordingly, toward a conclusion of market efficiency. The Court should not countenance this selective methodology. The identification of news days in an event study may "necessarily" involve *some* subjectivity, as the "expert must exercise judgment to identify events that are pertinent and what effects they have." *In re Waste Mgmt. Sec. Litig.*, 775 F. Supp. 3d at 760. But that subjective

---

[4]    Expert Report of Matthew D. Cain, Ph.D., *Genesee Cnty. Emps.' Ret. Sys. v. Docgo Inc.*, No. 23-cv-09476-KPF (S.D.N.Y. July 21, 2025), ECF No. 94-2.

license does not extend to "cherry pick[ing] days with significant movements," *id.*, or to "ad hoc use" of news-day/no-news-day labels, *Bell v. Ascendant Solutions, Inc.*, 2004 WL 1390009, at *2 (N.D. Tex. July 1, 2004), *aff'd*, 422 F.3d 307 (5th Cir. 2005), and courts exclude event studies that incorporate these flaws. Here, Cain's event study suggests cherry-picking of relevant dates, given (1) the notable change in methodology from other reports he authored around the same time (*see supra* at 15), and (2) the substantial overlap between his selected News Days and alleged corrective disclosure dates in the case. But even absent intentional bias in Cain's data, the event study's dates are at best untethered to Plaintiffs' allegations, making them "ad hoc" selections and not reliable support for a conclusion of market efficiency. *See id.* This Court should expect, and demand, more.

Cain's selection of News Days creates the appearance of a study designed to yield a predetermined outcome. Cain selected only eight "News Days" in his Analysis Period—five of which overlap with five of the "corrective disclosure" dates identified by the lawyers who hired him (and among those five, one date falling outside the alleged Class Period), and three of which are not otherwise tied to the specific allegations in this case. *Compare* Ex. 1, at Exhibit 6, *with* ECF 58 at 15 (identifying alleged corrective disclosures), *and* ECF 47, ¶¶181, 192, 202, 213, 225; *see also* Ex. 2 at 249:16-250:10. Each of these three categories presents its own issues, but taken together, they suggest Cain's News Days were chosen to "identify[] abnormal market movement" rather than to reliably assess the efficiency of the market. *See Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 91 (1st Cir. 2014).

As to the five News Days that overlap with dates on which Plaintiffs allege corrective disclosures, Cain's inclusion of those dates is clearly the product of "hindsight bias." *See* Expert

16

Report of Jennifer Marietta-Westberg[5] ("Marietta-Westberg Rpt."), ¶152. In explaining the design of his study, Cain states only that ELC's "quarterly earnings releases during the Analysis Period … represent a *potential* opportunity for the public release of new value-relevant Company information." Ex. 1, ¶73. But he conducted no analysis of the "Other Days" his event study ignored, to "determine whether announcements … on those days represent a potential opportunity for the public release of new value-relevant company information to investors." Ex. 2 at 234:17-235:19; *cf. Teva*, 2021 WL 872156, at *22 (plaintiffs' expert conducted tests using "four different sets of news days and non-news days for each security"). Instead, Cain conceded he knew before choosing his "News Days" that a majority of the eight quarterly earnings announcements in the Analysis Period overlapped with dates on which Plaintiffs allege corrective disclosures and "highly negative price changes" occurred. Ex. 2 at 251:18-253:12. Cain has not attempted to justify his study design—including the decision to use only earnings-announcement dates as News Days— as appropriate for this case, leaving only the reasonable inference that his set of News Days was purposefully chosen to incorporate a majority of dates known in advance to have "highly negative price changes."

Cain's inclusion of the final alleged corrective disclosure date as a News Day is the clearest evidence of cherry-picking. The date of a final alleged corrective disclosure in a securities class action is known to be "a day with 'both news and a substantial decline in the price of . . . the securit[y] at issue,'" and "its inclusion," both as a corrective disclosure *and* as a News Day in Cain's event study is "driven, at least in part, by the fact that there was an associated stock-price movement." *See Teva*, 2021 WL 872156, at *34, *35 (accepting this reasoning from plaintiffs' expert rebuttal report). Cain knew before constructing his event study that ELC's stock price

---

[5]    Exhibit M to the Declaration of Monica K. Loseman in Support of Defendants' Opposition to Lead Plaintiffs' Motion for Class Certification.

declined 19% on November 1, 2023, one day after the end of Class Period and the date on which Plaintiffs allege a final corrective disclosure occurred. Ex. 2 at 256:22-258:9. November 1, 2023 is the *only* date in Cain's Analysis Period that is not also part of the alleged Class Period—a notable departure from the otherwise identical date ranges, and one that cannot have been arbitrary.

Cain has identified no alternative basis for his selection of News Days, such as case- or Company-specific factors. As Defendants' economist expert witness, Dr. Jennifer Marietta-Westberg, explains, Cain did not adapt his definition of News Days to "test the response of the type of information at issue" here, such as "information specific to illicit daigou, or even daigou generally." Marietta-Westberg Rpt., ¶151. Instead, his selection of News Days was explicitly *not* tailored to the facts of this case or to the information environment around ELC. *See* Ex. 2 at 275:16-276:9 (comparing report in this case to a report previously filed in another case); *see generally* Ex. 5. The "complete disconnect" between Plaintiffs' allegations and the selection of earnings-release dates as News Days, especially paired with the potentially biased inclusion of alleged corrective disclosure dates as the remaining News Days, "nullifies" any "usefulness of [Cain's] work." *Bricklayers*, 752 F.3d at 91. The biased, unreliable event study and Cain's opinions based upon it are not legitimate bases for a finding of market efficiency and should be excluded under Rule 702.

> **C.     Cain's Opinion Regarding a Classwide Damages Methodology Is Not Helpful and Should Be Excluded Because It Does Not Account for Case-Specific Factors.**

Cain's opinion that damages can be adjudicated classwide based on common proof is superficial, disconnected from the specific issues in this case, and should be excluded. Because it does not account for details of Plaintiffs' theory of liability or how they will map onto facts of this case, Cain's high-level opinion that a classwide, out-of-pocket damages model can measure damages in a securities class action is irrelevant to the questions before the Court here.

Rule 702 requires as a condition of admissibility that expert evidence "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Here, where the Court is tasked with making findings of fact relevant to class certification, expert testimony that is "not relevant" to determining a fact in issue "and, ergo, non-helpful," should be excluded. *Daubert*, 509 U.S. at 591 (citation omitted); *see also In re Petrobras*, 862 F.3d at 261 (recognizing a decision on class certification may involve findings of fact). To be helpful with respect to classwide damages, an expert opinion should answer the question of whether a model exists that "actually measure[s] damages that result from the class's asserted theory of injury." *Waggoner*, 875 F.3d at 106 (citation omitted).

Cain's opinion on damages seeks to answer the wrong question, one that is not linked to Plaintiffs' theory of the case and irrelevant to the Court's analysis here. Cain offers opinions generally about the "'out-of-pocket' method of calculating damages," which he notes is a "standard and well-accepted methodology under § 10(b) of the Exchange Act," and the types of generic evidence that may be used as "inputs" into the out-of-pocket method's "formula." Ex. 1, ¶¶96-97. The description of his proposed damages methodology is written largely in the passive voice, *e.g.*, *id.* ¶¶98-100, or with reference to how "one" might measure certain figures, *id.* ¶103—emphasizing that, as Cain testified throughout his deposition, his opinion on damages does not account for any of the features that are likely to distinguish this case from a generic putative class action brought under Rule 10b-5. Instead, Cain *copied and pasted* his discussion of damages from previous cases that involved different facts, not accounting for the specific, complex circumstances here. Ex. 2 at 267:25-277:25; *see also id.* at 277:3-6 ("[M]y description of the out-of-pocket damages methodology is nearly identical across reports because it's the same methodology."); Ex. 5.

Cain has formed no opinions on whether daigou was illegal or illicit during the Class Period, nor is he qualified to do so, *see* Ex. 2 at 76:24-78:8, and thus he has not considered whether damages will need to account for the distinction between lawful and prohibited daigou activity. He has not considered the extent to which daigou was a feature of "doing business in China and Korea" during the relevant period, known to the general public or to some or all of ELC's investors, *see id.* at 122:10-123:9, and his opinion does not address the process of teasing out any investors' awareness of the practice. Although his report states generally that an out-of-pocket model could be altered by "valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents" to address variation in artificial inflation over time, he has not attempted to measure the likely sources of that variation here—like "how any perceived likelihood of [daigou-related] enforcement activity changed throughout the class period." Ex. 1, ¶104; Ex. 2 at 143:20-24. His opinion is not informed by any facts of the case as discussed in produced documents, deposition testimony, or publicly available documents like analyst reports. Ex. 2 at 61:20-62:6 (deposition transcripts and produced documents), 85:13-16 (analyst reports). Although he references "[t]he value of any confounding information" as an input that a damages model will address, he has not reviewed analyst reports or other sources that would identify the extent of confounding information here—and in fact has not yet assessed "whether it would be necessary or relevant to consider" any confounding factors. Ex. 1, ¶100; Ex. 2 at 207:13-214:17.

Indeed, Cain refused even to acknowledge that Plaintiffs' theory of liability is that ELC "concealed the fact that [its] sales growth in [its] Asia travel retail segment was driven by the prohibited gray market resale industry in China and South Korea, known as *daigou*," even though those were the words *he* chose to describe it. *Compare* Ex. 1, ¶16, *with* Ex. 2 at 281:15-285:18. Cain acknowledged at his deposition that "each case"—including cases involving materialization-

20

of-risk allegations—"involves its own loss causation and damages analysis, which begins with a consideration of the information environment and the allegations in the case." Ex. 2 at 136:7-137:11. But his report, including its single cursory reference to "materialization," demonstrates that Cain has not even begun to undertake that consideration here. Cain's opinion that a classwide damage assessment is feasible is blatant *ipse dixit* and must be excluded. *See LIBOR*, 299 F. Supp. 3d at 500.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant the motion to exclude opinions in Cain's Report, and related testimony, in connection with Plaintiffs' Motion.

Dated:    New York, New York
           January 23, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By:    _/s/ Monica K. Loseman_

Monica K. Loseman
GIBSON, DUNN & CRUTCHER LLP
1900 Lawrence Street
Suite 3000
Denver, CO 80202-2211
Telephone: 303.298.5784
Facsimile: 303.313.2828
MLoseman@gibsondunn.com

Barry H. Berke
Mary Beth Maloney
Laura K. O'Boyle
David M. Kusnetz
Megan R. Murphy
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035
BBerke@gibsondunn.com
MMaloney@gibsondunn.com
LOBoyle@gibsondunn.com
DKusnetz@gibsondunn.com
MMurphy2@gibsondunn

_Attorneys for Defendants_

22

**ATTORNEY CERTIFICATION PURSUANT TO LOCAL RULE 7.1(c)**

I, Monica K. Loseman, hereby certify that the attached document complies with the word count limit set for in Local Rule 7.1(c), as it contains 6,882 words, excluding the caption, table of contents, table of authorities, and signature blocks. In preparing this certification, I have relied on the word count of the word-processing system used to prepare the attached document.

Dated:  January 23, 2026
        New York, New York


/s/ *Monica K. Loseman*_____
   Monica K. Loseman