**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE THE ESTÉE LAUDER CO., INC. SECURITIES LITIGATION | Civil Action No. 1:23-cv-10669-AS |
|  | Hon. Arun Subramanian |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS'**
**UNOPPOSED MOTION FOR PRELIMINARY APPROVAL**
**OF PROPOSED CLASS ACTION SETTLEMENT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND....................................................................... 3

I.      RELEVANT PROCEDURAL HISTORY ......................................................................... 3

II.     NEGOTIATION OF THE SETTLEMENT AND THE TERMS OF THE
        PROPOSED SETTLEMENT ........................................................................................ 5

ARGUMENT............................................................................................................................ 7

I.      PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED .................. 7

        A.     Standards for Preliminary Approval of a Proposed Class Action
               Settlement ........................................................................................................ 7

        B.     Rule 23(e)(2)(A): Adequate Representation........................................................ 10

        C.     Rule 23(e)(2)(B): The Settlement Is the Product of Good Faith,
               Informed, and Arm's-Length Negotiations by Experienced Counsel ................... 11

        D.     Rule 23(e)(2)(C): The Settlement Provides Significant and Certain
               Benefits ........................................................................................................... 12

               1.      Many Risks to Recovery Remained........................................................ 12

               2.      The Effective Process for Distributing Relief.......................................... 16

               3.      The Settlement Does Not Excessively Compensate Lead Counsel.......... 18

        E.     Rule 23(e)(2)(D): Settlement Class Members Are Treated Equitably
               Relative to One Another ................................................................................... 18

        F.     The Remaining *Grinnell* Factors Support Preliminary Approval......................... 19

II.     PRELIMINARY CERTIFICATION OF THE SETTLEMENT CLASS......................... 20

III.    THE PROPOSED NOTICE PROGRAM SHOULD BE APPROVED .......................... 22

IV.     PROPOSED SCHEDULE OF SETTLEMENT-RELATED EVENTS .......................... 24

CONCLUSION........................................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advanced Battery Tech. Inc. Sec. Litig.*,
　298 F.R.D 171 (S.D.N.Y. 2014) ........................................................................12, 23

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
　2021 WL 345790 (E.D.N.Y. Feb. 1, 2021)....................................................................23

*Cavalieri v. Gen. Elec. Co.*,
　2009 WL 2426001 (N.D.N.Y. Aug. 6, 2009) ...........................................................20

*Christine Asia Co. Ltd. v. Yun Ma*,
　2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019)...............................................................9

*City of Detroit v. Grinnell Corp.*,
　495 F.2d 448 (2d Cir. 1974) *abrogated on other grounds by Goldberger v.
　Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)...........................................9, 19, 20

*City of Providence v. Aeropostale Inc.*,
　2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd sub. nom. Arbuthnot v.
　Pierson*, 607 F. App'x. 73 (2d Cir. 2015)................................................................12

*D'Amato v. Deutsche Bank*,
　236 F.3d 78 (2d Cir. 2001)....................................................................................20

*In re IMAX Sec. Litig.*,
　283 F.R.D. 178 (S.D.N.Y. 2012) ....................................................................19, 22

*In re Merrill Lynch Tyco Rsch. Sec. Litig.*,
　249 F.R.D. 124 (S.D.N.Y. 2008) ............................................................................19

*Moses v. New York Times Co.*,
　79 F.4th 235 (2d Cir. 2023) ..........................................................................8, 9, 11

*Mullane v. Cent. Hanover Bank & Trust Co.*,
　339 U.S. 306 (1950)................................................................................................22

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
　176 F.R.D. 99 (S.D.N.Y. 1997) ............................................................................11

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
　330 F.R.D. 11 (E.D.N.Y. 2019) ..............................................................................9

*Pearlstein v. Blackberry Ltd.*,
　2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022).........................................................18

*Schutter v. Tarena Int'l, Inc.*,
  2024 WL 4118465 (E.D.N.Y. Sept. 9, 2024) ..................................................................20

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2020 WL 4196468 (S.D.N.Y. July 21, 2020) ..................................................................12

*In re U.S. Foodservice Inc. Pricing Litig.*,
  2014 WL 12862264 (D. Conn. Dec. 9, 2014).................................................................18

*In re Veeco Instruments Inc. Sec. Litig.*,
  2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)...................................................................12

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)...................................................................................7, 22

*Yang v. Focus Media Holding Ltd.*,
  2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014)....................................................................7

**Statutes**

15 U.S.C. § 78u-4(a)(4) .............................................................................................18

15 U.S.C. §78u-4(a)(7)(A)-(F)..................................................................................24

**Rules**

Fed. R. Civ. P. 23(a) ...........................................................................................20, 21

Fed. R. Civ. P. 23(b)(3)........................................................................................20, 21

Fed. R. Civ. P. 23(c)(2)(B) .........................................................................................22

Fed. R. Civ. P. 23(e) ..........................................................................................1, 8, 9

Fed. R. Civ. P. 23(e)(1)..........................................................................................8, 22

Fed. R. Civ. P. 23(e)(1)(B) ....................................................................................8, 22

Fed. R. Civ. P. 23(e)(2)...........................................................................................8, 9

Fed. R. Civ. P. 23(e)(2)(A) .........................................................................................10

Fed. R. Civ. P. 23(e)(2)(B) ...........................................................................................................11

Fed. R. Civ. P. 23(e)(2)(C) ......................................................................................................9, 12

Fed. R. Civ. P. 23(e)(2)(D) .........................................................................................................18

Fed. R. Civ. P. 23(e)(3).................................................................................................................9

## PRELIMINARY STATEMENT

Lead Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System (collectively, "Lead Plaintiffs" or the "Michigan Funds"), on behalf of themselves and the other members of the proposed Settlement Class (defined below),[1] submit this memorandum of law in support of their unopposed motion for preliminary approval of the proposed settlement reached in the above-captioned action (the "Action"). If approved, the Settlement will provide a recovery of $210,000,000 in cash to resolve this proposed securities class action, pending against defendants The Estée Lauder Companies Inc. ("Estée Lauder," "ELC," or the "Company"); Fabrizio Freda and Tracey T. Travis (the "Individual Defendants" and, together with Estée Lauder, "Defendants"). The terms of the proposed Settlement are set forth in the Stipulation and Agreement of Settlement, dated May 6, 2026, which was entered into by Lead Plaintiffs and Defendants.

The Settlement eliminates the real risk that protracted litigation might lead to a lesser or no recovery—including significant risks relating to falsity, scienter, loss causation, class certification and damages—and guarantees a significant and near-term recovery for the Settlement Class. The proposed Settlement was achieved after hard-fought litigation, motion practice, and vigorous extended arm's-length negotiations before a well-respected mediator. Lead Plaintiffs—sophisticated institutional investors—oversaw the litigation and fully endorse the Settlement, which readily satisfies each of the approval factors required by Federal Rule of Civil Procedure 23(e) and Second Circuit precedent.

---

[1] All capitalized terms used in this memorandum that are not defined have the same meanings as in the Stipulation and Agreement of Settlement, dated May 6, 2026 (the "Stipulation"), which is attached as Exhibit 1 to the Declaration of Michael P. Canty ("Canty Decl."), filed herewith.  All exhibits are attached to the Canty Declaration.

If the Court grants preliminary approval, Lead Plaintiffs will be able to provide notice of the Settlement's terms and conditions to potential Settlement Class Members. A final approval hearing (the "Settlement Hearing") will then be conducted so that the Parties and Settlement Class Members may present arguments and evidence for and against the Settlement, and the Court will then make a final determination as to whether the Settlement is fair, reasonable, and adequate. The Court will also be asked to approve the proposed Plan of Allocation for distributing the proceeds of the Settlement and to consider Lead Counsel's Fee and Expense Application.

The proposed Preliminary Approval Order has been negotiated by the Parties and will, among other things: (i) preliminarily approve the Settlement on the terms set forth in the Stipulation; (ii) preliminarily certify the Settlement Class and appoint Lead Plaintiffs as Class Representatives and Lead Counsel as Class Counsel, for purposes of the Settlement only; (iii) approve the form and content of the long-form Notice, Claim Form, Postcard Notice, and Summary Notice, attached as Exhibits 1 through 4 to the Preliminary Approval Order; (iv) find that the procedures for distribution of the notices constitute the best notice practicable under the circumstances and comply with due process, Fed. R. Civ. P. 23, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"); (v) set a date and time for the Settlement Hearing, at which the Court will consider final approval of the Settlement, the Plan of Allocation, and Lead Counsel's application for attorneys' fees and expenses, including reimbursement of costs and expenses to Lead Plaintiffs pursuant to the PSLRA; and (vi) appoint Epiq Class Action & Claims Solutions ("Epiq" or the "Claims Administrator"), which was selected after a competitive bidding process, to administer the Settlement process.

For the reasons discussed herein, it is respectfully requested that the Court enter the proposed Preliminary Approval Order submitted herewith (and as Exhibit A to the Stipulation).

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    RELEVANT PROCEDURAL HISTORY**

On December 7, 2023, the Action, originally captioned *McAlice v. The Estée Lauder Companies, Inc., et al.*, No. 1:23-cv-10669-AS, was commenced by the filing of an initial complaint in the United States District Court for the Southern District of New York (the "Court") alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of a class of all persons and entities who purchased or otherwise acquired Estée Lauder common stock during the class period. ECF No. 1.

After the filing of a related securities class action captioned *West Virginia Laborers Pension Trust Fund v. The Estée Lauder Companies, Inc., et al.*, No. 1:24-cv-00468 (S.D.N.Y) (the "Related Action"), competing lead plaintiff motions, and the subsequent filing of notices of non-opposition, on February 20, 2024 the Court: (i) consolidated the Related Action with the Action (ECF No. 37), and (ii) appointed the Michigan Funds as Lead Plaintiffs and approved their selection of Labaton Keller Sucharow LLP ("Labaton") as Lead Counsel. ECF No. 38.

Thereafter, Lead Plaintiffs engaged in a thorough investigation of their claims for the purpose of drafting a comprehensive consolidated complaint, which included the review and analysis of: (i) documents filed publicly by the Company with the U.S. Securities and Exchange Commission ("SEC"); (ii) publicly available information, including press releases, news articles, and other public statements issued by or concerning the Company and the defendants; (iii) research reports issued by financial analysts concerning the Company; and (iv) other publicly available information. Additionally, Lead Plaintiffs, through Lead Counsel, contacted and interviewed 33 former employees of Estée Lauder to discuss the issues related to the Action (three of whom

provided information used in the Complaint and were cited as former employees or "FEs" in the Complaint) and consulted with experts on loss causation and damages issues. Lead Counsel also engaged an outside investigation firm to assist with its efforts to conduct investigations in Asia.

On March 22, 2024, Lead Plaintiffs filed the Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") asserting claims under Section 10(b) of Exchange Act and Section 20(a) against Defendants. ECF No. 47. The Complaint alleged that, from February 3, 2022 through October 31, 2023, inclusive, the price of Estée Lauder common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements and omissions, and declined when the truth was allegedly revealed through a series of partial corrective disclosures.

On May 3, 2024, Defendants filed a motion to dismiss the Complaint, which Lead Plaintiffs opposed. ECF Nos. 50-54. On March 31, 2025, the Court entered its Opinion and Order that denied Defendants' motion to dismiss, but determined one alleged misstatement was not actionable ("MTD Order"). ECF No. 58. On May 5, 2025, Defendants filed their Answer to the Complaint. ECF No. 78.

Beginning in April 2025, the Parties engaged in formal discovery efforts, including exchanging initial disclosures, serving requests for production of documents and interrogatories, as well as subpoenas on third parties. The Parties engaged in numerous meet-and-confer conferences regarding the scope of discovery. By March 2026, Defendants produced approximately 110,900 documents (approximately 514,000 pages) to Lead Plaintiffs, Lead Plaintiffs produced approximately 3,700 documents (approximately 122,000 pages) to Defendants, and third parties produced approximately 9,500 documents (approximately 47,700 pages). In total, approximately 124,000 documents (approximately 684,000 pages) were produced. The Parties

also participated in five depositions: Lead Plaintiffs conducted one deposition of Estée Lauder pursuant to Rule 30(b)(6); and Defendants conducted depositions of Lead Plaintiffs' class certification expert, the Lead Plaintiffs, and one third-party investment manager.

On July 25, 2025, Lead Plaintiffs filed their motion for class certification, and for the appointment of Lead Plaintiffs as Class Representatives and Lead Counsel as Class Counsel ("Class Certification Motion"). ECF Nos. 82-84. On January 23, 2026, Defendants filed their opposition, which was supported by four expert reports. ECF No. 104; ECF No. 105-1; ECF No. 105-2; ECF No. 105-3; ECF No. 105-13. On January 24, 2026, Defendants filed their Motion to Exclude Opinions in the Expert Report of Matthew D. Cain, Ph.D. and Related Testimony. ECF No. 106. Following the Parties' joint request for an extension of time (ECF No. 109), Lead Plaintiffs re-filed their Class Certification Motion (ECF No. 111) at the Court's request (ECF No. 110).

## II.     NEGOTIATION OF THE SETTLEMENT AND THE TERMS OF THE PROPOSED SETTLEMENT

In August 2025, as fact discovery was underway, the Parties began exploring the possibility of a negotiated resolution, ultimately agreeing that the Parties' counsel would meet in person to discuss a potential settlement through mediation.

On December 4, 2025, counsel for the Parties participated in a full-day mediation session before Hon. Layn Phillips (Ret.) of Phillips ADR Enterprises (the "Mediator"), a well-respected and experienced mediator. In advance of that session, the Parties submitted detailed confidential mediation statements, together with numerous supporting exhibits, which addressed both liability and damages issues. The December 4, 2025 session ended without any agreement being reached. The Parties continued discussions with the Mediator to further explore the possibility of a settlement and, on January 27, 2026, the Parties participated in a half-day, virtual mediation

session before the Mediator. In advance of the session, the Parties held separate virtual discussions with the Mediator's team. However, the session ended without any settlement being reached. The Parties continued discussions with the Mediator and on March 17, 2026, the Parties participated in another full-day, in-person mediation before the Mediator. In advance of the session, the Parties held separate virtual discussions with the Mediator's team. The session again ended without any settlement being reached, however the Parties continued discussions with the Mediator.

On March 23, 2026, the Mediator sent the Parties a mediator's recommendation for settlement and on April 1, 2026, the Parties accepted the recommendation and reached a settlement in principle to resolve all claims on a class-wide basis for $210,000,000. The Parties memorialized their agreement in a Term Sheet that was executed on April 2, 2026, subject to the execution of a formal settlement agreement, related papers, and approval by the Court.

On May 6, 2026, the Parties executed the Stipulation. In exchange for payment of the Settlement Amount, upon the Effective Date of the Settlement, Lead Plaintiffs and the Settlement Class will release the Released Plaintiffs' Claims against the Released Defendant Parties, and Defendants will release the Released Plaintiff Parties from all Released Defendant's Claims. *See* Stipulation ¶¶1(hh), (ll). The definition of Released Plaintiffs' Claims has been tailored to provide the Released Defendant Parties with "complete peace" while being limited to claims that were asserted, or could have been asserted, by the Settlement Class, arising out of both the facts and matters in the Action and the purchase or acquisition of Estée Lauder publicly traded common stock during the Class Period. The Settlement is not "claims-made" and there is no reversion of unclaimed funds to Estée Lauder. *See* Stipulation ¶11.

Additionally, the Stipulation reflects the Parties' agreement to extend the Class Period for purposes of the Settlement beyond the class period pled in the Complaint. *See* ECF No. 47

(pleading a class period of February 3, 2022 through October 31, 2023, both dates inclusive); Stipulation ¶1(oo). Leading up to this agreement, during the course of discovery, the Parties disagreed over the relevant time period for Defendants' document production and discovery requests. Specifically, Lead Plaintiffs sought discovery for a period of time broader than the class period alleged in the Complaint in order to capture additional disclosures by the Company purportedly relating to the Complaint's allegations. Ultimately, Lead Plaintiffs requested that the Court order that the relevant time period for Defendants' document production be January 1, 2020 through February 28, 2025. ECF No. 85. The Court granted Lead Plaintiffs' motion. ECF No. 89. The Parties' agreement to extend the Class Period for purposes of the Settlement reflects their negotiations to release Lead Plaintiffs' potential claims arising from additional disclosures by Estée Lauder during this time period.

## ARGUMENT

## I.    PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED

### A.    Standards for Preliminary Approval of a Proposed Class Action Settlement

Public policy favors settlement of litigation. *See Yang v. Focus Media Holding Ltd.,* 2014 WL 4401280, at *3 (S.D.N.Y. Sept. 4, 2014) ("[W]hen exercising discretion to approve a settlement, courts are 'mindful of the strong judicial policy in favor of settlements[.]'"[2] This is especially so in securities class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 116-17 (2d Cir. 2005) ("We are mindful of the "strong judicial policy in favor of settlements, particularly in the class action context. The compromise of complex litigation is encouraged by the courts and favored by public policy."").

---

[2] All internal quotations and citations are omitted, unless otherwise noted.

Rule 23 requires court approval of any settlement of a class action. A district court's review of a proposed class action settlement is a two-step process. First, the court performs a review of the terms of the proposed settlement to determine whether to send notice of the proposed settlement to the class. *See* Fed. R. Civ. P. 23(e)(1). Second, after notice and a hearing, the Court determines whether to grant final approval of the settlement. *See* Fed. R. Civ. P. 23(e)(2). A court may grant preliminary approval of a settlement upon a finding that it "will likely be able to" approve the settlement as fair, reasonable, and adequate at the final hearing, and certify the class for purposes of judgment on the proposal. *See* Fed. R. Civ. P. 23(e)(1)(B). By this motion, Lead Plaintiffs request that the Court take this first step: preliminary approval of the Settlement.

Effective December 1, 2018, Rule 23(e) was amended to, among other things, specify that the crux of a court's preliminary approval evaluation is whether notice should be provided to the class given the *likelihood* that the court will be able to finally approve the settlement, after considering "the four factors outlined in Rule 23(e)(2) holistically." *Moses v. New York Times Co.*, 79 F.4th 235, 243 (2d Cir. 2023); *see also* Fed. R. Civ. P. 23(e)(1)(B). Rule 23(e)(2) provides that a court may approve a proposed settlement that would bind class members "only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

    (A)    class representatives and counsel have adequately represented the class;

    (B)    the proposal was negotiated at arm's length;

    (C)    the relief provided for the class is adequate, taking into account:

        (i)    the costs, risks, and delay of trial and appeal;

        (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)    any agreement required to be identified under Rule 23(e)(3);[3] and

(D)    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Courts in the Second Circuit may also consider the factors enumerated in

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) *abrogated on other grounds by*

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), many of which overlap with the

Rule 23(e) factors. *See Moses*, 79 F.4th at 243 ("Rule 23(e)(2) does not displace our traditional

*Grinnell* factors, which remain a useful framework for considering the substantive fairness of a

settlement."). [4] Applying the standards set forth above, it is respectfully submitted that the

Settlement should be preliminarily approved. *See, e.g., In re Payment Card Interchange Fee &*

*Merch. Disc. Antitrust Litig.,* 330 F.R.D. 11, 60 (E.D.N.Y. 2019).

---

[3] Rule 23(e)(2)(C)(iv) requires the disclosure of any agreement between the Parties in connection with the proposed Settlement. Here, on April 2, 2026, the Parties entered into the Term Sheet. In addition to the Stipulation, on May 6, 2026 they entered into a confidential Supplemental Agreement Regarding Requests for Exclusion, (the "Supplemental Agreement"). Stipulation ¶¶40-41. The Supplemental Agreement sets forth the conditions under which Estée Lauder has the option to terminate the Settlement in the event that requests for exclusion from the Settlement Class exceed a certain agreed-upon threshold. As is standard in securities class actions, the Supplemental Agreement is kept confidential in order to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging a larger individual payment. *Christine Asia Co. Ltd. v. Yun Ma*, 2019 WL 5257534, at *15 (S.D.N.Y. Oct. 16, 2019). Pursuant to its terms, the Supplemental Agreement may be submitted to the Court *in camera* or under seal. The Supplemental Agreement, Stipulation, and Term Sheet are the only agreements concerning the Settlement entered into by the Parties.

[4] The *Grinnell* factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *City of Detroit*, 495 F.2d at 463.

B.       **Rule 23(e)(2)(A): Adequate Representation**

Lead Plaintiffs and Lead Counsel have adequately prosecuted this Action on behalf of the class since its inception and will continue to do so throughout the administration of the Settlement to secure and deliver its benefits to the Settlement Class. Lead Plaintiffs are sophisticated institutional investors that have, among other things, regularly conferred with Lead Counsel concerning the prosecution of the Action; reviewed periodic updates and other correspondence from counsel, including significant court filings and orders; responded to the discovery demands propounded by Defendants, including the production of responsive documents in connection with those demands; and sat for depositions. Moreover, through counsel, Lead Plaintiffs participated in the ongoing negotiations to achieve a settlement. Faithfully executing their duties, Lead Plaintiffs were engaged in each step of the litigation.

Likewise, Lead Counsel, highly experienced in securities class action litigation, diligently prosecuted the Action and considered the benefits of a resolution before agreeing to a settlement. *See* Exhibit 2 (firm profile). Lead Counsel has developed a deep understanding of the facts of the case and merits of the claims through: (i) a comprehensive investigation; (ii) drafting a detailed amended complaint; (iii) defeating Defendants' motion to dismiss; (iv) commencing and participating in discovery, including reviewing more than 120,400 documents (approximately, 560,000 pages) from Defendants and third-parties and participating in five depositions; (v) preparing the class certification motion; and (vi) exchanging extensive mediation briefing and participating in three mediation sessions. Lead Plaintiffs and Lead Counsel evaluated the potential risks in the case and negotiated vigorously to secure the $210 million recovery. Accordingly, the Settlement Class has been, and remains, well represented.

**C.      Rule 23(e)(2)(B): The Settlement Is the Product of Good Faith,
Informed, and Arm's-Length Negotiations by Experienced Counsel**

"Where the proposed settlement appears to be the product of serious, informed, non–collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). An "arm's-length negotiation [is] one of two procedural factors (the other being the adequacy of class representatives and counsel) – and one of four core factors that courts must consider when approving a proposed settlement[.]" *Moses*, 79 F.4th at 243.

Here, the Settlement was achieved by Lead Plaintiffs' and Lead Counsel's robust arm's-length negotiations with Defendants, overseen by an experienced third-party neutral Mediator. During the December 4, 2025 mediation session, the Parties vigorously asserted arguments concerning Lead Plaintiffs' ability to prove falsity and scienter, the relevance of outstanding discovery requests with respect to Lead Plaintiffs' claims, whether documents and testimony developed in discovery would support the allegations pled in the Complaint, and significant issues pertaining to loss causation and damages. With Lead Plaintiffs and Defendants still meaningfully apart in their respective positions after the mediation, they agreed to continue negotiations through the Mediator.

The Parties subsequently engaged in two additional mediation sessions. During these sessions, the Parties made additional presentations of their positions to the Mediator and continued negotiations. On March 23, 2026, the Mediator issued a proposal to settle the Action, which the Parties accepted on April 1, 2026.

Additionally, Lead Counsel, which has extensive experience prosecuting complex securities class actions (*see* Exhibit 2), believes that the Settlement is not only fair, reasonable, and

11

adequate, but is a very good result for Lead Plaintiffs and the Settlement Class. This opinion is entitled to "great weight." *See City of Providence v. Aeropostale Inc.*, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014), *aff'd sub. nom. Arbuthnot v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015).

Finally, the settlement was also negotiated with the oversight of Lead Plaintiffs, sophisticated institutional investors with collectively, billions of dollars in assets under management for the benefit of more than 15,300 employees, retirees, and beneficiaries in the state of Michigan. *See* ECF Nos. ECF Nos. 84-2, 84-3, 84-4. This also supports the fairness of the Settlement. *See In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("[U]nder the PSLRA, a settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness.'").

### D.       Rule 23(e)(2)(C): The Settlement Provides Significant and Certain Benefits

#### 1.       Many Risks to Recovery Remained

Rule 23(e)(2)(C)(i) instructs courts to consider the adequacy of a proposed settlement in light of "the costs, risks, and delay of trial and appeal." To determine whether the proposed Settlement is fair, reasonable, and adequate, courts balance the continuing risks of litigation against the benefits afforded to class members through settlement. Although Lead Plaintiffs and Lead Counsel believe the claims to be strong, they acknowledge that Defendants could advance several substantial arguments that could have reduced, or altogether eliminated, any recovery for Estée Lauder investors. It is well known that "[s]ecurities class actions present hurdles to proving liability that are particularly difficult for plaintiffs to meet." *In re Advanced Battery Tech. Inc. Sec. Litig.*, 298 F.R.D 171, 177 (S.D.N.Y. 2014); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *4 (S.D.N.Y. July 21, 2020) ("Courts recognize that [s]ecurities class actions are generally complex and expensive to prosecute.").

**Falsity and Scienter.** Lead Plaintiffs and the class would have faced significant hurdles at summary judgment and at trial in connection with, among other things, ultimately proving falsity and scienter, which are necessary for their Exchange Act claims. For example, Defendants would have likely continued to argue (as they did in their opposition to the Class Certification Motion) that *daigou*, as well as Estée Lauder's purported reliance on the sales practice, was both known to the market and an acceptable part of its business strategy in the Asia-Pacific region. Defendants would have strenuously argued that the market knew about the Company's reliance on *daigou* all along, as evidenced by market analysis and industry publications about the proliferation of *daigou* during and in the wake of the COVID-19 pandemic. Accordingly, Defendants would have argued at summary judgment and at trial that no investor could have been misled by Defendants' alleged omissions about *daigou* when they knew about its existence all along. Additionally, the nuances of the *daigou* market and its relationship with the prestige beauty industry would have become the subject of contentious expert discovery and motion practice, and likely would have resulted in a "battle of the experts," which stood to add great expense and risk to the class.

With respect to scienter, Defendants would likely have argued that they could not have knowingly or recklessly misled the market by failing to disclose Estée Lauder's reliance on *daigou* when they genuinely believed that the market was aware of the Company's *daigou* exposure based on the market and industry publications available at the time. Defendants also would have argued that the alleged false statements touting the success of the Travel Retail segment and sales in the APAC region were literally true and that there was no duty to disclose the existence of *daigou* to counteract any allegedly false impression made by those statements because Estée Lauder's exposure to *daigou* was already known to investors—thereby undercutting any inference that Defendants acted with scienter when making public statements to investors.

13

**Prevailing on Class Certification.** Lead Plaintiffs would have to succeed on their pending Class Certification Motion and maintain certification through trial. Defendants vigorously opposed class certification on several grounds, including, for example, that Lead Plaintiffs could not establish price impact or reliably measure damages on a class wide basis. *See* ECF No. 104 at 1-2. In support of their arguments, Defendants' opposition to Lead Plaintiffs' Class Certification Motion introduced four experts, three of whom Defendants proffered as experts on *daigou*, to opine on the history, risk, and purportedly "well-known" and "widespread" nature of *daigou*. *See id.* at 8.

Defendants notably argued that Lead Plaintiffs could not prove price impact because there was a "mismatch" between the alleged misstatements and the allegedly corrective disclosures in the Complaint. *See id.* at 9-10. Specifically, Defendants argued that the first three corrective disclosures on November 2, 2022, February 2, 2023, and May 3, 2023 did not mention the word or even concept of *daigou*, and instead attributed the Company's poor financial performance in the Travel Retail segment and APAC region to factors that were unrelated to the practice. Defendants' arguments that the alleged misrepresentations were "too generic" to be corrected by the specific nature of the corrective disclosures presented legal challenges that, if successful, could have shortened the class period and, accordingly, reduce damages.

**Loss Causation and Damages.** Even assuming that Lead Plaintiffs overcame the risk of establishing Defendants' liability and maintaining certification, Lead Plaintiffs would confront considerable challenges in establishing loss causation and class-wide damages. Defendants would continue to argue that Lead Plaintiffs cannot show that the stock price declines following each corrective disclosure were attributable to the alleged fraud. And, as they argued in opposing class

14

certification, Defendants would continue to assert that there was a "mismatch" between the contents of the alleged misrepresentations and the corrective disclosures.

Lead Plaintiffs consulted with an expert in damages and loss causation who analyzed class-wide damages in light of the facts and circumstances presented in the case and developed through the discovery process to date. Lead Plaintiffs' consulting damages expert estimated that maximum damages attributable to all five allegedly corrective disclosures was approximately $4.6 billion, depending on the trading model and assumptions used. However, this was far from a likely scenario given Defendants' arguments at class certification. If Defendants were successful in challenging the first three corrective disclosures and only the August 18, 2023 and November 1, 2023 corrective disclosures were found to be actionable, aggregate damages would have decreased to approximately $1.9 billion.

These estimates do not disaggregate confounding information that was released on the corrective disclosure days, which would further reduce damages to between $4.2 billion (for all five alleged corrective disclosure dates) and $1.85 billion (if only the August 18, 2023 and November 1, 2023 corrective disclosure dates remain) based on Lead Plaintiffs' damages expert's methodology. Moreover, Defendants had raised arguments, and likely would have continued to argue at summary judgment and trial, that Lead Plaintiffs were required to perform a far more in-depth disaggregation analysis to account for a more substantial number of confounding factors that impacted Estée Lauder's stock price. Critically, Defendants claimed that for certain corrective disclosures, Lead Plaintiffs would need to disaggregate more than 50% of the alleged stock price decline. If Defendants were successful in advancing such arguments, damages would be cut even

15

more substantially from the estimates described above.[5]

Accordingly, the Settlement recovers a range of approximately 4.6% of estimated maximum damages to 5%-11.4% of more likely recoverable estimated damages, which is above industry trends. According to Cornerstone Research, for Exchange Act cases with total estimated damages of more than $1 billion, the median percentage of recovery from 2016 to 2024 was 3.6% of total Cornerstone estimated damages, and the median percentage of recovery for such cases in 2025 was 3%. *See* Laarni T. Bulan and Eric Tam, *Securities Class Action Settlements – 2025 Review and Analysis* (Cornerstone Research 2026), Exhibit 3 at 7.

Notably, the $210 million recovery is within the top 100 securities class actions of all time. *See The Top 100 U.S. Class Action Settlements of All Time* (ISS/SCAS Dec. 31, 2025), Exhibit 4, at 13.  It is twelve times greater than the median reported recovery in securities class actions in 2025, which was $17.3 million. *See* Cornerstone Report, Exhibit 3, at 1.

Thus, the Settlement is a very favorable outcome for the Settlement Class.

### 2.    The Effective Process for Distributing Relief

The Settlement, like most securities class action settlements, will be effectuated with the assistance of an established and experienced claims administrator, Epiq. The Claims Administrator will employ a well-tested protocol for the processing of claims in a securities class action. Namely, a Claimant will submit, either by mail or online using the Settlement website, the Court-approved

---

[5] With respect to the additional potential corrective disclosures between May 1, 2024 and February 4, 2025, there were significant challenges with respect to a future recovery.  For instance, the November 1, 2023 corrective disclosure, as pled in the Complaint, revealed Estée Lauder's previously undisclosed reliance on *daigou* to generate sales in its travel retail business segment—the key fact underlying the alleged fraud. Because the disclosures had not been pled, amending the Complaint to include them would have resulted in a renewed motion to dismiss and additional legal challenges at class certification. The disclosures also were likely to have been the subject of substantial disaggregation challenges, which could have resulted in only a *de-minimis* amount of damages on these dates.

Claim Form. Based on the trade information provided by Claimants, the Claims Administrator will determine each Claimant's eligibility to recover by, among other things, calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation, and ultimately determine each eligible Claimant's *pro rata* portion of the Net Settlement Fund. *See* Stipulation ¶23. Lead Plaintiffs' claims will be reviewed in the same manner. Claimants will be notified of any defects or conditions of ineligibility and be given the chance to contest the rejection of their claims. *Id*. at ¶29(d). Any claim disputes that cannot be resolved will be presented to the Court for a determination. *Id*.

After the Settlement reaches its Effective Date (*id*. at ¶¶25, 38) and the claims process is completed, Authorized Claimants will be issued payments. If there are un-claimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions. If there are unclaimed funds, Lead Plaintiffs designate Consumer Federation of America ("CFA") as *cy pres* beneficiary, or such other non-sectarian, not-for-profit charitable organization approved by the Court. *Id*. at ¶26.[6]

---

[6] CFA is a non-profit, consumer advocacy organization established in 1968 to advance consumer interests through policy research, advocacy, and education. See www.consumerfed.org. With respect to victims of financial fraud, CFA has an Investor Protection program and an Investment Research Center that works nationwide to promote consumer-oriented policies that safeguard investors against fraud through: (i) the development of educational material for investors; (ii) drafting policies and legislation; (iii) and providing testimony and comments on legislation and regulations. www.consumerfed.org/issues/investor-protection. CFA has been approved in numerous securities cases, including *Chen v. Missfresh Limited, et al*., Case No. 22-cv-09836-JSR (S.D.N.Y.) and *ODS Capital LLC v. JA Solar Holdings Co. Ltd. et al*., No. 18-cv-12083 (S.D.N.Y.).

### 3.    The Settlement Does Not Excessively Compensate Lead Counsel

The reasonableness of attorneys' fees will be decided by the Court after Lead Counsel files a motion for attorneys' fees and Litigation Expenses. The Settlement does not contemplate any specific award. Lead Counsel will be compensated out of the Settlement Fund, under the common fund doctrine, and will not be compensated by Defendants. In connection with Lead Counsel's Fee and Expense Application, Lead Counsel will seek no more than 32% of the Settlement Fund, an amount that is within the percentages that courts in the Second Circuit have approved in class actions with comparable recoveries. *See, e.g., In re U.S. Foodservice Inc. Pricing Litig.,* 2014 WL 12862264, at *3 (D. Conn. Dec. 9, 2014) (awarding 33 1/3% of $297 million); *Pearlstein v. Blackberry Ltd.,* 2022 WL 4554858, at 11 (S.D.N.Y. Sept. 29, 2022) (awarding 33 1/3% of $165 settlement).

Lead Counsel will also seek payment of Litigation Expenses incurred during the prosecution of the Action, including an award to Lead Plaintiffs pursuant to the PSLRA, of no more than $875,000.

### E.    Rule 23(e)(2)(D): Settlement Class Members Are Treated <u>Equitably Relative to One Another</u>

The Settlement does not improperly grant preferential treatment to Lead Plaintiffs or any segment of the Settlement Class. Rather, all members of the Settlement Class, including Lead Plaintiffs, will receive a distribution from the Net Settlement Fund pursuant to the Plan of Allocation approved by the Court.[7] The proposed plan was created by Lead Plaintiffs' consulting

---

[7] Lead Plaintiffs may seek reimbursement of their reasonable costs and expenses (including lost wages) directly related to their participation in the Action, pursuant to the PSLRA. This would not constitute preferential treatment. *See* 15 U.S.C. § 78u-4(a)(4) (reimbursement of a plaintiff's costs and expenses is explicitly contemplated, in addition to receiving a *pro rata* portion of the recovery).

damages expert and is consistent with Lead Plaintiffs' theories of damages under the Exchange Act and the Court's rulings in the case.

Settlement Class Members that were allegedly harmed as a result of the alleged fraud, and that have an eligible claim pursuant to the Plan of Allocation, will receive their *pro rata* share of the Net Settlement Fund based on their "Recognized Claim" under the plan. *See, e.g.*, *In re Merrill Lynch Tyco Rsch. Sec. Litig.,* 249 F.R.D. 124, 135 (S.D.N.Y. 2008) ("A plan of allocation that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is presumptively reasonable.").

F.    **The Remaining *Grinnell* Factors Support Preliminary Approval**[8]

*Grinnell* **Factor 3 (the stage of the proceedings and the amount of discovery completed):** The fact that the Parties have not completed discovery does not weigh against preliminary approval. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 190 (S.D.N.Y. 2012) ("The threshold necessary to render the decisions of counsel sufficiently well informed, however, is not an overly burdensome one to achieve—indeed, formal discovery need not have necessarily been undertaken yet by the parties."). Prior to agreeing to a settlement, Lead Plaintiffs were in the midst of fact discovery and had reviewed approximately 560,000 pages of documents from Defendants and third parties and participated in five depositions; engaged in extensive motion practice including briefing on Defendants' motion to dismiss and filing their motion for class certification; consulted with a loss causation and damages expert, and participated in arm's-length settlement negotiations including three mediation sessions over the course of months. Accordingly, Lead

---

[8] The second *Grinnell* factor (the reaction of the class to the settlement) will be addressed in Lead Plaintiffs' reply papers in connection with its motion for final approval, after notice of the Settlement is disseminated, which will address any objections and requests for exclusion.

Plaintiffs and Lead Counsel entered into the Settlement fully informed about the Action's strengths and weaknesses.

*Grinnell* **Factor 7 (the ability of the defendants to withstand a greater judgment):** This factor is "typically relevant only when a settlement is less than what it might otherwise be but for the fact that the defendant's financial circumstances do not permit a greater settlement," which is not the case here. *Schutter v. Tarena Int'l, Inc.*, 2024 WL 4118465, at \*12 (E.D.N.Y. Sept. 9, 2024). Although it is likely Estée Lauder could withstand a greater judgment, "this factor, standing alone, does not suggest the settlement is unfair," especially where, as here, the "other *Grinnell* factors weigh heavily in favor of settlement." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001); *see also Cavalieri v. Gen. Elec. Co.*, 2009 WL 2426001, at \*2 (N.D.N.Y. Aug. 6, 2009) ("The court also notes that although neither party contends that defendants are incapable of withstanding greater judgment, that does not 'indicate that the settlement is unreasonable or inadequate.'").

## II.    PRELIMINARY CERTIFICATION OF THE SETTLEMENT CLASS

In preliminarily approving the proposed Settlement, the Court must consider whether it will be able to certify the Settlement Class under Fed. R. Civ. P. 23(a) and (b)(3). The Parties are requesting that the Court preliminarily certify the Settlement Class, which has been stipulated to by the Parties, for purposes of the Settlement only. The proposed Settlement Class consists of "all persons and entities that purchased or otherwise acquired the publicly traded common stock of The Estée Lauder Companies Inc. during the period from February 3, 2022 through February 3, 2025, both dates inclusive, and were allegedly damaged thereby"[9] Stipulation ¶1(oo). On July 25, 2025,

---

[9] Excluded from the Settlement Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or Control Person of Estée Lauder during the Class Period and their immediate families; (iv) any firm, trust,

20

Lead Plaintiffs filed the Class Certification Motion. ECF No. 82-84. In the interest of brevity, the Court is respectfully referred to Lead Plaintiffs' previously filed motion for a complete analysis of the arguments supporting class certification. *Id*.

In summary, pursuant to Rule 23(a): (i) the Settlement Class is so numerous that joinder of all members would be impracticable (ECF No. 83 at 8-9); (ii) there are questions of law or fact common to the Settlement Class (*id*. at 9-10); (iii) the claims or defenses of Lead Plaintiffs are typical of the claims or defenses of the Settlement Class (*id*. at 9-10); and (iv) Lead Plaintiffs and Lead Counsel will fairly and adequately protect the interests of the Settlement Class (*id*. at 10-11).

Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The proposed Settlement Class meets this standard: (i) common questions of both fact and law predominate (ECF No. 83 at 12-24); and (ii) a class action would be superior to other methods for the fair and efficient adjudication of the claims (*id*. at 24).

As explained earlier, the Stipulation reflects the Parties' agreement to extend the Class Period for purposes of the Settlement beyond the Class Period pled in the Complaint. *See* ECF No. 47 (pleading a Class Period of February 3, 2022 through October 31, 2023, both dates inclusive); Stipulation ¶1(oo) (defining the Class Period as February 3, 2022 through February 3, 2025, both dates inclusive). The Parties' agreement on this issue reflects their negotiations to release all claims

---

corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Estée Lauder's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, subsidiaries, trusts, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such. Also excluded from the Settlement Class will be any Settlement Class Members who or which exclude themselves from the Settlement Class by submitting a timely and valid request for exclusion that is accepted by the Court.

alleged, or that could have been alleged, including potential claims arising from additional disclosures by Estée Lauder between November 1, 2023 and February 3, 2025 relating to the allegations pled in the Complaint.

Courts within the Second Circuit have long acknowledged the propriety of certifying settlement classes. "Certification of a settlement class 'has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants.'" *IMAX,* 283 F.R.D. at 186. For the foregoing reasons, Lead Plaintiffs respectfully request that the Court preliminarily certify the proposed Settlement Class for purposes of implementing the proposed Settlement.

## III.    THE PROPOSED NOTICE PROGRAM SHOULD BE APPROVED

The proposed notices attached as Exhibits 1, 3, and 4 to the proposed Preliminary Approval Order would satisfy due process, the federal rules, and the PSLRA. Rule 23(c)(2)(B) requires notice of the pendency of a class action and settlement to be "the best notice that is practicable under the circumstances." It must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Due process is satisfied if the notice "fairly apprise[s] the [prospective] members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores, Inc.* 396 F.3d at 114.

Under Federal Rule of Civil Procedure 23(e)(1), "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). Lead Counsel proposes to provide notice by: (i) individual mailing of the Postcard Notice to all Settlement Class Members who can reasonably be identified and located, using mailing records obtained from Estée Lauder's transfer agent, as well as information provided by

third party banks, brokers, and other nominees about their customers; (ii) emailing of the Postcard Notice or link (to the extent emails are provided to the Claims Administrator); (iii) publication of the Summary Notice in *The Wall Street Journal,* as well as dissemination of the Summary Notice on the internet using *PR Newswire*; and (iv) posting documents on a website established for the Settlement, from which copies of the long-form Notice and Claim Form can be downloaded and claims can be completed using an online portal. *See* Exhibits A-1 to A-4 to the proposed Preliminary Approval Order. The Claims Administrator will also mail the long-form Notice and Claim Form upon request. The Postcard Notice will provide key information regarding the Settlement and the rights of Settlement Class Members in connection therewith, and will direct recipients to the website for more detailed information. Numerous courts have approved similar notice programs. *See, e.g., In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. at 182 n.3 ("The use of a combination of a mailed post card directing class members to a more detailed online notice has been approved by courts."); *In re Blue Apron Holdings, Inc. Sec. Litig.*, 2021 WL 345790, at *3-4 (E.D.N.Y. Feb. 1, 2021) (notice included emailed summary notice, mailed postcard notice, disseminating summary notice, and website).

Collectively, the proposed forms of notice here describe, *inter alia*: (i) the terms of the Settlement and the recovery; (ii) the reasons for the Settlement; (iii) the maximum attorneys' fees and expenses that may be sought (including the information required by LR 23.1); (iv) the procedures for requesting exclusion from the Settlement Class and objecting; (v) the procedure for submitting a Claim Form; (vi) the proposed Plan of Allocation for distributing the settlement proceeds to the Settlement Class; and (vii) the date, time, and place of the Settlement Hearing (which can be held in-person or remotely, in the Court's discretion). The long form Notice also satisfies the PSLRA's separate disclosure requirements by, *inter alia,* stating: (i) the amount of the

Settlement determined in the aggregate and on an average per share basis; (ii) that the Parties do not agree on the amount of damages that would be recoverable in the event Lead Plaintiffs prevailed; (iii) that Lead Counsel intends to make an application for attorneys' fees and expenses; (iv) the names, telephone numbers, and addresses of Lead Counsel; and (v) the reasons why the Parties are proposing the Settlement. 15 U.S.C. §78u-4(a)(7)(A)-(F).

Lead Plaintiffs also request that the Court appoint Epiq as the Claims Administrator to provide all notices approved by the Court, to process Claim Forms, and to administer the Settlement. Epiq is a nationally recognized notice and claims administration firm that has successfully and efficiently administered numerous complex securities class action settlements. *See* https://www.epiqglobal.com/en-us/services/class-action-mass-tort/class-actionadministration /claims-administration (last accessed May 7, 2026); Exhibit 5. Epiq was chosen after a competitive bidding process.

## IV.     PROPOSED SCHEDULE OF SETTLEMENT-RELATED EVENTS

Lead Plaintiffs respectfully propose the following schedule for Settlement-related events. The proposed schedule revolves around the date that the Court enters the Preliminary Approval Order and the date on which the Court schedules the final Settlement Hearing—which Lead Plaintiffs request be approximately 100 days from the date of this motion, in order to allow time for the notices to be disseminated and for recipients of the notices to act.

| Event | Proposed Timing |
|---|---|
| Deadline for commencement of mailing the Postcard Notice | *No later than 10 business days after entry of Preliminary Approval Order ("Notice Date")* |
| Deadline for publishing the Summary Notice | *Within 14 calendar days of the Notice Date.* |
| Deadline for filing motions in support of final approval of the Settlement, Plan of Allocation, and Lead Counsel's application for attorneys' fees and expenses | *No later than 35 calendar days before the Settlement Hearing.* |

24

| Deadline for receipt of requests for exclusion or objections | *Received no later than 21 calendar days before the Settlement Hearing.* |
| --- | --- |
| Deadline for filing reply papers | *No later than 7 calendar days before the Settlement Hearing.* |
| Deadline for submitting Claim Forms | *No later than 15 calendar days before the Settlement Hearing.* |
| Settlement Hearing | *At the Court's convenience, approximately 100 days from the filing of this motion. The hearing may be held either in-person or remotely, in the discretion of the Court. Any scheduling updates will be posted on the Settlement website and Lead Counsel's website.* |

## <u>CONCLUSION</u>

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court enter the proposed Preliminary Approval Order, submitted herewith, which will: (i) preliminarily approve the Settlement; (ii) approve the proposed manner and forms of notice to the Settlement Class; (iii) appoint Epiq as Claims Administrator; (iv) set a date and time for the Settlement Hearing to consider final approval of the Settlement and related matters, and grant such other and further relief as may be required.

DATED: May 7, 2026

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

*/s/ Michael P. Canty*
Michael P. Canty
James T. Christie
Jacqueline R. Meyers
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Email: mcanty@labaton.com
         jchristie@labaton.com

jmeyers@labaton.com

*Lead Counsel for Lead Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, Wayne County Employees' Retirement System, and the Proposed Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Thomas C. Michaud
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Email:   tmichaud@vmtlaw.com

*Additional Counsel for Lead Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System*

26

## CERTIFICATION OF WORD-COUNT COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the 8,750 word limit set forth in Local Civil Rule 7.1(c). The word count, exclusive of the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, is 7,773 words according to the word-processing system used to prepare the document.

Dated: May 7, 2026

/s/ *Michael P. Canty*
MICHAEL P. CANTY

27

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

/s/ *Michael P. Canty*
MICHAEL P. CANTY