**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE THE ESTÉE LAUDER CO., INC. SECURITIES LITIGATION | Civil Action No. 1:23-cv-10669-AS<br>Hon. Arun Subramanian |

# MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1

PRELIMINARY APPROVAL AND THE NOTICE PROGRAM .......... 3

ARGUMENT .......... 5

I. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL .......... 5

A. The Law Favors and Encourages Settlement of Class Action Litigation .......... 5

B. The Standards for Final Approval .......... 5

1. Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class .......... 7

2. The Settlement Was Reached After Arm's-Length Negotiations .......... 9

3. The Relief Provided by the Settlement Is Adequate .......... 11

(a) The Complexity, Costs, Risks, and Likely Duration of the Litigation Support Approval of the Settlement .......... 12

(b) The Effective Process for Distributing Relief to the Settlement Class .......... 18

(c) The Requested Attorneys' Fees and Expenses Are Reasonable .......... 20

4. Application of the Remaining *Grinnell* Factors Supports Approval .......... 20

(a) The Ability of Defendants to Withstand a Greater Judgment .......... 20

(b) The Reaction of the Settlement Class to Date .......... 20

(c) The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement .......... 21

(d) The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and Attendant Risks of Litigation .......... 22

II. THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED .......... 23

III. THE COURT SHOULD FINALLY CERTIFY THE SETTLEMENT CLASS .......... 24

IV. NOTICE SATISFIED RULE 23 AND DUE PROCESS ............................................. 25

CONCLUSION ............................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................15

*In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012)....................10, 12, 20, 23

*Christine Asia Co. Ltd. v. Yun Ma*,
2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019)....................6

*In re Citigroup Inc. Sec. Litig.*,
2014 WL 2112136 (S.D.N.Y. May 20, 2014)....................5

*City of Providence v. Aeropostale Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014)....................9

*Comcast Corp. v Behrend*,
569 U.S. 27 (2013)....................16

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....................16

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015), *aff'd sub nom.*
*In re Facebook, Inc.*, 674 F. App'x. 37 (2d Cir. 2016)....................12, 18

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)....................22, 23

*In re Giant Interactive Grp. Sec. Litig.*,
279 F.R.D. 151 (S.D.N.Y. 2011)....................24

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021)....................15

*In re Grab Holdings Ltd. Sec. Litig.*,
2025 WL 1413515 (S.D.N.Y. May 15, 2025)....................25

*In re IMAX Sec. Litig.*,
283 F.R.D. 178 (S.D.N.Y. 2012)....................22, 23, 24

*In re Initial Pub. Offering Sec. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009)....................12, 23

*Moses v. N.Y. Times Co.*,
79 F.4th 235 (2d Cir. 2023) ....................7

*Newman v. Stein*,
464 F.2d 689 (2d Cir. 1972)....................22

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*,
117 F.3d 721 (2d Cir. 1997)....................22, 24

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
330 F.R.D. 11 (E.D.N.Y. 2019) ....................7, 11

*Pearlstein v. BlackBerry Ltd.*,
2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022)....................12

*In re Polaroid ERISA Litig.*,
240 F.R.D. 65 (S.D.N.Y. 2006) ....................9

*Puddu v. 6D Glob. Techs., Inc.*,
2021 WL 1910656 (S.D.N.Y. May 12, 2021) ....................21

*Rodriguez v. CPI Aerostructures, Inc.*,
2023 WL 2184496 (E.D.N.Y. Feb. 16, 2023)....................25

*Rosi v. Aclaris Therapeutics, Inc.*,
2021 WL 5847420 (S.D.N.Y. Dec. 9, 2021) ....................5

*In re Signet Jewelers Ltd. Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2010) ....................9, 10, 12, 21

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
258 F. Supp. 2d 254 (S.D.N.Y. 2003)....................14

*Tchrs. Ret. Sys. of La. v. A.C.L.N. Ltd.*,
2004 WL 1087261 (S.D.N.Y. May 14, 2004) ....................22

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008)....................13, 18

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
2025 WL 2984717 (S.D.N.Y. Oct. 23, 2025) ....................7

*In re Veeco Instruments Inc. Sec. Litig.*,
2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ....................9, 20

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005)....................5, 25

*In re Warner Chilcott Ltd. Sec. Litig.*,
2009 WL 2025160 (S.D.N.Y. July 10, 2009) ..........21

*Yang v. Focus Media Holding Ltd.*,
2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ..........10

**Docketed Cases**

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
No. 1:20-CV-09568 (S.D.N.Y. Mar. 27, 2025) ..........23

*In re Teva Sec. Litig.*,
No. 3:17-cv-00558 (D. Conn. Jun. 2, 2022) ..........23

**Rules**

Rule 23(c)(2)(B) ..........26

Rule 23(e) ..........25

Rule 23(e)(2) ..........5

Rule 23(e)(2) Advisory Comm. Notes to 2018 Amendments ..........7

Rule 23(e)(2)(A) ..........7

Rule 23(e)(2)(B) ..........9

Rule 23(e)(2)(C) ..........11

Rule 23(e)(2)(C)(ii) ..........18

Lead Plaintiffs Macomb County Employees' Retirement System ("Macomb County ERS"), Macomb County Retiree Health Care Fund ("Macomb County RHC"), and Wayne County Employees' Retirement System ("Wayne County ERS") (collectively, "Lead Plaintiffs" or the "Michigan Funds"), on behalf of themselves and the other members of the proposed Settlement Class, respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 23, for: (i) final approval of the proposed Settlement of the above-captioned class action (the "Action") pursuant to the terms of the Stipulation and Agreement of Settlement, dated May 6, 2026 (the "Stipulation"; ECF No. 114-1); (ii) approval of the proposed Plan of Allocation for distribution of the Net Settlement Fund; and (iii) final certification of the Settlement Class.[1]

## PRELIMINARY STATEMENT

If approved, the proposed Settlement will provide a recovery of $210,000,000 in cash to resolve this securities class action, pending against defendants The Estée Lauder Companies Inc. ("Estée Lauder," "ELC," or the "Company"); and Fabrizio Freda and Tracey T. Travis (the "Individual Defendants" and, together with Estée Lauder, "Defendants"). The terms of the proposed Settlement are set forth in the Stipulation, which was entered into by Lead Plaintiffs and Defendants.

The Settlement is a very favorable result for the Settlement Class. It is within the ***top 100*** securities class action settlements of all time.[2] Additionally, it is ***12 times greater*** than the median

[1] All capitalized terms used in this memorandum that are not defined have the same meanings as in the Stipulation. Unless otherwise noted, citations and internal quotations have been omitted.

[2] *See The Top 100 U.S. Class Action Settlements of All Time* (ISS/SCAS Dec. 31, 2025) at 13, attached to the Declaration of Michael P. Canty, dated July 16, 2026 ("Canty Decl.") as Ex. 3, filed herewith. All exhibits referenced herein are annexed to the Canty Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ -__." The first numerical reference is to the designation of the entire exhibit attached to the Canty Declaration and the second alphabetical reference is to the exhibit designation within the exhibit itself.

reported recovery in securities class actions in 2025, which was $17.3 million.[3] As described below and in the accompanying Canty Declaration,[4] had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all, particularly in light of the possibility that the Court would, as a matter of law, credit Defendants' arguments that the alleged misstatements were not materially false, their views regarding a lack of price impact, or find that the alleged corrective disclosures did not cause the losses for which Lead Plaintiffs seek to recover. In choosing to settle at this time, Lead Plaintiffs and Lead Counsel took into consideration the substantial challenges associated with advancing the claims through a highly contested class certification process, summary judgment, and trial, as well as the duration and complexity of the legal proceedings that remained ahead.

The decision to settle was informed by a well-developed understanding of the strengths and weaknesses of the claims. Lead Plaintiffs litigated the Action with the utmost persistence and tenacity and were prepared to litigate their claims to trial. Lead Counsel conducted a rigorous investigation of the claims at issue, including contacting 33 former employees of Estée Lauder to discuss the issues related to the Action (three of whom provided information used in the Complaint and were cited as former employees or "FEs" in the Complaint), and working with an international outside investigation firm; prepared a detailed consolidated amended complaint; opposed a motion to dismiss the amended complaint; engaged in fact discovery—including the review and analysis

[3] *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2025 Review and Analysis* (Cornerstone Research 2026), Ex. 4 at 1.

[4] The Canty Declaration is an integral part of this submission and, for the sake of brevity in this motion and memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the litigation efforts; the negotiations leading to the Settlement; and the risks and uncertainties of continued litigation, among other things. Citations to "¶" in this memorandum refer to paragraphs of the Canty Declaration.

of approximately 560,000 pages of documents from Defendants and third parties and participation in five depositions; moved for certification of the class; consulted with experts in the fields of loss causation and damages, and engaged in arm's-length negotiations with a highly regarded Mediator. *See* Canty Decl., Sections III.-V.

Additionally, the Settlement has the full support of Lead Plaintiffs, sophisticated institutional investors that were actively involved throughout the litigation, diligently representing the Settlement Class. *See* Declaration of Mark F. Deldin and Harold Haugh on behalf of Macomb County Employees' Retirement System and Macomb County Retiree Health Care Fund, Ex. 1; and Declaration of Gerard Grysko on behalf of Wayne County Employees' Retirement System, Ex. 2.

The proposed Plan of Allocation for the distribution of the proceeds of the Settlement was developed with Lead Plaintiffs' damages expert and is a fair and reasonable method for distributing the Net Settlement Fund to eligible Claimants and should also be approved by the Court.

Given the foregoing considerations and the factors addressed below, Lead Plaintiffs respectfully submit that: (i) the Settlement meets the standards for final approval under Rule 23(e)(2) and is a fair, reasonable, and adequate result for the Settlement Class; (ii) the Plan of Allocation is a fair and reasonable method for allocating the Net Settlement Fund to Settlement Class Members who submit valid Claim Forms; and (iii) the Settlement Class should be finally certified, pursuant to Rule 23(a) and (b)(3).

## PRELIMINARY APPROVAL AND THE NOTICE PROGRAM

By order dated May 13, 2026, the Court preliminarily approved the Settlement, preliminarily certified the Settlement Class, and approved the forms and methods of providing

notice to the Settlement Class. ECF No. 115.[5] Pursuant to, and in compliance with, the Preliminary Approval Order, beginning on May 28, 2026 the Court-appointed Claims Administrator Epiq Class Action & Claims Solutions ("Epiq"), caused the Postcard Notice to be disseminated to potential Settlement Class Members and banks, brokers, and other nominees ("Nominees"). *See* Declaration of Melissa Mejia Regarding (A) Dissemination of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion, dated July 15, 2026 ("Mailing Decl."), Ex. 5 at ¶¶3-13. To date, a total of 1,090,299 Postcard Notices (or links to the Postcard Notice) have been mailed (or emailed). *Id*. at ¶13. On June 8, 2026, the Summary Notice was published in *The Wall Street Journal* and disseminated over the internet using *PR Newswire*. *Id*. at ¶14.

The Claim Form, Postcard Notice, and the long-form Notice, along with the Stipulation and other Settlement related documents, were posted on a website for the Settlement established by Epiq. *Id*. at ¶¶15-17. The website also provides important dates and deadlines in connection with the Settlement. *Id*. Copies of the Stipulation, Postcard Notice, long-form Notice, and Claim Form are also available on Lead Counsel's website, www.labaton.com. ¶116.

To date, reaction to the Settlement has been very positive. While the deadline (July 30, 2026) for objecting and seeking exclusion has not yet passed, there have been no objections to the Settlement and no requests for exclusion. Should any be received, Lead Plaintiffs will address them in their reply papers, which are due to be filed with the Court on August 13, 2026. Additionally, nothing has occurred to date to impact the Court's provisional certification of the Settlement Class.

[5] In the Preliminary Approval Order, the Court provisionally certified the proposed Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3). Nothing has occurred to alter the propriety of that determination.

## ARGUMENT

### I. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL

#### A. The Law Favors and Encourages Settlement of Class Action Litigation

Public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'"). *See also Rosi v. Aclaris Therapeutics, Inc.,* 2021 WL 5847420, at *8 (S.D.N.Y. Dec. 9, 2021) ("[c]ourts have recognized a public policy benefit in rewarding attorneys that bring successful securities actions that foster the enforcement of the federal securities laws"). This policy would be well-served by approval of the Settlement of this securities class action, which, absent resolution, could consume years of additional resources of this Court and, likely, the Court of Appeals for the Second Circuit.

#### B. The Standards for Final Approval

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be presented to the Court for approval. The Settlement should be approved if the Court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In ruling on final approval of a class settlement, courts in the Second Circuit have held that a court should examine both the negotiating process leading to the settlement and the settlement's substantive terms. *See Wal-Mart Stores*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig*., 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014).

Rule 23(e)(2) provides that a court may approve a class settlement as "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

i. the costs, risks, and delay of trial and appeal;

ii. the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

iii. the terms of any proposed award of attorneys' fees, including timing of payment; and

iv. any agreement required to be identified under Rule 23(e)(3);[6] and

(D) the proposal treats class members equitably relative to each other.

Rule 23, as amended in December 2018, has not changed the established overall standard for approving a proposed class action settlement, *i.e.*, evaluating whether it is fair, adequate, and reasonable. Fed R. Civ. P. 23(e)(2). In *City of Detroit v. Grinnell Corp*., which predates the Rule 23 amendments, the Second Circuit held that the following factors should be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

[6] The Parties executed their Term Sheet on April 2, 2026, and on May 6, 2026 they executed the Stipulation and the Confidential Supplemental Agreement Regarding Requests for Exclusion (the "Supplemental Agreement"). The Supplemental Agreement sets forth the conditions under which Estée Lauder has the option to terminate the Settlement in the event that requests for exclusion from the Settlement Class exceed a certain agreed-upon threshold. As is standard in securities class actions, the agreement is kept confidential in order to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging a larger individual payment. *See Christine Asia Co. Ltd. v. Yun Ma,* 2019 WL 5257534, at *15 (S.D.N.Y. Oct. 16, 2019). The Supplemental Agreement, Stipulation, and Term Sheet are the only agreements concerning the Settlement entered into by the Parties.

495 F.2d 448, 463 (2d Cir. 1974).

The Advisory Committee Notes to the 2018 amendments to Rule 23 indicate that the Rule 23(e) factors are not intended to "displace" any factor previously adopted by the Second Circuit, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) Advisory Comm. Notes to 2018 Amendments. Indeed, "[t]he Court understands the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*., 330 F.R.D. 11, 29 (E.D.N.Y. 2019); *Moses v. N.Y. Times Co.*, 79 F.4th 235, 243 (2d Cir. 2023) ("Rule 23(e)(2) does not displace our traditional *Grinnell* factors, which remain a useful framework for considering the substantive fairness of a settlement.); *see also In re Turquoise Hill Res. Ltd. Sec. Litig*., 2025 WL 2984717, at *5 (S.D.N.Y. Oct. 23, 2025) ("Most of the requirements set forth in the amendments to Rule 23(e)(2) have long been incorporated in the nine-factor test adopted by the Second Circuit in [*Grinnell*]."). Accordingly, Lead Plaintiffs will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the Rule 23(e)(2) factors and will also discuss the application of relevant, non-duplicative factors traditionally considered by the Second Circuit.

### 1. Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class action settlement, a court must consider whether the "class representatives and class counsel have adequately represented the class." Rule 23(e)(2)(A). Lead Plaintiffs vigorously litigated the claims in the Action, and the Settlement was achieved only after thorough, arm's-length, and mediated negotiations between counsel with considerable knowledge and expertise in the field of federal securities law.

From the outset of this litigation, Lead Plaintiffs, in consultation with Lead Counsel, diligently pursued this case on behalf of the class. Indeed, Lead Plaintiffs were the only institutional investors that sought to be appointed as lead plaintiffs in this matter. *See* ECF Nos. 21, 23, and 28. Given the damages at stake in this litigation and the absence of other institutional investors seeking appointment, Lead Plaintiffs' pursuit of the class's claims is noteworthy. As Lead Plaintiffs explained in their motion seeking lead plaintiff appointment, as institutional investors, they not only had the largest financial stake in the outcome of the litigation of all movants, but they were more apt to effectively manage this complex and nuanced securities litigation. *See* ECF No. 24 at 9-12. Without Lead Plaintiffs' efforts to serve as lead, the class's claims may not have been subject to the robust investigation, prosecution, and oversight that Lead Plaintiffs have brought to the table over the past two and a half years. Together with Lead Counsel, Lead Plaintiffs spearheaded a thorough investigation on behalf of all class members to ensure that the class would receive the best possible representation and results. *See* Canty Decl., Sections III.-V.

For instance, Lead Plaintiffs, among other things: reviewed and monitored the progress of the litigation and regularly conferred with Lead Counsel concerning its prosecution; reviewed periodic updates and other correspondence from Lead Counsel, including material pleadings and court filings; responded to discovery requests and produced documents pursuant to the discovery demands propounded by Defendants, ultimately producing approximately 3,700 documents (122,000 pages) to Defendants. A representative from Wayne County ERS and a representative from both Macomb County ERS and Macomb County RHC sat for a deposition in connection with class certification. Additionally, representatives of Lead Plaintiffs attended the mediation sessions and played key roles in the negotiations to achieve a settlement. *See generally* Exs. 1 & 2.

Lead Plaintiffs, like all other members of the Settlement Class, purchased or otherwise acquired Estée Lauder publicly traded common stock during the Class Period and were allegedly damaged thereby. Thus, the claims of the Settlement Class and Lead Plaintiffs would prevail or fail in unison, and the common objective of maximizing recovery from Defendants aligns the interests of Lead Plaintiffs and all members of the Settlement Class. *See, e.g., In re Polaroid ERISA Litig*., 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members."). Additionally, because Lead Plaintiffs are sophisticated institutional investors that took an active role in supervising the litigation, as envisioned by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and endorse the Settlement, the Settlement is "entitled to an even greater presumption of reasonableness." *In re Veeco Instruments Inc. Sec. Litig*., 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

Throughout the Action, Lead Plaintiffs had the benefit of the advice of knowledgeable counsel well-versed in shareholder class action litigation. Labaton Keller Sucharow LLP ("Labaton") is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 9-C) and was able to conduct the litigation successfully against skilled opposing counsel. Courts give "great weight" to the opinion of experienced and informed counsel. *In re Signet Jewelers Ltd. Sec. Litig*., 2020 WL 4196468, at *4 (S.D.N.Y. July 21, 2010); *City of Providence v. Aeropostale Inc.*, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014).

Accordingly, the Settlement Class has been, and remains, well represented.

### 2. The Settlement Was Reached After Arm's-Length Negotiations

In weighing approval of a class-action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). "Courts have traditionally considered other related circumstances in determining the 'procedural' fairness of a settlement,

including: (i) counsel's understanding of the strengths and weakness of the case based on factors such as the stage of the proceedings and the amount of discovery completed, (ii) the absence of any indication of collusion in the settlement negotiations, and (iii) a mediator's involvement in the negotiations." *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *3.

As noted above, the Parties and their counsel were well informed about the strengths and weaknesses of the case before agreeing to settle. *See* Canty Decl., Sections III.-VI. Among other things, Lead Counsel: conducted a rigorous international investigation of the claims at issue, including interviewing 33 former employees of Estée Lauder and consulting with experts; prepared a detailed consolidated amended complaint; opposed a motion to dismiss the amended complaint; engaged in fact discovery—including the review and analysis of approximately 560,000 pages of documents from Defendants and third parties and participation in five depositions; and moved for certification of the class. *See* Canty Decl., Sections III.-IV.

Furthermore, the proposed Settlement was achieved following three separate mediation sessions before the Honorable Layn Phillips (Ret.) of Phillips ADR Enterprises (the "Mediator"), a highly regarded and experienced mediator. *See* Canty Decl., Section V. Indeed, courts have long recognized the importance of arm's-length negotiations in connection with a settlement. *See, e.g.*, *In re Bear Stearns Cos., Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (finding a settlement fair where the parties engaged in "arm's length negotiations," including mediation before an experienced and well-regarded mediator of complex securities cases); *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) (participation of highly qualified mediator "strongly supports a finding that negotiations were conducted at arm's length and without collusion").

The first mediation was held in person on December 4, 2025. In advance of that session, the Parties submitted detailed confidential mediation statements and replies, together with numerous supporting exhibits to the Mediator, the Mediator's team, and each other, which addressed both liability and damages issues. The Parties did not resolve the Action at the December 4 mediation session. ¶74. On January 27, 2026, the Parties participated in a half-day, virtual mediation session before the Mediator. In advance of the session, the Parties held separate virtual discussions with the Mediator's team. However, the session ended without any settlement being reached. ¶75. The Parties continued discussions with the Mediator and, on March 17, 2026, the Parties participated in another full-day, in-person mediation session before the Mediator. In advance of the session, the Parties held separate virtual discussions with the Mediator's team. The session again ended without any settlement being reached, however the Parties continued discussions with the Mediator. ¶76.

On March 23, 2026, the Mediator sent the Parties a mediator's recommendation for settlement, which the Parties accepted on April 1, 2026. ¶77. A Term Sheet was executed on April 2, 2026, and the Parties subsequently negotiated the Stipulation, which sets forth the final terms and conditions of the Settlement. ¶¶77-80. The negotiations were at all times at arm's-length and have produced a result that is in the best interests of the Settlement Class.

### 3. The Relief Provided by the Settlement Is Adequate

The Court must consider whether "the relief provided for the class is adequate, taking into account … the costs, risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C). This assessment implicates several *Grinnell* factors, including: "(i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability; (iii) the risks of establishing damages; and (iv) the risks of maintaining the class through the trial." *In re Payment Card Interchange Fee*, 330 F.R.D. at 36.

### (a) The Complexity, Costs, Risks, and Likely Duration of the Litigation Support Approval of the Settlement

Securities class actions like this one are by their nature highly complex, and district courts have long recognized that "[a]s a general rule, securities class actions are notably difficult and notoriously uncertain to litigate." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015), *aff'd sub nom. In re Facebook, Inc.*, 674 F. App'x. 37 (2d Cir. 2016); *In re Bear Stearns*, 909 F. Supp. 2d at 266; *In re Signet Jewelers Ltd. Sec. Litig.,* 2020 WL 4196468, at *4 ("[I]n evaluating the settlement of a securities class action, federal courts, 'have long recognized that such litigation is notably difficult and notoriously uncertain.'"). "Accordingly, '[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *Pearlstein v. BlackBerry Ltd.*, 2022 WL 4554858, at *3 (S.D.N.Y. Sept. 29, 2022).

As detailed in the Canty Declaration, completing fact and expert discovery, certifying a class and maintaining certification, prevailing in connection with summary judgment challenges, and then achieving a litigated verdict (and sustaining any such verdict on appeal) would have been difficult and uncertain undertakings. *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 481 (S.D.N.Y. 2009) (finding that the complexity, expense, and duration of continued litigation support final approval where, among other things "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable"). Significantly, this case also would have confronted legal issues and difficulties related to the international aspects of Estée Lauder's business—such as the fact that its travel retail headquarters are in Europe and the prevalence of *daigou* across the Asia-Pacific ("APAC") region, including China and South Korea. ¶¶134-35.

Trial of the claims would have required extensive expert testimony on issues related to falsity, materiality, achieving and maintaining class certification, and proving damages. Courts

regularly observe that these sorts of disputes—requiring dueling testimony from experts—are particularly difficult for plaintiffs to litigate. *See*, *e.g.*, *In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in a "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited …").

In assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463. In most cases, this will be the most important factor for a court to consider in its analysis of a proposed settlement. *See id*. at 455 ("The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement."). As discussed below, Lead Plaintiffs faced significant challenges with respect to establishing falsity, materiality, scienter, and loss causation—to sustain the securities fraud claims through class certification, summary judgment, and trial.

**(i) Risks Related to Proving Liability: Material Falsity**

To prevail on the Section 10(b) and Rule 10b-5 claims, Lead Plaintiffs bore the burden of proving that each of the nine challenged statements was materially false or misleading when made. The challenged statements concerned the sources of Estée Lauder's purported success in its Travel Retail business segment and the Company's allegedly undisclosed reliance on *daigou* to drive sales. Among other things, at summary judgment and trial, Defendants would have likely argued that no investor could have been misled by Defendants' alleged omissions about *daigou* when they knew about its existence all along. For example, Defendants would have undoubtedly strenuously argued that the market had at least some knowledge about the Company's reliance on *daigou*, as evidenced by market analysis and industry publications about the proliferation of *daigou* during and in the wake of the COVID-19 pandemic. Defendants have already, and would continue to, put forward multiple experts to opine on *daigou*, investors' understanding of *daigou*, and *daigou*-

related regulations. *See* ECF Nos. 104, 105. Specifically, Defendants vigorously adhered to the position that *daigou* was a "widespread and well-known practice" that was regularly discussed among analysts and "not inherently illegal or improper." *See* ECF No. 104 at 4-5; ¶¶87-91.

**(ii) Risks to Proving Scienter**

Defendants would likely have argued that they could not have knowingly or recklessly misled the market by failing to disclose Estée Lauder's reliance on *daigou* when they genuinely believed that the market was aware of the Company's *daigou* exposure based on the market and industry publications available at the time. Defendants also would have likely argued that the alleged false statements touting the success of the Travel Retail segment and sales in the APAC region were literally true and that there was no duty to disclose the existence of *daigou* to counteract any allegedly false impression made by those statements because Estée Lauder's exposure to *daigou* was already known to investors—thereby undercutting any inference that Defendants acted with scienter. Defendants would have also continued to argue, as Estée Lauder's 30(b)(6) deponent testified, that *daigou* was a consumer behavior that the Company could not control, much less knowingly or recklessly mislead the market about. ¶¶92-95.

While Lead Plaintiffs and Lead Counsel believe they would have been able to develop strong counter arguments during discovery, even if Lead Plaintiffs prevailed at summary judgment and then trial, it is virtually certain that appeals would be taken, which would have, at best, delayed any recovery. *See, e.g., Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would, in light of the time value of money, make future recoveries less valuable than this current recovery").

**(iii) Risks Regarding Class Certification**

Lead Plaintiffs' motion for class certification was pending when the Parties agreed to settle. Defendants had opposed Lead Plaintiffs' motion and Lead Plaintiffs were preparing to submit their reply. ¶96. In opposing certification, Defendants relied on the Supreme Court's decision in *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys*., 594 U.S. 113, 123 (2021) ("*Goldman I*") and its "mismatch" framework to rebut the presumption of class-wide reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). As the Supreme Court explained in *Goldman I*, where plaintiffs rely on an indirect inference of price impact—*i.e.*, inferring that a back-end stock price decline after a corrective disclosure demonstrates that a front-end misstatement impacted the stock price—that inference "break[s] down" when there is a "mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman I*, 594 U.S. at 123; ¶98.

According to Defendants, Lead Plaintiffs could not prove price impact with respect to certain claims because there was a "mismatch" between the alleged misstatements and the allegedly corrective disclosures in the Complaint. *See* ECF No. 104 at 9-10. Specifically, Defendants argued that the first three allegedly corrective disclosures on November 2, 2022, February 2, 2023, and May 3, 2023 did not mention the word or even concept of *daigou*, and instead attributed the Company's poor financial performance in the Travel Retail segment and APAC region to factors that were unrelated to the practice. Had Defendants prevailed on their mismatch argument, the results would have significantly reduced the class's potential recovery. ¶99.

While Lead Plaintiffs believe their arguments would ultimately have prevailed, the *Goldman I* mismatch analysis is a relatively new and evolving area of law, and several post-*Goldman I* decisions in other circuits have granted defendants substantial relief on similar arguments. Defendants also signaled their intention to seek interlocutory appeal under Rule 23(f)

if the Court certified the full class period, which would have served to delay the case for more than a year. Even if Lead Plaintiffs prevailed at class certification and on appeal, Defendants also indicated they would continue pressing the mismatch issue at summary judgment and trial, where the burden of proving loss causation shifts squarely to Lead Plaintiffs. ¶¶102-103.

Additionally, Defendants also opposed class certification by arguing that Lead Plaintiffs could not show that "damages are capable of measurement on a classwide basis" pursuant to *Comcast Corp. v Behrend*, 569 U.S. 27, 35 (2013). Defendants argued that Lead Plaintiffs' expert's model failed "to offer a tangible method to isolate the incremental loss attributable to the disclosure of a previously concealed illegal *daigou* reliance risk" and "to disaggregate confounding information" such as the COVID-19 pandemic. ECF No. 104 at 18-19. Under Defendants' theory, class certification could not be granted under *Comcast*. Defendants' challenges under *Comcast*, if successful, could have thwarted class certification or, if pursued on appeal, posed a great risk of delay, uncertainty, and expense to the class. ¶104

**(iv) Risks Related to Proving Loss Causation and Damages**

After overcoming the hurdles involved in proving material falsity and scienter with respect to the alleged misstatements, and maintaining certification through trial, Lead Plaintiffs and the class faced ongoing challenges and uncertainty with respect to proving loss causation and damages. ¶¶105-112; *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'").

Defendants raised serious arguments that Lead Plaintiffs cannot show that the stock price declines following each alleged corrective disclosure were attributable to the alleged fraud. And, similar to the arguments Defendants advanced in opposing class certification, Defendants would have likely argued that statements regarding the success of the travel retail and APAC segments

that omitted the Company's reliance on *daigou* could not have been corrected by disclosures that also did not mention the company's reliance on *daigou*, grey market behavior, or other related concepts. ¶106.

Lead Plaintiffs' consulting damages expert estimated that maximum damages attributable to all five allegedly corrective disclosures was approximately $4.6 billion, depending on the trading model and assumptions used. However, if Defendants were successful in challenging the first three corrective disclosures and only the August 18, 2023 and November 1, 2023 corrective disclosures were found to be actionable, aggregate damages would have decreased to approximately $1.9 billion. ¶108.

Disaggregating damages to exclude non-fraud related information (such as COVID-19) presented yet another obstacle. The estimates provided above do not disaggregate confounding information that was released on the corrective disclosure days, which would further reduce damages to between $4.2 billion (for all five alleged corrective disclosure dates) and $1.85 billion (if only the August 18, 2023 and November 1, 2023 corrective disclosure dates remain), based on Lead Plaintiffs' damages expert's methodology. Moreover, Defendants likely would have continued to argue at summary judgment and trial that Lead Plaintiffs were required to perform a far more in-depth disaggregation analysis to account for a more substantial number of confounding factors that purportedly impacted Estée Lauder's stock price. Defendants argued that for certain corrective disclosures, Lead Plaintiffs would need to disaggregate more than 50% of the alleged stock price decline. If Defendants were successful in advancing such arguments, damages would be substantially reduced.[7] The Settlement, therefore, recovers a range of approximately 4.6% of

[7] With respect to additional potential corrective disclosures between May 1, 2024 and February 4, 2025 that Lead Plaintiffs could have pled, there were significant challenges with respect to a

estimated maximum damages to 5%-11.4% of more conservatively estimated damages. ¶¶109-110.

Defendants would have put forth well-qualified experts of their own to show that damages were significantly less. As courts have long recognized, the substantial uncertainty as to which side's experts might be credited by a jury presents a serious litigation risk. *See Telik,* 576 F. Supp. 2d at 579-80 (in this "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found…"); *Facebook*, 2015 WL 6971424, at *5 ("[D]amages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount Plaintiffs' losses. Under such circumstances, a settlement is generally favored over continued litigation.").

**(b) The Effective Process for Distributing Relief to the Settlement Class**

Rule 23(e)(2)(C)(ii) instructs courts to consider whether the relief provided to the class is adequate in light of the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Here, the proceeds of the Settlement will be distributed with the assistance of an experienced claims administrator, Epiq. The Claims Administrator will employ a well-tested protocol for the processing of claims in a securities class action. Namely, class members can submit, either by mail or online using the Claims

---

future recovery. For instance, the November 1, 2023 corrective disclosure pled in the Complaint allegedly revealed Estée Lauder's previously undisclosed reliance on *daigou*—the key fact underlying the alleged fraud. The additional disclosures, while compelling, were likely to have been challenged as immaterial given arguments that the truth was already known to the market and they were likely to be the subject of substantial disaggregation challenges that could have resulted in only a *de minimis* amount of damages on these dates. Amending the Complaint to include the disclosures would also have resulted in a renewed motion to dismiss and additional legal challenges at class certification. ¶110 fn 8.

Administrator's website, the Court-approved Claim Form. Based on the trade information provided by Claimants, the Claims Administrator will determine each Claimant's eligibility to recover by, among other things, calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation,[8] and ultimately determine each eligible Claimant's *pro rata* portion of the Net Settlement Fund. *See* Stipulation at ¶23; Ex. 5-B at ¶¶60-80. Lead Plaintiffs' claims will be reviewed in the same manner. Claimants will be notified of any defects or conditions of ineligibility and be given the chance to contest the rejection of their claims. Stipulation at ¶29(d)-(e). Any claim disputes that cannot be resolved will be presented to the Court. *Id.*

After the Settlement reaches its Effective Date (*id.* at ¶38) and the claims process is completed, Authorized Claimants will be issued payments. If there are unclaimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions. Thereafter, Lead Plaintiffs recommend that any *de minimis* balance that still remains in the Net Settlement Fund, after payment of any outstanding Notice and Administration Expenses, be contributed to the Consumer Federation of America ("CFA"), a non-sectarian, not-for-profit organization serving the public interest, or such other non-sectarian, not-for-profit organization approved by the Court. *Id.* at ¶26.[9]

[8] Approval of the Plan of Allocation is discussed in Section II., below.

[9] CFA is a non-profit, consumer advocacy organization established in 1968 to advance consumer interests through policy research, advocacy, and education. *See* www.consumerfed.org. With respect to victims of financial fraud, CFA has an Investor Protection program and an Investment Research Center that works nationwide to promote consumer-oriented policies that safeguard investors against fraud through: (i) the development of educational material for investors; (ii)

**(c) The Requested Attorneys' Fees and Expenses Are Reasonable**

As discussed in the accompanying Fee Memorandum, the requested attorneys' fees of 32% of the Settlement Fund, payable as ordered by the Court, and Litigation Expenses are reasonable in light of the recovery achieved, counsel's efforts, and the risks in the litigation. Most importantly, with respect to the Court's consideration of the fairness of the Settlement, neither Lead Plaintiffs nor Lead Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees and/or litigation expenses.

**4. Application of the Remaining *Grinnell* Factors Supports Approval**

**(a) The Ability of Defendants to Withstand a Greater Judgment**

While it is Lead Plaintiffs' understanding that Estée Lauder could withstand a judgment in excess of $210 million, courts generally do not find the ability of a defendant to withstand a greater judgment to be an impediment when the other factors favor the settlement. *See, e.g., Veeco*, 2007 WL 4115809, at *11 ("this factor alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied").

**(b) The Reaction of the Settlement Class to Date**

The reaction of a class to a proposed settlement is a significant factor in considering its fairness and adequacy. *See, e.g.*, *Bear Stearns*, 909 F. Supp. 2d at 266-67. Here, the Court-appointed Claims Administrator mailed Postcard Notices or emailed links to Postcard Notices to potential Settlement Class Members and their nominees. *See* Ex. 5 at ¶¶3-13. As of July 15, 2026, notice of the Settlement has been disseminated to 1,090,299 potential Settlement Class Members and nominees which includes mailed Postcard Notices and emailed links to the Postcard Notice.

---

drafting policies and legislation; (iii) and providing testimony and comments on legislation and regulations. *See* www.consumerfed.org/issues/investor-protection. CFA has been approved in numerous securities cases, including *Chen v. Missfresh Ltd.*, No. 22-cv-09836-JSR (S.D.N.Y.) and *ODS Capital LLC v. JA Solar Holdings Co. Ltd.*, No. 18-cv-12083 (S.D.N.Y.).

*Id*. at ¶13. In addition, on June 8, 2026, the Summary Notice was published in *The Wall Street Journal* and transmitted over the internet using *PRNewswire*. *Id*. at ¶14.

While the deadline set by the Court (July 30, 2026) has not yet passed, to date, no objections to the Settlement or requests for exclusion have been received. ¶13; Ex. 5 at ¶¶20-21; *see In re Warner Chilcott Ltd. Sec. Litig.*, 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009) (no class member objections since preliminary approval supported final approval). As provided in the Preliminary Approval Order, Lead Plaintiffs will file their reply papers no later than August 13, 2026 addressing any objections to the Settlement and any requests for exclusion.

**(c) The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement**

"[A] sufficient factual investigation must have been conducted to afford the Court the opportunity to 'intelligently make … an appraisal of the Settlement.'" *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1910656, at *4 (S.D.N.Y. May 12, 2021); *see also In re Signet Jewelers*, 2020 WL 4196468, at *7 ("When considering this *Grinnell* factor, the question is whether the parties . . . counsel possessed a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement.") (alteration in original).

Here, prior to agreeing to settle, Lead Counsel developed a full understanding of the facts of the case and merits of the claims through, among other things: a rigorous investigation, including interviewing 33 former employees of Estée Lauder, working with an international investigation firm, and consulting with experts in loss causation and damages; prepared a detailed consolidated amended complaint; opposed a motion to dismiss; engaged in fact discovery—including the review and analysis of approximately 560,000 pages of documents from Defendants and third parties and participation in five depositions; and moved for certification of the class. *See*

Canty Decl., Sections III.-IV. Additionally, the Parties participated in three formal mediation sessions before a highly experienced and respected neutral. *Id*. at Section V.

Armed with this substantial base of knowledge, Lead Plaintiffs were in a position to balance the proposed Settlement with a well-educated assessment of the likelihood of overcoming the risks of litigation. The fact that the Parties have not completed discovery does not weigh against approval of the Settlement. *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 190 (S.D.N.Y. 2012) ("The threshold necessary to render the decisions of counsel sufficiently well informed, however, is not an overly burdensome one to achieve—indeed, formal discovery need not have necessarily been undertaken yet by the parties.").

Accordingly, Lead Plaintiffs and Lead Counsel respectfully submit that they had "a clear view of the strengths and weaknesses of their case[]" and of the range of possible outcomes at trial. *Tchrs. Ret. Sys. of La. v. A.C.L.N. Ltd.*, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004).

#### (d) The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and Attendant Risks of Litigation

Courts typically analyze the last two *Grinnell* factors together, "consider[ing] and weigh[ing] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *20 (S.D.N.Y. Nov. 8, 2010). Courts agree that the determination of a "reasonable" settlement "is not susceptible [to] a mathematical equation yielding a particularized sum." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997). Instead, "in any case there is a range of reasonableness with respect to a settlement. . . ." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

As discussed above and in the Canty Declaration, the Settlement represents approximately 4.6% of estimated maximum damages and a range of 5%-11.4% of more conservatively estimated damages. These percentages compare favorably to similar court-approved securities settlements. *See, e.g.*, *In re Alibaba Grp. Holding Ltd. Sec. Litig.*, No. 1:20-CV-09568 (S.D.N.Y. Mar. 27, 2025), ECF No. 143 (final approval motion for $433.5 million settlement representing 3.73% of maximum damages) and slip op., ECF No. 151 (judgment approving settlement); *In re Teva Sec. Litig.*, No. 3:17-cv-00558 (D. Conn. Jun. 2, 2022), ECF No. 950-1 (final approval motion for $420 million settlement representing 3.4% recovery of maximum damages) and slip op., ECF No. 964 (judgment approving settlement).[10]

Moreover, the Settlement Amount is well above industry trends. It is within the ***top 100*** securities class action settlements of all time. Ex. 3 at 13. Additionally, it is ***12 times greater*** than the median reported recovery in securities class actions in 2025, which was $17.3 million. *See* Ex. 4 at 1.

In light of the circumstances before the Court, and all of the delay and uncertainty that would be inherent in continued litigation, the Settlement is an excellent result and falls squarely within the range of possible recoveries considered fair, reasonable, and adequate.

## II. THE PROPOSED PLAN OF ALLOCATION SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See IMAX*, 283 F.R.D. at 188-192; *Bear Stearns*, 909 F. Supp. 2d at 270. A plan of allocation with a "rational basis" satisfies this requirement. *FLAG Telecom*, 2010 WL 4537550, at *21; *Initial Pub. Offering*, 671 F. Supp. 2d at 497. A plan of allocation that

[10] Unreported slip opinions and related docketed items are submitted in a compendium to the Canty Declaration, Ex. 10.

reimburses class members based on the relative strength and value of their claims is reasonable. *See IMAX*, 283 F.R.D. at 192. However, a plan of allocation does not need to be tailored to fit each and every class member with "mathematical precision." *PaineWebber*, 171 F.R.D. at 133.

Here, the proposed Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among class members who submit valid claims. The Plan is set forth in full in the long-form Notice. *See* Ex. 5-B at ¶¶60-80. Epiq, as the Court-approved Claims Administrator, will determine each Claimant's Recognized Claim, calculated according to the formulas in the Plan. The Plan provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their calculated Recognized Claim. *Id*. at ¶¶62-63, 75. Each *pro rata* share will be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *Id*. at ¶75.

Lead Counsel believes that the proposed Plan provides a fair and reasonable method to equitably allocate the Net Settlement Fund. *See In re Giant Interactive Grp. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel"). To date, no objections to the proposed plan have been received. ¶124.

## III. THE COURT SHOULD FINALLY CERTIFY THE SETTLEMENT CLASS

Lead Plaintiffs' Preliminary Approval Motion and motion seeking certification of a class set forth the bases for the certification of the Settlement Class. *See* ECF Nos. 82-84, 112-114. The Court previously found that the Settlement Class satisfied the requirements of Rule 23(a) and (b)(3) and issued its Order preliminarily certifying a class for settlement purposes. ECF No. 115. Nothing has happened since preliminary approval was granted that would alter the Court's

findings. Lead Plaintiffs now request that the Court finally certify the Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3), for settlement purposes only, and appoint Lead Plaintiffs as Class Representatives and Labaton as Class Counsel. *See Rodriguez v. CPI Aerostructures, Inc.*, 2023 WL 2184496, at *5 (E.D.N.Y. Feb. 16, 2023) (recommending final certification of the settlement class, noting that there had been no objections or opt-outs from class members, and no other material information had emerged that would alter the court's findings since its preliminary approval order).

## IV. NOTICE SATISFIED RULE 23 AND DUE PROCESS

Lead Plaintiffs provided the Settlement Class with notice of the Settlement that satisfied all the requirements of Rule 23(e), the PSLRA, and due process. Notice of a settlement must be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings," *Wal-Mart Stores*, 396 F.3d at 114—and be the best notice practicable under the circumstances. Fed. R. Civ. P. 23(e). Both the substance of the notice program here and the methods of dissemination satisfied these standards.

The notice program's combination of individually mailed (or emailed if emails are provided) Postcard Notices to Settlement Class Members who could be identified with reasonable effort, supplemented by the Summary Notice in a widely circulated publication, transmission over a business newswire, and publication on internet websites, satisfied all requirements of Rule 23, due process, and the PSLRA. *See, e.g.*, *In re Grab Holdings Ltd. Sec. Litig.*, 2025 WL 1413515, at *5 (S.D.N.Y. May 15, 2025) (approving similar notice program that included mailing or emailing postcard notices to potential class members and nominees followed by publication notice and posting long-notice on a settlement website). As detailed in the accompanying Mailing Declaration, as of July 15, 2026, 1,090,299 Postcard Notices have been mailed or emailed to

potential Settlement Class Members, brokers, and nominees. *See* Ex. 5 at ¶13. In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted over *PR Newswire* on June 8, 2026. *Id.* at ¶14. Epiq also continues to maintain a dedicated settlement website, www.EsteeLauderSecuritiesSettlement.com. *Id.* at ¶¶15-17.

This combination of individual mailed notice to those who could be identified with reasonable effort, supplemented by publication and internet notice, was "the best notice … practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B).

## CONCLUSION

For all the foregoing reasons, Lead Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement, approve the proposed Plan of Allocation, and finally certify the Settlement Class for purposes of the Settlement only. Proposed orders will be submitted with Lead Plaintiffs' reply papers, after the deadline for objecting or seeking exclusion has passed.

DATED: July 16, 2026

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

*/s/ Michael P. Canty*
Michael P. Canty
James T. Christie
Jacqueline R. Meyers
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Email: mcanty@labaton.com
jchristie@labaton.com
jmeyers@labaton.com

*Lead Counsel for Lead Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, Wayne County Employees' Retirement System, and the Proposed Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Thomas C. Michaud
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Email: tmichaud@vmtlaw.com

*Additional Counsel for Lead Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System*

**CERTIFICATION OF WORD-COUNT COMPLIANCE**

The undersigned hereby certifies that the foregoing brief complies with the word limit set forth in Local Civil Rule 7.1(c). The word count, exclusive of the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, is 8,149 words according to the word-processing system used to prepare the document, less than the 8,750 maximum.

Dated: July 16, 2026

/s/ *Michael P. Canty*
Michael P. Canty

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

Dated: July 16, 2026

/s/ *Michael P. Canty*
MICHAEL P. CANTY