**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE THE ESTÉE LAUDER CO., INC. SECURITIES LITIGATION | Civil Action No. 1:23-cv-10669-AS<br>Hon. Arun Subramanian |

# MEMORANDUM OF LAW IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ....................1

ARGUMENT ....................3

I. THE REQUESTED FEE WOULD BE REASONABLE UNDER EITHER THE PERCENTAGE OR LODESTAR METHOD ....................3

A. The Requested Attorneys' Fee Would Be Reasonable Under the Percentage-of-the-Fund Method ....................4

B. The Requested Fees Have Been Awarded in Comparable Cases Within the Second Circuit ....................5

C. The Requested Attorneys' Fee Would Be Reasonable Under the Lodestar Method ....................7

II. THE REQUESTED FEE IS FAIR AND REASONABLE UNDER THE CIRCUMSTANCES OF THIS CASE WHEN APPLYING THE SECOND CIRCUIT'S FACTORS ....................10

A. Lead Counsel Devoted Significant Time and Labor to the Action ....................10

B. The Magnitude and Complexity of the Action Support the Requested Fee ....................11

C. The Risks of the Litigation Support the Requested Fee ....................13

D. The Quality of Lead Counsel's Representation Supports the Requested Fee ....................16

E. The Requested Fee in Relation to the Settlement ....................17

F. Public Policy Considerations Support the Requested Fee ....................18

III. LEAD COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED ....................19

IV. LEAD PLAINTIFFS' REQUESTED REIMBURSEMENT UNDER 15 U.S.C. §78u-4(a)(4) IS REASONABLE ....................21

V. THE REACTION OF THE SETTLEMENT CLASS TO DATE SUPPORTS THE REQUESTED FEES AND EXPENSES ....................22

CONCLUSION ....................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006), *aff'd*,
272 F. App'x 9 (2d Cir. 2008) ....................17

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001)....................13

*Andrews v. Plains All Am. Pipeline L.P.*,
2022 WL 4453864 (C.D. Cal. Sept. 20, 2022) ....................6

*In re Apollo Grp. Inc. Sec. Litig.*,
2012 WL 1378677 (D. Ariz. Apr. 20, 2012) ....................6

*Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*,
77 F.4th 74 (2d Cir. 2023) ....................19

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
772 F.3d 125 (2d Cir. 2014)....................22

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985)....................3

*In re Bayer AG Sec. Litig.*,
2008 WL 5336691 (S.D.N.Y. Dec. 15, 2008) ....................15

*Beckman v. KeyBank, N.A.*,
293 F.R.D. 467 (S.D.N.Y. 2013) ....................9

*In re Buspirone Antitrust Litig.*,
2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003)....................5

*In re Capacitors Antitrust Litig.*,
2023 WL 2396782 (N.D. Cal. Mar. 6, 2023)....................6

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2022 WL 3220783 (S.D.N.Y. Aug. 5, 2022)....................6

*In re China Sunergy Sec. Litig.*,
2011 WL 1899715 (S.D.N.Y. May 13, 2011) ....................19

*Christine Asia Co., v. Yun Ma*,
2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019)....................9, 22

*City of Providence v. Aeropostale Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd sub nom*,
*Arbuthnot v. Pierson,* 607 F. App'x. 73 (2d Cir. 2015) ....................4, 11, 12

*In re Comverse Tech., Inc., Sec. Litig.*,
2010 WL 2653354 (E.D. N.Y. June 24, 2010) ....................13, 18

*In re Deutsche Telekom AG Sec. Litig.*,
2005 WL 7984326 (S.D.N.Y. June 9, 2005) ....................9

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ....................7, 16, 18

*In re Flonase Antitrust Litig.*,
951 F. Supp. 2d 739 (E.D. Pa. 2013) ....................6

*Gay v. Tri-Wire Eng'g Sols., Inc.*,
2014 WL 28640 (E.D.N.Y. Jan. 2, 2014) ....................5

*Goldberger v. Integrated Res, Inc.*,
209 F.3d 43 (2d Cir. 2000) ....................4, 5, 10

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
594 U.S. 113 (2021) ....................19

*Hale v. State Farm Mut. Auto Ins. Co*.,
2018 WL 6606079 (S.D. Ill. Dec. 16, 2018) ....................6

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ....................5, 12

*Hicks v. Morgan Stanley*,
2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ....................3, 18

*In re Initial Pub. Offering Sec. Litig.*,
671 F. Supp. 2d 468 (S.D.N.Y. 2009) ....................17

*Lozada v. TaskUs, Inc.*,
2025 WL 3125848 (S.D.N.Y. Nov. 6, 2025) ....................12

*Luciano v. Olsten Corp*.,
109 F.3d 111 (2d Cir. 1997) ....................8

*Macedonia Church v. Lancaster Hotel, LP*,
2011 WL 2360138 (D. Conn. June 9, 2011) ....................5

*Maley v. Del Global Techs. Corp*.,
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ....................3

*In re Marsh & McLennan Cos. Sec. Litig.*,
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ....................22

*McDaniel v. Cnty. of Schenectady*,
595 F.3d 411 (2d Cir. 2010)....................4

*Missouri v. Jenkins*,
491 U.S. 274 (1989)....................8

*In re Neurontin Antitrust Litig.*,
2014 WL 12962880 (D.N.J. Aug. 6, 2014) ....................6

*Pearlstein v. Blackberry Ltd.*,
2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022)....................6

*Perez v. Rash Curtis & Assocs.*,
2020 WL 1904533 (N.D. Cal. Apr. 17, 2020) ....................6

*In re Perrigo Co. PLC Sec. Litig.*,
2022 WL 500913 (S.D.N.Y. Feb. 18, 2022)....................6

*In re PPDAI Grp. Inc. Sec. Litig.*,
2022 WL 198491 (E.D.N.Y. Jan. 21, 2022) ....................12

*Rogowski v. State Farm Life Ins. Co.*,
2023 WL 5125113 (W.D. Mo. Apr. 18, 2023) ....................6

*In re Signet Jewelers Ltd. Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) ....................7, 11, 13, 16

*Standard Iron Works v. ArcelorMittal*,
2014 WL 7781572 (N.D. Ill. Oct. 22, 2014)....................6

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008)....................5, 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................3

*In re Tenaris S.A. Sec. Litig.*,
2024 WL 1719632 (E.D.N.Y. Apr. 22, 2024) ....................5, 17

*In re Titanium Dioxide Antitrust Litigation*,
2013 WL 6577029 (D. Md. Dec.13, 2013)....................6

*In re U.S. Foodservice Inc. Pricing Litig.*,
2014 WL 12862264 (D. Conn. Dec. 9, 2014)....................6, 9

*In re Veeco Instruments Inc. Sec. Litig.*,
2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007)....................16, 17, 23

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005)....................4, 7, 8

*Woburn Ret. Sys. v. Salix Pharms., Ltd.*,
2017 WL 3579892 (S.D.N.Y. 2017)....................8

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. Sept. 21, 2005) ....................18

**Docketed Cases**

*In re Cnova N.V. Sec. Litig.*,
Master File No. 1:16-cv-00444-LTS-OTW, slip op. (S.D.N.Y. Mar. 20, 2018)....................6

*Corwin v. Y-Mabs Therapeutics, Inc.*,
No. 1:23-cv-00431-AS, slip op. (S.D.N.Y. Oct. 29, 2024) (Subramanian, J.) ....................9

*Dahl et al v. Bain Capital Partners, LLC*,
No. 1:07-cv-12388-WGY, ECF No. 1095 (D. Mass. Feb. 2, 2015)....................6

*Haddock v. Nationwide Life Ins. Co.*,
No. 01-cv-1552, slip op. (D. Conn. Apr. 9, 2015)....................9

*Landmen Partners, Inc. v. Blackstone Grp. L.P.*,
No. 08-cv-03601-HB-FM, slip op. (S.D.N.Y. Dec. 18, 2013) ....................6

*Osberg v. Foot Locker, Inc.*,
No. 07-cv-1358, slip op., (S.D.N.Y. June 8, 2018)....................6, 8

*St. Clair County Empl. Ret. Sys. V. Acadia Healthcare Co., Inc.*,
No. 3:18-cv-00988, slip op. (M.D. Tenn. Apr. 29, 2026)....................6

**Statutes**

15 U.S.C. §78u-4(a)(4) ....................21

Court-appointed Lead Counsel, Labaton Keller Sucharow LLP ("Labaton" or "Lead Counsel"), respectfully submits this memorandum of law in support of its motion, on behalf of itself and additional counsel Vanoverbeke Michaud & Timmony P.C., for an award of attorneys' fees in the amount of 32% of the Settlement Fund. Lead Counsel also seeks payment of $759,672.80, plus accrued interest, in Litigation Expenses that it reasonably incurred in prosecuting the Action, as well as $21,995.21, in the aggregate, as reimbursement to Lead Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System, directly related to the time they dedicated to representing the Settlement Class, as authorized by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## PRELIMINARY STATEMENT

As set forth in the Stipulation, the proposed Settlement, if approved by the Court, will resolve this case in its entirety in exchange for a $210 million cash payment. The recovery represents a very favorable result for the Settlement Class. The $210 million recovery is among the ***top 100 securities settlements*** of all time and was achieved through the skill, experience, and effective advocacy of Lead Counsel in the face of considerable challenges and an aggressive defense mounted by Defendants. In litigating the Action, Lead Counsel worked diligently on behalf of the class and expended extensive time and resources to ensure the best possible recovery for class members, all without any guarantee of recovery and compensation.

As detailed in the Declaration of Michael P. Canty,[1] submitted herewith, Lead Counsel, among other things, conducted a rigorous investigation into the claims and defenses at issue;

---

[1] Lead Counsel is simultaneously filing the Declaration of Michael P. Canty in Support of (I) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation

prepared a detailed amended complaint that expanded the scope of the initial complaint by adding particularized allegations regarding the sources of Estée Lauder's travel retail sales in relation to the *daigou* gray market; overcame Defendants' motion to dismiss; worked to build the case through discovery with the review and analysis of more than 560,000 pages of documents produced by Defendants and third parties and participated in five depositions; consulted with experts in the fields of market efficiency, loss causation, and damages; and prepared and filed Lead Plaintiffs' motion for class certification and completed related discovery. Lead Counsel also engaged in extensive settlement negotiations with Defendants, which included the exchange of mediation briefing and participation in three separate mediation sessions. In total, Plaintiffs' Counsel collectively invested over 47,000 hours, all on a contingency basis with no assurance of ever being paid. This dedication and effort has resulted in a significant cash recovery for the Settlement Class.

Against this backdrop, Lead Counsel requests a fee of 32% of the Settlement Fund, payment of Lead Counsel's Litigation Expenses in the amount of $759,672.80, plus accrued interest, and reimbursement of $21,995.21, in the aggregate, to Lead Plaintiffs for the time and resources they dedicated to representing the class, pursuant to the PSLRA. As demonstrated below, while the fee request is substantial, it is within the range of attorneys' fees awarded in

---

and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses, dated July 16, 2026 (the "Canty Declaration") (cited herein as "¶"). Capitalized terms have the meanings given to them in the Canty Declaration or the Stipulation and Agreement of Settlement, dated May 6, 2026 (ECF No. 114-1) (the "Stipulation").

All exhibits referenced below are attached to the Canty Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached to the Declaration and the second alphabetical reference is to the exhibit designation within the exhibit itself.

securities class actions of this magnitude, and the fee and expense requests are well supported by both case law and the facts of this case.

The fee and expense request also has the full support of Lead Plaintiffs. *See* Declaration on Behalf of Macomb County Employees' Retirement System and Macomb County Retiree Health Care Fund (Ex. 1 at ¶¶8-9) and Declaration on Behalf of Wayne County Employees' Retirement System (Ex. 2 at ¶¶8-9). Lead Plaintiffs are sophisticated institutional investors that supervised the Action, and have endorsed the requested fee as fair and reasonable in light of the result achieved, the quality of the work counsel performed, and the risks of the litigation.

For the following reasons, Lead Counsel respectfully submits that its efforts and the results achieved in this Action justify the requested fees and expenses.

## ARGUMENT

### I. THE REQUESTED FEE WOULD BE REASONABLE UNDER EITHER THE PERCENTAGE OR LODESTAR METHOD

The Supreme Court has emphasized that private securities actions are "an essential supplement to criminal prosecutions and [SEC] civil enforcement actions…." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "a most effective weapon in the enforcement" of the securities laws and are "a necessary supplement to [SEC] action"). Compensating counsel for bringing these actions is important because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley*, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005); *see also Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002) ("In considering an award of attorney's fees, the public policy of vigorously

enforcing the federal securities laws must be considered.").[2]

In the Second Circuit, courts "may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method." *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010). "[W]hether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances." *Goldberger v. Integrated Res, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).

In this case, the requested fee award—32% of the Settlement Fund—is well supported under either the "percentage" or "lodestar" method, given the circumstances here.

### A. The Requested Attorneys' Fee Would Be Reasonable Under the Percentage-of-the-Fund Method

Lead Counsel respectfully submits that the Court should award a fee based on a percentage of the common fund obtained. Courts have recognized that, in addition to providing just compensation, "awards of fair attorneys' fees from a common fund should also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future alleged misconduct of a similar nature." *City of Providence v. Aeropostale Inc.*, 2014 WL 1883494, at *11 (S.D.N.Y. May 9, 2014), *aff'd sub nom*, *Arbuthnot v. Pierson,* 607 F. App'x. 73 (2d Cir. 2015).

The Second Circuit has approved the percentage method, recognizing that the "trend in this Circuit is toward the percentage method" and that the method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir.

---

[2] All internal quotations and citations are omitted unless otherwise stated.

2005); *see also Goldberger,* 209 F.3d at 48-50 (either percentage of fund method or lodestar method may be used to determine fees, but noting the "lodestar method proved vexing" and results in "inevitable waste of judicial resources"); *In re Telik, Inc. Sec. Litig*., 576 F. Supp. 2d 570, 586 & n.7 (S.D.N.Y. 2008) ("[T]here is a strong consensus – both in this Circuit and across the country – in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery.").[3]

**B. The Requested Fees Have Been Awarded in Comparable Cases Within the Second Circuit**

The 32% fee requested by Lead Counsel is within the range of percentage fees awarded in the Second Circuit in complex class action cases. "District courts within the Second Circuit routinely approve attorneys' fees awards of one third or 33 1/3% as reasonable." *In re Tenaris S.A. Sec. Litig*., 2024 WL 1719632, at *10 (E.D.N.Y. Apr. 22, 2024); *see also Macedonia Church v. Lancaster Hotel, LP*, 2011 WL 2360138, at *14 (D. Conn. June 9, 2011) ("Class Counsel's request for 33-1/3% of the Settlement Fund is typical in class action settlements in the Second Circuit."); *Gay v. Tri-Wire Eng'g Sols., Inc*., 2014 WL 28640, at *11 (E.D.N.Y. Jan. 2, 2014) ("[D]istrict courts in this Circuit have routinely upheld attorney's fees awards of 30% to 33-1/3% in class action cases where a counsel's fee award was entirely contingent on success, and have occasionally approved greater attorney's fees awards").

Fee awards of 32%, or more, have been awarded in comparably sized common fund settlements reached in district courts throughout the Second Circuit. *See, e.g.*, *In re Buspirone Antitrust Litig*., 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y. Apr. 11, 2003) (awarding 33

[3] The percentage of the fund method is also "consistent with the PSLRA, which expressly provides that class counsel are entitled to attorneys' fees that represent a reasonable percentage of the damages recovered by the class." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *12 (S.D.N.Y. Dec. 19, 2014) (citing 15 U.S.C. § 78u-4(a)(6)).

1/3% of $220 million settlement); *Osberg v. Foot Locker, Inc.*, No. 07-cv-1358, slip op., ECF No. 423 (S.D.N.Y. June 8, 2018) (awarding 33% of $288.4 million settlement) (Ex. 10);[4] *In re U.S. Foodservice Inc. Pricing Litig.*, 2014 WL 12862264, at *3 (D. Conn. Dec. 9, 2014) (awarding 33 1/3% of $297 million settlement); and *Pearlstein v. Blackberry Ltd.,* 2022 WL 4554858, at *9-11 (S.D.N.Y. Sept. 29, 2022) (awarding 33 1/3% of $165 million settlement).[5]

---

[4] Unreported slip opinions and related filings are submitted herewith as Exhibit 10 in a compendium of cases.

[5] Fee awards of 32%, or more, have also been awarded in substantial common fund cases in other circuits. *See, e.g.*, *In re Capacitors Antitrust Litig*., 2023 WL 2396782, at *2 (N.D. Cal. Mar. 6, 2023) (awarding 40% in $165 million settlement); *St. Clair County Empl. Ret. Sys. V. Acadia Healthcare Co., Inc.*, No. 3:18-cv-00988, slip op. (M.D. Tenn. Apr. 29, 2026) (awarding 33 1/3% of $179 million settlement) (Ex. 10); *Rogowski v. State Farm Life Ins. Co*., 2023 WL 5125113, at *4-5 (W.D. Mo. Apr. 18, 2023) (awarding 33 1/3% of $325 million settlement); *Perez v. Rash Curtis & Assocs*., 2020 WL 1904533, at *15 (N.D. Cal. Apr. 17, 2020) (awarding 33 1/3% of $267 million settlement); *Hale v. State Farm Mut. Auto Ins. Co*., 2018 WL 6606079, at *13, 16 (S.D. Ill. Dec. 16, 2018) (awarding 33 1/3% of $250 million settlement); *In re Neurontin Antitrust Litig*., 2014 WL 12962880, at *3, 5 (D.N.J. Aug. 6, 2014) (awarding 33 1/3% of $190 million settlement); *In re Titanium Dioxide Antitrust Litigation*, 2013 WL 6577029, at *1 (D. Md. Dec.13, 2013) (awarding 33 1/3% of 163.5 million settlement); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 741, 756 (E.D. Pa. 2013) (awarding 33 1/3% of $150 million settlement); *In re Apollo Grp. Inc. Sec. Litig*., 2012 WL 1378677, at *9 (D. Ariz. Apr. 20, 2012) (awarding 33.33% of $145 million settlement); *Dahl et al v. Bain Capital Partners, LLC*, No. 1:07-cv-12388-WGY, ECF No. 1095 (D. Mass. Feb. 2, 2015) (electronic order granting motion and awarding 33% of $590.5 million settlement) (Ex. 10); *Standard Iron Works v. ArcelorMittal*, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) (awarding 33% of $163.9 million settlement); and *Andrews v. Plains All Am. Pipeline L.P.*, 2022 WL 4453864, at *1, 4 (C.D. Cal. Sept. 20, 2022) (awarding 32% of $230 million settlement).

Fees of 32% and higher are also routinely approved in smaller settlements. *See, e.g., In re Perrigo Co. PLC Sec. Litig*., 2022 WL 500913, at *1 (S.D.N.Y. Feb. 18, 2022) (awarding 33 1/3% of $31.9 million settlement); *In re Cnova N.V. Sec. Litig.,* Master File No. 1:16-cv-00444-LTS-OTW, slip op. at 5 (S.D.N.Y. Mar. 20, 2018) (awarding 33.3% of $28.5 million settlement) (Ex. 10); *Landmen Partners, Inc. v. Blackstone Grp. L.P*., No. 08-cv-03601-HB-FM, slip op. at 5 (S.D.N.Y. Dec. 18, 2013) (awarding 33.33% of $85 million settlement) (Ex. 10); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig*., 2022 WL 3220783, at *1 (S.D.N.Y. Aug. 5, 2022) (awarding 33 1/3% of $44 million settlement).

Accordingly, it is respectfully submitted that the requested fee is within the range of fees frequently awarded within the Second Circuit and would be comparable to fees awarded within the Second Circuit.

### C. The Requested Attorneys' Fee Would Be Reasonable Under the Lodestar Method

To ensure the reasonableness of a fee awarded under the percentage-of-the-fund method, the Second Circuit encourages district courts to "cross-check" the proposed award against counsel's lodestar. *Walmart Stores Inc. v. Visa USA Inc.*, 396 F. 3d 96, 123 (2d Cir. 2005) (quoting *Goldberger*, 209 F.3d at 50); *In re Signet Jewelers Ltd. Sec. Litig*., 2020 WL 4196468, at *16 (S.D.N.Y. July 21, 2020) (same).

Fees representing multiples above a lodestar are frequently awarded to reflect the contingency risk and other relevant enhancement factors. *See In re Signet Jewelers Ltd. Sec. Litig*., 2020 WL 4196468, at *16 ("fees representing multiples above the lodestar are regularly awarded to reflect the contingency-fee risk and other relevant factors"); *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *26 (S.D.N.Y. Nov. 8, 2010) ("[A] positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors[.]").

Here, Lead Counsel has spent more than 47,000 hours of attorney and other professional staff time litigating this complex securities case. *See* Declaration of Michael P. Canty on behalf of Labaton Keller Sucharow LLP ("Fee and Expense Decl."), Ex. 9-A. Lead Counsel's lodestar, derived by multiplying the hours spent by each attorney and other professional by their standard

"current" hourly rates, is $25,145,630.00. *Id*.[6] This lodestar is based on Lead Counsel's current hourly rates, which are comparable to those in the legal community for similar services by attorneys of reasonably comparable skill, experience, and reputation. "[P]erhaps the best indicator of the 'market rate' in the New York area for plaintiffs' counsel in securities class actions is to examine the rates charged by New York firms that *defend* class actions on a regular basis." *Telik*, 576 F. Supp. 2d at 589; *Luciano v. Olsten Corp*., 109 F.3d 111, 115 (2d Cir. 1997) ("[t]he 'lodestar' figure should be in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation"). The rates here range from $975 to $1,450 per hour for partners, $800 to $1,025 per hour for of counsels, and $350 to $700 for associates and other attorneys. *See* Ex. 9-A. Sample defense firm rates in 2025, gathered by Labaton annually from fee applications in bankruptcy court filings nationwide, often exceeded these rates. ¶149; Ex. 11.

The requested fee of 32% of the Settlement Fund, *i.e.,* $67,200,000, plus accrued interest, would represent a multiplier of 2.7 of Lead Counsel's lodestar. Such a multiplier is within the parameters used throughout courts within the Second Circuit and, as discussed herein, has been well-earned. *See, e.g*., *Walmart Stores Inc.* 396 F.3d at 123 (upholding a multiplier of 3.5 as reasonable on appeal); *Osberg v. Foot Locker, Inc.*, No. 07-cv-1358, ECF No. 423, slip op. (S.D.N.Y. June 8, 2018) (awarding 4.8 multiplier in $288.4 million settlement) (Ex. 10); *JP Morgan Precious Metals*, No, 18-cv-10356, ECF Nos. 99, 114, slip op. (S.D.N.Y July 7, 2022) (awarding multiplier of 3.24 in $60 million settlement) (Ex. 10); *Woburn Ret. Sys. v. Salix Pharms., Ltd*., 2017 WL 3579892, at *6 (S.D.N.Y. 2017) ("Although a lodestar multiplier of

[6] The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989).

3.14 for a settlement of $210 million is high, it is still within the range of lodestar multipliers approved in this Circuit."); *In re Deutsche Telekom AG Sec. Litig.*, 2005 WL 7984326, at *4 (S.D.N.Y. June 9, 2005) (approving multiplier of 3.96 in settlement of $120 million); *Corwin v. Y-Mabs Therapeutics, Inc.*, No. 1:23-cv-00431-AS, slip op. (S.D.N.Y. Oct. 29, 2024) (Subramanian, J.) (awarding 33.3% fee and 3.8 multiplier) (Ex. 10); *Haddock v. Nationwide Life Ins. Co.*, No. 01-cv-1552, ECF Nos. 598-1, 601, slip op. (D. Conn. Apr. 9, 2015) (awarding 3.0 multiplier in $140 million settlement) (Ex. 10); *In re U.S. Foodservice Inc. Pricing Litig.*, 2014 WL 12862264, at *3 (awarding 2.23 multiplier noting it was "well within the acceptable range"); *Christine Asia Co., v. Yun Ma*, 2019 WL 5257534, at *19 (S.D.N.Y. Oct. 16, 2019) (awarding fee representing a 2.15 multiplier, which court found to be "well within the range commonly awarded in securities class actions of this complexity and magnitude"). For instance, in *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013), the court awarded a fee representing a 6.3 multiplier, rather than a smaller multiplier, to avoid "penalizing plaintiffs' counsel for achieving an early settlement, particular[ly] where, as here, the settlement amount is substantial."

Additional work will be required of Lead Counsel on an ongoing basis, including: correspondence with Settlement Class Members; preparation for, and participation in, the final approval hearing; supervising the claims administration process being conducted by the Claims Administrator; and supervising the distribution of the Net Settlement Fund to Settlement Class Members who have submitted valid Claim Forms. However, Lead Counsel will not seek payment for this additional work.

For all these reasons, the lodestar "cross-check" supports the reasonableness of the requested fee.

* * *

In sum, Lead Counsel's requested fee award is within the range of what courts in the Second Circuit, and elsewhere, award in comparable class actions, whether calculated as a percentage of the fund or in relation to Lead Counsel's lodestar. Additionally, as discussed below, each factor established by the Second Circuit in *Goldberger* supports a finding that the requested fee is reasonable.

## II. THE REQUESTED FEE IS FAIR AND REASONABLE UNDER THE CIRCUMSTANCES OF THIS CASE WHEN APPLYING THE SECOND CIRCUIT'S FACTORS

The Second Circuit has set the following criteria for courts to consider when reviewing a request for attorneys' fees in a common fund case, whether under the percentage approach or the lodestar multiplier approach:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation. . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50. As discussed below, these factors and the analyses above demonstrate that Lead Counsel's requested fee would be reasonable.

### A. <u>Lead Counsel Devoted Significant Time and Labor to the Action</u>

The time and effort expended by Lead Counsel in prosecuting the Action and achieving the Settlement support the requested fee. As set forth in detail in the Canty Declaration, Lead Counsel's effort in the litigation advanced the case through numerous stages and litigation milestones, including:

- an extensive international investigation of the claims and defenses at issue, including interviews with 33 former employees of Estée Lauder (three of whom provided information used in the Complaint and were cited in the Complaint);

- preparing and filing a detailed amended Complaint, which expanded the scope of the initial complaint by adding particularized allegations regarding the sources of Estée Lauder's travel retail sales in relationship to the complex *daigou* gray market in various foreign locales across the Asia-Pacific ("APAC") region, including China and South

Korea. Lead Plaintiffs' investigation and research expounded on the regulatory and commercial landscape of modern *daigou* resellers and the history and impetus behind various government crackdowns on the practice;

- successfully opposing Defendants' extensive motion to dismiss the Complaint;
- moving for class certification, which included the preparation of a report from Lead Plaintiffs' market efficiency and damages expert, as well as discovery related to the motion including defending depositions of Lead Plaintiffs' three representatives and an investment manager and one deposition of Lead Plaintiffs' expert on market efficiency;
- propounding and responding to discovery, which included exchanging initial disclosures; the production of approximately 122,000 pages of Lead Plaintiffs' documents to Defendants; the review of approximately 560,000 pages of documents from Defendants and third parties; meeting and conferring on the scope of productions; and negotiating the terms of a Protective Order, ESI Protocol, and Foreign Language Protocol;
- preparing for and participating in three mediation sessions with Judge Phillips, which were preceded by detailed mediation statements and included multiple presentations on liability and damages followed by months of intense follow-up negotiations; and
- negotiated and drafted the terms of the Term Sheet and the Stipulation of Settlement.

*See generally* Canty Decl. at Sections III.-V. Lead Counsel expended more than 47,000 hours prosecuting the Action with a lodestar value of $25,145,630.00. *See* Ex. 9-A. At all times, Lead Counsel took care to staff the matter robustly but to avoid unnecessary duplication of effort.

### B. <u>The Magnitude and Complexity of the Action Support the Requested Fee</u>

Courts regularly recognize that securities class action litigation is "notably difficult and notoriously uncertain." *City of Providence,* 2014 WL 1883494, at *5; *In re Signet Jewelers Ltd. Sec. Litig.,* 2020 WL 4196468, at *4 (S.D.N.Y. July 21, 2020) ("[s]ecurities class actions are generally complex and expensive to prosecute"). Here, as explained in the Canty Declaration, prosecuting the class's claims required expertise, skill, and dedication. *See* Sections II.-VI. It involved extensive expert analysis across multiple fields like damages and loss causation in connection with the Exchange Act, as well as the *daigou* gray market in the APAC region (oftentimes with complex nomenclature and foreign concepts and language barriers), and

understanding the development and expansion of the practice over time, the rationales behind efforts of various government and regulatory bodies to curtail the practice, as well as public knowledge and perception of the practice in relationship to Estée Lauder's brand and sales. Moreover, the complexities were especially acute given the international aspects of Estée Lauder's business—including its travel retail headquarters in Europe and the prevalence of *daigou* in APAC. Lead Plaintiffs' pursuit of their claims involved documents and witnesses located across the globe, notably in China, which required specialized research into foreign law and local customs, and international investigators. ¶¶134-35. *See In re PPDAI Grp. Inc. Sec. Litig*., 2022 WL 198491, at *9 (E.D.N.Y. Jan. 21, 2022) (noting complexity of the action supported fee request in an action "requiring Plaintiffs to follow international conventions to retrieve documents and elicit testimony and imposing the expense and complication of obtaining translation services").

Additionally, certifying a class, completing discovery, prevailing in connection with summary judgment challenges, and then achieving a litigated verdict at trial, would have been difficult and dense. *See In re Hi-Crush Partners L.P. Sec. Litig*., 2014 WL 7323417, at *15 (S.D.N.Y. Dec. 19, 2014) (finding the "inherently complex Exchange Act issues regarding, *inter alia*, whether Defendants' omissions were materially misleading, whether Defendants' [sic] acted with scienter and if loss causation could be established" supported approval of requested fee award).

Accordingly, the magnitude and complexity of the Action support the conclusion that the requested fee is fair and reasonable. *See City of Providence*, 2014 WL 1883494, at *16 ("[T]he complex and multifaceted subject matter involved in a securities class action such as this supports the fee request"); *Lozada v. TaskUs, Inc.*, 2025 WL 3125848, at *10 (S.D.N.Y. Nov. 6,

2025), *report and recommendation adopted*, 2025 WL 3482752 (S.D.N.Y. Dec. 4, 2025) (approving fee request and stating, "the litigation, like most federal securities cases, was reasonably complex, as indicated by the volume of documents produced during discovery and the legal issues analyzed").

### C. The Risks of the Litigation Support the Requested Fee

The risks associated with this contingency fee case also support the requested fee. "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *In re Comverse Tech., Inc., Sec. Litig.*, 2010 WL 2653354, at *5 (E.D. N.Y. June 24, 2010); *see also In re Signet*, 2020 WL 4196468, at *19 ("The Second Circuit has recognized that the risks associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award"); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (it is "appropriate to take [contingent-fee] risk into account in determining the appropriate fee").

The Parties were deeply divided on virtually every issue in the litigation, as detailed in the Canty Declaration at Sections III. & VI. and the accompanying Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Proposed Class Action Settlement and Plan of Allocation ("Settlement Memorandum"), and there was no guarantee Lead Plaintiffs' position would prevail. If Defendants had succeeded with respect to any of their defenses, Lead Plaintiffs and the class could have recovered nothing or far less than the Settlement Amount. Nonetheless, Lead Counsel vigorously pursued the class's claims and took on each challenge. Moreover, Lead Plaintiffs were the only institutional investors that sought appointment in this matter to pursue claims on behalf of themselves and the class. ¶25.

Although Lead Plaintiffs and Lead Counsel believe that the alleged misstatements supported strong claims of securities fraud, and although the Court denied Defendants' Motion to

Dismiss, Lead Plaintiffs faced the ongoing burdens of supporting their liability claims in connection with summary judgment and prevailing at trial, as well as in likely appeals – a process that could extend for years and might lead to a smaller recovery, or no recovery at all. ¶¶85-95.

Summary judgment would provide Defendants with another chance to contest the elements of Lead Plaintiffs' claims as a matter of law, including, falsity, materiality, scienter, and loss causation. With respect to falsity, among other things, Defendants would have continued to argue that *daigou*, as well as Estée Lauder's purported reliance on the sales practice, was both known to the market and an acceptable part of its business strategy in the APAC region and therefore, no investor could have been misled by Defendants' alleged omissions about *daigou* when they knew about its existence all along. ¶¶87-90. Regarding scienter, Defendants would likely have argued that they could not have knowingly or recklessly misled the market by failing to disclose Estée Lauder's reliance on *daigou* when they genuinely believed that the market was aware of the Company's *daigou* exposure based on the market and industry publications available at the time. ¶¶92-95.

Even if Lead Plaintiffs were successful in proving falsity and scienter with respect to the alleged misstatements, they faced significant challenges and uncertainty with respect to proving loss causation and damages. Defendants would continue to assert that there was no causal connection between the contents of the alleged misrepresentations and many of the alleged corrective disclosures.

In order to recover maximum damages, estimated to be approximately $4.6 billion by Lead Plaintiffs' expert depending on the trading model and assumptions used, Lead Plaintiffs would need to prove that the allegedly corrective information disclosed on all five allegedly

corrective disclosure dates caused the price Estée stock to decline. ¶¶106-08. However, if Defendants were successful in challenging the first three corrective disclosures and only the August 18, 2023 and November 1, 2023 corrective disclosures were found to be actionable, aggregate damages would have decreased to approximately $1.9 billion. ¶108.

Additionally, Defendants were likely to argue that Lead Plaintiffs could not disaggregate confounding information that was purportedly released on the corrective disclosure days, which would further reduce damages to between $4.2 billion (for all five alleged corrective disclosure dates) and $1.85 billion (if only the August 18, 2023 and November 1, 2023 corrective disclosure dates remain) based on Lead Plaintiffs' damages expert's methodology. Moreover, Defendants claimed that for certain corrective disclosures, Lead Plaintiffs would need to disaggregate more than 50% of the alleged stock price decline. Such arguments were nuanced and complex, requiring close work with experts. If Defendants were successful in advancing such arguments, damages would be cut even more substantially from the estimates described above. ¶¶109-110. Accordingly, the ultimate contours of the actionable misstatements and disclosures could have significantly compromised Lead Plaintiffs' ability to succeed at trial and obtain a judgment for the class. *See In re Bayer AG Sec. Litig*., 2008 WL 5336691, at *5 (S.D.N.Y. Dec. 15, 2008) (noting the "difficulty of establishing loss causation [] and the difficulty in proving that Defendants acted with scienter, militate in favor of fee awards").

Of course, Lead Plaintiffs would also have to succeed on their pending Class Certification Motion and maintain certification through trial. Defendants vigorously opposed class certification on several grounds, including, for example, that Lead Plaintiffs could not establish price impact or reliably measure damages on a class wide basis. ¶¶96-104. Each of

these grounds could have been the basis for post-trial attacks to even a successful verdict, and post-trial appeals.

In the face of many uncertainties, Lead Counsel undertook this case on a wholly contingent basis, knowing that the litigation would require the devotion of substantial time and expense with no guarantee of compensation. ¶¶136-142. As discussed further below, Lead Counsel's assumption of this contingency fee risk strongly supports the requested fee. *See FLAG Telecom*, 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award.").

### D. The Quality of Lead Counsel's Representation Supports the Requested Fee

The quality of the representation by Lead Counsel is another important factor that supports the reasonableness of the requested fee. Lead Counsel is a nationally recognized leader in the field of securities class action litigation and has substantial experience litigating and trying securities class actions in courts throughout the country. ¶144; Ex. 9-C. The attorneys who were principally responsible for prosecuting this case relied upon their skill to develop and implement strategies to overcome myriad obstacles raised by Defendants throughout the litigation. Lead Counsel respectfully submits that the quality of its representation is best evidenced by the quality of the result achieved. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.,* 2020 WL 4196468, at *20; *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *7 (S.D.N.Y. Nov. 7, 2007).

As set forth in the Canty Declaration, the Settlement is ***well above*** industry trends. The $210 million recovery is among the top 100 securities settlements of all time and twelve times greater than the median reported recovery in securities class actions in 2025, which was $17.3 million. Ex. 3 at 13; Ex. 4 at 1. The Settlement recovers a range of approximately 4.6% of estimated maximum damages and 5%-11.4% of more conservatively estimated damages.

According to Cornerstone Research, for Exchange Act cases with total estimated damages of more than $1 billion, the median percentage of recovery from 2016 to 2024 was 3.6% of total Cornerstone estimated damages, and the median percentage of recovery for such cases in 2025 was 3%. Ex. 4 at 7. Additionally, courts have regularly approved settlements that recover lower or similar percentages of damages in large settlements. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 468, 483 (S.D.N.Y. 2009) (approving $586 million settlement that represented 2% of aggregate expected recovery); *see also In re Tenaris S.A. Sec. Litig*., 2024 WL 1719632, at *8 (E.D.N.Y. Apr. 22, 2024) (recognizing that the "proposed settlement amount … represents 4.02-5.01% of the total estimated 'best-case' recovery" and was "significantly higher than the 2.4-2.9% average settlement recovery rate" for similar class actions). In sum, this excellent recovery supports approval of the fee request.

The quality of Lead Counsel's representation is further demonstrated by the fact that this substantial recovery was obtained after opposing a consistently aggressive defense by highly skilled attorneys at Gibson, Dunn & Crutcher LLP. Courts recognize that the strength of Lead Counsel's opposition should be considered in assessing its performance. *See, e.g.*, *Veeco*, 2007 WL 4115808, at *7 (among factors supporting fee award was that defendants were represented by "one of the country's largest law firms"); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work."), *aff'd*, 272 F. App'x 9 (2d Cir. 2008).

**E. <u>The Requested Fee in Relation to the Settlement</u>**

"When determining whether a fee request is reasonable in relation to a settlement amount, 'the court compares the fee application to fees awarded in similar securities class-action

settlements of comparable value.'" *Comverse*, 2010 WL 2653354, at *3. As discussed in Section I.B, *supra*, the requested fee is within the range of percentage fees that this Court and other courts have awarded in comparable cases and, accordingly, the fee requested is reasonable in relation to the Settlement.

### F. Public Policy Considerations Support the Requested Fee

As mentioned above, courts within the Second Circuit have long held that public policy favors the award of reasonable attorneys' fees in class action securities litigation. *See*, *e.g., Flag Telecom*, 2010 WL 4537550, at *29 (if the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook"). "In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. Sept. 21, 2005).

Judge McMahon has noted the importance of "private enforcement actions and the corresponding need to incentivize attorneys to pursue such actions on a contingency fee basis" in *Shapiro v. J.P. Morgan Chase & Co*:

> [C]lass actions serve as private enforcement tools when . . . regulatory entities fail to adequately protect investors . . . . [P]laintiffs' attorneys need to be sufficiently incentivized to commence such actions in order to ensure that defendants who engage in misconduct will suffer serious financial consequences . . . . [A]warding counsel a fee that is too low would therefore be detrimental to this system of private enforcement.

2014 WL 1224666, at *24 (S.D.N.Y. Mar. 24, 2014) (citing *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515-16 (S.D.N.Y. 2009)); *see also Hicks*, 2005 WL 2757792, at *9

("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding.").

Lead Counsel is keenly aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts by plaintiff's counsel produced no fee for counsel. *See* Canty Decl., Section IX.3.(e). For example, Labaton was co-lead counsel in the *Goldman* case, which spanned more than 13 years, three class certification orders at the district court level, three appeals of class certification to the Second Circuit, *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.,* 77 F.4th 74, 105 (2d Cir. 2023) (recounting history, reversing last certification order and remanding for de-certification), and an appeal to the Supreme Court, *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021) (reversing certification and remanding for further consideration). Despite co-lead counsel's and plaintiffs' relentless advocacy, tens of thousands of hours, millions in lodestar, and millions in expenses, they were unable to successfully certify the class and recover any damages on behalf of investors. ¶141.

Accordingly, this factor supports Lead Counsel's fee request.

## III. LEAD COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED

Lead Counsel's fee application includes a request for payment of Litigation Expenses, in the amount of $759,672.80, which were reasonably incurred and necessary to prosecute the Action. *See* Ex. 9-B. *See In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011) (in a class action, attorneys should be compensated "for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and

necessary to the representation' of those clients"). This amount is below the $875,000 cap that the notices informed potential Settlement Class Members that counsel may apply for.

The amount of Litigation Expenses is consistent with the stage of the litigation and the claims and defenses at issue. Lead Counsel incurred expenses related to, among other things, expert and consultant fees, mediation fees, depositions, international investigators, travel, and litigation support fees related to electronic discovery. A complete breakdown by category of the expenses incurred is set forth in Exhibit B to the Labaton Fee and Expense Decl., submitted herewith as Exhibit 9. These expense items are not duplicated in the firm's hourly rates.

The largest expense relates to the retention of Lead Plaintiffs' testifying and consulting experts. These fees total $347,700.00, or approximately 46% of the total Litigation Expenses. ¶158; Ex. 9-B. For example, in connection with class certification, Lead Counsel retained Matthew D. Cain, Ph.D. to opine on loss causation and market efficiency matters. Mr. Cain was also retained to draft the proposed Plan of Allocation. Lead Counsel consulted with other experts to estimate aggregate damages. *Id.*

Litigation support costs related to the electronic discovery produced in the case total $142,424.95, or approximately 19% of all expenses. ¶159. Lead Counsel also incurred $21,775.00 (approximately 3% of total expenses) in connection with retaining an outside investigation firm with international investigative experience. ¶161.

The expenses include $26,762.62 for the fees and costs of court reporters in connection with the depositions taken and defended (approximately 4% of total expenses), and $3,977.50 in connection with outside counsel retained by Lead Counsel for former employees, who may have been witnesses, in connection with discovery requests. ¶163.

The expenses also include $138,218.75 for Lead Plaintiffs' share of the fees and costs of the mediator (approximately 18% of total expenses). ¶160. Lead Counsel also seeks reimbursement of $43,245.72 for work-related transportation expenses, meals, and lodging related to, among other things, participating in depositions, the mediation, working late hours, and for representatives of Lead Plaintiffs to attend the final Settlement Hearing. (Any first-class airfare has been reduced to economy rates.). ¶164.

The remainder of the expenses sought are the types that are necessarily incurred in complex commercial litigation and routinely charged to clients who pay by the hour.

## IV. LEAD PLAINTIFFS' REQUESTED REIMBURSEMENT UNDER 15 U.S.C. §78u-4(a)(4) IS REASONABLE

Lead Counsel also seeks reimbursement of $21,995.21, in the aggregate, on behalf of Lead Plaintiffs directly related to their representation of the class. *See* Declaration of Macomb County, submitted herewith as Ex. 1, and Declaration of Wayne County, submitted herewith as Ex. 2. The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). Here, Macomb County is seeking $4,657.02 related to the approximately 53.5 hours it dedicated to the Action (Ex. 1 at ¶¶10-13), and Wayne County is seeking $17,338.19 related to the approximately 172 hours it dedicated to the Action (Ex. 2 at ¶¶10-13).

Here, as described more fully in Lead Plaintiffs' Declarations, Lead Plaintiffs have been committed to pursuing the class's claims—and have taken an active role in so doing. Among other things, Lead Plaintiffs: (i) conferred with counsel on the overall strategy for prosecuting the Action and maximizing the recovery for the class; (ii) reviewed material pleadings and court filings; (iii) evaluated regular status reports from counsel regarding developments in the

litigation; (iv) responded to discovery requests propounded by Defendants, including interrogatories and requests for the production of documents; (v) searched for and compiled documents for production to Defendants; and (vi) sat for a deposition. Ex. 1 at ¶¶4-5, 10-12; Ex. 2 at ¶¶4-5, 10-12. Additionally, Lead Plaintiffs analyzed and responded to Defendants' settlement proposals over the course of the mediation efforts, and ultimately authorized the acceptance of the Settlement. Ex. 1 at ¶¶5-6; Ex. 2 at ¶¶5-6. These efforts required representatives of Lead Plaintiffs to dedicate time and resources to the Action that they would have otherwise devoted to their regular duties.

Courts within this District regularly approve payments to compensate representative plaintiffs under similar circumstances. *See, e.g., Christine Asia Co*., 2019 WL 5257534, at *20 (granting PSLRA awards to each of the five lead plaintiffs for their "substantial time and effort [devoted] to prosecuting [the] action, including preparing for and being deposed by Defendants, reviewing pleadings and briefs, assisting with discovery responses, collecting documents for production, and evaluating and approving the settlement"); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig*., 772 F.3d 125, 132-33 (2d Cir. 2014) (affirming $453,003.04 award to representative plaintiffs for time spent by employees); *In re Marsh & McLennan Cos. Sec. Litig*., 2009 WL 5178546, at *21 (S.D.N.Y. Dec. 23, 2009) (awarding $144,657 to New Jersey Attorney General's Office and $70,000 to certain Ohio pension funds).

## V. THE REACTION OF THE SETTLEMENT CLASS TO DATE SUPPORTS THE REQUESTED FEES AND EXPENSES

The reaction of the Settlement Class to date also supports the fee and expense request. Through July 15, 2026, the Claims Administrator has mailed or emailed 1,090,299 copies or links to the Postcard Notice to potential Settlement Class Members and nominees informing them that, among other things, Lead Counsel intends to apply to the Court for an award of

attorneys' fees in an amount not to exceed 32% of the Settlement Fund and for up to $875,000 in Litigation Expenses. *See* Mailing Decl., Ex. 5 at ¶¶3-10, Exs. A & B thereto. While the time to object to the Fee and Expense Application does not expire until July 30, 2026, to date, only one objection regarding the maximum fee and expense amounts set forth in the notices has been received. *See* ECF No. 118-120, Canty Decl. Exs. 6-8. (It appears the objection was filed twice with different trading information.) The objection will be addressed in Lead Counsel's reply papers, which will be filed on or before August 13, 2026.

Additionally, the request for attorneys' fee of 32% and expenses is made with the full support of Lead Plaintiffs. *See* Ex. 1 at ¶¶8-9; Ex. 2 at ¶¶8-9. Lead Plaintiffs' endorsement of the fee supports its approval. *See Veeco*, 2007 WL 4115808, at *8 ("Public policy considerations support the award in this case because the Lead Plaintiff . . . – a large public pension fund – conscientiously supervised the work of lead counsel and has approved the fee request.").

**CONCLUSION**

For all the foregoing reasons, Lead Counsel respectfully requests that the Court award attorneys' fees in the amount of 32% of the Settlement Fund, which includes accrued interest; $759,672.80 in Litigation Expenses, plus accrued interest; and $21,995.21 in the aggregate as reimbursement to Lead Plaintiffs pursuant to the PSLRA. A proposed order will be submitted with Lead Counsel's reply papers, after the deadline for objecting has passed.

Dated: July 16, 2026

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

*/s/ Michael P. Canty*
Michael P. Canty
James T. Christie
Jacqueline R. Meyers

140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Email: mcanty@labaton.com
jchristie@labaton.com
jmeyers@labaton.com

*Lead Counsel for Lead Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, Wayne County Employees' Retirement System, and the Proposed Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Thomas C. Michaud
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Email: tmichaud@vmtlaw.com

*Additional Counsel for Lead Plaintiffs Macomb County Employees' Retirement System, Macomb County Retiree Health Care Fund, and Wayne County Employees' Retirement System*

**CERTIFICATION OF WORD-COUNT COMPLIANCE**

The undersigned hereby certifies that the foregoing brief complies with the 8,750 word limit set forth in Local Civil Rule 7.1(c). The word count, exclusive of the caption, any index, table of contents, table of authorities, signature blocks, or any required certificates, is 7,274 words according to the word-processing system used to prepare the document.

Dated: July 16, 2026

/s/ *Michael P. Canty*
MICHAEL P. CANTY

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

Dated: July 16, 2026

/s/ *Michael P. Canty*
MICHAEL P. CANTY