UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE THE ESTÉE LAUDER CO., INC. SECURITIES LITIGATION** | **Civil Action No.**<br>**1:23-cv-10669-AS**<br><br><br>**Hon. Arun Subramanian** |

OBJECTOR'S MEMORANDUM OF LAW IN OPPOSITION TO LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES

## TABLE OF CONTENTS

- **PRELIMINARY STATEMENT** …………………………………………….….... 1
- **ARGUMENT**.................................................................................................... 1
  - **I. LEAD COUNSEL'S HOURLY BILLING RATES ARE MANIFESTLY UNREASONABLE** ..................................................................... 1
    - *A. The Absence of True Market Discipline in Contingent Settings* . 1
    - *B. Capping Offensive Partner Rates of $1,450 Per Hour* ……....... 2
    - *C. Improper Inflation of Document Review and Staff Attorney Billing Metrics* ....................................................................... 2
    - *D. The 47,000-Hour Metric Demonstrates Severe Billing Inefficiency and Document Review Inflation* …………………….…...3
  - **II. THE COMBINATION OF EXCESSIVE HOURLY RATES AND A 2.7 MULTIPLIER CONSTITUTES AN IMPROPER DOUBLE RECOVERY** ... 3
    - *A. The Reality of the Multiplier and Effective Rates* …………….... 4
    - *B. Premature Risk Abatement and Pre-Trial Settlement* ……........ 4
    - *C. Lead Counsel's Reliance on Osberg as a 'Benchmark' is Procedurally Deficient* ....................................................... 4

○ **III. THE FLAT 32% FEE DEMAND VIOLATES THE SECOND CIRCUIT'S MEGA-FUND SLIDING SCALE DOCTRINE** ........................................... 5
○ **IV. COUNSEL DEMANDS PREMIUM COMPENSATORY REWARDS FOR A LOW FRACTIONAL RECOVERY RATE** ...................................... 5
○ **V. LEAD COUNSEL'S EXPENSE REQUESTS CONTAIN NON-RECOVERABLE OVERHEAD AND INFLATED MARKUPS** ......... 5
  ■ *A. Computerized Research and In-House Duplicating Constitute Non-Recoverable Overhead* .......................................................... 6
  ■ *B. The Request Includes Impermissible Estimates and Deficient, Un-Itemized Expert Bloat*................................................................. 6
● **CONCLUSION** ......................................................................... 7

---

# TABLE OF AUTHORITIES

## Cases

- *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74 (2d Cir. 2023)
- *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000)
- *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 468 (S.D.N.Y. 2009)
- *McDaniel v. County of Schenectady*, 595 F.3d 411 (2d Cir. 2010)
- *Osberg v. Foot Locker, Inc.*, No. 07-cv-1358 (S.D.N.Y. June 8, 2018)
- *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005)

## Statutes

- Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4

## PRELIMINARY STATEMENT

Objector is a member of the court-certified Settlement Class who purchased common stock of The Estée Lauder Co., Inc. during the Class Period. Objector takes no issue with the underlying $210 million cash settlement framework. However, Objector submits this memorandum to formally oppose Lead Counsel's attempt to siphon **$67,200,000.00**—a staggering 32% of the common fund—away from damaged investors.

This fee request is exorbitant. It relies on a lodestar baseline of $25,145,630.00 featuring offensive, unnegotiated billing rates up to **$1,450 per hour for individual partners**. Counsel couples these top-of-the-market rates with a massive **2.7 positive multiplier**. This creates an abusive windfall for a case that settled entirely via mediation prior to facing the acute risks of summary judgment or trial.

Public policy and Second Circuit precedent command this Court to protect the silent class. The requested fee should be slashed to a reasonable **15% to 20% scale**, and the counsel's hourly rates must be legally capped to match actual market realities.

## ARGUMENT

## I. Lead Counsel's Hourly Billing Rates Exceed the "Prevailing Market Rate" for Reasonable Class Action Advocacy

Lead Counsel's baseline lodestar calculation relies on a cost structure that is detached from standard commercial realities. As set forth in Document 125-9, partner rates range from **$975 to $1,450 per hour**, and of counsels range from **$800 to $1,025 per hour**. These rates cannot withstand judicial scrutiny.

### A. The Absence of True Market Discipline in Contingent Settings

In standard commercial litigation, a paying client exercises strict financial oversight, negotiating caps, blended rates, and deep discounts. In a class action framework, absent class members have zero leverage to negotiate. Class counsel unilaterally selects their highest possible rates and applies them retroactively without facing true competitive market pressure. This Court must step in as a fiduciary guardian to reject these unchallenged numbers.

### B. Capping Offensive Partner Rates of $1,450 Per Hour

An hourly rate of $1,450 for a pre-trial, mediation-based resolution grossly overcompensates counsel and fails the test of reasonable billing judgment. While New York is an expensive legal market, the firm's reliance on block billing makes it impossible to distinguish high-level strategy from routine tasks. Billing a premium partner rate for baseline document review or procedural filings constitutes a clear misallocation of capital; these are clerical and administrative tasks that should be performed by lower-cost associates or excluded entirely. This Court should reject the firm's attempt to turn class litigation into a luxury billing mechanism and instead cap reasonable partner rates at a standard market baseline of $450 per hour.

## C. Improper Inflation of Document Review and Staff Attorney Billing Metrics

In Document 125, Lead Counsel notes that they utilized an electronic discovery platform to analyze the substantial data. However, the individual line-item Lodestar Report in Exhibit A reveals an systemic lack of billing discipline among review staff. Specifically, the firm utilizes **Staff Attorneys (SA)** as mechanical document reviewers while billing them out at unconscionable metrics between **$405 and $550 per hour**.

The scale of this baseline padding is vast:

- Staff Attorney **M. Weitz** logged **1,253.0 hours** at **$525/hr**, totaling **$657,825.00**.
- Staff Attorney **V. Pinhas** logged **1,257.1 hours** at **$450/hr**, totaling **$565,695.00**.
- Staff Attorney **L. Vigna** logged **1,337.4 hours** at **$505/hr**, totaling **$670,337.00**.
- Total for only three staff reviewers: **$1,893,857.00** (Before Multiplier)

In the competitive private marketplace, standard document review is an outsourced, lower-cost administrative function. Billing mechanical data sifting at premium firm rates up to $550/hour—and then asking this court to apply a **2.7x multiplier** to turn those hours into an effective rate of **$1,485 per hour**—is an absurd distortion of the lodestar cross-check.

While Lead Counsel's partners properly limited their absolute hours, the internal staffing ratio of this litigation reveals a glaring structural inefficiency. The firm billed just 4,166.5 hours to standard associates, but shifted a staggering **40,551.4 hours** onto an army of Staff Attorneys billed at up to $550 per hour. This tells the Court that instead of utilizing a traditional, balanced litigation team where mid-level associates handle complex draft work at a flat firm rate, the firm weaponized an automated 'document mill' architecture. They insulated their partners, starved their actual associate tier, and maximized profits by running massive volume through high-margin contract reviewers.

**D. The 47,000-Hour Metric Demonstrates Severe Billing Inefficiency and Document Review Inflation**

Lead Counsel asserts that the 47,772.3 hours expended in this action reflect a necessary and rigorous commitment to the class. A simple mathematical analysis of the firm's own metrics proves otherwise.

According to Document 125, the discovery pool was strictly limited to approximately 560,000 pages of text. The Lodestar Report shows that Staff Attorneys—the firm's primary document reviewers—logged a staggering 40,551.4 hours out of that total. To claim that a document review team required an average of over four minutes to examine every single page of a 560,000-page data pool is a confession of profound inefficiency.

This sluggish pace is completely indefensible given Lead Counsel's own admissions. In their Memorandum of Law, Lead Counsel boasts that to "efficiently focus on the most relevant documents," they utilized the **"Relativity eDiscovery platform and its search and data analytic software tools** to analyze the data and target the most significant communications, workpapers, and reports.**"**

This admission exposes a glaring contradiction. The primary purpose of advanced e-discovery analytics is to cull out boilerplate duplicates, email footers, and administrative clutter, allowing human reviewers to bypass the junk and move rapidly. Yet, despite using automation to "target" the data, Lead Counsel still demanded **4.34 minutes per page for the *entire* 560,000-page universe.** Lead Counsel cannot claim the benefits of technological efficiency while simultaneously billing the class for an old-fashioned, slow-moving manual slog.

By demanding credit for 4.34 minutes per page at premium rates up to $550/hour **for work that software already filtered**, Lead Counsel is asking this Court to bless a highly sluggish, front-loaded billing apparatus. This un-audited duplication of labor was clearly designed to inflate the baseline lodestar before applying a compounding 2.7x risk multiplier.

## II. The Combination of Excessive Hourly Rates and a 2.7 Multiplier Constitutes an Improper Double Recovery

Lead Counsel requests a **2.7 positive multiplier** on top of their already maximized standard rates. This creates a compounding billing premium that heavily exploits the common fund.

3

## A. The Reality of the Multiplier and Effective Rates

A 2.7 multiplier applied to a $1,450 partner rate forces the class to effectively pay **$3,915 per hour** for an attorney's time. Multipliers are designed to reward extraordinary binary trial risks. If a firm chooses to calculate its baseline lodestar using top-of-the-market hourly rates, it has already baked its expertise and reputation into that baseline. Compounding that baseline with a 2.7x multiplier constitutes an abusive double recovery that strips capital directly from class victims.

## B. Premature Risk Abatement and Pre-Trial Settlement

Here, the case concluded via a mediator's recommendation. Lead Counsel did not have to face a jury, manage live witness cross-examinations, or handle post-trial appellate emergencies. Counsel was completely spared the acute, binary risks of a summary judgment dismissal or a trial defeat.

## C. Lead Counsel's Reliance on *Osberg* as a "Benchmark" is a Procedurally Deficient False Equivalency

Lead Counsel heavily relies on *Osberg v. Foot Locker, Inc.* to justify its aggressive 32% fee request and highly elevated 2.7x lodestar multiplier. This comparison is fundamentally flawed.

The extraordinary 33% fee and 4.8x multiplier awarded in *Osberg* were **premium rewards earned through a decade of hyper-extended, high-risk litigation**. The *Osberg* counsel faced the ultimate gamble: they survived a full merits trial, secured a post-trial judgment, and fought through subsequent appellate enforcement.

To treat a grueling, post-trial judgment case like *Osberg* as a generic "benchmark" for a case that **concluded safely through pre-trial mediation** completely distorts the legal framework of risk compensation. Multipliers are explicitly designed to reward counsel for bearing actual, existential trial risk. Because Lead Counsel here settled before preparing trial exhibits, impaneling a jury, or ever exposing themselves to a defense verdict, they cannot claim the same premium risk multiplier.

By attempting to anchor their fees to *Osberg*, Lead Counsel is asking this Court to award them a **"trial premium" for an administrative exit**. This Court should reject this false equivalency and reduce both the percentage and the multiplier to reflect the vastly lower risk profile of this pre-trial settlement.

4

## III. The Flat 32% Fee Demand Violates the Second Circuit's Mega-Fund Sliding Scale Doctrine

Lead Counsel seeks a standard flat percentage (32%) typically reserved for small-scale common funds. The Second Circuit explicitly warns that as a common fund scales into a "mega-fund" exceeding $100 million, a flat-rate approach yields an unearned windfall due to economies of scale.

The actual effort required to litigate a securities action does not scale symmetrically with the size of the recovery. Reviewing document caches or drafting complaints costs the exact same amount of attorney hours whether the ultimate settlement is $20 million or $200 million. By demanding a flat 32% of a $210 million fund, Lead Counsel is capturing an unfair portion of the mega-fund premium that belongs strictly to shareholders. Reducing the fee to a graduated 15% to 20% scale preserves over **$25.2 million to $35.7 million** for the actual victims of the alleged fraud.

## IV. Counsel Demands Premium Compensatory Rewards for a Low Fractional Recovery Rate

Finally, the Court must evaluate the requested fee against the deep haircut forced upon the class. Lead Counsel's own expert estimated maximum damages at **$4.6 billion**.

The $210 million cash settlement represents a recovery rate of **just 4.6% of total losses**. While a 95.4% discount may be a pragmatic compromise to avoid a decade of litigation, it cannot be framed as an unmitigated victory that warrants premium fee percentages. Lead Counsel should not receive standard, un-adjusted top-tier percentages and risk multipliers while the class absorbs a catastrophic loss on their investment capital.

## V. Lead Counsel's Expense Requests Contain Non-Recoverable Overhead and Inflated Markups

Lead Counsel's request for $759,672.80 in total litigation expenses should be heavily reduced because it improperly attempts to shift standard firm overhead, excessive commercial copy markups, and unverified future estimates onto the class.

5

## A. Computerized Research and In-House Duplicating Constitute Non-Recoverable Overhead

Lead Counsel's request for $21,389.46 in computerized research expenses should be rejected. Lead Counsel admits these expenses were incurred through standard legal databases like "Lexis, Westlaw, and PACER." Under well-settled Second Circuit precedent, flat-rate monthly or annual subscriptions to electronic research platforms are standard costs of doing business. They are already fully absorbed by the premium hourly lodestar rates requested by counsel—which top out at an offensive $1,450 per hour for partners. As the Second Circuit has made clear, because online research tools save attorney time, those efficiencies must be reflected in a streamlined bill, not double-charged back to the client as an independent line-item expense (see *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 187 n.2 (2d Cir. 2008)). Unless Lead Counsel can prove these charges reflect case-specific, transactional, pay-per-search fees rather than a pro-rata slice of the firm's pre-existing annual subscription, the class should not subsidize the firm's baseline operating tools.

Similarly, Lead Counsel requests $10,836.80 for in-house printing, seeking an abusive commercial markup of $0.20 per page for black-and-white text and an astonishing $0.40 per page for color copies. Running an office printer is a fixed, negligible cost of doing business. This Court should reject Lead Counsel's attempt to convert basic office photocopying into an independent, high-margin profit center at the expense of the fraud victims.

## B. The Request Includes Impermissible Estimates and Deficient, Un-Itemized Expert Bloat

Under Footnote 1, Lead Counsel admits that the $142,424.95 "Litigation Support" category contains uncurated, speculative estimates for electronic "cold storage" extending through September 2026. Courts require actual, itemized historical receipts to shift costs to a class; they do not bless forward-looking budget projections.

Furthermore, the expense ledger lists a massive, flat block of $347,700.00 for "Experts/Consultants" regarding "Damages/Market Efficiency/Plan of Allocation." Presenting a single, six-figure lump sum with zero itemization—failing to disclose the experts' names, hours logged, hourly rates, or specific tasks completed—prevents this Court from conducting its required judicial audit. Because Lead Counsel has failed to provide a transparent, itemized breakdown demonstrating that nearly half of their total expense request was reasonably and necessarily incurred, this Court should deny or significantly reduce the unverified expert award.

6

## CONCLUSION

For the reasons stated above, Objector respectfully requests that this Court protect the financial interests of the silent Settlement Class and enter an Order that:

1. **Denies** Lead Counsel's request for a flat 32% fee award;
2. **Reduces** the allowed attorneys' fees to a maximum cap between **15% and 20%** of the Settlement Fund;
3. **Caps baseline partner and staff review rates** to a reasonable, market-verified Southern District baseline to eliminate the flagrant inflation of mechanical e-discovery hours; and
4. **Denies any risk multiplier** above a standard 1.5x cross-check tier, reflecting the pre-trial mediation closure of this case.

Dated: July 27, 2026

Respectfully submitted,

/s/ Avrohom Senderovic

Avrohom Senderovic

40 Kristin Ct

Lakewood, NJ 08701

wisconsinmcmxci@gmail.com

7